## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | | |
|---|---|---|
| BENJAMIN WATSON, JR., individually and as Executor of the Estate of JOSHUA KALEB WATSON; SHEILA WILEMON WATSON; SHANE WALTERS and AMANDA WALTERS, individually and as Putative Co-Executors of the Estate of CAMERON SCOTT WALTERS; SHANE WALTERS as Representative and Guardian of S.L.W., a minor child; AMANDA WALTERS as Representative and Guardian of L.N.W. a minor child; DUSTIN WALTERS; MASON WALTERS; SAMEH HAITHAM and EVELYN BRADY, individually and as Putative Co-Executors of the Estate of MOHAMMED SAMEH HAITHAM; SAMEH HAITHAM as Representative and Guardian of S.S.H., a minor child and S.S.H. II, a minor child; SHADIN HAITHAM; JOHN ROBERT BRADY; IRVIN LAWRENCE JR.; GEORGE JOHNSON; BREANNA THOMAS; RYAN BLACKWELL; CARLY BLACKWELL; KRISTY LEHMER; JESSICA PICKETT; CURTIS PICKETT; CHARLES HOGUE; MATTHEW TINCH; JESSICA TINCH; JONATHAN GLASS; JOY GLASS; MATTHEW HOUSAM; MICHAEL HOYLAND; THOMAS C. BORTNER; GRANT LOPEZ; HEATHER LOPEZ; MATTHEW KEEBLER; and KRYSTENA KEEBLER | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | **PLAINTIFFS' COMPLAINT**<br><br>**Case No.: 3:21-cv-329** |

Plaintiffs,

v.

KINGDOM OF SAUDI ARABIA.

Defendant.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................1

II.     NATURE OF THE CASE..................................................................4

III.    JURISDICTION & VENUE...............................................................5

IV.     PARTIES .................................................................................................7

V.      FACTUAL ALLEGATIONS ..........................................................13

        A.      Saudi Arabia's Arms & Training Contracts with the United States ...13

        B.      The Security Cooperation Education and Training Program..............14

        C.      The United States Foreign Military Sales & Direct Commercial Sales
                Programs..............................................................................................15

        D.      International Military Student Vetting & Screening...........................19

        E.      Saudi Arabia's State-Sanctioned Support for Ideological and Violent
                Extremism ...........................................................................................20

        F.      Saudi Arabia's Connections to al-Qaeda and State-Sanctioned Support
                for al-Qaeda in the Arab Peninsula (AQAP).......................................22

        G.      Saudi Arabia's State Surveillance of its Citizens, Particularly Those
                Abroad .................................................................................................31

        H.      2nd Lt. Al-Shamrani's State-Funded Education ..................................35

        I.      Saudi Arabia's Deliberate and Reckless Failures to Investigate,
                Monitor, Supervise and Report Al-Shamrani......................................35

        J.      Saudi Arabia Recklessly Failed to Provide Sufficient Country Liaison
                Officer Assistance at NAS Pensacola .................................................41

        K.      The Execution of Al-Shamrani's "Special Mission": The NAS
                Pensacola Massacre.............................................................................46

        L.      Overview of Al-Shamrani's Murderous Rampage ............................47

i

M.    The Lives Al-Shamrani Destroyed and Forever Changed ..................52

N.    The NAS Pensacola Shooting Investigation Revealed Systemic
      Problems with Saudi Arabia's Security Screening ............................71

**VI.   CAUSES OF ACTION** ................................................................................**74**

**VII.  PRAYER FOR RELIEF** ..........................................................................**149**

## INDEX OF ACRONYMS

| Acronym | Full Term |
|---------|-----------|
| AFSAT | Air Force Security Assistance and Training |
| AN | Naval Airman |
| AQAP | Al-Qaeda in the Arabian Peninsula (a/k/a Al-Qaeda or Al-Qa'ida) |
| AR15 | Armalite semi-automatic rifle |
| ATA | Anti-Terrorism Act, 18 U.S.C. § 2333, ET SEQ. |
| BOT | Blanket Orders for Training |
| BUDS | Basic Underwater Demolition Seal Training |
| CLO | Country Liaison Officer |
| CO | Commanding Officer |
| CONUS | The Continental United States to include the District of Columbia |
| CPC | Civilian Personnel Office |
| CT | Computerized Tomography |
| DCS | Direct Commercial Sales |
| DoD | Department of Defense |
| DoN | Department of the Navy |
| DSCA | Direct Commercial Sales Program |
| ECSO | Escambia County Sheriff's Office |
| ENS | Ensign |
| FBI | Federal Bureau of Investigation |
| FL | Florida |
| FMF | Foreign Military Financing |
| FMS | Foreign Military Sales |
| FSIA | Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, et seq. |
| FTO | Foreign Terrorist Organization |
| GS | General Schedule |
| IMET | International Military Education and Training |
| IMS | International Military Students |
| IMSO | International Military Student Offices |
| IMT | International Military Training |
| iOS | Mobile Operating System |
| ITO | Invitational Travel Order |
| NFO | Naval Flight Officer |

| JASTA | Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, Sept. 28, 2016, 130 Stat. 852 |
|---|---|
| Kingdom | Kingdom of Saudi Arabia |
| KSA | Kingdom of Saudi Arabia |
| LOA | Letter of Offer and Acceptance |
| LOR | Letter of Request |
| MILDEP | Military Department |
| MoD | Ministry of Defense |
| MoIA | Ministry of Islamic Affairs of Saudi Arabia |
| MOI | Memoranda of Intent |
| MTT | Mobile Training Team |
| NAS | Naval Air Station |
| NATRACOM | Naval Air Training Command |
| NCO | Non-Commissioned Officer |
| NY | New York |
| PM/DDTC | Bureau of Political-Military Affairs' Directorate of Defense Trade Controls |
| PM/RSAT | Office of Regional Security and Arms Transfers in the Department of State's Bureau of Political-Military Affairs |
| PTSD | Post-Traumatic Stress Disorder |
| RSAF | Royal Saudi Air Force |
| SCETP | United States Security Cooperation Education and Training Program |
| SECDEF | Secretary of Defense |
| SWAT | Special Weapons and Tactics |
| TA | U.S. Naval Flight Student Training Administration |
| TDY | Temporary Duty Assignment |
| UAV | Unmanned Aerial Vehicle |
| US | United States |
| USAF | United States Air Force |
| WSO | Weapons Systems Officers |
| YN1 | Yeoman First Class |

## COMPLAINT

Plaintiffs Benjamin Watson Jr., Individually and as Executor of the Estate of Joshua Kaleb Watson; Sheila Wilemon Watson; Shane Walters and Amanda Walters, Individually and as Putative Co-Executors of the Estate of Cameron Scott Walters; Shane Walters as Representative and Guardian of S.L.W., a minor child; Amanda Walters as Representative and Guardian of L.N.W., a minor child;  Dustin Walters; Mason Walters; Sameh Haitham and Evelyn Brady, Individually and as Putative Co-Executors the Estate of Mohammed Sameh Haitham; Sameh Haitham as Representative and Guardian of S.S.H., a minor child and S.S.H. II, a minor child; Shadin Haitham; John Robert Brady; Irvin Lawrence Jr.; George Johnson; Breanna Thomas; Ryan Blackwell; Carly Blackwell; Kristy Lehmer; Jessica Pickett; Curtis Pickett; Charles Hogue; Matthew Tinch; Jessica Tinch; Jonathan Glass; Joy Glass; Matthew Housam; Michael Hoyland; Thomas C. Bortner; Grant Lopez; Heather Lopez; Matthew Keebler; and Krystena Keebler, by and through their respective counsel, hereby bring this Action and allege:

## I.   INTRODUCTION

1.     In the eyes of the American people, there is no greater betrayal than the realization that a purported ally is, in fact, an enemy.

2.     In the history of the United States, countless numbers of American citizens have made the supreme sacrifice in defense of their Country and its

1

inalienable principles, after a foreign power attacks on American soil.  It is precisely for that reason that every American understands the significance of the dates December 7, 1941 and September 11, 2001.

3.      A Royal Saudi Air Force pilot named Mohammed Saeed Al-Shamrani understood all too well that those dates were burned into the hearts and souls of the American people.   Al-Shamrani was a Trojan Horse sent by his country, the Kingdom of Saudi Arabia, and its proxy, al Qaeda in the Arabian Peninsula, for flight training at Naval Air Station Pensacola, Florida under the auspices of a program tied to billions of dollars in military arms sales from the United States to the Kingdom.  Little did the American people know that such an arrangement would soon devolve into a horrific, Faustian bargain.

4.      On September 11, 2019, Al-Shamrani announced on social media – social media being monitored by both the Kingdom and al Qaeda -- that "**The Countdown Has Begun**."

5.      The countdown was towards another attack on American soil designed to occur on the anniversary of the most infamous of strikes on a U.S. Naval base. Realizing that December 7, 2019 fell on a Saturday and that few American military and civilian personnel would be at work at NAS Pensacola, Al-Shamrani planned a deadly attack for the day previous:  December 6.

6.     Early that fateful morning, Al-Shamrani, acting in service to his country, wearing his Royal Saudi Air Force flight suit, and carrying a semi-automatic 9 mm pistol and hundreds of rounds of ammunition loaded into extended clips, walked into Building 633 – the heart of the U.S. Naval Aviation Schools Command – and began a murderous rampage.  Firing hundreds of rounds, Al-Shamrani murdered three Navy servicemembers; severely wounded four Navy servicemembers, a Navy civil servant, seven Sheriff's deputies, and a Department of Defense police officer; and caused other first responders to be injured in their efforts to stop him.  In the words of one Navy servicemember Al-Shamrani shot seven times, "You could just feel the hate."

7.     Hate indeed.  Hate for America; hate for its Government (Al-Shamrani repeatedly shot out photographs of Presidents Donald J. Trump and George H.W. Bush), hate for its people, hate for its way of life.  Hate in service to his country and al Qaeda.

8.     Every American servicemember and his or her family bravely understands and accepts that he or she may someday be called upon, in the name of freedom, to make the supreme sacrifice in armed conflict on a distant battlefield.  No American servicemember or his or her family expects he or she to be gunned down, unarmed, on a secure U.S. military base in America's front yard by a purported ally. There is no greater betrayal.

3

9.     A betrayal that continues with the abject failure of the King and Crown Prince of the Kingdom of Saudi Arabia to make good on promises they made to the victims and their families shortly after their officer's malicious and deadly attack, promises that the Kingdom and its government would provide them redress.

10.    The time of empty promises is over.

11.    The victims of this terrorist attack bring this action together under Federal and State law to seek accountability in honor of those whose lives were so violently taken from them.

## II.    NATURE OF THE CASE

12.    Plaintiffs bring this action against the Defendant Kingdom of Saudi Arabia under multiple exceptions to foreign sovereign immunity pursuant to the Foreign Sovereign Immunity Act of 1976 (FSIA), the Anti-Terrorism Act of 1991 (ATA) as amended by the Justice Against Sponsors of Terrorism Act of 2016 (JASTA), and state law.

13.    JASTA, which Congress enacted over a Presidential veto, is expressly intended:

> to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against…foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

28 U.S.C. §2333, note.

14.     JASTA establishes federal court jurisdiction over the tortious acts of any foreign state anywhere in the world when that foreign state causes injury and death in a terrorist attack on the United States.

15.     The NAS Pensacola Terrorist Attack ("NAS Terrorist Attack") was an act of international terrorism, as defined in 18 U.S.C. § 2331, that occurred in the United States. The NAS Terrorist Attack was caused by Defendant Saudi Arabia through the tortious acts of its officials, employees and/or agents acting within the scope of their office, employment and/or agency.  The tortious acts detailed herein were intentional, knowing, reckless, willful and/or grossly negligent.

### III.     JURISDICTION & VENUE

16.     This Court has original jurisdiction over this action pursuant to §§ 28 U.S.C. 1330; 1331; and 18 U.S.C. § 2333.

17.     This Court has subject-matter jurisdiction over this action because the following exceptions to foreign sovereign immunity are satisfied:

a.  **The JASTA Terrorism Exception** - 28 U.S.C § 1605(B) provides this Court with subject-matter jurisdiction because Plaintiffs seek money damages against the Kingdom of Saudi Arabia for injuries and death caused by an act of international terrorism, as defined in 18 U.S.C. § 2331, that occurred in the United States.  The NAS Terrorist Attack was caused by the Kingdom of Saudi Arabia through the tortious acts of its

officials, employees, and/or agents acting within the scope of their office, employment and/or agency.  The tortious acts detailed herein were intentional, knowing, reckless, willful and/or grossly negligent.

b. **The Non-commercial Tort Exception** - 28 U.S.C. § 1605(a)(5) provides this Court with subject-matter jurisdiction because Plaintiffs seek money damages against the Kingdom of Saudi Arabia for injuries and death occurring in the United States and caused by the Kingdom of Saudi Arabia through the tortious acts of its officials, employees, and/or agents acting within the scope of their office, employment and/or agency.

c. **The Commercial Activity Exception** - 28 U.S.C. § 1605(a)(2) provides this court with subject-matter jurisdiction because the torts at issue arise in connection with a commercial activity carried on in the United States by the Kingdom of Saudi Arabia; or upon an act performed in the United States in connection with a commercial activity of the Kingdom of Saudi Arabia elsewhere; or upon an act outside the United States in connection with a commercial activity of the Kingdom of Saudi Arabia elsewhere that caused a direct effect in the United States.

d. **Wavier of Sovereign Immunity** - 28 U.S.C § 1605(a)(1) provides this

6

Court with subject-matter jurisdiction over this action because the Kingdom of Saudi Arabia has waived its immunity from these claims both expressly and implicitly.

18.     This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367.

19.     This Court will have personal jurisdiction over the Kingdom of Saudi Arabia upon service of this Complaint pursuant to 28 U.S.C. § 1608.

20.     Venue in this District is proper pursuant to 18 U.S.C. § 2334(a), 28 U.S.C. §§ 1391(b)(2) and 1391(f)(1), as one or more Plaintiffs reside in this District and a substantial part of the events giving rise to this litigation occurred within this District.

### IV.    <u>PARTIES</u>

21.     Plaintiffs Benjamin Watson Jr. and Sheila Wilemon Watson, are the surviving parents of Joshua Kaleb Watson and are residents and citizens of Coffee County, Alabama.  Plaintiff Benjamin Watson, Jr. is the Executor of the Estate of Joshua Kaleb Watson.  Decedent, Joshua Kaleb Watson, was murdered by Al-Shamrani on December 6, 2019 in the NAS Terrorist Attack.  Joshua Kaleb Watson, was 23 years-old at the time of his death.  He was a 2019 graduate of the United States Naval Academy and a commissioned officer in the United States Navy stationed at NAS Pensacola.

22.     Plaintiffs Shane Walters and Amanda Walters, are the surviving parents of Cameron Scott Walters and are residents and citizens of Bryan County, Georgia. Shane and Amanda Walters are the Putative Co-Executors of the Estate of Cameron Scott Walters.  Shane and Amanda Walters also bring this action as Representatives and Guardians of L.N.W., a minor child and S.L.W., a minor child.    Decedent, Cameron Scott Walters, was murdered by Al-Shamrani on December 6, 2019 in the NAS Terrorist Attack.  Cameron Scott Walters, was 21 years-old at the time of his death.  He was an Airman Apprentice in the United States Navy stationed at NAS Pensacola.  He is survived by his parents and siblings, Dustin Walters, Mason Walters, S.L.W., and L.N.W.  Dustin Walters, Mason Walters, S.L.W. and L.N.W. are all residents and citizens of Bryan County, Georgia.

23.     Plaintiffs Sameh Haitham and Evelyn Brady, are the surviving parents of Mohammed Sameh Haitham.  Sameh Haitham is a resident and citizen of Cook County, Illinois and Evelyn Brady is a resident and citizen of Pinellas County, Florida.  Sameh Haitham and Evelyn Brady are the Putative Co-Executors of the Estate of Mohammed Sameh Haitham.  Sameh Haitham is the Representative and Guardian of S.S.H., a minor child and S.S.H. II, a minor child.   Decedent, Mohammed Sameh Haitham, was murdered by Al-Shamrani on December 6, 2019 in the NAS Terrorist Attack.  Mohammed Sameh Haitham, was 19 years-old at the time of his death.  He was an Airman Apprentice in the United States Navy stationed

at NAS Pensacola.  He is survived by his parents and siblings, S.S.H, S.S.H. II, Shadin Haitham, John Robert Brady and Irvin Lawrence, Jr.  S.S.H. and S.S.H. II are residents and citizens of Cook County, Illinois.  Shadin Haitham is a resident and citizen of Escambia County, Florida.  John Robert Brady and Irvin Lawrence, Jr. are residents and citizens of Pinellas County, Florida.

24.     Plaintiff Breanna Thomas is a 24 year-old commissioned officer in the United States Navy stationed at NAS Pensacola.  Ensign Thomas is a resident and citizen of Escambia County, Florida.  Al-Shamrani shot Ensign Thomas during the NAS Terrorist Attack.

25.     Plaintiff Kristy Lehmer is a 24 year-old commissioned officer in the United States Navy stationed at NAS Pensacola.  Ensign Lehmer is a resident and citizen of Escambia County, Florida.  Al-Shamrani shot Ensign Lehmer during the NAS Terrorist Attack.

26.     Plaintiff George Johnson is a 26 year-old Airman Apprentice in the United States Navy.  Airman Johnson is a resident and citizen of King County, Washington.  Al-Shamrani shot Airman Johnson seven times during the NAS Terrorist Attack.

27.     Plaintiffs Jessica and Curtis Pickett are residents and citizens of Escambia County, Florida.  Jessica Pickett is a 40 year-old veteran of the United States Navy. Ms. Pickett was stationed at NAS Pensacola until she retired from the

Navy with the rating of Yeoman First Class in July 2018.  In February 2019, Ms. Pickett was re-hired by the Navy as a federal civil servant and went back to work at NAS Pensacola.  Al-Shamrani shot Ms. Pickett nine times in the NAS Terrorist Attack.

28.    Plaintiffs Ryan and Carly Blackwell are residents and citizens of Escambia County, Florida. Ryan Blackwell is 26 years-old and was an Airman in the United States Navy until his medical discharge on June 28, 2020.  Al-Shamrani shot Airman Blackwell six times during the NAS Terrorist Attack.

29.    Plaintiff Charles Hogue is a 60 year-old veteran of the United States Navy.  Charles Hogue is a Department of Defense police officer assigned to NAS Pensacola.  Captain Hogue is a resident and citizen of Escambia County, Florida. Al-Shamrani shot Captain Hogue during the NAS Pensacola Terrorist Attack.

30.    Plaintiffs Matthew Tinch and Jessica Tinch are residents and citizens of Escambia County, Florida.  Plaintiff Matthew Tinch is an Escambia County Sheriff's Deputy.  Al-Shamrani shot Deputy Tinch in the NAS Terrorist Attack.

31.    Plaintiffs Jonathan Glass and Joy Glass are residents and citizens of Escambia County, Florida.  Plaintiff Jonathan Glass is an Escambia County Sheriff's Deputy.  Al-Shamrani shot Deputy Glass in the NAS Terrorist Attack.

32.     Plaintiffs Michael Hoyland is a resident and citizen of Escambia County, Florida.  Plaintiff Michael Hoyland is an Escambia County Sheriff's Deputy injured in the NAS Terrorist Attack.

33.     Plaintiff Thomas C. Bortner is a resident and citizen of Santa Rosa County, Florida.   Plaintiff Thomas C. Bortner is an Escambia County Sheriff's Deputy injured in the NAS Terrorist Attack.

34.     Plaintiffs Grant Lopez and Heather Lopez are residents and citizens of Santa Rosa County, Florida.  Plaintiff Grant Lopez is an Escambia County Sheriff's Deputy injured in the NAS Terrorist Attack.

35.     Plaintiff Matthew Housam is a resident and citizen of Escambia County, Florida. Plaintiff Matthew Housam is an Escambia County Sherriff's Deputy injured in the NAS Terrorist Attack.

36.     Plaintiffs Matthew Keebler and Krystena Keebler are residents and citizens of Santa Rosa County, Florida. Plaintiff Matthew Keebler is an Escambia County Sheriff's Deputy injured in the NAS Terrorist Attack.

37.     All Plaintiffs are U.S. Nationals.

38.     Defendant, Kingdom of Saudi Arabia, is a foreign state within the meaning of 28 U.S.C. §1603(a), and "Saudi Arabia" or the "Kingdom" or "KSA" as used hereinafter refers to the Kingdom of Saudi Arabia, its government Ministries and other bodies (including but not limited to its Ministry of Defense, Ministry of

11

Islamic Affairs, Ministry of the Interior, Ministry of Foreign Affairs, Royal Saudi Air Force, and Embassies throughout the world), its alter-egos, and its officials, employees, or agents not only in the United States but throughout the world, while acting within the scope of their office, employment or agency. Including but not limited to:

a. Mohammed Saeed Al-Shamrani, was a Second Lieutenant in the RSAF and a member of AQAP. Mohammed Saeed Al-Shamrani was a citizen and resident of the Kingdom of Saudi Arabia.

b. RSAF John Doe No. 1, was the RSAF Country Liaison Officer ("CLO") responsible for Al-Shamrani's supervision and oversight. RSAF John Doe No. 1 was aware that Al-Shamrani had a weapon on base in violation of KSA and U.S. policy. RSAF John Doe No. 1 was aware of Al-Shamrani's planned attack and abandoned his post in September 2019 to return to Saudi Arabia. His post was left abandoned until January 2020 (1 month after the NAS Terrorist Attack). RSAF John Doe. No. 1 is a citizen and resident of the Kingdom of Saudi Arabia.

c. RSAF John Does No. 2-12 are members of the Royal Saudi Air Force who were stationed at NAS Pensacola and assisted Al-Shamrani with the planning and execution of the NAS Terrorist Attack. RSAF John

Does No. 2-12 are citizens and residents of the Kingdom of Saudi Arabia.

d.  KSA John Does No. 13-20 are officials, employees and agents of the Kingdom of Saudi Arabia, its government Ministries and other bodies who were involved in the selection, promotion and vetting of Al-Shamrani and RSAF John Does No. 1-12 prior to their arrival in the United States.

e.  KSA John Does No. 21-30 are officials, employees and agents of the Kingdom of Saudi Arabia, its government Ministries and other bodies who are involved with and have provided AQAP in Yemen with material support.

## V.   FACTUAL ALLEGATIONS

### A.   Saudi Arabia's Arms & Training Contracts with the United States

39.   Saudi Arabia is the United States' largest foreign military sales customer, with more than $350 billion in active military contracts pending.

40.   A significant portion of the arms trade between Saudi Arabia and the United States involves the training of Saudi Arabian pilots, airmen, soldiers and sailors on United States' military bases.

41.   United States' training of Saudi military pilots, airman, soldiers and sailors is funded by the Saudi Arabian government and is a critical component and

condition of Saudi Arabia's purchase of United States' aircraft, vessels, military equipment, and weapons systems. At the end of 2019 there were 852 Saudi Arabian citizens in the United States for training related to military cooperation and arms purchases. That represents 16% of the total students from 153 countries participating in these programs in 2019.

42. At the time of the attack, Al-Shamrani was a flight student enrolled in the United States' Security Cooperation Education and Training Program (SCETP), receiving flight training as part of a multibillion-dollar contract between the United States and Saudi Arabia.

**B.    The Security Cooperation Education and Training Program**

43. The SCETP consists of U.S. military education and training conducted by the United States Department of Defense (DoD) for international personnel from eligible countries. Major training programs include International Military Education and Training (IMET) and Foreign Military Sales (FMS).

44. The IMET program is based on the belief that many officer-graduates will rise to positions of prominence within their armed forces and, in all probability, also within their governments and business communities.

45. SCEPT Objective No. 3 expressly provides that it is intended, "To create skills needed for effective operation and maintenance of equipment acquired from the U.S. through Foreign Military Sales (FMS), U.S. Grant programs

(International Military Education and Training (IMET), Foreign Military Financing (FMF), etc.), or direct commercial sales from U.S. vendors[.]"

## C.   The United States Foreign Military Sales & Direct Commercial Sales Programs

46.    Under the FMS Program, the United States government manages approximately $55 billion per year in new sales of defense equipment to foreign allies and partners. The Office of Regional Security and Arms Transfers in the Department of State's Bureau of Political-Military Affairs (PM/RSAT) manages the FMS approval process, in close partnership with the Defense Security Cooperation Agency (DSCA).  DSCA coordinates implementation of FMS cases the military services negotiate with U.S. defense contractors.  These sales provide the foreign customers with a complete defense capability that includes training, sustainment, and contractor logistics support.[1]

47.    Foreign governments can also purchase defense goods and services through the Direct Commercial Sales Program. These sales are negotiated privately between foreign end-users and U.S. companies, but are overseen by the Bureau of Political-Military Affairs' Directorate of Defense Trade Controls (PM/DDTC)

---

[1] U.S. Department of State, *U.S. Arms Sales and Defense Trade – Fact Sheet,* (Jan. 20, 2021), available at: https://www.state.gov/u-s-arms-sales-and-defense-trade/#:~:text=FOREIGN%20MILITARY%20SALES%20(FMS),to%20foreign%20allies%20and%20partners.

which provides regulatory approvals for approximately $115 billion per year in sales of defense equipment, service, and related manufacturing technologies.

48.    The United States has $126.6 billion in active government-to-government sales agreements with Saudi Arabia under the FMS system.  In May of 2017, Saudi Arabia committed to an additional $110 billion purchases of U.S. military goods and training in order to modernize the Saudi Armed forces, of which $27 billion has been assigned to currently active FMS transactions.

49.    Since 2014, the U.S. has authorized the permanent export of more than $8.2 billion in defense articles to Saudi Arabia via the DCS process.  The top categories of DCS to Saudi Arabia include: tanks/military vehicles, military electronics, munitions, and launch vehicles.

50.    Part and parcel of these sales agreements is the critical training and education necessary to use these sophisticated products.

51.    These commercial transactions with Saudi Arabia involving equipment and training are conducted using Letters of Request (LORs), Letters of Offer and Acceptance (LOAs), Memoranda of Intent (MOIs), and amendments thereto.

52.    An FMS LOA is a government-to-government agreement expressly governed by U.S. law. It is signed by representatives of the DoD and the foreign government.

53.    Each LOA contains a set of Standard Terms and Conditions that provide the U.S. Government and foreign country obligations, as well as the general financial terms of the transaction.

54.    The Standard Terms and Conditions provide that the foreign country must agree to indemnify and hold the U.S. Government, its agents, officers, and employees harmless from any and all loss or liability (whether in tort or in contract) which might arise in connection with the LOA.  The agreements also require the foreign state to follow strict policies and procedures designed to ensure the safety of the United States and its citizens.

55.    Training and education provided by DoD and U.S. contractors both in the United States and abroad can be sold using FMS Blanket Orders for Training. "BOTs" can include, but are not limited to, flight training, technical training, professional military education, specialized training, mobile training teams (MTTs), English language training, U.S. Government and contractor engineering, technical and logistics support services, and other related elements of logistical and program support. These Blanket Orders for Training cover all relevant types of training offered by or contracted through the U.S. Military branches (e.g. Navy and Air Force) or other Department of Defense (DoD) Agencies, to include participation in DOD-sponsored education within the Contiguous States and District of Columbia (CONUS), as well as MTTs that will travel to the purchasing country.  Program

17

management, trainers, simulators, travel, billeting, and medical support may also be included as components of the sales.

56.     As an RSAF officer, Al-Shamrani trained as part of an Air Force Security Assistance and Training (AFSAT) Blanket Order for Training. AFSAT manages FMS training orders for United States Air Force (USAF)-sponsored purchases. Prospective RSAF flight officers complete part of their training at NAS Pensacola. Prospective RSAF weapon systems officers (WSOs), like Al-Shamrani, complete all of their aviation training at NAS Pensacola.

57.     The Kingdom could have attempted to use its own resources to build aircraft and weapons and train its agents to use them.  However, the Kingdom chose instead to enter the marketplace and purchase the products and training from the United States and its vendors and contractors.

58.     The commercial agreements at issue were entered into in the United States and are governed by U.S. law.

59.     Al-Shamrani was only able to access the secure military installation NAS Pensacola because of his employment in the RSAF and his enrollment in the training programs provided under an FMS contract.  Al-Shamrani committed the attack in the midst of performance of the contract, and was receiving the training and educational services purchased by Saudi Arabia for him at the time he killed and injured Plaintiffs.

60.     As discussed more fully below, the Kingdom deliberately, intentionally and/or recklessly violated innumerable terms of their commercial agreement(s) with the United States.  The Kingdom's blatant violations include independent tortious acts that occurred both in Saudi Arabia and in the United States, all of which caused injury and death to American citizens in the United States.

**D.     International Military Student Vetting & Screening**

61.     All international military students, regardless of program, funding source and the classification level of training, *must* complete local "host nation" security screening and medical screening prior to receiving an Invitational Travel Order (ITO) and issuance of a visa to travel to the United States for training.

62.     The Kingdom of Saudi Arabia's Ministry of Defense (MoD) is responsible for implementing host nation screening/vetting protocols and for ensuring compliance with these protocols while conducting the screening of candidates prior to their nomination to participate in FMS/IMET programs.

63.     Saudi Arabia represented that it conducted the security, medical, and internal character vetting of Al-Shamrani, and completed that process on May 15, 2017.

64.     Upon completion of his screening, Al-Shamrani received an approval for an A-2 visa. Military personnel coming to the United States for education or training at any armed forces training facility are classified as "foreign government

19

officials" and issued A-2 visas. Initial visa requests require completion of a Form DS-160, the Online Nonimmigrant Visa Application. This form includes entries on personal details, travel, companions, contact information, passport details, family, work/education/training, and security/background. The security portion contains fifty-five (55) "yes" or "no" questions pertaining to such areas as terrorism, espionage, illegal activity, immigration violations, felony convictions, etc.

65.     On August 8, 2017, the visa application process was concluded and Al-Shamrani was issued his Invitational Travel Orders.

66.     Twenty days later, on August 28, 2017, Al-Shamrani was inside the United States, on a secure military installation at Joint Base San Antonio-Lackland, receiving military training pursuant to the FMS BOT between the United States and Saudi Arabia.

**E.     Saudi Arabia's State-Sanctioned Support for Ideological and Violent Extremism**

67.     The House of Saud is the ruling royal family of Saudi Arabia.  It comprises the descendants of Muhammad bin Saud, known as the founder of the First Saudi State.  In the 18th century, a pact between Muhammad bin Saud and Islamic preacher Muhammad ibn Abd al-Wahhab brought a fiercely puritanical branch of Islam to the Najd region of present-day Saudi Arabia.  The religious ideology of al-Wahhab is generally referred to as "Wahhabism" or "Salafism."  The

term Wahhabi is used primarily by outsiders to distinguish the movement form others within Islam; adherents often refer to themselves as Salafis.

68.    The agreement between the Al Saud and al-Wahhab is commonly referred to as the "Holy Alliance."  The Al Saud agreed to endorse al-Wahhab's austere form of Islam and in return gained political legitimacy and regular tithes from al-Wahhab's followers.  The religious-political alliance endures to this day in Saudi Arabia.  King Salman, the current King of Saudi Arabia, is a direct descendant of Muhammad bid Saud, whereas, Saudi Arabia's top religious official, Grand Mufti Sheikh Abdulaziz Al al-Shaikh is a direct descendant of al-Wahhab.   Wahhabism and the teachings of al-Wahhab are the state-sponsored religion of Saudi Arabia.

69.    The Kingdom of Saudi Arabia adheres to Sharia law.  Saudi Arabia's legal system and state constitution are based on a literal interpretation of the Quran and Sunna (Traditions of the Prophet Muhammad).  Islamic law and the Quran are the paramount law in Saudi Arabia and unconditionally govern the Saudi Royal Family and any state-sponsored rules or regulations.

70.    In Saudi Arabia the Wahhabi clerics are directly employed in the government and are given full control of the religious, social and cultural life of the Kingdom.   The Wahhabi religious establishment controls schools, universities, mosques, ministries, international organizations and media groups.  Saudi Arabia has spent billions of dollars promoting its religious ideology and the expansion of

Wahhabism throughout the Middle East and around the world. The Kingdom employs officers, Imams and religious propagators through its Ministry of Islamic Affairs (MOIA) which maintains offices at Saudi Embassies, Consulates and Missions around the world. In the last thirty years the Saudi's are estimated to have spent over $200 billion dollars in a strategic campaign to promote Wahhabism.

71.     Hard-line religious leaders have significant sway in Saudi society and beyond. The Kingdom is known for its vast and growing social media. Many of the Kingdom's biggest stars are Wahhabi preachers and demagogues. Additionally, Saudi money has strategically silenced virtually all criticism of its hardline religious ethos in the international media.

## F.     Saudi Arabia's Connections to al-Qaeda and State-Sanctioned Support for al-Qaeda in the Arab Peninsula (AQAP)

72.     The 1990s saw the emergence of Islamic radicalism that relied heavily upon and incorporated Saudi Wahhabism. The result came to be known as Salafi jihadism, the dominant radical ideology of the world's most extreme Islamic terrorist organizations. Early funding for these organizations has been directly traced to Saudi Arabia and its government ministries.

73.     One such terrorist organization grounded in Salafi jihadism is the Foreign Terrorist Organization al-Qaeda, one of the deadliest terrorist organizations in the world. Al-Qaeda is a global terror network that has been linked to radical extremists and jihadists throughout the Middle East and beyond. It was founded in

1988 by Saudi citizen Osama bin Laden and several Muslim insurgents who fought in the Soviet-Afghan War.  Since the early 1990s, al-Qaeda has targeted the United States with terrorist attacks, including the 9/11 attacks, and has used Wahhabism to justify its campaign of anti-American violence throughout the world.

74.    Members of al-Qaeda believe it is their holy duty to kill Americans and their allies, on their own soil and around the world.  Their goal is to use jihad to expel all Western influence out of the Middle East.

75.    Since al-Qaeda's inception, Saudi Arabia, through its government officials, members of the governing Royal Family, and prominent Saudi citizens have poured funds and weapons into al-Qaeda and have provided diplomatic, travel and other logistical support for al-Qaeda.

76.    Al-Qaeda has been designated a Foreign Terrorist Organization (FTO) since October 8, 1999.[2]

77.    In January 2009, al-Qaeda in the Arab Peninsula (AQAP) was formed out of Saudi Arabian and Yemeni branches of al-Qaeda.  AQAP is considered the most dangerous and most organized of all al-Qaeda branches.

78.    According to the U.S. State Department's 2018 Country Reports on Terrorism, AQAP has declared that its goals are "to establish a caliphate and Sharia

---

[2] *See* U.S. Department of State FTO list at: https://www.state.gov/foreign-terrorist-organizations/

law in the Arabian Peninsula and the wider Middle East."[3] To further these goals, AQAP uses violence to remove governments it considers to be apostate. It hopes to establish the caliphate within Yemen and then spread it over the Arabian Peninsula.[4]

79.     AQAP has been designated a Foreign Terrorist Organization since January 19, 2010.[5]

80.     In the last five years, AQAP has grown significantly stronger due to the ongoing civil war in Yemen.  AQAP and Saudi Arabia are currently fighting side-by-side in the Yemen war against the Houthis movement.  Saudi Arabia has provided AQAP with significant resources in connection with the Yemen civil war including weapons and military equipment as well as intelligence and financial support.

81.     With sustained support from Saudi Arabia, AQAP has swollen in size and has extended its reach. In July 2018, the U.N. Security Council's Counter-Terrorism Committee estimated AQAP had 6,000 to 7,000 inside Yemen alone.[6]

---

[3] U.S. Department of State, Bureau of Counterterrorism, *Country Reports on Terrorism 2018* (October 2019), p. 318, https://www.state.gov/wp-content/uploads/2019/11/Country-Reports-on-Terrorism-2018-FINAL.pdf.

[4] Australian Department of Home Affairs, "Al-Qa'ida in the Arabian Peninsula (AQAP)," November 26, 2019, https://www.nationalsecurity.gov.au/Listedterroristorganisations/Pages/Al-QaidaintheArabianPeninsulaAQAP.aspx.

[5] FTO list, *supra* fn. 2.

[6] United Nations Security Council, Counter-Terrorism Committee, *S/2018/705 – Twenty-Second Report of the Analytical Support and Sanctions Monitoring Team*

82.   AQAP is unique among al-Qaeda franchises in that it is entrusted by al-Qaeda's core leadership with the leading role in recruitment through propaganda and media on behalf of the entire al-Qaeda "brand."

83.   AQAP leadership has included several prominent Saudi Arabian citizens, including founding members Said al-Shahri and Mohammed al-Aufi, who assumed leadership positions in late January 2009.  The two newly-minted AQAP leaders had been returned to Saudi Arabia from Guantanamo Bay and were purportedly "graduates" of Saudi rehabilitation and reintegration programs.[7]

84.   Saudi-born Khalid bin Umar Batarfi, who was designated as a terrorist by the State Department in January 2018, has been identified as the leading AQAP commander in Yemen's Abyan Governorate and formerly part of the AQAP shura council.  The UN Security Council referred to Batarfi as deputy leader of AQAP as

---

*Submitted Pursuant to Resolution 2368 (2017) Concerning ISIL (Da'esh), al-Qaida and Associated Individuals and Entities* (July 27, 2018), pp. 9-10, https://www.undocs.org/S/2018/705.

[7] Christopher Boucek, *Examining Saudi Arabia's 85 Most Wanted List*, CTC Sentinel, May 2009, Vol. 2 Issue 5.

recently as January 2020.[8] In February 2020, after the NAS Terrorist Attack, AQAP

announced Batarfi as the new leader of the organization.[9]

85.     Ibrahim Sulayman Muhammad al-Rubaysh, a senior AQAP leader and

mufti until his death in April 2015, was also a Saudi citizen.[10]

86.     Another prominent Saudi AQAP member was Ibrahim Hassan Tali al-

Asiri, a bomb maker who was designated as a terrorist by the State Department in

March 2011.

87.     The heavy Saudi presence within the group's upper echelons suggests

it maintains robust recruiting and support networks in Saudi Arabia, despite its base

of operations in Yemen.

---

[8] United Nations Security Council, Counter-Terrorism Committee, *S/2020/53 – Twenty-Fifth Report of the Analytical Support and Sanctions Monitoring Team Submitted to the Security Council Committee Pursuant to Resolutions 1267 (1999), 1989 (2011) and 2253 (2015) Concerning Islamic State in Iraq and the Levant (Da'esh), al-Qaida and Associated Individuals, Groups, Undertakings and Entities, in Accordance with Paragraph (A) of Annex I to Resolution 2368 (2017)* (January 20, 2020), pp. 8-9, https://undocs.org/S/2020/53.

[9] "AQAP Confirms Death Of Leader Qassim al-Rimi, Announces Successor," SITE Intelligence Group, February 23, 2020, https://ent.siteintelgroup.com/Statements/aqap-claims-credit-for-naval-air-station-pensacola-leader-calls-lone-wolves-to-act.html.

[10] U.S. Department of the Treasury, Office of Foreign Assets Control, "Specially Designated Nationals List Update," December 18, 2014, https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20141218.aspx.

88.    One of AQAP's most notorious members was the Yemeni-American cleric Anwar al-Awlaki. After fleeing to Yemen in 2004, al-Awlaki became a prominent English-language propagandist for al-Qaeda. In that role, al-Awlaki became perhaps the most prolific jihadist ideologue of all time. His fluency in English, charisma, and historical understanding of Islam vastly increased the resonance of his propaganda. Al-Awlaki propagandized through hundreds of hours of audio and video lectures, along with written essays, blog posts and other content. Al-Awlaki's videos and writings have continued to influence countless extremists, including Al-Shamrani. According to the FBI, Al-Shamrani's social media posts echoed the teachings of al-Awlaki.[11]

89.    In addition to his role as a propagandist, al-Awlaki served as AQAP's external operations commander. In this role, he directed some of the group's highest-profile operations, including the attempt by Umar Farouk Abdulmutallab to bomb a Northwest Airlines flight on Christmas 2009. Abdulmutallab is commonly known as the "Underwear Bomber," due to his smuggling of a bomb in his underwear. Al-Awlaki was also involved in a failed plot to bomb U.S. cargo planes in October 2010.

---

[11] Declan Walsh, "Al Qaeda Claims it Directed Florida Naval Base Shooting," *The New York Times*, February 2, 2020, https://www.nytimes.com/2020/02/02/world/middleeast/al-qaeda-claims-it-directed-florida-naval-base-shooting.html.

90.     Abdullah al-Maliki was the AQAP member who issued AQAP's claim of responsibility for the Pensacola shooting.[12] Maliki was killed in May 2020 in an air strike after the U.S. government unlocked Al-Shamrani's phone, suggesting that Al-Shamrani's phone held details of Maliki's location.[13]

91.     AQAP aggressively sets its sights on Western targets. In March 2009, an AQAP suicide bomber in Yemen killed four South Korean tourists. On Christmas 2009, "Underwear Bomber" Umar Farouk Abdulmutallab failed to fully detonate an explosive on Northwest Airlines Flight 253 from Amsterdam to Detroit. In October 2010, two cargo planes containing explosives were directed to the U.S. in a failed bomb plot. And in January 2015, two AQAP-affiliated gunmen stormed the offices of *Charlie Hebdo* in Paris and murdered 12 people.

92.     In Yemen, AQAP pays its fighters with Saudi riyals due to the support it receives from Saudi Arabia. AQAP often pays fighters better and more

---

[12] Federal Bureau of Investigation, press conference, "FBI Director Christopher Wray's Remarks at Press Conference Regarding Naval Air Station Pensacola Shooting Investigation," May 18, 2020, https://www.fbi.gov/news/pressrel/press-releases/fbi-director-christopher-wrays-remarks-at-press-conference-regarding-naval-air-station-pensacola-shooting-investigation.

[13] Department of Justice, Office of Public Affairs, press release, "Attorney General William P. Barr and FBI Director Christopher Wray Announce Significant Developments in the Investigation of the Naval Air Station Pensacola Shooting," May 18, 2020, https://www.justice.gov/opa/pr/attorney-general-william-p-barr-and-fbi-director-christopher-wray-announce-significant.

consistently than pro-government forces, prompting defections and allowing it to grow in strength.

93.    An increase in numbers of Saudi AQAP members after 2010 greatly improved the group's ability to fundraise through donations from Saudi Arabia, and Saudi Arabia allows AQAP financiers to work unencumbered throughout its territory.

94.    Saudi Arabia has repeatedly failed to prosecute individuals in its country who are raising money on behalf of AQAP. Indeed, individuals have appeared on Saudi state television and met with Saudi Arabia's grand mufti after being sanctioned by the United States. For example, in 2015, a state-run television network featured Abdulwahhab al-Humayqani. At the time, al-Humayqani had been sanctioned for terrorist financing and was a senior leader within AQAP.  His appearance on a state-run network, was a tacit endorsement of AQAP and its supporters by the Saudi government.

95.    In August 2018, an investigation by The Associated Press cited evidence that the Saudi-led coalition has cooperated with AQAP members in Yemen—recruiting hundreds of fighters, paying others to leave specific cities, and neglecting to confiscate their weapons or stolen cash. According to interviews with Yemeni officials, tribal leaders, and AQAP members, some forces from the Saudi-led coalition recruit current and former members of the terrorist organization

because they are skilled fighters. AQAP members claimed that the terrorist group is allied with two of the four central commanders of the Saudi-led coalition on the Red Sea coast, and The Associated Press has identified the al-Qaeda logo on weapons utilized by coalition fighters during a campaign in 2017.

96.     Saudi Arabia's direct support to AQAP aligns with its well-known tolerance toward, and frequent state-sanctioned support for extremist or terrorist actors. In fact, Saudi Arabia is widely viewed as the world's largest source of funds to, and promoter of, Salafist jihadism.

97.     In a May 25, 2017, Washington Post article, journalist Fareed Zakaria wrote:

> The facts are well-known. For five decades, Saudi Arabia has spread its narrow, puritanical and intolerant version of Islam — originally practiced almost nowhere else — across the Muslim world.  Osama bin Laden was Saudi, as were 15 of the 19 9/11 terrorists.
>
> And we know, via a leaked email from former secretary of state Hillary Clinton, in recent years the Saudi government, along with Qatar, has been "providing clandestine financial and logistic support to [the Islamic State] and other radical Sunni groups in the region." Saudi nationals make up the second-largest group of foreign fighters in the Islamic State and, by some accounts, the largest in the terrorist group's Iraqi operations. The kingdom is in a tacit alliance with al-Qaeda in Yemen.[14]

---

[14] Fareed Zakaria, *How Saudi Arabia Played Donald Trump*, Washington Post, May 25, 2017, available at: https://www.washingtonpost.com/opinions/global-

98.     The Kingdom of Saudi Arabia has presented a public face to the United States and other Western countries as a nation fighting al-Qaeda and terrorism while at the same time, Saudi Arabian government actors and agents have given al-Qaeda and other Islamic extremist material support and resources.  Saudi Arabian donors and sympathizers remain a critical financial support base of al-Qaeda and constitute the most significant source of funding to al-Qaeda.

## G.     Saudi Arabia's State Surveillance of its Citizens, Particularly Those Abroad

99.     The Saudi government regulates and controls all internet activity in Saudi Arabia.  Any information that is "incompatible with Islamic religion and national regulations" is censored.  Websites and blogs within Saudi Arabia must be registered and receive accreditation from the Kingdom's Culture and Information Ministry.

100.   The Saudi Regime also has sweeping surveillance capabilities with regard to telecommunications and online activity.  The Saudi Arabian government actively monitors its citizens' use of mobile phones and the internet.

101.   The Saudi Regime even more aggressively monitors its citizens living outside of Saudi Arabia.  It is well known within the intelligence communities that the Kingdom tracks internet and mobile phone usage of students and military

---

opinions/saudi-arabia-just-played-donald-trump/2017/05/25/d0932702-4184-11e7-8c25-44d09ff5a4a8_story.html.

31

personnel serving abroad on Saudi funded scholarships.  To the extent that a Saudi citizen expresses thoughts or ideas inconsistent with the Kingdom or its faith, they are immediately censored (or worse) by the government.

102.   Saudi Arabia had the capacity to monitor Al-Shamrani and detect his extremist ties. The country has previously surveilled other Saudi service members' online activity.

103.   For example, a former Royal Saudi Air Force officer, Yahya Assiri, while serving in the Saudi armed forces, created an online account in 2004 to debate politics in online chat forums and write articles. For these activities, Assiri used the pseudonym "Abu Fares" and a lion avatar to shield his identity. The Saudi Air Force intelligence detained and interrogated Assiri about his writings as "Abu Fares" online.[15]

104.   This demonstrates that Saudi authorities had the knowledge and ability to de-mask Saudi soldiers operating anonymously online well over a decade before Al-Shamrani attacked U.S. service members. And unlike Assiri, Al-Shamrani was not taking similar steps to mask his identity in his social media posts that made his support for AQAP and his jihadist principles clear.

---

[15] Rori Donaghy, "*The Saudi Air Force Officer who Became a Human Rights Advocate*," Middle East Eye, March 6, 2015.

105.   Saudi Arabia's technical surveillance capabilities have advanced since the interrogation of Assiri. Saudi Arabia now employs sophisticated software to track its citizens at home and abroad. One tool used by Saudi Arabia is, Pegasus, a highly-sophisticated spyware program, which "can infiltrate both iOS and Android devices," allowing operators "to read text messages, including those that are end-to-end encrypted; examine photos; and track a phone's location." The spyware can also silently enable telephones and cameras. Saudi Arabia's use of Pegasus demonstrates that it had the technical capability to track Al-Shamrani's messages despite the fact that his communication with AQAP were through end-to-end encrypted messaging apps.[16]

106.   In 2017, Saudi Crown Prince Mohammed bin Salman's former top advisor, Saud bin Abdullah al-Qahtani, announced that the Saudi government was capable of identifying anonymous Twitter users.[17] This capability enabled Saudi

---

[16] Siena Anstis, Ronald Deibert, & John Scott-Railton, "A Proposed Response to the Commercial Surveillance Emergency," *Lawfare,* July 19, 2019, https://www.lawfareblog.com/proposed-response-commercial-surveillance-emergency.

[17] Layla Quran, "Saudi Students in U.S. Say Their Government Watches Their Every Move," *PBS NewsHour,* March 19, 2019, https://www.pbs.org/newshour/world/saudi-students-in-u-s-say-their-government-watches-their-every-move.

Arabia to identify Al-Shamrani as the owner of the Twitter account on which he posted extremist messages.

107.   In 2019, Saudi Arabia was surveilling its citizens in the United States using cell phone tracking data. On November 1, 2019, Saudi telephone companies began submitting an inordinate number of user location requests, typically used to help foreign companies "register roaming charges" to U.S. phone companies. The requests, given their volume, allowed Saudi phone companies to track the whereabouts of Saudis in the United States.

108.   Specifically, the data showed that Saudi citizen's mobile phones were being tracked as they travelled through the U.S. as often as two to thirteen (13) times per hour. Experts who reviewed the data believe the data indicates it was "highly likely" that the Saudis were engaged in a surveillance campaign, based on the magnitude of the location requests, and that this frequency suggests Saudi citizens in the U.S. "could probably have been tracked on a map to within hundreds of metres of accuracy in a city."[18]

109.   Saudi Arabia therefore knew exactly where Al-Shamrani and his fellow RSAF officers were throughout November and December 2019, leading up to the attack, including during his unauthorized travel to the 9/11 memorial.

---

[18] Stephanie Kirchgaessner, "Revealed: Saudis Suspected of Phone Spying Campaign in US," *The Guardian* (London), March 29, 2020.

**H.      2nd Lt. Al-Shamrani's State-Funded Education**

110.   2nd Lt. Al-Shamrani was born in 1998 in Tabalah and grew up in Al Ahsa.  Al Ahsa is part of the Najd region of Saudi Arabia, which is known for its strict interpretation of Islam and Wahhabi fundamentalism.

111.   Al-Shamrani studied Wahhabism in Saudi Arabia and was provided state-funded textbooks characterizing Christians and Jews as infidels and enemies of Islam.  The curriculum called for non-believers to be punished by death and justified the use of violence in the name of Islam.

112.   Al-Shamrani became active on Twitter in 2012.  His twitter account bore his first and last name and was easily traceable to him.

113.   In 2015, Al-Shamrani began following religious extremist and hardline clerics.  By 2015, Al-Shamrani's Twitter account showed evidence of radicalization and anti-American sentiments.

114.   At least as early as 2015, Al-Shamrani made contact with operatives from AQAP.

**I.      Saudi Arabia's Deliberate and Reckless Failures to Investigate, Monitor, Supervise and Report Al-Shamrani**

115.   In 2015, Al-Shamrani joined the RSAF.  Al-Shamrani told friends and family that he had been chosen to undergo a "special mission."

116.   Al-Shamrani underwent extensive vetting when he joined the RSAF.

35

117.   At this point, Saudi Arabia knew of Al-Shamrani's radicalization and anti-American sentiments, which were publicly associated with a Twitter account bearing his name and were regularly shared with Al-Shamrani's friends and family.

118.   Nevertheless, Al-Shamrani was allowed to enroll in the RSAF Academy.

119.   Throughout Al-Shamrani's service with the RSAF, Al-Shamrani regularly posted radical fundamental ideology on his social medial accounts.  Al-Shamrani also posted anti-American and anti-Jewish ideology on his social media accounts.  Al-Shamrani also commented on and encouraged others to post radical Islamic sentiments on social media.  Al-Shamrani was followed by and friends with other Saudi Arabian citizens in the government and RSAF who read and commented on Al-Shamrani's radical posts.

120.   Of the hundreds of students in his RSAF Academy class, Al-Shamrani was one of two awarded a scholarship to enter a joint military training program in the United States.

121.   In the RSAF, candidates for foreign training programs are nominated by their squadron commanders, who send the nominations up the chain of command in the Kingdom's Defense Ministry.

122.   United States Representative Matthew Gaetz described the military program as follow: "The way the program works is that the foreign government has

to certify that these are the best of their best, that these are their future generals and admirals and senior military officials for their countries."

123.   Prior to coming to the United States, Al-Shamrani had undergone extensive military training by the Saudi government, including, but not limited to, intelligence and weapons training, including the use of semi-automatic pistols in combat.

124.   As a prospective trainee in an American flight program, Al-Shamrani was required to be thoroughly screened by Saudi security forces before and after his name was put forward to the Kingdom's Defense Ministry.

125.   At this point, Saudi Arabia knew of Al-Shamrani's radicalization and anti-American sentiments, as well as his affiliation with AQAP.

126.   At the request of Saudi Arabia, Al-Shamrani was granted an A-2 visa for military training in the United States.

127.   In financing, training, and providing critical logistical support to Al-Shamrani, Saudi Arabia was instrumental in securing one of the rarest and most useful strategic objectives a terrorist organization could secure: a well-trained AQAP operative, with access to U.S. military installations and personnel on U.S. soil.

128.   In 2017, the Saudi government paid for Al-Shamrani to spend a year learning English at the Lackland Air Force Base in San Antonio, Texas.

129.   In May 2018 Al-Shamrani moved to attend pilot training at Naval Aviation Schools Command at NAS Pensacola, in Pensacola, Florida.

130.   Over the next year and a half, Al-Shamrani participated in Naval Flight Officer training and took classes on a variety of subjects, including aviation preparation and Naval Flight Officer training.

131.   In February 2019, Al-Shamrani travelled to Saudi Arabia. Al-Shamrani spent a portion of his trip performing the Umrah – a religious pilgrimage to the holy city of Mecca.

132.   In July 2019, Al-Shamrani obtained a Florida state hunting license, under a hunting license exception, which he used to buy a Glock 45 9-millimeter pistol. Al-Shamrani also purchased hundreds of rounds of 9-millimeter ammunition.

133.   The pistol and ammunition were purchased in violation of KSA policies and procedures, which prevent international military students such as Al-Shamrani from owning a firearm.

134.   Al-Shamrani stored the pistol, extended clips, and ammunition in the Saudi Arabian barracks.

135.   Al-Shamrani carried the pistol along with ammunition from July of 2019 to December 6, 2019 around NAS Pensacola in his pilot helmet bag.

136.   The Kingdom of Saudi Arabia's commanding officer on base (also referred to as a CLO) knew that Al-Shamrani had a weapon and significant

ammunition in violation of both U.S. and KSA policy. The other Saudi Arabian trainees stationed at NAS Pensacola also knew that Al-Shamrani had a weapon and ammunition on base in violation of both U.S. and KSA policy.

137. The Saudi CLO's performance in his duties fell well below the requisite standards. He rarely attended the Navy's weekly progress reviews covering his subordinates and he abandoned his post on September 21, 2019, returning to Saudi Arabia without identifying any replacement or relief for his role. Saudi Arabia failed to fill his absence until January 2020 – approximately one month after the NAS Terrorist Attack.

138. Al Shamrani and his fellow RSAF officers failed to notify anyone in command that the CLO had departed and that his station was unfilled, leaving them unsupervised at NAS Pensacola. There was a marked decline in the performance and grooming standards of all Saudi students after the CLO's departure. In addition, all Saudi housing inspections ceased.

139. At this point, the Kingdom knew of the CLO's departure and the now total lack of supervision of Al-Shamrani and the RSAF flight students.

140. On September 11, 2019, Al-Shamrani posted an ominous message on social media, saying that "the countdown has begun."

141. Later that month, Al-Shamrani wrote out a will purporting to explain his forthcoming attack, saved it using the Notes app on his iPhone, and sent a copy

to AQAP.  AQAP was working with Al-Shamrani to plan the attack and maximize U.S. casualties.

142.   In November 2019, Al-Shamrani went with a group of Royal Saudi Air Force trainees to visit the 9/11 memorial in New York City.  The leave was not authorized or sanctioned, and was in violation of U.S. and KSA policy.

143.   Al-Shamrani and his travel companions failed to notify any senior officer of their plans or their departure from Pensacola to New York, even though Al-Shamrani and the other Saudi officers were aware of the leave protocols. Despite Saudi Arabia's surveillance on their cellphones, it did nothing to address this unauthorized trip by its students.

144.   During the visit to NY and the 9/11 Museum at Ground Zero, the RSAF trainees paid tribute to the 9/11 hijackers and discussed the plans for the NAS Terrorist Attack.

145.   On December 5, 2019, the night before the attack, Al-Shamrani hosted a dinner party for fellow RSAF Trainees.  During the dinner party Al-Shamrani screened videos of mass shootings and discussed his plan to commit the NAS Terrorist attack the following day.

146.   One of the RSAF trainees who attended the dinner party called in sick the morning of the shooting.  Instead of attending flight training, he stood outside building 633 and recorded the shooting on his cell phone.

40

147.   Two other RSAF trainees who attended the dinner party also called in sick the morning of the shooting.  They watched the attack from a car nearby.

148.   None of the Royal Saudi Air Force trainees at the scene of the attack reported Al-Shamrani's behavior nor did they try to stop the NAS Terrorist Attack. Because they supported it.

## J.   Saudi Arabia Recklessly Failed to Provide Sufficient Country Liaison Officer Assistance at NAS Pensacola

149.   A Country Liaison Officer (CLO) is an "officer or non-commissioned officer (NCO) of a foreign military establishment selected by his or her government and attached to MILDEP [schools of a military department] or DoD agency for the primary purpose of helping administer IMS [International Military Students] from his or her home country."[19]

150.   At all times overlapping with Al-Shamrani's presence in the United States and during the attack at NAS, Saudi Arabia was required to have an RSAF CLO assigned to NAS Pensacola to assist in administering RSAF Students on base.

151.   The Security Assistance Management Manual, DSCA, Chapter 10, IMET states:

- Liaison personnel are authorized only when a country is scheduled to train a large number of students or where student background warrants liaison personnel assistance… An FMS

---

[19] *See* https://samm.dsca.mil/glossary/country-liaison-officer-clo.

case is required for non-IMET sponsored liaison personnel to cover associated support expenses (e.g., leased office space and phone). CLO support and duties will be identified and stated in an agreement between the unit and sponsoring country. Performance standards and expectations will be clearly stated and agreed with actionable options for low standards. *See* C10.20.8

- Due to the need for CLO accountability, it is required that all CLOs report to the IMSOs [International Military Student Offices] for in/out processing in addition to notifying IMSOs of any departure from assigned duty location (i.e. leave, TDY, etc.) scheduled leave in-country. CLOs will adhere to the same administrative requirements as the IMS to ensure accountability. *See* C10.20.8.1.

- CLOs are briefed prior to departure. CLOs will adhere to any IMS administrative requirements to ensure accountability for their safety and welfare. *See* C10.20.8.2.

152. The U.S. Naval Flight Student Training Administration Manual (TA Manual) further provides that CLOs are required, among other things, to:

- Comply with all appropriate NAS instructions;

- Maintain contact with their students and with the IMS office;

- Ensure that their students adhere to all NATRACOM regulations;

- Assist in routine inspections of their students and their assigned quarters;

- Take necessary action for minor breaches of discipline by their students; and

- In the event of a serious accident or death of a student, the CLO should report to the CO of the squadron and assist as required.[20]

153.   It is critical that CLOs adhere to the rules and regulations of the position, and of the school/agency to which they are assigned. "CLO duties require presence. In the absence of a CLO, good order and discipline are at risk."[21]

154.   CLOs for Saudi Arabian flight students support high-risk training that requires constant awareness of people and their unique human factors. Due to the differences in language, culture, customs, ideologies, and backgrounds, the RSAF CLOs presence, attention, and continuity of service are necessary to ensure the safety and welfare of all service members.

155.   RSAF John Doe No. 1 was the Saudi CLO assigned to NAS Pensacola at all times relevant to this action.

156.   Because Al-Shamrani was an RSAF officer, he fell under the oversight of RSAF John Doe No. 1. In fact, Al-Shamrani knew and understood that the RSAF John Doe No. 1 was responsible for ensuring compliance with Navy and IMET/FMS program standards and regulations, having worked with the RSAF John Doe No. 1 during his time at NAS Pensacola.

---

[20] CNATRAINST 1500.4J, *Naval Flight Student Training Administration Manual* (2014).

[21] U.S. Navy, *Command Investigation Report – Fatal Shooting Incident at Naval Air Station Pensacola, Florida on 6 December 2019*, February 21, 2020.

157.   In early June 2019, the RSAF John Doe No. 1 departed on leave. At that time, he shipped his household goods, on his own, back to Saudi Arabia.

158.   On June 12, 2019, the *deputy* RSAF CLO detached from the unit and Saudi Arabia failed to identify a replacement for his position.

159.   On August 19, 2019, the RSAF John Doe No. 1 returned to Pensacola from leave. He worked for only a few consecutive days, and on August 29, 2019, returned to Riyadh.

160.   On September 16, 2019, five days after Al-Shamrani's "countdown" had begun tweet, RSAF John Doe No. 1 returned to Pensacola but he avoided going to the base and did not report to his office, rather, he requested all official correspondence be forwarded to a hotel in Orlando, Florida.

161.   On September 21, 2019, RSAF John Doe No. 1 returned to Saudi Arabia. His post remained unoccupied until January 2020.

162.   The DoD and the Navy determined that such failures, in particular, those resulting in the inattention and absence of the RSAF John Doe No. 1 were a "contributing factor" leading to the operational success and lethality of the attack at NAS.[22]

---

[22] *Id.*

163.   The Navy further determined that the "absence of the RSAF John Doe No. 1 created a marked decline in the military bearing" of RSAF students, and that the mere presence of an RSAF CLO at NAS Pensacola from September to December 2019 may have "provided 2nd Lt. Al-Shamrani with better oversight and resulted in proactive intervention by [Saudi Arabia]" prior to the attack."[23]

164.   The Saudi CLO, RSAF John Doe No. 1, was acting on the behalf of, and within the scope and course of his employment with, Saudi Arabia at the time of these failures.

165.   The failures of Saudi CLO, RSAF John Doe No. 1, caused and contributed to the acts of international terrorism in this action and occurred within the United States and did not involve the exercise or performance of discretionary functions.

166.   The acts of the Saudi CLO, RSAF John Doe No. 1, were based upon, and occurred in connection with, the commercial activities of Saudi Arabia in the United States and elsewhere, and caused a direct effect in the United States. Specifically the Saudi CLO, RSAF John Doe No. 1, was present and working (or failing to work) in the United States pursuant to the commercial transactions between Saudi Arabia and the United States related to the sale of arms and training. He was

---

[23] *Id.*

required to be present and accountable, and maintain direct and continuous oversight of Al-Shamrani and John Does 2-12.

## K.   The Execution of Al-Shamrani's "Special Mission": The NAS Pensacola Massacre

167.   On the morning of December 6, 2019, Al-Shamrani entered the Pensacola Naval Air Station wearing his RSAF uniform.  Al-Shamrani shot and murdered three American servicemen and shot and severely wounded six other servicemen and women, two sheriff deputies and a federal police officer.  Al-Shamrani fired hundreds of rounds of ammunition during the attack.

168.   The morning of the attack, Al-Shamrani tweeted a series of messages from his twitter account:

> I'm not against you for just being American, I don't hate you because your freedoms, I hate you because every day you supporting, funding and committing crimes not only against Muslims but also humanity.  I am against evil, and America as a whole has turned into a nation of evil.  What I see from America is the supporting of Israel which is invasion of Muslim countries, I see invasion of many countries by its troops, I see Guantanamo Bay.  I see cruise missiles, cluster bombs and UAV.

> Your decision-makers, the politicians, the lobbyists and the major corporations are the ones gaining from your foreign policy, and you are the ones paying the price for it.  What benefit is it to the American people to suffer for the sake of supporting Israel?  Do you expect to transgress against others and yet be spared retribution?  How many more body-bags are American families willing to receive?  For how long can the US survive this war of attrition?  The US Treasury spend billions of dollars, in order to give Americans a false sense of security.

> The security is shared destiny.  You will not be safe until we live
> it as reality in pleastain [sic], and American troops get out of our
> lands.

169.    Shortly after sending the tweets and during the time Al-Shamrani was supposed to be in flight training, at approximately 6:40am, Al-Shamrani entered Building 633 at NAS Pensacola, where generations of pilots have gone through aviation preflight indoctrination classes as a rite of passage on the way to becoming aviators.  Al-Shamrani knew the military and civilian personnel in Building 633 would be unarmed in accordance with base policy and given his own classroom experience there.

170.    Ensign Watson, Airman Walters, Airman Haitham, Airman Johnson, Airman Blackwell, Ensign Thomas, Ensign Lehmer and Ms. Pickett were all working in building 633 the morning of December 6, 2019.  Captain Hogue, Sergeant Hoyland and Deputies Glass, Tinch, Lopez, Bortner, Housam, and Keebler were first responders to the attack.

## L.    Overview of Al-Shamrani's Murderous Rampage

171.    After visiting an Islamic prayer room on another part of the base, Al-Shamrani drove his car to the west-side parking lot of Building 633.

172.    At approximately 6:42 a.m., Al-Shamrani, wearing his RSAF flight suit and carrying a flight bag filled with hundreds of rounds of 9 mm ammunition loaded

into extended clips, entered Building 633 through an unlocked and unguarded door on the northwest corner of the building.

173.   Al-Shamrani, under the color of his RSAF uniform, walked throughout the building freely and casually, taking note of all the rooms in which people were located. After thoroughly scouting the building's interior he returned to the quarterdeck.

174.   There, he stood at the watch office service window (which had no glass), removed his gun from the duffle bag and shot AN Walters in the back of the head, killing him.

175.   Al-Shamrani then turned his weapon on Ensign Watson who, upon hearing the shot that killed AN Walters, leapt from his chair to stop Al-Shamrani, screaming "Stop, stop, stop!"

176.   Al-Shamrani shot Ensign Watson five times, in the neck, in the ear, in the leg, and across his forehead, knocking Ensign Watson to the ground.

177.   Believing Ensign Watson was dead, Al-Shamrani then turned and headed back to the International Military Training (IMT) office to kill everyone inside.

178.   When Al-Shamrani arrived at the IMT Office, the door was closed and locked. Airman Johnson had closed it upon hearing the initial gunfire. The upper half of the door had nine opaque panes of glass, which Al-Shamrani promptly shot

out, and then proceeded to pour between 30 and 40 rounds into the office, which was occupied by Airman Johnson, Airman Blackwell, and Ensign Thomas.

179.   Airman Johnson was shot seven times; Airman Blackwell was shot six times; Ensign Thomas was shot once.

180.   Al-Shamrani could have reached through the broken glass to unlock the door and enter the room, but he was distracted by shouting from the quarterdeck. ENS Watson had gotten up, crawled through the quarterdeck office service window, and was shouting to personnel that there was an active shooter and that they had to leave the building immediately.

181.   As Ensign Watson attempted to exit the building, Al-Shamrani shot him in the back, hitting Ensign Watson's spleen.  Somehow, Ensign Watson made it to the bottom of the stairs leading from the front main entrance of Building 633, and then advised first responders as to Al-Shamrani's identity and location before collapsing.

182.   Almost immediately thereafter, Airman Haitham, who was outside the main front entrance of Building 633, entered the building to assist.  Al-Shamrani stood before him, pistol raised.  Airman Haitham raised his hands and said, "Don't shoot!"  Al-Shamrani shot Airman Haitham in the chest, killing him.

183.   Al-Shamrani then left the quarterdeck and headed south along the main passageway.  Near the quarterdeck were photographs of President Trump and former

President George H. W. Bush, who had been a Navy pilot.  Al-Shamrani poured multiple rounds from his pistol into both photographs, sending a message that he was not simply killing people, he was attacking the United States Government.

184.   He then walked back towards the door to the passageway, turned to his left, looked into the office supervisor's office, and saw Jessica Pickett hiding under a desk.  Al-Shamrani walked behind the desk, pulled out the chair, shot Jessica Pickett nine times, pushed the chair back in, and walked out into the hallway.

185.   Returning to the quarterdeck, Al-Shamrani went up the stairs and looked north along the passageway.  He saw Ensign Kristy Lehmer leaving a classroom on the left side of the passageway and shot her once in the hip.

186.   Al-Shamrani then heard additional voices coming from the quarterdeck.  He headed back down the stairs and engaged Navy security forces and DOD Police in a gun battle.   Captain Hogue was shot in the leg.

187.   At or near this time, first responders from the Escambia County Sheriff's Office (ECSO), including Plaintiffs Jonathan Glass, Matthew Tinch, Thomas C. Bortner, and Grant Lopez, arrived on scene and encountered now-wounded Captain Hogue who advised them to enter Building 633 through the south and southwest entrances of the building.

188.   Al-Shamrani had moved to the second floor of the building and began engaging the ESCO Deputies with gunfire from his elevated position from a stairwell, striking Deputy Glass in the right arm.

189.   Al-Shamrani, using his intimate knowledge of the building, doubled back along the second floor to flank the Deputies.

190.   Al-Shamrani began his descent down a second stairwell with his Glock pistol extended outward and came in the view of Deputy Lopez who was able to shoot Al-Shamrani in the shoulder before his gun jammed.

191.   Al-Shamrani unfazed by being shot, charged into the narrow hallway coming straight onto Deputies Tinch and Bortner, shooting Tinch in the leg and knocking him down.

192.   As he was engaging Deputies Tinch and Bortner, ESCO Sergeant Michael Hoyland and Deputies Mathew Housam and Matthew Keebler rounded a corner in the hallway behind Al-Shamrani who, sensing their presence, turned and immediately poured gunfire towards them.

193.   Sergeant Hoyland and Deputies Housam and Keebler returned fire, striking Al-Shamrani and neutralizing the threat.

194.   During the shootout, Al-Shamrani chanted "Allahu Akbar!"  - an Islamic phrase, meaning "God is great!"

**M.      The Lives Al-Shamrani Destroyed and Forever Changed**

## Ensign Joshua Kaleb Watson

195.   Joshua Kaleb Watson ("Kaleb") was born in 1996, the youngest of three boys.  Kaleb and his brothers were raised by their parents, Ben and Sheila Wilemon Watson, in Enterprise, Alabama.

196.   Kaleb was inducted into the Naval Academy in the summer of 2015. At the Naval Academy, Midshipman Watson was a Mechanical Engineering major, a small-arms instructor, a wrestling coach, and the captain of the Navy Rifle Team his senior year.  The capstone of his senior year was his selection to become a Naval aviator.

197.   Ensign Watson was the officer on watch during the attack.   Al-Shamrani shot Ensign Watson six times.   Ensign Watson was transported by ambulance to Baptist Hospital in Pensacola, where he died of his wounds.

198.   In recognition of his extraordinary heroism and his wounds, the Navy posthumously awarded Ensign Watson his "wings of gold" and the Purple Heart Medal.   The Governor of Alabama posthumously awarded ENS Watson the Governor's Cross and placed a plaque in his honor on the Alabama Fallen Heroes Wall at the state capitol.

### Airman Cameron Scott Walters

199.   Cameron Scott Walters was the second son of Shane and Amanda Walters.  He grew up in Georgia.  Upon graduating from high school, Cameron decided to follow in his father's footsteps and serve his Country as a member of the United States Navy.

200.   Upon graduation from boot camp in November 2019, Cameron was stationed at NAS Pensacola.  Cameron aspired to become a flight crew mechanic.

201.   December 6, 2019, was Airman Walters' first day on watch duty.  He was assigned to Building 633.  Al-Shamrani approached Airman Walters from the rear and shot him in the back of his head, killing him instantly.

202.   The Navy posthumously awarded Airman Walters his "wings of gold" and the Purple Heart Medal.

### Airman Mohammed Haitham

203.   Mohammed Haitham ("Mo") was the first-born child of Evelyn Brady and Sameh Haitham.  Mo grew up in St. Petersburg, Florida and attended Lakewood High School.  He was a stellar student and athlete.  While at Lakewood, Mo played on the varsity track, cross country and basketball team, and served as the manager for the women's basketball team.  Mo was seen among his peers as a peacemaker.

204.   After graduating high school, Mo joined the Navy.  Mo aspired to be a Naval Aircrewman.

205.    Mo lived his last minutes the way he lived his entire life.  Mo, unarmed, ran toward Al-Shamrani with his hands up, pleading with him to stop taking lives.  Al-Shamrani shot Airman Haitham in the sternum, killing him instantly.

206.    The Navy posthumously awarded Airman Haitham his "wings of gold" and the Purple Heart Medal.

### Airman George Johnson

207.    George Johnson is 26 years old and grew up in Bothell, Washington, a suburb of Seattle.  He graduated from Bothell High School in 2013.  George is a single parent; his son is six years old.

208.    On January 23, 2019, George joined the Navy.  He enlisted for a term of 6 years active duty and 2 years in the reserves and was assigned to NAS Pensacola for training as an Aircrewman.

209.    Al-Shamrani shot Airman Johnson seven times.  Six of the shots entered his body; the seventh was blocked by a metal "I love you" card in his wallet that his mother had given him.  The card saved Airman Johnson's life, because otherwise the bullet would have hit his femoral artery, and Airman Johnson would have bled out.  Three of the shots hit his right leg.  One entered at the top of his knee, carved his femur and his knee cap, and lodged in the top of his tibia.  The other two shots hit his calf and were through-and-throughs.  Three shots hit his left buttock; all were through-and-throughs, one of which missed his spine by an inch and a half.

210.   Airman Johnson was treated at Baptist Hospital, where he remained for a week and a half.  Airman Johnson was then transferred to West Florida Hospital for rehabilitation.

211.   In March 2020, Airman Johnson underwent a second surgery to remove bone fragments from his right knee.  The bone fragments severely damaged the knee, and it is likely that Airman Johnson will have to walk with the aid of a cane for the rest of his life.  He cannot twist his right leg at all without suffering intense pain.

212.   Navy doctors have diagnosed Airman Johnson with severe Post Traumatic Stress Disorder, which will likely result in his discharge from the Navy, shattering his dreams of being a Navy aircrewman.   Airman Johnson is on medication for his leg pain, his PTSD, his anxiety attacks, and his recurring nightmares; he continues to undergo mental health treatment.

213.   The Navy awarded Airman Johnson the Purple Heart Medal for his wounds and a Navy Commendation Medal for his bravery.

**<u>Ensign Breanna Thomas.</u>**

214.   Breanna Thomas was born in 1996 – on the same day Joshua Kaleb Watson was born.  She grew up in Vacaville, California.

215.   Both of Breanna's parents were in the Navy.  Like Ensign Watson, she knew from an early age that she wanted to be a Naval aviator.  From the time she

was six years old, Breanna was the only girl among a group of young people who would flock to a flight indoctrination program hosted by the local Air Force base.

216.   Breanna was inducted into the U.S. Naval Academy in 2015.   She majored in aerospace engineering and was a member of the Gospel Choir, Midshipman Black Studies Club, National Society of Black Engineers, and, for three years, the Navy Women's Rugby Team.   She served as a squad leader in the first semester of her first class (senior) year and as a battalion adjutant second semester.

217.   Al-Shamrani shot Ensign Thomas in the calf of her right leg.   An ambulance took Ensign Thomas to West Florida Hospital.   There, staff cleaned out and dressed her wound and x-rayed her leg.   She was then discharged later the same day.

218.   Eventually, Ensign Thomas returned to her aviation training pipeline. Subsequently, however, Ensign Thomas requested a six-month hiatus from her training to recover from the long-term effects of the shooting.

219.   The Navy awarded Ensign Thomas the Purple Heart Medal and the Navy and Marine Corps Commendation Medal for her wound and her bravery.

### Airman Ryan Blackwell

220.   Ryan Blackwell is 27 years old.   Ryan attended high school in Cape Cartaret, North Carolina, where he excelled in wrestling.   He won the North Carolina state high school wrestling championship in his weight class in 2009 and 2010.

221.   Ryan joined the Navy in July 2017 and enrolled in Basic Underwater Demolition Seal Training (BUDS).

222.   Al-Shamrani shot Airman Blackwell six times:  once in his right arm, twice in the back on either side of his spine, one off the side of his right ribcage, one in the back of his right calf, and one in the left foot.  One of the bullets that entered his back came out through his thigh.  The other bullet that entered his back hit his pelvis, severed his intestines, and came out of his left hip. Airman Blackwell's wounds were life threatening.

223.   Airman Blackwell was taken from the front gate at NAS Pensacola to Baptist Hospital, where he underwent emergency surgery. The gunshot wounds to his back caused significant injuries to his gastrointestinal system. Airman Black well was discharged from Baptist Hospital on December 13, 2019. He returned on March 31, 2020 for additional surgery and was discharged on April 3, 2020.

224.   Airman Blackwell underwent eight months of physical therapy and occupational therapy at Andrews Institute in Gulf Breeze, Florida. Airman Blackwell also underwent psychological treatment for Post-Traumatic Stress Disorder (PTSD).

225.   Airman Blackwell still has not recovered the full use of his right arm.

226.   For his bravery and wounds, the Navy awarded Airman Blackwell the Navy Marine Corps Medal and the Purple Heart Medal.

### Ms. Jessica Pickett

227.   Jessica Pickett was born in 1980. She grew up in Troy, Alabama and attended Pike Liberal Arts High School, graduating in 1998. She enlisted in the Navy shortly thereafter, in July 1998.

228.   Jessica spent 20 years in the Navy, rising to the rating of Yeoman First Class (YN1). Her last duty station in uniform was at the Schools Command at Naval Air Station (NAS) Pensacola.

229.   Jessica retired from the Navy in July 2018.  In February 2019, she was rehired by NAS Pensacola as a federal employee at a GS-5 level.

230.   Al-Shamrani shot Jessica nine times.   The nine shots created 11 wounds, because two of the shots were through-and-throughs. Jessica had three wounds in her left leg, three wounds in her right leg, three wounds in her pelvic area, and two wounds in her stomach. The stomach wound was a through-and-through; the bullet entered Jessica's left side and exited through her navel. Miraculously, the bullet did not hit any organs.  One of the bullets shot into her left leg shattered her left femur.

231.   Jessica underwent surgery to remove the seven bullets still lodged in her body and to have a metal rod inserted in her left leg that runs from her hip to the bottom of her femur. The rod will remain for the rest of her life. Jessica was

transferred to West Florida Hospital on December 14, 2019 for physical therapy, and finally came home on December 23, 2019.

232.   Jessica cannot walk without the aid of a walker.  Even when she uses the walker, her movements are slow, tentative, and painful. She uses a wheelchair any time she needs to go some distance or get somewhere quickly. Her left hip is in constant pain, and her left side from her hip to her toes is often swollen and discolored.

233.   Jessica underwent a second surgery on her left leg in April 2020 to remove bone marrow from her tibia and pack it into a gap in her femur that has not healed as well as the doctors had hoped. She is deeply afraid to go out, and the idea of going back to NAS Pensacola is unimaginable.

234.   Jessica in on medication for pain, sleep assistance, nightmares, and regulation of her heart rate. She, her husband, and her children are all in therapy to deal with the lasting trauma of what they all went through on December 6.

235.   In recognition of her extraordinary heroism on December 6, 2019, Jessica was presented with the Secretary of Defense Medal of Freedom Award.

**Ensign Kristy Lehmer**

236.   Ensign Kristy Lehmer is 26 years old and hales from Pueblo, Colorado.

237.   Ensign Lehmer began her military career as an enlisted member of the United States Marine Corps, in which she served as an intelligence analyst.  Two

years later, and as the result of exceptional performance and promise, Ensign Lehmer received a nomination from the Secretary of the Navy to attend the United States Naval Academy.

238.   Ensign Lehmer received an appointment to the Naval Academy and was inducted into the Class of 2019.

239.   At the Naval Academy, Ensign Lehmer was an Oceanography major, played women's rugby, and received her first choice of service selection:  training to become a Naval Flight Officer (NFO) at NAS Pensacola.

240.   Al-Shamrani shot ENS Lehmer once in the hip.  She was taken to Branch Medical on base.  Personnel at Branch Medical packed Ensign Lehmer's gunshot wounds, started an IV, and dialed 911.  An ambulance arrived and took Ensign Lehmer to Baptist Hospital in Pensacola.

241.   A CT scan revealed that the bullet from Al-Shamrani's gun was still in Ensign Lehmer's body, despite the fact that the round had caused an exit wound as well as an entrance wound.  As medical personnel were moving her, the bullet fell out of her second wound.  The pain caused by the repacking of the wounds was so intense that Ensign Lehmer lost consciousness.

242.   Ensign Lehmer was discharged from the hospital the next day, and began a course of physical therapy for the next six months.  Although she has now recovered from the shooting physically, the events of that day continue to haunt her.

She has nonetheless bravely and resiliently worked her way back into flight training, vowing not to let Defendants destroy her dream of becoming a Naval aviator.

243.    The Navy awarded Ensign Lehmer the Purple Heart Medal for the wounds she sustained in then NAS Terrorist Attack.

### **Captain Charles Hogue**

244.    Department of Defense Police Captain Charles Hogue is 60 years old and has been a police officer for more than 20 years. During that time he has worked his way up from Sergeant to Captain and is a Shift Supervisor responsible for the NAS Pensacola police force consisting of Navy and DoD personnel that form five patrol units and personnel operating the Main and West Gates.

245.    Before joining DoD Police, Captain Hogue served in the U.S. Navy as Master-at-Arms, and retired in in 2000.

246.    On the day of the attack, Captain Hogue began his shift at 03:50am. When the shooting started he was at the DoD Police station on base and was alerted to an "active shooter." He immediately mounted a vehicle with other officers and was on site at Building 633 within three minutes of the call.

247.    Upon entering the Building 633 Captain Hogue observed victims on the ground and destruction of the quarter deck.  Al-Shamrani saw Captain Hogue and immediately opened fire.

248.   Captain Hogue was struck by a bullet in his right thigh that barely missed the femoral artery and other critical anatomy.

249.   Captain Hogue was evacuated to Baptist Hospital where he underwent multiple surgeries to repair the damage to his body. He had three surgeries, and was hospitalized for two days. After discharge, he developed a serious infection and was hospitalized again from December 24, 2019 to January 8, 2020. He underwent extensive physical therapy for 60 days and received department-provided psychological care. Although he still has pain and extensive scarring, Captain Hogue returned to full duty on April 10, 2020. He thinks about the attack and what he saw and experienced every day.

250.   For his actions during the attack, Captain Hogue was awarded the Medal of Valor- Secretary of Defense (SECDEF); the Medal of Freedom and the Secretary of the Navy Distinguished Civilian Medal for Valor.

**Deputy Jonathan Glass**

251.   Escambia County Sherriff Deputy Jonathan Glass was born in September 1990, and grew up in Poland. His parents were Missionaries and he did not return home to the United States until 2008 when he attended Bible College.

252.   He joined the United States Marine Corps Reserves after college and continues to serve as a Marine Reservist in an intelligence unit based out of Mobile, Alabama.

253.   Deputy Glass joined the Escambia County Sheriff's Office in 2017 as part of the Cadet program and graduated from the Law Enforcement Academy in 2018. He has served in the Warrington Precinct of Escambia County since he began serving as a Deputy.

254.   On December 6, 2019 Deputy Glass was working the midnight shift and was set to get off at 7 a.m.  He arrived at his home near NAS Pensacola at 6:50 a.m. and was sitting in his vehicle waiting for the end of his shift when an emergency alert came over the radio advising there was an "active shooter" on base.

255.   Upon arrival at the main entry of Building 633, Deputy Glass saw wounded and bloodied American servicemen.  Deputy Glass entered the building and immediately noticed numerous bullet casings on the floor, and heard several gun shots further down the hall to his right.

256.   When he rounded a corner in the hallway Deputy Glass observed Al-Shamrani, and fired upon him. As Deputy Glass chambered another round he was struck in the right arm by a bullet, causing him to drop his weapon.

257.   Deputy Glass was evacuated to Baptist Hospital where he was treated for his gunshot wound.

258. Following the attack Deputy Glass experienced flashbacks and hypervigilance for which he has received medical treatment.

259.    As a result of the attack, Deputy Glass was placed on leave and then light duty for two months, and returned to full duty in May 2020. Deputy Glass suffers from permanent nerve damage in his right arm.

260.    For his actions during the attack, Deputy Glass was awarded the Distinguished Public Service Award from the Secretary of the Navy; The Purple Heart; Medal of Valor; and the U.S. Department of Justice Award for Courage and Bravery in the face of Terrorism.

### **Deputy Matthew Tinch**

261.    Escambia County Sheriff's Deputy Matthew Tinch was born in 1990. He grew up in Pensacola, Florida where he graduated from High School and College.

262.    Deputy Tinch joined the Escambia County Sheriff's Office in 2014 and worked as a patrol officer in the South Precinct.

263.    On the morning of December 6, 2019 Deputy Tinch had just pulled into work and was parking his vehicle when he heard the alert tone advising him that there was an "active shooter" on NAS Pensacola.

264.    Deputy Tinch entered Building 633 through the Southwest entrance with Deputies Glass and Bortner.  Deputy Tinch exchanged fire with Al-Shamrani, and was struck in the knee cap dropping him to the ground.

265.   Deputy Tinch was evacuated to Baptist Hospital where he was taken into surgery to remove the bullet from his knee and repair the tissue and bone damage. He remained hospitalized for two days.

266.   After the attack, Deputy Tinch has suffered from depression and anxiety. He thinks about the shooting often and dwells on thoughts about what his family would have done if he had died. He has received medical treatment for these conditions.

267.   For his actions during the attack, Deputy Tinch was awarded the Distinguished Public Service Award from the Secretary of the Navy; The Purple Heart; Medal of Valor; and the U.S. Department of Justice Award for Courage and Bravery in the face of Terrorism.

**Deputy Thomas C. Bortner**

268.   Escambia County Sheriff's Deputy Thomas C. Bortner is 33 years old and was born and raised in the Crestview area. He always had a desire to be in law enforcement.

269.   He began working for the Escambia County Sheriff's Office in 2013 and has been assigned to the Beach Precinct, South Precinct and most recently to the K9 unit.

270.   On the morning of December 6, 2019 Deputy Bortner was in the Precinct parking lot walking his dog waiting for muster when he heard the tone alert advising him that there was an "active shooter" on NAS Pensacola.

271.   Deputy Bortner entered Building 633 with Deputies Tinch and Glass. Deputy Bortner exchanged fire with Al-Shamrani.

272.   During the attack, Deputy Bortner broke his ribs when breaking down a door to provide cover for himself and other wounded deputies. He also suffered hearing loss as a result of the attack.

273.   After the attack, Deputy Bortner received medical treatment for his broken bones and hearing loss, and suffered from anxiety and hypervigilance. He thinks about the shooting regularly.

274.   For his actions during the attack, Deputy Bortner was awarded the Purple Heart.

### Deputy A. Grant Lopez

275.   Escambia County Sheriff's Deputy Grant Lopez is 49 years old. He was raised in the Dallas/Fort Worth, Texas metro area, and graduated from high school in Gulfport, Mississippi. He went on to attend Wyoming Technical Institute in Laramie, Wyoming before settling in Pensacola and starting a career in law enforcement.

276.   Deputy Lopez has been in law enforcement since 2003 when he was recruited by the Escambia County Sheriff's Office. He is currently assigned to the motorcycle patrol unit, and was previously assigned to South End Patrol and served as a Field Training Officer.

277.   On the day of the attack, Deputy Lopez began his shift at 6:00 a.m. working traffic patrol until he heard the emergency alert notifying local law enforcement of an "active shooter" on NAS Pensacola. He immediately responded with several other Deputies to Building 633.

278.   Al-Shamrani engaged Deputy Lopez and Deputy Lopez shot Al-Shamrani once in the shoulder before his gun jammed and he retreated.

279.   As a result of the attack, Deputy Lopez suffered sleep loss for several days, a loss of appetite, a heightened sense of awareness of his surroundings and paranoia regarding whether this was an isolated incident or not.

280.   Deputy Lopez has become hyper-vigilant when placed in situations that remind him of the attack.  He replays the events in his mind often, and suffers from survivor's guilt, frequently wondering if others would not have been hurt if his gun had not malfunctioned.  Due to his mental state following the attack, Deputy Lopez was placed on Administrative Leave for 31 days, during which time he worked with a therapist.

281.   For his actions on the morning of December 6, 2019, Deputy Lopez was awarded the Distinguished Public Service Award from the Secretary of the Navy; Medal of Valor; and the U.S. Department of Justice Award for Courage and Bravery in the face of Terrorism.

**Matthew Housam**

282.   Escambia County Sheriff's Deputy Matthew Housam is 30 years old. He grew up in Springfield, Illinois before moving to Pensacola, Florida in 2014 to be closer to his family.

283.   He served in the United States Army Reserves prior to moving to Pensacola where he worked as a firefighter from 2014 to 2016.

284.   In 2016 he joined the Escambia County Sheriff's Office.

285.   On December 6, 2019 Deputy Housam was pulling into the South Precinct parking lot when the emergency alert came over the radio advising of an "active shooter" event on NAS Pensacola. Deputy Housam and others from the South Precinct immediately responded to the base.

286.   Deputy Housam engaged Al-Shamrani, who was fifty yards away from his position.  Deputy Housam fired 12-14 rounds before hearing Sergeant Hoyland call for them to stop shooting.

287.   Since the shooting he has suffered from hearing loss and tinnitus that was not present prior to the attack.  Deputy Housam has also suffered from

nightmares and anxiety. He thinks about the attack regularly and the impact it has had on him, his department and his fellow officers who responded.

288.   For his actions during the attack, Deputy Housam was awarded the Distinguished Public Service Award from the Secretary of the Navy; the Medal of Valor; and the U.S. Department of Justice Award for Courage and Bravery in the face of Terrorism.

### **Matthew Keebler**

289.   Escambia County Sheriff's Deputy Matthew Keebler is 29 years old and moved to Pace, Florida as a child. Deputy Keebler graduated from Pace High School and went on to graduate from the University of West Florida in Pensacola where he obtained a degree in Criminal Justice.

290.   Deputy Keebler grew up wanting to be a law enforcement officer and was recruited by the Escambia County Sheriff's Office during his final semester at the University of West Florida. He began working in Patrol by August of 2015. He currently works as an investigator.

291.   On the morning of December 6, 2019, Deputy Keebler heard an alert come over the radio advising that there was an "active shooter" on NAS Pensacola. He proceeded directly to the base and responded to Building 633.

292.   Deputy Keebler engaged the suspect with his rifle from approximately fifty yards away, firing 10-12 shots until the suspect dropped and was down.

293.   As a result of the attack on December 6, 2019, Deputy Keebler has suffered hearing loss and tinnitus. He has also suffered from flashbacks, increased hypervigilance, and replays the events of the day often in his mind.

294.   For his actions during the attack, Deputy Keebler was awarded Distinguished Public Service Award from the Secretary of the Navy- Medal of Valor- U.S. Department of Justice Award for Courage and Bravery in the face of Terrorism

### Sergeant Michael Hoyland

295.   Escambia County Sheriff's Office Sergeant Michael Hoyland was born in 1966. He is originally from New Orleans, Louisiana but has been a longtime resident of Pensacola, Florida.

296.   Sergeant Hoyland is a 23 year veteran of the Escambia County Sheriff's Office where he has worked in several different units. He has been a member of the departments SWAT team for 17 years and is currently acting as one of the department's supervisors for the South end of the patrol area for Escambia County.

297.   On December 6, 2019 Sergeant Hoyland was at the precinct office preparing for the start of the shift when a tone alert came over the radio announcing there was an "active shooter" on Naval Air Station Pensacola.  Sergeant Hoyland immediately responded.

298.   Sergeant Hoyland engaged Al-Shamrani and fired 8-10 rounds in the direction of Al-Shamrani, striking Al-Shamrani.

299.   As a result of the attack on December 6, 2019 Sergeant Hoyland suffers from hearing loss and tinnitus. Sergeant Hoyland received department-provided mental health treatment.

300.   For his actions during the attack, Sergeant Hoyland was awarded the Distinguished Public Service Award from the Secretary of the Navy; the Medal of Valor; and the U.S. Department of Justice Award for Courage and Bravery in the face of Terrorism.

## N.   The NAS Pensacola Shooting Investigation Revealed Systemic Problems with Saudi Arabia's Security Screening

301.   During the investigation of the December 6, 2019 shooting, the recovery of Al-Shamrani's cell and computer data revealed his frequent communications with AQAP.  The FBI and Attorney General William Barr later concluded that the shooting was an act of terrorism motived by jihadist ideology.

302.   As a result of the U.S. investigation into the attack, twenty-one Saudi military trainees were terminated from the program and sent back to Saudi Arabia.

303.   Attorney General Barr announced that the investigation uncovered that the twenty-one Saudi trainees possessed "derogatory material."  Seventeen of the trainees had social media accounts linked to anti-American or jihadi content.  Fifteen

71

of the trainees, including some of the seventeen linked to anti-American content, had other illicit material in their possession.

304.   That so many Saudi military trainees were, at a minimum, sympathetic to AQAP, and that several more were actually accomplices to the NAS Terrorist Attack demonstrates the military trainees' belief that their  support and/or sympathy of Salafi jihadism were in furtherance of KSA political and religious goals.

305.   AQAP released a claim of responsibility for the attack on NAS Pensacola on February 2, 2020. The claim came from al-Malahem Media, an official AQAP media outlet. The speaker in the claim of responsibility video is Qassim al-Rimi, the Emir of AQAP since 2015.

306.   The FBI determined that Abdullah al-Maliki was the AQAP operative who "issued AQAP's claim of responsibility for the attack," for his specific act of uploading and distributing the video. Indeed, until his death in May of this 2020, al-Maliki was reportedly active within al-Malahem Media.  The FBI also identified Maliki as one of Al-Shamrani's "overseas associates."

307.   The claim of responsibility video included specific details and photographs that could only have been provided by Al-Shamrani. For example, the video mentions specific physical testing that Al-Shamrani would have had to undergo during his training.  The video also includes pictures of Al-Shamrani that could have only been provided to AQAP by Al-Shamrani.

308.   The video also broadcast screenshots and the terms of Al-Shamrani's Will. The FBI confirmed that the Will in the video is the same as the one Al-Shamrani had on his phone.  AQAP's ability to obtain a copy of Al-Shamrani's Will is evidence that he communicated directly with the group in the days prior to the attack.

309.   A recent Saudi Arabian report identified six themes of how Al-Shamrani viewed the world: (i) support for radical Islam and terrorism; (ii) support for the Afghan Taliban; (iii) hatred for America and the West; (iv) opposition to the existence of Israel; (v) sectarianism; and (vi) rejection of Saudi government reforms.

310.   All of the information was known to the Kingdom *before* it sent Al-Shamrani to the United States for military training.

311.   As details of the attack and Al-Shamrani's extensive relationship with AQAP began to emerge, so did the serious flaws in Saudi Arabia's implementation of screening protocols.

312.   Senator Marco Rubio stated that the attack exposed "***some serious flaw***" in the vetting process for the training programs.

313.   Senator Rick Scott stated, "It's clear that we need to take steps to ***ensure that any and all foreign nationals are scrutinized and vetted extensively*** before being embedded with our American men and women in uniform… There is no reason we should be providing state-of-the-art military training to people who wish

us harm. And most importantly, there is no reason to risk the safety and security of our American men and women in uniform. If not for the bravery displayed by the military personnel on the ground and local law enforcement, today's tragedy could have been much worse. We must be vigilant against those who wish our country and our people harm."

314.  Florida Representative Matt Gaetz stated the attack represented a "*serious failure in the vetting process*."

315.  Florida Governor Ron DeSantis stated that he has raised the issue of retribution for the attack with President Trump and stated, "Given that this was a foreign national in the employ of a foreign service is, and there will be time to do this, but obviously the government of Saudi Arabia needs to make things better for these victims and I think *they are going to owe a debt here given that this is one of their individuals*."

# VI.   CAUSES OF ACTION

## COUNT ONE

### VICARIOUS LIABILITY / RESPONDEAT SUPERIOR

### All Plaintiffs

316.  Plaintiffs repeat and re-allege all of the preceding paragraphs as if fully set forth herein.

317.   At all times relevant herein, Defendant Kingdom of Saudi Arabia acted through its officials or employees, who were acting within the scope of their office or employment.

318.   Saudi Arabia, through KSA John Does 13 – 20, screened, hired, retained, trained, promoted and supervised its RSAF officers and personnel that were stationed at NAS Pensacola leading up to and during the attack, including 2nd Lt Al-Shamrani and RSAF John Does 1 – 12.

319.   2nd Lt Al-Shamrani had been specifically trained by Saudi Arabia in the proficient use of weapons, including semi-automatic pistols, to lethally engage targets.

320.   Saudi Arabia cloaked 2nd Lt. Al-Shamrani with its authority by bestowing on him an officer's rank, the RSAF uniform, and selecting him to receive special training in the United States. It further gave him authority to act on its behalf when it represented that he had been sufficiently screened according the requisite security protocols prior to his admission into the United States.

321.   On December 6, 2019, while employed as an officer of the Saudi Royal Air Force and wearing his Saudi Air Force uniform, Al-Shamrani utilized his weapons training and possession of a Glock 45 semi-automatic pistol that had been stored at the Saudi barracks under the direct supervision of Saudi Air Force superiors at Pensacola, did shoot and kill, maim, and severely wound American servicemen

and women and law enforcement officials while acting in the scope of his employment for the Saudi Royal Air Force.

322.   Al-Shamrani was acting upon what he believed and understood was the policy and ideology the Kingdom of Saudi Arabia, and therefore, on its behalf. This belief of Al-Shamrani is supported by the Kingdom of Saudi Arabia's well-known support for Salafism, state-sanctioned religious ideologies supporting violence against non-believers, tacit alliance with and material support to AQAP in Yemen, and its deliberate indifference to Al-Shamrani's easily discernible (to Saudi Arabia) association with AQAP.

323.   Al-Shamrani followed the state-sanctioned ideology of l Wahhabi clerics and was motivated by jihadist ideology and a hatred for the United States. Al-Shamrani believed Salafi jihadism against the United States was an essential part of his military duties under the law of Islam and furthered the interests of Wahhabism and the Kingdom of Saudi Arabia.   The religious leadership of the Kingdom did nothing to dissuade him of that belief; indeed, the Kingdom deliberately ignored it and encouraged it.

324.   Al-Shamrani's conduct as a RSAF officer in uniform, a position of authority only available to him by his employment with Saudi Arabia, provided him access to a secure military installation, by and through which he was able to plan and commit the terrorist attack.

325.   Al-Shamrani's intentional acts were a direct outgrowth of conduct that was within the scope of Al-Shamrani's employment as an RSAF officer. If not for his employment with RSAF, Al-Shamrani would not have had access to his victims, nor the knowledge, training, skill, opportunity, and capability required to successfully plan and commit the attack.

326.   Al-Shamrani's employment as a RSAF officer was a necessary precursor to the intentional wrongful acts that he committed causing Plaintiffs' injuries.

327.   Similarly, the actions, omissions, and wrongful conduct of RSAF John Does 1 - 12, as well as those responsible for screening them for training in the United States, KSA Does 12-20, were done in the course and scope of their employment with Saudi Arabia

328.   Accordingly, Saudi Arabia is liable for the tortious and wrongful conduct of its employees, 2nd Lt. Al-Shamrani, RSAF John Does 1 – 12, KSA John Does 12 – 20, and KSA John Does 20–30, that gives rise to the Counts herein under the doctrine of respondeat superior.

**WHEREFORE**, Plaintiffs pray that the Court find Saudi Arabia vicariously liable.

## COUNT TWO

## VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)

## [Primary Liability, 18 U.S.C. § 2339 Predicate]

### All Plaintiffs

329.   Plaintiffs re-allege and incorporate by reference all of the preceding factual allegations as if set forth herein.

330.   This count is brought pursuant to 28 U.S.C. § 1605B of the Foreign Sovereign Immunities Act known as JASTA permitting claims under 18 U.S.C. § 2333(a) for the injuries and deaths suffered by U.S. nationals in the NAS Terrorist Attack.

331.   At all times relevant herein, Defendant Kingdom of Saudi Arabia acted through its officials or employees, who were acting within the scope of their office or employment.

332.   Saudi Arabia harbored and concealed persons, including 2nd Lt Al-Shamrani, who it knew, or had reasonable grounds to know, had committed or was about to commit, an offense under 18 U.S.C. § 2332b, and therefore violated 18 U.S.C. § 2339. Saudi Arabia knew or had reason to know that Al-Shamrani was an AQAP associate, and had been in contact with AQAP  and held anti-American and Salafi jihadist sentiments. Despite this, Saudi Arabia permitted Al-Shamrani to join the RSAF, and harbored 2nd Lt Al-Shamrani within the ranks of the RSAF and in RSAF housing in Saudi Arabia and in the United States. Saudi Arabia failed to report

or disclose 2nd Lt Al-Shamrani's association with AQAP or his extremist views, and thereby concealed him from detection, enabling him to plan and commit the NAS attack.

333.   The NAS attack involved conduct transcending national boundaries, the commission of an assault with a dangerous weapon resulting in serious bodily injuries and deaths within the United States, and created a substantial risk of serious bodily injury to persons by destroying or damaging real or personal property within the United States in violation of the laws of Florida and the United States.

334.   Saudi Arabia knew or recklessly disregarded that by harboring and/or concealing associates of AQAP, including 2nd Lt Al-Shamrani, within its military, this support would be used by AQAP in the preparation for, or in carrying out, the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, commission of acts of terrorism transcending national boundaries, attacking government facilities, financing terrorism, and the provision of training to FTOs.

335.   Saudi Arabia's conduct, by harboring and concealing terrorists who were committing terrorist acts against Americans, involved violent acts and acts dangerous to human life. Saudi Arabia's conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a). Saudi Arabia' support for AQAP appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian

populations of the United States, (b) to influence the policy of the U.S. by intimidation and coercion, and (c) to affect the conduct of the U.S. government by mass destruction and assassination.

336.  Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Saudi Arabia's conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Saudi Arabia's conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

337.  The aforesaid acts of Saudi Arabia were not mere negligence, but each act individually and/or in combination with one or more acts constituted conduct that was intentional, reckless, willful and/or grossly negligent and each of those acts individually and/or in combination with one or more of those acts was a proximate cause of the NAS Terrorist Attack and the resulting injuries and/or deaths of Plaintiffs' decedents.

338.  The NAS Terrorist Attack could not have occurred absent the knowing and substantial assistance provided to Al-Shamrani and AQAP by Saudi Arabia. Those attacks and resulting injuries and deaths were a natural, probable and reasonably foreseeable consequence of the Kingdom's conduct.

339.  Saudi Arabia is vicariously liable for the tortious conduct of 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 - 30,

its employees/agents, who were acting within the scope of their agency/employment at the time of their conduct giving rise to this cause of action.

340.  Plaintiffs, the surviving family members of each decedent, the decedents and their Estates have suffered and will continue to suffer past and future damages as a result of the injuries and deaths sustained in the NAS Terrorist Attack, including but not limited to: personal injury damages, wrongful death damages, survival damages, economic damages, pecuniary loss, non-economic damages, pain and suffering, torture, imprisonment, kidnapping, fear of impending death, physical trauma, mental anguish, mental distress, grief, loss of enjoyment of life, loss of earnings, financial support, services, companionship, care, guidance, consortium, solatium, burial costs, medical and other expenses and other provable damages allowed by law.

**WHEREFORE**, Plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, wrongful death, all recoverable losses under 28 U.S.C. §1605B and 18 U.S.C. §2333 and other appropriate relief be entered on their second cause of action in favor of the Plaintiffs individually and as estate representatives and against Defendant Saudi Arabia, with separate awards for each Plaintiff, where appropriate, plus interest, costs, compensatory damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

## COUNT THREE

## VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)

## [Primary Liability, 18 U.S.C. § 2339A Predicate]

### All Plaintiffs

341.   Plaintiffs re-allege and incorporate by reference all of the preceding factual allegations as if set forth herein.

342.   This count is brought pursuant to 28 U.S.C. § 1605B of the Foreign Sovereign Immunities Act known as JASTA permitting claims under 18 U.S.C. § 2333(a) for the injuries and deaths suffered by U.S. nationals in the NAS Terrorist Attack.

343.   At all times relevant herein, Defendant Kingdom of Saudi Arabia acted through its officials or employees, who were acting within the scope of their office or employment.

344.   Saudi Arabia provided material support to the AQAP in violation of 18 U.S.C. § 2339A. It did so by providing weapons, funding and equipment to AQAP in Yemen. It further provided material support to AQAP by deliberately, recklessly or with a conscious disregard, failing to implement and/or execute security screening protocols and oversight of its RSAF candidates for training in the United States who were operatives and/or sympathizers of AQAP. In doing so, Saudi Arabia provided travel, transportation, training, safe haven, lodging, communications equipment and personnel to AQAP that was necessary to and reasonably related to the Attack

committed by RSAF 2nd Lt Al-Shamrani. Al-Shamrani and RSAF Does 1-12 further provided material support directly to AQAP by communicating with AQAP and using their positions within the Saudi Royal Air Force to facilitate the NAS Terrorist Attack.

345.   Saudi Arabia knew or recklessly disregarded that its material support would be used by AQAP in the preparation for, or in carrying out, the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, commission of acts of terrorism transcending national boundaries, attacking government facilities, financing terrorism, and receiving training from FTOs. Those acts by the AQAP, in turn, violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively. Saudi Arabia also disguised the nature of its support, in further violation of 18 U.S.C. § 2339A.

346.   Saudi Arabia's conduct, by providing material support to a group that was committing terrorist acts against Americans, involved violent acts and acts dangerous to human life. Saudi Arabia's conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a). Saudi Arabia' support for AQAP appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian

populations of the United States, (b) to influence the policy of the U.S. by intimidation and coercion, and (c) to affect the conduct of the U.S. government by mass destruction and assassination.

347.  Saudi Arabia's conduct transcended national boundaries in terms of the means by which it was accomplished.

348.  Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Saudi Arabia's conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Saudi Arabia's conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

349.  The aforesaid acts of Saudi Arabia were not mere negligence, but each act individually and/or in combination with one or more acts constituted conduct that was intentional, reckless, willful and/or grossly negligent and each of those acts individually and/or in combination with one or more of those acts was a proximate cause of the NAS Terrorist Attack and the resulting injuries and/or deaths of Plaintiffs' decedents.

350.  The NAS Terrorist Attack could not have occurred absent the knowing and substantial assistance provided to Al-Shamrani and AQAP by Saudi Arabia. Those attacks and resulting injuries and deaths were a natural, probable and reasonably foreseeable consequence of the Kingdom's conduct.

351.   Saudi Arabia is vicariously liable for the tortious conduct of 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 - 30, its employees/agents, who were acting within the scope of their agency/employment at the time of their conduct giving rise to this cause of action.

352.   Plaintiffs, the surviving family members of each decedent, the decedents and their Estates have suffered and will continue to suffer past and future damages as a result of the injuries and deaths sustained in the NAS Terrorist Attack, including but not limited to: personal injury damages, wrongful death damages, survival damages, economic damages, pecuniary loss, non-economic damages, pain and suffering, torture, imprisonment, kidnapping, fear of impending death, physical trauma, mental anguish, mental distress, grief, loss of enjoyment of life, loss of earnings, financial support, services, companionship, care, guidance, consortium, solatium, burial costs, medical and other expenses and other provable damages allowed by law.

**WHEREFORE**, Plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, wrongful death, all recoverable losses under 28 U.S.C. §1605B and 18 U.S.C. §2333 and other appropriate relief be entered on their third cause of action in favor of the Plaintiffs individually and as estate representatives and against Defendant Saudi Arabia, with separate awards for each plaintiff, where appropriate, plus interest, costs,

compensatory damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

## COUNT FOUR

### VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)
### [Primary Liability, 18 U.S.C. § 2339B Predicate]

#### All Plaintiffs

353.   Plaintiffs re-allege and incorporate by reference all of the preceding factual allegations as if set forth herein.

354.   This count is brought pursuant to 28 U.S.C. § 1605B of the Foreign Sovereign Immunities Act known as JASTA permitting claims under 18 U.S.C. § 2333(a) for the injuries and deaths suffered by U.S. nationals in the NAS Terrorist Attack.

355.   At all times relevant herein, Defendant Kingdom of Saudi Arabia acted through its officials or employees, who were acting within the scope of their office or employment.

356.   Saudi Arabia provided material support to AQAP in violation of 18 U.S.C. § 2339B. It did so by providing weapons, funding and equipment to AQAP in Yemen. It further provided material support to AQAP by purposefully, recklessly, or with a conscious disregard, failing to implement and/or execute security screening protocols and oversight of its RSAF candidates for training in the United States who were operatives or sympathizers of AQAP. In doing so, Saudi Arabia provided

travel, transportation, training, safe haven, lodging, communications equipment and personnel to AQAP that was necessary to and reasonably related to the Attack committed by RSAF 2nd Lt Al-Shamrani. All of which likewise qualified as material support. Saudi Arabia further disguised the nature of its support, in further violation of 18 U.S.C. § 2339B. Al-Shamrani and RSAF Does 1-12 further provided material support directly to AQAP by communicating with AQAP and using their positions within the Saudi Royal Air Force to facilitate the NAS Terrorist Attack.

357.   The United States has designated AQAP as an FTO under 8 U.S.C. § 1189 since January 19, 2010. At all times since that designation, Saudi Arabia knew or recklessly disregarded that the AQAP was a designated FTO and/or that AQAP had engaged in acts of terrorism against the United States.

358.   Saudi Arabia's conduct, by providing material support to a designated FTO, involved violent acts and acts dangerous to human life. Saudi Arabia's conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a). Saudi Arabia's conduct appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations the United States, (b) to influence the policy of the U.S., by intimidation and coercion, and (c) to affect the conduct of the U.S. by mass destruction and assassination.

359.   Saudi Arabia's conduct transcended national boundaries in terms of the means by which it was accomplished.

360.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Saudi Arabia's conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Saudi Arabia's conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

361.   The aforesaid acts of Saudi Arabia were not mere negligence, but each act individually and/or in combination with one or more acts constituted conduct that was intentional, reckless, willful and/or grossly negligent and each of those acts individually and/or in combination with one or more of those acts was a proximate cause of the NAS Terrorist Attack and the resulting injuries and/or deaths of Plaintiffs' decedents.

362.   The NAS Terrorist Attack could not have occurred absent the knowing and substantial assistance provided to Al-Shamrani and AQAP by Saudi Arabia. Those attacks and resulting injuries and deaths were a natural, probable and reasonably foreseeable consequence of the Kingdom's conduct.

363.   Saudi Arabia is vicariously liable for the tortious conduct of 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 - 30, its employees/agents, who were acting within the scope of their agency/employment at the time of their conduct giving rise to this cause of action.

364. Plaintiffs, the surviving family members of each decedent, the decedents and their Estates have suffered and will continue to suffer past and future damages as a result of the injuries and deaths sustained in the NAS Terrorist Attack, including but not limited to: personal injury damages, wrongful death damages, survival damages, economic damages, pecuniary loss, non-economic damages, pain and suffering, torture, imprisonment, kidnapping, fear of impending death, physical trauma, mental anguish, mental distress, grief, loss of enjoyment of life, loss of earnings, financial support, services, companionship, care, guidance, consortium, solatium, burial costs, medical and other expenses and other provable damages allowed by law.

**WHEREFORE**, Plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, wrongful death, all recoverable losses under 28 U.S.C. §1605B and 18 U.S.C. §2333 and other appropriate relief be entered on their fourth cause of action in favor of the Plaintiffs individually and as estate representatives and against Defendant Saudi Arabia, with separate awards for each Plaintiff, where appropriate, plus interest, costs, compensatory damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

## COUNT FIVE

## VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)
### [Primary Liability, 18 U.S.C. § 2339C Predicate]

### All Plaintiffs

365.   Plaintiffs re-allege and incorporate by reference all of the preceding factual allegations as if set forth herein.

366.   This count is brought pursuant to 28 U.S.C. § 1605B of the Foreign Sovereign Immunities Act known as JASTA permitting claims under 18 U.S.C. § 2333(a) for the injuries and deaths suffered by U.S. nationals in the NAS Terrorist Attack.

367.   At all times relevant herein, Defendant Kingdom of Saudi Arabia acted through its officials or employees, who were acting within the scope of their office or employment.

368.   Saudi Arabia, by providing funding to AQAP that financed the AQAP's terrorist activities, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(A). Saudi Arabia knew or recklessly disregarded that AQAP would use those funds in full or in part to carry out acts constituting an offense within the scope of the International Convention for the Suppression of Terrorist Bombings, as implemented by the United States at 18 U.S.C. § 2332f, including by delivering, placing, discharging, or detonating

90

explosives or other lethal devices in, into, or against places of public use and government facilities, with the intent to cause death or serious bodily injury.

369.   Saudi Arabia, by making payments to AQAP that financed the AQAP's terrorist activities, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(B). Saudi Arabia knew or recklessly disregarded that AQAP would use those funds in full or in part to carry out acts intended to cause death or serious bodily injury to civilians and/or others not taking an active part in the hostilities in a situation of armed conflict, and that the AQAP's purpose was to intimidate the U.S. population and to compel the U.S. governments to change its policies in the Middle East and abroad.

370.   Saudi Arabia's provision of funds to AQAP involved violent acts and acts dangerous to human life. Saudi Arabia's conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a). Saudi Arabia's support for AQAP appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian population of the United States, (b) to influence the policy of the U.S. by intimidation and coercion, and (c) to affect the conduct of the U.S by mass destruction and assassination.

371.   Saudi Arabia's conduct transcended national boundaries in terms of the means by which it was accomplished.

372.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Saudi Arabia's conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Saudi Arabia's conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

373.   The aforesaid acts of Saudi Arabia were not mere negligence, but each act individually and/or in combination with one or more acts constituted conduct that was intentional, reckless, willful and/or grossly negligent and each of those acts individually and/or in combination with one or more of those acts was a proximate cause of the NAS Terrorist Attack and the resulting injuries and/or deaths of Plaintiffs' decedents.

374.   The NAS Terrorist Attack could not have occurred absent the knowing and substantial assistance provided to Al-Shamrani and AQAP by Saudi Arabia. Those attacks and resulting injuries and deaths were a natural, probable and reasonably foreseeable consequence of the Kingdom's conduct.

375.   Saudi Arabia is vicariously liable for the tortious conduct of 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 - 30, its employees/agents, who were acting within the scope of their agency/employment at the time of their conduct giving rise to this cause of action.

376.  Plaintiffs, the surviving family members of each decedent, the decedents and their Estates have suffered and will continue to suffer past and future damages as a result of the injuries and deaths sustained in the NAS Terrorist Attack, including but not limited to: personal injury damages, wrongful death damages, survival damages, economic damages, pecuniary loss, non-economic damages, pain and suffering, torture, imprisonment, kidnapping, fear of impending death, physical trauma, mental anguish, mental distress, grief, loss of enjoyment of life, loss of earnings, financial support, services, companionship, care, guidance, consortium, solatium, burial costs, medical and other expenses and other provable damages allowed by law.

**WHEREFORE**, Plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, wrongful death, all recoverable losses under 28 U.S.C. §1605B and 18 U.S.C. §2333 and other appropriate relief be entered on their fifth cause of action in favor of the Plaintiffs individually and as estate representatives and against Defendant Saudi Arabia, with separate awards for each Plaintiff, where appropriate, plus interest, costs, compensatory damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

## COUNT SIX

## VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
### [Aiding-And-Abetting Liability, Attack Predicate]

### All Plaintiffs

377. Plaintiffs re-allege and incorporate by reference all of the preceding factual allegations as if set forth herein.

378. At all times relevant herein, Defendant Kingdom of Saudi Arabia acted through its officials or employees, who were acting within the scope of their office or employment.

379. The terrorist attacks that killed or injured Plaintiffs or their family members were acts of international terrorism committed by RSAF 2nd Lt Al-Shamrani, a member of AQAP.

380. The terrorist attack committed by AQAP, which killed or injured Plaintiffs and their family members, was a violent act and an act dangerous to human life that violated the criminal laws of the United States and many States, including Florida where the attack occurred. In particular, the attack constituted acts of murder, attempted murder, assault, battery, false imprisonment, the destruction of U.S. property by fire or explosive, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, commission of acts of terrorism transcending national boundaries, and bombing

places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332b, and 2332f, respectively.

381.   AQAP's terrorist attack appears to have been intended (a) to intimidate or coerce the civilian populations of the United States, (b) to influence the policy of the U.S. by intimidation and coercion, and (c) to affect the conduct of the U.S. government by mass destruction and assassination.

382.   This terrorist attack occurred inside the territorial jurisdiction of the United States.

383.   Saudi Arabia aided and abetted and knowingly provided substantial assistance to AQAP – and aided and abetted and knowingly provided substantial assistance to AQAP's attack on Plaintiffs – by providing weapons, funding and equipment to AQAP in Yemen, and by permitting AQAP operatives to bypass the security screening protocol of its RSAF candidates for training in the United States, which included 2nd Lt Al-Shamrani and RSAF John Does 1 - 12. In doing so, Saudi Arabia knowingly provided travel, transportation, safe haven, lodging, communications equipment and personnel to AQAP that was necessary to and reasonably related to the attack committed by RSAF 2nd Lt Al-Shamrani.

384.   The nature of Saudi Arabia's conduct, and the acts it encouraged, is extreme and outrageous such that it demonstrates either the specific intent to commit terrorism, or the reckless indifference to the harm and severe physical and emotional

distress suffered by the victims of terrorism, planned, authorized or committed by AQAP. Saudi Arabia, Al-Shamrani and RSAF John Does 1 - 12 took purposeful and concerted steps to deny, conceal, and mask their role in aiding and abetting AQAP. In the process, Saudi Arabia knowingly violated U.S. and Saudi laws, the terms and conditions of the FMS LOAs, U.S and Saudi military codes of conduct, and the rules and regulations of IMS training programs. Specifically, Defendant's conduct permitted AQAP to infiltrate its military, transport an operative to the United States, allowed that operative time to plan and routinely communicate with AQAP leadership, and ultimately commit AQAP's first deadly act of terrorism directed at U.S. service members and civilians on U.S. soil. The fact that Saudi Arabia feigns sorrow, makes empty promises, and ignores Plaintiffs to this day, further elucidates the deplorable nature of its substantial assistance to AQAP that resulted in the NAS Terrorist Attack.

385.   The amount of assistance and material support Saudi Arabia provided to AQAP was significant, and permitted Al-Shamrani to use his employment with the RSAF to gain deadly skills and access. Defendant's substantial material support to AQAP was not only substantial because of what it did for AQAP, but also substantial because of what it did not do, but that it was required to do in relation to implementing screening protocols and providing oversight of its RSAF students in the United States.

386.   The assistance the Saudi Arabia provided AQAP was substantial and essential to the commission of the attack. Without Al-Shamrani's employment within the RSAF, he would never have been at NAS Pensacola. Saudi Arabia provided AQAP access to the United States and a secure military base, and allowed it to circumvent screening protocols designed to protect against the very type of infiltration and attack that occurred. Saudi Arabia did all of this while under the obligation to do the opposite.  Moreover, the material support that Saudi Arabia provides to AQAP in Yemen, permitted it safe have and sanctuary from which AQAP leadership could communicate, instruct and inspire Al-Shamrani, and after the attack, from where AQAP leadership was able to safely claim responsibility, exult Al-Shamrani as their "knight" and a "martyr," and capitalize on the attack as a media and recruitment tool.

387.   Saudi Arabia was present at the scene of the attack. Not only through its flight officer 2nd Lt Al-Shamrani, but also by and through its RSAF training candidates who were on scene observing and filming the attack, and who accompanied Al-Shamrani, but failed to report him,  throughout the three-month-long  "countdown" phase while he was preparing for the attack. Moreover, the purposeful absence of the CLO from the scene of the attack and his empty post at NAS in the months leading up to the attack also contributed to the ability of Al-Shamrani to successfully execute his plan.

388.   Saudi Arabia has an extensive relationship with AQAP. It has allowed AQAP financiers to work freely within its borders. Permitted its citizens, whom it monitors closely, to flock to its ranks. Provided weapons, money and material support to the group's leadership and command in Yemen. Granted access to state-funded television and media to its prominent members. Promoted and proselytized the foundational tenets of its extreme beliefs. Encourage its core values in state-funded schools. And tolerated the adoption and adherence to its principles amongst its military service members, and others throughout the Saudi state apparatus.

389.   Saudi Arabia knew that AQAP was an FTO and was so designated for committing the same types of acts that caused the injuries to the Plaintiffs in this case. Saudi Arabia knew that Al-Shamrani was a member of AQAP and had radicalized before coming to the United States. Saudi Arabia knew of the prohibitions against providing material support to terrorist, and knew of the dangers that these individuals/entities represented as a result of their connections to terrorism. Despite this knowledge, Saudi Arabia agreed to provide AQAP with material support. Saudi Arabia knew the reason that security screening protocols were implemented, and knew that Insider Threat attacks were foreseeable risk, but failed to implement screening protocols anyway.   Saudi Arabia acted knowingly or with deliberate indifference to the fact that its substantial assistance would be used

to provide material support to AQAP and were deliberately indifferent to the irreparable harm that it would cause American service members and civilians.

390.   The terrorist attacks that killed or injured Plaintiffs and their family members were committed, planned, and/or authorized by AQAP, which the United States has designated as an FTO under 8 U.S.C. § 1189 since 2010.

391.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attack committed by the AQAP. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

392.   The aforesaid acts of Saudi Arabia were not mere negligence, but each act individually and/or in combination with one or more acts constituted conduct that was intentional, reckless, willful and/or grossly negligent and each of those acts individually and/or in combination with one or more of those acts was a proximate cause of the NAS Terrorist Attack and the resulting injuries and/or deaths of Plaintiffs' decedents.

393.   The NAS Terrorist Attack could not have occurred absent the knowing and substantial assistance provided to Al-Shamrani and AQAP by Saudi Arabia. Those attacks and resulting injuries and deaths were a natural, probable and reasonably foreseeable consequence of the Kingdom's conduct.

394.   Saudi Arabia is vicariously liable for the tortious conduct of 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 - 30, its employees/agents, who were acting within the scope of their agency/employment at the time of their conduct giving rise to this cause of action.

395.   Plaintiffs, the surviving family members of each decedent, the decedents and their Estates have suffered and will continue to suffer past and future damages as a result of the injuries and deaths sustained in the NAS Terrorist Attack, including but not limited to: personal injury damages, wrongful death damages, survival damages, economic damages, pecuniary loss, non-economic damages, pain and suffering, torture, imprisonment, kidnapping, fear of impending death, physical trauma, mental anguish, mental distress, grief, loss of enjoyment of life, loss of earnings, financial support, services, companionship, care, guidance, consortium, solatium, burial costs, medical and other expenses and other provable damages allowed by law.

**WHEREFORE**, Plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, wrongful death, all recoverable losses under 28 U.S.C. §1605B and 18 U.S.C. §2333 and other appropriate relief be entered on their sixth cause of action in favor of the Plaintiffs individually and as estate representatives and against Defendant Saudi Arabia, with separate awards for each Plaintiff, where appropriate, plus interest, costs,

compensatory damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

## COUNT SEVEN

### LOSS OF SOLATIUM

**(Benjamin Watson, Jr.; Sheila Wilemon Watson; Shane Walters; Amanda Walters; Dustin Walters; Mason Walters; L.N.W.; S.L.W.; Sameh Haitham; Evelyn Brady; S.S.H.; S.S.H. II; Shadin Haitham; John Robert Brady; Irvin Lawrence, Jr.; Carly Blackwell; Curtis Pickett; Jessica Tinch; Joy Glass; Heather Lopez; and Krystena Keebler)**

396. Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs as if set forth herein.

397. At all times relevant herein, Defendant Kingdom of Saudi Arabia acted through its officials or employees, who were acting within the scope of their office or employment.

398. The family member Plaintiffs of the primary-injured Plaintiffs in this Action, Benjamin Watson, Jr., Sheila Wilemon Watson, Shane Walters, Amanda Walters, Dustin Walters, Mason Walters, S.L.W., L.N.W., Sameh Haitham, Evelyn Brady, John Robert Brady, Irvin Lawrence, Jr., S.S.H., S.S.H. II, Shadin Haitham, Curtis Pickett; Jessica Tinch; Joy Glass; Matthew Housam; Heather Lopez; and Krystena Keebler bring this count and cause of action for loss of solatium.

399. The family member Plaintiffs were closely related to, and share strong bonds, love and affection with the primary-injured Plaintiffs.

400.    Saudi Arabia's reckless and intentional conduct in providing material support for acts of international terrorism resulting in extrajudicial killings and severe injuries caused severe emotional distress upon the families of the primary-injured Plaintiffs, and will result in future prolonged suffering and heartbreak.

401.    Saudi Arabia is vicariously liable for the tortious conduct of 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 -30, its employees/agents, who were acting within the scope of their agency/employment at the time of their conduct giving rise to this cause of action.

402.    As a direct and proximate result of Saudi Arabia's reckless and intentional acts resulting in acts of international terrorism and extrajudicial killings, Benjamin Watson, Jr., Sheila Wilemon Watson, Shane Walters, Amanda Walters, Dustin Walters, Mason Walters, S.L.W., L.N.W., Sameh Haitham, Evelyn Brady, John Robert Brady, Irvin Lawrence, Jr., S.S.H., S.S.H. II, Shadin Haitham, Curtis Pickett; Jessica Tinch; Joy Glass; Carly Blackwell; Heather Lopez; and Krystena Keebler have suffered loss of solatium, severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, and other severe mental and physical manifestations, as well as other harms.

**WHEREFORE**, Plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, wrongful death, all recoverable losses under 28 U.S.C. §1605B and 18 U.S.C. §2333 and other

appropriate relief be entered on their seventh cause of action in favor of the Plaintiffs individually and as estate representatives and against Defendant Saudi Arabia, with separate awards for each Plaintiff, where appropriate, plus interest, costs, compensatory damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

## COUNT EIGHT

### ASSAULT

**(Plaintiffs George Johnson, Breanna Thomas, Ryan Blackwell, Kristy Lehmer, Jessica Pickett, Charles Hogue, Matthew Tinch, Johnathan Glass, Matthew Housam, Michael Hoyland, Thomas C. Bortner, Grant Lopez, and Matthew Keebler)**

403.   Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs as if set forth herein.

404.   At all times relevant herein, Defendant Kingdom of Saudi Arabia acted through its officials or employees, who were acting within the scope of their office or employment.

405.   Al-Shamrani intentionally and knowingly committed, attempted, and/or threatened to commit wrongful acts, including carrying and brandishing a firearm, pointing the firearm at Plaintiffs, yelling and threatening to commit bodily harm, and/or in fact shooting his firearm repeatedly at or near Plaintiffs.

406.   Al-Shamrani caused Plaintiffs to imminently fear and/or apprehend such harmful, offensive and/or unlawful contact.

407.   Al-Shamrani acted with the intent to threaten and harm, and did actually threaten and harm Plaintiffs.

408.   Plaintiffs did not consent to such conduct, which caused injury, damage, loss, and harm to Plaintiffs.

409.   Defendant Saudi Arabia, 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 – 30 acted in concert and aided and abetted each other by encouraging the attack which injured Plaintiffs, and substantially assisted one another in the planning, support and commission the attack during which Plaintiffs were assaulted.

410.   Saudi Arabia is vicariously liable for the tortious conduct of 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 - 30, its employees/agents, who were acting within the scope of their agency/employment at the time of their conduct giving rise to this cause of action.

**WHEREFORE**, Plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, all recoverable losses under 28 U.S.C. §1605 and 18 U.S.C. §2333 and other appropriate relief be entered on their eighth cause of action in favor of the Plaintiffs individually against Defendant Saudi Arabia, with separate awards for each Plaintiff, where appropriate, plus interest, costs, compensatory damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper

## COUNT NINE

### BATTERY

**(Plaintiffs George Johnson, Breanna Thomas, Ryan Blackwell, Kristy Lehmer, Jessica Pickett, Charles Hogue, Matthew Tinch, Johnathan Glass, Matthew Housam, Michael Hoyland, Thomas C. Bortner, Grant Lopez, and Matthew Keebler)**

411. At all times relevant herein, Defendant Kingdom of Saudi Arabia acted through its officials or employees, who were acting within the scope of their office or employment.

412. Al-Shamrani intentionally and knowingly committed wrongful acts which resulted in harmful or offensive contact with the bodies of Plaintiffs.

413. Plaintiffs did not consent to the contact.

414. Al-Shamrani acted with the intent to cause injury and actually did cause injury, damage, loss and harm to Plaintiffs, including as a result of the following:

   a. Plaintiff George Johnson was shot seven times during the attack.

   b. Plaintiff Breanna Thomas was shot once during the attack.

   c. Plaintiff Ryan Blackwell was shot six times during the attack.

   d. Plaintiff Kristy Lehmer was shot once during the attack.

   e. Plaintiff Jessica Pickett was shot nine times during the attack.

   f. Plaintiff Charles Hogue was shot once during the attack.

   g. Plaintiff Matthew Tinch was shot once during the attack.

h.   Plaintiff Jonathan Glass was shot once during the attack.

i.   Plaintiff Matthew Housam was shot at multiple times and was struck by concussive forces, flying glass and debris.

j.   Plaintiff Michael Hoyland was shot at multiple times and was struck by concussive forces, flying glass and debris.

k.   Plaintiff Thomas C. Bortner was shot at multiple times and was struck by concussive forces, flying glass and debris.

l.   Plaintiff Grant Lopez was shot at multiple times and was struck by concussive forces, flying glass and debris.

m.   Plaintiff Matthew Keebler was shot at multiple times and was struck by concussive forces, flying glass and debris.

415.   Defendant Saudi Arabia, Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 – 30 acted in concert and aided and abetted each other by encouraging the attack which injured Plaintiffs, and substantially assisted one another in the planning, support and commission of the attack during which Plaintiffs were battered.

416.   Saudi Arabia is vicariously liable for the tortious conduct of 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 -30, its employees/agents, who were acting within the scope of their agency/employment at the time of their conduct giving rise to this cause of action

**WHEREFORE**, Plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, all recoverable losses under 28 U.S.C. §1605 and 18 U.S.C. §2333 and other appropriate relief be entered

on their ninth cause of action in favor of the Plaintiffs individually against
Defendant Saudi Arabia, with separate awards for each Plaintiff, where
appropriate, plus interest, costs, compensatory damages, treble damages, attorney's
fees, and such other relief as the Court deems just and proper.

## COUNT TEN

## FALSE IMPRISONMENT

**(Plaintiffs George Johnson, Breanna Thomas, Ryan Blackwell, Kristy
Lehmer, Jessica Pickett, Charles Hogue, Matthew Tinch, Johnathan Glass,
Thomas C. Bortner, Grant Lopez)**

417.   Plaintiffs re-allege and incorporate by reference all of the preceding
paragraphs as if set forth herein.

418.   At all times relevant herein, Defendant Saudi Arabia acted through its
officials or employees who were acting within the scope of their office or
employment.

419.   Saudi Arabia arbitrarily, detained, restrained and/or falsely imprisoned
Plaintiffs within boundaries fixed by the Defendant's employee Al-Shamrani. Such
detention, restraint and/or false imprisonment was unreasonable, illegal and unjust,
and carried out without any lawful authority or justification under the circumstances.

420.   Plaintiff George Johnson was placed in fear for his safety, deprived of
his liberty, and reasonably believed he was detained against his will by an employee
or official of Saudi Arabia when he was unable to leave after the door to the IMET

office was closed and locked upon hearing the initial gun shots to keep Al-Shamrani from making entry.

421.   Plaintiff Breanna Thomas was placed in fear for her safety, deprived of her liberty, and reasonably believed she was detained against her will by an employee or official of Saudi Arabia when she was unable to leave after the door to the IMET office was closed and locked upon hearing the initial gun shots to keep Al-Shamrani from making entry.

422.   Plaintiff Ryan Blackwell was placed in fear for his safety, deprived of his liberty, and reasonably believed he was detained against his will by an employee or official of Saudi Arabia when he was unable to leave after the door to the IMET office was closed and locked upon hearing the initial gun shots to keep Al-Shamrani from making entry.

423.   Plaintiff Kristy Lehmer was placed in fear for his safety, deprived of her liberty, and reasonably believed she was detained against her will by an employee or official of Saudi Arabia when she was shot leaving an upstairs classroom and was forced back inside to take cover and avoid being shot again by Al-Shamrani.

424.   Plaintiff Jessica Pickett was placed in fear for her safety, deprived of her liberty, and reasonably believed she was detained against her will by an employee or official of Saudi Arabia when she was forced to hide under her desk in

an attempt to avoid detection by Al-Shamrani as he went about his shooting rampage.

425.  Plaintiff Charles Hogue was placed in fear for his safety, deprived of his liberty, and reasonably believed he was detained against his will by an employee or official of Saudi Arabia when he was shot in the main entrance hallway of the building and was unable to safely get away due to his injuries.

426.  Plaintiff Matthew Tinch was placed in fear for his safety, deprived of his liberty, and reasonably believed he was detained against his will by an employee or official of Saudi Arabia when he was shot in the knee and forced to take cover in an office near where he was hit to avoid being shot by Al-Shamrani a second time.

427.  Plaintiff Jonathan Glass was placed in fear for his safety, deprived of his liberty, and reasonably believed he was detained against his will by an employee or official of Saudi Arabia when he was forced to take cover in the bathroom of the main hallway after being shot in the arm and unable to safely exit the building to safety.

428.  Plaintiff Thomas C. Bortner was placed in fear for his safety, deprived of his liberty, and reasonably believed he was detained against his will by an employee or official of Saudi Arabia when he was forced to take cover inside an office with Deputy Tinch and Jessica Pickett who were wounded to avoid Al-Shamrani.

429.   Plaintiff Grant Lopez was placed in fear for his safety, deprived of his liberty, and reasonably believed he was detained against his will by an employee or official of Saudi Arabia when he was forced to take cover in an office under the stairway after his gun jammed and he was unable to safely exit the building to avoid being shot by Al-Shamrani.

430.   Due to the barrage of gun fire, threats from Al-Shamrani, and disabling injuries, Plaintiffs had no reasonable means of escape and/or were not aware of any reasonable means of escape.

431.   Al-Shamrani purposefully used his knowledge of Building 633 to foreclose any escape and prevent his victims from retreating to or accessing any exit.

432.   Plaintiffs did not consent to being restrained, detained, or prevented from escaping Building 633, and therefore such restraint and detention was against their will.

433.   Al-Shamrani's intentional restraint of Plaintiffs was unreasonable and unwarranted under the circumstances, and caused and/or substantially contributed to Plaintiffs' injuries, damages, losses, and harm.

434.   Defendant Saudi Arabia, Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 – 30 acted in concert and aided and abetted each other by encouraging the attack which injured Plaintiffs, and substantially

assisted one another in the planning, support and commission of the attack during which Plaintiffs were falsely imprisoned.

435.   Saudi Arabia is vicariously liable for the tortious conduct of 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 -30, its employees/agents, who were acting within the scope of their agency/employment at the time of their conduct giving rise to this cause of action

**WHEREFORE**, Plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, all recoverable losses under 28 U.S.C. §1605 and 18 U.S.C. §2333 and other appropriate relief be entered on their tenth cause of action in favor of the Plaintiffs individually against Defendant Saudi Arabia, with separate awards for each Plaintiff, where appropriate, plus interest, costs, compensatory damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

## COUNT ELEVEN

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**(Plaintiffs George Johnson, Breanna Thomas, Ryan Blackwell, Kristy Lehmer, Jessica Pickett, Charles Hogue, Matthew Tinch, Johnathan Glass, Matthew Housam, Michael Hoyland, Thomas C. Bortner, Grant Lopez, and Matthew Keebler)**

436.   Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs as if set forth herein.

111

437.   At all times relevant herein, Defendant Saudi Arabia acted through its officials or employees who were acting within the scope of their office or employment.

438.   Al-Shamrani intentionally caused severe emotional distress to Plaintiffs by his willful, wanton, extreme, and outrageous conduct, including but not limited to threatening Plaintiffs with physical harm at the scene of the attack and physically attacking Plaintiffs by shooting hundreds of rounds in rapid succession at and into Plaintiffs. While doing so, Al-Shamrani was yelling "Allahu Akbar!" and making terroristic threats and gestures at his victims.

439.   Al-Shamrani recklessly caused severe emotional distress to Plaintiffs by his willful, wanton, extreme and outrageous conduct, including but not limited to physically attacking Plaintiffs and threatening Plaintiffs with physical harm at the scene of the attack.

440.   The emotional distress experienced by Plaintiffs is of such intensity and duration that no ordinary person should be expected to endure it.

441.   Al-Shamrani's conduct went beyond all possible bounds of decency, and was so extreme and outrageous in character that a reasonable member of the community would regard such conduct as shocking, atrocious, and utterly intolerable in a civilized community.

442.   Plaintiffs' resulting severe emotional distress was a reasonably foreseeable consequence of Al-Shamrani's extreme and outrageous conduct and such conduct contributed substantially to producing Plaintiffs' emotional distress.

443.   As a direct and proximate result of the Defendants' extreme and outrageous conduct, Plaintiffs suffered severe emotional distress, and mental pain and anguish.

444.   Defendant Saudi Arabia, 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 – 30 acted in concert and aided and abetted each other by encouraging the attack which injured Plaintiffs, and substantially assisted one another in the planning, support and commission of the attack during which Plaintiffs were intentionally inflicted with emotional distress.

445.   Saudi Arabia is vicariously liable for the tortious conduct of 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 -30, its employees/agents, who were acting within the scope of their agency/employment at the time of their conduct giving rise to this cause of action

**WHEREFORE**, Plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, all recoverable losses under 28 U.S.C. §1605 and 18 U.S.C. §2333 and other appropriate relief be entered on their eleventh cause of action in favor of the Plaintiffs individually against Defendant Saudi Arabia, with separate awards for each Plaintiff, where appropriate,

plus interest, costs, compensatory damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

## COUNT TWELVE

**VIOLATION OF FLORIDA'S CIVIL HATE CRIME STATUTE**
**Florida Statutes § 775.085(2)**

**All Plaintiffs**

446.   Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs as if set forth herein.

447.   At all times relevant herein, Defendant Saudi Arabia acted through its officials or employees who were acting within the scope of their office or employment.

448.   Florida Statutes § 775.085(2) provides a private right of action for victims of hate crimes against their offenders. This encompasses crimes against persons the commission of which evidences prejudice based upon the victims' actual or perceived race, color, ancestry, ethnicity, religion, sexual orientation, national origin, homeless status or advanced age.

449.   As alleged herein, Plaintiffs incurred injuries as a result of Al-Shamrani's intentional acts committed as a result his of prejudice towards Plaintiffs' actual or perceived race, ancestry, ethnicity, religion and national origin.

114

450.   Defendant Saudi Arabia has acknowledged that in committing the attack Al-Shamrani was inspired by: (i) support for radical Islam and terrorism; (ii) hatred for America and the West; (iii) opposition to the existence of Israel; and (iv) sectarianism, among other things.

451.   Prior to the attack, Al-Shamrani posted anti-American comments and materials online and visited historical landmarks of infamous terrorist attacks on American soil.

452.   The day of the attack, Al-Shamrani publicly declared, "I hate you because every day you supporting, funding and committing crimes not only against Muslims but also humanity.  I am against evil, and America as a whole has turned into a nation of evil."

453.   During the attack, Al-Shamrani yelled anti-American statements, made pejorative references to American heritage, shot at and ripped up posters of American Presidents and politicians, and destroyed and desecrated U.S. government property.

454.   In doing so, Al-Shamrani was outwardly exhibiting much of the intolerant and extreme anti-American and anti-Western prejudices considered dogma in Defendant Saudi Arabia's state-sponsored religious ideology and nonsecular educational curricula to which he was exposed, and in which he was educated and groomed. Al-Shamrani's prejudicial persecutory conduct is the proximate cause of Plaintiffs' injuries and damages alleged herein.

455.   As a result of Al-Shamrani's conduct, Plaintiffs are entitled to treble damages for economic or non-economic losses, including damages for emotional distress, and reasonable attorneys' fees and costs.

456.   Defendant Saudi Arabia, 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 – 30 acted in concert and aided and abetted each other by encouraging the attack which injured Plaintiffs, and substantially assisted one another in the planning, support and commission of the attack during which Plaintiffs were attacked on the basis of their race, religion, ethnicity, nationality, and ancestry.

457.   Saudi Arabia is vicariously liable for the tortious conduct of 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 -30, its employees/agents, who were acting within the scope of their agency/employment at the time of their conduct giving rise to this cause of action

**WHEREFORE**, Plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, all recoverable losses under 28 U.S.C. §1605 and 18 U.S.C. §2333 and other appropriate relief be entered on their twelfth cause of action in favor of the Plaintiffs individually against Defendant Saudi Arabia, with separate awards for each Plaintiff, where appropriate, plus interest, costs, compensatory damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

## COUNT THIRTEEN

**FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES STATUTE TERRORISM OR FACILITATING TERRORISM**
**Florida Statutes § 772.13**

**All Plaintiffs**

458.   Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs as if set forth herein.

459.   At all times relevant herein, Defendant Saudi Arabia acted through its officials or employees who were acting within the scope of their office or employment.

460.   Florida Statutes § 772.13 provides a private right of action to any person injured by an act of terrorism or for a violation of the law for which the penalty is increased for facilitating or furthering terrorism.

461.   Plaintiffs were injured by an act of international terrorism as defined by Florida Statutes § 775.30, in that the NAS attack involved violent acts and acts dangerous to human life which were a violation of the criminal law of Florida and the United States, and were intended to intimidate, injure and coerce a civilian population; influence the policies of the United States by intimidation or coercion; and affect the conduct of the government of the United States through the destruction of property, assassination and murder.

117

462.   Al-Shamrani's conduct violated the following Florida Statutes, among others:

   a.   Fl. Stat. § 782.04(1)(a)(1) – Murder
   b.   Fl. Stat. § 782.065 – Attempted Murder of a Law Enforcement Officer
   c.   Fl. Stat. § 784.045 – Aggravated Battery
   d.   Fl. Stat. § - 784.07 – Assault or Battery on Law Enforcement Officer
   e.   Fl. Stat. § 787.02 - False Imprisonment
   f.   Fl. Stat. § 790.15 - Discharging a Firearm in Public
   g.   Fl. Stat. § 790.19 – Shooting in Buildings

463.   Al-Shamrani's conduct resulted in death and serious bodily injuries.

464.   The activities, in violation of Florida Stat. §§ 782.04(1)(a)(1); 782.065; 784.045;  784.07; 787.02; 790.15; 790.19, undertaken by Saudi Arabia, 2nd Lt. Al-Shamrani, RSAF John Does 1-12, KSA John Does 13-20, and KSA John Does 20-30,  show that they unlawfully, willfully and knowingly combined, confederated, conspired and agreed to participate, as principals or as aiders and abettors, in the commission of said violations.

465.   Pursuant to Fla. Stat. § 772.13, Plaintiffs are entitled to recover statutory damages, treble damages, attorney's fees and costs, incurred in this action,

**WHEREFORE**, by reason of the foregoing, Plaintiffs request that this Court enter a judgment for damages and treble damages against Defendants, jointly and severally, for payment of claims submitted by Defendants, and further enter an order granting Plaintiffs' minimum fines, interest, attorney's fees, costs, incidental expenses and any additional damages this Court deems just.

## COUNT FOURTEEN

## NEGLIGENCE & GROSS NEGLIGENCE

### All Plaintiffs

466.   Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs as if set forth herein.

467.   At all times relevant herein, Defendant Saudi Arabia acted through its officials or employees who were acting within the scope of their office or employment.

468.   Insider Threats and "Blue on Blue" terrorist attacks are the precise danger that can occur if safety and security screening measures are not properly implemented or recklessly or willfully ignored.

469.   Infiltrating military and security units, assuming the uniform of security forces or police, and conducting "lone wolf" attacks against the United States and Western targets are the precise tactics, techniques, and procedures that AQAP propagated and urged its associates to carry out – and celebrated when successfully employed.

470.   Saudi Arabia knew that insider threats within military units and at military bases was a significant security risk posed by AQ/AQAP loyalists within its military; and understood the purpose of screening its candidates was to ensure safety

119

and prevent the very type of terrorist attack that occurred on December 6, 2019 at NAS Pensacola.

471.   Saudi Arabia was in the best position to properly screen, monitor and prevent Al-Shamrani from gaining access to the United States and conducting the attack, and the United States relied upon Saudi Arabia to properly screen its personnel before nominating them for training in the United States.

472.   Saudi Arabia had a duty of reasonable care in ensuring its candidates did not pose a security threat to the United Sates, and that security screening protocols for students selected for training in the United States were properly implemented.

473.   Saudi Arabia had a duty of reasonable care in ensuring its training candidates were properly screened for security threats, properly trained to recognize and report security threats, routinely monitored, and sufficiently supervised.

474.   Saudi Arabia had a duty, and was required, to ensure its personnel in the United States complied the protocols, rules, regulations, codes of conduct and standards of the U.S. Department of State, U.S. Department of Defense, the RSAF, and the command-specific programs in which they participated, including the SCETP, FMS, and IMET.

475.   Saudi Arabia knew, or by the exercise of reasonable care should have known, of the following:

i.      Prior to joining the RSAF, Al-Shamrani had been exposed to and was an adherent to radical Islamic ideology that promoting extremist views, violent jihad, and a belief that nonbelievers deserve to die, especially Americans;

ii.     Prior to joining the RSAF, Al-Shamrani was a follower of al-Qaeda and AQAP clerics and other extremist ideologues;

iii.    Al-Shamrani fit the age, demographic and psychological profile for an ideal AQAP recruit;

iv.     The risks and dangers posed to the United States by AQAP, a group that it supports and works with hand-in-glove in Yemen;

v.      That AQAP would use material support it received to commit terrorism against the United States;

vi.     That AQAP intended to, or previously, infiltrated the RSAF, for the purpose of committing terrorism;

vii.    The risks and dangers posed by improper, insufficient or nonexistent screening of RSAF recruits;

viii.   The risks and dangers posed by improper, insufficient or nonexistent screening of RSAF candidates for training in the United States;

ix.     The risks and dangers posed by insufficient staffing of CLO and Deputy CLO positions at NAS Pensacola resulting in little to no direct oversight of RSAF personnel on base;

x.      That Al-Shamrani was using his public social media pages to post and share extremist content, prior to the attacks;

xi.     That Al-Shamrani and Does 2-12 took unapproved leave to travel to New York to visit the 9/11 memorial, prior to the attack;

xii.    That Al-Shamrani purchased a firearm and hundreds of rounds of ammunition, stored the firearm and ammunition in the RSAF barracks, and carried the firearm and munition onto a restricted

military base, in contravention of applicable rules, codes of conduct, and regulations, prior to the attack;

xiii.   That Al-Shamrani was sharing and showing mass shooting video content to his fellow RSAF colleagues prior to the attack;

476.   Saudi Arabia intentionally, deliberately and recklessly breached its duty by failing to exercise reasonable care. Such failures by Saudi Arabia and KSA John Does 13 - 30 include but are not limited to:

i.   Failure to implement screening protocols and properly screen and actively monitor 2nd Lt. Al-Shamrani when he joined the RSAF and as he progressed through its ranks;

ii.   Failure to implement screening protocols and properly screen Al-Shamrani when nominating him for flight training in the United States pursuant to the FMS and BOTS agreements between the United States and Saudi Arabia;

iii.   Failure to investigate and screen Al-Shamrani's social media, phone, and email accounts prior to nominating him for FMS/BOTS training through the IMET Program in the United States;

iv.   Failure to subject their units or personnel to psychological and behavioral tests to determine ideological inclinations, anxieties, and social/family issues prior their nomination for training in the United States;

v.   Failure to timely and adequately submit security application for Al-Shamrani in advance of travel to the United States;

vi.   Failure to adequately investigate, collect, track, store, manage, update and share data critical to the security screening of its RSAF candidates for training in the United States;

vii.     Failure to adequately assign responsibility for Al-Shamrani's nomination for FMS/BOTS training to his immediate commanders in RSAF with personal knowledge of Al-Shamrani;

viii.    Failure to provide or require guidance or training to RSAF personnel selected for FMS/BOTS training in the United State on security, religious, ideological, and cultural awareness;

ix.      Failure to continually monitor its FMS/BOT/IMET training personnel in the United States, or act on information it was aware of from such monitoring if done;

x.       Failure to ensure its supervisory officers (i.e., CLOs) submitted monthly reports on its RSAF students to include any discipline, behavioral, security, or ideological issues of a derogatory nature;

xi.      Failure to ensure sufficient supervisory manning to carry out the required tasking pursuant to IMET, FMS and BOTS requirements;

xii.     Failure to set, train, implement, follow, enforce and comply with performance standards and expectations for RSAF personnel while in the United States;

xiii.    Failure to comply with the requirements of the Defense Security Cooperation Agency (DSCA) Security Assistance Management Manual related to CLO support duties and standards;

xiv.     Failure to set, train, implement, follow, enforce and comply with standards related to the purchasing, transporting, and storing firearms by RSAF personnel in the United States;

xv.      Failure to instruct, train, implement, follow and enforce standards on reporting Insider Threats by RSAF personnel while in the United States, and failing to report and act upon any such

indications of an Insider Threat were demonstrated by Al-Shamrani prior to the attack;

xvi.      Failure to report and act upon instances of unauthorized travel by IMET and RSAF personnel, including 2nd Lt. Al-Shamrani, within the United States;

xvii.     Failure to conduct periodic or routine visits to its units in the United States to ensure compliance with regulations and standards;

xviii.     Failure to ensure that RSAF supervisory personnel were of sufficient rank and grade to match the expectations and requirements of overseeing RSAF personnel in the United States;

xix.     Failure to adequately track, record and report upon training progress, security, behavior, ideology, and psychological aspects of RSAF students in the United States;

xx.     Failure to implement and enforce its code of conduct with respect to RSAF students in the United States;

xxi.     Failure to adequately monitor and track psychological and ideological behavior of RSAF students in the United States, and prior to nomination for training pursuant to FMS/BOTS and IMET programs;

xxii.     Failure to audit, update and enhance their screening procedures for units and personnel nominated for training in the United States as its knowledge of known threats, including Insider Threats and "Green on Blue" styled attacks, evolved over time and prior to the NAS attack.

477.   A reasonable actor in the same or similar position as Saudi Arabia would have properly implemented screening protocols, sufficiently screened its

personnel nominated for FMS/IMET training, continually screened its personnel while they were in United States, and provided sufficient oversight of its security screening process.

478.  Saudi Arabia was required and had a duty, to properly implement and ensure CLO performance standards and provide continuity of leadership to its RSAF students in the United States. Saudi Arabia intentionally, deliberately and recklessly failed to meet this requirement, and thereby breached its duty to do so. Such failures by Saudi Arabia and the RSAF John Doe No. 1 include but are not limited to:

> i.    Failure to regularly attend meetings involving his RSAF students;
>
> ii.   Failure to submit routine reports on RSAF students regarding discipline, behavior, security or ideological issues of a derogatory nature;
>
> iii.  Failure to report changes in behavior and inclinations of RSAF students;
>
> iv.   Failure to maintain contact with IMS students and offices;
>
> v.    Failure to monitor RSAF students;
>
> vi.   Failure to implement continuous CLO review of RSAF students;
>
> vii.  Failure to inspect RSAF students and their assigned quarters;
>
> viii. Failure to maintain presence at his assigned post;
>
> ix.   Failure to ensure that RSAF students adhered to DON, DoD, and IMET regulations;
>
> x.    Failure to make routine administrative reports as required by Saudi Arabia;

xi.       Failure to properly inform commanders of absences from their post or at administrative and faculty meetings;

xii.      Failure to provide formal CLO standards of performance and actionable options for low performance;

xiii.     Failure to relieve CLOs for poor performance or absence;

xiv.      Failure to ensure CLO accountability;

xv.       Failure to formally report issues with RSAF John Doe No. 1's lack of presence availability and engagement;

xvi.      Failure to report deterioration of RSAF student good order and discipline in the absence of the RSAF John Doe No. 1;

xvii.     Failure to report and address unauthorized and irregular absences of the RSAF CLO and RSAF students;

xviii.    Failure to take corrective action for substandard CLO and RSAF student performance;

xix.      Failure to address inter-service rivalries between RSAF CLOs and students;

xx.       Failure to address perceived perpetual discord between Saudi Arabia CLOs at NAS Pensacola;

xxi.      Failure to formalize procedures for handling RSAF CLO absences;

xxii.     Failure to train CLOs on handling of subordinate complaints;

xxiii.    Failure to train CLOs on the identification and reporting of behavioral deviations that require command intervention;

xxiv.     Failure to recognize, report and address Al-Shamrani's questionable interactions with instructors and colleagues;

xxv.      Failure to adequately address Al-Shamrani's vocalized dissatisfaction with the handling of personnel issues and perceived abuses by instructors and colleagues;

126

      xxvi.      Failure to recognize, report and address Al-Shamrani's increasing isolation from fellow students;

     xxvii.     Failure by the RSAF CLO John Doe No. 1 to be at his assigned post in Building 633 on December 6, 2019;

   xxviii.     Failure to report the absence of, and replace, the deputy RSAF CLO assigned to NAS Pensacola;

     xxix.      Failure to report violations of orders that are required to be enforced;

      xxx.      Failure to fill the empty RSAF CLO position at NAS Pensacola for three (3) months, during the time in which Al Shamrani was making his final preparations and plans, possessing a firearm in his barracks and on base, taking unauthorized leave to the 9/11 museum, and displaying substandard behavior that should have been reported and addressed.

479.   A reasonable actor in the same or similar position as Saudi Arabia would have properly implemented CLO performance standards, ensure CLO compliance with codes of conduct and regulations, continually monitored and screened its personnel, including the CLO, while they were in United States, and provided sufficient command oversight of its RSAF students.

480.   Saudi Arabia was required, and had a duty, to ensure its FMS/IMET students properly implemented and followed codes of conduct and safety regulations, and intentionally, deliberately and recklessly failed to meet this requirement, and thereby breached its duty to do so. Such failures by Saudi Arabia and the RSAF John Does No. 2 -12 include but are not limited to

       i.      Failure to report violations of orders that are required to be enforced;

ii.     Failure to report Al-Shamrani's behavior  unbecoming of an RSAF officer;

iii.    Failure to report Al-Shamrani's purchase of a firearm and ammunition;

iv.    Failure to report Al-Shamrani's storage of a firearm and ammunition in his barracks;

v.     Failure to report Al-Shamrani's posting and sharing of anti-American and extremist material on social media;

vi.    Failure to report Al-Shamrani's unauthorized travel;

vii.   Failure to report the absence of the CLO and Deputy CLO.

481.   A reasonable actor in the same or similar position as Saudi Arabia would have properly implemented screening protocols, sufficiently screened its personnel nominated for FMS/IMET training, continually screened its personnel while they were in United States, and provided sufficient command oversight of its RSAF students.

482.   Saudi Arabia' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful actor would do in the same situation to prevent foreseeable harm to Plaintiffs.

483.   Saudi Arabia acted and/or failed to act knowingly, willfully, and with a conscious disregard or indifference to the life, safety or rights of persons exposed to their conduct, including Plaintiffs, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiffs.

484.   Plaintiffs were injured as a direct and proximate result of Saudi Arabia's acts and omissions constituting negligence and gross negligence, including its failure to use reasonable care in implementing screening protocols, regulations and codes of conduct, as well as its failure to selecting, promoting, monitoring, and supervising FMS/IMET students.

485.   Saudi Arabia's negligence and gross negligence were a substantial factor in causing and or contributing to Plaintiffs' injuries and damages.

486.   As a result of Saudi Arabia's negligence and gross negligence, Plaintiffs have sustained severe and permanent injuries, including, but not limited to death, extreme physical pain, disability, disfigurement, mental anguish, psychological trauma, medical expenses and other pecuniary harm, and have been caused to endure and will endure in the future physical pain, suffering and mental anguish, has been caused to incur and will incur in the future medical and related expenses, has been caused to suffer and will suffer in the future lost earnings and lost earning capacity, has been and will continue to be disabled from their customary activities, and has otherwise been caused to suffer damages.

487.   Saudi Arabia is vicariously liable for the negligence and gross negligence of 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 -30, its employees/agents, who were acting within the scope of

their agency/employment at the time of their conduct giving rise to this cause of action.

**WHEREFORE**, Plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, all recoverable losses under 28 U.S.C. §1605 and 18 U.S.C. §2333 and other appropriate relief be entered on their fourteenth cause of action in favor of the Plaintiffs individually against Defendant Saudi Arabia, with separate awards for each Plaintiff, where appropriate, plus interest, costs, compensatory damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

## COUNT FIFTEEN

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### All Plaintiffs

488.   Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs as if set forth herein.

489.   At all times relevant herein, Defendant Saudi Arabia acted through its officials or employees who were acting within the scope of their office or employment.

490.   Saudi Arabia had a duty of reasonable care in ensuring its candidates did not pose a security threat to the United Sates, and that security screening

protocols for students selected for training in the United States were properly implemented.

491.   Saudi Arabia had a duty of reasonable care in ensuring its training candidates were properly screened for security threats, properly trained to recognize and report security threats, routinely monitored, and sufficiently supervised.

492.   Saudi Arabia had a duty, and was required, to ensure its personnel in the United States complied with and implemented the protocols, rules, regulations, codes of conduct and standards of the U.S. Department of State, U.S. Department of Defense, the RSAF, and the command-specific programs in which they participated.

493.   Saudi Arabia was required and had a duty, to properly implement and ensure CLO performance standards and provide continuity of leadership to its RSAF students in the United States.

494.   Saudi Arabia was required, and had a duty, to ensure its FMS/IMET students properly implemented and followed codes of conduct and safety regulations.

495.   Saudi Arabia knew, or by the exercise of reasonable care should have known, that failure to exercise its duty of care in selecting qualified students, implementing security screening protocols, and monitoring and overseeing students in the United States could result in a violent attack that would cause severe emotional distress to Plaintiffs.

496.   Saudi Arabia by its negligence, gross negligence, reckless and intentional conduct, including but not limited to failing to implement security screening protocols, failing to report safety and security violations, and failing to provide sufficient command oversight resulted in a violent and lethal attack against Plaintiffs, and caused severe emotional distress.

497.   Plaintiffs witnessed their close friends and family being stalked by a heavily armed gunman for 15 minutes during which time they saw, heard or were otherwise able to perceive that their close acquaintances were being subjected to severe physical injuries and/or death.

498.   Plaintiffs suffered physical injuries and physical impacts from external forces during the attack, including gunshot wounds, concussive blast forces, blunt force trauma, contusions, broken bones, sprain, falls, strikes from debris and shrapnel, bruises, cuts, scraps, and lacerations.

499.   Due to having witnessed the attack, Plaintiffs suffer from psychological trauma.

500.   The psychological trauma has resulted in discernable physical injuries including, but not limited to: headaches, panic attacks, nightmares, insomnia, hypervigilance, fear of crowds, social withdrawal, flashbacks, depression, anxiety, hot flashes, muscle tension, and other objectively discernible physical impairments.

501.   Plaintiffs' resulting severe emotional distress was a reasonably foreseeable consequence of Saudi Arabia's wrongful conduct.

502.   As a direct and proximate result of Saudi Arabia's negligence, gross negligence, and reckless and intentional conduct, including its failure to use reasonable care in implementing screening protocols, regulations and codes of conduct, as well as its failure to selecting, promoting, monitoring, and supervising FMS/IMET students, Plaintiffs' suffered severe emotional distress and physical injuries.

503.   Saudi Arabia's negligence, gross negligence, and reckless and intentional acts were a substantial factor in causing and or contributing to Plaintiffs' severe emotional distress and its associated physical manifestations. The emotional distress experienced by Plaintiffs is of such intensity and duration that no ordinary person should be expected to endure it.

504.   As a result of Saudi Arabia's negligence, gross negligence, and reckless and intentional acts, Plaintiffs have sustained severe and permanent injuries, including, but not limited mental anguish, psychological trauma, medical expenses and other pecuniary harm, and have been caused to endure and will endure in the future physical pain, suffering and mental anguish, has been caused to incur and will incur in the future medical and related expenses, has been caused to suffer and will suffer in the future lost earnings and lost earning capacity, has been and will continue

to be disabled from their customary activities, and has otherwise been caused to suffer damages.

505. Saudi Arabia is vicariously liable for the negligence and gross negligence of 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 -30, its employees/agents, who were acting within the scope of their agency/employment at the time of their conduct giving rise to this cause of action.

**WHEREFORE**, Plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, all recoverable losses under 28 U.S.C. §1605 and 18 U.S.C. §2333 and other appropriate relief be entered on their fifteenth cause of action in favor of the Plaintiffs individually against Defendant Saudi Arabia, with separate awards for each Plaintiff, where appropriate, plus interest, costs, compensatory damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

## COUNT SIXTEEN

**WRONGFUL DEATH**

**Florida Wrongful Death Act**
**§768.16 Florida Statutes**

**(Benjamin Watson Jr. Individually and as Executor of the Estate of Joshua Kaleb Watson; Sheila Wilemon Watson; Shane Walters and Amanda Walters, Individually and as Putative Co-Executors of the Estate of Cameron Scott Walters; Sameh Haitham and Evelyn Brady, Individually and as Putative Co-Executors the Estate of Mohammed Sameh Haitham)**

506.   Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs as if set forth herein.

507.   At all times relevant herein, Defendant Saudi Arabia acted through its officials or employees who were acting within the scope of their office or employment.

508.   The claims for wrongful death and/or those other claims available under applicable law, set forth herein are hereby asserted on behalf of all persons having such claims.

### The Watson Family

509.   Plaintiffs Benjamin Watson Jr. is the duly qualified and appointed Personal Representative of the Estate of Joshua Kaleb Watson, deceased, as evidenced by the Order Appointing Personal Representative dated February 26, 2020 entered in Circuit Court for Santa Rosa County, Florida.

510.   The beneficiaries of a recovery for wrongful death, pursuant to Florida Statute Section 768.16 and their relationship to decedent Joshua Kalen Watson are as follows:

a.   The Estate of Joshua Kaleb Watson has a claim for medical expenses, funeral expenses, and net accumulations to the Estate;

b.   Benjamin Watson Jr, as natural parent and next friend of the deceased, has been deprived of the comfort, care, consortium, companionship, protection, support, services and society of his son, and he has endured extreme mental pain and anguish. His losses and damages are permanent and continuing in nature; and Sheila Wilemon Watson, as natural parent and next friend of the deceased, has been deprived of the comfort, care, consortium, companionship, protection and society of her son, and she has endured extreme mental pain and anguish.  Her losses and damages are permanent and continuing in nature.

511.   As a direct result of the negligence, gross negligence and intentional tortious conduct of Saudi Arabia, Plaintiffs' decedent Joshua Kaleb Watson, suffered gunshot wounds that resulted in his death.

512.   The negligence, gross negligence and intentional tortious conduct of Saudi Arabia was a proximate cause of the terrorist attack that resulted in the death of Plaintiffs' decedent Joshua Kaleb Watson.

513.   As a direct, foreseeable and proximate result of the wrongful death Joshua Kaleb Watson, Plaintiffs Benjamin Watson Jr. and Sheila Wilemon Watson, as the surviving natural parents and heirs of Joshua Kaleb Watson, have suffered damages, including but not limited to extreme mental pain and anguish, lost companionship, care, consortium, and protection, as well as lost support and services, and medical and funeral expenses.

514.   As a direct, foreseeable and proximate result of his wrongful death, the Estate of Joshua Kaleb Watson suffered damages for medical and funeral expenses and lost net accumulations.

515.   In addition to a claim for wrongful death, Plaintiffs assert, in the alternative, a survival claim for all injuries, damages, costs and fees, to the extent allowable by law.

**The Walters Family**

516.  Plaintiffs Shane Walters and Amanda Walters are the Putative appointed Co-Personal Representatives of the Estate of Cameron Scott Walters, deceased.

517.   The beneficiaries of a recovery for wrongful death, pursuant to Florida Statute Section 768.16 and their relationship to decedent Cameron Scott Walters are as follows:

a.   The Estate of Cameron Scott Walters has a claim for medical expenses, funeral expenses, and net accumulations to the Estate;

b.   Shane Walters, as natural parent and next friend of the deceased, has been deprived of the comfort, care, consortium, companionship, protection, support, services and society of his son, and he has endured extreme mental pain and anguish. His losses and damages are permanent and continuing in nature; and Amanda Walters, as natural parent and next friend of the deceased, has been deprived of the comfort, care, consortium, companionship, protection and society of her son, and she has endured extreme mental pain and anguish.  Her losses and damages are permanent and continuing in nature.

518.   As a direct result of the negligence, gross negligence and intentional tortious conduct of Saudi Arabia, Plaintiffs' decedent Cameron Scott Walters, suffered gunshot wounds that resulted in his death.

519.   The negligence, gross negligence and intentional tortious conduct of Saudi Arabia was a proximate cause of the terrorist attack that resulted in the death of Plaintiffs' decedent Cameron Scott Walters.

520.   As a direct, foreseeable and proximate result of the wrongful death Cameron Scott Walters, Plaintiffs Shane Walters and Amanda Walters, as the surviving natural parents and heirs of Cameron Scott Walters, have suffered damages, including but not limited to extreme mental pain and anguish, lost companionship, care, consortium, and protection, as well as lost support and services, and medical and funeral expenses.

521.   As a direct, foreseeable and proximate result of his wrongful death, the Estate of Cameron Scott Walters suffered damages for medical and funeral expenses and lost net accumulations.

522.   In addition to a claim for wrongful death, Plaintiffs assert, in the alternative, a survival claim for all injuries, damages, costs and fees, to the extent allowable by law.

### The Haitham/Brady Family

523.   Plaintiffs Sameh Haitham and Evelyn Brady are the putative Co-Personal Representatives of the Estate of Mohammed Sameh Haitham, deceased.

524.   The beneficiaries of a recovery for wrongful death, pursuant to Florida Statute Section 768.16 and their relationship to decedent Mohammed Sameh Haitham are as follows:

a.   The Estate of Mohammed Sameh Haitham has a claim for medical expenses, funeral expenses, and net accumulations to the Estate;

b.   Sameh Haitham, as natural parent and next friend of the deceased, has been deprived of the comfort, care, consortium, companionship, protection, support, services and society of his son, and he has endured extreme mental pain and anguish. His losses and damages are permanent and continuing in nature; and Evelyn Brady, as natural parent and next friend of the deceased, has been deprived of the comfort, care, consortium, companionship, protection and society of her son, and she has endured extreme mental pain and anguish.  Her losses and damages are permanent and continuing in nature.

525.   As a direct result of the negligence, gross negligence and intentional tortious conduct of Saudi Arabia, Plaintiffs' decedent Mohammed Sameh Haitham, suffered gunshot wounds that resulted in his death.

526.   The negligence, gross negligence and intentional tortious conduct of Saudi Arabia was a proximate cause of the terrorist attack that resulted in the death of Plaintiffs' decedent Mohammed Sameh Haitham.

527.   As a direct, foreseeable and proximate result of the wrongful death Mohammed Sameh Haitham, Plaintiffs Sameh Haitham and Evelyn Brady, as the surviving natural parents and heirs of Mohammed Sameh Haitham, have suffered damages, including but not limited to extreme mental pain and anguish, lost companionship, care, consortium, and protection, as well as lost support and services, and medical and funeral expenses.

528.   As a direct, foreseeable and proximate result of his wrongful death, the Estate of Mohammed Sameh Haitham suffered damages for medical and funeral expenses and lost net accumulations.

529.   In addition to a claim for wrongful death, Plaintiffs assert, in the alternative, a survival claim for all injuries, damages, costs and fees, to the extent allowable by law.

530.   Saudi Arabia is vicariously liable for the tortious conduct, negligence and gross negligence of 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 -30, its employees/agents, who were acting within the scope of their agency/employment at the time of their conduct giving rise to this cause of action.

**WHEREFORE**, Plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for wrongful death, all recoverable losses under 28 U.S.C. §1605 and 18 U.S.C. §2333 and other appropriate relief be entered on their sixteenth cause of action in favor of the Plaintiffs individually against Defendant Saudi Arabia, with separate awards for each Plaintiff, where appropriate, plus interest, costs, compensatory damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

## COUNT SEVENTEEN

### SURVIVAL ACTION

### §46.021 Florida Statutes

**(Benjamin Watson Jr. Individually and as Executor of the Estate of Joshua Kaleb Watson; Sheila Wilemon Watson; Shane Walters and Amanda Walters, Individually and as Putative Co-Executors of the Estate of Cameron Scott Walters; Sameh Haitham and Evelyn Brady, Individually and as Putative Co-Executors the Estate of Mohammed Sameh Haitham)**

531.   Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs as if set forth herein.

532.   At all times relevant herein, Defendant Saudi Arabia acted through its officials or employees who were acting within the scope of their office or employment.

533.   This claim is brought in the alternative to Count Fourteen, and Plaintiffs reserve all rights related to election of remedies and claims.

534.   The claims arising before and capable of surviving the deaths of Joshua Kaleb Watson, Cameron Scott Walters, and Mohammed Sameh Haitham, and/or those other claims available under applicable law, set forth herein are hereby asserted on behalf of all persons having such claims.

535.   Before their deaths, Joshua Kaleb Watson, Cameron Scott Walters, and Mohammed Sameh Haitham suffered severe mental anguish, and extreme conscious pain and suffering as a result of injuries that did not cause their deaths, including blunt force trauma, lacerations, fractures, and burns, as well as the conscious knowledge and awareness of their impending death.

536.   As a direct foreseeable, and proximate result of the negligence, gross negligence and intentional tortious conduct of Saudi Arabia, Plaintiffs' decedents, Joshua Kaleb Watson, Cameron Scott Walters, and Mohammed Sameh Haitham suffered serious bodily injuries resulting in conscious pain and suffering, disability, disfigurement, and mental anguish prior to their death.

537.   Saudi Arabia is vicariously liable for the tortious conduct, negligence and gross negligence of 2nd Lt. Al-Shamrani, RSAF Does 1 -12, KSA John Does 13 – 20, and KSA John Does 21 -30, its employees/agents, who were acting within the scope of their agency/employment at the time of their conduct giving rise to this cause of action.

**WHEREFORE**, Plaintiffs pray that judgment(s) for relief in the form of an

award or awards of monetary damages for all claims that survive Plaintiffs deaths, all recoverable losses under 28 U.S.C. §1605 and 18 U.S.C. §2333 and other appropriate relief be entered on their seventeenth cause of action in favor of the Plaintiffs individually against Defendant Saudi Arabia, with separate awards for each Plaintiff, where appropriate, plus interest, costs, compensatory damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

## COUNT EIGHTEEN

### LOSS OF CONSORTIUM

**(Carly Blackwell; Curtis Pickett; Jessica Tinch; Joy Glass; Matthew Housam; Heather Lopez; and Krystena Keebler)**

538.   Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs as if set forth herein.

539.   The spouses of the primary-injured Plaintiffs in this Action, who live and cohabit with the primary-injured Plaintiffs bring this count and cause of action.

540.   At all times relevant herein, Defendant Saudi Arabia acted through its officials or employees who were acting within the scope of their office or employment.

541.   As a direct and proximate result of the conduct of Saudi Arabia and its negligence, gross negligence, and intentional tortious conduct described herein, Curtis Pickett; Jessica Tinch; Joy Glass; Matthew Housam; Heather Lopez; and

Krystena Keebler have necessarily paid and/or have become liable to pay, and will continue to pay and/or continue to be liable to pay, for medical aid, medical treatment, and medications of the primary Plaintiffs in this Action.

542.   As a direct and proximate result of the conduct of Saudi Arabia and its negligence, gross negligence, and intentional tortious conduct described herein, Curtis Pickett; Jessica Tinch; Joy Glass; Matthew Housam; Heather Lopez; and Krystena Keebler he have been caused and will continue to be caused the loss of their spouses' consortium, companionship, services, society, love, and comforts, and their martial association has been altered, and, accordingly,

543.   Curtis Pickett; Jessica Tinch; Joy Glass; Matthew Housam; Heather Lopez; and Krystena Keebler have been caused great mental anguish and emotional distress.

544.   Plaintiffs demand judgment against Saudi Arabia for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT NINETEEN

### BREACH OF CONTRACT
### THIRD-PART BENEFICIARIES

### All Plaintiffs

545.   Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs as if set forth herein.

546.   This is a claim for breach of two contracts between the United States and the Kingdom of Saudi Arabia that were contemplated and entered into for the benefit of Plaintiffs.

547.   First, Saudi Arabia and the United States entered a contract for the sale military equipment, goods, and training.

548.   The contract required that Saudi Arabia nominate, screen, and ensure that its personnel posed no risk to the United States.

549.   The contract also required Saudi Arabia to indemnify the United States, and hold the U.S. Government, its agents, officers, and employees harmless from any and all loss or liability (whether in tort or in contract) which might arise in connection with the contract.

550.   The parties to the contract were acutely aware of the importance of screening foreign military candidates from Saudi Arabia for security threats.

551.   The parties to the contract were acutely aware that losses and liability, in tort or contract, could arise in connection with the contract, including claims of third-parties such as Plaintiffs, and negotiated and agreed to terms intended to allocate such liability for such claims.

552.   Although Plaintiffs are not a direct party to the contract, they are properly considered third-party beneficiaries to the contract between Saudi Arabia and the United States.

553.   Saudi Arabia breached the contract with the United States when it (1) failed to implement security screening protocols for its personnel selected for training in the United States, and (2) failed to comply with the terms and conditions of the LOA/LOR/MOI related to safety and security the contract.

554.   Second, Saudi Arabia and the United States entered an oral contract after the NAS Terrorist Attack.

555.   After the Attack, King Salman of Saudi Arabia and his son the Kingdom's de facto ruler and heir apparent Crown Prince Mohamed bin Salman held several meetings with the President of the United States and other high ranking United States and Florida Officials.

556.   During these discussions the Kingdom and the United States reached an agreement.   The Kingdom agreed to cooperate fully in the investigation and compensate the victims for its employees' attack in exchange for the United States agreeing to release all RSAF trainees from custody and allow them to return to Saudi Arabia.

557.   On January 13, 2020, Attorney General William Barr, made an official statement regarding the agreement between the United States and Saudi Arabia, stating:

> The Kingdom of Saudi Arabia determined that this material demonstrated conduct unbecoming an officer in the Saudi Royal Air Force and Royal Navy and the 21 cadets have been dis-enrolled from their training curriculum in the U.S. military and

147

will be returning to Saudi Arabia (later today).The ***Kingdom has assured*** me that it will review each of these cases under their code of military justice and criminal code.   ***The Kingdom has also agreed*** that we will have full access to anyone we want to interview in Saudi Arabia and any documents relevant to our investigation.  Indeed, it has already been providing documents. ***Further, the Kingdom has assured us*** that, if we later decide to charge any of those being sent back to Saudi Arabia in connection with this counterterrorism investigation, it will return them for trial.

558.   President Trump was asked about the NAS attack by reporters and detailed his phone call with King Salman bin Abdulaziz Al Saud, stating:

I spoke to the King of Saudi Arabia. They are devastated in Saudi Arabia. We are finding out what took place, whether it's one person or a number of people, ***and the King will be involved in taking care of the families and loved ones. He feels very strongly***. He is very very devastated by what happened, what took place, likewise the Crown Prince. They are devastated by what took place in Pensacola. ***And I think they are going to help out the families very greatly***. But right now they send their condolences. And as you know I sent my condolences, it's a very shocking thing, and uh, we'll find out, we'll get to the bottom of it very quickly.

559.   The United States and Saudi Arabia entered into the oral contract with the express intent that the contract benefit Plaintiffs.

560.   The parties were acutely aware of the Plaintiffs' injuries and potential claims at the time of the agreement.

561.   The parties were acutely aware of the importance of Saudi Arabia's cooperation in legal proceedings in the United States, and Saudi Arabia agreed to cooperate and subject itself to such proceedings.

562.   Saudi Arabia breached the agreement by failing to compensate Plaintiffs or even engage with Plaintiffs.

563.   As a direct and proximate result of Saudi Arabia's breaches, Plaintiffs suffered, and continue to suffer, economic damages including but not limited to medical expenses, funeral expenses, lost income, and other pecuniary harms attendant to the breaches of contract.

**WHEREFORE**, Plaintiffs demand compensatory damages against the Kingdom of Saudi Arabia together with attorney's fees and costs of suit, and such other relief as the Court may deem necessary or appropriate.

### VII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court:

a)   Accept jurisdiction over this action;

b)   Enter judgment against Defendant finding Defendant liable under the Anti-Terrorism Act, 18 U.S.C. § 2333, and applicable state law;

c)   Award Plaintiffs compensatory and solatium damages to the maximum extent permitted by law, and treble any compensatory and solatium damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333;

d)   Enter judgment against Defendant and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333;

e)    Award Plaintiffs their fees and  costs sustained in connection with the

prosecution of this action, including attorneys' fees, pursuant to 18

U.S.C. § 2333;

f)    Award Plaintiffs pre and post-judgment interest; and

g)    Award Plaintiffs any such further relief the Court deems just and proper.

Plaintiffs demand a jury trial on any other or all factual issues so triable by

jury.

Dated:  February 22, 2021

| /s/ Christopher G. Paulos | /s/ Michael C. Maher |
|---|---|
| Christopher G. Paulos Esq. (FL #91579) | Michael C. Maher, Esq. (FL #92290) |
| **LEVIN, PAPANTIONIO, RAFFERTY, PROCTOR, BUCHANAN, O'BRIEN, BARR, MOUGEY, P.A.** | Matthew S. Mokwa, Esq. (FL# 47761) |
| 316 South Baylen Street, Suite 600 | **THE MAHER LAW FIRM, P.A.** |
| Pensacola, Florida 32502 | 271 W. Canton Ave., Suite 1 |
| Phone: (850) 435-7067 | Winter Park, FL 32789 |
| Fax: (850) 435-6067 | Phone:  (407) 839-0866 |
| cpaulos@levinlaw.com | Fax:  (407) 425-7958 |
|  | mmaher@maherlawfirm.com |
|  | mmokwa@maherlawfirm.com |
| *Counsel for Charles Hogue; Matthew Tinch; Jessica Tinch; Matthew Keebler; Krystena Keebler; Matthew Housam; Michael Hoyland; Thomas C. Bortner; Jonathan Glass; Joy Glass; Grant Lopez and Heather Lopez* | *Counsel for Benjamin Watson Jr.; Sheila Watson; Evelyn Brady; Co-Counsel of Estate of Mohammed Sameh Haitham; Irvin Lawrence Jr.; George Johnson; Breanna Thomas; Ryan Blackwell; Carly Blackwell; Kristy Lehmer; Jessica Pickett and Curtis Pickett* |
| /s/ James P. Kreindler | /s/ David E. Harris |
| James P. Kreindler (NY #1704980) | David E. Harris (TX #24049273) |

150

| | |
|---|---|
| Daniel O. Rose (NY #2774271)<br>Andrew J. Maloney, III (NY #2261659)<br>**KREINDLER & KREINDLER LLP**<br>750 Third Avenue<br>New York, NY 10017<br>Phone: (212) 687-8181<br>Fax: (212) 972-9432<br>jkreindler@kreindler.com<br>drose@kreindler.com<br>amaloney@kreindler.com<br><br>*Counsel for Benjamin Watson Jr.;*<br>*Sheila Watson; Estate of Joshua Kaleb*<br>*Watson; Evelyn Brady; Co-Counsel of*<br>*Estate of Mohammed Sameh Haitham;*<br>*Irvin Lawrence Jr.; George Johnson;*<br>*Breanna Thomas; Ryan Blackwell;*<br>*Carly Blackwell; Kristy Lehmer;*<br>*Jessica Pickett and Curtis Pickett* | Louie J. Cook (TX # 24101191)<br>**SICO HOELSCHER HARRIS, LLP**<br>802 N. Carancahua Street, Suite 900<br>Corpus Christi, TX 78401<br>Phone:(877) 631-9965<br>Fax: (361) 653-3333<br>dharris@shhlaw.com<br>lcook@shhlaw.com<br><br><br>*Counsel for Shane Walters; Amanda*<br>*Walters; Estate of Cameron Scott*<br>*Walters; L.N.W.; S.L.W.; Mason*<br>*Walters; Dustin Walters; Sameh*<br>*Haitham; Co-Counsel of Estate of*<br>*Mohammed Sameh Haitham; S.S.H.;*<br>*S.S.H. II; Shadin Haitham* |
| */s/ Jeffrey McFadden*<br>Jeffrey McFadden, Esq. (FL #19052)<br>**LAW OFFICES OF JEFFREY E.**<br>   **McFADDEN, LLC**<br>312 Prospect Bay Dr. E<br>Grasonville, MD 21638-1181<br>Phone:  (410) 490-1163<br>jmcfadden@jmcfaddenlaw.com<br><br><br>*Counsel for Benjamin Watson Jr.;*<br>*Sheila Watson; Estate of Joshua Kaleb*<br>*Watson; Evelyn Brady; Co-Counsel of*<br>*Estate of Mohammed Sameh Haitham;*<br>*Irvin Lawrence Jr.; George Johnson;*<br>*Breanna Thomas; Ryan Blackwell;*<br>*Carly Blackwell; Kristy Lehmer;*<br>*Jessica Pickett and Curtis Pickett* | */s/ R. Frank Melton, II*<br>R. Frank Melton, II (FL # 475440)<br>Jesse Stern (FL # 118440)<br>**NEWSOME MELTON**<br>201 S. Orange Ave., Suite 1500<br>Orlando, Florida 32801<br>Phone: (407) 648-5977<br>Fax: (407) 648-5282<br>melton@newsomelaw.com<br>stern@newsomelaw.com<br><br>*Counsel for Shane Walters; Amanda*<br>*Walters; Estate of Cameron Scott*<br>*Walters; L.N.W.; S.L.W.; Mason*<br>*Walters; Dustin Walters; Sameh*<br>*Haitham; Co-Counsel of Estate of*<br>*Mohammed Sameh Haitham; S.S.H.;*<br>*S.S.H. II; Shadin Haitham* |

|  |  |
|--|--|