## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA

BENJAMIN WATSON, JR.; SHEILA
WILEMON WATSON; SHANE
WALTERS; AMANDA WALTERS;
DUSTIN WALTERS; MASON
WALTERS; SAMEH HAITHAM;
EVELYN BRADY; SHADIN
HAITHAM; JOHN ROBERT BRADY;
IRVIN LAWRENCE JR.; GEORGE
JOHNSON; BREANNA THOMAS;
RYAN BLACKWELL; CARLY
BLACKWELL; KRISTY LEHMER;
JESSICA PICKETT; CURTIS PICKETT;
CHARLES HOGUE; MATTHEW
TINCH; JESSICA TINCH; JONATHAN
GLASS; JOY GLASS; MATTHEW
HOUSAM; MICHAEL HOYLAND;
THOMAS C. BORTNER; GRANT
LOPEZ; HEATHER LOPEZ;
MATTHEW KEEBLER; and
KRYSTENA KEEBLER,

**ORAL ARGUMENT
REQUESTED**

Case No. 3:21-cv-329

*Plaintiffs*,

v.

KINGDOM OF SAUDI ARABIA,

*Defendant.*

## MOTION OF THE KINGDOM OF SAUDI ARABIA
## TO DISMISS THE AMENDED COMPLAINT
## AND MEMORANDUM OF LAW IN SUPPORT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

MOTION OF THE KINGDOM OF SAUDI ARABIA
TO DISMISS THE AMENDED COMPLAINT ......................................1

INTRODUCTION ................................................................................2

BACKGROUND ..................................................................................4

    I.     The Pensacola Shooting ..........................................................4

    II.    The United States' Investigations ...........................................6

    III.   Plaintiffs' Complaint ..............................................................9

STANDARD OF REVIEW ................................................................10

ARGUMENT ......................................................................................12

    I.     The Non-Commercial-Tort Exception Does Not Apply....................12

         A.    The Attack Was Not Within The Scope Of
             Al Shamrani's Employment........................................12

         B.    Saudi Arabia's Alleged Failure To Prevent
             Al Shamrani's Attack Does Not Satisfy The
             Non-Commercial-Tort Exception ...........................16

             1.    Alleged Acts Or Omissions Occurring
                 Outside The United States Cannot
                 Support Jurisdiction.......................................16

             2.    Alleged Acts or Omissions Involving
                 Discretionary Functions Cannot
                 Support Jurisdiction.......................................18

             3.    Plaintiffs Fail To Plead Or To Prove Causation.............22

         C.    Plaintiffs' Allegations That Saudi Arabia
              Supported Al Qaeda Are Insufficiently Pleaded,
              Baseless, And Irrelevant ...........................................28

II.     The JASTA Terrorist-Act Exception Does Not Apply .......................30

III.    The Commercial-Activity Exception Does Not Apply.......................34

IV.     The Waiver Exception Does Not Apply ...............................................37

CONCLUSION ....................................................................................................40

REQUEST FOR ORAL ARGUMENT ..................................................................40

LOCAL RULE 7.1(F) CERTIFICATION

LOCAL RULE 5.1(F) CERTIFICATION

# TABLE OF AUTHORITIES

Page

CASES

*Agriturf Mgmt., Inc. v. Roe*, 656 So. 2d 954 (Fla. Dist. Ct. App. 1995)..................13

*Andersen v. United States*, 2009 WL 6633307 (S.D. Fla. Oct. 21, 2009)..............15

*Andrews v. United States*, 121 F.3d 1430 (11th Cir. 1997)................................19, 20

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)....................................25, 27

*Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279
   (11th Cir. 1999) ......................................................................................37, 38

*Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*,
   788 F.3d 1329 (11th Cir. 2015) ......................................................................37

*Argentine Republic v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989)..................................................................................10, 40

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..................................................11, 15, 32, 39

*Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517
   (D.C. Cir. 1984) ..............................................................................................16

*Berkovitz v. Islamic Republic of Iran*, 735 F.2d 329 (9th Cir. 1984) .....................36

*Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) .....................................................23

*Boyce v. Pi Kappa Alpha Holding Corp.*, 476 F.2d 447 (5th Cir. 1973) ...............31

*Bridges v. Speer*, 79 So. 2d 679 (Fla. 1955) ...........................................................31

*Burke v. Cooke*, 2005 WL 8162897 (N.D. Fla. May 5, 2005),
   *report and recommendation adopted*, 2005 WL 8162894
   (N.D. Fla. May 25, 2005) ........................................................................ 31-32

*Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207
   (D.C. Cir. 1997).................................................................................................19

*Burrage v. United States*, 571 U.S. 204 (2014) ........................................22, 23, 27

*Butler v. Sukhoi Co.*, 579 F.3d 1307 (11th Cir. 2009)......................................10, 11

*Carlyle v. United States*, 674 F.2d 554 (6th Cir. 1982) ...........................................19

*Cicippio v. Islamic Republic of Iran*, 30 F.3d 164 (D.C. Cir. 1994) ......................36

*City of Green Cove Springs v. Donaldson*, 348 F.2d 197 (5th Cir. 1965).........13, 26

*CSX Transp., Inc. v. McBride*, 564 U.S. 685 (2011) ...............................................25

*De Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir. 1984) ...............................36

*DeJesus v. Jefferson Stores, Inc.*, 383 So. 2d 274 (Fla. Dist. Ct. App. 1980) ...................................................................................................13

*Doe v. Cramer*, 2018 WL 8265221 (S.D. Fla. Aug. 10, 2018) ...............................14

*Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009) .....................................................18

*Doe v. United States*, 2017 WL 5068883 (M.D. Fla. Nov. 3, 2017) .......................14

*Dudley v. Community Pub. Serv. Co.*, 108 F.2d 119 (5th Cir. 1939) ......................33

*Elders v. United Methodist Church*, 793 So. 2d 1038 (Fla. Dist. Ct. App. 2001) ...................................................................................................13

*Gager v. United States*, 149 F.3d 918 (9th Cir. 1998)............................................19

*Glaab v. Caudill*, 236 So. 2d 180 (Fla. Dist. Ct. App. 1970) .................................31

*Goss v. Human Servs. Assocs., Inc.*, 79 So. 3d 127 (Fla. Dist. Ct. App. 2012) ...................................................................................................13

*Guile v. United States*, 422 F.3d 221 (5th Cir. 2005) .............................................19

*Hammer v. Lee Mem'l Health Sys.*, 2018 WL 3707832 (M.D. Fla. Aug. 3, 2018) ................................................................................................15

*Harper v. United States*, 2020 WL 4192540 (D.D.C. July 21, 2020) ....................20

*Haven v. Polska*, 215 F.3d 727 (7th Cir. 2000) ......................................................38

*Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010) ....................................25

*Hemmings v. Jenne*, 2010 WL 4005333 (S.D. Fla. Oct. 12, 2010) ........................15

*Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So. 2d 353
    (Fla. Dist. Ct. App. 2001) ...............................................................15

*Island City Flying Serv. v. General Elec. Credit Corp.*, 585 So. 2d 274
    (Fla. 1991) ........................................................................................26

*Jackson v. County of Wayne*, 217 F. App'x 103 (3d Cir. 2007) .............................32

*Jam v. International Fin. Corp.*, 139 S. Ct. 759 (2019) .........................................34

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
    513 U.S. 527 (1995) ..........................................................................24

*Jones v. City of Hialeah*, 368 So. 2d 398 (Fla. Dist. Ct. App. 1979) .....................13

*Kato v. Ishihara*, 360 F.3d 106 (2d Cir. 2004) ........................................................36

*Keen v. Florida Sheriffs' Self-Insurance Fund*, 962 So. 2d 1021
    (Fla. Dist. Ct. App. 2007) ...............................................................14

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123
    (D.C. Cir. 2004) ...............................................................................23

*Kirchmann v. United States*, 8 F.3d 1273 (8th Cir. 1993) .......................................21

*Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989) ........................................13

*Luke v. Gulley*, 975 F.3d 1140 (11th Cir. 2020) ........................................................4

*Mallory v. O'Neil*, 69 So. 2d 313 (Fla. 1954) ..........................................................13

*Mamani v. Berzain*, 654 F.3d 1148 (11th Cir. 2011).........................................27, 32

*Martin v. United Sec. Servs., Inc.*, 373 So. 2d 720 (Fla. Dist.
    App. 1979) ........................................................................................13

*Mason v. Florida Sheriffs' Self-Insurance Fund*, 699 So. 2d 268
    (Fla. Dist. Ct. App. 1997) ...............................................................15

*McCain v. Florida Power Corp.*, 593 So. 2d 500 (Fla. 1992)................................25

*McDonald v. The Socialist People's Libyan Arab Jamahiriya*,
    666 F. Supp. 2d 50 (D.D.C. 2009)...................................................37

*MCI Telecomms. Corp. v. Alhadhood*, 82 F.3d 658 (5th Cir. 1996) ......................35

*Mercado Del Valle v. United States*, 856 F.2d 406 (1st Cir. 1988).........................19

*Miller v. United States*, 992 F.3d 878 (9th Cir. 2021) .............................................22

*Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169 (5th Cir. 1994) ..........................13

*Nettles v. Thornton*, 198 So. 2d 44 (Fla. Dist. Ct. App. 1967) ......................... 13-14

*O'Bryan v. Holy See*, 556 F.3d 361 (6th Cir. 2009) ....................................13, 16, 17

*O'Donnell v. United States*, 736 F. App'x 828 (11th Cir. 2018)............................25

*OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015) ........................................35

*Odyssey Marine Expl., Inc. v. Unidentified Shipwrecked Vessel*,
    657 F.3d 1159 (11th Cir. 2011) ........................................................................10

*Perez v. Zazo*, 498 So. 2d 463 (Fla. Dist. Ct. App. 1986) .......................................13

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (2019).........................34, 35

*Robinson v. Government of Malaysia*, 269 F.3d 133 (2d Cir. 2001)...........10, 11, 29

*Robles v. Holy See*, 2021 WL 5999337 (S.D.N.Y. Dec. 20, 2021) .........................18

*Rux v. Republic of Sudan*, 461 F.3d 461 (4th Cir. 2006).........................................23

*S & Davis Int'l, Inc. v. Republic of Yemen*, 218 F.3d 1292
    (11th Cir. 2000) ................................................................................................40

*S.D. v. City of Cape Coral*, 2017 WL 5906281 (M.D. Fla.
    Nov. 30, 2017) ..................................................................................................15

*Samantar v. Yousuf*, 560 U.S. 305 (2010) ...............................................................11

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)...................................................10, 35

*Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702 (11th Cir. 2014) .......................25

*Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239
    (2d Cir. 1996)....................................................................................................39

*Sosa v. Coleman*, 646 F.2d 991 (5th Cir. Unit B June 1981) .................................26

*Special Olympics Florida, Inc. v. Showalter*, 6 So. 3d 662
(Fla. Dist. Ct. App. 2009) .............................................................13

*Spencer v. Assurance Co. of Am.*, 39 F.3d 1146 (11th Cir. 1994).....................13, 14

*Strange v. Islamic Republic of Iran*, 320 F. Supp. 3d 92 (D.D.C. 2018) ......35, 36, 38

*Swarna v. Al-Awadi*, 622 F.3d 123 (2d Cir. 2010) ..................................... 12-13, 19

*Tallahassee Furniture Co. v. Harrison*, 583 So. 2d 744
(Fla. Dist. Ct. App. 1991) .............................................................15

*Terrorist Attacks on September 11, 2001*, In re:

538 F.3d 71 (2d Cir. 2008) ......................................................11, 37

714 F.3d 109 (2d Cir. 2013) ....................................................16, 30

*Travel Assocs., Inc. v. Kingdom of Swaziland*, 1990 WL 134512
(D.D.C. Aug. 30, 1990) ...............................................................18

*U.S. Commodity Futures Trading Comm'n v. Southern Tr. Metals,
Inc.*, 894 F.3d 1313 (11th Cir. 2018)..................................22, 23, 25

*UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210
(5th Cir. 2009) .............................................................................36

*United States v. Gaubert*, 499 U.S. 315 (1991) ...................................18, 19

*United States v. Hatfield*, 591 F.3d 945 (7th Cir. 2010)...........................23

*University of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) ........................23

*Watson v. City of Hialeah*, 552 So. 2d 1146 (Fla. Dist. Ct. App. 1989) ................26

*Waubanascum v. Shawano Cty.*, 416 F.3d 658 (7th Cir. 2005)..............................32

## STATUTES AND RULES

Extension of Admiralty Jurisdiction Act, ch. 526, 62 Stat. 496 (1948) .................25

Federal Tort Claims Act, 28 U.S.C. § 2680(a) ...................................................19, 20

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583,
     90 Stat. 2891 (codified as amended at, *inter alia*, 28 U.S.C.
     §§ 1602-1611) ............................................................. 1, 2, 10, 18, 19, 23, 35

     28 U.S.C. § 1603(d) ..................................................................34, 35

     28 U.S.C. § 1604 .................................................................................10

     28 U.S.C. § 1605(a)(1) ..........................................................12, 37

     28 U.S.C. § 1605(a)(2) ..........................................4, 12, 34, 36

     28 U.S.C. § 1605(a)(5) ..............................................2, 12, 31

     28 U.S.C. § 1605(a)(5)(A) ..............................3, 12, 18, 22

     28 U.S.C. § 1608(a)(4) ........................................................................9

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222,
     130 Stat. 852 (2016) ........................................3, 12, 30, 31, 33, 34

     28 U.S.C. § 1605B ...............................................................................12

     28 U.S.C. § 1605B(b) .................................................................30, 31

     28 U.S.C. § 1605B(d) .............................................3, 30, 31, 33

Racketeer Influenced and Corrupt Organizations Act,
     18 U.S.C. § 1961 *et seq.* ..............................................................25

Fed. R. Civ. P.:

     Rule 12(b)(1) .........................................................................1, 4, 10

     Rule 12(b)(2) ...............................................................................................1

     Rule 12(b)(6) ......................................................................................1, 11

Fed. R. Evid. 803(8)(A)(3) ...................................................................4, 7


LEGISLATIVE MATERIALS

H.R. Rep. No. 94-1487 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604 ............37, 38

ADMINISTRATIVE MATERIALS

Naval Air Training Command, U.S. Naval Flight Student Training
    Administration Manual, CNATRAINST 1500.4H (2014),
    *available at* https://web.archive.org/web/20161023110802/
    https://www.cnatra.navy.mil/local/docs/instructions/1500.4.pdf............21, 22

U.S. Dep't of Defense, Defense Security Cooperation Agency:

    Authorization Letter, Security Assistance Management Manual
    (Apr. 30, 2012), https://samm.dsca.mil/listing/authorization-
    letter ...............................................................................................................21

    Foreign Military Sales Letter of Offer and Acceptance,
    Standard Terms and Conditions, https://samm.dsca.mil/figure/
    figure-c5f4 .....................................................................................................38

    Security Assistance Management Manual, https://samm.dsca.mil/
    listing/chapters.....................................................................................8, 9, 21

U.S. Dep't of Justice:

    Attorney General William P. Barr and FBI Director Christopher
    Wray Announce Significant Developments in the Investigation
    of the Naval Air Station Pensacola Shooting (May 18, 2020),
    https://www.justice.gov/opa/pr/attorney-general-william-p-
    barr-and-fbi-director-christopher-wray-announce-significant .................8, 24

    Attorney General William P. Barr Announces the Findings of
    the Criminal Investigation into the December 2019 Shooting at
    Pensacola Naval Air Station (Jan. 13, 2020),
    https://www.justice.gov/opa/speech/attorney-general-william-p-
    barr-announces-findings-criminal-investigation-december-2019.........6, 7, 39

U.S. Embassy & Consulates in Saudi Arabia, *Joint Statement of the
    U.S.-Saudi Arabia Strategic Dialogue* (Oct. 21, 2020),
    https://sa.usembassy.gov/joint-statement-of-the-u-s-saudi-
    arabia-strategic-dialogue/ .............................................................................28

U.S. Navy, *Command Investigation Report – Fatal Shooting Incident
    at Naval Air Station Pensacola, Florida on 6 December 2019*
    (Feb. 21, 2020), https://www.secnav.navy.mil/foia/
    readingroom/HotTopics/Pensacola%20Investigation/Command
    %20Investigation%20-%20NAS%20Pensacola%20Shooting
    %20Report%20and%20Endorsements%20(Redacted%20for%
    20Release).pdf ................................................. 4, 5, 7, 8, 9, 17, 21, 24, 26, 27

## OTHER MATERIALS

Attorney General Barr and FBI Deputy Director Bowdich Hold Press
    Conference (Jan. 13, 2020), https://www.youtube.com/watch?
    v=sXI5qUsPjEY .............................................................................6, 7

Attorney General Barr, FBI Director Wray Announce Developments
    in the Investigation of the NAS Pensacola Shooting (May 18,
    2020), https://www.youtube.com/watch?v=nfqff_NsYiI..............................14

Embassy of Saudi Arabia, *In Phone Call with U.S. President, Saudi
    King Condemns Florida Shooting* (Dec. 6, 2019),
    https://www.saudiembassy.net/news/phone-call-us-president-
    saudi-king-condemns-florida-shooting............................................................6

Tim Lister, *WikiLeaks cables assess terrorism funding in Saudi
    Arabia, Gulf states*, CNN (Dec. 6, 2010), http://www.cnn.com/
    2010/WORLD/meast/12/06/wikileaks.terrorism.funding/...........................29

Maggie Michael, Trish Wilson & Lee Keath, *AP Investigation:
    US allies, al-Qaida battle rebels in Yemen*, Assoc. Press
    (Aug. 6, 2018), https://apnews.com/article/saudi-arabia-united-
    states-ap-top-news-middle-east-international-news-
    f38788a561d74ca78c77cb43612d50da .......................................................29

Model Penal Code (1985) ........................................................................23

Stanford Univ.:

    *Al Qaeda in the Arabian Peninsula*, https://cisac.fsi.stanford.edu/
    mappingmilitants/profiles/al-qaeda-arabian-peninsula .................................28

    *Mapping Militant Organizations:  Al Qaeda*,
    https://cisac.fsi.stanford.edu/mappingmilitants/profiles/al-qaeda.................28

Fareed Zakaria, *How Saudi Arabia played Donald Trump*, Wash. Post
    (May 25, 2017), https://www.washingtonpost.com/opinions/
    global-opinions/saudi-arabia-just-played-donald-trump/2017/
    05/25/d0932702-4184-11e7-8c25-44d09ff5a4a8_story.html .......................29

## MOTION OF THE KINGDOM OF SAUDI ARABIA
## TO DISMISS THE AMENDED COMPLAINT

Under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6),

Defendant Kingdom of Saudi Arabia ("Saudi Arabia") respectfully moves this

Court for an order dismissing all claims in the Amended Complaint for lack of

subject-matter jurisdiction under the Foreign Sovereign Immunities Act of 1976,

lack of personal jurisdiction, and failure to state a claim upon which relief can

be granted.

In support of its motion, Saudi Arabia sets forth its arguments in the

accompanying memorandum of law.

## INTRODUCTION

Mohammed Saeed Al Shamrani's terrorist attack at Naval Air Station Pensacola was a rogue act. Before the attack, Al Shamrani pledged allegiance to Al Qaeda, an enemy of both the United States and the Kingdom of Saudi Arabia ("Saudi Arabia"). An extensive FBI investigation found "no evidence of assistance or pre-knowledge of the attack by other members of the Saudi military."

Saudi Arabia deplores the Pensacola attack and expresses its deep condolences to the victims and their families. But there is no legal basis for this Court to exercise subject-matter or personal jurisdiction over Plaintiffs' claims against Saudi Arabia arising from that attack. Saudi Arabia is a foreign sovereign presumptively immune from suit under the Foreign Sovereign Immunities Act of 1976 ("FSIA"). Plaintiffs rely on four exceptions to immunity but have not pleaded and cannot prove facts to support any of those exceptions.

*First*, the non-commercial-tort exception does not apply for multiple reasons. That exception requires a loss "caused by" a "tortious act" of a foreign state's official or employee "acting within the scope of his office or employment." 28 U.S.C. § 1605(a)(5). As the FBI has confirmed, Al Shamrani's attack was conducted in furtherance of his pledged allegiance to Al Qaeda – a sworn enemy of Saudi Arabia. It was outside the scope of his employment as a member of the Royal Saudi Air Force ("RSAF").

Moreover, the entire tort – all parts of the act and the injury – must occur in the United States.  Allegations that Saudi Arabia failed to prevent the attack by negligently hiring or supervising Al Shamrani cannot meet that requirement because nearly all of Saudi Arabia's alleged conduct was outside the United States.

The limited allegations that describe an omission within the United States (that a supervisor was absent for three months) concern a "discretionary function," *id.* § 1605(a)(5)(A), for which Saudi Arabia retains immunity.  Nor is it either plausible or provable that the supervisor's absence caused the attack.

Finally, Plaintiffs' baseless allegations that Saudi Arabia materially aided Al Qaeda are conclusory, unsupported, and lack any causal link to the attack.

*Second*, the exception for terrorist acts created by the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) ("JASTA"), does not apply.  JASTA, like the non-commercial-tort exception, requires an act within the scope of employment, which Al Shamrani's attack was not.  JASTA also forecloses Plaintiffs' theories that Saudi Arabia negligently hired or failed to supervise Al Shamrani.  "[A]cts that constitute mere negligence" cannot create jurisdiction, nor can any "omission."  28 U.S.C. § 1605B(d).  Plaintiffs' baseless allegations that Saudi Arabia materially aided Al Qaeda fail under JASTA for the same reasons that they fail under the non-commercial-tort exception.

*Third*, the commercial-activities exception, 28 U.S.C. § 1605(a)(2), does not apply.  The military training program that brought Al Shamrani to the United States was not commercial activity.  Nor was there anything commercial about his rogue attack in furtherance of his pledged loyalty to Al Qaeda.

*Fourth*, and finally, Saudi Arabia has not waived its sovereign immunity.  Such waivers must be clear and unambiguous.  None occurred here.

## BACKGROUND

### I.   The Pensacola Shooting

Al Shamrani joined the RSAF in 2015 and was later nominated to receive military training in the United States.  Am. Compl. ¶¶ 134, 139.  Through the Security Cooperation Education and Training Program, the United States provides military supplies and training to eligible foreign nations such as Saudi Arabia.  *Id.* ¶ 44; Ex. A (U.S. Navy, *Command Investigation Report – Fatal Shooting Incident at Naval Air Station Pensacola, Florida on 6 December 2019*, at 25 (Feb. 21, 2020) ("Navy Report")).[1]  Al Shamrani trained as a weapon systems officer at Naval Air Station Pensacola ("NAS Pensacola").  Am. Compl. ¶ 56; Navy Report 25.

---

[1] Citations to Exhibits in this Memorandum refer to the Exhibits to the accompanying Declaration of Gregory G. Rapawy.  This Court may consider the Navy Report because the Amended Complaint relies upon it (at ¶ 173 n.33).  *See Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020).  The Navy Report is also admissible evidence that may be considered on a Rule 12(b)(1) factual challenge, *see infra* pp. 10-11, because it "sets out . . . factual findings from a legally authorized investigation."  Fed. R. Evid. 803(8)(A)(3).

In August 2017, Al Shamrani entered the United States.  Am. Compl. ¶¶ 67-68; Navy Report 35.  Plaintiffs allege that, before his entry, Saudi Arabia subjected him to security, medical, and internal character vetting.  Am. Compl. ¶ 64; *see also id.* ¶¶ 135, 143.  Plaintiffs allege that Saudi Arabia could have monitored his social media and mobile communications, *id.* ¶¶ 107-125, and that his social media accounts would have showed radicalization and anti-American sentiments, *id.* ¶¶ 131-132, 138.

From August 2017 to May 2018, Al Shamrani received English training at Lackland Air Force Base in San Antonio, Texas.  *Id.* ¶¶ 68, 148-149; Navy Report 27-28, 35.  In May 2018, he moved to NAS Pensacola.  Am. Compl. ¶¶ 149-150; Navy Report 35-40.

On December 6, 2019, Al Shamrani posted an anti-American message on his Twitter account threatening violence, then attacked members of the U.S. military.  Am. Compl. ¶¶ 187-188; Navy Report 40-43.  He killed three U.S. servicemembers and injured eight others.  Navy Report 5.  Law enforcement killed him on the scene.  Am. Compl. ¶ 212.

Saudi Arabia immediately denounced Al Shamrani's attack.  King Salman bin Abdulaziz Al Saud called President Donald J. Trump on the day of the attack to "affirm[] that the perpetrator of this heinous crime does not represent the Saudi

people, who count the American people as friends and allies," and "directed Saudi security services to cooperate" with the United States' investigation.[2]

## II.    The United States' Investigations

A.      On January 13, 2020, Attorney General William Barr announced findings from the FBI's investigation of the Pensacola shooting.[3]  The "one goal" of this investigation was to determine if Al Shamrani "acted alone, or if anyone helped him."[4]  The "investigation involved hundreds of special agents from the FBI, intelligence analysts, and professional experts," interviews of "more than 500 witnesses, base personnel, and the shooter's friends, classmates and associates," "dozens of surveillance teams," and "numerous search warrants, subpoenas, court orders, and emergency disclosure requests."  January 13, 2020 Press Conference at 10:20-11:25.  Saudi Arabia "gave complete and total support" to the investigation, including "order[ing] all Saudi trainees to fully cooperate."  January 13, 2020

---

[2] Embassy of Saudi Arabia, *In Phone Call with U.S. President, Saudi King Condemns Florida Shooting* (Dec. 6, 2019), https://www.saudiembassy.net/news/phone-call-us-president-saudi-king-condemns-florida-shooting.

[3] *See* Ex. B (U.S. Dep't of Justice, Attorney General William P. Barr Announces the Findings of the Criminal Investigation into the December 2019 Shooting at Pensacola Naval Air Station (Jan. 13, 2020) ("January 13, 2020 Investigative Findings")).

[4] Attorney General Barr and FBI Deputy Director Bowdich Hold Press Conference at 10:11-20 (Jan. 13, 2020) ("January 13, 2020 Press Conference"), https://www.youtube.com/watch?v=sXI5qUsPjEY.

Investigative Findings.  The FBI acknowledged Saudi Arabia's "assistance" as "critical."  *Id.*[5]

The FBI found "no evidence of assistance or pre-knowledge of the attack by other members of the Saudi military (or any other foreign nationals) who [we]re training in the United States."  *Id.*  Although "[e]arly reports indicated that the shooter arrived at the site[] accompanied by other Saudi cadets, who took video of the attack as it unfolded," the FBI found that was "not . . . accurate."  *Id.*  Rather, "[o]ther Saudi cadets happened to be in the area and, after the attack began, they took some videos of the resulting commotion."  *Id.*  The FBI also "extensively vet[ted]" a trip that Al Shamrani took to New York in November 2019 and found the trip was not "an unusual activity" and was consistent with Saudi students' practice of traveling in the United States.  January 13, 2020 Press Conference at 17:45-18:00; *see also* Navy Report 53 ("Visiting major U.S. cities is a normal practice for visiting foreign military personnel.").[6]

---

[5] This Court may consider the results of the FBI's investigation because the Amended Complaint relies (at, *e.g.*, ¶¶ 320-321, 324, 327, 341-344) upon the FBI's findings and because those findings are admissible under Federal Rule of Evidence 803(8)(A)(3).  *See supra* note 1.

[6] According to the Attorney General, the FBI found that 17 Saudi military students in the United States had social media containing "some jihadi or anti-American content."  January 13, 2020 Investigative Findings.  The Attorney General did not indicate that those students agreed with or sponsored that content. The FBI found the content did not warrant prosecution.  *See id.*

The FBI released additional findings on May 18, 2020, after unlocking an iPhone used by Al Shamrani.[7]  The phone contents showed that Al Shamrani had "significant ties" to Al Qaeda and communicated with Al Qaeda "using end-to-end encrypted apps, with warrant-proof encryption, deliberately in order to evade law enforcement."  May 18, 2020 Investigative Update.  The FBI did not state that any additional evidence on Al Shamrani's phone indicated assistance or pre-knowledge of the attack by Saudi Arabia or other Saudi military trainees.

> **B.**     On February 21, 2020, the United States Navy issued the Navy Report.  On July 7, 2020, the Chief of Naval Operations adopted it.  The Navy Report found that the attack's "primary cause" was Al Shamrani's "self-radicalization."  Navy Report 7.  It found that, before entering the United States, Al Shamrani had passed human rights, security, and medical screening conducted by the United States, *see id.* at 135-36, looking for evidence of "support" of "terrorist activity."[8]  Despite "isolated events and indicators" of Al Shamrani's

---

[7] *See* Ex. C (U.S. Dep't of Justice, Attorney General William P. Barr and FBI Director Christopher Wray Announce Significant Developments in the Investigation of the Naval Air Station Pensacola Shooting (May 18, 2020) ("May 18, 2020 Investigative Update")).

[8] Ex. D (Defense Security Cooperation Agency, Security Assistance Management Manual ("Security Manual") C10.8.1 (requiring screening by the United States), C10.8.3 (requiring security training to be conducted in Saudi Arabia "by in-country [U.S. officials] . . . for evidence of . . . terrorist activity or support . . . or other U.S.-designated illegal or objectionable activities")).  This Court may consider the Security Manual because the Amended Complaint relies (at ¶ 171) on it.  *See supra* note 1.

"potential threat," "no one person or organization knew or could have known"
Al Shamrani "would attack active duty service members and civilians." *Id.* at 7.
Al Shamrani's "path to radicalization was not recognized and interrupted" in part
because "his record contained neither disciplinary nor significant performance
issues." *Id.*

### III.   Plaintiffs' Complaint

Plaintiffs are the victims of the Pensacola shooting or their survivors.  On
February 22, 2021, they filed suit against Saudi Arabia.  On May 11, 2021, they
filed an amended complaint.  On January 18, 2022, Plaintiffs completed service
under 28 U.S.C. § 1608(a)(4).  *See* ECF Nos. 23, 23-1.

Plaintiffs advance three theories of liability.  *First*, Plaintiffs contend Saudi
Arabia is vicariously liable for Al Shamrani's attack because the attack was within
Al Shamrani's scope of employment.  *E.g.*, Am. Compl. ¶¶ 345-362.  *Second*,
Plaintiffs claim Saudi Arabia is liable for failing to prevent the Pensacola attack
because it inadequately screened and supervised Al Shamrani.  *E.g.*, *id.* ¶¶ 135-
186, 502-525.  *Third*, Plaintiffs assert Saudi Arabia is liable because it supposedly
provided material support to Al Qaeda.  *E.g.*, *id.* ¶¶ 78-106.

## STANDARD OF REVIEW

The FSIA declares "a foreign state . . . immune from the jurisdiction of the courts of the United States . . . except as provided" by certain exceptions. 28 U.S.C. § 1604.  That statutory framework is "the sole basis for obtaining jurisdiction over a foreign state in the courts of" the United States.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989).  It renders Saudi Arabia "presumptively immune from the jurisdiction of United States courts."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  Unless an exception is shown, the FSIA bars both subject-matter and personal jurisdiction over a foreign state.  *See id.*; *Amerada Hess*, 488 U.S. at 435 n.3.[9]

In moving to dismiss under Federal Rule of Civil Procedure 12(b)(1), Saudi Arabia "may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both."  *Robinson v. Government of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001); *see Butler*, 579 F.3d at 1313 (legal challenge); *Odyssey Marine Expl., Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1169 (11th Cir. 2011) ("factual attack").  Saudi Arabia raises both challenges here.

---

[9] The Amended Complaint concedes (at ¶ 39) that Saudi Arabia is a foreign state entitled to sovereign immunity.  *See Butler v. Sukhoi Co.*, 579 F.3d 1307, 1313 n.8 (11th Cir. 2009) (defendant's "initial burden" of showing it is a foreign state is satisfied where that fact is uncontested); *see also Nelson*, 507 U.S. at 356.

To resolve a legal challenge, this Court applies the familiar Rule 12(b)(6) standard, taking as true well-pleaded factual allegations, but disregarding "conclusory allegations or legal conclusions masquerading as factual conclusions." *Butler*, 579 F.3d at 1313-14; *see Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

To resolve a factual challenge, Plaintiffs must "produc[e] evidence that the conduct which forms the basis of [the] complaint falls within one of the statutorily defined exceptions." *Butler*, 579 F.3d at 1312-13 (internal quotations omitted; first alteration added).

> Determining whether this burden is met involves a review of the allegations in the complaint, the undisputed facts, if any, placed before the court by the parties, and – if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue – resolution of disputed issues of fact.

*In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 80 (2d Cir. 2008) (cleaned up), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010); *see Butler*, 579 F.3d at 1313.  Only if Plaintiffs "carr[y]" that "burden of production" does the Court "resolve disputed issues of fact, with the . . . foreign sovereign shouldering the burden of persuasion." *Robinson*, 269 F.3d at 141.

## ARGUMENT

Plaintiffs rely on four statutory exceptions to foreign sovereign immunity: (1) the non-commercial-tort exception, *see* 28 U.S.C. § 1605(a)(5); (2) the JASTA terrorist-act exception, *see id.* § 1605B; (3) the commercial-activity exception, *see id.* § 1605(a)(2); and (4) waiver of foreign sovereign immunity, *see id.* § 1605(a)(1). Am. Compl. ¶ 18. As to each exception, Plaintiffs can neither plead nor prove a basis for this Court to exercise jurisdiction over Saudi Arabia.

## I.    The Non-Commercial-Tort Exception Does Not Apply

Section 1605(a)(5), the non-commercial-tort exception, includes claims "for personal injury or death . . . occurring in the United States and caused by the tortious act or omission of [a] foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment." 28 U.S.C. § 1605(a)(5). It excludes "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." *Id.* § 1605(a)(5)(A).

### A.    The Attack Was Not Within The Scope Of Al Shamrani's Employment

Al Shamrani did not commit the attack "while acting within the scope of his office or employment." 28 U.S.C. § 1605(a)(5). Scope of employment is determined by the law of the place where injury occurred. *See Swarna v. Al-Awadi*,

622 F.3d 123, 144 (2d Cir. 2010).[10]  Here, that place is Florida.  Under Florida law,

an employee's conduct is within the scope of employment only if the conduct:

(1) was "the kind . . . which the employee was employed to perform," (2) "occurred

within the time and space limits of his employment," and (3) was "activated at

least in part by a purpose to serve the employment."  *Spencer v. Assurance Co.*

*of Am.*, 39 F.3d 1146, 1150 (11th Cir. 1994).

Tortious acts "undertaken for reasons that are purely personal to an

employee" fall outside the scope of employment.  *Id*.  Intentional criminal acts

almost always fall outside the scope of employment because employees are not

(with rare exception) employed to commit crimes.  *See*, *e.g.*, *id.* (battery); *City of*

*Green Cove Springs v. Donaldson*, 348 F.2d 197, 202-03 (5th Cir. 1965) (rape).

Many Florida cases apply this rule.[11]

---

[10] *Accord O'Bryan v. Holy See*, 556 F.3d 361, 381 (6th Cir. 2009); *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 173 (5th Cir. 1994); *Liu v. Republic of China*, 892 F.2d 1419, 1425-26 (9th Cir. 1989).

[11] *See*, *e.g.*, *Mallory v. O'Neil*, 69 So. 2d 313, 314-15 (Fla. 1954) (shooting); *Goss v. Human Servs. Assocs., Inc.*, 79 So. 3d 127, 132 (Fla. Dist. Ct. App. 2012) (sexual assault); *Special Olympics Florida, Inc. v. Showalter*, 6 So. 3d 662, 665-66 (Fla. Dist. Ct. App. 2009) (per curiam) (molestation); *Elders v. United Methodist Church*, 793 So. 2d 1038, 1041 (Fla. Dist. Ct. App. 2001) (sexual misconduct); *Agriturf Mgmt., Inc. v. Roe*, 656 So. 2d 954, 955 (Fla. Dist. Ct. App. 1995) (sexual abuse); *Perez v. Zazo*, 498 So. 2d 463, 465 (Fla. Dist. Ct. App. 1986) (stabbing); *DeJesus v. Jefferson Stores, Inc.*, 383 So. 2d 274, 274 (Fla. Dist. Ct. App. 1980) (assault); *Martin v. United Sec. Servs., Inc.*, 373 So. 2d 720, 721 (Fla. Dist. Ct. App. 1979) (per curiam) (murder); *Jones v. City of Hialeah*, 368 So. 2d 398, 400-01 (Fla. Dist. Ct. App. 1979) (shooting); *Nettles v. Thornton*, 198 So. 2d 44,

Plaintiffs cannot show that Al Shamrani's attack on U.S. service members "serve[d] [his] employment," *Spencer*, 39 F.3d at 1150, in the RSAF.  As Plaintiffs acknowledge, Al Qaeda claims responsibility for Al Shamrani's attack.  Am. Compl. ¶ 96.  As the FBI further found, "Al Shamrani . . . radicalized not, after training here in the United States, but at least as far back as 2015," and later joined "the [Royal] Saudi Air Force Academy in order to carry out what he called a special operation."[12]

Plaintiffs assert (at ¶¶ 348-350, 357-360) that Al Shamrani was able to commit his attack because Saudi Arabia provided Al Shamrani with employment, weapons training, a rank, and a uniform.  Whether Al Shamrani's attack was possible because of his employment is separate from whether the attack was within the scope of his employment.  Florida courts have rejected the theory on which Plaintiffs rely.  *See Keen v. Florida Sheriffs' Self-Insurance Fund*, 962 So. 2d 1021, 1024 (Fla. Dist. Ct. App. 2007) (crime outside scope of employment despite

---

45 (Fla. Dist. Ct. App. 1967) (assault); *Doe v. Cramer*, 2018 WL 8265221, at *3-4 (S.D. Fla. Aug. 10, 2018) (false imprisonment, sexual assault); *Doe v. United States*, 2017 WL 5068883, at *2 (M.D. Fla. Nov. 3, 2017) (rape).

[12] Attorney General Barr, FBI Director Wray Announce Developments in the Investigation of the NAS Pensacola Shooting at 5:25-6:00 (May 18, 2020), https://www.youtube.com/watch?v=nfqff_NsYiI.

officer "illegally us[ing] his position as a pretense to place [the victim] in a position where he could sexually assault her").[13]

Indeed, Al Shamrani's murder of American servicemembers was not merely outside the scope of his employment; it betrayed his own country.  Although Plaintiffs claim (at ¶ 351) that the attack furthered "the policy and ideology of the Kingdom of Saudi Arabia," that conclusory assertion is not entitled to an assumption of truth.  *See Iqbal*, 556 U.S. at 679.  It also makes no sense alongside Plaintiffs' own allegations (at ¶¶ 40-43) that Saudi Arabia is the largest participant in the United States' foreign military sales and training programs.  Al Shamrani's crime threatened to harm that longstanding, vital security relationship.  He served Al Qaeda's interests, not Saudi Arabia's.

---

[13] *See also Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So. 2d 353, 358 (Fla. Dist. Ct. App. 2001) (sexual assault by pastor who "had access to [a minor] because of his position as the Church pastor"); *Mason v. Florida Sheriffs' Self-Insurance Fund*, 699 So. 2d 268, 270 (Fla. Dist. Ct. App. 1997) (sexual battery by officer while "on duty, in uniform," and "serving a warrant"); *Tallahassee Furniture Co. v. Harrison*, 583 So. 2d 744, 758 (Fla. Dist. Ct. App. 1991) (assault enabled by "job-related contact"); *Hammer v. Lee Mem'l Health Sys.*, 2018 WL 3707832, at *4 (M.D. Fla. Aug. 3, 2018) (perpetrator "was able to sexually assault Plaintiff because of his position as her nurse"); *S.D. v. City of Cape Coral*, 2017 WL 5906281, at *2 (M.D. Fla. Nov. 30, 2017) (assault occurred "during [the officer's] shift, in the police car, and while [he] was in uniform, utilizing his position as a Cape Coral police officer to intimidate and coerce plaintiff"); *Hemmings v. Jenne*, 2010 WL 4005333, at *4 (S.D. Fla. Oct. 12, 2010) (similar); *Andersen v. United States*, 2009 WL 6633307, at *6 (S.D. Fla. Oct. 21, 2009) (similar).

### B.    Saudi Arabia's Alleged Failure To Prevent Al Shamrani's Attack Does Not Satisfy The Non-Commercial-Tort Exception

Plaintiffs' theory that Saudi Arabia failed to prevent Al Shamrani's attack by inadequately screening or supervising him also cannot support jurisdiction under the non-commercial-tort exception.  That theory seeks relief for alleged acts or omissions outside the United States; for the performance, or failure to perform, discretionary functions; and for acts or omissions that did not cause the attack.

### 1.    Alleged Acts Or Omissions Occurring Outside The United States Cannot Support Jurisdiction

For the non-commercial-tort exception to apply, "the 'entire tort' must be committed in the United States."  *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 109, 115 (2d Cir. 2013); *see also Amerada Hess*, 488 U.S. at 441.  Both the "tortious act" allegedly committed by the foreign sovereign and the "injuries and damages" flowing from that act must occur within the United States.  *Terrorist Attacks*, 714 F.3d at 116; *accord O'Bryan*, 556 F.3d at 382; *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1525 (D.C. Cir. 1984).

Plaintiffs' failure-to-screen and failure-to-supervise theories rely almost entirely on acts or omissions in Saudi Arabia, not in the United States.  They allege Saudi Arabia "knew" or "should have known" Al Shamrani had been radicalized "*[p]rior* to joining the RSAF" by screening him before he entered the United States, *e.g.*, Am. Compl. ¶¶ 135, 143, 512(i)-(viii) (emphasis added); that Saudi

Arabia should have surveilled Al Shamrani's phone and social media, *e.g.*, *id.* ¶¶ 107-125; and that Saudi Arabia did not "properly screen" Al Shamrani "*before* nominating [him] for training in the United States," *e.g.*, *id.* ¶ 507 (emphasis added). *See also*, *e.g.*, *id.* ¶¶ 513(i)-(ix), (xxiii), 514, 518.  "[A]ny portion of plaintiffs' claims that relies upon acts committed . . . abroad cannot survive." *O'Bryan*, 556 F.3d at 385; *see id.* (rejecting such claims for "negligent supervision").

Plaintiffs' limited allegations about acts or omissions in the United States cannot stand alone.  Plaintiffs assert that Saudi Arabia's country liaison officer ("CLO" or "liaison officer") – an individual who "help[s] administer IMS," that is, international military students – for the RSAF went on leave in June 2019, periodically returned in August and September, and was absent from NAS Pensacola during the period from September 21, 2019, until after the attack on December 7, 2019.  Am. Compl. ¶¶ 169, 177-182.  Plaintiffs assert that this absence purportedly put "'good order and discipline . . . at risk,'" *id.* ¶ 173 (quoting Navy Report 226), and "'created a marked decline in the military bearing' of RSAF students," *id.* ¶ 184 (quoting Navy Report 11).  As set out below, the liaison-officer allegations do not support jurisdiction under the non-commercial-tort exception because they involve discretionary functions and because Plaintiffs can neither plead nor prove that they "caused" Plaintiffs' injuries.

### 2. Alleged Acts or Omissions Involving Discretionary Functions Cannot Support Jurisdiction

Plaintiffs claim that Saudi Arabia "fail[ed] to implement and/or execute security screening protocols and oversight of its RSAF candidates for training in the United States."  Am. Compl. ¶ 390; *see*, *e.g.*, *id.* ¶¶ 507 (duty to "properly screen [and] monitor"), 509, 513-518.  But the non-commercial-tort exception excludes "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused."  28 U.S.C. § 1605(a)(5)(A); *see United States v. Gaubert*, 499 U.S. 315, 322-23 (1991); *OSI, Inc. v. United States*, 285 F.3d 947, 950-53 (11th Cir. 2002).

Hiring and supervising a government employee is a discretionary function. *See Doe v. Holy See*, 557 F.3d 1066, 1083-85 (9th Cir. 2009) ("[T]he tortious act exception [under the FSIA] does not provide jurisdiction over Doe's negligent hiring, supervision, and failure to warn claims because they are barred by the discretionary function exclusion."); *Robles v. Holy See*, 2021 WL 5999337, at *12-14 (S.D.N.Y. Dec. 20, 2021) (finding immunity under the FSIA and reasoning that "[c]ase-law is clear that decisions related to employment and supervision are exactly the kind of policy judgments that the discretionary exclusion was designed to shield"); *Travel Assocs., Inc. v. Kingdom of Swaziland*, 1990 WL 134512, at *3 (D.D.C. Aug. 30, 1990) ("Plaintiff's claim of negligent training and supervision of

the former Swaziland ambassador . . . clearly involves the performance of discretionary functions.").

Decisions applying the discretionary-exception provision in the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a), are in accord.[14]  *See Gaubert*, 499 U.S. at 334 ("negligent selection of directors and officers"); *Andrews v. United States*, 121 F.3d 1430, 1440-41 (11th Cir. 1997) ("decisions about how and how much to supervise the safety procedures of independent contractors"); *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1217 (D.C. Cir. 1997) ("hiring, training, and supervising of [transit] employees").[15]

The principle that hiring and supervision are discretionary applies fully to military personnel.  *See, e.g.*, *Mercado Del Valle v. United States*, 856 F.2d 406, 407-09 (1st Cir. 1988) (supervision by Air Force of military student organization) (Breyer, J.); *Carlyle v. United States*, 674 F.2d 554, 556-57 (6th Cir. 1982) ("supervision of [Army] recruits").  And that principle has special force here because Plaintiffs' claims touch on the sensitive areas of security risks and religious or ideological beliefs.

---

[14] Cases on the FTCA's discretionary-function exception are persuasive authority as to the FSIA's similar exception.  *See, e.g.*, *Swarna*, 622 F.3d at 145.

[15] *See also Guile v. United States*, 422 F.3d 221, 230-31 (5th Cir. 2005) ("negligent supervision" of psychiatrists); *Gager v. United States*, 149 F.3d 918, 921 (9th Cir. 1998) ("training and supervision in mail bomb detection").

*Harper v. United States*, 2020 WL 4192540 (D.D.C. July 21, 2020), applied the FTCA's discretionary-function exception to similarly tragic facts.  That case arose from the mass shooting by former Army Major Nidal Hassan at Fort Hood in 2009.  *Id.* at *1.  Hassan, like Al Shamrani, was allegedly influenced by Al Qaeda's ideology when he killed 13 people and injured more than 30 others.  *Id.* at *2.  Victims of the attack and surviving family members, like those here, alleged that Hassan's military employers "were aware of his extremist views" but failed to "tak[e] precautions . . . or disciplin[e]" him.  *Id.*  The district court dismissed their claims because the military's "supervision and discipline decisions with respect to" enlisted members "involve judgment and discretion."  *Id.* at *5.  The same logic has equal force here.

Plaintiffs' attempts (at ¶ 519) to avoid the discretionary-function exception fall short.  *First*, Plaintiffs assert generally that Saudi Arabia's hiring and supervision of Al Shamrani was governed by laws, policies, and regulations.  But they identify no mandatory law, regulation, or policy – either of the United States or of Saudi Arabia– by which Saudi Arabia was required to abide in hiring and supervising Al Shamrani.  *Cf. Andrews*, 121 F.3d at 1441 ("'Where no statute or regulation controls the government's monitoring of a contractor's work, the extent of monitoring required or actually accomplished is necessarily a question

of judgment, or discretion, for the government.'") (quoting *Kirchmann v. United States*, 8 F.3d 1273, 1276 (8th Cir. 1993)).[16]

*Second*, Plaintiffs err in relying (at ¶¶ 171-172) on two U.S. military manuals that they allege required Saudi Arabia to have a country liaison officer present:  the Security Manual and the U.S. Naval Flight Student Training Administration Manual.[17]  The Security Manual provides "guidance" to "organizational entities within the [Department of Defense]" and does not impose mandatory duties on Saudi Arabia.[18]  It also states (at C10.20.8) that "CLO support and duties will be identified and stated in an agreement between the unit and sponsoring country."  The Navy Report found (at 223) that no such "formal agreement" existed and, if one had, it "would be nonbinding."

The Training Manual (at 1-1) sets out "procedures for the processing of all students undergoing flight training in the Naval Air Training Command" and is directed to "[c]ommanders" within that Command.  Like the Security Manual,

---

[16] Plaintiffs also vaguely assert that Al Shamrani violated "policies and procedures" by purchasing a gun, Am. Compl. ¶¶ 145, 152, and traveling to New York, *id.* ¶¶ 162-163.  Those alleged violations were not within the scope of his employment.  *See supra* pp. 12-15.  In any event, Plaintiffs cite no mandatory rule prohibiting the purchase or the trip.  The Navy Report found (at 53, 90) that the purchase was "legal[] . . . under existing federal law," and the trip was "normal."

[17] *See* Ex. E (Naval Air Training Command, CNATRAINST 1500.4H (2014) ("Training Manual")).

[18] Defense Security Cooperation Agency, Authorization Letter, Security Manual (Apr. 30, 2012), https://samm.dsca.mil/listing/authorization-letter.

it imposed no mandatory duties on Saudi Arabia.  Concerning liaison officers, the Training Manual states (at 9-7) that, "[a]t the request of another country . . . , a CLO may be assigned to assist with the administrative duties for [international military students] for his or her country" – that is, a liaison officer could be present at Saudi Arabia's "request" and the assignment was permitted ("may"), not mandatory.

*Third*, Plaintiffs cannot overcome immunity with formulaic assertions that Saudi Arabia "intentionally, deliberately and recklessly breached its duty" to screen or supervise Al Shamrani.  *E.g.*, Am. Compl. ¶ 513.  The discretionary-function limitation cannot be circumvented by allegations that the discretionary act was undertaken with a culpable mental state.  *See Miller v. United States*, 992 F.3d 878, 889 (9th Cir. 2021) (explaining that "the Supreme Court's decision in *Gaubert* forecloses adopting" a "carve-out" even for "intentional and bad-faith torts"); *see also* 28 U.S.C. § 1605(a)(5)(A) (granting immunity "regardless of whether the discretion be abused").

### 3.    Plaintiffs Fail To Plead Or To Prove Causation

**i.    But-for causation.**  When Congress creates a causation requirement, it legislates against "traditional background principles."  *Burrage v. United States*, 571 U.S. 204, 214 (2014).  Those principles divide causation into "two constituent parts:  actual cause and legal cause."  *Id.* at 210; *see also U.S. Commodity Futures*

*Trading Comm'n v. Southern Tr. Metals, Inc.*, 894 F.3d 1313, 1329 (11th Cir. 2018) (discussing the "common-law rules" for causation).  Under the "traditional understanding" of "actual causality," certain " '[c]onduct is the cause of a result' if 'it is an antecedent but for which the result in question would not have occurred.' " *Burrage*, 571 U.S. at 211 (quoting Model Penal Code § 2.03(1)(a) (1985)) (brackets in *Burrage*); *see id.* (describing but-for causation as "the minimum concept of cause"); *Southern Tr. Metals*, 894 F.3d at 1329 ("[P]roximate cause necessarily encompasses *cause in fact*, requiring proof of 'but-for' causation.").[19]

Once acts and omissions outside the United States are excluded, Plaintiffs are left only with the liaison officer's absence.  Even if they could plead around the discretionary-function exception (which they cannot), Plaintiffs still have not alleged facts plausibly showing that Al Shamrani's attack would not have occurred

---

[19] Some courts have read the phrase "caused by" in other FSIA exceptions to impose a form of proximate-causation requirement that does not include but-for causation.  *See Rux v. Republic of Sudan*, 461 F.3d 461, 472-74 (4th Cir. 2006); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127-31 (D.C. Cir. 2004).  Those cases are inconsistent with the Supreme Court's reasoning in *Burrage* that "but for 'is the minimum concept of cause' " and that a causation element requires but-for causation unless there is some "textual or contextual indication to the contrary."  571 U.S. at 211-12 (quoting *United States v. Hatfield*, 591 F.3d 945, 948 (7th Cir. 2010)); *see also*, *e.g.*, *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1739 (2020) (explaining that the phrase " 'because of' . . . incorporates the 'simple' and 'traditional' standard of but-for causation") (quoting *University of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346, 360 (2013)).  They are also contrary to the Eleventh Circuit's teaching that proximate causation "encompasses" but-for causation.  *Southern Tr. Metals*, 894 F.3d at 1329.  In any event, Plaintiffs fail to show any form of causation.

but for that absence.  According to Plaintiffs, the liaison officer's "primary purpose" was to "help[] administer" international military students, Am. Compl. ¶¶ 169-170, with duties like "[m]aintain[ing] contact with their students," "[a]ssist[ing] in routine inspections," and "[t]ak[ing] necessary action for minor breaches of discipline," *id.* ¶ 172.  Plaintiffs do not and cannot allege that liaison officers are responsible for stopping "[i]nsider [t]hreats."  *Id.* ¶ 504.

Plaintiffs also assert that Al Shamrani was in contact with Al Qaeda in 2015 and was planning an attack before he joined the RSAF.  *Id.* ¶¶ 132-134, 341.  The FBI similarly concluded that Al Shamrani joined the RSAF in order to carry out a so-called "special operation."  May 18, 2020 Investigative Update.  Both the FBI and the Navy found that no other Saudi or U.S. military members stationed with Al Shamrani had pre-knowledge of the attack.  Those individuals included a Royal Saudi Naval Force ("RSNF") liaison officer who was present "[d]uring absences of the RSAF CLO" and "executed some duties as a joint CLO" for RSAF and RSNF, although without a "formal agreement" to do so.  Navy Report 224.  Taking all those allegations and facts into account, it is not plausible that, but for the RSAF liaison officer's absence, Al Shamrani's attack would not have occurred.

ii.    **Proximate causation.**  The phrase "caused by" also requires what "tort law has traditionally called 'proximate causation.'"  *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995) (construing similar

language in the Extension of Admiralty Jurisdiction Act).  Generally, proximate

cause reflects a recognition that "'[i]njuries have countless causes'" and a refusal

"'to trace a series of events beyond a certain point.'"  *Southern Tr. Metals*, 894

F.3d at 1330 (quoting *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692-93 (2011)).

Courts apply the doctrine by "ask[ing] . . . whether the alleged violation led directly

to the plaintiff's injuries," *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 465

(2006) (applying the Racketeer Influenced and Corrupt Organizations Act

("RICO")), or "'whether and to what extent the defendant's conduct foreseeably

and substantially caused the specific injury that actually occurred,'" *O'Donnell v.*

*United States*, 736 F. App'x 828, 833 (11th Cir. 2018) (per curiam) (quoting

*McCain v. Florida Power Corp.*, 593 So. 2d 500, 502-03 (Fla. 1992)).

The liaison officer's alleged absence did not directly cause Al Shamrani's

attack.  A causal chain is not direct "where plaintiff's injury d[oes] not 'necessarily'

follow from defendant's . . . acts" and the "connection" between act and injury is

"not 'straightforward.'"  *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 713

(11th Cir. 2014) (applying RICO and quoting *Hemi Group, LLC v. City of New*

*York*, 559 U.S. 1, 14-15 (2010) (plurality)).  The Amended Complaint suggests

only that the officer's presence "*may* have 'provided [Al Shamrani] with better

oversight and resulted in proactive intervention by [Saudi Arabia]' prior to the

attack."  Am. Compl. ¶ 184 (quoting Navy Report 11) (emphasis and first alteration added).  That is insufficient to plead proximate causation.

Nor was Al Shamrani's attack a foreseeable result of the liaison officer's alleged absence.  "[A] criminal act generally breaks the chain of causation" because "a person usually has no reason to foresee the criminal acts of another."  *Sosa v. Coleman*, 646 F.2d 991, 993-94 (5th Cir. Unit B June 1981) (applying Florida law).  For example, *Island City Flying Service v. General Electric Credit Corp.*, 585 So. 2d 274 (Fla. 1991), held a worker's employer could not have foreseen his criminal theft of an airplane.  *See id.* at 277.  The court found it irrelevant that the thief received a bad-conduct discharge from the military and had job performance problems for which he had been fired twice.  *See id.* at 275.  None of those facts made it foreseeable that the worker would commit theft.[20]

Here, Plaintiffs make no well-pleaded allegations that the RSAF liaison officer (or anyone else) had reason to foresee that Al Shamrani would commit an attack.  They assert without detail and without factual support that the liaison officer knew of Al Shamrani's legal firearm purchase, Am. Compl. ¶¶ 152, 156,

---

[20] *See also City of Green Cove Springs*, 348 F.2d at 201 (city's negligence did not proximately cause the assault and rape of an arrestee by a police officer in the absence of any "demonstrated propensity to sexual misconduct or otherwise" by the officer); *Watson v. City of Hialeah*, 552 So. 2d 1146, 1149 (Fla. Dist. Ct. App. 1989) (negligent hiring and retention of police officer did not proximately cause murder where there was insufficient basis "to charge the city with knowledge that the officers would commit murder").

and that other RSAF trainees knew of the firearm purchase and the impending attack, *id.* ¶¶ 156, 164-165, but did not try to stop the attack "[b]ecause they supported it," *id.* ¶¶ 167-168.  Conclusory allegations of what defendants "knew or should have known" should be disregarded.  *See Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011).  In addition, Plaintiffs' allegations are contrary to admissible evidence.  Following an extensive investigation, the FBI concluded that there is "no evidence of assistance or pre-knowledge of the attack by other members of the Saudi military."  *See supra* p. 7.

Plaintiffs also err in relying (at ¶¶ 183-184) on the Navy Report's finding that the liaison officer's absence was one of 14 "contributing factors" that "may have influenced the sequence of events leading to the attack."  Navy Report 8-9. "[C]ontributing factors" are neither but-for nor proximate causes.  *See Burrage*, 571 U.S. at 215-16 (but-for causation does not cover "merely contribut[ing]" factors); *Anza*, 547 U.S. at 460 (proximate causation covers only "direct causal" factors).  Other "contributing factors" identified by the Navy Report include: an "[a]dverse . . . microclimate" for international students; "[h]arassment" by an instructor; "[p]erceived inadequacy of the resolution of [a] . . . harassment complaint"; "[r]eported noise infractions"; and the "[d]eparture of [Al Shamrani's] roommate on leave in November 2019."  Navy Report 8-9.  That is not a list of proximate causes.

### C.   Plaintiffs' Allegations That Saudi Arabia Supported Al Qaeda Are Insufficiently Pleaded, Baseless, And Irrelevant

Plaintiffs err in claiming that the non-commercial-tort exception applies based on Saudi Arabia's purported provision of material support to Al Qaeda. Am. Compl. ¶ 378.  We must say at the outset that Saudi Arabia categorically denies Plaintiffs' baseless allegation.  Saudi Arabia has been repeatedly targeted on its own soil by Al Qaeda[21] and has worked hand-in-glove with the United States in its war against Al Qaeda and other terrorist actors.[22]  The Amended Complaint contains no well-pleaded allegations that Saudi Arabia materially supported Al Qaeda.  Its conclusory assertions (at, *e.g.*, ¶ 81) that Saudi Arabia has "poured funds and weapons into" the terrorist group deserve no weight.

Nor is there evidence backing those assertions.  Plaintiffs cite two newspaper articles (at ¶¶ 103-106), but both are hearsay and cannot meet Plaintiffs'

---

[21] Stanford Univ., *Mapping Militant Organizations:  Al Qaeda* (describing "[m]ajor [a]ttacks" including a 2004 attack in Khobar, Saudi Arabia), https://cisac.fsi.stanford.edu/mappingmilitants/profiles/al-qaeda; Stanford Univ., *Al Qaeda in the Arabian Peninsula* (describing Al Qaeda subgroup's 2009 attempt to assassinate Prince Mohammed bin Nayef Al Saud), https://cisac.fsi.stanford.edu/mappingmilitants/profiles/al-qaeda-arabian-peninsula.

[22] *See, e.g.*, U.S. Embassy & Consulates in Saudi Arabia, *Joint Statement of the U.S.-Saudi Arabia Strategic Dialogue* (Oct. 21, 2020) ("The United States and Saudi Arabia stressed the importance of their close partnership in countering terrorism and the Kingdom's key role in maintaining regional and international security, and the two countries reviewed mutual efforts to strengthen security in Iraq."), https://sa.usembassy.gov/joint-statement-of-the-u-s-saudi-arabia-strategic-dialogue/.

burden to provide "sufficient evidence" to establish an exception to sovereign immunity.  *Robinson*, 269 F.3d at 141.  In any event, neither supports Plaintiffs' allegations.  One article is an Associated Press report describing "decisive victories" against Al Qaeda in Yemen by "a military coalition led by Saudi Arabia and backed by the United States,"[23] but attributing them to negotiation – hardly the "direct support" to Al Qaeda that Plaintiffs (at ¶ 104) claim.  The other article describes a "leaked email" that purportedly describes Saudi "support" for "the Islamic State" and "other radical Sunni groups."[24]  The link to the "leaked email" leads to a cable from a U.S. Ambassador stating that individual "donors in Saudi Arabia" (not the Saudi government) fund extremist groups and that the Saudi government is "cooperating more actively than at any previous point to respond to terrorist financing concerns raised by the United States, and to investigate and detain financial facilitators of concern."[25]

Plaintiffs' material-support theory also fails for two other, independent reasons.  *First*, it is based on purported conduct that occurred entirely outside

---

[23] Ex. F (Maggie Michael, Trish Wilson & Lee Keath, *AP Investigation: US allies, al-Qaida battle rebels in Yemen*, Assoc. Press (Aug. 6, 2018)).

[24] Ex. G (Fareed Zakaria, *How Saudi Arabia played Donald Trump*, Wash. Post (May 25, 2017)).

[25] The cited article's reference to the "leaked email" hyperlinks to another that describes the contents of the cable.  *See* Ex. H (Tim Lister, *WikiLeaks cables assess terrorism funding in Saudi Arabia, Gulf states*, CNN (Dec. 6, 2010)).

the United States.  Am. Compl. ¶¶ 78-106.  The entire-tort rule bars consideration
of these extraterritorial allegations.  *See Terrorist Attacks*, 714 F.3d at 116-17
(applying entire-tort rule to allegations of "providing funding and other aid" to
Al Qaeda outside the United States).

*Second*, Plaintiffs' allegations do not support any plausible inference that
purported support for Al Qaeda in the Middle East caused Al Shamrani's attack.
Indeed, Plaintiffs make no allegations at all connecting the two.  They cannot
meet any standard of causation – but-for, proximate, or otherwise.

## II.    The JASTA Terrorist-Act Exception Does Not Apply

Plaintiffs fail to plead, and cannot prove, any basis for jurisdiction under
JASTA.  Unlike the non-commercial-tort exception, JASTA does not require an
entire tort within the United States and has no discretionary-function exception.
Instead, it has other requirements.  As relevant here, Plaintiffs must establish:
(1) an "act or acts" of Saudi Arabia, or of "an official, employee, or agent" of
Saudi Arabia, "acting within the scope of . . . office, employment, or agency,"
(2) that was "tortious," and (3) that "caused" their injuries.  28 U.S.C. § 1605B(b).
JASTA excludes claims "on the basis of an omission or a tortious act or acts that
constitute mere negligence."  *Id.* § 1605B(d).

Two of Plaintiffs' theories for jurisdiction fail under JASTA for reasons
already given.  JASTA provides no exception to immunity based on Plaintiffs'

vicarious-liability theory because Al Shamrani did not commit the attack within the scope of his employment.  *See supra* pp. 12-15.[26]  And JASTA provides no exception to immunity based on Plaintiffs' material-support theory because Plaintiffs proffer no well-pleaded allegations or evidence that Saudi Arabia supported Al Qaeda and fail to show that any such support caused Al Shamrani's attacks.  *See supra* pp. 28-30.

The analysis is different for Plaintiffs' negligent-hiring and failure-to-supervise theories, but the result is the same.  *First*, allegations of "mere negligence" are insufficient under JASTA.  28 U.S.C. § 1605B(d).  For a tortious act to constitute gross negligence or recklessness, rather than "mere negligence," the tortfeasor must "know[]" that an injury was "imminent or 'clear and present.' " *Bridges v. Speer*, 79 So. 2d 679, 682 (Fla. 1955); *see Boyce v. Pi Kappa Alpha Holding Corp.*, 476 F.2d 447, 452 (5th Cir. 1973).[27]  Courts routinely hold that

---

[26] The JASTA exception differs from the non-commercial-tort exception in that it includes liability for the acts of "agent[s]" as well "official[s]" and "employee[s]."  *Compare* 28 U.S.C. § 1605(a)(5) *with id.* § 1605B(b).  That difference is immaterial because the Amended Complaint does not allege, or allege any facts to show, that Al Shamrani had any agency relationship with Saudi Arabia other than his employment as an RSAF officer.

[27] *See also Glaab v. Caudill*, 236 So. 2d 180, 183 (Fla. Dist. Ct. App. 1970) ("chargeable knowledge of awareness of the imminent danger"); *Burke v. Cooke*, 2005 WL 8162897, at *2 (N.D. Fla. May 5, 2005) ("aware[ness]" of "clear and present danger"), *report and recommendation adopted*, 2005 WL 8162894 (N.D. Fla. May 25, 2005).

failures to conduct background checks are ordinary negligence, not gross negligence or recklessness. *See Jackson v. County of Wayne*, 217 F. App'x 103, 106-07 (3d Cir. 2007) ("not securing sufficient background information" on foster parents was "mere negligence"); *Waubanascum v. Shawano Cty.*, 416 F.3d 658, 668 (7th Cir. 2005) (inadequate background checks of foster parent "at most amount[ed] to some species of negligence").

Plaintiffs present no well-pleaded allegations and no competent evidence to show that Saudi Arabia's hiring and supervision of Al Shamrani was more than mere negligence (if that). The Court should disregard Plaintiffs' conclusory allegations that Saudi Arabia "knew of Al-Shamrani's radicalization," *e.g.*, Am. Compl. ¶¶ 114, 136, 144, 366, 423, 512(i)-(ii), (x), that Saudi Arabia "knew" Al Shamrani "was sharing and showing mass shooting video content," *id.* ¶ 512(xiii), or that it was "aware of Al-Shamrani's planned attack," *id.* ¶ 39(b). "'[B]are assertions'" of what Saudi Arabia "knew or should have known" are "'not entitled to be assumed true.'" *Mamani*, 654 F.3d at 1153-54 (quoting *Iqbal*, 556 U.S. at 681); *see id.* (requiring allegations of "specific acts" indicating knowledge).[28] Plaintiffs' assertions are also contradicted by the FBI's finding after

---

[28] Plaintiffs also allege that Saudi Arabia "knew that Al-Shamrani had a weapon." Am. Compl. ¶¶ 39(b), 156, 512(xii). Even if that were true, knowledge that a military officer had a weapon does not reasonably imply knowledge that he will commit a terrorist attack.

extensive investigation that Saudi Arabia did not assist in and had no pre-knowledge of Al Shamrani's attack.  *See supra* p. 7.

*Second*, Plaintiffs' contention that Saudi Arabia tortiously failed to prevent the attack relies on purported omissions.  JASTA precludes jurisdiction "on the basis of an omission."  28 U.S.C. § 1605B(d).  The statutory distinction between acts and omissions mirrors the common-law distinction between "non-feasance, which is doing nothing," and "misfeasance, the doing of things in a wrong and negligent matter."  *Dudley v. Community Pub. Serv. Co.*, 108 F.2d 119, 121 (5th Cir. 1939).  Even if Plaintiffs had adequately alleged – as they have not – that Saudi Arabia knew or should have known of Al Shamrani's radicalization or his planned attack, Saudi Arabia's alleged inaction in the face of such purported knowledge still would not support jurisdiction under § 1605B(d).

That statutory limitation matters here because the Amended Complaint relies extensively on alleged failures to act.  It devotes an entire section to Saudi Arabia's alleged "failures to investigate, monitor, supervise and report Al-Shamrani," Am. Compl. § V.I (capitalization omitted), and another section to Saudi Arabia's alleged "fail[ure] to provide sufficient country liaison officer assistance," *id.* § V.J (same).  In its concluding counts, paragraph 513 lists 24 supposed "[f]ailure[s]," and paragraph 515 lists 30.  All of those allegations are irrelevant to jurisdiction under JASTA.

## III.    The Commercial-Activity Exception Does Not Apply

The commercial-activity exception applies where an "action is based upon"
(1) "commercial activity carried on in the United States by the foreign state,"
(2) "an act performed in the United States in connection with a commercial activity
of the foreign state elsewhere," or (3) "an act outside the territory of the United
States in connection with a commercial activity of the foreign state elsewhere
and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).
Plaintiffs must proceed under the first prong because they allege only "commercial
activity" occurring in the United States – namely, "the training of Saudi Arabian
airmen, soldiers and sailors on United States' military bases."  Am. Comp. ¶ 41;
*see generally id.* ¶¶ 40-68.  They do not allege relevant commercial activity
elsewhere, as the second and third prongs require.

The "commercial character" of activity is determined by its "nature . . .
rather than by . . . its purpose."  28 U.S.C. § 1603(d).  That is, "commercial activity"
"must be 'the *type*' of activity 'by which a private party engages in' trade or
commerce*.  Jam v. International Fin. Corp.*, 139 S. Ct. 759, 772 (2019) (quoting
*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (2019)) (emphasis in
*Weltover*); *see* 28 U.S.C. § 1603(d) (defining "commercial activity" as the "regular
course of commercial conduct or a particular commercial transaction or act").
Military training that the United States offers sovereign "allies and partners,"

Am. Compl. ¶ 46, to further its military alliances and national security interests is not the type of activity by which a private party engages in trade or commerce and is not "commercial activity."  *See MCI Telecomms. Corp. v. Alhadhood*, 82 F.3d 658, 664 (5th Cir. 1996) (concluding that military training is not "commercial activity" under the FSIA); *see also Strange v. Islamic Republic of Iran*, 320 F. Supp. 3d 92, 97 (D.D.C. 2018) ("Afghanistan does not engage in commercial activity like a 'private player in the market' by accepting foreign aid from the United States in the form of assistance in developing its armed forces.").

Even if a military training arrangement between sovereign allies could be "commercial activity," Plaintiffs' claims would not be "based upon" that activity. The Supreme Court has held that an action is "based upon" commercial activity where the activity "constitutes the 'gravamen' of the suit."  *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 34-35 (2015); *see Nelson*, 507 U.S. at 356-57 (courts must "identify[] the particular conduct on which the . . . action is 'based'"). Where "there is nothing wrongful" about the commercial activity "standing alone," *OBB Personenverkehr*, 577 U.S. at 35, that requirement is not met.

Plaintiffs do not claim that the military training arrangement was wrongful. Instead, the alleged acts and omissions "upon" which their claims are "based" are Al Shamrani's attack, *e.g.*, Am. Compl. ¶¶ 345-362; Saudi Arabia's alleged negligent hiring and inadequate supervising of Al Shamrani, *e.g.*, *id.* ¶¶ 135-186,

502-525; and Saudi Arabia's supposed support to Al Qaeda, *e.g.*, *id.* ¶¶ 78-106. None of those acts or omissions is commercial activity.

*First*, Al Shamrani's attack itself was not commerce or trade.  *See Strange*, 320 F. Supp. 3d at 97-98 (concluding that, even if assistance to develop Afghanistan's military was "commercial activity," a case arising from a terrorist attack during such assistance is not "based upon an act 'in connection with' those activities") (quoting 28 U.S.C. § 1605(a)(2)).  Courts have similarly rejected commercial-activity jurisdiction in cases alleging murder, *see Berkovitz v. Islamic Republic of Iran*, 735 F.2d 329, 332 (9th Cir. 1984); kidnapping, *see Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 167-68 (D.C. Cir. 1994); and assassination, *see De Letelier v. Republic of Chile*, 748 F.2d 790, 797 (2d Cir. 1984).

*Second*, Saudi Arabia's hiring and supervising of military service members is not commercial activity.  *See UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210, 216 (5th Cir. 2009) (holding that a contract "to provide personnel [to RSAF] that were vital to the operation of a national air defense system" was not commercial); *see generally Kato v. Ishihara*, 360 F.3d 106, 110 (2d Cir. 2004) ("'public or governmental and not commercial in nature, would be the employment of diplomatic, civil service, or military personnel'") (quoting H.R. Rep. No. 94-1487, at 16 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6615).

*Third*, and finally, allegations of funding Al Qaeda (which are conclusory and baseless, *see supra* pp. 28-30) also do not describe "commercial activity." *See Terrorist Attacks*, 538 F.3d at 92; *McDonald v. The Socialist People's Libyan Arab Jamahiriya*, 666 F. Supp. 2d 50, 52 (D.D.C. 2009) ("sponsoring terrorists" – as opposed to "trading with them" – is not commercial activity).

## IV.   The Waiver Exception Does Not Apply

Plaintiffs fail (at ¶ 18) to show that Saudi Arabia has waived its sovereign immunity.  They can neither plead nor prove that Saudi Arabia agreed to jurisdiction in the United States.  A waiver of immunity may be made "explicitly or by implication," 28 U.S.C. § 1605(a)(1), but either way must be "clear and unambiguous," *Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*, 788 F.3d 1329, 1338 (11th Cir. 2015); *Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1291-92 (11th Cir. 1999).  Courts "rarely" find implicit waiver.  *Aquamar*, 179 F.3d at 1291 n.24.  Such rare cases typically involve one of three situations:  a foreign state has (1) "'agreed to arbitration in another country,'" (2) "'agreed that the law of a particular country should govern a contract,'" or (3) "'filed a responsive pleading in an action without raising the defense of sovereign immunity.'"  *Id.* (quoting H.R. Rep. No. 94-1487, at 18, *reprinted in* 1976 U.S.C.C.A.N. 6617).

Plaintiffs cannot clear that high bar.  *First*, Plaintiffs allege that Saudi Arabia "anticipate[d] being subject to the jurisdiction of the courts in the United States." Am. Compl. ¶ 589.  That conclusory claim is entitled to no weight.  Even if it were taken at face value, anticipation is not waiver.

*Second*, Plaintiffs point to the Foreign Military Sales Letter of Offer and Acceptance ("LOA") between the United States and Saudi Arabia, which contains Standard Terms and Conditions that require Saudi Arabia "to indemnify and hold the U.S. Government, its agents, officers, and employees harmless from any and all loss or liability (whether in tort or in contract) which might arise in connection with the LOA."  *Id.* ¶ 54; *see also id.* ¶¶ 586, 588; Ex. I (LOA Standard Terms and Conditions § 3.1).  That provision relates only to potential claims against the United States by third parties.

Because the LOA says nothing about claims that private parties may assert against Saudi Arabia, it does not "demonstrate[ ]" Saudi Arabia's "amenability to being subjected to suit in this country."  *Strange*, 320 F. Supp. 3d at 98-99 (contract provision addressing claims against United States did not waive Afghanistan's sovereign immunity); *see also Haven v. Polska*, 215 F.3d 727, 734-35 (7th Cir. 2000) (agreement to provide "lump-sum payment" to extinguish claims of U.S. citizens did not waive immunity); *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 245-46 (2d Cir. 1996) ("A generalized undertaking

to pay the debt of a national . . . does not imply that the guaranteeing state agrees to be sued on such an undertaking in a United States court.").

*Third*, Plaintiffs allege that Saudi Arabia "agreed to cooperate fully in the investigation and compensate the victims" of the Pensacola shooting and to allow any Saudi citizens involved in the attacks to be prosecuted in the United States. Am. Compl. ¶¶ 593-596.  They assert this agreement was in an "oral contract," *id.* ¶ 597, between King Salman and President Trump.  To be clear, Saudi Arabia did indeed "g[i]ve complete and total support" to the investigation, "order[ing] all Saudi trainees to fully cooperate."  January 13, 2020 Investigative Findings.  None was charged.  That has nothing to do with immunity.

As for the alleged promise to compensate the victims, Plaintiffs' statement that any such statement constituted a "waiver of immunity," Am. Compl. ¶ 596, is conclusory and "not entitled to the assumption of truth."  *Iqbal*, 556 U.S. at 679. The only nonconclusory statement they allege is President Trump's characterization that Saudi Arabia "agreed to 'tak[e] care of the families [and] help out the families very greatly.'"  Am. Compl. ¶ 596 (brackets in original).  The agreement as so characterized "'contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States.'" *S & Davis Int'l, Inc. v. Republic of Yemen*, 218 F.3d 1292, 1301 (11th Cir. 2000) (quoting *Amerada Hess*, 488 U.S. at 442-43).  It therefore does not waive immunity.

## CONCLUSION

The Court should dismiss Plaintiffs' Amended Complaint.

## REQUEST FOR ORAL ARGUMENT

Because of the complexity and importance of the issues raised by this motion,

Saudi Arabia requests oral argument under Local Rule 7.1(K).  We estimate that

one hour of argument will suffice.

Dated:  March 21, 2022                    Respectfully submitted,

                                          */s/ Benjamin H. Brodsky*
                                          Benjamin H. Brodsky
                                          Florida Bar No. 73748
                                          Brodsky Fotiu-Wojtowicz, PLLC
                                          200 SE 1st Street, Suite 400
                                          Miami, Florida 33131
                                          Tel: (305) 503-5054
                                          bbrodsky@bfwlegal.com
                                          docketing@bfwlegal.com

                                          Michael K. Kellogg (*pro hac vice* pending)
                                          Gregory G. Rapawy (*pro hac vice* pending)
                                          Andrew C. Shen (*pro hac vice* pending)
                                          Kellogg, Hansen, Todd,
                                             Figel & Frederick, P.L.L.C.
                                          1615 M Street, N.W., Suite 400
                                          Washington, D.C. 20036
                                          Tel: (202) 326-7900
                                          Fax: (202) 326-7999
                                          mkellogg@kellogghansen.com
                                          grapawy@kellogghansen.com
                                          ashen@kellogghansen.com

                                          *Counsel for the Kingdom of Saudi Arabia*

## LOCAL RULE 7.1(F) CERTIFICATION

I, Benjamin H. Brodsky, hereby certify that, pursuant to Local Rule 7.1(F), attached is a Consent Motion for Leave To Exceed Word Limit.  The foregoing Memorandum of Law in Support of Saudi Arabia's Motion To Dismiss the Amended Complaint contains 9,146 words, which is 1,146 words in excess of Local Rule 7.1(F)'s 8,000-word limit.  As reflected in the Consent Motion, Plaintiffs' counsel has stated that Plaintiffs do not oppose Saudi Arabia's request to file a Memorandum of Law in excess of the 8,000-word limit.

## LOCAL RULE 5.1(F) CERTIFICATION

I, Benjamin H. Brodsky, hereby certify that on March 21, 2022, I caused a true and correct copy of the Motion of the Kingdom of Saudi Arabia To Dismiss the Amended Complaint and Memorandum of Law in Support to be served via the CM/ECF system to all parties or counsel of record that have entered appearances in this action.

Respectfully submitted,

*/s/ Benjamin H. Brodsky*
Benjamin H. Brodsky
Florida Bar No. 73748
Brodsky Fotiu-Wojtowicz, PLLC
200 SE 1st Street, Suite 400
Miami, Florida 33131
Tel: (305) 503-5054
bbrodsky@bfwlegal.com
docketing@bfwlegal.com