UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

BENJAMIN WATSON, JR., et al.,
     Plaintiffs,

v.                             Case No.: 3:21cv00329/MCR/ZCB

KINGDOM OF SAUDI ARABIA,
     Defendant.
_____/

## REPORT AND RECOMMENDATION

On December 6, 2019, Mohammed Saeed Al-Shamrani committed a terrorist attack at Naval Air Station Pensacola. Before he was killed by law enforcement, Al-Shamrani murdered three U.S. Navy servicemembers. He also injured other servicemembers, as well as law enforcement officers. The terrorist organization al-Qaeda claimed responsibility for Al-Shamrani's attack.

The tragic events of December 6, 2019 form the basis of this lawsuit. Plaintiffs are the deceased servicemembers' heirs, as well as the individuals who survived the attack. Defendant is the Kingdom of Saudi Arabia, in whose military Al-Shamrani was enlisted at the time of the attack. In a 172-page amended complaint, Plaintiffs seek to hold Saudi Arabia responsible for Al-Shamrani's attack. (Doc. 5). Invoking the Foreign Sovereign Immunities Act, Saudi Arabia has filed a motion to dismiss for lack of jurisdiction. (Doc. 46). Plaintiffs have responded in

1

opposition, arguing that four exceptions to the Act apply.  (Doc. 39).  Plaintiffs have also moved for jurisdictional discovery, which Saudi Arabia has opposed.  (Docs. 43, 44).  The Court held a lengthy oral argument hearing (Doc. 53), and the matter is now ripe for resolution.

This is a difficult case.  It is factually difficult because it involves an evil act committed on U.S. soil against members of the armed forces and law enforcement officers—the bravest among us.  It is legally difficult because it involves a complex statutory scheme that reflects a longstanding presumption that foreign sovereigns are beyond the jurisdiction of U.S. courts.  Having exhaustively considered the matter and despite feeling great sympathy for Plaintiffs, the Court believes the law precludes the exercise of jurisdiction over Saudi Arabia.  The Court, therefore, recommends granting Saudi Arabia's motion to dismiss and denying Plaintiffs' motion for jurisdictional discovery.

## I.      Summary of Factual Allegations

### A.   Events before December 6, 2019

Mohammed Saeed Al-Shamrani was a member of the Royal Saudi Air Force (RSAF).  (Doc. 5 at 18).[1]  He was selected to receive aviation training from the U.S.

---

[1]The page numbers cited herein are those assigned by the Court's electronic docketing system, as opposed to the page numbers at the bottom of the parties' filings.

military through a Security Cooperation Education and Training Program.  (*Id*. at 20).  Al-Shamrani was assigned to complete that training at Naval Air Station Pensacola (NAS-P).  (*Id*. at 24).  Before being approved for the training program, Al-Shamrani was to be vetted by Saudi Arabia.  (*Id*. at 26).  Al-Shamrani subsequently received approval and was granted a U.S. visa.  (*Id*.).  He arrived in the U.S. on August 28, 2017, but he did not begin aviation training at NAS-P until May of 2018.  (*Id*. at 27, 51).

From May of 2018 to December of 2019, Al-Shamrani participated in training at NAS-P.  (*Id*. at 51).  In July of 2019, Al-Shamrani purchased a 9mm handgun and ammunition.  (*Id*. at 52).  It is alleged that between July 2019 and December 6, 2019, Al-Shamrani regularly entered NAS-P with the handgun concealed in his pilot helmet bag.  (*Id*.).

Plaintiffs allege that Al-Shamrani's supervising officer at NAS-P (a RSAF member tasked with overseeing Saudi Arabian trainees)[2] knew Al-Shamrani had been carrying a handgun on base—something that violated both U.S. and RSAF policy.  (*Id*.).  Nonetheless, the supervising officer took no action.  The supervising officer then departed from NAS-P in September of 2019, which Plaintiffs allege left

---

[2] This individual is referred to throughout the pleadings as the "CLO," which stands for Country Liaison Officer.  (Doc. 5 at 55).

3

Al-Shamrani and the other Saudi Arabian trainees with no RSAF oversight at NAS-P.  (*Id*. at 52-53).   According to Plaintiffs, Saudi Arabia did not assign a new supervising officer for NAS-P until nearly a month after Al-Shamrani's deadly attack.  (*Id*. at 53).

In November of 2019, Al-Shamrani and some other RSAF trainees visited the 9/11 Memorial in New York City.  (*Id*. at 53-54).   Plaintiffs allege that during the trip, Al-Shamrani and other RSAF trainees praised the 9/11 hijackers and discussed plans for launching an attack at NAS-P.  (*Id*. at 54).[3]   According to Plaintiffs, the trip to New York was unauthorized.  (*Id*. at 53).

The night before the attack (December 5, 2019), Al-Shamrani dined with other RSAF trainees.  (*Id*. at 54).   During the dinner, Al-Shamrani allegedly discussed his plans to attack NAS-P the next morning.[4]  (*Id*.).   Several of the RSAF trainees who dined with Al-Shamrani that night failed to report for duty on the morning of December 6, 2019.  (*Id*.).

---

[3] Contrary to this allegation, the U.S. Navy and the FBI concluded that none of the other RSAF trainees were aware of Al-Shamrani's planned attack.  (Doc. 47-1 at 7; Doc. 47-2 at 3).

[4] As previously noted, this allegation contradicts the findings of the U.S. Navy and the FBI.

**B.  Events of December 6, 2019**

In the early morning hours of December 6, 2019, Al-Shamrani used Twitter to send a series of anti-American messages that included the following: "I hate you because every day you (sic) supporting, funding and committing crimes not only against Muslims but also humanity.  I am against evil, and America as a whole has turned into a nation of evil." (*Id*. at 60).  When Al-Shamrani arrived at NAS-P on December 6, 2019, he visited an Islamic prayer room.  (*Id*. at 61).  He then drove his car to Building 633.  (*Id*.).  At approximately 6:42 a.m., Al-Shamrani entered Building 633 wearing his RSAF uniform and carrying his flight bag.  (*Id*.).  Concealed in the flight bag was the 9mm handgun and ammunition.  (*Id*.).

Once inside Building 633, Al-Shamrani withdrew the handgun and began shooting.  (*Id*. at 62).  Al-Shamrani chanted "Allahu Akbar"—an Islamic phrase meaning "God is great"—throughout his attack.  (*Id*. at 65).  Al-Shamrani's bullets struck and killed Ensign Joshua Kaleb Watson, Airman Cameron Scott Walters, and Airman Mohammed Haitham.  (*Id*. at 62-64).  He also shot and wounded Airman George Johnson, Ensign Breanna Thomas, Airman Ryan Blackwell, Ms. Jessica Pickett, and Ensign Kristy Lehmer.  (*Id*.).

Soon after the attack began, law enforcement officers from the Department of Defense and the Escambia County Sheriff's Office arrived, engaged Al-Shamrani,

5

and fatally shot him.  (*Id*. at 64-65).  While heroically working to neutralize Al-Shamrani, Captain Charles Hogue of the Department of Defense Police Force and Escambia County deputies Jonathan Glass, Matthew Tinch, Thomas Bortner, Grant Lopez, Matthew Housam, Michael Hoyland, and Matthew Keebler all suffered injuries.  (*Id*. at 16-17).

### C.   Events after December 6, 2019

Saudi Arabia immediately denounced Al-Shamrani's actions.  (Doc. 46 at 17-18).  The Federal Bureau of Investigation (FBI) investigated the attack.  Based on that investigation, the Attorney General announced that there was "no evidence of assistance or pre-knowledge of the attack" by the other RSAF members who were training in the United States.  (Doc. 47-2 at 3).  The Attorney General also stated that Saudi Arabia provided "complete and total support" for the investigation and had ordered all RSAF trainees "to fully cooperate."  (*Id*.).  After gaining access to the contents of Al-Shamrani's cell phone, the FBI released a statement explaining that it appeared Al-Shamrani had "significant ties" to al-Qaeda.  (Doc. 47-3 at 2).

The Navy also investigated the attack and issued a 267-page report.  (Doc. 47-1).  The Navy found that "[t]he self-radicalization" of Al-Shamrani was "the primary cause" of the attack.  (Doc. 47-1 at 30).  According to the Navy, "no one person or

organization knew or could have known" of Al-Shamrani's plan to attack NAS-P. (*Id.*).

### D.   The legal proceedings

In their complaint, Plaintiffs seek to hold Saudi Arabia responsible for Al-Shamrani's attack.  Plaintiffs allege Al-Shamrani was a "Trojan Horse sent by. . .the Kingdom of Saudi Arabia, and its proxy, al Qaeda in the Arabian Peninsula. . .under the auspices of a program tied to billions of dollars in military arms sales from the United States to [Saudi Arabia]."  (Doc. 5 at 8).  The complaint asserts the following causes of action:

1)  Vicarious liability/respondeat superior (*Id.* at 86);
2)  Violation of the Anti-Terrorism Act, 18 U.S.C. § 2339 predicate (primary liability) (*Id.* at 96);
3)  Violation of the Anti-Terrorism Act, 18 U.S.C. § 2339A predicate (primary liability) (*Id.* at 100);
4)  Violation of the Anti-Terrorism Act, 18 U.S.C. § 2339B predicate (primary liability) (*Id.* at 105);
5)  Violation of the Anti-Terrorism Act, 18 U.S.C. § 2339C predicate (primary liability) (*Id.* at 109);
6)  Violation of the Anti-Terrorism Act (aiding and abetting liability) (*Id.* at 113);
7)  Loss of Solatium (*Id.* at 120);
8)  Assault (*Id.* at 122);
9)  Battery (*Id.* at 124);
10)  False imprisonment (*Id.* at 126);
11)  Intentional infliction of emotional distress (*Id.* at 131);
12)  Violation of Florida's Civil Hate Crime Statute (*Id.* at 133);
13)  Florida Civil Remedy for Terrorism or Facilitating Terrorism (*Id.* at 136);
14)  Negligence and Gross Negligence (*Id.* at 138);

7

15) Negligent infliction of emotional distress (*Id*. at 151);
16) Wrongful death (*Id*. at 155);
17) Survival action (*Id*. at 162);
18) Loss of Consortium (*Id*. at 164); and
19) Breach of Contract (*Id*. at 166).

As relief, Plaintiffs ask for compensatory and solatium damages, treble damages, and attorneys' fees.  (*Id*. at 170).

Saudi Arabia has filed a motion to dismiss for lack of jurisdiction.  (Doc. 46). Plaintiffs have responded in opposition and moved for jurisdictional discovery. (Docs. 39, 43).

## II.    Discussion

The motions currently before the Court focus on the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1604.  Saudi Arabia claims the FSIA provides it with sovereign immunity and strips this Court of jurisdiction over Plaintiffs' claims.  Plaintiffs parry by arguing that jurisdiction exists under four exceptions to the FSIA.  Before delving into the particulars of the parties' arguments, an overview of the FSIA is in order.

Congress passed the FSIA in 1976, codifying "basic principles of international law long followed both in the United States and elsewhere." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 179-80 (2017). The FSIA provides that, "a foreign state shall be immune from the jurisdiction of the

8

courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604.  According to the Supreme Court, the FSIA "provides the sole basis for obtaining jurisdiction over a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (cleaned up).

Under the FSIA, a foreign state is "presumptively immune" unless one of the FSIA's "express exceptions" applies. *OBB Personenverkeher AG v. Sachs*, 577 U.S. 27, 31 (2015); *see also Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1325 (11th Cir. 2003) (recognizing that the FSIA provides "a general grant of immunity for foreign governments and their agents . . . unless the foreign government activity is subject to a specific exception").  In the years since 1976, the FSIA has been amended several times to add new exceptions and modify others.  *See generally* 14A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3662.3 (4th ed. 2023) (discussing various amendments to the FSIA).  The FSIA has numerous exceptions.  Most are found in 28 U.S.C. § 1605, while one is found in 28 U.S.C. § 1605B.  If none of the exceptions apply, then "the district court lacks subject matter jurisdiction over the plaintiff's claims" against the foreign state. *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1312 (11th Cir. 2009).[5]

---

[5] Although often discussed in terms of a defect in subject matter jurisdiction, the absence of a FSIA exception also deprives a court of personal jurisdiction over a foreign state.  *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S.

In terms of who bears the burden of establishing jurisdiction under the FSIA, the courts have employed a burden-shifting framework.  Under this framework, the defendant must initially show that it is a foreign state.  *In re Terrorist Attacks on Sept. 11, 2011*, 714 F.3d 109, 114 (2d Cir. 2013).  If the defendant does so,[6] then the plaintiff bears the "burden of production" to establish "that jurisdiction exists because a FSIA exception applies."  *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1221 n.9 (11th Cir. 2018).  This means that "the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted."  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 114.  Upon the plaintiff's satisfaction of the burden of production, "the defendant must bear the ultimate burden of persuasion to show that no FSIA exceptions to immunity apply."  *Devengoechea*, 889 F.3d at 1221 n.9.; *see also Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001) (explaining that "if the plaintiff comes forward with sufficient evidence to carry its burden of production" regarding a FSIA exception, then the court should "resolve disputed

---

428, 435 n.3 (1989) (noting that "personal jurisdiction, like subject-matter jurisdiction, exists only when one of the exceptions to foreign sovereign immunity . . . applies").

[6] There is no dispute that Saudi Arabia is a foreign state.

issues of fact, with the defendant foreign sovereign shouldering the burden of persuasion").

A defendant's motion to dismiss for lack of jurisdiction can take the form of a facial challenge, a factual challenge, or both. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003); *Robinson*, 269 F.3d at 140. With a facial (sometimes called a "legal") challenge, a defendant "challenge[s] subject matter jurisdiction based on the allegations in the complaint." *Morrison*, 323 F.3d at 924 n.5. For purposes of a facial challenge, the complaint's allegations are taken as true. *Id*. A factual challenge, on the other hand, "challenge[s] subject matter jurisdiction in fact, irrespective of the pleadings." *Id*. Thus, when there is a factual challenge a district court "may consider extrinsic evidence" and need not assume the allegations' truth.[7] *Id*.; *see also Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (explaining

---

[7] It is inevitable that when there is a factual challenge to jurisdiction under the FSIA, "the jurisdiction and merits inquiries overlap to the extent that each requires examination of the applicable substantive law." *Robinson*, 269 F.3d at 142. Although it can be challenging to delve into such issues at an early stage of the proceeding, doing so "preserves the effectiveness of the immunity doctrine by avoiding putting the foreign government defendant to the expense of defending what may be a protracted lawsuit without an opportunity to obtain an authoritative determination of its amenability to suit at the earliest possible opportunity." *Id*. (cleaned up).

that when a factual challenge is made, "no presumptive truthfulness attaches to the plaintiff's allegations") (internal quotations omitted).

Here, Saudi Arabia mounts both facial and factual challenges to the Court's subject matter jurisdiction.  (Doc. 46 at 22; Doc. 42 at 9).  With respect to the facial challenge, Saudi Arabia asserts that—even if the allegations are taken as true—Plaintiffs have failed to allege facts sufficient to fall within a FSIA exception.  And with respect to the factual challenge, Saudi Arabia says the factual allegations that the complaint relies on to establish a FSIA exception are inconsistent with the actual facts as shown by extrinsic evidence.

In their response to the motion to dismiss, Plaintiffs have argued that this Court has jurisdiction over Saudi Arabia based on the following four FSIA exceptions:  (1) the Justice Against Sponsors of Terrorism Act (JASTA) exception, 28 U.S.C. § 1605B; (2) the noncommercial tort exception, 28 U.S.C. § 1605(a)(5); (3) the commercial activity exception, 28 U.S.C. § 1605(a)(2); and (4) the waiver exception, 28 U.S.C. § 1605(a)(1).  (Doc.  39 at 23, 30, 49, 71, 78).  Each will be considered below.  The Court will first consider the JASTA exception because Plaintiffs' counsel emphasized at oral argument that "this is a JASTA case."  (Doc. 53 at 51, 52).

### A.   The JASTA exception to the FSIA

On September 28, 2016, Congress overrode a presidential veto to enact JASTA, 28 U.S.C. § 1605B.  *See* 14A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3662.3 (4th ed. 2023) (explaining the history of JASTA).  Congress passed JASTA "in part to allow suits against Saudi Arabia for the September 11 attacks."[8]  *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 642 (S.D.N.Y. 2018) (cleaned up).  Congress intended for JASTA to "provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries . . . that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 (2016).  Among other things, JASTA created a new FSIA exception for certain terrorism-related cases.  *Id.*  Below

---

[8] Prior to JASTA's passage, the FSIA's terrorism exception only applied to foreign states that the U.S. government had designated as state sponsors of terrorism.  Saudi Arabia had never received that designation and, therefore, could not be sued under the prior exception.  *See In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 794 (S.D.N.Y. 2005) (explaining that the pre-JASTA terrorism exception "does not provide an exception to immunity" for Saudi Arabia because it "has not been designated a state sponsor of terrorism").  Unlike its predecessor, the JASTA exception does not require the foreign state to be designated as a state sponsor of terrorism.  *Gonzalez v. Google, Inc.*, 282 F. Supp. 3d 1150, 1160 (N.D. Cal. 2017).

13

is the relevant language of the JASTA exception:

> (b) Responsibility of foreign states.—A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by—
>> (1) an act of international terrorism in the United States; and
>> (2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.
> . . . .
> (d) Rule of construction.—A foreign state shall not be subject to the jurisdiction of the courts of the United States under subsection (b) on the basis of an omission or a tortious act or acts that constitute mere negligence.

28 U.S.C. § 1605B(b), (d).

The JASTA exception contains five elements.  First, there was an injury to property or a physical injury or death of a person within the U.S.  Second, there was an act of international terrorism in the U.S.  Third, there was a tortious act committed by a foreign state or one of its officials, employees, or agents while acting within the scope of that person's office, employment, or agency.  Fourth, the injury or death was caused by the act of international terrorism and the tortious act by the foreign state and/or its officials, employees, or agents.  Fifth, damages resulted.  *See In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d at 642 (describing the elements of the JASTA exception).

14

In the current case, Saudi Arabia says Plaintiffs have not satisfied the third (tortious act) and fourth (causation) elements of the JASTA exception.  (Doc. 27 at 30-34; Doc. 42 at 28-34).  Saudi Arabia further claims that the JASTA exception's exclusion in § 1605B(d) for "omission[s]" and acts of "mere negligence" applies here.  (*Id*.).

The JASTA exception requires a tortious act committed by either the foreign state itself or one of its officials, agents, or employees who was acting within scope of the office, agency, or employment.  28 U.S.C. § 1605B(b)(2).  Plaintiffs believe both are present in this case.  They allege Al-Shamrani was an employee of Saudi Arabia who was acting within the scope of his employment when he opened fire at NAS-P.  And they allege Saudi Arabia itself committed tortious acts that caused the NAS-P attack.  Saudi Arabia says neither is correct.  For the reasons below, the Court agrees with Saudi Arabia.

### 1.    Al-Shamrani was not acting within the scope of his employment

Plaintiffs allege that the JASTA exception applies because Al-Shamrani was an employee of Saudi Arabia who was acting within the scope of his employment when he committed the terrorist attack at NAS-P.  (*See* Doc. 5 at 12, 92-96).  Saudi Arabia sees things differently.  It argues that the terrorist attack was not within the scope of employment for a RSAF member like Al-Shamrani.  To determine whether

15

a foreign state's employee was acting within the scope of employment for FSIA purposes, the Court must apply the law of the state where the injury occurred. *See In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d at 643 (applying New York law because it was the site of most of the injuries caused by the 9/11 attacks); *see also O'Bryan v. Holy See*, 556 F.3d 361, 383 (6th Cir. 2009) (recognizing that "[s]tate law, not federal common law, governs whether an officer's or employee's action is within the scope of employment in determining the applicability of the FSIA") (cleaned up).

Because the injuries from Al-Shamrani's attack occurred in Pensacola, Florida, the Court will apply Florida law.  For an employee's acts to be considered within the scope of employment, "Florida law requires that the conduct (1) must have been the kind for which the employee was employed to perform; (2) must have occurred within the time and space limits of his employment; and (3) must have been activated at least in part by a purpose to serve the employment." *Spencer v. Assurance Co. of Am.*, 39 F.3d 1146, 1150 (11th Cir. 1994).  In Florida, an employer is not responsible for an employee's conduct when the employee "does the wrongful act to accomplish some purpose of his own." *City of Green Cove Springs v. Donaldson*, 348 F.2d 197, 203 (5th Cir. 1965) (cleaned up) (applying Florida law); *see also DeJesus v. Jefferson Stores, Inc.*, 383 So. 2d 274, 275 (Fla. 3d DCA 1980)

16

(holding that an employee acted outside the scope of employment because "the assaults were undertaken for reasons which were purely personal to the employee and were neither activated by a purpose to serve the master nor related in any way to the furtherance of [the employer's] business").   As a general rule, "batteries by employees are held to be outside the scope of an employee's employment." *Agriturf Mgmt., Inc. v. Roe*, 656 So. 2d 954, 955 (Fla. 2d DCA 1995); *see also City of Green Cove Springs*, 348 F.2d at 202 (recognizing that under Florida law it is "generally held that liability for an assault by an employee that bears no relation to the real or apparent scope of his employment or to the interest of his employer is not imposed upon the employer").

Looking to the first scope of employment requirement, the question is: Have Plaintiffs produced evidence showing that Al-Shamrani's terrorist attack was the type of conduct Saudi Arabia employed him to perform?  The answer is:  No.  Saudi Arabia employed Al-Shamrani to serve its national defense by flying airplanes and operating weapons systems as a member of its air force.  It is undisputed that the U.S. is one of Saudi Arabia's most important military allies.  Saudi Arabia obtains significant benefits from its relationship with the U.S., not the least of which was the aviation training program at NAS-P.  Plaintiffs have not sufficiently shown that

jeopardizing an important strategic relationship by causing a disastrous diplomatic incident was within Al-Shamrani's job description.

That conclusion is supported by Saudi Arabia's immediate denunciation of Al-Shamrani's attack. And it is further supported by Saudi Arabia's full cooperation with the FBI, as well as the FBI's conclusion that there was "no evidence of assistance or pre-knowledge of the attack" by Al-Shamrani's RSAF colleagues. (Doc. 47-2 at 3). Rather, the FBI concluded that Al-Shamrani's attack was motivated by his personal "jihadist ideology." (*Id*. at 2). And the Navy similarly found that Al-Shamrani was "self-radicaliz[ed]." (Doc. 47-1 at 7). Put another way, Al-Shamrani committed the attack for his own reasons, and actions "undertaken for reasons that are purely personal to an employee," *Spencer*, 39 F.3d at 1150, fall outside the scope of employment. There is nothing before the Court to support a conclusion that a murderous rampage on a U.S. military installation was "the kind [of conduct] for which [Al-Shamrani] was employed [by Saudi Arabia] to perform." *Id*.

Plaintiffs have argued that Al-Shamrani acted within the scope of his employment because his position with the RSAF provided him with access to NAS-P, as well as the opportunity and ability to commit the attack. (Doc. 5 at 95). But that is insufficient to show that Al-Shamrani was acting within the scope of his

employment.  Just as a pastor (who has access to children and the opportunity to interact with them by virtue of his position) acts beyond the scope of his employment when he sexually assaults a child from the church, *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So. 2d 353, 358 (Fla. 3d DCA 2001), a foreign military trainee who has access to a Naval base by virtue of his position acts beyond the scope of his employment when he commits a murderous attack at the base.  "While [Al-Shamrani] may have had access to [NAS-P] because of his position as [a RSAF trainee] . . . he was not engaging in authorized acts or serving the interests of the [RSAF] during the time" he opened fire at NAS-P.  *Id.*; *see also Agriturf*, 656 So. 2d at 955 (finding that an employee who molested a child on a business's premises was acting beyond the scope of his employment, even though the business "provided the means and the place for [the man] to molest" the child); *Swarna v. Al-Awadi*, 622 F.3d 123, 145 (2d Cir. 2010) (concluding that a Kuwaiti diplomat was not acting within the scope of his employment when he sexually assaulted a woman in the U.S. because "it is beyond question that [the diplomat] did not rape [the victim] to further Kuwait's purposes in the United States").  The information before the Court shows that Al-Shamrani acted for his own purposes and not those of Saudi Arabia when he committed the terrorist attack at NAS-P.  Because Plaintiffs have failed to meet their burden of "producing evidence," *Sequeira v. Republic of Nicaragua*, 815 F. App'x

19

345, 349 (11th Cir. 2020) (cleaned up), to show that the NAS-P attack was within the scope of Al-Shamrani's employment, the JASTA exception does not apply.

In reaching that conclusion, the Court did not overlook Plaintiff's reliance on the Ninth Circuit's decision in *Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989). In *Liu*, the court held that the Director of China's Defense Intelligence Bureau acted within the scope of his employment when he ordered the murder of a journalist who had been critical of China. *Id*. at 1421. The decision in *Liu* is distinguishable from the current case for two reasons. First, the Ninth Circuit was applying California's broad "enterprise theory" for scope of employment. *Id*. at 1427; *see also Smithen v. United States*, No. CV 09-00414-GW, 2017 WL 11628588, at *8 (C.D. Cal. July 28, 2017) (recognizing that "[i]n California, the scope of employment has been interpreted broadly"). That is different than the test applied by the Florida courts. Second, the actor in *Liu* was a high-level Chinese defense official who committed an act that was designed to suppress criticism of China—an act that the court referred to as "sufficiently job related to impose vicarious liability" under California law. *Liu*, 892 F.2d at 1427. That is not comparable to what happened in the current case where a low-level RSAF trainee

20

committed a terrorist attack that in no way served the purposes of his employer, Saudi Arabia.  Thus, the Ninth Circuit's decision in *Liu* is not persuasive here.[9]

### 2.     A tortious act of Saudi Arabia did not cause Al-Shamrani's terrorist attack

Next is Plaintiffs' claim that the JASTA exception applies based on Saudi Arabia's own tortious conduct, as opposed to the tortious conduct of its employee, Al-Shamrani.  As set forth above, a foreign state is not immune under the FSIA if there was physical injury or death in the United States "caused by—(1) an act of

---

[9] The Court also did not overlook Plaintiffs' argument that Al-Shamrani was an "agent" of Saudi Arabia who was acting within the scope of his agency when he committed the NAS-P attack.  The argument lacks merit because, as with the employer-employee relationship, a principal is generally not vicariously liable for an agent's intentional torts and criminal actions because such actions are outside the scope of an agent's authority.  *See Jones v. City of Hialeah*, 368 So. 2d 398, 400 (Fla. 3d DCA 1979) (explaining that "[t]here is no liability where the agent has stepped aside from his employment to commit a tort which the principal neither directed in fact, nor could be supposed, from the nature of his employment, to have authorized or expected the agent to do").  Plaintiffs have come forward with no evidence to show that Al-Shamrani was an agent who was "serv[ing] the interests of the principal [Saudi Arabia]" when he committed the terrorist attack.  *Id.*  To the extent Plaintiffs argue that Al-Shamrani's actions can be attributed to Saudi Arabia because he was cloaked with "apparent authority" to commit the attack, the argument is similarly meritless.  Under Florida law, apparent authority "arises where the principal causes others to believe that an individual has the authority to conduct the act in question."  *Moecker v. Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291, 1312 (M.D. Fla. 2001).  Here, the Court has no basis for finding that Saudi Arabia caused anybody to believe that Al-Shamrani was authorized to launch a terrorist attack at NAS-P.

international terrorism in the United States; and (2) a tortious act or acts of the foreign state . . . ." 28 U.S.C. § 1605B(b). For the exception to apply, the foreign state's tortious act must have been one that involves more than an "omission" or "mere negligence." 28 U.S.C. § 1605B(d).

Everyone here agrees that an act of international terrorism caused physical injury and death in the United States. But did Saudi Arabia commit a tortious act that was based on something other than an omission or mere negligence? If so, did that tortious act "cause" the deaths and physical injuries at NAS-P? The Court now turns to those questions.

> ### a.    Did Saudi Arabia commit a tortious act that was based on something more than an omission or mere negligence?

Plaintiffs argue that the JASTA terrorism exception applies because Saudi Arabia committed tortious acts that caused Al-Shamrani's attack at NAS-P. The alleged tortious acts of Saudi Arabia can be placed in two categories. In the first category are the allegations regarding Saudi Arabia's vetting, retention, and supervision of Al-Shamrani. And in the second category are the allegations that Saudi Arabia materially supported terrorism.

> ### i.    Allegations regarding Saudi Arabia's vetting, retention, and supervision of Al-Shamrani

Looking to the first category, Plaintiffs allege that Saudi Arabia acted with

negligence and gross negligence in its vetting, retaining, and supervising of Al-Shamrani. (*See* Doc. 5 at 138-51).  More specifically, Plaintiffs claim Saudi Arabia failed to sufficiently investigate Al-Shamrani's background before approving him to participate in the training program at NAS-P.  Plaintiffs also claim that Saudi Arabia failed to appropriately monitor Al-Shamrani's social media and other activities, and it failed to appropriately supervise Al-Shamrani during his time at NAS-P.

The problem for Plaintiffs is that their vetting, retention, and supervision claims are based on omissions by Saudi Arabia.  And the JASTA exception provides that a "foreign state shall *not* be subject to the jurisdiction of the courts of the United States [under JASTA] on the basis of an *omission* or a tortious act or acts that constitute mere negligence."  28 U.S.C. § 1065B(d) (emphases added).  The term "omission" is undefined in the statute, so the Court will apply the term's plain and ordinary meaning.  *See United States v. Meyer*, 50 F.4th 23, 27 (11th Cir. 2022) (stating that when a statutory term is undefined, courts "attempt to discern its ordinary meaning").  To aid in that task, the Court looks to the dictionary.  *Id*.  The dictionary defines "omission" as "a failure to do something."  *Omission*, *Black's Law Dictionary* (8th ed. 2004); *Omission*, *Webster's Third New Int'l Dictionary* (2002) (defining "omission" as "apathy toward or neglect of duty: lack of action").

A review of Plaintiffs' complaint reveals that the allegations about the vetting, retention, and supervision of Al-Shamrani are based on Saudi Arabia's "failure to do something."   Indeed, the negligence/gross negligence cause of action (Count Fourteen) states that Saudi Arabia breached its duty of reasonable care by failing to do sixty-one separate things.   (Doc. 5 at 140-48).   Each of the sixty-one things identified in the complaint begins with the phrase "failure to" before detailing the specific ways Saudi Arabia allegedly breached its duty of reasonable care.   (*Id.*). Each allegation of Saudi Arabia's "failure to" do something is an allegation of an "omission"—and omissions cannot provide the basis for jurisdiction under the JASTA exception.  *See In re Terrorist Attacks on Sept. 11, 2011*, 298 F. Supp. 3d 631, 643 (S.D.N.Y. 2018) (recognizing that JASTA "specifically preclude[s] the exercise of jurisdiction over claims against foreign states on the basis of an omission") (cleaned up).   Because Plaintiffs' allegations regarding Saudi Arabia's vetting, retaining, and supervising of Al-Shamrani are premised on omissions, they cannot provide this Court with jurisdiction under the JASTA exception.[10]

---

[10] Plaintiffs have titled their cause of action in Count Fourteen as "negligence & gross negligence." (Doc. 5 at 138).   Negligence and gross negligence are, however, two separate torts with separate elements.  *See generally Elec. Boat Corp. v. Fallen*, 343 So. 3d 1218, 1220 (Fla. 5th DCA 2022) (explaining the difference between negligence and gross negligence under Florida law).   To the extent Plaintiffs are pursuing a negligence claim against Saudi Arabia, the JASTA exception would not provide jurisdiction because it excludes claims based on a "tortious act or acts that

### ii. Allegations that Saudi Arabia provided material support to terrorism in violation of the Anti-Terrorism Act

Looking to the second category of alleged tortious acts, Plaintiffs claim Saudi Arabia provided material support for terrorism. The legal basis for Plaintiffs' material support claims is the Anti-Terrorism Act, 18 U.S.C. § 2333.[11] The Anti-Terrorism Act authorizes claims based on two theories of liability—primary and secondary. A primary liability claim is one "against the principal perpetrators of acts of international terrorism, but not against secondary actors who facilitate such

---

constitute mere negligence." 28 U.S.C. § 1605B(d). To the extent Plaintiffs are pursuing a gross negligence claim, that claim would not be barred by the JASTA exception's "mere negligence" exclusion because gross negligence requires more than "mere negligence." *See Glaab v. Caudill*, 236 So. 2d 180, 182 (Fla. 2d DCA 1970) (explaining that gross negligence is more than simple negligence and less than willful and wanton conduct). But because the complaint grounds any gross negligence claim on omissions by Saudi Arabia, the gross negligence claim falls within JASTA's "omission" exclusion as explained above. To be clear, the issue is not whether Plaintiffs have plausibly alleged a gross negligence claim under Florida law. Instead, the issue is whether Plaintiffs' gross negligence claim is sufficient to provide this Court with jurisdiction under the JASTA exception. It is not, and that is because the JASTA exception excludes omissions. Although Florida tort law may allow a gross negligence claim based on an omission, the JASTA exception does not confer this Court with jurisdiction over a foreign state based on such a claim.

[11]Claims for relief under the Anti-Terrorism Act are viewed as tort claims. *See Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 83 (E.D.N.Y. 2019) (recognizing that the Anti-Terrorism Act "ultimately is a tort statute") (internal quotations omitted); *see also Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 50 (D.D.C. 2010) (treating the Anti-Terrorism Act as a "federal tort statute").

acts by others." *Freeman*, 413 F. Supp. 3d at 82 (cleaned up).  A secondary liability claim is one against "'any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed . . . an act of international terrorism.'"  *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (quoting 18 U.S.C. § 2333(d)(2)).[12]

Plaintiffs have brought both primary and secondary Anti-Terrorism Act claims against Saudi Arabia.[13]  (*See* Doc. 5 at 96-119).  The primary liability claims allege that Saudi Arabia directly provided material support for the terrorist attack at NAS-P.  The secondary liability claim alleges that Saudi Arabia engaged in acts of material support that aided and abetted the terrorist attack.  Because both the primary and secondary liability claims involve an alleged tortious act that requires more than mere negligence and is not based on an omission, Plaintiffs have cleared the first

---

[12] A secondary liability or aiding and abetting claim was not originally available under the Anti-Terrorism Act.  Such a claim was added by JASTA.  *Honickman*, 6 F.4th at 494.

[13] Although not currently before the Court, it bears noting that it is questionable whether a secondary liability/aiding and abetting claim can be brought against a foreign state under the Anti-Terrorism Act.  The statute authorizes a cause of action against "any person," and at least one court has held that a foreign state falls outside the definition of a "person."  *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03MDL1570, 2023 WL 1797629, at *8-9 (S.D.N.Y. Feb. 7, 2023) (holding that foreign states are not subject to aiding and abetting liability under the Anti-Terrorism Act because they are not "persons" for purposes of the Act).

hurdle with regard to those claims.[14]   That brings us to the second hurdle, which is whether Plaintiffs have established that an alleged tortious act of Saudi Arabia caused Al-Shamrani's terrorist attack at NAS-P.

> **b.    Did a tortious act of Saudi Arabia cause the terrorist attack at NAS-P?**

It is not enough for Plaintiffs to allege that Saudi Arabia committed a tortious act involving more than an omission or mere negligence—the JASTA exception requires that Plaintiffs go further and show that the tortious act caused the deaths and physical injuries at NAS-P.   To answer the causation question, the Court must first determine what type of causation the JASTA exception requires.   Saudi Arabia argues "but for" causation is required.   (Doc. 42 at 24-26).   For their part, Plaintiffs argue the standard is "proximate causation."   (Doc. 39 at 44-46).

This is an issue of first impression in the Eleventh Circuit.   Other courts outside the Eleventh Circuit, however, have confronted the issue and appear unanimous in the view that the jurisdictional causation standard is proximate cause. *See, e.g.*, *Rux v. Republic of Sudan*, 461 F.3d 461, 473 (4th Cir. 2006) (stating

---

[14] These alleged tortious acts of material support include harboring and concealing terrorists, providing weapons and training to terrorists, failing to implement appropriate screening protocols, and providing funding to terrorists.   (Doc. 5 at 96-112).

"proximate cause is the appropriate standard to apply at this juncture"); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127-28 (D.C. Cir. 2004) (applying proximate cause and finding "no textual warrant" for the claim that "but for" cause is the appropriate standard); *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. at 645 (explaining that "JASTA's 'caused by' requirement was not meant to incorporate principles of 'but for causation'" and adopting "the traditional test for proximate causation" for purposes of jurisdictional causation under JASTA).[15]   Additionally, the Supreme Court has held in the context of another jurisdictional statute that "the phrase 'caused by' . . . requir[es] what tort law has traditionally called 'proximate causation.'" *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995).

The cases cited above have persuaded the Court that the JASTA exception's causation standard is proximate cause.  Proximate cause requires a "reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d at

---

[15] The Fourth Circuit in *Rux* and the D.C. Circuit in *Kilburn* were considering a prior FSIA terrorism exception (28 U.S.C. § 1605(a)(7)), which included virtually identical causation language as that now found in the JASTA exception, 28 U.S.C. § 1605B.  The *In re Terrorist Attacks on September 11, 2001* court was considering the JASTA terrorism exception, and it relied on *Rux* and *Kilburn* in concluding that proximate cause is the appropriate standard.

645.  To meet that standard, a plaintiff must show two things: (1) the defendant's

conduct was a "substantial factor in the sequence of events that led to the plaintiff's

injury"; and (2) "the plaintiff's injury must have been reasonably foreseeable or

anticipated as a natural consequence of the defendant's actions."  *Id.* (cleaned up);

*see also Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017) (same).

Plaintiffs have failed to produce evidence showing that any tortious acts taken

by Saudi Arabia proximately caused Al-Shamrani's terrorist attack.  Aside from the

allegations based on omissions and mere negligence (which are excluded under 28

U.S.C. § 1605B(d)),[16] what is left are the allegations regarding Saudi Arabia's

material support of terrorism.  Those allegations are conclusory and unsupported by

the evidence in the record.  *See generally In re: Terrorist Attacks on Sept. 11, 2001*,

714 F.3d 118, 124 (2d Cir. 2013) (affirming dismissal of material support of

---

[16] It bears mentioning that even if the vetting, retention, and supervision claims were
not barred by the exclusion for omissions and acts of mere negligence, they would
fail for a lack of causation.  Plaintiffs have not met their burden of producing
evidence to show that Saudi Arabia's alleged deficiencies in vetting, retaining, and
supervising Al-Shamrani were a substantial factor in the terrorist attack or that the
terrorist attack was reasonably foreseeable as a consequence of such alleged
deficiencies.  *See generally Watson v. City of Hialeah*, 552 So. 2d 1146, 1149 (Fla.
3d DCA 1989) (finding that "[e]ven if the city was negligent in failing to discharge,
reassign, or transfer" two police officers, the plaintiff had failed to show causation
because it was not reasonably foreseeable to the city that the police officers would
commit a heinous murder).

terrorism claims because the allegations regarding the defendants' connection to the 9/11 attacks were "conclusory" and failed to establish "a proximate causal relationship" between the alleged material support and the terrorist attacks). Moreover, Plaintiffs have failed to show that any of Saudi Arabia's supposed support of al-Qaeda in the Arabian Peninsula (AQAP) was a "substantial factor in the sequence of events," *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d at 646 (cleaned up), that led to Al-Shamrani's attack.

The complaint alleges that some Saudi Arabian citizens are important members of AQAP.  (Doc. 5 at 33).  And Plaintiffs claim that the "heavy" presence of Saudi Arabian citizens in AQAP's "upper echelons suggests it maintains robust recruiting and support networks in Saudi Arabia, despite its base of operations in Yemen."  (*Id*. at 35).  The complaint also discusses prior terrorist attacks committed by AQAP, and it states that "AQAP pays its fighters with Saudi riyals due to the support it receives from Saudi Arabia."  (*Id*. at 37).  It states that AQAP has fundraised "through donations from Saudi Arabia."  (*Id*.).  It also contains statements regarding Saudi Arabia's adherence to "Sharia law" and the presence of "Wahhabi clerics" in the Saudi Arabian government.  (*Id*. at 28-29).  And it talks about things Al-Shamrani was likely taught in the Saudi Arabian schools.  (*Id*. at 47-48).  Another part of the complaint quotes a newspaper article from 2017 that states Saudi Arabia

has spread an extreme version of Islam and "is in a tacit alliance with al-Qaeda in Yemen." (*Id*. at 39). Elsewhere, the complaint accuses Saudi Arabia of "present[ing] a public face . . . as a nation fighting al-Qaeda and terrorism while at the same time" providing support and resources to al-Qaeda and other Islamic extremists. (*Id*. at 40).

Plaintiffs have not produced evidence showing that Saudi Arabia's government provided support to AQAP and that such support was a substantial factor in Al-Shamrani's attack at NAS-P. Moreover, Plaintiffs have not shown that Saudi Arabia could have reasonably foreseen or anticipated the NAS-P attack as a natural consequence of its actions. Connecting any conduct by Saudi Arabia to the NAS-P attack requires the stacking of inference, upon inference, upon inference. It also requires accepting at face value Plaintiffs' conclusory allegations about Saudi Arabia's connections to and support of al-Qaeda. But Saudi Arabia has mounted a factual challenge to jurisdiction under the FSIA, which means the Court cannot simply accept the complaint's allegations as true.[17] Rather, Plaintiffs must produce evidence supporting their allegations. Unsubstantiated innuendo, generalized accusations, and conclusory statements are not enough. Although there need not be

---

[17] Even with a facial challenge, "conclusory allegations and legal conclusions" are insufficient to state a claim. *Smith v. United States*, 873 F.3d 1348, 1351 (11th Cir. 2017).

a direct connection between the acts of a foreign state and the act of terrorism, there does need to be a "reasonable" one. *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d at 645. Plaintiffs have not shown such a reasonable connection here.

The Southern District of New York's decision in *In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d 631 (S.D.N.Y. 2018), is instructive on this point. The court there found that the plaintiffs had not established that "Saudi Arabia is directly liable for its own tortious actions that proximately caused the 9/11 Attacks." *Id*. at 647. The 9/11 court similarly found that the plaintiffs failed to show a causal connection between a Saudi Arabian entity, the Saudi High Commission (SHC), and the 9/11 attacks. The 9/11 court held that the complaint failed to "plausibly allege" that the SHC's conduct "bears any reasonable connection whatsoever to the 9/11 Attacks." *Id*. The allegations found insufficient in *In re Terrorist Attacks on September 11, 2001* are similar to those made against Saudi Arabia in the current case, both in terms of their conclusory nature and the lack of a causal connection between the alleged support by Saudi Arabia and the terrorist attack.

The deficiencies in Plaintiffs' causation allegations become obvious when this case is compared to another opinion arising out of the 9/11 litigation—this one involving claims against Sudan. *See In re Terrorist Attacks on Sept. 11, 2001*, No.

32

03-MD-01570, 2022 WL 4227151 (S.D.N.Y. May 3, 2022).  In that opinion, the

9/11 court found that claims against Sudan could go forward under the JASTA

exception.   The 9/11 court explained that there was a close connection between

Sudan and al-Qaeda.  According to the court, the plaintiffs had shown:

- "Al Qaeda's organizational expertise existed because of Sudan."
- Sudan "was a safe harbor as al Qaeda devised plans to attack civil aviation."
- Sudan "gave terrorists papers to foil international counterterrorism efforts."
- Sudan supported al Qaeda in prior terrorist attacks against the United States.
- "Year after year, [Sudan] put the might of a sovereign nation's security services and diplomatic privileges into al Qaeda's growth."
- "Sudan was not several steps removed from al Qaeda.  It worked directly with the organization and actively sought to forge connections with its leadership.  Sudan aided operations directly against the U.S. homeland and U.S. personnel overseas rather than against other nations."

*Id.* at *10.  The 9/11 court summed up its analysis of the jurisdictional causation

issue by stating, "[i]f a nation takes in a group of terrorists because it wants them to

attack the United States, listens approvingly as they talk about attacking the United

States, helps them fund attacks on the United States, trains them in the skills needed

to attack the United States, and supports them in other terrorist attacks on the United

States, then that nation is a substantial factor in the reasonably foreseeable outcome

of those terrorists injuring and killing people when they again attack the United

33

States."  *Id.*; *see also Rux v. Republic of Sudan*, 461 F.3d 461, 474 (4th Cir. 2006)

(finding that the plaintiffs established Sudan's actions proximately caused a terrorist

attack because the allegations described "how Sudan provided Al-Qaeda a base of

operations to plan and prepare for the bombing and provided operational support for

the attack"); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123,

1129-30 (D.C. Cir. 2004) (concluding there was "no doubt that the plaintiff's

allegations satisfy the proximate cause standard" where the complaint sufficiently

established that the Libyan government had "funded and directed" a terrorist

organization to murder an American citizen).

　　The current case against Saudi Arabia pales in comparison to what the 9/11

court found to be sufficient against Sudan.  Whereas in the 9/11 case there was direct,

extensive, and overt support for terrorism against the U.S. at the highest levels of

Sudan's government, Plaintiffs here have provided vague, conclusory, and

unsubstantiated allegations of indirect support by Saudi Arabia.  What the Court has

before it is insufficient to support a finding that the Saudi Arabian government

provided material support to terrorism and that support proximately caused the NAS-

P attack.  As the 9/11 court stated when distinguishing Sudan from several Saudi

Arabian entities, the allegations against Saudi Arabia are "too tenuous to support

jurisdiction, in no small part because if support from [Saudi Arabia] reached al

Qaeda, it did so indirectly and through intermediaries." *In re Terrorist Attacks on Sept. 11, 2001*, 2022 WL 4227151, at *10; *see also In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d at 647 (rejecting the plaintiff's allegations that Saudi Arabia was "directly liable for its own tortious actions that proximately caused the 9/11 attacks"). Because Plaintiffs have not produced evidence showing Saudi Arabia provided material support for terrorism that was a substantial factor in the sequence of events that led to the NAS-P attack and that Plaintiffs' injuries were reasonably foreseeable as a natural consequence of Saudi Arabia's actions, they have not satisfied the JASTA exception's causation element.

To recap, the JASTA exception to the FSIA does not provide the Court with jurisdiction over Plaintiffs' claims. Plaintiffs have failed to meet their burden of producing evidence to show that (1) Al-Shamrani was acting within the scope of his employment when he attacked NAS-P; or (2) a tortious act of Saudi Arabia that was based on more than an omission or mere negligence caused Al-Shamrani's attack at NAS-P. Having concluded that the JASTA exception does not apply, the Court will turn to the noncommercial tort exception to the FSIA.

### B. The noncommercial tort exception to the FSIA

The FSIA provides an exception to sovereign immunity where "money damages are sought against a foreign state for personal injury or death . . . occurring

in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment." 28 U.S.C. § 1605(a)(5). This exception is known as the "noncommercial tort exception." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 111 (2d Cir. 2013). Here, Plaintiffs argue the noncommercial tort exception applies for two reasons: (1) a tortious act or omission of Saudi Arabia caused the NAS-P attack, and (2) a tortious act of Al-Shamrani while acting within the scope of his employment caused the NAS-P attack. (Doc. 39 at 30-49). With respect to the scope of employment theory, the Court's analysis above regarding the JASTA exception is fully applicable. For the reasons previously stated, Al-Shamrani was not acting within the scope of his employment as a RSAF member when he launched the terrorist attack at NAS-P. As for Plaintiffs' claims regarding Saudi Arabia's own tortious conduct, it is necessary to consider two limitations that have been placed on the noncommercial tort exception—the entire tort rule and the discretionary function exclusion.[18]

---

[18] The noncommercial tort exception and the JASTA exception share some similar language. But the two exceptions have key differences. Most notably, the noncommercial tort exception (unlike the JASTA exception) does not exclude omissions and acts of mere negligence. The noncommercial tort exception does, however, exclude discretionary functions, and it requires the entire tort to occur

### 1.     The entire tort rule

The noncommercial tort exception only applies if the "entire tort" was committed in the United States. *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 116; *see also Doe v. Fed. Dem. Republic of Ethiopia*, 851 F.3d 7, 10 (D.C. Cir. 2017) (recognizing that "the *entire* tort must occur in the United States for the noncommercial tort exception to apply") (cleaned up).  This rule finds its genesis in *Argentine Republic v. Amerada Hess Shipping Corp.*, where the Supreme Court held that the noncommercial tort exception "covers only torts occurring within the territorial jurisdiction of the United States."  488 U.S. 428, 441 (1989).  Thus, the noncommercial tort exception is inapplicable if "any portion of plaintiffs' claims [] relies upon acts committed by the [defendant] abroad."  *O'Bryan v. Holy See*, 556 F.3d 361, 385 (6th Cir. 2009).  That is true even if the injury was suffered on United States soil.  *See Doe*, 851 F.3d at 10 ("The 'entire tort'—including not only the injury but also the act precipitating that injury—must occur in the United States."); *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 116 (finding that the "entire tort" was not committed in the United States, even though "the injuries and damage caused by the September 11, 2001 attacks" occurred in the United States).  The entire

within the United States—neither the entire tort rule nor the discretionary function exclusion apply to the JASTA exception.

tort rule is in keeping with Congress's desire that the noncommercial tort exception be "limited" in scope, *O'Bryan*, 556 F.3d at 382, and apply in "relatively few situations." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 116 n.8.[19]

To understand how the entire tort rule works in the context of Plaintiffs' claims that Saudi Arabia acted tortiously in its vetting, retention, and supervision of Al-Shamrani, let's look at the Sixth Circuit's decision in *O'Bryan*. In *O'Bryan*, victims of sexual abuse by Catholic priests sued Holy See, which is the central government of the Catholic Church and a foreign state for FSIA purposes. *O'Bryan*, 556 F.3d at 369. The Sixth Circuit explained that the plaintiffs' claims that Holy See failed to appropriately supervise the offending priests "cannot survive" under the entire tort rule because Holy See's acts of supervision "presumably occurred abroad." *Id*. at 385. Similarly, the *O'Bryan* court stated that claims relating to Holy See's promulgation of a policy regarding priests accused of child molestation "would not fall within the tortious act exception because it too presumably occurred abroad." *Id*.

With respect to Plaintiffs' claims that Saudi Arabia acted tortiously by providing material support to terrorism, a decision from the 9/11 court again proves

---

[19] The "primary purpose" of the noncommercial tort exception was to prevent foreign countries from avoiding responsibility for traffic accidents caused by their officials in the United States. *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 116 n.8.

instructive.  The plaintiffs in the 9/11 case sought to hold several Saudi Arabian entities responsible for allegedly "providing funding and other aid to entities that purportedly supported al Qaeda." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 117.  The Second Circuit found that the plaintiffs' allegations fell outside of the noncommercial tort exception because the alleged acts of material support "took place completely outside the United States." *Id.*

When the lessons of *O'Bryan* and *In re Terrorist Attacks on September 11, 2001* are applied here, it is evident that the entire tort rule dooms Plaintiffs' argument that jurisdiction exists under the noncommercial tort exception.  The claims regarding Saudi Arabia's vetting, retention, and supervision of Al-Shamrani are not based entirely on things that happened in the United States.  Rather, Plaintiffs' allegations involve things they claim Saudi Arabian officials failed to do in Saudi Arabia—i.e., conducting a thorough background check, monitoring social media, and supervising the CLO assigned to NAS-P.  Likewise, the allegations regarding material support of terrorism involve actions Plaintiffs say Saudi Arabian officials took in Saudi Arabia.  Although the injuries and damages occurred in the United States, every element of the alleged tortious acts did not.[20]  Thus, the entire tort rule

---

[20] Plaintiffs have argued that "not all of the conduct constituting the tort must occur within the United States; it is sufficient that only some of the acts or omissions occur here, so long as a plaintiff can allege at least one entire tort occurring in the United

prevents Plaintiffs from obtaining jurisdiction over Saudi Arabia under the noncommercial tort exception.

## 2.   The discretionary function exclusion

The noncommercial tort exception to the FSIA does not allow jurisdiction over "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A).   This exclusion is known as the discretionary function exclusion.   When addressing the FSIA's discretionary function exclusion, "courts typically apply the interpretation of the discretionary function exception of the

---

States." (Doc. 39 at 31) (cleaned up).  In support of that argument, Plaintiffs have cited *Olsen by Sheldon v. Gov't of Mexico*, 729 F.2d 641 (9th Cir. 1984).  The reliance on *Olsen* is misplaced.  The Ninth Circuit issued *Olsen* in 1984, which was five years before the Supreme Court's opinion in *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989).  The Court's decision in *Argentine Republic* "first articulated" the entire tort rule.  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 115-16.  And it held that the noncommercial tort exception only applies to "torts occurring" in the United States.  *Argentine Republic*, 488 U.S. at 441.  The *Argentine Republic* Court did not say "parts of torts," or "the injury from torts"—it said "torts."  Given the language of *Argentine Republic*, as well as the persuasive precedent from the Second, Sixth, and D.C. Circuits, the Court believes that "the entire tort—including not only the injury but also the act precipitating that injury—must occur in the United States." *Doe v. Fed. Dem. Republic of Ethiopia*, 851 F.3d 7, 10 (D.C. Cir. 2017) (cleaned up); *O'Bryan*, 556 F.3d at 385 (6th Cir. 2009) (stating "any portion of plaintiffs' claims that relies upon acts committed . . . abroad cannot survive" under the entire tort rule); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 115-16 (same).

Federal Tort Claims Act (the FTCA)." *O'Bryan*, 556 F.3d at 383. They do that

because the language of the FSIA discretionary function exclusion "replicate[s] that

of the FTCA" discretionary function provision, and "the legislative history of the

FSIA . . . directs [courts] to the FTCA." *Id.*; *see also Swarna v. Al-Awadi*, 622 F.3d

123, 145 (2d Cir. 2010) (looking to FTCA caselaw "when interpreting the FSIA's

discretionary function provision").

The courts have adopted a two-step test for determining whether the FSIA's

discretionary function exclusion applies.[21] First, did the challenged action involve

"an element of choice or judgment," or was it compelled by a federal statute,

regulation, or policy? *O'Bryan*, 556 F.3d at 384 (internal quotations omitted).

Second, if it did involve choice or judgment, then was the "choice or judgment [] of

the type Congress intended to exclude from liability—that is, whether the choice or

judgment was one involving social, economic, or political policy"? *Id.* (internal

quotations omitted).

Numerous courts have recognized at step one that hiring, retaining, and

supervising employees involves an element of judgment and choice. *See, e.g.*, *id.* at

384 (stating that "[a] number of courts" have concluded "that the selection of

---

[21] The two part test was adopted from the Supreme Court's FTCA caselaw. *See United States v. Gaubert*, 499 U.S. 315 (1991); *see also Berkovitz by Berkovitz v. United States*, 486 U.S. 531 (1988).

employees, officials and officers" is typically a discretionary function); *see also Swarna*, 622 F.3d at 146 (holding that the plaintiff's claim "that Kuwait failed to institute procedures or a system to monitor its employees implicates a discretionary function"); *Andrews v. United States*, 121 F.3d 1430, 1441 (11th Cir. 1997) (explaining that "decisions regarding the exercise of supervisory authority are of the sort the discretionary function exception was designed to encompass").   That remains true even when the employees are members of the military.   *See Harper v. United States*, No. CV 12-1802, 2020 WL 4192540, at *5 (D.D.C. July 21, 2020) (explaining that the plaintiffs "are at bottom questioning the Army and DOD's supervision and discipline decisions" and "such decisions involve judgment and discretion"); *see also Carlyle v. U.S., Dep't of the Army*, 674 F.2d 554, 555 (6th Cir. 1982) (finding that the Army's decision regarding "whether or not to supervise" and "the extent of any such supervision" over a group of recruits was a "discretionary function").   Similarly, courts have held that a "failure to warn about an individual's dangerousness" is a discretionary function for purposes of the FSIA.   *Doe v. Holy See*, 557 F.3d 1066, 1084 (9th Cir. 2009).

And at step two of the test, courts have recognized that "hiring, training, and supervision choices . . . are choices susceptible to policy judgment."   *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1217 (D.C. Cir. 1997) (internal

quotations omitted); *see also Carlyle*, 674 F.2d at 557 (recognizing that a decision regarding supervision of recruits was a "planning level, policy-making decision"); *Swarna*, 622 F.3d at 146 (applying the discretionary function exclusion because the plaintiff's failure to supervise claims against Kuwait alleged a "failure that occurred at the planning level of government"). Indeed, the "[c]ase-law is clear that decisions related to employment and supervision are exactly the kind of policy judgments that the discretionary exclusion [in the FSIA] was designed to shield." *Robles v. Holy See*, No. 20-CV-2106, 2021 WL 5999337, at *14 (S.D.N.Y. Dec. 20, 2021).

Here, Plaintiffs try to get around the discretionary function exclusion by arguing that Saudi Arabia was required to engage in certain conduct regarding the vetting, retention, and supervision of Al-Shamrani. (*See* Doc. 39-44). It is true that the discretionary function exclusion does not apply when a "federal statute, regulation, or policy specifically prescribes a course of action." *Foster Logging, Inc. v. United States*, 973 F.3d 1152, 1157 (11th Cir. 2020) (internal quotations omitted). But Plaintiffs have failed to identify any statute, regulation, or policy that mandated conduct by Saudi Arabia with respect to its vetting, retention, and supervision of Al-Shamrani.

Plaintiffs have cited a handful of documents they claim fit the bill—namely, the Joint Security Cooperation Education and Training Manual ("Joint Security

Manual"), the Security Assistance Management Manual ("Security Management Manual"), the Flight Student Training Administration Manual ("Flight Student Manual"), the NAS-P Personal Firearms Policy ("Firearms Policy"), the VT-86 Commanding Officer's Violence Prevention Policy ("VT-86 Policy"), and the NAS-P International Military Student Liberty Policy ("Student Liberty Policy"). Unfortunately for Plaintiffs, none of those manuals/policies imposed a mandatory obligation on Saudi Arabia. The Joint Security Manual, the Security Management Manual, the Flight Student Manual, and the VT-86 Policy are aimed at the U.S. military and regulate the conduct of U.S. entities. They were not binding on Saudi Arabia. The Firearms Policy and the Student Liberty Policy may have regulated the conduct of Al-Shamrani while he was at NAS-P, but they did not mandate that Saudi Arabia take any specific actions.

For example, the Joint Security Manual expressly states that it "applies to the active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve . . . the Reserve Components of the Army, the Navy, the Air Force, the Marine Corps, the Air National Guard, the Coast Guard, and DOD agencies." (Doc. 39-8 at 4). Thus, it is clear that the Joint Security Manual regulates the conduct of the U.S. military when training international personnel. (*See* Doc. 39-8 at 24) (stating the purpose of the Joint Security Manual). It does not, however,

44

regulate countries (like Saudi Arabia) who send international personnel for training by the U.S. military.   Put another way, the Joint Security Manual does not "mandate[]" that Saudi Arabia "perform [its] function in a specific manner." *Foster Logging, Inc.*, 973 F.3d at 1158.

Similarly, the Security Management Manual is designed for the U.S. military and the Department of Defense.  It discusses the "roles and responsibilities" of the Department of Defense and other U.S. agencies.  (Doc. 39-9 at 3).  The section of the Manual dealing with international training "describes policies and procedures related to the *provision* of international training and education provided under security cooperation authorities."  (*Id*. at 9) (emphasis added).  As the use of the word "provision" shows, the Manual is designed for the U.S. military as the provider of the training.  It is not aimed at regulating the recipients of the U.S. military's training.  Although there is a section of the Manual that requires "security screening of each [international] student," that section imposes an obligation on "in-country *U.S. officials*" to conduct a "security screening."  (*Id*. at 24) (emphasis added).  It imposes no obligation on a foreign country like Saudi Arabia.

The same is true of the Flight Student Manual, which states that its purpose is to "outline procedures for processing students undergoing flight training." (Doc. 39-12 at 3).  The Manual states that the "action" it requires is for "[c]ommanders" to

45

implement the policy. (*Id*. at 4). The context of the document shows that by "commanders," the Manual is referring to U.S. military personnel.

Plaintiffs have argued that the Flight Student Manual imposed a duty on foreign nations to have a Country Liaison Officer (CLO) assigned to supervise their military members while they received training in the United States. And Plaintiffs claim Saudi Arabia breached that duty at NAS-P by failing to have a CLO onsite throughout Al-Shamrani's training. The Flight Student Manual, however, does not mandate that a foreign nation assign a CLO. Instead, the Flight Student Manual makes the assignment of a CLO discretionary. It states as follows: "At the request of another country and with the concurrence [of certain U.S. Navy offices], a CLO *may* be assigned to assist with the administrative duties for [trainees] from his or her country." (*Id*. at 85) (emphasis added). The Flight Student Manual contemplates situations where there is no CLO assigned, as it states: "In case of serious injury or death *where no CLO is assigned*, the [Training Air Wing Commanders International Military Services Officer] shall act as coordinator with the [International Military Student]'s country representatives." (*Id*.) (emphasis added).[22] Thus, Plaintiffs are

_____

[22] It bears noting that the Navy's investigation into Al-Shamrani's attack found that there was no "formal agreement" with Saudi Arabia regarding CLO performance and standards. (Doc. 47-1 at 246). The Navy's investigation further found that "[e]ven if such an agreement existed . . . the agreement would be nonbinding." (*Id*.). Further evidence that at the relevant time Saudi Arabia was not required to have a

incorrect in their assertion that the Flight Student Manual imposed mandatory obligations on Saudi Arabia.

Likewise, the VT-86 Policy governed the conduct of a Navy squadron.  *See* (Doc. 39-14 at 2) (requiring "[a]ll members of VT-86" to "carry[] out this policy"). Nothing in the VT-86 Policy can be fairly read as imposing mandatory obligations on a foreign country like Saudi Arabia.  As for the Firearms Policy and the Student Liberty Policy, neither imposed any mandatory obligations on Saudi Arabia.  These policies regulate the conduct of individuals at NAS-P, not the conduct of foreign states.  Thus, they do not provide the Court with a basis for finding the discretionary function exclusion to be inapplicable.

At bottom, Plaintiffs have not identified a "federal statute, regulation, or policy" that "specifically prescribe[d] a course of action" or "mandate[d] particular conduct," *United States v. Gaubert*, 499 U.S. 315, 322, 324 (1991), regarding Saudi Arabia's vetting, retention, and supervision of Al-Shamrani.  Instead, the vetting,

---

CLO present, nor was it required to ensure that the CLO performed certain tasks, can be found in the Navy Report's recommendations.  One of those recommendations (9.3.5) was that, going forward, the Navy should "require the presence of a CLO as a requirement for the execution" of aviation training.  (*Id*. at 250).  And another recommendation (9.3.4) was that the Navy "identify contract vehicles to require CLO presence" for certain types of training.  (*Id*.).  Those recommendations would have been wholly unnecessary if such things were already required before Al-Shamrani's attack.

retention, and supervision "involved the exercise of choice and judgment" and were "the kind of policy judgment that the discretionary function exception was designed to shield." *Id*. at 331-32; *see also Swarna*, 622 F.3d at 146 (finding that the plaintiff's claim that "Kuwait failed to institute procedures or a system to monitor its employees implicates a discretionary function"). Accordingly, the discretionary function exclusion prevents Plaintiffs from obtaining jurisdiction over Saudi Arabia under the noncommercial tort exception to the FSIA.[23]

## C.   The commercial acts exception to the FSIA

The commercial acts exception to the FSIA is the third exception that Plaintiffs say gives the Court jurisdiction over Saudi Arabia. The commercial acts exception provides in pertinent part that a foreign state "shall not be immune . . . in any case—(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). Broken down into its constituent parts, this exception requires that the activity in question be

---

[23] Even if Plaintiffs' claims were able to get by the entire tort rule and the discretionary function exclusion, they would run into a causation problem. The noncommercial tort doctrine, like the JASTA exception discussed previously, requires a causal connection between the tortious acts and the deaths and injuries. And for the reasons already explained regarding the JASTA exception, Plaintiffs have failed to produce evidence showing the requisite causal connection between the actions of Saudi Arabia and Al-Shamrani's terrorist attack.

"commercial." And it requires that the plaintiff's lawsuit be "based upon" that commercial activity. Are those requirements met here? Plaintiffs say they are, and Saudi Arabia says they are not. Saudi Arabia has the better argument.

### 1.    "Commercial activity" requirement

For purposes of the FSIA, "[a] 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). When determining the commercial character of an activity, courts must focus on the "nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id*. Congress, however, left "the critical term 'commercial' largely undefined." *Saudi Arabia v. Nelson*, 507 U.S. 349, 359 (1993) (internal quotations omitted). This "diffidence necessarily results in judicial responsibility to determine what a 'commercial activity' is for purposes of the Act." *Id*. Carrying out that responsibility, the Supreme Court has explained that a foreign state "engages in commercial activity" when it "exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Id*. at 360 (cleaned up). Thus, the issue becomes "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce." *Id*. at 360-61 (cleaned up) (emphasis in original). Or if the actions are

49

the type that "require sovereign power and thus cannot be performed by a private party." *Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1325 (11th Cir. 2003).

Here, Plaintiffs claim that Saudi Arabia's arrangement for RSAF members to receive training from the U.S. military at NAS-P was a "commercial activity." The Court disagrees. Military training is a sovereign activity and by entering into a training arrangement with the U.S. military, Saudi Arabia "was not exercising powers that a 'private player within the market' could or would exercise." *Strange v. Islamic Republic of Iran*, 320 F. Supp. 3d 92, 97 (D.D.C. 2018). After all, "pledges from one sovereign nation to help develop the armed forces of another . . . is not the type of activity that private players engage in." *Id*. Entering into "such an agreement inherently would require the exercise of state authority." *Id*.

Neither XYZ Corporation nor Joe Q. Public can enter an agreement to receive fighter jet training from the U.S. Navy. At its core, the agreement between the U.S. and Saudi Arabia that led to Al-Shamrani's presence at NAS-P was "a military training agreement between two sovereign parties." *MCI Telecomms. Corp. v. Alhadhood*, 82 F.3d 658, 664 (5th Cir. 1996). And that is not "the type of transaction that private actors could complete." *Beg*, 353 F.3d at 1325; *see also MCI Telecomms. Corp.*, 82 F.3d at 664 (refusing to apply the commercial activity

exception to the FSIA in a case involving a military training agreement between the U.S. and the United Arab Emirates); *UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210, 216 (5th Cir. 2009) (explaining that an agreement to provide training and perform maintenance on Saudi Arabia's fighter jets was not a "commercial activity" for FSIA purposes because the agreement involved providing "personnel that were vital to the operation of a national air defense system," which was an "undeniably sovereign" act).

Before moving on, it is necessary to distinguish *SAMCO Global Arms, Inc. v. Arita*, 395 F.3d 1212 (11th Cir. 2005)—a case on which Plaintiffs rely.  (Doc. 39 at 72).  In that case, an arms dealer entered a contract to sell weapons to Honduras.  *Id.* at 1213.  The arms dealer sued Honduras for breach of contract, and Honduras argued it was immune under the FSIA.  *Id.* at 1214.  Rejecting that argument, the *SAMCO Global Arms* court found that the commercial activity exception to the FSIA applied.  In support of its conclusion, the court explained that "where the activity at issue involves a government's contract for purchase and sale of goods, the activity is commercial."  *Id.* at 1216.  The *SAMCO Global Arms* court further explained that the contract was "essentially for the bailment of goods with a purchase option," which "obviously could have been executed by individuals in the private marketplace."  *Id.*

The current case is like *SAMCO Global Arms* in the sense that it involves a foreign military.  The similarities, however, end there.  The current case does not involve the sale of goods between a private corporation and a foreign country.  Rather, it involves a military training arrangement between one sovereign nation's military and another sovereign nation's military.  Whereas a private party can buy goods from another private party or enter into a bailment with a purchase option, a private party cannot enter into a contract for fighter jet training with the U.S. Navy.  Thus, *SAMCO Global Arms* is distinguishable.  The case before the Court today, unlike *SAMCO Global Arms*, is one where the purpose of the arrangement between the U.S. and Saudi Arabia was "undeniably sovereign." *UNC Lear Servs., Inc.*, 581 F.3d at 216.  As such, the commercial activity exception to the FSIA does not apply.

### 2.    "Based upon" requirement

Even if the military training program qualified as "commercial activity," the commercial activity exception to the FSIA would not apply because Plaintiffs' lawsuit is not "based upon" the military training program.  As set forth above, the commercial activity exception only applies if "the action is based upon a commercial activity carried on in the United States."  28 U.S.C. § 1605(a)(2).  The FSIA does not define the phrase "based upon," but the Supreme Court has explained that "an

action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit." *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015).

A suit is not "based upon" an act simply because that act constitutes "a single element of a claim." *Id*. at 34. Rather, "the commercial activity relied upon by plaintiff for jurisdictional purposes must be also the activity upon which the lawsuit is based; that is, there must be a connection between that activity and the act complained of in the lawsuit." *O'Bryan v. Holy See*, 556 F.3d 361, 378 (6th Cir. 2009) (cleaned up). "A mere tangential or attenuated connection between the act and the commercial activity will not suffice." *Strange*, 320 F. Supp. 3d at 98 (cleaned up). What is required is a "significant nexus . . . between the commercial activity in th[e] country . . . and a plaintiff's cause of action." *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 155 (2d Cir. 2007) (cleaned up).

The Supreme Court's decision in another case involving Saudi Arabia is helpful here. In *Saudi Arabia v. Nelson*, the plaintiff—a U.S. citizen—agreed to work at a hospital in Saudi Arabia. 507 U.S. at 352. After reporting misconduct at the hospital, the plaintiff was arrested, jailed, and tortured by Saudi Arabian officials. *Id*. at 352-53. Upon his eventual release, the plaintiff returned to the U.S. and sued Saudi Arabia. *Id*. at 353. The plaintiff argued that the FSIA's commercial activity exception applied because the conduct that precipitated his arrest was related to his

employment.  *Id*. at 355-56.  Rejecting that argument, the *Nelson* Court held that although the employment agreement "led to the conduct that eventually injured" the plaintiff, the agreement "was not the basis" for the lawsuit.  *Id*. at 358.  The Court further explained that the lawsuit was about tortious conduct allegedly committed by Saudi Arabia, and the "torts, [] not the arguably commercial activities that preceded their commission, form the basis for the [plaintiff's] suit."  *Id*.

Applying the above here, the alleged commercial activity (i.e., the military training arrangement between the U.S. and Saudi Arabia) is not "the particular conduct that constitutes the gravamen," *OBB Personenverkehr AG*, 577 U.S. at 35 (cleaned up), of Plaintiffs' lawsuit.  Rather, the "gravamen" or "foundation," *id*. at 33, 35, of this lawsuit is a terrorist attack and the harms it caused.  Plaintiffs' lawsuit is not about some commercial deal gone bad.  This case, like *Nelson*, is about tortious acts—"not the arguably commercial activities that preceded their commission." *Nelson*, 507 U.S. at 358.  Because "there is simply no plausible way that this Court could say that Plaintiffs' claims in this case are based upon an act in connection with [any] commercial activities," *id*. (cleaned up), the FSIA's commercial activity exception does not apply.

**D.   The waiver exception to the FSIA**

Finally, Plaintiffs claim that the FSIA's waiver exception provides the Court

with jurisdiction.   Under the waiver exception, a "foreign state shall not be immune . . . in any cases—(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver." 28 U.S.C. § 1605(a)(1).  The showing required for waivers of immunity is "exacting." *Strange*, 320 F. Supp. 3d at 98.  Both explicit and implicit waivers are narrowly construed in favor of the foreign state. *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 691 (D.C. Cir. 2022).   An explicit waiver occurs when a foreign state "expressly consents to forgo its sovereign immunity with respect to a certain class of disputes or a particular subject matter." *Id*.  Explicit waivers must be "clear[] and unambiguous[]." *Id*.

Similarly, the implied waiver provision is "narrow." *Calzadilla v. Banco Latino Internacional*, 413 F.3d 1285, 1287 (11th Cir. 2005).  It does not apply unless the foreign state "reveals its intent to waive its immunity by: (1) agreeing to arbitration in another country, (2) agreeing that the law of a particular country should govern a contract, or (3) filing a responsive pleading in an action without raising the defense of sovereign immunity." *Id*.

Plaintiffs contend that Saudi Arabia explicitly waived its sovereign immunity by agreeing to cooperate with the U.S. government's investigation of Al-Shamrani's

attack.  They also point to a statement from President Trump, which expressed that the King of Saudi Arabia had said he would "take care of the families" of the victims. (Doc. 5 at 169).

Neither the agreement to cooperate in the investigation nor the statement by President Trump (about what the King of Saudi Arabia allegedly said) constitute an explicit waiver of sovereign immunity.  Agreeing to cooperate in a U.S. government investigation into a terrorist attack is not the same thing as explicitly giving up immunity and consenting to be sued for damages by U.S. citizens regarding that terrorist attack.  Nor is the statement from the King to President Trump about "tak[ing] care of the families" an explicit waiver of sovereign immunity.  The statement says nothing about agreeing to be sued by the victims' families.  It says nothing about consenting to the jurisdiction of the U.S. courts.  And it says nothing about waiving sovereign immunity.  *See generally Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442-43 (1989) (refusing to find a waiver of sovereign immunity and stating it could not "see how a foreign state can waive its immunity . . . by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States").  What is required to explicitly waive sovereign immunity is a "clear, complete, unambiguous, and unmistakable manifestation of

56

the sovereign's intent to waive its immunity." *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1292 (11th Cir. 1999) (internal quotations omitted). Plaintiffs have not supported their explicit waiver argument with any such "clear, complete, unambiguous, and unmistakable manifestation" by Saudi Arabia. Thus, Saudi Arabia has not explicitly waived its sovereign immunity.

Plaintiffs' implied waiver argument fares no better. According to Plaintiffs, Saudi Arabia implicitly waived its sovereign immunity by entering into a military training agreement with the United States. Plaintiffs do not have a copy of any such agreement, but they speculate that the agreement probably contained a clause that could be viewed as an implied waiver of sovereign immunity. In support of their argument, Plaintiffs point to a sample Foreign Military Sales Letter of Offer and Acceptance (LOA) that they believe is similar to the agreement Saudi Arabia may have had with the United States. And that sample LOA states that it "is subject to U.S. law and regulation, including U.S. procurement law." (Doc. 27-1 at 426). This, Plaintiffs say, is sufficient to satisfy the "exacting," *Strange*, 320 F. Supp. 3d at 98, standard required for implied waivers.

The Court disagrees. First, Plaintiffs have not provided any actual agreement between the United States and Saudi Arabia. Plaintiffs are merely speculating about what an agreement might have said. The Court cannot find an implied waiver based

on such speculation.  Second, even if Saudi Arabia signed a contract identical to the sample LOA, the language of the LOA is insufficient to impliedly waive sovereign immunity.

The LOA makes clear that it does not contemplate disputes being resolved through litigation.  According to the LOA: "The [U.S. Government] and the Purchaser agree to resolve any disagreement regarding this LOA *by consultations*[24] between the [U.S. Government] and the Purchaser and not to refer any such disagreement to any international tribunal or third party for settlement."  (Doc. 27-1 at 426) (emphasis added).  This language demonstrates that any signatories to the LOA contemplated disputes being resolved outside of court through the international consultation process.  Thus, the "Court certainly cannot say that it demonstrates [Saudi Arabia's] amenability to being subjected to suit in this country."  *Strange*, 320 F. Supp. 3d at 99.  In reaching that conclusion, the Court is mindful that courts have been "reluctant to find" implied waivers of sovereign immunity and have done so only when "the waiver was unmistakable."  *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991).  The language of the LOA is not unmistakable.

---

[24] In the international law context, a "consultation" is defined as the "interactive methods by which states seek to prevent or resolve disputes."  *Consultation*, *Black's Law Dictionary* (8th ed. 2004).

To summarize, Plaintiffs have argued that four exceptions to the FSIA apply in this case—(1) the JASTA exception; (2) the noncommercial tort exception; (3) the commercial activity exception; and (4) the waiver exception.  Plaintiffs have failed to meet their burden of "overcom[ing] the presumption that [Saudi Arabia] is immune from suit by producing evidence that the conduct which forms the basis of the complaint falls within" any of the four asserted exceptions.  *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1313 (11th Cir. 2009) (cleaned up).  Saudi Arabia is, therefore, immune under the FSIA, and this Court lacks jurisdiction over Plaintiffs' lawsuit.

### E.   Jurisdictional discovery is unwarranted

In response to Saudi Arabia's motion to dismiss, Plaintiffs moved for jurisdictional discovery.  (Doc. 43).  Foreign sovereign immunity is not only immunity from liability, but also immunity from the hassle and expense of the litigation process.  *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 206 (2d Cir. 2016).  Courts, therefore, should be hesitant to authorize jurisdictional discovery against a foreign state.  *Id.*[25]

---

[25] Plaintiffs have argued that they have a "qualified right to jurisdictional discovery." (Doc. 43 at 1).  And they cite to precedent saying that a district court "abuses its discretion if it completely denies a party jurisdictional discovery."  (*Id.*) (citing cases).  None of the cases cited by Plaintiffs, however, involved jurisdictional discovery of a foreign state that has asserted immunity under the FSIA.  In fact, Plaintiffs' motion for jurisdictional discovery lacks any discussion of how courts have handled jurisdictional discovery requests in FSIA cases.  Contrary to the

When deciding if jurisdictional discovery should be permitted against a foreign state, a district court is "to balance the need for discovery to substantiate exceptions to statutory foreign sovereign immunity against the need to protect a sovereign's . . . legitimate claim to immunity from discovery." *Butler*, 579 F.3d at 1314 (cleaned up) (affirming the denial of jurisdictional discovery). This standard is designed to ensure "that jurisdictional discovery is ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination." *Id*. (cleaned up). Thus, broad and vague requests for jurisdictional discovery from a foreign state should be denied. *See Sequeira v. Republic of Nicaragua*, 815 F. App'x 349, 352 (11th Cir. 2020) (affirming the denial of jurisdictional discovery because of the "breadth and lack of detail involved in [the plaintiff's] request for jurisdictional discovery").

---

impression provided by a quick read of Plaintiffs' motion, the rules are entirely different when jurisdictional discovery is sought in a mine run case and when it is sought in a case involving the FSIA. *See, e.g.*, *Consulting Concepts Int'l, Inc. v. Kingdom of Saudi Arabia*, No. 19 Civ. 11787, 2021 WL 1226361, at *7 (S.D.N.Y. Apr. 1, 2021) (explaining that in a case involving foreign sovereign immunity, the plaintiff has "no automatic right" to jurisdictional discovery and, instead, the plaintiff "must establish a prima facie case that the district court has jurisdiction over the defendant before discovery is granted") (cleaned up); *see also Kelly v. Syria Shell Petrol. Dev. B.V.*, 213 F.3d 841, 849 (5th Cir. 2000) (recognizing that in FSIA cases jurisdictional discovery "is *not* permitted as a matter of course" because of the unique comity concerns raised by allowing discovery against a foreign country).

To obtain jurisdictional discovery from a foreign state, a plaintiff must first "establish a *prima facie* case" that jurisdiction is proper under an exception to the FSIA. *Butler*, 579 F.3d at 1314; *see also Licea v. Curacao Drydock Co.*, 794 F. Supp. 2d 1299, 1304 (S.D. Fla. 2011) ("Jurisdictional discovery is only available where the plaintiff is able to carry its initial burden of establishing a *prima facie* case that jurisdiction exists."); *Stutts v. De Dietrich Grp.*, 465 F. Supp. 2d 156, 169 (E.D.N.Y. 2006) ("District courts in this circuit routinely reject requests for jurisdictional discovery where a plaintiff's allegations are insufficient to make out a *prima facie* case of jurisdiction.").

Here, as explained above, Plaintiffs have not established a *prima facie* case that an exception to the FSIA applies. Moreover, Plaintiffs have requested broad jurisdictional discovery that falls at the other end of the spectrum from the type of targeted and circumspect jurisdictional discovery that courts can authorize against a foreign state. In their motion, Plaintiffs seek eight "buckets" of discovery. (Doc. 43 at 9-18). Each "bucket" of requested discovery is quite broad and resembles the merits discovery that occurs in a normal case. For example, in the first "bucket" Plaintiffs seek "jurisdictional discovery to substantiate their allegations and prove [Saudi Arabia] was aware of Al-Shamrani's radicalization and [al-Qaeda] sympathies prior to sending him to the United States." (*Id.* at 10). According to

61

Plaintiffs, the information sought could be found in Saudi Arabia's "files," and Al-Shamrani's "social media accounts, electronic devices and communications." (*Id*.).

In the second "bucket," Plaintiffs seek "all of the information in [Saudi Arabia's] possession that it has shared with the FBI." (*Id*. at 11). And Plaintiffs request jurisdictional discovery to "test and examine the reliability and scope of the Navy investigation." (*Id*.). In another "bucket," Plaintiffs seek "discovery exploring the facts known or knowable by [Saudi Arabia] and RSAF Does 1-30 prior to Al-Shamrani's terrorist attack." (*Id*. at 15). To gain that information, Plaintiffs want to depose numerous individuals, including Saudi Arabian officials. They also want to review "communications, social media accounts, and electronic devices" of Saudi Arabia's officials and agents. (*Id*.).

These are just a few examples of the extremely broad jurisdictional discovery that Plaintiffs want this Court to authorize. Granting Plaintiffs' request, however, would be inconsistent with the requirement that jurisdictional discovery of a foreign state be circumspect. It would also be inconsistent with the purposes underlying the FSIA's grant of sovereign immunity—the discovery sought by Plaintiffs would be expensive, invasive, and undoubtedly time-consuming for Saudi Arabia. Instead of seeking jurisdictional discovery "to confirm specific factual allegations" that do "not cause the undue burdens that foreign sovereign immunity is designed to prevent,"

*Sequeira*, 815 F. App'x at 351-52, Plaintiffs have effectively asked the Court to greenlight a "fishing expedition" that seeks a large amount of information from a foreign state "without any non-speculative basis for believing that [the information] would establish jurisdiction" under the FSIA. *Arch Trading Corp.*, 839 F.3d at 207; *see also Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (affirming the denial of jurisdictional discovery that "was based on little more than a hunch that it might yield jurisdictionally relevant facts"). Plaintiffs have not sought limited and circumspect jurisdictional discovery to verify specific factual allegations in the complaint. They have sought broad discovery in the apparent hopes of finding information that may help establish an exception to the FSIA. That is impermissible. Thus, Plaintiffs' motion for jurisdictional should be denied.

### III.   Conclusion

What happened at NAS-P on December 6, 2019 was a tragedy. Plaintiffs understandably want accountability and compensation. The law, however, does not permit them to obtain those things from Saudi Arabia. Under the FSIA, Saudi Arabia is beyond this Court's jurisdiction unless an exception applies. Plaintiffs have failed to meet their burden of producing evidence to show that an exception applies. And Plaintiffs are not entitled to the broad jurisdictional discovery they have sought. Accordingly, it is respectfully **RECOMMENDED** that:

63

1) Defendant Saudi Arabia's Motion to Dismiss (Doc. 46) be **GRANTED** and this matter be **DISMISSED for lack of jurisdiction under the Foreign Sovereign Immunities Act**;

2) Plaintiffs' Motion for Jurisdictional Discovery (Doc. 43) be **DENIED**;

3) The Clerk of Court be directed to close this case.

At Pensacola, Florida, this 11th day of May 2023.

/s/ *Zachary C. Bolitho*
Zachary C. Bolitho
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.** <u>**Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.**</u>  **An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.** *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636.**