# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

BENJAMIN WATSON, JR., et al.,

               *Plaintiffs,*

v.

KINGDOM OF SAUDI ARABIA,

               *Defendant.*

**Case No. 3:21-cv-00329-MCR-ZCB**

# PLAINTIFFS' OBJECTIONS TO MAGISTRATE JUDGE'S
# REPORT & RECOMMENDATION

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................4

II.   STANDARD OF REVIEW ....................................................6

   A.   Report and Recommendation ..........................................6

III.   OBJECTIONS TO THE R&R.................................................7

   A.   The R&R imposes an evidentiary burden on Plaintiffs that is inconsistent with controlling precedent. .......................................7

   B.   The R&R failed to grant Plaintiffs jurisdictional discovery. .......................13

   C.   The R&R's recommendation to dismiss Plaintiffs' JASTA claims is based upon multiple factual and legal errors. ...............................17

      1.   The R&R's analysis of the course and scope of employment issues is incomplete and erroneous. ..........................................18

      2.   The R&R erroneously determined that KSA's tortious acts were non-actionable omissions and/or mere negligence. ..............................25

      3.   The R&R failed to address KSA's material support to Al-Shamrani (a known AQAP operative).................................................28

      4.   The R&R erroneously concluded that Plaintiffs failed to establish proximately causation. ................................................30

   D.   KSAThe Magistrate Judge misapplied the noncommercial tort exception, which permits jurisdiction over KSA. ......................................32

      1.   The R&R erroneously concluded that Plaintiffs did not plead one entire tort occurring in the United States ....................................32

      2.   The R&R erroneously concluded that the CLO's misconduct was discretionary.........................................................33

   E.   The R&R misapplied the commercial activity exception, which permits jurisdiction over KSA ................................................34

      1.   The R&R erroneously concluded that KSA's purchase of airplanes and pilot training was not commercial activity ..............................34

      2.   The R&R erroneously concluded that Plaintiffs' direct negligence cause of action was based upon the terrorist attack................................36

   F.   The R&R's analysis and recommendation on FSIA's waiver exception ignores evidence the Court could have easily ordered to be discovered.............37

IV.   CONCLUSION ............................................................37

## I.   INTRODUCTION

Plaintiffs respectfully object to the Magistrate Judge's Report and Recommendation. (Doc. 53, the "R&R"). If adopted, the Court will commit numerous errors of law and adopt several factual findings that are without record support.

This case undoubtedly turns on some complex areas of federal and state law, and it has implications for international relations as well as for servicemembers, their families, and the people of Pensacola at large. Some of the legal questions— particularly involving JASTA, a relatively new statute passed in response to foreign-sponsored terrorist acts just like this one—must be answered without the benefit of extensive history in case law. For all these reasons, the Court should rigorously scrutinize the Report and Recommendation, and take care not to adopt conclusions of law and findings of fact that are incorrect.

One legal error in particular infects the others, and that was the Magistrate Judge's refusal to permit one *bit* of jurisdictional discovery—even to locate discrete documents, such as the U.S./Saudi contract governing the placement of military students at NAS Pensacola, or U.S. investigators' actual findings, or the contents of Al-Shamrani's unlocked cell phone. Rather than introduce authentic copies of such materials, Saudi Arabia introduced ersatz versions: drafts and templates of these documents. The Magistrate Judge should not have permitted

Saudi Arabia to manipulate the record and get away with arguing from these poor-quality documents. The originals should have been produced.

But the Magistrate Judge's failure to order jurisdictional discovery stemmed from a second legal error he committed: a misreading of sovereign immunity law regarding Plaintiffs' pleading obligations. The R&R misreads FSIA law by putting a burden on Plaintiffs to "produce" evidence, the evidence that they may properly acquire in jurisdictional discovery, before they can have any of that discovery. This circular sentence-first, verdict-after approach gave Saudi Arabia (hereinafter "KSA") total insulation from suit. But the federal courts' *limited* jurisdiction to hear claims against foreign sovereigns does not mean there is *no* jurisdiction.

Having misread the law and barred Plaintiffs from the discovery they were entitled to, the Magistrate Judge then drew findings of fact based on an incomplete and misleading factual record. Perhaps the clearest such finding is that Al-Shamrani was "self-radicalized," R&R at 18, which is relevant because the Magistrate Judge then relied on it to conclude that KSA did not motivate Al-Shamrani's attack. The Magistrate Judge made other totally unsupported findings of fact, such as that KSA gave "full cooperation" to the FBI. *Id*. at 18. What actual *evidence* of that was there, other than KSA's self-serving factual record? (The truth—that KSA deported more than a dozen flight students home forever and without being interviewed by the U.S. Navy for possessing anti-American and

jihadi beliefs—was not even disputed by the Defendant or discussed by the Magistrate Judge.) There are other troubling failures to look at actual facts, such as the Magistrate Judge's failure to take into account anything learned after American investigators were ultimately able to decrypt Al-Shamrani's iPhone—including critical knowledge that Al-Shamrani had been involved with Al-Qaeda/AQAP since 2015 and planned the attack with its assistance. That information isn't part of the Navy Report or the press releases because the iPhone was accessed *after* those documents were written. The Magistrate Judge made his findings of fact without having those facts. He also failed to credit the same allegations in the Complaint.

Beyond these core errors, the R&R makes numerous other errors of law and fact. Plaintiffs deal with each of these in turn.

Plaintiffs ask the Court to revisit the legal errors *de novo*, as it is bound to do, and to set aside the erroneous findings of fact.

## II.    STANDARD OF REVIEW

### A.    Report and Recommendation

In reviewing a report and recommendation, the district court "may accept, reject, or modify, in whole or in part, the findings recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3). When a party makes specific objections to a magistrate judge's report, the district court engages in *de novo* review of the issues raised. *See* 28 U.S.C § 636(b)(1); Fed. R.

Civ. P. 72(b)(3). A *de novo* review means the district court "give[s] fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. of Educ. Of Ga.*, 896 F.2d 507, 512 (11th Cir. 1990) (citation omitted).

## III.    OBJECTIONS TO THE R&R

### A.    The R&R imposes an evidentiary burden on Plaintiffs that is inconsistent with controlling precedent.

The Magistrate Judge referred to the FSIA "burden-shifting framework" which applies when there is a dispute as to whether the FSIA allows a federal court to assert jurisdiction over a foreign sovereign. (R&R at 10.) In the Magistrate Judge's view, after a showing that the defendant is a sovereign, "the plaintiff bears the 'burden of production' to establish 'that jurisdiction exists because a FSIA exception applies.'" *Id.* According to this view, Plaintiffs were required to adduce evidence—apparently, admissible documents and sworn testimony—to show that this Court could assert jurisdiction. Having set the bar this high, the Magistrate Judge criticized the Plaintiffs for failing to meet it, over and over—on JASTA (R&R at 35 ("Plaintiffs have failed to meet their burden of producing evidence")), on the noncommercial tort exception (R&R at 36 (relying on the faulty JASTA conclusion as "fully applicable")), on the waiver exception (R&R at 57 ("Plaintiffs have not provided any actual agreement")), and so on.

The core legal error here was demanding admissible evidence from Plaintiffs to carry their "burden of production." The Magistrate Judge demanded too high a burden from Plaintiffs. Overwhelming, nationwide authority holds that a plaintiff satisfies its initial burden of production to establish a prima facie exception based solely on the particularized allegations of fact in the complaint and the extent to which those facts are undisputed.

"[T]o establish subject matter jurisdiction under the FSIA, the plaintiff must overcome the presumption that the foreign state is immune from suit by producing evidence that the conduct which forms the basis of [the] complaint falls within one of the statutorily defined exceptions." *Butler v. Sukhoi Co*., 579 F.3d 1307, 1312–13 (11th Cir. 2009) (citations and internal quotations omitted).

Our Circuit then went on to clearly define what "producing evidence" actually means: "Whether the plaintiff has satisfied his burden of production in this regard is determined by looking at ***the allegations in the complaint [and] the undisputed facts, if any***, placed before the court by the parties." *Id*. at 1313 (emphasis added) (citations and internal quotations omitted); *accord O'Bryan v. Holy See*, 556 F.3d 361, 376–77 (6th Cir. 2009); *Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 559–60 (2d Cir. 2020); *Robinson v. Gov't of Malay*., 269 F.3d 133 (2d Cir. 2001).

Wright & Miller is in accord that a plaintiff's allegations are sufficient:

> Once a defendant has made a prima facie case for immunity by showing that it is a foreign entity or individual within the ambit of the Immunities Act, the plaintiff must **allege** that his suit falls under one of these specified exceptions; the burden then ultimately shifts back to the foreign state to show the exception does not apply, and thus that it is immune from the jurisdiction of United States courts.

Wright & Miller, 14A Fed. Prac. and Proc. § 3662.3 (emphasis added); *see also* 15A Moore's Federal Practice—Civil § 104.07 ("if the plaintiff's **allegations** and uncontroverted evidence bring the claim within an FSIA exception to sovereign immunity, the burden then shifts back to the foreign state to prove that the relevant exceptions do apply.") (emphasis added).

And a leading FSIA guide for judges is also in accord:

> [Q]uestions of subject-jurisdiction under the FSIA are resolved through a three-part burden shifting framework. First, the defendant must make a prima facie showing that it is a foreign state thereby becoming presumptively immune from the jurisdiction of United States courts . . .
>
> Next, the plaintiff must sufficiently 'alleg[e] **or** proffer[] evidence' of a FSIA exception . . .
>
> Finally, if the plaintiff satisfies its burden of production, the defendant bears '[t]he ultimate burden of persuasion by a preponderance of the evidence' that the FSIA exception does not apply.

Federal Judicial Center, The Foreign Sovereign Immunities Act: A Guide For Judges 26 (2013) (quoting *Arch Trading Corp. v. Republic of Ecuador*, No. 13-cv-445 (PAC), 2015 WL 3443906, at *2 (S.D.N.Y. May 28, 2015)) (emphasis added).

In short: although Plaintiffs' initial burden of production is couched in terms of "producing evidence," what all these authorities say is that the Court must consider Plaintiffs' well pleaded ***allegations*** to be sufficient "evidence" to carry the initial burden—separate and apart from any documentary evidence Plaintiffs may have proffered in support of those allegations. *See Butler*, 579 F.3d at 1312–13; *O'Bryan*, 556 F.3d at 376–77; *Pablo Star*, 961 F.3d at 559–60; *Robinson*, 269 F.3d at 133.

Plaintiffs met their initial burden. The burden then shifted to KSA, to prove immunity, by a preponderance of the evidence. Under the FSIA burden shifting framework and the Rule 12(b)(1) factual challenge standard, Plaintiffs' well pleaded allegations do govern and must be accepted as true until the Defendant produces evidence contradicting all or some of them. "In a factual challenge, the defendant has the burden to produce evidence to contradict the plaintiff's allegations. If the burden is met, the allegations do not carry a presumption of truthfulness." *Sinaltrainal v. Coca-Cola Co.*, 256 F. Supp. 2d 1345, 1350–51 (S.D. Fla. 2003); *see also Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (D.D.C. 2007) (in a factual challenge under FSIA "the defendant may introduce testimony, affidavits, or other evidence to dispute the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.").

The R&R did not follow this law and instead went down another path. It determined that, once KSA proffered its minimal evidence—namely, the two outdated press releases and the preliminary Navy report—the "burden of production" immediately shifted to Plaintiffs to provide hard "evidence" in support of *all* of their allegations of fact.

That was error. Plaintiffs were entitled—under the law—to rely on their plausibly pled allegations.

Moreover, as a factual matter, the documents submitted by KSA do not actually rebut Plaintiffs' well-pled allegations. And they certainly do not rebut *all* of the material allegations in the Complaint.[1]

The Magistrate Judge also ignored precedent that gives Plaintiffs a chance to meaningfully rebut KSA's factual contentions. In *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000), the court held in a factual challenge—the court must resolve the factual challenge, but critically, it *also* "must give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Id.* at 40. As will be discussed in the next section, by

---

[1] Plaintiffs discussed the deficiencies associated with the documents in their Jurisdictional Discovery Motion. *See* Doc. 43 at 4-9. *See, also In re Terrorist Attacks on Sept. 11, 2001*, No. 03MDL1570GBDSN, 2023 WL 1797629, at *11 (S.D.N.Y. Feb. 7, 2023), reconsideration denied, No. 03MDL1570GBDSN, 2023 WL 2971480 (S.D.N.Y. Apr. 17, 2023) (exercising caution when "relying on unsupported 'conclusions' in investigative documents").

failing to grant Plaintiffs any jurisdictional discovery, the Magistrate Judge did not give any opportunity to "secure and present evidence" to rebut KSA's factual challenge.[2]

Thus the R&R really erred in three interlocking ways: (1) it did not take Plaintiffs' allegations to be true; (2) it did not give Plaintiffs the chance to secure the evidence to back up their allegations; and then (3) it resolved KSA's factual challenge in its favor on this incomplete record.

In support of its insupportable burden shifting framework , the R&R cites to four cases.[3] None of them applied the heightened evidentiary burden imposed by the Magistrate Judge here. In fact, all four were decided as a matter of law considering only the allegations of the complaint and the undisputed facts.

Plaintiffs did demonstrate the existence, and reliability, of documents supporting their allegations. In fact, a good deal of Plaintiffs' factual allegations

---

[2] Jurisdictional discovery is especially warranted when the jurisdictional facts are intertwined with the merits of the case. Indeed, outside the ambit of FSIA, the Eleventh Circuit will not rule on a 12(b)1 factual challenge if the jurisdictional facts are intertwined with the merits of the case. In such a situation, the Eleventh Circuit will find jurisdiction and address the indirect attack on the merits at a later stage in the litigation pursuant to the standard articulated in Rule 56. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1530 (11th Cir. 1990); *Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003).

[3] *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1312-1313 (11th Cir. 2009); *In re Terrorist Attacks on Sept. 11, 2011*, 714 F.3d 109 (2d Cir. 2013); *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213 (11th Cir. 2018); and *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001).

are derived directly from authoritative documents which Plaintiffs expressly cited in the Complaint. Plaintiffs further supplemented the record with additional evidence attached to Plaintiffs' Opposition to the Motion to Dismiss. Virtually all of these allegations and factual submissions were not even contested, but the Magistrate Judge did not acknowledge most of them.

Plaintiffs object to the Magistrate Judge's incorrect legal analysis and to all of the findings of fact that flowed from it. The Magistrate Judge should have credited Plaintiffs' well-pleaded allegations and then given Plaintiffs a meaningful chance to "secure and produce" evidence to rebut KSA's contentions.

## B.    The R&R failed to grant Plaintiffs jurisdictional discovery.

The R&R deals with Plaintiffs' motion for jurisdictional discovery as somewhat of an afterthought: tucked back on pages 59–63 of this 64-page Order. This underscores the error. The Magistrate Judge should have considered and granted this motion *first*, allowed all of the discovery sought, and *then* conducted an evidentiary hearing and resolved KSA's factual challenge with the relevant evidence in hand. Instead, Plaintiffs' ability to rebut KSA's challenge was truncated from the beginning.

The Magistrate Judge denied Plaintiffs' motion for jurisdictional discovery for two erroneous reasons:

First, he incorrectly held that "Plaintiffs have not established a *prima facie* case that an exception to the FSIA applies." (R&R at 61.) This was based on the R&R's incorrect legal analyses, which Plaintiffs discuss below. Plaintiffs *did* make out a *prima facie* case through their well-pled and undisputed allegations. The Magistrate Judge did not think so, but his conclusions on those points were based on Plaintiffs' failure to have documentary evidence in hand. It is circular and, frankly, unfair, to require FSIA plaintiffs to come forward with all possible evidence to meet a FSIA exception, before they can obtain jurisdictional discovery. Moreover, under that standard, jurisdictional discovery would never be necessary and would never be ordered: only plaintiffs with all the facts in hand could get past a motion to dismiss, and then they wouldn't need any discovery. This cannot be the holding of the Court.

Second, the Magistrate Judge wrote that Plaintiffs' discovery requests were "broad," a "fishing expedition," "speculative," and not "the type of targeted and circumspect jurisdictional discovery that courts can authorize against a foreign state." (R&R at 61, 62.)

That was error. Plaintiffs carefully tailored their eight proposed categories of discovery to counter those factual challenges KSA asserted. Plaintiffs also tied each category to the various FSIA exemptions that they alleged, and explained how having that discovery would satisfy one or more exemptions. This is not a shotgun

approach; it is a scalpel operation. Again, at issue in KSA's jurisdictional challenge are the merits of Plaintiffs' case, including highly factual issues like causation and scope of employment. When the merits of a cause of action are intertwined with the jurisdictional facts, a significantly more robust evidentiary record is necessary. *See Lawrence*, 919 F.2d 1525, 1530-31 (vacating the dismissal and remanding the case because the factual record did not support the District Court's factual finding on scope of employment).

"When . . . there is a factual question regarding a foreign sovereign's entitlement to immunity, and thus a factual question regarding a district court's jurisdiction, the district court 'must give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'" *Hansen v. PT Bank Negara Indon.*, 601 F.3d 1059, 1063–64 (10th Cir. 2010). "[A]t the very least, discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination." *Id*.

Even if Plaintiffs' discovery requests were too broad, the Magistrate Judge should have considered each category—or ordered discovery in a portion of one or more categories—rather than rejecting them all wholesale.[4] Magistrate Judges are

---

[4] In *Hansen* the Tenth Circuit found that an order authorizing jurisdiction discovery was narrowly tailored that simply stated "[plaintiff] shall be entitled to conduct limited jurisdiction discovery on whether [defendant] … conducted commercial activity that satisfies the commercial activity exception under the [FSIA] ." 601

well-equipped to supervise the course and scope of discovery. And there was no suggestion that the discovery sought was not proportional to the needs of the surviving Plaintiffs and their families. The end result of denying this motion was the death of all claims.

Federal courts, of course, enjoy great discretion in permitting or disallowing discovery. Nevertheless, the Court must give Plaintiffs "ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'" *Phoenix Consulting*, 216 F.3d at 40. In another JASTA/FSIA case involving KSA and Sudan, the Southern District of New York noted that it must "conduct a 'delicate balancing'" between international comity and the rights of plaintiffs "while managing discovery." *In re September 11*, 2020 WL 8611024, at *2 (S.D.N.Y. Aug. 27, 2020). However, "[p]laintiffs must be given the discovery necessary to determine if JASTA applies." *Id*.

The Magistrate Judge's denial of the motion for jurisdictional discovery was error.

---

F.3d at 1063-64. The *Hansen* Court also noted that the district could entertain a motion to limit the discovery if it became unnecessarily burdensome. *Id*.

**C.  The R&R's recommendation to dismiss Plaintiffs' JASTA claims is based upon multiple factual and legal errors.**

The R&R analyzed Plaintiffs' claim to jurisdiction under JASTA, starting on page 13. Ultimately, the R&R determined that JASTA did not authorize jurisdiction. R&R at 35. This conclusion was erroneous and Plaintiffs object to it in full.

Congress enacted JASTA "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against [any person or entity that] provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b), 130 Stat. at 853 (emphases added); *see, e.g., Kaplan v. Lebanese Can. Bank SAL*, 999 F.3d 842, 855 (2d Cir. 2021) (discussing this language).

Consistent with that goal, JASTA also authorized civil claims based upon theories of "secondary" liability—against anyone who conspired to violate the Anti-Terrorism Act, 18 U.S.C. § 2333(a) ("ATA") or aided and abetted persons who violated the ATA or otherwise engaged in terrorist activities. 18 U.S.C. § 2333(d)(2); *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206 (2023).

1.  **The R&R's analysis of the course and scope of employment issues is incomplete and erroneous.**

On pages 15–21 of the R&R, the Magistrate Judge wrote that one reason Plaintiffs could not establish jurisdiction under JASTA was because Al-Shamrani was not acting within the course and scope of his employment. That conclusion—which was based on legal error mixed with improper findings of fact—was erroneous for a few core reasons.

First, as discussed above, the Magistrate Judge should have credited Plaintiffs' well-pled allegations, particularly those unrebutted by any factual challenge raised by KSA. In one error of this type, the Magistrate Judge asked: "Have Plaintiffs produced evidence showing that Al-Shamrani's terrorist attack was the type of conduct KSA employed him to perform? The answer is: No." (R&R at 17.) Rather than relying on Plaintiffs' undisputed allegations, the Magistrate Judge went outside the record to answer his own question "Saudi Arabia employed Al-Shamrani to . . . fly[] airplanes and operat[e] weapons systems". *Id*. There was no citation or *record* evidence of this. The Magistrate Judge also adopted—as the factual truth—statements like that KSA granted "full cooperation with the FBI" or that Al-Shamrani acted "for his own reasons." *Id*. at 18. As discussed above, wherever the R&R adopted factual findings without sufficient record evidence, it was erroneous, and Plaintiffs object to all such conclusions in this part of the R&R.

Second, the Magistrate Judge properly selected Florida law to construe the scope of Al-Shamrani's employment, but he erred in his reading of that law.

The R&R cited to a three-factor test commonly used in Florida, and holds that conduct is within the scope of employment if it:

> (1) was "the kind for which the employee was employed to perform;"
>
> (2) "occurred within the time and space limits of his employment;" and
>
> (3) was "activated at least in part by a purpose to serve the employment."

(R&R at 16 (citing *Spencer v. Assurance Co. of Am.*, 39 F.3d 1146, 1150 (11th Cir. 1994).)

The Magistrate Judge cited the right test. KSA conceded factor (2) ("time and space"). That left factors (1) and (3). The Magistrate Judge found that Plaintiffs did not establish either. Each of these conclusions was error.

First, as to factor (1), whether Al-Shamrani's conduct was the kind of which he was employed to perform, the Magistrate Judge erred in focusing solely on Al-Shamrani's attack on December 6, 2019, and concluding terrorist attacks were not within Al-Shamrani's job description. The Magistrate Judge further found that "[p]laintiffs have not sufficiently shown that jeopardizing an important strategic relationship by causing a disastrous diplomatic incident was within Al-Shamrani's job description." (R&R at 17-18).

19

However, in Florida, to fall within the scope of employment, the conduct does not have to be specifically authorized by the employer, nor does it have to be necessary or appropriate to serve the employer's interests, and the employer may even forbid it. *See Stinson v. Prevatt*, 94 So. 656, 657 (1922).[5] The Court must consider the unique facts of each case, including but not limited to, the employee's motivation, nature of their duties and the course of the assault, each in terms of the other, and none of these factors is singularly decisive. *Columbia By the Sea, Inc. v. Petty*, 157 So. 2d 190, 193 (Fla. Dist. Ct. App. 1963).

The Magistrate Judge's analysis of factor (1) is founded upon his declaration that as "general rule [that] 'batteries by employees are held to be outside the scope of an employee's employment.'" (citing *Agriturf Mgmt., Inc. v. Roe*, 656 So. 2d 954, 955 (Fla. 2d DCA 1995)). However, this "general rule" has numerous exceptions.[6]

The R&R ignored this precedent in favor of its assumption of what conduct was within Al-Shamrani's job description, however, use of this type of flawed

---

[5] Florida courts sometimes refer to this theory of liability as "apparent scope of employment" as opposed to "actual scope of employment." *See Watts v. City of Hollywood,* 146 F.Supp. 3d 1254, 1262 (S.D. Fla. 2015); *Trabulsy v. Publix Super Mkt., Inc*., 138 So.3d 55, 556 (Fla. 5th DCA 2014).

[6] For example, Fn. 13 to Plaintiffs' Opposition includes thirteen cases that found intentional torts within the scope of employment under Florida law. (Doc. 39, fn. 13). The R&R fails to address any of these cases.

logic has been squarely rejected in Florida. Such reasoning, "distort[s] the inquiry" because "employees would not be hired to do something illegal," simply as a matter of "common sense." *Watts*, 146 F.Supp. 3d at 1262. If the Magistrate Judge's job description test was correct, it "'would open a huge gap in *respondeat superior* liability, if not eviscerate it.'" *Watts v. City of Port St. Lucie, Florida,* 2016 WL 1110316 (S.D. Fla. 2016)

Second, as to factor (2), the Magistrate Judge spends little time assessing this issue because the location and time of the attack is not in dispute. However, the weight of this factor should not have been ignored in light of the facts of this case, and the Magistrate Judge erred in failing to account for the relevance of this factor to its analysis of this issue.

Specifically, under Florida law, intentional torts can fall within the scope and course of employment provided there is a sufficient nexus with the activities, or when the employment facilitates an assault that would not otherwise have occurred. *See Tampa Maid Seafood Prods. v. Porter*, 415 So. 2d 883, 885 (Fla. 1st DCA 1982). Intentional torts have been found within the course and scope of employment when an employee's conduct occurs on duty, on the job site, while in uniform, or when employees exploit their authority to create opportunity for their for their tortious conduct. *See McMillan v. Dep'tD of Corr.*, No. 5:13-CV-292-WS-

GRJ, 2016 WL 4059230, at *4 (N.D. Fla. July 8, 2016), *adopted*, No. 5:13CV292-WS/GRJ, 2016 WL 4059679 (N.D. Fla. July 27, 2016).

The particular undisputed facts of this case warrant significant relevance to the decision of this issue, especially because the unrebutted allegations establish a strong nexus between Al-Shamrani's employment and the attack. This nexus begins the fact that his employment with KSA was the sole reason he was in the United States, the job allowed him to obtain a Visa, the same Visa he used to purchase the gun he used in the attack. He used his KSA-provided combat and weapons training to maximize the lethality of the attack; he used his uniform and KSA-security clearances to gain access to the highly secure military base; he also used his position uniform to casually scout his route that he used to attack his victims, and used the knowledge and familiarity of the building that he gained from his employment to his advantage during the attack. The attack occurred at the very location where he would class, train, and perform his work for KSA on the base, the same building where he would report for duty each day, including on December 6.

The R&R ignores all of this evidence and wrongly concludes that intentional torts cannot be within the scope of employment unless expressly authorized. The R&R cites mostly non-Florida cases that involve sexual assaults (conduct that is

highly distinguishable from this case and display nothing near a similar nexus between the employment and the acts). R&R, p. 18-19, Fn. 9.

Third, as to factor (3), the R&R's limited selection of facts and incorrect application of law further resulted in it concluding that Al-Shamrani acted purely "for his own purposes and not that of Saudi Arabia." (R&R at 18.) This finding of fact flies in the face of the particularized and undisputed allegations.

As noted above, Florida law requires a fact intensive analysis that includes the consideration of the motives and intent of the employee, their subjective beliefs about their job-related duties, as well as their understanding of their authority to take (or refrain from) specific actions for their employer or for the purposes of the employer. Florida's consideration of these factors is consistent with long-established tort and agency principles.[7] The key factor under Florida law is the subject intent of the agent and whether the tortious act was done to further an interest of the employer – however, excessive or misguided it may be. *Hennagan v. Dep't of Hwy. Safety & Mot. Veh.*, 467 So.2d 748, 751 (Fla. 1st DCA 1985); *Parsons v. Weinstein Enters., Inc.*, 387 So.2d 1044, 1045–46; Restatement (Second) of Agency, §235 cmt. *a* ("It is the state of the servant's mind which is

---

[7]*See e.g.*, Restatement (Third) of Agency §§ 2.01; 2.02; 2.04; 7.03; 7.05 (2006); and Restatement (Second) of Agency, §§ 212 (the entire conduct of the master and his relation to the servant must be considered); § 26; § 213; § 219(d) (principal is liable when agent was aided in accomplishing the tort by the existence of the agency relation.); § 236.

material. Its external manifestations are important only as evidence. Conduct is within the scope of employment only if the servant is actuated to some extent by an intent to serve his master.").

The Court did not look to Al-Shamrani's state of mind and his subjective belief about the purpose of the attack, rather, the Court looked to whether KSA authorized the attack and benefited from it. (R&R, p. 17-19). There was significant evidence that the attack was inspired by Saudi Arabia's political and religious ideology. For example, Al-Shamrani's state of mind is documented in the manifesto he published hours before the attack, which reiterates the same violent themes and ideas contained in KSA's state-mandated textbooks, official military publications, and public statements made before the attack. Plaintiffs' unrebutted allegations establish that KSA encouraged violent extremist ideas in its military and schools, that Al-Shamrani was exposed to and adhered to these teachings, and that they motivated the attack. Additionally, seventeen of Al-Shamrani's fellow RSAF members in the United States were found to have anti-American and Jihadist content on their devices. This is sufficient to establish that Al-Shamrani "was motivated, at least in part, by a purpose to serve" KSA. *McMillan*, 2016 WL 4059230, at *4 (N.D. Fla. July 8, 2016).

Had the Magistrate Judge properly applied Florida law, and not made unsupported findings of fact, he would have been compelled to deny Saudi Arabia's motion on JASTA.

### 2. The R&R erroneously determined that KSA's tortious acts were non-actionable omissions and/or mere negligence.

In enacting JASTA, Congress supplied a "rule of construction" at 28 U.S.C. § 1605B(d). This rule says: "A foreign state shall not be subject to the jurisdiction of the courts of the United States under subsection (b) [JASTA] **on the basis of an omission or a tortious act or acts that constitute mere negligence**." (Emphasis added.)

This is not the clearest drafting, and there are at least two ways to read it: (1) A foreign state is immune from suit   if it makes an omission or tortious act, where the level of culpability as to the omission or tort is mere negligence. *Or:* (2) A foreign state is immune from suit on the basis of *any* omission, and is also immune from suit on the basis of a tort where the level of culpability is mere negligence.

In other words, the question is: can Plaintiffs hold KSA liable on the basis of omissions? The Magistrate Judge held that the answer is No, R&R at 22, and then went on to hold that because Plaintiffs' negligence and gross negligence counts are all founded on omissions, those claims do not support jurisdiction under JASTA, R&R at 23–24. Both of those legal conclusions are wrong.

First, the Magistrate Judge misreads Section 1605B(d)—at least to the extent he held that more-than-merely-negligent omissions cannot support JASTA jurisdiction. The R&R cites no case in support of its reading of Section 1605B(d), and unfortunately, there is none because JASTA cases are rare.

The statute should be read to say that an omission, which is more culpable than mere negligence, can be the basis for jurisdiction. That would be consistent with JASTA's stated purpose, which is "to provide civil litigants with the broadest possible basis . . . to seek relief against . . . foreign countries . . . that have provided material support . . . to persons that engage in terrorist activities against the United States." JASTA, § 2(b), Pub. L. No. 114-222, 130 Stat. 852, 853. When faced with similar ambiguities in the FSIA, courts have construed them broadly based on the "text, history, and purpose of the statute [that] make clear that the statute does not counsel a narrow reading." *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1168 (D.C. Cir. 2013) (citing *Doe v. Bin Laden*, 663 F.3d 64, 70 (2d Cir.2011) (referring generally to FSIA's § 1605A terrorism exception). The same approach should apply to interpreting JASTA since it too was a change to the FSIA by which "Congress sought to lighten the jurisdictional burdens borne by victims of terrorism seeking judicial redress[.]" *Id*.

Also, in another context, the Foreign Sovereign Immunity Act does expressly authorize claims founded on a "tortious act or omission." 28 U.S.C. § 1605(a)(5).

It would be unusual if FSIA granted this Court jurisdiction to hear garden-variety tort cases founded on grossly negligent omissions, but JASTA did not authorize the Court to hear suits alleging *international terrorism* on the same.

Second, the Magistrate Judge erred in characterizing all of Plaintiffs' claims as being grounded on omissions. (R&R at 24 ("the negligence/gross negligence cause of action . . . states that Saudi Arabia breached its duty of reasonable care by failing to do sixty-one separate things," each of which "is an allegation of an 'omission'—and omissions cannot provide the basis for jurisdiction under the JASTA exception").)

This is legal error because Plaintiffs do not allege that KSA omitted to vet Al-Shamrani. What Plaintiffs allege is that KSA vetted Al-Shamrani extremely poorly—committing an affirmative act with gross negligence. The gross negligence claim is not based on an omission. It's based on the Saudi government's shoddy investigation of the evidence of Al-Shamrani's terrorist inclinations. As the Complaint amply alleges, KSA assumed an affirmative duty to the United States to properly vet its military students. KSA acted recklessly in the face of indisputable (and undisputed) facts that Al-Shamrani had terrorist connections. KSA nevertheless employed him, trained him, and sent him to the United States. Plaintiffs also alleged that KSA's Country Liaison Officer and Al-Shamrani's fellow officers were aware of his radicalization. This evidence was

based on publicly available documents (KSA likely knows more) and it was not disputed.

Finally, Plaintiffs submitted unrebutted allegations of Al-Shamrani's extremist postings online, as well as KSA's surveillance of its own citizens' electronic devices and their online activities, which certainly extends to members its own military. This supported a level of knowledge which made KSA's hiring and screening of Al-Shamrani particularly grossly negligent.

The Magistrate Judge erred by misreading Section 1605B(d) to exclude grossly negligent omissions, and erred again by construing the Complaint to allege *only* omissions, not gross misconduct.

### 3. The R&R failed to address KSA's material support to Al-Shamrani (a known AQAP operative).

The Court failed to address Plaintiffs' evidence and legal theories that KSA's support of Al-Shamrani constitutes material support of terrorism under JASTA.[8] By overlooking this component of Plaintiffs' JASTA claims, the R&R fails to provide a complete analysis of jurisdiction under JASTA.

---

[8] For The Magistrate Judge analyzed Plaintiffs' JASTA material support claims under the theory that Al-Shamrani was providing material support to al-Qaeda (finding that it was outside the scope of his employment); and that KSA was providing material support to al-Qaeda in Yemen (finding that Plaintiffs allegations were conclusory); however, the Court failed to address Plaintiffs' argument that KSA was providing material support directly to Al-Shamrani (a known al-Qaeda member).

Plaintiffs' unrebutted allegations related to this theory of liability include: Al-Shamrani was a member of AQAP since at least 2015. Compl. ¶133; KSA knew of Al-Shamrani's connections and ties to AQAP prior to sending him to the United States. *Id*. ¶¶ 62, 135, 139–47, 330–31. Nevertheless, KSA certified Al-Shamrani's eligibility to participate in the U.S.-based training program and knowingly submitted false documentation on his behalf. *Id.* ¶¶ 64–68. KSA continued to provide material support to Al-Shamrani as his anti-American behavior and support for terrorism became more obvious and aggressive, including training, lodging, money and access to a secure military base.

The aforementioned evidence establishes a theory of liability under JASTA for material support of a Foreign Terrorist Organization. *See In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 643 (S.D.N.Y. 2018) (finding the "tortious" conduct JASTA is designed to address includes "countries that have knowingly or recklessly provided material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries.") Moreover, KSA's material support to Al-Shamrani did not involve "omissions." *See* R&R, p. 26-29 (finding KSA's provision of material support to AQAP, as alleged, not to involve omissions and sufficiently tortious under JASTA).

**4. The R&R erroneously concluded that Plaintiffs failed to establish proximately causation.**

Plaintiffs object to the R&R's erroneous conclusion that, at this stage of the case, Plaintiffs have not satisfied JASTA's proximate cause standard. The R&R correctly concludes that the traditional test for proximate causation (rather than KSA's proposed "but for" causation test) is the appropriate standard. However, the R&R's conclusion that Plaintiffs have failed to establish proximate cause is based on several errors.

First, the R&R's erroneous burden of production placed on Plaintiffs infects its analysis of proximate cause. For example, the R&R improperly faults Plaintiffs for the inability to produce additional evidence proving causation, when such evidence is usually beyond reach without discovery, particularly in terrorism cases. R&R, p. 29; *see Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), *certified question answered*, 194 A.3d 38 (D.C. 2018), *and vacated and remanded sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020) (noting the difficulties faced by FSIA terrorism plaintiffs in obtaining firsthand evidence and eyewitness testimony without the ability to conduct discovery).

Second, the R&R's incorrect interpretation of "omission," and its corresponding wholesale categorization of KSA's conduct as non-actionable "omissions," results in a deficient analysis of proximate cause.

Third, the errors made by the R&R in addressing the issue of course and scope of employment resulted in it failing to address KSA's material support to al-Shamrani (discussed in the section above).

 Fourth, the R&R required Plaintiffs to show that the NAS-P attack specifically, as opposed to terrorism generally, was reasonably foreseeable to KSA (R&R at 31), but this is not the law. JASTA "[does not] require proof that [a defendant] knew of the specific attacks at issue when it "aided terrorists, and the law does not shield those who support terrorism but lack knowledge of a specific attack." *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 332 (2d Cir. 2018*); Kaplan v. Lebanese Canadian Bank*, SAL, 999 F.3d 842, 859 (2d Cir. 2021). Nor does the law protect those found to be willfully blind. *In re Chiquita Brands Int'l, Inc*., 284 F. Supp. 3d 1284, 1316 (S.D. Fla. 2018).

Lastly, the R&R fails to recognize that, at this stage of the case, establishing causation for jurisdictional purposes requires a more liberal application of the proximate cause standard than is reserved for proving substantive causation on the merits for any of the claims later in the case. *See In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 645 n. 8 (S.D.N.Y. 2018) ("It is well settled…that jurisdictional causation under the FSIA is distinct from and more liberal than the substantive causation elements of any one claim.") (citing *Rux v. Republic of Sudan*, 461 F.3d 461, 472; and *Owens*, 864 F.3d at 778 (D.C. Cir. 2017)

("Establishing... causation for jurisdictional purposes is a lighter burden than proving a winning case on the merits."). Rather, at nearly every turn in its analysis the R&R finds that Plaintiffs did not produce evidence to prove proximate cause and fails to credit (or even mention) Plaintiffs' numerous unrebutted allegations.

### D.   KSAThe Magistrate Judge misapplied the noncommercial tort exception, which permits jurisdiction over KSA.

#### 1.   The R&R erroneously concluded that Plaintiffs did not plead one entire tort occurring in the United States

The Court relied on *O'Bryan v. Holy See*, 556 F.3d 361, 385 for the premise that Plaintiffs claims are barred by the entire tort doctrine. However, the *O'Bryan* case says the opposite and actually supports Plaintiffs' claims. The next sentence following the quote cited in the R&R reads as follows:

> These conclusions are not wholly dispositive, however, of the claims against the Holy See. As noted before, plaintiffs' claims are not based solely on the conduct of the Holy See itself or the allegedly abusive conduct of priests. All of plaintiffs' claims also advance theories of liability premised on the conduct of Holy See employees in the United States engaged in the supervision of the allegedly abusive priests. These portions of plaintiffs' claims meet the four requirements for application of the tortious act exception.

*O'Bryan*, 556 F.3d at 386.

To obtain jurisdiction under the noncommercial tort exception, Plaintiffs put forth a theory of liability based on the negligence of Al-Shamrani's supervising officer (RSAF John Doe 1, the CLO). The Complaint alleges that RSAF CLO was

32

responsible for training and supervising the KSA trainees, including Al-Shamrani. ¶ 175-76. The CLO's performance fell well below the requisite, mandatory, standards. ¶169-86. The CLO further abandoned his post 10 days after Al-Shamrani's "the countdown has begun" tweet. *Id*. ¶¶ 157-58, 160. During this time, Al-Shamrani made his final preparations and plans for the NAS Attack. The Navy also concluded that the CLO's failures, and particularly his absence, were "contributing factor[s]" leading to the attack. (Doc. 47-1 at 8). The undisputed facts establish that the CLO's conduct was a substantial contributing factor in causing the attack and were therefore a legal cause of Plaintiffs' injuries.

Plaintiffs have alleged "at least one entire tort" occurring in the U.S.

## 2. The R&R erroneously concluded that the CLO's misconduct was discretionary

Binding Eleventh Circuit and Supreme Court case law set forth a two-part test for assessing a government actor's misconduct as "discretionary": (1) the action must involve an element of "judgment or choice" and (2) if it does, that judgment must be "of the kind that the discretionary function exception was designed to shield." *U.S. v. Gaubert*, 499 U.S. 315, 322–23 (1991).

Plaintiff cited to numerous mandatory governmental policies and safety standards that removed the CLOs discretion in his supervision of Al-Shamrani. *See Shamoun v. Rep. of Iraq.*, 441 F. Supp. 3d 976, 996 (S.D. Cal. 2020) (citing *Kennewick Irr. Dist. v. U.S*, 880 F.2d 1018, 1026 (9th Cir. 1989) (mandatory

governmental policies and safety standards remove discretion). *See Doc. 39 at 17-24.*

Those regulations removed the CLO's discretion as to his duty to supervise Al-Shamrani and his duty to report Al-Shamrani's violent, disruptive and threatening behavior. A factual finding to the contrary sets a dangerous precedent.

As for the second part of the test, as stated above, KSA does not (and cannot) plausibly argue that the regulations governing the conduct and supervision of IMS in the U.S.—rules intended to ensure safety and security—evidence an intention to leave responsibility for such issues to the discretion of an IMS's home government. There is absolutely no policy reason to leave discretion to a foreign nation as to whether or not its soldiers will follow applicable rules, and laws while present inside a secure military installation.

### E.   The R&R misapplied the commercial activity exception, which permits jurisdiction over KSA

#### 1.   The R&R erroneously concluded that KSA's purchase of airplanes and pilot training was not commercial activity

The Court improperly looked to the "purpose" of the transaction as opposed to its nature. In fact, the R&R expressly acknowledges that it reached its conclusion by reviewing the purpose of the transaction not its nature:

> The case before the Court today, unlike *SAMCO Global Arms*, is one where the *purpose* of the arrangement between the U.S. and Saudi Arabia was undeniably

> sovereign . . . . As such, the commercial activity
> exception to the FSIA does not apply.

R&R at 52.

The FSIA states "[t]he commercial character of an activity shall be determined by reference to the *nature* of the course of conduct or particular transaction or act, rather than by reference to its *purpose*." 28 U.S.C. § 1603(d) (emphasis added); *see also Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992).

The Complaint alleges that the transaction was commercial. Compl. ¶¶ 46–59. The type of activity KSA was involved in was purchasing goods and services. *Id.* The "purpose" or "motive" of the activity is not relevant. *See Devengoechea v. Bolivarian Republic of Venez.*, 889 F.3d 1213 (11th Cir. 2018) ("Whether a foreign government acts out of a profit motive or out of a desire to fulfill 'uniquely sovereign objectives' is entirely irrelevant to the analysis of whether an activity qualifies as 'commercial.'").

Plaintiffs cited several cases were the Court found that the purchase of military equipment from a foreign government was "commercial activity." One such case was *Simon v. Republic of Hungary*, 443 F. Supp. 3d 88, 109–11 (D.D.C. 2020). In *Simon*, the court found that the purchase by Hungary of military equipment from the United States through the Foreign Military Sales Program (FMS) was "commercial activity."

Plaintiffs further object to the factual findings made by the Magistrate on this issue. For example, the R&R concludes that "at its core, the agreement between the U.S. and KSA that led to Al-Ahamrani's presence at NAS-P was a 'military training agreement between two sovereign parties." KSA has not produced the actual agreement and there is no record evidence supporting the Magistrate's characterization of it. The Complaint alleges the opposite. Compl. ¶¶ 46–59.

### 2. The R&R erroneously concluded that Plaintiffs' direct negligence cause of action was based upon the terrorist attack

The R&R fails to acknowledge that different causes of action and/or theories of liability can be "based upon" different conduct or "gravmania." *Rodriguez v. Pan Am. Health Org*., 2020 U.S. App. LEXIS 8172, *11–17 (D.C. Cir. Mar. 29, 2022). Plaintiffs alleged that the "gravamen" of its direct negligence claim against KSA was its failure to fulfill the terms of its commercial contract with the United States. In its opposition, Plaintiffs demonstrated that KSA's failure to comply with terms of its contract rendered it liable under clause one and clause three of the commercial activity exception. 28 U.S.C. § 1605(a)(2).

The Magistrate Judge improperly limited his analysis to the terrorist attack despite the allegations in the Complaint demonstrating that KSA willfully failed to comply with the terms of the training agreement. Plaintiffs adequately pled that each element of Counts Fourteen and Nineteen can be proven based upon KSA's

commercial activity and therefore met the commercial activity exception as to these counts.

**F.  The R&R's analysis and recommendation on FSIA's waiver exception ignores evidence the Court could have easily ordered to be discovered.**

The Magistrate Judge criticized Plaintiffs for "not provid[ing] any actual agreement between the United States and Saudi Arabia." (R&R at 57.) But, once again, without jurisdictional discovery, Plaintiffs were unable to do so. The Magistrate Judge credited KSA's version of facts, including a template contract from the internet—despite the fact that KSA itself *has* the actual contract in hand. The Magistrate Judge permitted KSA to selectively produce, or conceal, the documents that helped KSA. Plaintiffs should not have been held to this impossible disadvantage.

## IV.  CONCLUSION

Plaintiffs respectfully ask the Court to reconsider the erroneous factual findings and conclusions of law present in the R&R, and not to adopt the R&R as written.

Dated: June 26, 2023        Respectfully submitted,

       */s/ Christopher G. Paulos*       
       Christopher G. Paulos Esq. (FL#91579)
       **LEVIN, PAPANTONIO, RAFFERTY,**
       **PROCTOR, BUCHANAN, O'BRIEN,**
       **BARR, MOUGEY, P.A.**
       316 South Baylen Street, Suite 600
       Pensacola, Florida 32502
       Phone: (850) 435-7067
       Fax: (850) 436-6067
       cpaulos@levinlaw.com

       *Counsel for Plaintiffs Charles Hogue,*
       *Matthew Tinch, Jessica Tinch, Matthew*
       *Keebler, Krystena Keebler, Matthew*
       *Housam, Michael Hoyland, Thomas C.*
       *Bortner, Jonathan Glass, Joy Glass, Grant*
       *Lopez and Heather Lopez*

       Filed on Behalf of All Plaintiffs

## Local Rule 7.1(F) Certification

I, Christopher G. Paulos, certify that, pursuant to Local Rule 7.1(F), that the foregoing Plaintiffs Objections to Magistrate Judge's Order and Report and Recommendation contains 7,835 words.  This complies with Rule. 7.1, Local Rules, Northern District of Florida.

## Local Rule 5.1(F) Certification

I, Christopher G. Paulos, certify that on June 26, 2023, I caused a true and correct copy of Plaintiffs' Objections to Magistrate Judge's Order and Report and Recommendation, attached hereto, to be served through the Court's CM/ECF system upon all parties or counsel or record, who have entered appearances in this action.

Dated: June 26, 2023                    Respectfully submitted,


                                        */s/ Christopher G. Paulos*
                                        Christopher G. Paulos Esq. (FL#91579)
                                        **LEVIN, PAPANTONIO, RAFFERTY,
                                        PROCTOR, BUCHANAN, O'BRIEN,
                                        BARR, MOUGEY, P.A.**
                                        316 South Baylen Street, Suite 600
                                        Pensacola, Florida 32502
                                        Phone: (850) 435-7067
                                        Fax: (850) 436-6067
                                        cpaulos@levinlaw.com