UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

BENJAMIN WATSON, JR., et al.,

    Plaintiffs,

v.                                    CASE NO. 3:21cv329-MCR-ZCB

KINGDOM OF SAUDI ARABIA,

    Defendant.
_____/

## ORDER

    This case involves an unprecedented terrorist attack on American soil. What makes the attack unprecedented is that it was carried out on a United States military base, Pensacola Naval Air Station ("Air Station"), by a Saudi Arabian military officer present on base as part of an ongoing multi-billion dollar military equipment and training agreement between the United States and Saudi Arabia—two countries that have had a strategic partnership for over eight decades.[1] On December 6, 2019, Royal Saudi Air Force Officer Mohammed Saeed Al-Shamrani armed himself, entered the Air Station's aviation training building, and started shooting, ultimately murdering three servicemembers and injuring several other servicemembers as well

---

[1] *See* Press Release, U.S. Dep't of State, United States-Saudi Arabia Relationship: Eight Decades of Partnership (June 6, 2023), https://www.state.gov/united-states-saudi-arabia-relationship-eight-decades-of-partnership/.

as several law enforcement officers. The deceased servicemembers' heirs and surviving servicemembers and law enforcement officers filed suit against Saudi Arabia, seeking to hold the country liable for the attack and raising nineteen claims under both the federal Anti-Terrorism Act and state common law. *See* Plaintiff's Amend. Compl., ECF No. 5 at 86–166.  Understandably, this tragic active shooter event resulted in a significant response from the United States, including an investigation by the Federal Bureau of Investigation which remains ongoing, another investigation by the United States Navy that was followed by a thorough report with detailed recommendations, public statements from then-President Donald Trump and other political leaders about ongoing diplomatic discussions with Saudi Arabian officials about the incident, and a counter-terrorism operation in the Middle East.

To date, the parties in this case have focused their attention on threshold matters of subject-matter jurisdiction, personal jurisdiction, and jurisdictional discovery. Currently, Magistrate Judge Zachary Bolitho's report and recommendation that the Court deny Plaintiffs' jurisdictional discovery request and grant Saudi Arabia's motion to dismiss for lack of personal jurisdiction is pending before the Court, together with Plaintiffs' objections. Given the sensitive nature of the United States foreign relations that could be impacted by this case, the Court finds it necessary—before ruling on Plaintiffs' objections to the Report and

CASE NO. 3:21cv329-MCR-ZCB

Recommendation—to raise the political question doctrine as a potential bar to jurisdiction and seek a statement of interest from the United States under 28 U.S.C. § 517.

The political question doctrine derives from Article III's case or controversy requirement. *See Made in the USA Found. v. United States*, 242 F.3d 1300, 1312 (11th Cir. 2001). It requires federal courts to abstain from ruling on nonjusticiable political questions that are more appropriately decided by the political branches of government, in order to safeguard the separation of powers prescribed by the Constitution of the United States. *See Carmichael v. Kellogg Brown and Root Srvs., Inc.*, 572 F.3d 1271, 1280 (11th Cir. 2009); *see also Baker v. Carr*, 369 U.S. 186, 217 (1962) ("The non-justiciability of a political question is primarily a function of the separation of powers."). Federal courts have no jurisdiction over a case that presents a political question. *See Made in the USA Found.*, 242 F.3d at 1319 (concluding that the "case presents a nonjusticiable political question, thereby depriving the court of Article III jurisdiction"). A case gives rise to a nonjusticiable political question where at least one of the following factors is present: (1) the Constitution itself has clearly committed resolution of the question to another branch of government; (2) there is a "lack of judicially discoverable and manageable standards" for resolving the issue; (3) the court cannot decide the case without "an

initial policy determination of a kind clearly for nonjudicial discretion"; (4) the case is impossible to independently resolve without "expressing lack of the respect due coordinate branches of government"; (5) there is an "unusual need for unquestioning adherence to a political decision already made"; or (6) the possibility of "embarrassment" if multiple branches of government answer the same question in different ways. *Baker*, 369 U.S. at 217; *Aktepe v. United States*, 105 F.3d 1400, 1403 (11th Cir. 1997). A case with significant political implications does not necessarily present a nonjusticiable political question, however. *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012) (quoting *INS v. Chadha*, 462 U.S. 919, 943 (1983)) ("[C]ourts cannot avoid their responsibility merely 'because the issues have political implications.'"); *see also Leibovitch v. Islamic Republic of Iran*, 297 F. Supp. 4d 816, 827 (N.D. Ill. 2018) (quoting *Baker*, 369 U.S. at 211, 217) ("[T]here is a distinction between 'political questions' and 'political *cases*,' and not 'every case or controversy which touches foreign relations lies beyond judicial cognizance.'") (emphasis in original). Only those cases that unavoidably "require the court to decide a political question" should "be dismissed." *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1358 (11th Cir. 2007); *see also Baker*, 369 U.S. at 217 ("Unless one of these formulations is *inextricable* from the case at bar, there should be no dismissal for non-justiciability. . . .") (emphasis added).

Cases involving foreign policy and military affairs often raise political question concerns. *See Aktepe*, 105 F.3d at 1403; *see also Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.") (citation omitted).[2] And they tend to uniquely demonstrate the sensitive separation of powers balance courts must strike between fulfilling the judiciary's role in applying the law to facts, *see Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."), and abstaining from improper judicial intervention into settled foreign relations with allied governments. *See, e.g., In re Grand Jury Proceedings*, 691 F.2d 1384, 1388 (11th Cir. 1984) (citing *Chi. & S.*

---

[2] *Compare Matar v. Dichter*, 500 F. Supp. 2d 284, 293–96 (S.D. N.Y. 2007), *aff'd on other grounds by* 563 F.3d 9 (2d Cir. 2009) (political question doctrine barred claims arising from a foreign ally's military operation that allegedly caused foreign civilian casualties on foreign soil because "allowing [the] case to proceed would undermine the Executive's ability to manage the conflict at issue through diplomatic means" and would impact the delicate diplomacy of the Middle East by "enmesh[ing] the courts in policing armed conflicts"), *and Doe I v. State of Israel*, 400 F. Supp. 2d 86, 111 (D. D. C. 2005) (finding that political question doctrine barred plaintiffs' claims arising out of Israeli government's formal operations in Palestine), *with Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 28 (D. D.C. 2005) (political question doctrine did not bar plaintiffs' terror-related claims seeking compensation from country that allegedly sponsored terrorism because case presented no separation of powers concerns as Congress had waived sovereign immunity for material support of terrorism claims under the Foreign Sovereign Immunities Act, and the Executive Branch had already deemed the defendant a terror sponsor, leaving the court to simply carry out its role in applying the law), and *Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 279–82 (1st Cir. 2005) (holding that a case involving international terrorism did not present a political question because the court could "determine questions of sovereign immunity under a legal, as opposed to a political," regime).

CASE NO. 3:21cv329-MCR-ZCB

*Airlines v. Waterman Steamship Corp.*, 333 U.S. 103, 111 (1948) ("[C]ourts should not impinge upon the political prerogatives of the governments in the sensitive area of foreign relations. . . .").

This case involves issues of foreign and military policy, which, on first blush, appear to have the potential to impact the United States' foreign relations with a strategic ally, particularly were the case to go to trial. The subject terror attack was carried out by a Saudi military officer who had privileged access to a United States military base as a part of an ongoing multi-billion-dollar military equipment and training agreement with Saudi Arabia. Obligations under this agreement are central to Plaintiffs' theory of liability, *see, e.g.* Amend. Compl., ECF No. 5 at 160–62 (asserting a breach of contract claim on the basis that Plaintiffs are third-party beneficiaries to the military training contract and that Saudi Arabia allegedly breached this contract by failing to "ensure its personnel posed no risk to the United States"), and the proper construction of these agreements may impact sensitive foreign relations with Saudi Arabia if the ultimate legal conclusion differs from what Saudi Arabia and the United States understand the agreement to be. Moreover, any jury verdict could disrupt foreign relations in the event the Executive Branch has made a conscious decision—for reasons of sensitive foreign policy—not to negotiate compensation for the victims through diplomatic channels. *See id*. at 89–90, 160–63

(alleging that President Trump spoke with Saudi Arabian King Salman bin Abdulaziz Al Saud about "taking care of the [victim's] families and loved ones" and that such compensation was never provided).

Additionally, discovery and a potential trial would certainly raise questions about the United States Navy's overall operation of the international aviation training program and the conclusions made in its investigative report. For example, the Navy's report concluded that the international aviation training program had a "microclimate" of harassment that was partially responsible for the terror attack and that internal vetting and chain-of-command procedures could have been improved to identify terror risks earlier. *See* Navy Investigation Report, ECF No. 47-1. Plaintiffs' theory of the case—that Saudi Arabia's actions primarily caused the terror attack—is seemingly at odds with both the Navy's report and government official's public statements regarding the FBI investigation,[3] potentially undermining the FBI's ongoing investigation and the Navy's already settled investigative conclusions. And most likely, a trial on the merits would raise questions of comparative fault regarding the Navy's role in causing the attack, possibly

---

[3] *See* ECF No. 47-2 (Former Attorney General William Barr discussing that "[t]he Kingdom of Saudi Arabia gave complete and total support for our counter-terrorism investigation" and that the FBI uncovered "there was no evidence of assistance or preknowledge of the attack by other members of the Saudi military").

CASE NO. 3:21cv329-MCR-ZCB

incentivizing Saudi Arabia to blame the United States—its ally— in federal court to lessen its own liability.

Again, these concerns seemingly implicate serious and sensitive matters of foreign policy and military affairs that often present nonjusticiable political questions. *See Aktepe*, 105 F.3d at 1403. Since foreign and military affairs are generally within the powers of the Executive Branch and the Executive Branch has already been heavily involved in this specific case, the Court finds it appropriate and necessary to seek a statement of interest from the United States under 28 U.S.C. § 517, regarding its position on whether the issues in this case raise or implicate serious and sensitive matters of foreign policy and military affairs such that the political question doctrine should bar Plaintiffs' suit.

Accordingly, the United States is directed to file a response to this Order within thirty (30) days. In its response, the United States may decline to submit a statement of interest or accept the Court's invitation by filing a statement of interest. The United States may file its response under seal, if appropriate. The Clerk of the Court is directed to serve this Order on the Attorney General of the United States, the Solicitor General of the United States, and the United States Attorney for the Northern District of Florida. Once the Court has reviewed the United States'

position, and if warranted, an appropriate briefing schedule will be set to allow the parties to respond.

**DONE AND ORDERED** this 27th day of July 2023.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

CASE NO. 3:21cv329-MCR-ZCB