## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA

BENJAMIN WATSON, JR.; SHEILA
WILEMON WATSON; SHANE
WALTERS; AMANDA WALTERS;
DUSTIN WALTERS; MASON
WALTERS; SAMEH HAITHAM;
EVELYN BRADY; SHADIN
HAITHAM; JOHN ROBERT BRADY;
IRVIN LAWRENCE JR.; GEORGE
JOHNSON; BREANNA THOMAS;
RYAN BLACKWELL; CARLY
BLACKWELL; KRISTY LEHMER;
JESSICA PICKETT; CURTIS PICKETT;
CHARLES HOGUE; MATTHEW
TINCH; JESSICA TINCH; JONATHAN
GLASS; JOY GLASS; MATTHEW
HOUSAM; MICHAEL HOYLAND;
THOMAS C. BORTNER; GRANT
LOPEZ; HEATHER LOPEZ;
MATTHEW KEEBLER; and
KRYSTENA KEEBLER,

                    *Plaintiffs*,

    v.

KINGDOM OF SAUDI ARABIA,

                    *Defendant*.

Case No. 3:21-cv-329

## THE KINGDOM OF SAUDI ARABIA'S SUPPLEMENTAL BRIEF
## REGARDING THE POLITICAL-QUESTION DOCTRINE

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ............................................................................... 1

LEGAL STANDARD ......................................................................... 2

ARGUMENT ...................................................................................... 2

I.     Plaintiffs' Negligence Theory Presents Political Questions ............................ 4

     A.    Plaintiffs' Negligence Theory Requires Decisions That Are Constitutionally Committed To The Executive And Legislative Branches ............................................................. 4

     B.    There Are No Judicially Discoverable And Manageable Standards For Plaintiffs' Negligence Theory ...................................... 10

     C.    Adjudicating Plaintiffs' Negligence Theory Would Express Lack Of Respect For The Executive Branch ........................................ 13

II.    Plaintiffs' Vicarious Liability And Material Support Theories Present Political Questions ........................................................................... 16

CONCLUSION ..................................................................................... 18

LOCAL RULE 7.1(F) CERTIFICATION

LOCAL RULE 5.1(F) CERTIFICATION

# TABLE OF AUTHORITIES

Page

CASES

*3M Combat Arms Earplug Prods. Liab. Litig.*, *In re*,
   2021 WL 1600487 (N.D. Fla. Apr. 23, 2021) .................................................8

*Agudelo v. Padron*, 2019 WL 13182381 (S.D. Fla. Aug. 26, 2019) .......................9

*Aktepe v. United States*, 105 F.3d 1400 (11th Cir. 1997) ...........................3, 4, 9, 10

*Baker v. Carr*, 369 U.S. 186 (1962).......................................................2, 3, 4, 10, 13

*Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271
   (11th Cir. 2009) .................................................................2, 4, 5, 10, 11, 12

*Gilligan v. Morgan*, 413 U.S. 1 (1973)...............................................................4, 10

*Gilmore v. Palestinian Interim Self-Government Auth.*,
   675 F. Supp. 2d 104 (D.D.C. 2009)................................................................18

*Grand Jury Subpoena dated Aug. 9, 2000*, *In re*, 218 F. Supp. 2d 544
   (S.D.N.Y. 2002)...............................................................................................10

*Gross v. German Found. Indus. Initiative*, 456 F.3d 363 (3d Cir. 2006)...............18

*Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458
   (3d Cir. 2013)..............................................................................................7, 12

*Hilton v. Guyot*, 159 U.S. 113 (1895).....................................................................10

*Holmes v. Laird*, 459 F.2d 1211 (D.C. Cir. 1972)..................................................15

*Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221
   (1986)................................................................................................................2

*Lane v. Halliburton*, 529 F.3d 548 (5th Cir. 2008)...................................................7

*Loquasto v. Fluor Corp.*, 512 F. Supp. 3d 728 (N.D. Tex. 2021) .......................7, 8

*Made in the USA Found. v. United States*, 242 F.3d 1300
   (11th Cir. 2001) ..............................................................................................13

*Main St. Entm't, Inc. v. Faircloth*, 342 So. 3d 232 (Fla. Dist. Ct. App. 2022) ...................................................................................................9

*Matar v. Dichter*, 500 F. Supp. 2d 284 (S.D.N.Y. 2007), *aff'd*, 563 F.3d 9 (2d Cir. 2009) ......................................................................13, 17

*McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331 (11th Cir. 2007) ..........................................................................................4

*Secretary of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700 (4th Cir. 2007) .........................................................................15

*Smith v. GTE Corp.*, 236 F.3d 1292 (11th Cir. 2001)....................................3

*Smith v. Halliburton Co.*, 2006 WL 2521326 (S.D. Tex. Aug. 30, 2006) .......................................................................................................8

*Sowers v. R.J. Reynolds Tobacco Co.*, 975 F.3d 1112 (11th Cir. 2020) ..................7

*Taylor v. Kellogg, Brown & Root Servs., Inc.*, 658 F.3d 402 (4th Cir. 2011) ..........................................................................................12

*United States v. Yunis*, 867 F.2d 617 (D.C. Cir. 1989)...............................14

*Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57 (2d Cir. 2005)...............13

*Y.H. Invs., Inc. v. Godales*, 690 So. 2d 1273 (Fla. 1997) ...........................7

STATUTES

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (codified as amended at, *inter alia*, 28 U.S.C. §§ 1602-1611)...............................................................................2, 18

Fla. Stat.:

§ 768.81(1)(c) ...............................................................................9

§ 768.81(3)(a) ...............................................................................7

ADMINISTRATIVE MATERIALS

The White House, *The Jeddah Communique:  A Joint Statement
Between the United States of America and the Kingdom of
Saudi Arabia* (July 15, 2022), https://www.whitehouse.gov/
briefing-room/statements-releases/2022/07/15/the-jeddah-
communique-a-joint-statement-between-the-united-states-of-
america-and-the-kingdom-of-saudi-arabia/ ................................................... 17

U.S. Dep't of Defense, Defense Security Cooperation Agency:

Foreign Military Sales Letter of Offer and Acceptance,
Standard Terms and Conditions, https://samm.dsca.mil/
figure/figure-c5f4 ........................................................................... 14

Security Assistance Management Manual,
https://samm.dsca.mil/listing/chapters ........................................... 6

The Letter of Offer and Acceptance (LOA),
https://www.dsca.mil/foreign-customer-guide/letter-offer-and-
acceptance-loa ................................................................................. 15

U.S. Dep't of State, *United States-Saudi Arabia Relationship:  Eight
Decades of Partnership* (June 6, 2023), https://www.state.gov/
united-states-saudi-arabia-relationship-eight-decades-of-
partnership/ ..................................................................................... 17

U.S. Navy, *Command Investigation Report – Fatal Shooting Incident
at Naval Air Station Pensacola, Florida on 6 December 2019*
(Feb. 21, 2020) .......................................................................... 6, 12

OTHER MATERIALS

*Black's Law Dictionary* (8th ed. 2004) .................................................... 15

# INTRODUCTION

The Court has raised the question whether this case is nonjusticiable under the political-question doctrine.  The answer is yes.  At their core, Plaintiffs' claims ask this Court to review the hiring and supervision of Mohammed Al Shamrani by the Royal Saudi Air Force ("RSAF") – a claim that would undoubtedly be nonjusticiable if made against the U.S. military.  This Court is no better equipped to stand in judgment of Saudi Arabia's military decisions.

Resolution of Plaintiffs' suit on the merits also would require scrutiny of the U.S. military's policies and conduct, including its screening and oversight of Al Shamrani.  Whether Saudi Arabia acted negligently cannot be evaluated without considering the United States' own screening and oversight (and how that compared to Saudi Arabia's), what information was available to both militaries, and whether this information could have helped either military detect or prevent the attack.  Each of those questions is nonjusticiable.

Plaintiffs have also sought discovery from the FBI and the Navy, have attacked their findings on the causes of Al Shamrani's attack, and, ultimately, urge this Court to contradict the Executive Branch's determinations that Saudi Arabia had no pre-knowledge of the attack and that Al Shamrani's own self-radicalization was the primary cause of his acts.  This suit thus threatens to interfere with the United States' handling of the attack and its ongoing partnership with Saudi Arabia.

# LEGAL STANDARD

The political-question doctrine reflects constitutional limits on the subject-matter jurisdiction of the courts. *See Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009) (affirming dismissal for lack of subject-matter jurisdiction based on political-question doctrine). Challenges to jurisdiction "can be asserted on either facial or factual grounds." *Id.*; *see* Report and Recommendation 11-12, ECF No. 54 ("R&R") (describing such challenges in the context of foreign sovereign immunity). Facial challenges "are based solely on the allegations in the complaint"; a factual challenge may involve extrinsic evidence. *Carmichael*, 572 F.3d at 1279; *see* R&R 11-12. Here, Saudi Arabia and Plaintiffs have already submitted extrinsic evidence in connection with Saudi Arabia's factual challenge to subject-matter and personal jurisdiction under the Foreign Sovereign Immunities Act of 1976 ("FSIA"). The Court may consider that evidence in applying the political-question doctrine.

# ARGUMENT

The political-question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230 (1986). Courts consider six factors drawn from *Baker v. Carr*,

369 U.S. 186 (1962), to decide whether a case presents a nonjusticiable political

question.  Those factors are:

> [1] a textually demonstrable constitutional commitment of the issue to
> a coordinate political department; [2] a lack of judicially discoverable
> and manageable standards for resolving it; [3] the impossibility of
> deciding without an initial policy determination of a kind clearly for
> nonjudicial discretion; [4] the impossibility of a court's undertaking
> independent resolution without expressing lack of the respect due
> coordinate branches of government; [5] an unusual need for
> unquestioning adherence to a political decision already made; or
> [6] the potentiality of embarrassment from multifarious
> pronouncements by various departments on one question.

*Aktepe v. United States*, 105 F.3d 1400, 1402-03 (11th Cir. 1997) (brackets in

original).  "[A]ny one of [those factors] may carry a controversy beyond justiciable

bounds."  *Id.* at 1402.  Because the political-question doctrine is a limit on subject-

matter jurisdiction, a court may (and when appropriate should) raise it on its own

motion, as this Court has done.  *See Smith v. GTE Corp.*, 236 F.3d 1292, 1299

(11th Cir. 2001).

Plaintiffs pursue three theories of liability – (1) that Saudi Arabia is directly

liable for alleged negligence in its hiring and supervising Al Shamrani, *e.g.*, Am.

Compl. ¶¶ 135-186, 502-525; (2) that Saudi Arabia is vicariously liable for Al

Shamrani's acts, *e.g.*, *id.* ¶¶ 345-362; and (3) that Saudi Arabia allegedly provided

material support to Al Shamrani by supporting Al Qaeda in the Arabian Peninsula

("AQAP"), *e.g.*, *id.* ¶¶ 78-106.  Each of Plaintiffs' theories is nonjusticiable under

the first, second, fourth, and sixth *Baker* factors.

I.    **Plaintiffs' Negligence Theory Presents Political Questions**

    A.    **Plaintiffs' Negligence Theory Requires Decisions That Are Constitutionally Committed To The Executive And Legislative Branches**

The first *Baker* factor "recognizes that, under the separation of powers, certain decisions have been exclusively committed to the legislative and executive branches of the federal government, and are therefore not subject to judicial review." *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1358-59 (11th Cir. 2007). "The Constitution emphatically confers authority over the military upon the executive and legislative branches of government." *Aktepe*, 105 F.3d at 1403. That includes "[t]he complex[,] subtle, and professional decisions as to the composition, training, equipping, and control of a military force" that "are essentially professional military judgments." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *see Carmichael*, 572 F.3d at 1293-96 (holding negligent training and supervision claims against a military contractor to be nonjusticiable). "The Constitution [also] commits the conduct of foreign affairs to the executive and legislative branches of government." *Aktepe*, 105 F.3d at 1403; *see id.* ("Foreign policy and military affairs figure prominently among the areas in which the political question doctrine has been implicated.").

The Eleventh Circuit has held that the political-question doctrine can bar claims brought against partners or contractors of the U.S. military. In *Carmichael*, for instance, the Eleventh Circuit held that claims brought against a military

contractor operating a military convoy were nonjusticiable because "military judgments governed the planning and execution of virtually every aspect of the convoy in which Sergeant Carmichael was injured."  572 F.3d at 1275, 1281.  The court reasoned that, at "the broadest level, these include the military's decision to utilize civilian contractors in conducting the war in Iraq, and its decision to use the contractors specifically in connection with fuel-transportation missions such as the one at issue here."  *Id.* at 1281.  The claims also implicated narrower military judgments about operation of the specific convoy.  *Id.* at 1281-83.

Adjudicating Plaintiffs' claims here would similarly require this Court to evaluate the United States' conduct of military affairs and foreign relations.  At the broadest level, Plaintiffs themselves frame their case as a challenge to the U.S.-Saudi security partnership.  *See* Am. Compl. ¶ 1 ("In the eyes of the American people, there is no greater betrayal than the realization that a purported ally is, in fact, an enemy.").  The judgment that Saudi Arabia is an ally, and that the United States and Saudi Arabia should continue their longstanding joint security partnership, is one properly reached by the political branches, not the courts.

At a narrower level, this Court cannot evaluate Plaintiffs' claims without considering the United States' screening and oversight of Al Shamrani.  Prior to his entry into the military training program, the United States conducted human rights, security, and medical screening on Al Shamrani that specifically looked for

evidence of "support" of "terrorist activity."  *See* Navy Report 133-36, ECF No.

47-1.[1]  The United States further provided oversight and supervision of Al

Shamrani throughout his training.  *See id.* at 7, 10-11 (finding that Al Shamrani

had "five separate commands over an 18-month period, limiting oversight by

individual commanders," and that there was inadequate "coordination" or

"sufficient information sharing" between his supervisors); *id.* at 8 (finding

"[h]arassment" of Al Shamrani by a "contracted instructor"); *id.* (finding another

instructor "[o]bserv[ed] [Al Shamrani's] attempted weapon purchase").

     Should this case proceed to the merits, Saudi Arabia would expect to show –

as the Navy Report found – that Al Shamrani's "self-radicalization" was the

"primary cause" of the attack and that "no one person or organization knew or

could have known" Al Shamrani "would attack active duty service members and

civilians."  *Id.* at 7.  Nonetheless, the United States' own screening and oversight

of Al Shamrani would be relevant to both causation and apportionment of fault.

     As to causation, Plaintiffs' negligence theory would require this Court to

assess whether and to what extent alleged deficiencies in Saudi Arabia's vetting

and supervision caused the attack, as compared to any deficiencies in the United

---

[1] *See also* ECF No. 47-4 (Defense Security Cooperation Agency, Security
Assistance Management Manual) C10.8.1 (requiring screening by the United
States), C10.8.3.1 (requiring security training to be conducted in Saudi Arabia "by
in-country [U.S. officials] . . . for evidence of . . . terrorist activity or support . . . or
other U.S.-designated illegal or objectionable activities").

States' own screening and oversight. *See Lane v. Halliburton*, 529 F.3d 548, 561 (5th Cir. 2008) ("If we must examine the Army's contribution to causation, 'political question' will loom large."). As to apportionment of fault, Plaintiffs have brought Florida state-law claims, which apply a comparative-fault standard. *See* Fla. Stat. § 768.81(3)(a) (providing that, "[i]n a negligence action, the court shall enter judgment against each party liable on the basis of such party's percentage of fault" compared to the percentages of fault of other parties and nonparties). Even if this Court finds deficiencies in Saudi Arabia's vetting and supervision, it would need to decide whether and to what extent to apportion fault to the United States. *See Sowers v. R.J. Reynolds Tobacco Co.*, 975 F.3d 1112, 1135-36 (11th Cir. 2020) ("In Florida cause is equated with fault . . . . One whose conduct was entirely or partially the legal cause of an injury is entirely or partially at fault for that injury."). Under such a "proportional-liability system . . . , there is simply no way to determine damages without evaluating [the U.S.'s] military decisions." *Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 474 (3d Cir. 2013).[2]

*Loquasto v. Fluor Corp.*, 512 F. Supp. 3d 728 (N.D. Tex. 2021), is instructive. There, civilians and soldiers injured during a suicide bombing at

---

[2] Florida's comparative-fault statute applies even where the nonparties bearing fault would be immune from suit. *See Y.H. Invs., Inc. v. Godales*, 690 So. 2d 1273, 1277 (Fla. 1997) (per curiam) (statute addresses fault of "all of the other entities who contributed to the accident, *regardless of whether they have been or could have been joined as defendants*").

Bagram Airfield in Afghanistan brought suit against a private contractor that provided "base operations support" and that hired the suicide bomber. *See id.* at 731-32. The contractor asserted that litigation would involve a "proportionate responsibility" defense, which would "require the Court to inquire into the propriety of the military's approval of [the suicide bomber] for base access and the soundness of the military's security screenings at base entry points." *Id.* at 735-36. The court agreed, dismissing the case under the political-question doctrine and explaining that "decisions related to control and access to a military base . . . are textually committed to the political branches of government." *Id.* at 736. The same result is appropriate here. *See also Smith v. Halliburton Co.*, 2006 WL 2521326, at *5-6 (S.D. Tex. Aug. 30, 2006) (similar facts); *cf. In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 1600487, at *2 (N.D. Fla. Apr. 23, 2021) (citing *Loquasto* as an example of a case presenting a political question).

Plaintiffs' assertion that Saudi Arabia's vetting and supervision were grossly negligent does not diminish the consideration that must be given the United States' vetting and supervision. Plaintiffs' claim is that Saudi Arabia "vetted Al-Shamrani extremely poorly," Rule 72 Objs. 27, ECF No. 57 – a difference in degree of negligence but not in kind. *See* R&R 24 (explaining Plaintiffs' claim is based on Saudi Arabia's alleged failure to do 61 acts, which breached a duty of reasonable

care).[3]  The Court would still need to evaluate Saudi Arabia's conduct alongside the United States' when assessing causation and relative fault.  *See* Fla. Stat. § 768.81(1)(c) (comparative fault applies to "[n]egligence actions," which are determined by reference to "[t]he substance of an action, not conclusory terms"); *Main St. Entm't, Inc. v. Faircloth*, 342 So. 3d 232, 235 (Fla. Dist. Ct. App. 2022) (comparative fault applied despite label of "willful[ ] and unlawful[ ]" conduct); *Agudelo v. Padron*, 2019 WL 13182381, at *3 (S.D. Fla. Aug. 26, 2019) (same for "gross negligence").  And, in any event, Plaintiffs have failed to allege or to come forward with facts to support their allegations that Saudi Arabia acted or failed to act with gross negligence or recklessness.  *See* Rule 72 Opp. 16-18, ECF No. 65.

Finally, the political-question doctrine would unquestionably apply if Plaintiffs brought claims asserting that the United States negligently supervised its own service members.  The Eleventh Circuit addressed such a situation in *Aktepe*. There, Turkish Navy sailors brought claims against the United States for injuries caused when, during joint military training, U.S. sailors mistakenly fired live missiles at a Turkish vessel.  105 F.3d at 1401-02.  The Eleventh Circuit held that those claims "directly implicate[d] foreign relations and military affairs," and so

---

[3] *See also*, *e.g.*, Pls.' Opp. to MTD 45, ECF No. 39 (arguing Saudi Arabia "had the means, ability, and duty to screen Al-Shamrani for . . . terrorist ties"; that "reasonable inquiry . . . would have discovered" those ties; that Saudi Arabia did not conduct sufficient "oversight" or "inspect[ions]"; and that Saudi Arabia "failed to address or report significant issues").

"raise[d] a nonjusticiable political question." *Id.* at 1403.  It explained that the Constitution "reserves to the legislative and executive branches responsibility for developing military training procedures that will ensure the combat effectiveness of our fighting forces." *Id.* at 1403-04.

Plaintiffs' assertion of such claims against the United States' security partner, Saudi Arabia, should be treated in the same manner.  Principles of international comity favor "recogni[zing] . . . the . . . executive . . . acts of another nation." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895); *see also In re Grand Jury Subpoena dated Aug. 9, 2000*, 218 F. Supp. 2d 544, 553 (S.D.N.Y. 2002) ("International comity dictates that courts in this country give a foreign sovereign the same protection afforded to the executive branch of the United States.").  Comity thus provides an additional reason to find nonjusticiable claims against Saudi Arabia that would be nonjusticiable if brought against the United States itself.

**B.     There Are No Judicially Discoverable And Manageable Standards For Plaintiffs' Negligence Theory**

The second *Baker* factor recognizes that courts lack the "competence" to review certain "complex[,] subtle, and professional decisions," which include "the composition, training, equipping, and control of a military force." *Morgan*, 413 U.S. at 10.  Where military decisions are challenged as negligent, the question whether a defendant "acted reasonably or breached the standard of care cannot be answered by reference to the standards used in ordinary tort cases." *Carmichael*,

572 F.3d at 1288.  As the Eleventh Circuit explained in a suit concerning alleged negligent conduct in operating a military convoy, "what a reasonable driver would have done" in a civilian context, such as "dr[iving] a fuel truck . . . on Interstate I-95," is a distinct question from "what a reasonable driver subject to military control over his exact speed and path would have done."  *Id.* at 1288-89.  As to the latter, there are no judicially discoverable and manageable standards regarding the military convoy driver's "training," "degree of supervision," and "the standards according to which his performance should be judged."  *Id.* at 1294-95.

Plaintiffs' negligence theory would similarly require scrutiny of Saudi Arabia's military judgment without manageable standards.  Plaintiffs place at issue the amount of screening reasonably necessary to prevent insider threats in its military, *see* Am. Compl. ¶¶ 135, 143, 512(i)-(viii); the extent to which Saudi Arabia should surveil its service members' communications and social media, *see id.* ¶¶ 107-125; and the amount and nature of supervision that Saudi Arabia should exercise over its service members, *see id.* ¶¶ 156-186.

To illustrate the lack of available standards to resolve such questions, consider Plaintiffs' allegations regarding the absence of an RSAF Country Liaison Officer ("CLO").  The Navy found that, even though the RSAF CLO was absent for a period, the Royal Saudi Naval Force ("RSNF") CLO was present "[d]uring the absences of the RSAF CLO" and "executed some duties as a joint CLO" for the

RSAF and RSNF, although without a "formal agreement" to do so.  Navy Report 224.  Further, as set forth above, the U.S. military also oversaw Al Shamrani during that period.  *See supra* pp. 5-6.  There would be no judicially manageable standards available for this Court to assess either whether oversight by any CLO was necessary or whether oversight by the RSNF CLO (against the backdrop of the oversight provided by the United States) met a reasonable level of care.

Moreover, determining causation and proportional fault would require this Court to assess the United States' military judgments regarding Al Shamrani's screening and oversight.  *See supra* pp. 6-9.  Courts regularly hold they lack standards to assess those judgments.  *See Carmichael*, 572 F.3d at 1289-90 ("impossible to ascertain [the contractor's] liability in connection with the rollover without determining the military's liability" because the military's own "negligence might have played a causal role in the accident"); *Harris*, 724 F.3d at 469-70 ("contributory negligence and proximate cause defenses" would "present nonjusticiable issues" if under state law they would require "evaluating unreviewable military decisions"); *Taylor v. Kellogg, Brown & Root Servs., Inc.*, 658 F.3d 402, 411-12 (4th Cir. 2011) ("contributory negligence defense" rendered a negligence claim nonjusticiable because it required "evaluat[ing] military decisions" such as "whether back-up power should have been supplied" to a malfunctioning tank ramp).  This Court should follow that well-reasoned authority.

**C.    Adjudicating Plaintiffs' Negligence Theory Would Express Lack Of Respect For The Executive Branch**

The fourth and sixth *Baker* factors – which concern lack of respect for a coordinate branch and embarrassment of the United States due to conflicting pronouncements from different branches – are particularly important in the area of foreign relations.  *See*, *e.g.*, *Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 72-74 & n.17 (2d Cir. 2005) (relying on fourth *Baker* factor in case arising out of Austrian Holocaust claims); *Matar v. Dichter*, 500 F. Supp. 2d 284, 295 (S.D.N.Y. 2007) (reasoning that hearing a claim against Israel for alleged extrajudicial killings in Gaza "would cause the sort of intragovernmental dissonance and embarrassment that gives rise to a political question"), *aff'd*, 563 F.3d 9 (2d Cir. 2009); *see also Made in the USA Found. v. United States*, 242 F.3d 1300, 1317 (11th Cir. 2001) (explaining that "*Baker* . . . recognized the special importance of our nation speaking with one voice in the field of foreign affairs").

The FBI and the Navy have already concluded that Saudi Arabia had no pre-knowledge of the attack and that it would have been difficult (if not impossible) to detect Al Shamrani's plans.  R&R 6-7.  These findings came from an extensive investigation that involved Saudi Arabia's "complete and total support."  *Id.*  This Court correctly observed in raising the political-question issue that Plaintiffs' suit is "at odds" with the Executive Branch's findings.  *See* ECF No. 60, at 7.  Indeed, Plaintiffs seek to have this Court contradict the FBI's and the Navy's reasoned

conclusions.  Plaintiffs, for instance, have moved for discovery "to test and examine the reliability" of the FBI's and the Navy's findings and the "scope" of their investigations; they have also stated that they "anticipate issuing subpoenas to the FBI and other investigating entities."  ECF No. 43, at 10-11.  This Court could not rule in Plaintiffs' favor without expressing a lack of respect for the Executive Branch and without issuing a conflicting pronouncement about the cause of the attack.[4]

In addition, the military-training agreement between the United States and Saudi Arabia explicitly commits dispute resolution to the Executive Branch's diplomatic channels, not to the courts.  Specifically, the Terms and Conditions of the Letter of Offer and Acceptance ("LOA") between Saudi Arabia and the United States provide as follows for "Dispute Resolution":  "The [United States] and [Saudi Arabia] agree to resolve any disagreement regarding this LOA by consultations between the [United States] and [Saudi Arabia] and not to refer any such disagreement to any international tribunal or third party for settlement."  ECF No. 47-9, at 11, ¶ 7.2.  The "consultations" referenced in the LOA are "the

---

[4] Plaintiffs have stated they will seek to compel Saudi Arabia to produce "all of the information . . . that it has shared with the FBI."  ECF No. 43, at 11.  Those requests threaten to interfere with the security relationship between the United States and Saudi Arabia under which they provide each other sensitive material on the understanding that it will be kept confidential.  *Cf. United States v. Yunis*, 867 F.2d 617, 622-23 (D.C. Cir. 1989) ("The Supreme Court has long recognized that a legitimate government privilege protects national security concerns.").

'interactive methods by which states seek to prevent or resolve disputes.'"  R&R

58 n.24 (quoting *Black's Law Dictionary* 335 (8th ed. 2004)).  And the bar on

"refer[ral] . . . to any . . . third party for settlement" precludes judicial review.

*Secretary of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 708 (4th

Cir. 2007) (interpreting same LOA Terms and Conditions).[5]

As this Court has previously observed, the "[o]bligations under this

agreement are central to Plaintiffs' theory of liability."  ECF No. 60, at 6; *see* Am.

Compl. ¶¶ 582-591 (alleging Saudi Arabia "failed to comply with the terms and

conditions of the LOA/LOR/MOI related to safety and security," including alleged

requirements that "Saudi Arabia nominate, screen, and ensure that its personnel

posed no risk to the United States").  Because Plaintiffs' claims "trace" back to

"the provisions of an international agreement the enforcement mechanism of which

is diplomatic recourse only," they are nonjusticiable.  *Holmes v. Laird*, 459 F.2d

1211, 1222 (D.C. Cir. 1972) (interpreting agreement providing that "[a]ll

differences between" Germany and the United States "relating to the interpretation

or application of this Agreement shall be settled by negotiation without recourse to

any outside jurisdiction").

---

[5] "[T]he LOA is the government-to-government agreement that identifies the
defense articles and services the USG proposes to sell."  Defense Security
Cooperation Agency, The Letter of Offer and Acceptance (LOA),
https://www.dsca.mil/foreign-customer-guide/letter-offer-and-acceptance-loa.  The
Standard Terms and Conditions at ECF No. 47-9 are "dictated by U.S. law" and
are "included with every" foreign military sale.  *Id.*

## II.     Plaintiffs' Vicarious Liability And Material Support Theories Present Political Questions

Plaintiffs' theories that Saudi Arabia may be held vicariously liable for Al Shamrani's attack and directly liable for providing material support to AQAP also rely on contentions that present political questions.

Plaintiffs' theory that Al Shamrani acted within the scope of his employment is premised in part on allegations that Al Shamrani's "attack was inspired by Saudi Arabia's political and religious ideology" and that Saudi Arabia "encourage[s] violent extremist ideas in its military and schools."  Rule 72 Objs. 24; *see* Am. Compl. § V.E (complaint section titled:  "Saudi Arabia's State-Sanctioned Support for Ideological and Violent Extremism").  Plaintiffs' material-support theory is premised on allegations that Saudi Arabia supports Al Qaeda, a terrorist organization that has attacked Saudi Arabia on its own soil multiple times.  *See id.* § V.F (complaint section titled:  "Saudi Arabia's Connections to al-Qaeda and State-Sanctioned Support for al-Qaeda in the Arab Peninsula (AQAP)"); ECF No. 53, at 68:15-17 (Plaintiffs' counsel asserting that material-support theory was "critically important").[6]

---

[6] Although the Court need not reach the merits of those theories to dismiss them for lack of jurisdiction, it is important to note that they are insufficiently pleaded and untrue.  *See* ECF No. 46, at 28-29 (citing, among other things, Al Qaeda's attacks on Saudi Arabia and statements regarding the "close partnership" between Saudi Arabia and the United States in combating terrorism).

Any decision by this Court adopting either premise would interfere with the Executive Branch's conduct of foreign affairs as to the United States' longstanding security partnership with Saudi Arabia. *See supra* pp. 4-5 (factor one). Evaluating these premises would also require the Court to sit in judgment of the entire country of Saudi Arabia's "political and religious ideology" and methods of fighting Al Qaeda – questions for which no judicially discoverable and manageable standards exist. *See supra* pp. 10-11 (factor two). Further, accepting Plaintiffs' claims would express a lack of respect for the Executive Branch's judgment and would conflict with its longstanding and recently reaffirmed "partner[ship] with Saudi Arabia on political, security, [and] counterterrorism . . . issues."[7] *See supra* p. 13 (factors four and six); *cf. Matar*, 500 F. Supp. 2d at 295 (warning of "potential impact of this litigation on the Middle East's delicate diplomacy").

---

[7] U.S. Dep't of State, *United States-Saudi Arabia Relationship:  Eight Decades of Partnership* (June 6, 2023), https://www.state.gov/united-states-saudi-arabia-relationship-eight-decades-of-partnership/; *see id.* (describing United States' intent to "[b]uild[ ] upon the commitments made in the Jeddah Communique during President Biden's visit to Saudi Arabia in 2022" and United States' "commit[ment] to advancing [its] security partnership with Saudi Arabia through defense sales that will support a more integrated and regionally networked air and missile defense architecture" and through "participating in joint military exercises"); The White House, *The Jeddah Communique:  A Joint Statement Between the United States of America and the Kingdom of Saudi Arabia* (July 15, 2022) (noting, among other things, the important work of "the Terrorist Financing Targeting Center . . . based in the Kingdom of Saudi Arabia"), https://www.whitehouse.gov/briefing-room/statements-releases/2022/07/15/the-jeddah-communique-a-joint-statement-between-the-united-states-of-america-and-the-kingdom-of-saudi-arabia/.

*        *        *

Saudi Arabia continues to urge this Court to adopt the reasons for dismissal under the FSIA given in Magistrate Judge Bolitho's well-reasoned and thorough Report and Recommendation. The political-question doctrine provides additional reasons for dismissal that this Court may adopt in the alternative to or in conjunction with those reasons. As this Court has observed, *see* ECF No. 68, at 2 (citing *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 389-90 (3d Cir. 2006)), the United States' determination not to file a statement of interest does not resolve the issue. Indeed, that determination is fully consistent with dismissal. *See Gilmore v. Palestinian Interim Self-Government Auth.*, 675 F. Supp. 2d 104, 108 (D.D.C. 2009) (government "caution[ing] that no inference should be drawn from its decision not to participate").

## CONCLUSION

For the reasons given above as well as those set forth in the Report and Recommendation, this case should be dismissed for lack of jurisdiction.

Dated:  October 10, 2023         Respectfully submitted,

*/s/ Benjamin H. Brodsky*
Benjamin H. Brodsky
Florida Bar No. 73748
Brodsky Fotiu-Wojtowicz, PLLC
200 SE 1st Street, Suite 400
Miami, Florida 33131
Tel: (305) 503-5054
bbrodsky@bfwlegal.com
docketing@bfwlegal.com

Michael K. Kellogg (*pro hac vice*)
Gregory G. Rapawy (*pro hac vice*)
Andrew C. Shen (*pro hac vice*)
Kellogg, Hansen, Todd,
   Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
mkellogg@kellogghansen.com
grapawy@kellogghansen.com
ashen@kellogghansen.com

*Counsel for the Kingdom of Saudi Arabia*

## LOCAL RULE 7.1(F) CERTIFICATION

I, Benjamin H. Brodsky, hereby certify, pursuant to Local Rule 7.1(F), that The Kingdom of Saudi Arabia's Supplemental Brief Regarding The Political-Question Doctrine contains 4,341 words.

## LOCAL RULE 5.1(F) CERTIFICATION

I, Benjamin H. Brodsky, hereby certify that on October 10, 2023 I caused a true and correct copy of The Kingdom of Saudi Arabia's Supplemental Brief Regarding The Political-Question Doctrine to be served via the CM/ECF system to all parties or counsel of record that have entered appearances in this action.

Respectfully submitted,

*/s/ Benjamin H. Brodsky*
Benjamin H. Brodsky
Florida Bar No. 73748
Brodsky Fotiu-Wojtowicz, PLLC
200 SE 1st Street, Suite 400
Miami, Florida 33131
Tel: (305) 503-5054
bbrodsky@bfwlegal.com
docketing@bfwlegal.com