UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| BENJAMIN WATSON, JR., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KINGDOM OF SAUDI ARABIA <br><br> Defendant. | Civil Action No. <br> 3:21-cv-00329-MCR-ZCB |

**PLAINTIFFS' RESPONSE TO COURT ORDER DATED SEPTEMBER 26, 2023 [ECF No. 68] RAISING POLITICAL QUESTION DOCTRINE**

Plaintiffs respectfully respond to the Court's Order entered September 26, 2023, permitting the parties to address the political question doctrine.

**I.    Introduction.**

Plaintiffs are grateful for the opportunity to address the issues raised in the Court's Order and acknowledge two points, at the threshold, that they must presume are beyond dispute. First, that this is a landmark case that raises complex issues as to the limits of a foreign government's sovereign immunity. And second, that our country's federal district courts are, in the first instance, the gatekeepers of their own subject matter jurisdiction and that questions regarding such jurisdiction may be

1

raised at any point in the proceedings, even if not raised by the parties themselves. *See Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001).

In aid of that determination, Plaintiffs respectfully submit that the overarching question presented with respect to the applicability of the political question doctrine in this case is whether the provision of monetary relief to Plaintiffs and their families for injuries suffered in an al-Qaeda terrorist attack perpetrated by an agent of the Kingdom of Saudi Arabia is constitutionally committed to the Executive Branch and thus not within the province of an Article III Court. Plaintiffs further respectfully submit that the Congress of the United States answered that question in 2016 when it overrode the veto of President Barack Obama and enacted the Justice Against Sponsors of Terrorism Act (JASTA).[1] In so doing, Congress made clear that the relief requested by Plaintiffs in this case is constitutionally committed to this Court and all Article III courts across the country. With JASTA, Congress created a federal cause of action that removes a foreign sovereign's immunity from civil tort claims if that foreign sovereign (or its agents) directly or indirectly commits acts of

---

[1] Now codified at 28 U.S.C. § 1605B. JASTA was enacted to lower jurisdictional barriers including those impeding victims of the Sept. 11 terror attacks. Its express objective is to "provide civil litigants with the broadest possible basis … to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, Pub. L. No. 114-222, § 2(b), 130 Sta. 852, 853 (2016) (Amendment). In enacting JASTA, Congress amended both the FSIA and ATA, creating a federal cause of action for victims of acts of international terrorism that occur within the United States. JASTA permits U.S. nationals to bring FSIA terrorism claims "against a foreign state in accordance with section 2333 of [the federal Antiterrorism Act ("ATA")."" *See* 28 U.S.C. § 1605B(c) (incorporating by reference 18 U.S.C. § 2333 that sets forth the civil remedies of the ATA).

terrorism, or conspires, aids and abets, or provides material support to those who commit such acts. Congress expressly anticipated and directed that federal courts, not the Executive Branch, would adjudicate allegations of terrorism against foreign sovereigns, including the Kingdom of Saudi Arabia.

Defendant Kingdom of Saudi Arabia, which has been a defendant in the very 9/11 litigation that lead to the enactment of JASTA, is well-aware of this constitutional commitment, which is why it did not raise the political question doctrine in its motion to dismiss for lack of subject matter jurisdiction, despite having the burden to do so. *See Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1206 (9th Cir. 2007) (holding that party urging the defense "must carry the primary burden of establishing a political question").

Equally significant is the United States Government's declination to intervene and assert either sovereign immunity or the political question doctrine – despite this Court's express invitation to do so. Here the Executive Branch was provided with the opportunity (an opportunity it could have taken *ab initio*, from the moment Plaintiffs first filed their claims) to intervene and make clear in no uncertain terms that the litigation could politically interfere both with our country's relationship with the Kingdom of Saudi Arabia and with its own potential exposure in the litigation. The Government's silence on those issues only serves further to support Plaintiffs' position that this Court has jurisdiction to hear Plaintiffs' claims.

3

The constitutional commitment of JASTA aside, many of the concerns raised by the Court in its Order dated July 27, 2023 are premature. Based on the limited record before this Court, it is impossible to conclusively determine that a political question renders this case nonjusticiable. *See e.g. McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1365 (11th Cir. 2007) ("It would be inappropriate to dismiss the case, on the mere chance that a political question may eventually present itself."); *Al Shimari v. CACI Premier Tech., Inc.* 758 F.3d 516, 537 (4th Cir. 2014) ("A thorough analysis of these matters … cannot be achieved simply by reviewing plaintiffs' pleadings and the limited record on appeal, but also will require factual development of the record by the district court and possibly additional jurisdictional discovery."); *Alperin v. Vatican Bank*, 410 F.3d 532, 539 ("[S]pectre of difficulty down the road does not inform our justiciability determination at this early stage of the proceedings.").

Judicial resolution of Plaintiffs' claims is not barred simply because the case has the potential to impact the United States' foreign relations with the Kingdom. "[A] predicted negative impact on foreign relations does not, by itself, render a case nonjusticiable under the political question doctrine." *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 377 (3d Cir. 2006); *see also Antolok v. United States*, 873 F.2d 369, 392 (D.C. Cir. 1989) (Wald, C.J., concurring) ("I read [Baker v. Carr] as a reminder that our focus should be on the particular issue presented for our

4

consideration, not the ancillary effects which our decision may have on political actors.").

Simply stated, this is a tort suit for money damages. Plaintiffs seek redress for the harms they suffered at the hands of Saudi Arabia. Plaintiffs are confident that they can prove their claims without putting any discretionary decisions of the United States Military or State Department at issue.

**II.      The Political Question Doctrine is Not Applicable to the Facts of This Case.**

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the Halls of Congress or the confines of the Executive Branch." *Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 230 (1986). However, it is "error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr*, 369 U.S. 186, 211 (1962). A nonjusticiable political question does not exist "merely because [a] decision may have significant political overtones." *Japan Whaling*, 478 U.S. at 230. "The doctrine is one of political questions, not one of political cases." *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995) (cleaned up).

In *Baker,* the Supreme Court enumerated six factors that could render a case non-justiciable under the political question doctrine:

5

> Prominent on the surface of any case held to involve a political question is found (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; or (2) a lack of judicially discoverable and manageable standards for resolving it; or (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or (4) the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment of multifarious pronouncements by various departments on one question.

369 U.S. at 217.

"Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." *Baker*, 369 U.S. at 217.

With respect to the first three *Baker* factors, courts routinely decline to apply the political question doctrine to cases involving tort suits. There should be no question that the Judiciary is capable of adjudicating tort claims and has manageable standards with which to do so. *Baker* factors four through six are only relevant if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important government interests. *See Kadic*, 70 F.3d at 249. These factors will generally not apply to a case where the State Department has refused to intervene and assert the political question doctrine. *See e.g., Gross,* 456 F.3d at 387 ("There is no possibly of expressing a lack of respect due the Executive Branch when the

6

Executive has not expressed its interest in the dispute."); *McMahon,* 502 F.3d at 1365 ("The apparent lack of interest from the United States to this point fortifies our conclusion that the case does not yet present a political questions.").

Because the *Baker* factors are not implicated by Plaintiffs' FSIA, JASTA and state law tort claims, the political question doctrine is not applicable and does not require dismissal of this case. The six *Baker* factors are discussed below.

### A.   This Case Does Not Present the Court with an Issue that is Committed to the Executive Branch.

"The first *Baker* formulation is primarily concerned with direct challenges to actions taken by a coordinate branch of the federal government." *Bixby v. KBR, Inc.*, 748 F. Supp. 2d 1224, 1234 (D. Or. 2010). "[W]hen faced with an 'ordinary tort suit' the textual commitment factor actually weighs in favor of resolution by the judiciary." *Id*. at 1235 (*quoting Lane v. Halliburton*, 529 F.3d 548, 554 (5th Cir. 2008). "It is an extraordinary occasion, indeed, when the political branches delve into the matters of tort-based compensation." *Lane*, 529 F.3d at 554.

Federal courts routinely hold that lawsuits under the FSIA and ATA are justiciable.[2] They do so because such lawsuits are "tort suit[s] brought under a

---

[2] *See Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 520 (E.D.N.Y. 2012) (rejecting political-question argument because "ATA suits are expressly authorized by Congress"); *see also Knox v. Palestine Liberation Org.*, 306 F. Supp. 2d 424, 448 (S.D.N.Y. 2004); *Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 280-82 (1st Cir. 2005); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 422 F. Supp. 2d 96, 99-100 (D.D.C. 2006); *Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 162 (D.D.C. 2006); *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 295 n.45

7

legislative scheme that Congress enacted for the express purpose of providing a legal remedy for injuries or death occasioned by acts of international terrorism." *Ungar*, 402 F.3d at 280. Courts further adjudicate terrorism cases despite asserted implications for U.S. foreign policy. For example, courts have sustained claims against: (i) the Palestine Liberation Organization for supporting attacks in the Gaza Strip (*Biton*, 412 F. Supp. 2d at 5-6); (ii) a Chinese state-owned bank for funding a bombing in Tel Aviv (*Wultz*, 755 F. Supp. 2d at 19, 25-27); and (iii) a Jordanian bank for maintaining accounts for Hamas (*Almo*g, 471 F. Supp. 2d at 295, n.45). Those cases all had "political overtones," and some even touched on issues as sensitive as the "Israeli-Palestinian conflict." *Ungar*, 402 F.3d at 281. But the FSIA and ATA statutory scheme made all of them justiciable, and it has the same effect here.

There is no treaty or executive agreement providing a mechanism by which to resolve the claims at issue in this case. Rather, Congress has delineated that responsibility to Article III courts through its enactment of JASTA. Additionally, Plaintiffs are aware of no defense that the Kingdom could raise that would implicate the political question doctrine. In order for a defense to implicate the political question doctrine the Kingdom must demonstrate that its defense will require (i)

---

(E.D.N.Y. 2007); *Biton v. Palestinian Interim Self-Government Auth.*, 412 F. Supp. 2d 1, 5-6 (D.D.C. 2005); and *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 25-27 (D.D.C. 2010).

8

reexamination of a decision by the military; and (ii) the decision at issue is insulated from judicial review. *McMahon*, 502 F.3d at 1359-60. The Kingdom would also have to carry its burden to establish each element of the defense with sufficient evidence. *See Lofgren v. Polaris Indus.*, 509 F. Supp. 1009, 1017 (M.D. Tenn. 2020).

**B.    There are Judicially Discoverable and Manageable Standards for Resolving this Case.**

No special standards are needed to resolve this dispute. The legal and factual questions presented in this case are of the type the Judiciary is constitutionally competent to resolve. This Court has standards by which to answer Plaintiffs' FSIA and JASTA claims, as well as Plaintiffs' state law tort claims, all of which have been extensively set forth in the parties' motions practice to date.

This case can be adjudicated using the same rules and principles employed in any ordinary tort case. *See Lofgren*, 509 F. Supp. at 1028 ("[C]ourts have been hesitant to dismiss cases under the political question doctrine when a case arises under tort law, since states generally have well-established tort and negligence frameworks that provide clear standards for resolving cases.").

For example, many of the Kingdom's duties and responsibilities are derived directly from written procedures, contracts and agreements, which the Court is more than capable of reviewing. *See Bixby,* 745 F. Supp. 2d at 1239 (finding judicially discoverable and manageable standards because defendants' conduct could be measured against the standard of care established in the government contract); *see*

*also Gross*, 456 F.3d at 387 ("Courts routinely determine if a written text is an enforceable contract … and routinely address questions of agency, third-party beneficiaries and damages").

This Court may also apply the statutory text of the FSIA to determine whether Saudi Arabia should lose its shield of immunity. For example, the JASTA/ATA claims ask the Court to determine whether Saudi Arabia's conduct, including but not limited to the NAS Pensacola attack, meets the statutory definition of "international terrorism," 18 U.S.C. § 2333(a), and whether such conduct, including providing material support to the subject Foreign Terrorist Organization, was sufficiently tortious such that it satisfies the elements of the statute (*e.g.*, whether Saudi Arabia (or its agents) provided material support to and/or "aid[ed] and abet[ted]" the acts of terrorism that caused Plaintiffs' injuries *id.* § 2333(d); and 28 U.S.C § 1605B.)

"[T]hat this case might require the deposition of government witnesses may complicate the court's task, but it does not make this claim resemble those in which the judiciary lacks standards to render a decision." *Gross*, 456 F.3d at 387; *see also*, *Japan Whaling*, 478 U.S. at 230 ("[O]ne of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because" of the "interplay" between the statute and "the conduct of this Nation's foreign relations."). Additionally, the fact that the torts at issue in this case were committed in the context

10

of services performed under a contract with the military does not render the traditional principles of tort law obsolete. *See Bixby*, 745 F. Supp. 2d at 1239.

As the Eleventh Circuit has previously stated:

> [T]the fact that the issues before us arise in a politically charged context does not convert what is essentially an ordinary tort suit into a non-justiciable political question . . . Here, we are faced with an ordinary tort suit, alleging that the defendants breached a duty of care owed to the plaintiffs or their decedents . . . Because the common law of tort provides clear and well-settled rules on which the district court can easily rely, this case does not require the court to render a decision in the absence of "judicially discoverable and manageable standards."

*Linder v. Portocarrero*, 963 F.2d 332, 337 (11th Cir. 1992).

Additionally, the political question doctrine is less likely to be applicable when a plaintiff requests monetary damages as compensation for a personal injury. *See Koohi v. United States*, 976 F.2d 1328, 1332 (9th Cir. 1992) ("A key element in our conclusion that the plaintiffs' action is justiciable is the fact that the plaintiffs seek only damages for their injuries. Damage actions are particularly judicially manageable.").

Therefore, the statutes upon which Plaintiffs' claims are based expressly arm courts with "judicially discoverable and manageable standards," *Baker*, 369 U.S. at 217.

### C. The Court Can Resolve this Case Without Forming any Policy Determinations Reserved to the Executive Branch.

As for the third *Baker* factor, the "initial policy determination involved here has already been made by the U.S. Congress"—that Americans "injured by terrorist acts" should be able to sue for money damages under the FSIA, JASTA and the ATA. *See Biton*, 412 F. Supp. 2d at 6. Allowing this case to proceed would not require the Court to second-guess the political branches, rather, it would further the intent of the FSIA, ATA and JASTA. *See id*. In fact, the FSIA and ATA contain several statutory protections to prevent intrusions into foreign-policy decision-making, including one immunizing government officials from suit. *See* 18 U.S.C. § 2337; *see also id*. 18 U.S.C. § 2336(b)-(c) and 28 U.S.C. § 1605(g) (authorizing stays on "national security" grounds); 28 U.S.C. § 1605(a)(6) (enforcing arbitration agreements); and 28 U.S.C. § 1611 (immunizing specific types of property from execution).

The Court will not be required to make a policy determination reserved to the Executive Branch. The Court's decision will be limited to the adjudication of Plaintiffs' tort claims. This will require the Court to apply federal statutory and Florida common law to the facts of this case. Adjudicating these discrete issues will not require the court to make pronouncements on foreign policy or otherwise trigger the third *Baker* factor.

Though this case may indirectly relate to Executive Branch decisions, it remains justiciable because it does not challenge those decisions. *See McMahon v. Presidential Airways, Inc.*, 460 F. Supp. 2d 1315, 1319-20 (M.D. Fla. 2006) (dismissal warranted in "exceedingly small" number of such cases), *aff'd* 502 F.3d 1331 (11th Cir. 2007). Plaintiffs' claims concern historical facts about Defendants' conduct and whether that conduct materially supported or aided and abetted the attack at NAS Pensacola. The Court can answer those factual questions without opining about U.S. policy. For example, the Court may apply the terms and conditions of the applicable contracts and agreements without inquiring into the propriety of the government's decisions to enter into such contracts. *See Bixby*, 748 F. Supp. 2d at 1239.

### D.    Adjudication of this Case Would not Require a Showing of Lack of Respect Due the Executive Branch.

The United States has carefully reviewed the pleadings in this case and has filed a notice of non-participation (ECF No. 67). There is no possibility of expressing a lack of respect due the Executive Branch, because the Executive Branch has not expressed its interest in the dispute.

The Court provided the United States ample notice and opportunity to file a statement of interest related to the potential political questions pertaining to military and foreign policies. The Court has afforded the United States reasonable time and detailed direction on the specific policy issues and questions for which the Court

13

sought the United States' position. Nevertheless, the United States declined to do so, and its decision came after "actively considering whether to file a statement of interest… coordinat[ing] with multiple entities within the Executive Branch," and obtaining "approval of the U.S. Department of Justice through the Principal Deputy Assistant Attorney General for the Civil Division." *Se*e ECF No. 62 at 2; and ECF No. 67.

The decision of the United States to decline the Court's invitation to participate or comment upon the potential political questions demonstrates that the third *Baker* factor does not bar this case. *See e.g.*, *Matar v. Dichter*, 500 F. Supp. 2d 284, 295-296 (S.D.N.Y. 2007), *aff'd on other ground by* 563 F.3d 9 (2d Cir. 2009) (giving great deference to the statement of interest filed by the Department that "advocated forcefully for the dismissal of [the] action based in part on foreign policy concerns."); *Sosa v. Alvarez–Machain*, 542 U.S. 692, 733, n.21 (2004) (noting that in some cases "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy"); *Republic of Austria v. Altmann*, 541 U.S. 677, 701 (2004) (finding a State Department statement of interest, if offered, would be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy.).

To the extent the Court is concerned that Defendant may ultimately seek to share or shift blame to the U.S. Navy or Defense Department for Plaintiffs' injuries,

any such potential liability does not implicate the political question doctrine. *See Ridgell v. HP Enterprise Serv's LLC*, 209 F. Supp. 3d 1, 20 (D.D.C. 2016) ("Even if the Navy were to hold part of the blame for the damages sustained in these cases, it does not render the claims against [defendant] non-justiciable on the basis of a political question") (citing *Hill v. McDonald*, 442 A.2d 133, 137 (D.C.1982) ("one cannot escape liability for one's own negligence merely because another person … may have contributed to the injury by his wrongful or negligent act")).

As the record in this case reflects, the Executive Branch has been aware of the facts of this case since December 6, 2019. It even served the Complaint on the Defendant through its diplomatic channels. The Court has now afforded it reasonable opportunity to participate and raise any political concerns it may have, and it has declined to do so.

### E.    This Case Does Not Require the Court to Question any Political Decisions Already Made by The Executive Branch.

There is no possibility of this Court questioning a political decision already made by the Executive Branch because the Executive Branch has not made any such decision. *See Alperin*, 410 F.3d at 557-58 ("[T]his case is before us not because the Holocaust Survivors disagree with a political decision made regarding their claims, but rather because there simply has been no decision"). As the Eleventh Circuit described in *Ungaro-Benages v. Dresdner Bank AG*:

15

> The President could have settled these cases. In that case, federal courts would be interfering with the executive's conduct of foreign relations if we continued to exercise jurisdiction. Such is not the situation here. The President has purposefully chosen not to settle these claims directly and, instead, has instructed the federal courts to use existing legal grounds.

379 F.3d 1227, 1237 (11th Cir. 2004).

Assuming, arguendo, that the President has the power to resolve Plaintiffs' claims, "The mere existence" of such power, "without an exercise of that power, does not render those claims nonjusticiable." *Gross*, 456 F.3d at 387.

With respect to the Court's concern that discovery in this case may call into question or ultimately contradict the conclusions of U.S. Government investigations into the Pensacola mass shooting, it should be noted at the outset that investigative "conclusions" are not political decisions.

In addition, with respect to the Navy's investigation, Plaintiffs have repeatedly pointed out in their motion papers that the primary purpose of the investigation was to determine what improvements the Navy might make to ensure terror attacks on its U.S. bases might be prevented, not to determine the culpability of the Kingdom of Saudi Arabia. *See e.g.,* ECF No. 43, Plaintiffs' Motion for Jurisdictional Discovery at 5-9. The Navy Investigation also was concluded before Al-Shamrani's cell phone was unlocked. *Id*. The evidence discovered on Al-Shamrani's phone (that Al-Shamrani had been in contact with al-Qaeda since at least 2015 and planned the attack with al-Qaeda's assistance) alters many of the Navy's

16

conclusions. *Id*. Moreover, Navy investigators did not have access to records they considered "germane to their overall findings." *Id*. at 5-6.

  **F. This Case Does Not Raise the Possibility of Embarrassment to Any Government Body.**

  There is no possibility of embarrassment to the Executive Branch because the Executive Branch has not expressed its interest in the dispute. As discussed above, there is no possibility of multifarious pronouncements by various departments because the Legislature (through JASTA) has constitutionally mandated the resolution of this case to the Judiciary, and the Executive Branch has decided not to act. As the Ninth Circuit summarized in *Alperin*: "[T]his lawsuit is the only game in town with respect to claimed looting and profiteering by the Vatican Bank. No ongoing government negotiations, agreements, or settlements are on the horizon." 410 F.3d at 558.

**III. Conclusion.**

  For all of the foregoing reasons, the political question doctrine does not apply to this case.

Dated: October 10, 2023.                    Respectfully submitted,

                                            */s/ Matthew S. Mokwa*
                                            Matthew S. Mokwa, Esq. (FL#47761)
                                            **THE MAHER LAW FIRM, P.A.**
                                            398 W. Morse Blvd., Suite 200
                                            Winter Park, Florida 32789
                                            Phone: (407) 839-0866
                                            Fax: (407) 425-7958
                                            mmokwa@maherlawfirm.com

                                            Filed on Behalf of All Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2023 and in compliance with L.R. 5.1(F), I, Matthew S. Mokwa, electronically filed the foregoing document with the Clerk of Court using the Court's CM/ECF system which sends notice to all parties or counsel of record that have entered appearances in this action.

                                            */s/ Matthew S. Mokwa*
                                            Matthew S. Mokwa, Esq.