## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**BENJAMIN WATSON, JR, et al.,**

    **Plaintiffs,**

**v.**                                        **CASE NO. 3:21cv329-MCR-ZCB**

**KINGDOM OF SAUDI ARABIA,**

    **Defendant.**

_____/

## <u>ORDER</u>

This suit arises out of a terrorist attack at Naval Air Station Pensacola ("NAS Pensacola") on December 6, 2019.  On that date, Mohammad Saeed Al-Shamrani, a Second Lieutenant in the Royal Saudi Air Force ("RSAF"), went on a shooting rampage murdering three United States Navy servicemembers and severely injuring four United States Navy servicemembers, a Navy civil servant, seven Escambia County Sheriff's deputies plus a member of the Department of Defense Police Force, and injuring other first responders as well.  The shooting rampage stopped only after Al-Shamrani was shot and killed by the return gunfire and bravery of the responding officers.

Plaintiffs—the surviving victims of the attack and representatives of the deceased servicemembers—brought this 19-count suit under various federal and state terrorism-related statutes and Florida common law against Defendant Kingdom

of Saudi Arabia ("Saudi Arabia") and unnamed officials.[1]  Saudi Arabia filed a

motion to dismiss, invoking its sovereign immunity by asserting both facial and

factual challenges to the Amended Complaint.  *See* Fed. R. Civ. P. 12(b)(1); ECF

No. 46.  As a foreign state, Saudia Arabia is presumed immune from suit in United

States' courts under the Foreign Sovereign Immunities Act ("FSIA"), *see* 28 U.S.C.

§ 1604, and consequently, a specific statutory exception to immunity must apply in

order for federal jurisdiction to exist.  Plaintiffs asserted four FSIA statutory

exceptions in the Amended Complaint and in response to the motion to dismiss:  (1)

the Justice Against Sponsors of Terrorism Act ("JASTA") exception, 28 U.S.C.

§ 1605B; (2) noncommercial torts exception, § 1605(a)(5); (3) commercial activity

exception, § 1605(a)(2); and (4) the exception for waiver, § 1605(a)(1).  ECF No.

39.  Plaintiffs also requested jurisdictional discovery.  *See* ECF No. 43.

The undersigned referred the motion to dismiss to the assigned Magistrate

Judge for a Report and Recommendation ("R&R") and referred the request for

---

[1] The specific causes of action include primary and secondary liability under the Anti-Terrorism Act, 18 U.S.C. §§ 2339, 2339A, 2339B, 2339C (harboring a terrorist or providing material support to a terrorist and terrorist organization); Florida common law claims of loss of solatium, assault, battery, false imprisonment, intentional and negligent infliction of emotional distress, negligence and gross negligence, loss of consortium, and third party breach of contract; and state law claims under Florida's Civil Hate Crime Statute, Florida's Civil Remedy for Terrorism and Facilitating Terrorism statute, and Florida's Wrongful Death Act.  ECF No. 5 (Amended Complaint).

jurisdictional discovery for disposition by order. The Magistrate Judge held oral argument and entered an R&R recommending that the undersigned grant the motion to dismiss based on sovereign immunity and deny discovery. *See Watson v. Kingdom of Saudi Arabia*, Case No. 3:21cv329/MCR/ZCB, ECF No. 54, 2023 WL 4047586, at *1 (N.D. Fla. May 11, 2023). Plaintiffs objected, and Saudi Arabia has responded. *See* ECF Nos. 57, 65.

When reviewing a magistrate judge's R&R on a dispositive matter, the Court reviews *de novo* all aspects to which a party has specifically objected and "may accept, reject, or modify, in whole or in part, the findings or recommendations made." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3); *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1245 (11th Cir. 2007) ("the district court is generally free to employ the magistrate judge's findings to the extent that it sees fit"). Objections to a nondispositive order, such as the denial of the request for discovery, are reviewed for clear error. Fed. R. Civ. P. 72(a). The undersigned has made a *de novo* determination of all timely filed objections to the R&R and reviewed objections to the denial of discovery for clear error.[2] For reasons that follow, the

---

[2] While clear error is the correct standard for review of the nondispositional denial of discovery, the undersigned has alternatively reviewed the objections regarding discovery *de novo* since they are contained within the R&R, and the result is the same.

undersigned agrees that the motion to dismiss should be granted and discovery denied.

## I.      Factual Background

The Magistrate Judge's Summary of Factual Allegations accurately lays out the events leading up to the attack, the attack itself, and subsequent events and  is adopted without objection and incorporated into this Order by reference. Nonetheless, to facilitate a discussion of the parties' objections, this Order provides an overview of the allegations stated in the Amended Complaint.

At the time of Al-Shamrani's attack, he was a member of the RSAF.  He was also, as United States officials later determined, affiliated with al Qaeda[3] in the Arabian Peninsula ("AQAP"), an organization designated by the United States Department of State as a Foreign Terrorist Organization.  Al-Shamrani carried out the attack wearing his RSAF uniform and while attending military and flight training at NAS Pensacola.  Plaintiffs allege that this training was provided through a Security Cooperation Education and Training Program and is critical to Saudi

---

[3] Proper capitalization and/or hyphenation for "al Qaeda" is inconsistent and unclear at best from the briefs, Westlaw searches, and even Wikipedia.  The undersigned follows the Supreme Court's lead, using lower case, except at the beginning of a sentence, and no hyphen, unless quoted differently.

Arabia's purchase of military defense equipment from the United States.[4]   The Amended Complaint alleges that this is a standard "commercial contract" between the United States and a foreign state, as shown by the terms of a standard form Letters of Request, Offer, and Acceptance ("LOA"), which states that United States' laws and regulations apply and that the foreign country agrees to indemnify and hold the United States Government and its agents or officers harmless from any loss or liability (in tort or contract) that might arise in connection with the agreement. ECF No. 5 ¶¶ 50-54.  According to the Amended Complaint, Saudi Arabia is the United States' largest foreign purchaser of military equipment.

Plaintiffs allege that Al-Shamrani "underwent extensive vetting" when he joined the RSAF in 2015 and by then, he was already radicalized in his religious jihadism and anti-American and anti-Jewish ideology.[5]   They further allege that

---

[4] The agreement allows Saudi Arabia to modernize its armed forces through the purchase of equipment and obtain the "training and education necessary to use these sophisticated products." ECF No. 5 ¶¶ 46–50.

[5] Plaintiffs allege that Saudi Arabia sanctions extremism because Wahhabi religious clerics are directly employed by the Saudi Arabia government and given full control over schools, universities, and mosques; it is alleged that "hard-line' religious leaders "have significant sway in Saudi society" and permeate the military.  ECF No. 5 ¶¶ 72–77.  Plaintiffs further allege that Saudi Arabia's Ministry of Defense "routinely publishes a magazine distributed to all members of its military in print and online entitled 'the Muslim Soldier,'" which "frequently contained articles written by Saudi-state supported clerics" known for extremist beliefs. *Id.* ¶¶ 74–75. Plaintiffs cite one magazine from February 2018 containing extremist language that is reportedly consistent with Al-Shamrani's expressed views.   Plaintiffs contend that this education amounted to state-

Saudi Arabia knew of Al-Shamrani's anti-American sentiments because he was active on Twitter and "regularly posted his radical fundamental ideology on his social media accounts" but nevertheless allowed him to join the RSAF and sent him to the United States for flight training.  ECF No. 5 at ¶¶ 134–150.  The Amended Complaint also alleges that Al-Shamrani told friends when he joined the RSAF that he had been chosen to undergo a "special mission."  ECF No. 5 at ¶ 134.

Al Shamrani began his aviation training at NAS Pensacola in May 2018.  John Doe 1 was the RSAF Country Liaison Officer ("CLO") responsible for supervising Al-Shamrani at NAS Pensacola.  It is alleged that in July 2019, while in the United States, Al-Shamrani purchased the weapon used in the December 2019 attack and possessed it on base in violation of the policies of both countries.  The Amended Complaint alleges in conclusory terms that the CLO "was aware that Al-Shamrani had a weapon on base in violation" of policy and "was aware of Al-Shamrani's planned attack."[6]  On September 11, 2019, Al-Shamrani announced on social media that "the countdown has begun."[7]   ECF No. 5 at ¶ 160.  According to the Amended

---

sponsored indoctrination into jihadism, but there is no allegation that the Saudi government is engaged in terrorist activities or actively recruits terrorists for such activity.

[6] No factual allegations support these conclusory general statements of knowledge.

[7] Plaintiffs allege that the countdown remark was related to President Trump's recognition of Jerusalem as the capital of Israel on December 6, 2017.  Also, shortly before the December 6, 2019, attack, Al-Shamrani made social media postings that echoed the radical propaganda of

Complaint, within a matter of days after Al-Shamrani's social media "countdown" statement, the CLO "abandoned his post" (approximately three months before the attack) and returned to Saudi Arabia.  ECF No. 5 ¶¶ 39(b), 157.  The CLO position was not filled again until January 2020—after the December 2019 attack.   On February 2, 2020, AQAP took responsibility for the attack.[8]

The United States Navy and the Federal Bureau of Investigation ("FBI") each conducted investigations after the attack and issued reports with findings within a short period, some of which are referenced in the Amended Complaint.  Namely, Plaintiffs state that the FBI had determined by January 13, 2020, that Al-Shamrani's December 6 attack was an act of terrorism motivated by jihadist ideology.[9]  And they point to the Navy Command Investigation Report ("Navy Report") (February

---

AQAP and indicated that he felt the targeting of Americans was justified as retribution for the United States' support of Israel.

[8] Al Qaeda has been designated by the United States as a Foreign Terrorist Organization since 1999.  ECF No. 5 at ¶ 82 & n.2.  AQAP was formed from al Qaeda branches in 2009 and has been designated by the United States as a Foreign Terrorist Organization since 2010.  *Id.* ¶¶ 83, 85.  Plaintiffs allege that AQAP and Saudi Arabia have fought "side-by-side in the ongoing Yemen war against the Houthis movement" and that Saudi Arabian officials and prominent citizens have provided al Qaeda with funds, weapons, and diplomatic travel.  *Id.* ¶ 81, 86. It is further alleged that Saudi Arabia has provided AQAP with "significant resources in connection with the Yemen civil war including weapons and military equipment as well as intelligence and financial support."  *Id.* ¶ 86.   Additionally, Plaintiffs allege that "[t]he heavy Saudi presence within the group's [AQAP's] upper echelons suggests it maintains robust recruiting and support networks in Saudi Arabia, despite its base of operations in Yemen."  *Id.* ¶ 93.  Notably, there is no allegation that Saudi Arabia recruits AQAP members for the RSAF.

[9] Plaintiffs also allege that the FBI investigation is ongoing.

21, 2020), which found that the CLO had a duty to be present on base, and his absence from the base and failure to supervise Al-Shamrani was a "contributing factor" leading to the operational success of the attack. *Id.* at ¶¶ 173, 183. According to the Navy Report, had the CLO been present from September to December 2019, he "may have provided 2nd Lt. Al-Shamrani with better oversight and resulted in proactive intervention by [Saudi Arabia] prior to the attack."[10] *Id.* at ¶ 184. On May 18, 2020, the Attorney General announced publicly that the FBI had successfully unlocked Al-Shamrani's phones, which revealed that he had been radicalized years before joining the RSAF and had been in direct communication with AQAP up until the night before the attack.[11]

Following the incident, twenty-one Saudi trainees were found to have possessed "derogatory material"[12] unbecoming an officer and were immediately returned to Saudi Arabia on assurance to the Attorney General that he would have

---

[10] There is no allegation that the Navy concluded the CLO knew Al-Shamrani had a weapon in violation of policy or that any report blamed Saudi Arabia for the attack.

[11] Plaintiffs allege that Al-Shamrani's frequent communications with AQAP revealed systemic problems with Saudi Arabia's security screening.  They also allege that he shared his plans with his some of his fellow cadets the night before the attack, but there is no allegation that they participated or that any Saudi official ordered the attack.

[12] The January 13, 2020 press release of the Attorney General stated that cadets possessed material containing Anti-American or jihadi sentiments and at least fifteen individuals had some contact with child pornography, although he determined that the conduct would not in the normal course result in federal prosecution.

"full access" to anyone he wanted to interview in the investigation and the cadets would be returned for trial if charged. *Id.* at ¶ 324. It is further alleged that during discussions between the United States and Saudi Arabia after the incident, Saudi Arabia agreed to "cooperate fully in the investigation and compensate the victims for its employees' attack."[13] *Id.* at ¶ 594. Plaintiffs characterize these statements as an oral contract between the two countries requiring Saudi Arabia to fully cooperate in legal proceedings in the United States and to compensate victims, which they say Saudi Arabia allegedly breached by failing to even engage with Plaintiffs.

## II.    DISCUSSION

The Magistrate Judge recommended finding that Plaintiffs failed to make a *prima facie* case as to any one of the FSIA exceptions raised and also denied Plaintiffs' request for jurisdictional discovery. Plaintiffs object on numerous grounds, arguing that the Magistrate Judge incorrectly shifted the burden of production to them, which in turn led to him to improperly deny them jurisdictional discovery, and also erred in various aspects of the legal analysis pertaining to each statutory exception. Saudi Arabia responds that the burden-shifting objections are

---

[13] The Amended Complaint cites news reports of President Trump announcing that the King and Crown Prince of Saudi Arabia had agreed to "be involved in taking care of the families," and stating, "I think they are going to help out the families very greatly." *Id.* ¶ 596 (internal marks omitted). Obviously, this has not happened.

academic because as to each FSIA exception, the Magistrate Judge first determined that Plaintiffs' allegations were inadequate or conclusory and thus the suit does not withstand a facial, let alone factual, challenge.  The undersigned agrees..

Indisputably, "[f]ederal courts are courts of limited jurisdiction" empowered to act only as authorized under the Constitution and as conferred by statute. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  The party invoking federal jurisdiction bears the burden to establish subject matter jurisdiction. *Id.*  In the FSIA context, a foreign state is presumptively entitled to sovereign immunity "*unless* an FSIA statutory exception applies."[14] *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1312 (11th Cir. 2009) (emphasis in original); *see also* 28 U.S.C. § 1604 (same).  If no exception applies, "then the district court lacks subject matter jurisdiction over the plaintiff's claims." *Butler*, 579 F.3d at 1312.

---

[14] "The FSIA is a jurisdictional statute; it 'does not create or modify any causes of action.'" *Comparelli v. Republica Bolivariana De Venezuela*, 891 F.3d 1311, 1319 (11th Cir. 2018) (quoting *Republic of Austria v. Altmann*, 541 U.S. 677, 695 n.15 (2004)); *see also* 28 U.S.C. § 1330(a) (providing "original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a)" for any claim for relief for which "the foreign state is not entitled to statutory immunity").  Foreign sovereign immunity "affords a complete protection 'from *suit*,'" *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 586 (D.C. Cir. 2020) (quoting *Bolivarian Rep. of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 174 (2017)), and is "not merely a defense to liability," *Belhas v. Ya'alon*, 515 F.3d 1279, 1281 (D.C. Cir. 2008) (internal quotations omitted) (stating also that "the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case").

A defendant bears "the initial burden of presenting a *prima facie* case that it is a foreign state," *Butler*, 579 F.3d at 1313 n.8, which here is uncontested.  By moving to dismiss on this defense, a foreign state may challenge subject matter jurisdiction "based on either (1) the inadequacy of the pleadings as a matter of law; or (2) a denial of the allegations in the complaint."  *Rux v. Republic of Sudan*, 461 F.3d 461, 467 (4th Cir. 2006).  "[H]ow the district court proceeds to resolve the motion to dismiss depends upon whether the motion presents a factual [or facial] challenge." *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

The Plaintiff must then overcome the presumption of immunity by identifying a FSIA exception and setting out a *prima facie* case that the exception applies, both legally and factually.  *Butler*, 579 F.3d  at 1313 (stating a plaintiff must "produc[e] evidence that the conduct which forms the basis of the complaint falls within one of the statutorily defined exceptions" (quoting *S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1300 (11th Cir. 2000)) (internal marks omitted); *see also Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1221 n.9 (11th Cir. 2018) (stating plaintiff must make an "initial showing that jurisdiction exists based on an exception").  If the Plaintiff establishes a *prima facie* showing that an exception applies, "the defendant must bear the ultimate burden of persuasion to

show that no FSIA exceptions to immunity apply."[15]  *Devengoechea,* 889 F.3d at 1221 n.9.

Although the Eleventh Circuit requires the production of "evidence" to make out a *prima facie* case that a FSIA exception applies *where the facts are disputed*, if the defendant raises a purely legal challenge, as opposed to a factual one, the court considers whether the allegations taken as true are sufficient to bring the case within the specific exception invoked.  *Devengoechea,* 889 F.3d at 1221 n.9 (citing *Bolivarian Rep. of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 174, 187 (2017) (stating purely legal questions must be resolved)).  A facial challenge is a challenge to legal sufficiency.  *Butler*, 579 F.3d at 1313 ("Where, as here, the party asserting immunity under the FSIA does not contest the alleged jurisdictional facts, but rather, challenges their legal adequacy, we review de novo the complaint's jurisdictional allegations to determine whether they were sufficient to eliminate the appellants' presumptive immunity."); *see also Mwani v. bin Laden*, 417 F.3d 1, 15 (D.C. Cir. 2005) (it is a challenge to legal sufficiency where, although

---

[15] As aptly explained in the 9/11 Attacks litigation: "Determining whether [Plaintiffs'] burden is met involves a review of the allegations in the complaint, the undisputed facts, if any, placed before the court by the parties, and—if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue—resolution of disputed issues of fact."  *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 80 (2nd Cir. 2008) (alterations accepted, internal quotations omitted), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010).

the foreign state "does not expressly concede the truth of the plaintiffs' factual allegations, it argues that even if taken as true, the allegations are insufficient to come within [a FSIA] exception").  With a purely legal challenge, the plaintiff bears the ultimate burden of proving that the FSIA exception invoked applies as a matter of law. *Devengoechea,* 889 F.3d at 1221 n.9.  To overcome a facial legal challenge, the Plaintiffs "must include sufficient facts to support a reasonable inference that their claims satisfy the terrorist exception and, therefore, that an exercise of subject matter jurisdiction is appropriate." *Rux*, 461 F.3d at 468.

While Plaintiffs take issue with the Magistrate Judge's application of the burden of production, the Court finds it unnecessary to address the debate because, even accepting the nonconclusory allegations in the Amended Complaint as true, the jurisdictional allegations are facially insufficient to support the asserted statutory exceptions and overcome presumptive immunity as a matter of law.  *See Butler*, 579 F.3d at 1313.  For reasons that follow, the undersigned agrees with the Magistrate Judge's legal analysis and conclusion that the motion to dismiss should be granted but finds no need to consider Saudi Arabia's factual challenge or to adopt any factual "findings" in the R&R.

Plaintiffs invoke the following FSIA exceptions: (1) JASTA, 28 U.S.C. § 1605B, based on alleged tortious acts of Al-Shamrani, other officials responsible

for vetting and supervising him, and Saudi Arabia's alleged material support for terrorism; (2) noncommercial torts, § 1605(a)(5), based on alleged negligence in vetting, retaining, and supervising Al-Shamrani; (3) commercial activity, § 1605(a)(2), based on contract; and (4) waiver, § 1605(a)(1).

### 1.    JASTA Exception, 28 U.S.C. § 1605B

As accurately stated in the R&R, the JASTA exception to foreign sovereign immunity, allows suit against a foreign state if:

> (b) . . . money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by—
>
> > (1) an act of international terrorism in the United States; and
> >
> > (2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.

28 U.S.C. § 1605B(b).[16]  Distilled into its elements, this exception requires proof of: (1) an injury or death within the United States; (2) an act of international terrorism in the United States; (3) a tortious act by the foreign state or by its official, employee,

---

[16] The Anti-Terrorism Act ("ATA") authorizes a civil tort suit for U.S. nationals injured by an act of international terrorism.  *See* 18 U.S.C. § 2333.  Although an ATA suit is ordinarily not authorized against a foreign state, *see* 18 U.S.C. § 2337(2), the new sovereign immunity exception of JASTA, § 1605B, expressly allows suit against a foreign state "in accordance with § 2333," as long as the requirements of § 1605B(b) are met.  28 U.S.C. § 1605B(c).

or agent acting within the scope of that office, employment or agency;[17] (4)
causation; and (5) resulting damages.  ECF No. 54 at 14 (citing *In re Terrorist
Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 642 (S.D.N.Y. 2018).  Additionally,
element (3) (a "tortious act") is further defined by § 1605B(d), which expressly
precludes jurisdiction based on "an omission or a tortious act or acts that constitute
mere negligence."  § 1605B(d).

In this case, the following elements are undisputed: (1) an injury or death
occurred within the United States, (2) as a result of an act of terrorism in the United
States, and (5) damages resulted.  The heart of the dispute centers on elements (3)
and (4)—*i.e.,* whether a tortious act (not an omission or negligence) of/by Saudi
Arabia or an employee or agent of Saudi Arabia while acting within their scope of
employment caused the Plaintiffs' harm.  Plaintiffs argue the JASTA exception is
satisfied because Al-Shamrani, the CLO, and other employees of Saudi Arabia
committed tortious acts within the scope of their employment, and Saudi Arabia
committed the tort of providing material aid to a terrorist (Al-Shamrani) and AQAP
(a terrorist organization), each of which, they allege, caused the attack.

---

[17] Under the JASTA exception, it does not matter where the foreign state's or employee's
tort occurs, as long as the act of international terrorism occurred in the United States.  *See* 28
U.S.C. § 1605B(b)(2).

a. Scope of Al-Shamrani's Employment.  In a nutshell, Plaintiffs argue that Al-Shamrani acted within the scope of his employment because his work provided him access to the place where the attack occurred, and he believed he was serving the interests of Saudi Arabia due to his state-indoctrinated extremist religious beliefs. The Magistrate Judge rejected these arguments, finding that Al-Shamrani's acts were not within the scope of his employment because they were committed for his own personal religious extremist purposes.  Plaintiffs argue that the Magistrate Judge erred in not accepting their well-pled allegations and by misconstruing Florida law. The undersigned disagrees and finds no error in the Magistrate Judge's reasoning.

There is no dispute that under Florida law, the scope of employment inquiry turns on whether the conduct (1) was "the kind for which the employee was employed to perform;" (2) "occurred within the time and space limits" of employment; and (3) was "activated at least in part by a purpose to serve the employment." *Spencer v. Assurance Co. of Am.*, 39 F.3d 1146, 1150 (11th Cir. 1994) (applying Florida law); *see* ECF No. 54 at 16.  The Magistrate Judge determined that: (1)  Al-Shamrani was employed to fly airplanes, not engage in an attack at the base,[18] and (2)  although the conduct occurred within the time and space

---

[18] Plaintiffs contest the Magistrate Judge's finding that Al-Shamrani was employed to fly airplanes, arguing that this is not supported by the record.  The criticism is meritless and belied by

limits of Al-Shamrani's employment as an RSAF member, (3) Al-Shamrani acted

for his own interests, not those of Saudi Arabia.[19]   The Magistrate Judge rejected

Plaintiffs' argument that the scope of employment analysis is satisfied in this case

solely because Al-Shamrani's work provided him access to NAS Pensacola and an

opportunity to commit the attack.  ECF No. 54 at 17–21.  The Magistrate Judge is

correct.

The general rule in Florida is that an employee's act of common law battery

to accomplish his own purpose is outside the scope of his employment. *See City of*

*Miami v. Simpson*, 172 So. 2d 435, 437 (Fla. 1965) ("The master's liability does not

arise when the servant steps aside from his employment to commit the tort or does

the wrongful act to accomplish some purpose of his own.").  In other words, "[i]f the

tort is activated by a purpose to serve the master or [employer], then [the employer]

is liable. Otherwise he is not." *Id.*; *see also City of Green Cove Springs v. Donaldson*,

---

Plaintiffs' own allegations in the Amended Complaint that Al-Shamrani was "a Second Lieutenant in the RSAF;" that "[a]t the time of the attack, Al-Shamrani was a flight student participating in the United States' Security Cooperation Education and Training Program;" and that "[t]he training provided to Al-Shamrani involved language education and flight training for the planes purchased by the Kingdom of Saudi Arabia." ECF No. 5 at ¶¶ 39(a), 43, 58.

[19]   The Magistrate Judge also determined that the conduct was not within the scope of Al-Shamrani's agency because there was no basis for finding that Saudi Arabia authorized the attack or caused anyone to believe Al-Shamrani was authorized to launch a terrorist attack.  ECF No. 54 at 21 n.9.  This is not expressly challenged.

348 F.2d 197, 203 (5th Cir. 1965)[20] (citing Florida law stating an employer is liable when an employee does a lawful and authorized act in "an unauthorized manner" but not when the employee does "an unlawful or prohibited act" (internal quotations omitted)).   As the Magistrate Judge correctly recognized and discussed, sexual assault cases in Florida illustrate the general principle that rejects liability for unlawful conduct where there could be no purpose to serve the employer.  *See e.g., Iglesia Cristiana La Casa Del Senor, Inc*., 783 So. 2d 353, 357 (3d DCA 2001) (reversing a jury verdict and finding that a pastor's sexual assault of a minor was not within the scope of employment; the church could not be vicariously liable for his criminal act, despite the access provided by the employment); *Agriturf Mgmt., Inc. v. Roe*, 656 So. 2d 954 (Fla. 2d DCA 1995) (employer was not liable for sexual assault of a child, despite the fact that the act occurred on the employer's property and during the employee's work of closing the business for the day).

Plaintiffs allege that Al-Shamrani wore his RSAF uniform during the attack, committed the attack at his workplace, and/or believed that he was, at least in part, serving his employer's (Saudi Arabia's) interests due to state-indoctrinated religious beliefs.  Even accepting these allegations, they are not enough because neither the

---

[20] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) (adopting the case law of the former Fifth Circuit before October 1, 1981, as precedent in this Circuit).

act itself nor the alleged belief by Al-Shamrani that he was serving his employer is grounded in any work-related task or duty of an RSAF member participating in a cooperative training program as a flight trainee at NAS Pensacola, where he was not authorized to possess a weapon. Plaintiffs argue, correctly, that Florida courts have found the scope of employment inquiry satisfied where an employee's intentional tort bears a close nexus to the workplace, to a work-related duty, or to the employee/employer relationship.[21] But the Court has reviewed the cases cited and finds none of them analogous to this case. *See* ECF No. 39 at 28–29 n. 13 (listing cases[22]). True, the cited cases involved a wide variety of intentional torts, even

---

[21] *See, e.g., McMillan v. Dep't of Corr.*, No. 5:13-CV-292-W S-GRJ, 2016 WL 4059230, at *4 (N.D. Fla. July 8, 2016) (explaining that illegal acts of employees are not always "beyond the reach of vicarious liability," such as where a supervisor abused his power by sexually assaulting an inmate, using the employee/employer relationship to gain access to a locked room and to an inmate he was supposed to be supervising); *Hennagan v. Dep't of Highway Safety & Motor Vehicles,* 467 So. 2d 748, 750 (Fla. 1st DCA 1985) (an officer's excessive use of force is not, as a matter of law, outside the scope of employment).

[22] *See, e.g., Fields v. Devereux Found., Inc.*, 244 So. 3d 1193 (Fla. 2d DCA 2018) (assault by a case manager while supervising a visitation); *Valeo v. E. Coast Furniture Co.*, 95 So. 3d 921, 925 (Fla. 4th DCA 2012) (assault purportedly to protect employer's business money); *Gonpere Corp. v. Rebull*, 440 So. 2d 1307 (Fla. 3d DCA 1983) (building manager shot a tenant over an eviction dispute); *Parsons v. Weinstein Enterprises, Inc.*, 387 So. 2d 1044, 1045 (Fla. 3d DCA 1980) (finding a jury question where a patron who allegedly broke a lamp at the business was beaten by a bouncer, while the owner watched); *Lay v. Roux Labs., Inc.*, 379 So. 2d 451, 453 (Fla. 1st DCA 1980) (overzealous parking lot enforcer); *Forster v. Red Top Sedan Service, Inc.*, 257 So. 2d 95 (Fla. 3d DCA 1972) (bus driver assaulted driver of car who delayed him in his duties); *Jax Liquors, Inc. v. Hall,* 344 So.2d 247 (Fla. 1st DCA 1976) (security guard shot an unruly bar patron for removing a drinking glass); *Columbia by the Sea, Inc. v. Petty,* 157 So. 2d 190 (Fla. 2d DCA 1963) (restaurant employee assaulted patron who refused to pay 35 cents for salad dressing).

shootings, at the workplace, but in each instance, contrary to the facts alleged here, the assault arose out of or in relation to an actual work-related task, dispute, or exercise of supervisory authority gone awry.[23]

While no one factor is singularly decisive in this fact intensive inquiry, as Plaintiffs argue, *see Columbia By the Sea, Inc. v. Petty*, 157 So. 2d 190, 191 (Fla. 2d DCA 1963) ("seldom is one of the factors"—nature of duties, course of the assault, or motivation—"deemed of itself decisive; rather, each must be considered in terms of the others"), this case is unquestionably out of the ordinary.  Nothing in the cases cited by Plaintiffs is by any means comparable to Al-Shamrani's murderous attack, which in the undersigned's view was so extreme as to be outside the scope of Al-Shamrani's RSAF employment as a matter of law.  *See Stinson v. Prevatt,* 94 So. 656, 657 (1922) (framing the scope of employment standard as *excluding* homicide[24]); *see also Doe v. Norwich Roman Catholic Diocesan Corp*., 268 F. Supp.

---

[23] Plaintiffs also cite *Tampa Maid Seafood Products v. Porter*, 415 So. 2d 883, 885 (Fla. 1st DCA 1982), which involved an attack committed by an employee using a knife from the workplace.  Although the court found that the tort arose within the scope of employment, the case is distinguishable because here, Al-Shamrani did not commit the attack with a weapon he was authorized to use for work, and the weapon was not related to his military training.  In fact, Al-Shamrani's possession of the gun and ammunition used in the attack on base violated work policies.  *Tampa Maid Seafood* is also distinguishable because it is a worker's compensation case, and Florida courts have explained that the worker's compensation scope of employment test  is broader than the common law tort test. *See Sussman v. Fla. E. Coast Properties, Inc.*, 557 So. 2d 74, 75 (Fla. 3d DCA 1990).

[24] In 1922, the Florida Supreme Court set out the general rule that:

2d 139, 142 (D. Conn. 2003) ("there are occasional cases where a servant's digression from duty is so clear-cut that the disposition of the case becomes a matter of law").[25]

b. Inadequate Vetting, Retention, Supervision.  Plaintiffs also invoked the JASTA exception based on Saudi Arabia's vicarious liability for the negligence or gross negligence of unnamed officials or employees in the vetting and/or retention

---

. . . an employer is liable in damages for the wrongful act of his employee that causes injury to another person, if the wrongful act is done while the employee is acting within the apparent scope of his authority as such employee to serve the interests of the employer, even though the wrongful act also constitutes a crime *not a homicide* or was not authorized by, or was forbidden by, the employer, or was not necessary or appropriate to serve the interests of the employer, unless the wrongful act of the employee was done to accomplish his own purposes, and not to serve the interests of the employer.

*Stinson,* 94 So. at 657 (emphasis added).  In *Stinson,* a supervisor shot and killed a man at the workplace, having mistakenly believed the man was wrongfully enticing laborers away from the company.  While the court found a question of fact on scope of employment, the case is easily distinguishable.  There, a jury could find that the killing stemmed from the supervisor's job requirements of protecting the business and ensuring that laborers were not enticed away to other companies—job duties for which the supervisor was authorized to carry a weapon.  *Id.* The court concluded that therefore, the wrongful act did not "clearly appear" to have been done maliciously for the employee's own purpose.  Here, by contrast, Plaintiffs allegations admit that Al-Shamrani's job did not involve the use or possession of a weapon or ammunition on base—in fact, Plaintiffs readily concede that doing so violated the policies of both countries.  Plaintiffs also recognize that the murders were committed as an act of religious jihadism and terrorism.  Since there is no allegation that Saudi Arabia ordered the attack or authorized Al-Shamrani to use a weapon on base or even to individually possess one for any purpose related to his job (ECF No. 5 at ¶ 156), these terrorist acts were clearly malicious and personal.

[25] It is also worth noting Plaintiffs' allegation that Al-Shamrani "was radicalized years before joining the RSAF." ECF No. 5 at ¶ 341.   If this is true, it demonstrates an even greater disconnect between his radical beliefs and his *employment*.

of Al-Shamrani, or based on the CLO's inadequate supervision of Al-Shamrani while in the United States. The Magistrate Judge concluded that these allegations do not provide a basis for invoking the JASTA exception because Plaintiffs' claims of negligence (and gross negligence) are based on omissions, which do not provide a legal basis for invoking the JASTA immunity exception. *See* 28 U.S.C. § 1605B(d). Plaintiffs object to the characterization of their claims as premised on "omissions" but further argue that omissions can support jurisdiction under the JASTA exception if premised on more culpability than mere negligence, such as gross negligence. The undersigned disagrees.

As noted above, the JASTA immunity exception does not subject a foreign state to "the jurisdiction of the courts of the United States under subsection (b) on the basis of an omission or a tortious act or acts that constitute mere negligence" 28 U.S.C. § 1605B(d). This language is clear and unambiguous. The plain meaning of omission is a "failure to do something," as the Magistrate Judge correctly noted. ECF No. 54 at 23; *see also* Garner's Dictionary of Legal Usage 632 (3d ed. 2011) (defining "omission" as "ordinarily denoting the failure to do something"). Plaintiffs have not cited any authority supporting an interpretation of this phrase that would allow suit based on a "reckless" or "gross" omission, and the undersigned has found none. Moreover, as the statutory phrase is structured, the term "omission" stands on

its own, neither preceded by nor immediately followed by any limiting modifier. *See generally Lockhart v. United States*, 577 U.S. 347, 351 (2016) (under the "rule of the last antecedent," a limiting clause or phrase is ordinarily read as modifying only the noun or phrase immediately preceding it, not words or phrases more remote). The undersigned's *de novo* review of the Amended Complaint confirms that Plaintiffs' allegations are all phrased as a failure of the foreign state and/or its agent(s) to do something, which does not satisfy JASTA.[26]

c. Material Support & the Element of Causation. Plaintiffs also allege that their injuries were "caused by" Saudi Arabia's tortious acts of harboring Al-Shamrani (a terrorist and AQAP member) within its military and providing material support both to Al-Shamrani and AQAP (a designated terrorist organization), such

---

[26] To the extent there are allegations that Saudi Arabia knew of Al-Shamrani's affiliation with AQAP, ECF No. 5 ¶ 144, or that the CLO knew Al-Shamrani had an unauthorized weapon, *id*. at ¶ 156, and failed to take action, these allegations are nonetheless based on omissions (the failure to do something about it), and in any event, the allegations of knowledge are conclusory in nature and not supported by any reasonably sufficient factual allegations. *See Mamani v. Berzain*, 654 F.3d 1148, 1153-54 (11th Cir. 2011) (stating that claims under the Alien Tort Statute based on allegations that a defendant leader or official "knew or should have known" of wrongful acts and failed in his duty to prevent it are "[e]asy to say about leaders of nations, but without adequate factual support of more specific acts by *these* defendants, these bare allegations are not entitled to be assumed as true") (internal marks omitted, emphasis in original). The allegations that Al-Shamrani shared his plans with fellow cadets the night before the attack show no basis for vicarious liability. The CLO was not present to know this and unlawfully retain him based on it, and any failure to perform a duty to report on the part of the trainees would have been a mere omission. The trainees' "participation" in planning is alleged only in conclusory terms, and there is no allegation that any trainee or RSAF official and/or agent participated in the attack itself or approved, ordered, or facilitated the attack.

as funding, weapons, and training.[27]  The Magistrate Judge concluded that proximate cause is the appropriate legal standard for causation under § 1605B(b) and that Plaintiffs' allegations were insufficient to establish proximate cause between Saudi Arabia's conduct and the NAS Pensacola attack.

Plaintiffs alleged that Saudi Arabia provided material support in the form of financing and training to Al-Shamrani.  Specifically, they alleged that Saudi Arabia "knew" Al-Shamrani was affiliated with AQAP because he had made social media comments, he was "extensively vetted" prior to joining the RSAF (contrary to their allegations that he was insufficiently vetted), and Saudi Arabia has engaged in surveillance of its citizens on social media or websites (although they also alleged that Saudi Arabia failed to appropriately monitor Al Shamrani's social media). Plaintiffs argue that the Magistrate Judge failed to discuss these allegations.  The undersigned disagrees.  While not listing them explicitly in the material support

---

[27] *See* 18 U.S.C. §§ 2339 (harboring or concealing a person one knows or has reasonable grounds to believe has committed or is about to commit an act of terrorism); 2339A (providing material support or resources intended to be used in an act of terrorism, including money, training, lodging, safehouses); 2339B (providing material support to designated foreign terrorist organizations); 1339C (prohibiting the financing of terrorism, directly or indirectly, with the intention or knowledge that the funds will be  used to carry out an act of terrorism). These torts require knowledge that the materials provided will be used to support a designated terrorist organization or an act of terrorism. *See generally Holder v. Humanitarian L. Project*, 561 U.S. 1, 16 (2010) (discussing knowledge requirement of § 2339B); *In re Chiquita Brands Int'l, Inc*., 284 F. Supp. 3d 1284, 1307–1309 (S.D. Fla. 2018) (discussing intent requirements under ATA provisions).

analysis, the Magistrate Judge clearly considered these allegations, but he found them conclusory and insufficient to show that any tortious act of Saudi Arabia proximately caused Al-Shamrani's terrorist attack.  On *de novo* review, the only support allegedly given to Al-Shamrani was through his job as an RSAF member, and the allegations that Saudi Arabia knew he was an AQAP operative because he had expressed extremist views and some citizens were subject to surveillance are both conclusory and speculative; there is no sufficient factual allegation from which to reasonably infer that Saudi Arabia knew Al-Shamrani was a terrorist intending to attack the United States.

The Magistrate Judge also found proximate cause lacking as to AQAP. Plaintiffs object, arguing that the Magistrate Judge improperly required a higher burden of proximate cause than necessary at the jurisdictional stage, citing *In re Terrorist Attacks*, 298 F. Supp. 3d at 645 n.8 ("It is well settled that jurisdictional causation under the FSIA is distinct from and more liberal than the substantive causation elements of any one claim.").  On *de novo* review, the undersigned concludes that the Magistrate Judge correctly applied the proximate cause standard as articulated in *In re Terrorist Attacks*.  While this jurisdictional standard may not be as stringent as a "but for" requirement, *see id.*, it still requires "some reasonable connection" to show that the damages alleged were "caused by" the foreign state's

act.[28]  *Id.* at 645–46 (interpreting § 1605B(b) and quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 778 (D.C. Cir. 2017), *vacated and remanded sub nom on other grounds*, *Opati v. Republic of Sudan*, 590 U.S. 418 (2020)).  This is met by showing that the defendant's conduct was (1) a "substantial factor in the sequence of events that led to plaintiff's injury" and (2) that the injury was "reasonably foreseeable or anticipated as a natural consequence of the defendant's actions."  *Id.* at 646 (also noting that the causal link is insufficient if it is "so attenuated that the consequence is more aptly described as mere fortuity" (quoting *Paroline v. United States*, 572 U.S. 434, 445 (2014)).  The Magistrate Judge required nothing more.

Turning to the allegations of material support to AQAP (a designated foreign terrorist organization), Plaintiffs assert:  "Saudi Arabia and AQAP are currently fighting side-by-side in the Yemen war against the Houthis movement," and "Saudi Arabia has provided AQAP with significant resources in connection with the Yemen civil war including weapons and military equipment as well as intelligence and financial support."  ECF No. 5 at ¶86.  Also, Plaintiffs allege that certain Saudi

---

[28] The court in *In re Terrorist Attacks* rejected a more stringent "but for" standard in favor of the traditional proximate cause standard.  298 F. Supp. 3d at 645–46 (citing *Owens*, 864 F.3d at 794; *Rux v. Republic of Sudan*, 461 F.3d 461, 466 (4th Cir. 2006); and *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1124 (D.C. Cir. 2004)).

citizens have been members or leaders in AQAP.[29]  Although these allegations show some general connections between Saudi Arabia and AQAP, the only nonconclusory allegations are limited to the conduct of private citizens or mutual efforts to defeat the Houthis movement in the "ongoing civil war in Yemen."  *Id.*  Reviewing the allegations *de novo*, the undersigned concludes as a matter of law that these connections are too remote and tenuous to demonstrate that Saudi Arabia's actions were a "substantial factor in the sequence of events" leading to the NAS Pensacola attack or that the attack was "reasonably foreseeable" to Saudi Arabia based on its activities in connection with Yemen.  Furthermore, there are no "specific, non-conclusory allegations," *In re Terrorist Attacks*, 298 F. Supp. 3d at 647, that Saudi Arabia or any particular government employee or agent acting within the scope of his/her employment provided material support directly to AQAP, and certainly no

---

[29] Plaintiffs' allegations reference a wide variety of news articles about the Yemen conflict and one excerpt of congressional testimony indicating that Saudi Arabia or some Saudi individuals may have a "relationship" with AQAP in relation to the Yemen war.  *See also* ECF No. 39 (exhibits).  The allegations also state only in conclusory terms that "Saudi Arabian government actors and agents have given al-Qaeda and other Islamic extremist material support and resources." ECF No. 5 ¶106.  They also allege that individual "Saudi Arabian donors and sympathizers remain a critical financial support base of al-Qaeda and constitute the most significant source of funding to al-Qaeda," *id.*, which does not implicate any government official.

allegation that any support was provided *for the planning of this or any attack in the United States*.[30]

Plaintiffs argue that foreseeability of *this particular terrorist attack* is not required where material support is knowingly provided to a designated terrorist organization.  This is incorrect for jurisdictional purposes under § 1605(b), which requires *injury in the United States*.  Plaintiffs rely on ATA cases discussing the standards for providing material support to a terrorist organization through aiding and abetting.  *See Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 858–61 (2d Cir. 2021) (allegation that financial defendant knowingly provided material support to a known terrorist organization was sufficient to show a general awareness that its money laundering banking services were playing a role in terrorist activities); *Linde v. Arab Bank, PLC*, 882 F.3d 314, 332 (2d Cir. 2018) (stating the newly enacted aiding and abetting claim requires a general awareness of the defendant's role in an "overall illegal activity" from which an "act of international terrorism" is a foreseeable risk).  These cases are inapposite because they did not involve any

---

[30] The Magistrate Judge also provided specific examples in the R&R of other cases where the allegations were found sufficient and concluded the instant case "pales in comparison" to allegations that have been found to be sufficient in other cases.  ECF No. 54 at 32–35.  Even if the allegations were sufficient to show material support, Saudi Arabia has denied those allegations, and Plaintiffs have failed to produce evidence in support or to show a specific or targeted allegation that could be proven with limited jurisdictional discovery.

question of overcoming sovereign immunity under § 1605B(b), which by its express

terms does not reference aiding and abetting.[31]  Instead, § 1605(b) requires that the

injury be "caused by" a tortious act of *the foreign state* or its employee or agent

acting within the scope of employment, and causing injury in the United States, to

overcome sovereign immunity, and reasonable foreseeability is a part of that

proximate causation equation.  As the Magistrate Judge concluded, there does not

need to be a direct connection between the acts of the foreign state and the act of

terrorism, but there must be a "reasonable" one.  *See In re Terrorist Attacks*, 298 F.

Supp. 3d at 645.  This demands some showing that the alleged support in the war in

Yemen was a substantial factor in the sequence of events *leading to* Al-Shamrani's

---

[31] The courts in *Kaplan* and *Linde* were considering a provision of JASTA that amended the ATA by adding secondary liability against a "person" who aids and abets terrorism by knowingly providing substantial assistance.  18 U.S.C. § 2333(d)(2).  The amendment states specifically that "person" is determined as defined in 1 U.S.C. § 1 (defining "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals").  A foreign state is not included in that definition of "person" and "aiding and abetting" is not included in the JASTA foreign immunity exception.  As explained in the *In re Terrorist Attacks* MDL, JASTA does not create aiding and abetting liability against foreign states. *See In re Terrorist Attacks on September 11, 2001*, No. 03MDL1570GBDSN, 2023 WL 1797629, at *8 (S.D.N.Y. Feb. 7, 2023) ("Congress considered and amended foreign sovereign immunity in one section of the [JASTA] but provided no explicit waiver of foreign sovereign immunity in its aiding-and-abetting amendment." which is codified at § 2333(d)(2)), *reconsideration denied*, No. 03MDL1570GBDSN, 2023 WL 2971480 (S.D.N.Y. Apr. 17, 2023).  Although substantive liability under the ATA is not at issue, the Court finds this textual analysis persuasive.  But importantly at this jurisdictional stage, aiding and abetting a designated terrorist organization based on a potentially lesser "general awareness" substantive standard is simply not included in § 1605B(b) as a basis for overcoming sovereign immunity.

attack *and* some reasonably foreseeable consequence in the United States, which is not plausible on the allegations of the Amended Complaint; or some showing that it was reasonable to foresee that AQAP would act as Saudi Arabia's *agent* in carrying out an attack in the United States, which Plaintiffs have not even alleged. The undersigned agrees with the Magistrate Judge that on these allegations, "[c]onnecting any conduct by Saudi Arabia to the NAS-P attack requires the stacking of inference, upon inference, upon inference," which amounts to no more than speculation.  ECF No. 54 at 31.

## 2.    Noncommercial Tort Exception, 28 U.S.C. § 1605(a)(5)

Plaintiffs also assert that the FSIA's noncommercial tort exception applies based on the CLO's negligence, namely, his failure to follow rules regarding adequate supervision.  Under the FSIA, a foreign state has no immunity from suit for personal injury or death "occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment."  28 U.S.C. § 1605(a)(5). This exception, unlike the JASTSA exception of § 1605B(b), authorizes jurisdiction for *any* tortious act, even a negligent one, or an omission; but its application is limited by the "discretionary function exception," § 1605(a)(5)(A), and the "entire tort rule," *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109,

115–16 (2d Cir. 2013) ("the 'entire tort' must be committed in the United States") (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 441 (1989)).

The term "discretionary function" is not defined in the FSIA, but there is no dispute that courts apply a two-part inquiry to decide the issue, requiring consideration of: (1) "whether the challenged action involved an element of choice or judgment" or the course of action is mandated by a federal statute, regulation, or policy, and (2) if judgment is exercised, "whether the choice or judgment was one involving social, economic or political policy."[32] *O'Bryan v. Holy See,* 556 F.3d 361, 383 (6th Cir. 2009) (internal quotations omitted) (citing *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (explaining that the discretionary function exception "protects only governmental actions and decisions based on considerations of public policy")).  As noted by the Magistrate Judge, case law is clear that decisions related to the hiring and supervision of employees are discretionary functions because (1) these decisions involve an element of judgment and (2) are the type of policy judgments the FSIA discretionary exclusion is designed

---

[32] "[C]ourts typically apply the interpretation of the discretionary function exception of the Federal Tort Claims Act (FTCA)" in the FSIA context because the same language is used in both statutes, and the FTCA is referenced in the FSIA's legislative history.  *O'Bryan v. Holy See,* 556 F.3d 361, 383 (6th Cir. 2009).

to shield.  *See, e.g. id.* at 384; *Andrews v. United States*, 121 F.3d 1430, 1441 (11th Cir. 1997) ("courts have recognized that decisions regarding the exercise of supervisory authority are of the sort the discretionary function exception was designed to encompass"); *Burkhart v. Washington Metro. Area Transit Auth.,* 112 F.3d 1207, 1217 (D.C. Cir. 1997) (stating "hiring, training, and supervision choices" are the type that are "susceptible to policy judgment."); *Carlyle v. United States, Dep't of Army*, 674 F.2d 554, 556-57 (6th Cir. 1982) (the manner of supervising army recruits "was a planning level, discretionary function"); ECF No. 54 at 42-43 (citing cases).

Plaintiffs do not argue that hiring, retaining and supervising employees are not discretionary acts but argue instead that in this case, Saudi Arabia was subject to mandatory United States Navy regulations and policies that removed the CLO's discretion, and consequently, the tort claims are not barred by the discretionary function exception.  The Magistrate Judge carefully reviewed the regulations and manuals that Plaintiffs cited in the Amended Complaint and attached to their response and concluded that in fact they do not impose a mandatory obligation on Saudi Arabia to properly screen, hire, train or supervise its trainees.  *See* ECF No. 54 at 43-47.  Instead, the Joint Security Cooperation Education and Training Manual, the Security Assistance Management Manual, the Flight Student Training

Administration Manual, the NAS-P Personal Firearms Policy, the VT-86 Commanding Officer's Violence Prevention Policy, and the NAS-P International Miliary Student Liberty Policy are aimed at the United States military or student conduct. In their objections, Plaintiffs cite to these same regulations and policy manuals but do not argue any particular error in the Magistrate Judge's review of them, and the undersigned's *de novo* review reveals nothing to the contrary either. While these manuals may have imposed obligations on Al-Shamrani as a student and contemplated that a CLO may be assigned to assist trainees, they do not mandate conduct by Saudi Arabia. Because no United States federal statute or military regulation or policy mandates conduct by Saudi Arabia or the CLO in these areas, and supervision and training are the type of duties that require the exercise of judgment and policy-level decisions subject to protection under the discretionary function exception, Plaintiffs have not satisfied the noncommercial tort exception. *See O'Bryan,* 556 F.3d 384. The Magistrate Judge's discussion and decision are adopted.[33]

---

[33] Because the discretionary function exception bars jurisdiction over the noncommercial torts, the undersigned finds no need to discuss the entire tort rule, except to briefly note agreement with the Magistrate Judge that this also would bar the claim. Saudi Arabia's alleged failure to supervise Al-Shamrani during the months preceding the attack did not take place entirely within the United States because the CLO had returned to Saudi Arabia and was no longer present on base. *See O'Bryan*, 556 F.3d at 387 (concluding claims of negligent supervision of clergy by the Holy See could not proceed under the one tort rule because its supervision would not have occurred

### 3.      Commercial Activity Exception, 28 U.S.C. § 1605(a)(2)

Another FSIA exception applies to commercial activity. *See* 28 U.S.C.

§ 1605(a)(2).  Under this exception, a foreign state is subject to federal jurisdiction

in a case in which the action is "based upon" (1) "a commercial activity carried on

in the United States by the foreign state;" (2) "an act performed in the United States

in connection with a commercial activity of the foreign state elsewhere," or (3) "an

act outside the United States in connection with a commercial activity of the foreign

state and that act causes a direct effect in the United States."  *Id.*; *Devengoechea*,

889 F.3d at 2220.  Significantly, for a claim to be "based upon" commercial activity,

the commercial activity alleged must be the gravamen of the action.  *See OBB*

*Personenverkehr AG v. Sachs*, 577 U.S. 27, 34 (2015) ("an action is 'based upon'

the 'particular conduct' that constitutes the 'gravamen' of the suit"); *Saudi Arabia*

*v. Nelson*, 507 U.S. 349, 357 (1993) (requiring "something more than a mere

connection with or relation to commercial activity").  An activity of a foreign state

is commercial in nature if it is "the type of action[] by which a private party engages

in 'trade and traffic or commerce'" and not the type of action that requires the

---

in the United States, but finding the noncommercial tort exception was met for liability premised
on supervisors who were located within the United States).

exercise of "powers peculiar to sovereigns."[34] *Devengoechea*, 889 F.3d at 1221 (quoting *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)). The focus is on the foreign state's actions, not its motives. *Id.*

Plaintiffs argue that their claims of negligence (Count 14) and third-party breach of contract (Count 19) are "based upon" a commercial transaction—that is, Saudi Arabia's purchase of goods and services from the United States, which governs their relationship. The Magistrate Judge disagreed, concluding that (1) Saudi Arabia's alleged contract for military arms and training of its servicemembers is not commercial but instead amounts to an exercise of sovereign power, citing *UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210, 216–17 (5th Cir. 2009) ("Maintaining an air defense system is a similarly sovereign act."); *MCI Telecommunications Corp. v. Alhadhood*, 82 F.3d 658, 664 (5th Cir. 1996) (finding that "a military training agreement between two sovereign parties" was not commercial in nature), and (2) that even if the program could qualify as commercial, the gravamen of this lawsuit is decidedly not "based upon" commercial activity within the meaning of § 1605(a)(2). Plaintiffs object, arguing that their negligence

---

[34] For instance, regulating limits on foreign currency exchange is a sovereign activity that cannot be exercised by a private party, but "a contract to buy army boots or even bullets is a commercial activity because private companies can similarly use sales contracts to acquire goods." *Weltover,* 504 U.S. at 614–15.

and breach of contract claims are based on a commercial contract and that the Magistrate Judge erred by improperly looking to the "purpose" of the transaction as opposed to its "nature." They argue that the "motive" behind the transaction is not relevant, *see Devengoechea*, 889 F.3d at 1221, and that Saudi Arabia's failure to fulfill the terms of its commercial contract, *i.e.*, failure to properly vet and supervise Al-Shamrani, is the "gravamen" of the suit.  On *de novo* review, the undersigned finds these arguments unavailing in light of settled law and the facts alleged and adopts the reasoning and conclusion of the Magistrate Judge.

Foremost, the Magistrate Judge's decision is not based on motive but on the inherently sovereign *nature* of the agreement. As described in the Amended Complaint,[35] "[t]hese sales provide the foreign customers with a complete defense capability that includes training, sustainment, and contractor logistics support," and "[p]art and parcel of these sales agreements is the critical training and education necessary to use these sophisticated products."  ECF No. 5 at ¶ 46. 50.  Plaintiffs further allege that "[p]rogram management, trainers, simulators, travel, billeting, and medical support may also be included as components of the sales," and that Al-Shamrani was present at NAS Pensacola to complete all of his aviation training.  *Id.*

---

[35] While the agreement is not in the record, the Court accepts Plaintiffs' allegations regarding its nature.

¶¶ 55, 56, 58.  Through this agreement, RSAF personnel are trained on equipment, language, and aviation skills at a secure United States Navy base alongside United States servicemembers, aiding Saudi Arabia in developing an air defense system. This cooperative arrangement necessarily involves the exercise of sovereign judgment and powers of a type that "cannot be exercised by private citizens" and thus is not commercial in nature.  *See Devengoechea*, 889 F.3d at 1221; *UNC Lear Servs.*, 581 F.3d at 216.

The Court rejects Plaintiffs' reliance on *Simon v. Republic of Hungary*, 443 F. Supp. 3d 88, 110 (D.D.C. 2020), *aff'd in part, remanded in part*, 77 F.4th 1077 (D.C. Cir. 2023), as misplaced.  There, the court determined that Hungary's military equipment purchases, including airplanes, munitions, electronics and armaments, from the United States' foreign military sales program, were simply commercial contracts for goods.  *Id.* (citing *Weltover*, 504 U.S. at 614, and stating "a contract to buy army boots" is commercial in nature).  Here, by contrast, the agreement between the United States and Saudi Arabia, as alleged, included an interwoven cooperative training relationship between two sovereign countries that was not at issue in *Simon* and could not be purchased by an ordinary citizen.

Because the agreement alleged is not commercial in nature, there is no need to consider Plaintiffs' argument that the gravamen of their causes of action for

negligence and contract are "based upon" a commercial transaction. That said, the Magistrate Judge also ruled alternatively on the issue, and the undersigned agrees with his conclusion. The Supreme Court has made it clear that instead of "individually analyzing" each cause of action, courts must "zero[] in on the core of the[] suit." *OBB Personenverkehr*, 577 U.S. at 34 (stating *Nelson* "teaches that an action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit"). Viewing the 170-page Amended Complaint as a whole, all of Plaintiffs' claims of injury turn on the one "tragic episode," *id.*, which is Al-Sharmrani's act of terrorism in the United States, not a commercial activity. As the Magistrate Judge concluded, there is no plausible way this Court could say that the claims are "based upon" contract or any act in connection with commercial activity.[36]  *See* ECF No. 54 at 54 ("Plaintiffs' lawsuit is not about some commercial deal gone bad."). The objection is overruled.

### 4.    Waiver Exception, 28 U.S.C. § 1605(a)(1)

The final FSIA exception invoked by Plaintiffs is waiver. A foreign state is not immune in any case "in which [it] has waived its immunity either explicitly or

---

[36] Additionally, because the gravamen of the suit can be determined based on the allegations as a whole, the Court finds no clear error in the denial of discovery to obtain the contract.

by implication." 28 U.S.C. § 1605(a)(1).   Both explicit and implicit waivers of sovereign immunity are "narrowly construed," and a waiver must be clear and unambiguous.  *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 691 (D.C. Cir. 2022); *see also Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991) (requiring waiver to be "unmistakable" and "unambiguous"); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990) (FSIA legislative history noted courts have found implied waiver of sovereign immunity if the foreign state agreed to arbitration in another country, agreed that the law of a particular country governed a contract, or filed a responsive pleading without raising the defense of sovereign immunity).

Plaintiffs rely on a sample LOA stating it is subject to United States law and regulation, including procurement law, and argue that Saudi Arabia's conduct after the attack demonstrates waiver by verbally agreeing to cooperate in the investigation and to compensate victims (as alleged through statements of the Attorney General and former President Trump).   The Magistrate Judge rejected the arguments, reasoning that no clear waiver appears in the terms of the standard form LOA, which incorporates United States regulations and procurement law but instead indicates that any dispute will be resolved through "consultations" between the parties..

Plaintiffs' only objection is that they were denied discovery to obtain the actual contract to see whether there are any terms of waiver; they do not know whether it contains an express waiver of immunity. The denial of discovery is not clearly erroneous or contrary to law. Jurisdictional discovery in the FSIA context is "ordered circumspectly and only to verify specific facts crucial to an immunity determination." *Butler*, 579 F.3d at 1314; *see also Sequeira v. Republic of Nicaragua*, 815 F. App'x 345, 351–52 (11th Cir. 2020) (stating that although district courts have "a range of choice" regarding discovery, jurisdictional discovery against a foreign state must be "used only to confirm specific factual allegations" and must "not cause the undue burdens that foreign sovereign immunity is designed to prevent."). This requires courts to balance the need "for discovery to substantiate exceptions . . . against the need to protect a sovereign's or sovereign agency's legitimate claim to immunity from discovery," *Butler*, 579 F.3d at 1314 (internal quotations and alterations omitted). In other words, the party seeking jurisdictional discovery from a foreign sovereign must first articulate a nonconclusory and "reasonable basis" for jurisdiction, *In re Terrorist Attacks*, 298 F. at 641, and "a likelihood that additional supplemental facts will make jurisdiction proper," *Doe v. Bin Laden*, 580 F. Supp. 2d 93, 96 (D.D.C. 2008) (internal marks omitted).

Plaintiffs relied on and cited the standard LOA form in their response to the motion, *see* ECF No. 39 at 79, and they referenced it in the Amended Complaint, ECF No. 5 at 23 ¶¶ 51, 52, 53, 54.  Because neither the terms of the LOA nor the public statements alleged support any finding of express or implied waiver of sovereign immunity—conclusions also reached by the Magistrate Judge and to which Plaintiffs do not specifically object—no allegations support their request for discovery.  Plaintiffs are seeking discovery based only on speculation.[37]

In sum, the role of the Court is limited by the jurisdictional dictates set forth by Congress to protect a foreign state's sovereignty, notwithstanding the gravity of this tragic and horrific terrorist attack.

Accordingly:

1.     The R&R, ECF No. 54, is adopted as discussed herein and all objections are **OVERRULED.**

2.     Saudi Arabia's Motion to Dismiss based on sovereign immunity, ECF No. 46, is **GRANTED**, and the case is **DISMISSED.**

---

[37] The undersigned summarily denies all objections regarding discovery and finds no error, let alone clear error, in the Magistrate Judge's denial of discovery.  Given the Plaintiffs' failure to adequately allege a nonconclusory and reasonable basis for jurisdiction based on an FSIA exception, discovery is both unnecessary and unwarranted.

CASE NO. 3:21cv329-MCR-ZCB

3.     Plaintiffs Motion for Jurisdictional Discovery, ECF No. 43, is

**DENIED**.

4.     The Clerk is directed to close the file.

**DONE AND ORDERED** this 30th day of March 2024.


*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**