**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

BENJAMIN WATSON JR, et al.

USDC NO.  3:21CV00329-MCR-ZCB

Vs

KINGDOM OF SAUDI ARABIA          USCA NO.  _____


**TRANSMITTAL OF NOTICE OF INTERLOCUTORY APPEAL**

The following documents are hereby transmitted to the Clerk, U. S. Court of Appeals. The Certified copy of the appeal notice, docket entries, judgment/opinion/order appealed from are enclosed.


Judge Appealed From:      Judge M. CASEY RODGERS

Appellate Docket Fee:      Paid

Court Reporters:            N/A
Cert of Appealability:
Appeal as to:              Doc #73 Judgment
                           Doc #72 Order Adopting R & R
                           Doc #54 Report and Recommendation


JESSICA J. LYUBLANOVITS,
CLERK OF COURT

By:   A'Donna Bridges
Deputy Clerk
1 North Palafox Street
April 29, 2024          Pensacola, Florida 32502-5658

CLOSED,APPEAL,R&R

# U.S. District Court
## Northern District of Florida (Pensacola)
## CIVIL DOCKET FOR CASE #: 3:21-cv-00329-MCR-ZCB
## Internal Use Only

WATSON et al v. KINGDOM OF SAUDI ARABIA
Assigned to: JUDGE M CASEY RODGERS
Referred to: MAGISTRATE JUDGE ZACHARY C BOLITHO
Cause: 28:1331 Fed. Question: Personal Injury

Date Filed: 02/22/2021
Date Terminated: 03/31/2024
Jury Demand: None
Nature of Suit: 360 P.I.: Other
Jurisdiction: Federal Question

**Plaintiff**

**BENJAMIN WATSON, JR**
*INDIVIDUALLY AND AS EXECUTOR OF
THE ESTATE OF JOSHUA KALEB
WATSON*

represented by   **ANDREW J MALONEY , III**
KREINDLER & KREINDLER LLP - NEW
YORK NY
485 LEXINGTON AVENUE
28TH FLOOR
NEW YORK, NY 10017
212-687-8181
Email: amaloney@kreindler.com
*ATTORNEY TO BE NOTICED*

**DANIEL O ROSE**
KREINDLER & KREINDLER LLP - NEW
YORK NY
485 LEXINGTON AVENUE
28TH FLOOR
NEW YORK, NY 10017
212-973-3414
Email: drose@kreindler.com
*ATTORNEY TO BE NOTICED*

**JAMES PAUL KREINDLER**
KREINDLER & KREINDLER LLP - NEW
YORK NY
485 LEXINGTON AVENUE
28TH FLOOR
NEW YORK, NY 10017
212-687-8181
Fax: 212-972-9432
Email: jkreindler@kreindler.com
*ATTORNEY TO BE NOTICED*

**MATTHEW SCOTT MOKWA**
MAHER LAW FIRM PA - WINTER PARK
FL
398 WEST MORSE BOULEVARD
SUITE 200
WINTER PARK, FL 32789
407-839-0866

Email: mmokwa@maherlawfirm.com
*ATTORNEY TO BE NOTICED*

**MICHAEL CHARLES MAHER**
THE MAHER LAW FIRM - WINTER
PARK FL
271 WEST CATON AVENUE
SUITE 1
WINTER PARK, FL 32789
407-839-0866
Email: mmaher@maherlawfirm.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**SHEILA WILEMON WATSON**                    represented by    **ANDREW J MALONEY , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL O ROSE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JAMES PAUL KREINDLER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MATTHEW SCOTT MOKWA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MICHAEL CHARLES MAHER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**SHANE WALTERS**                            represented by    **DAVID E HARRIS**
*INDIVIDUALLY AND AS CO-EXECUTOR*                              SICO HOELSCHER HARRIS LLP -
*OF THE ESTATE OF CAMERON SCOTT*                              CORPUS CHRISTI TX
*WALTERS AND AS REPRESENTATIVE*                               802 N CARANCAHUA
*AND GUARDIAN OF S L W A MINOR*                               SUITE 900
*CHILD*                                                       CORPUS CHRISTI, TX 78401
                                                             361-653-3300
                                                             Fax: 361-653-3333
                                                             Email: dharris@shhlaw.com
                                                             *ATTORNEY TO BE NOTICED*

**LOUIE JEFFERSON COOK**
SICO HOELSCHER HARRIS LLP -
CORPUS CHRISTI TX
802 N CARANCAHUA
SUITE 900
CORPUS CHRISTI, TX 78401
361-653-3300
Fax: 361-653-3333

Email: lcook@shhlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**AMANDA WALTERS**                        represented by **DAVID E HARRIS**
*INDIVIDUALLY AND AS CO-EXECUTOR*                     (See above for address)
*OF THE ESTATE OF CAMERON SCOTT*                      *ATTORNEY TO BE NOTICED*
*WALTERS AND AS REPRESENTATIVE*
*AND GUARDIAN OF L N W A MINOR*                        **LOUIE JEFFERSON COOK**
*CHILD*                                                (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**S L W**                                 represented by **DAVID E HARRIS**
*A MINOR CHILD*                                        (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **LOUIE JEFFERSON COOK**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**L N W**                                 represented by **DAVID E HARRIS**
*A MINOR CHILD*                                        (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **LOUIE JEFFERSON COOK**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**DUSTIN WALTERS**                        represented by **DAVID E HARRIS**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **LOUIE JEFFERSON COOK**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**MASON WALTERS**                         represented by **DAVID E HARRIS**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **LOUIE JEFFERSON COOK**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**SAMEH HAITHAM**                         represented by **DAVID E HARRIS**
*INDIVIDUALLY AND AS CO-EXECUTOR*                     (See above for address)
*OF THE ESTATE OF MOHAMMED*                           *ATTORNEY TO BE NOTICED*
*SAMEH HAITHAM AND AS*

*REPRESENTATIVE AND GUARDIAN OF S*
*S H A MINOR CHILD AND S S H II A*
*MINOR CHILD*

**LOUIE JEFFERSON COOK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MATTHEW SCOTT MOKWA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MICHAEL CHARLES MAHER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EVELYN BRADY**                          represented by   **ANDREW J MALONEY , III**
*INDIVIDUALLY AND AS CO-EXECUTOR*                     (See above for address)
*OF THE ESTATE OF MOHAMMED*                           *ATTORNEY TO BE NOTICED*
*SAMEH HAITHAM*

**DANIEL O ROSE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JAMES PAUL KREINDLER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MATTHEW SCOTT MOKWA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MICHAEL CHARLES MAHER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**S S H**                                represented by   **DAVID E HARRIS**
*A MINOR CHILD*                                       (See above for address)
*ATTORNEY TO BE NOTICED*

**LOUIE JEFFERSON COOK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**S S H, II**                            represented by   **DAVID E HARRIS**
*A MINOR CHILD*                                       (See above for address)
*ATTORNEY TO BE NOTICED*

**LOUIE JEFFERSON COOK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SHADIN HAITHAM**

represented by **DAVID E HARRIS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LOUIE JEFFERSON COOK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOHN ROBERT BRADY**

represented by **ANDREW J MALONEY , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL O ROSE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JAMES PAUL KREINDLER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MATTHEW SCOTT MOKWA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MICHAEL CHARLES MAHER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**IRVIN LAWRENCE, JR**

represented by **ANDREW J MALONEY , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL O ROSE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JAMES PAUL KREINDLER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MATTHEW SCOTT MOKWA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MICHAEL CHARLES MAHER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GEORGE JOHNSON**

represented by **ANDREW J MALONEY , III**
(See above for address)

*ATTORNEY TO BE NOTICED*

**DANIEL O ROSE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JAMES PAUL KREINDLER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MATTHEW SCOTT MOKWA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MICHAEL CHARLES MAHER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BREANNA THOMAS**                      represented by   **ANDREW J MALONEY , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL O ROSE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JAMES PAUL KREINDLER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MATTHEW SCOTT MOKWA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MICHAEL CHARLES MAHER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RYAN BLACKWELL**                      represented by   **ANDREW J MALONEY , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL O ROSE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JAMES PAUL KREINDLER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KRIS ELLIOTT**
ELLIOTT LAW FIRM PA - GULF

BREEZE FL
362 GULF BREEZE PKWY STE 118
GULF BREEZE, FL 35621
850-677-0567
Fax: 850-254-7822
Email: kris@elflaw.com
*ATTORNEY TO BE NOTICED*

**MATTHEW SCOTT MOKWA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MICHAEL CHARLES MAHER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CARLY BLACKWELL**                    represented by    **ANDREW J MALONEY , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL O ROSE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JAMES PAUL KREINDLER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KRIS ELLIOTT**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MATTHEW SCOTT MOKWA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MICHAEL CHARLES MAHER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**KRISTY LEHMER**                    represented by    **ANDREW J MALONEY , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL O ROSE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JAMES PAUL KREINDLER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MATTHEW SCOTT MOKWA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MICHAEL CHARLES MAHER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JESSICA PICKETT**                    represented by   **ANDREW J MALONEY , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL O ROSE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JAMES PAUL KREINDLER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MATTHEW SCOTT MOKWA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MICHAEL CHARLES MAHER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CURTIS PICKETT**                    represented by   **ANDREW J MALONEY , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL O ROSE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JAMES PAUL KREINDLER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MATTHEW SCOTT MOKWA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MICHAEL CHARLES MAHER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHARLES HOGUE**                    represented by   **WILLIAM FRANKLIN CASH , III**
LEVIN PAPANTONIO RAFFERTY -
PENSACOLA FL

316 S BAYLEN STREET
SUITE 600
PENSACOLA, FL 32502
850-435-7059
Email: bcash@levinlaw.com
*ATTORNEY TO BE NOTICED*

**CHRISTOPHER GUS PAULOS**
LEVIN PAPANTONIO RAFFERTY -
PENSACOLA FL
316 S BAYLEN STREET
PENSACOLA, FL 32502
850-435-7067
Email: cpaulos@levinlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MATTHEW TINCH**                    represented by  **WILLIAM FRANKLIN CASH , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CHRISTOPHER GUS PAULOS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JESSICA TINCH**                    represented by  **WILLIAM FRANKLIN CASH , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CHRISTOPHER GUS PAULOS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JONATHAN GLASS**                   represented by  **WILLIAM FRANKLIN CASH , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CHRISTOPHER GUS PAULOS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOY GLASS**                        represented by  **WILLIAM FRANKLIN CASH , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CHRISTOPHER GUS PAULOS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **MATTHEW HOUSAM** | represented by | **WILLIAM FRANKLIN CASH , III**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **CHRISTOPHER GUS PAULOS**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **MICHAEL HOYLAND** | represented by | **WILLIAM FRANKLIN CASH , III**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **CHRISTOPHER GUS PAULOS**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **THOMAS C BORTNER** | represented by | **WILLIAM FRANKLIN CASH , III**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **CHRISTOPHER GUS PAULOS**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **GRANT LOPEZ** | represented by | **WILLIAM FRANKLIN CASH , III**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **CHRISTOPHER GUS PAULOS**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **HEATHER LOPEZ** | represented by | **WILLIAM FRANKLIN CASH , III**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **CHRISTOPHER GUS PAULOS**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **MATTHEW KEEBLER** | represented by | **WILLIAM FRANKLIN CASH , III**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **CHRISTOPHER GUS PAULOS**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

**KRYSTENA KEEBLER**                          represented by   **WILLIAM FRANKLIN CASH , III**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **CHRISTOPHER GUS PAULOS**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**KINGDOM OF SAUDI ARABIA**                   represented by   **ANDREW C SHEN**
                                                              KELLOGG HANSEN TODD ET AL -
                                                              WASHINGTON DC
                                                              1615 M STREET NW
                                                              SUITE 400
                                                              WASHINGTON, DC 20036
                                                              202-326-7963
                                                              Email: ashen@kellogghansen.com
                                                              *ATTORNEY TO BE NOTICED*

                                                              **BENJAMIN H BRODSKY**
                                                              BRODSKY FOTIU-WOJTOWICZ PLLC -
                                                              MIAMI FL
                                                              200 SE 1ST STREET
                                                              SUITE 400
                                                              MIAMI, FL 33131
                                                              305-503-5054
                                                              Fax: 786-749-7644
                                                              Email: bbrodsky@bfwlegal.com
                                                              *ATTORNEY TO BE NOTICED*

                                                              **GREGORY G RAPAWY**
                                                              KELLOGG HANSEN TODD ET AL -
                                                              WASHINGTON DC
                                                              1615 M STREET NW
                                                              SUITE 400
                                                              WASHINGTON, DC 20036
                                                              202-326-7967
                                                              Email: grapawy@kellogghansen.com
                                                              *ATTORNEY TO BE NOTICED*

                                                              **MICHAEL K KELLOGG**
                                                              KELLOGG HANSEN TODD ET AL -
                                                              WASHINGTON DC
                                                              1615 M STREET NW
                                                              SUITE 400
                                                              WASHINGTON, DC 20036
                                                              202-326-7902
                                                              Fax: 202-326-7999
                                                              Email: mkellogg@kellogghansen.com
                                                              *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/22/2021 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number BFLNDC-5955484.), filed by HEATHER LOPEZ, MATTHEW KEEBLER, JESSICA PICKETT, DUSTIN WALTERS, JONATHAN GLASS, SHEILA WILEMON WATSON, BREANNA THOMAS, BENJAMIN WATSON, JR, RYAN BLACKWELL, THOMAS C BORTNER, GEORGE JOHNSON, JESSICA TINCH, JOY GLASS, MATTHEW HOUSAM, KRISTY LEHMER, JOHN ROBERT BRADY, MATTHEW TINCH, EVELYN BRADY, GRANT LOPEZ, S S H, CURTIS PICKETT, SHADIN HAITHAM, CHARLES HOGUE, MICHAEL HOYLAND, L N W, SHANE WALTERS, SAMEH HAITHAM, S S H, II, IRVIN LAWRENCE, JR, MASON WALTERS, AMANDA WALTERS, KRYSTENA KEEBLER, CARLY BLACKWELL, S L W. (Attachments: # 1 SUMMONS FOR KINGDOM OF SAUDI ARABIA) (PAULOS, CHRISTOPHER) (Entered: 02/22/2021) |
| 02/22/2021 | 2 | CIVIL COVER SHEET. (PAULOS, CHRISTOPHER) (Entered: 02/22/2021) |
| 02/23/2021 | 🔒 | (Court only) ***Set Deadline - 90 Day No Activity Deadline set for **5/24/2021**. (blr) (Entered: 02/23/2021) |
| 02/23/2021 | 3 | Summons Issued as to KINGDOM OF SAUDI ARABIA. (blr) (Entered: 02/23/2021) |
| 03/09/2021 | 4 | Summons Returned Unexecuted - refused and returned as to KINGDOM OF SAUDI ARABIA. (blr) (Entered: 03/10/2021) |
| 05/11/2021 | 5 | FIRST AMENDED COMPLAINT against KINGDOM OF SAUDI ARABIA, filed by HEATHER LOPEZ, MATTHEW KEEBLER, JESSICA PICKETT, DUSTIN WALTERS, JONATHAN GLASS, SHEILA WILEMON WATSON, BREANNA THOMAS, BENJAMIN WATSON, JR, RYAN BLACKWELL, THOMAS C BORTNER, GEORGE JOHNSON, JESSICA TINCH, JOY GLASS, MATTHEW HOUSAM, KRISTY LEHMER, JOHN ROBERT BRADY, MATTHEW TINCH, EVELYN BRADY, GRANT LOPEZ, S S H, CURTIS PICKETT, SHADIN HAITHAM, CHARLES HOGUE, MICHAEL HOYLAND, L N W, SHANE WALTERS, SAMEH HAITHAM, S S H, II, IRVIN LAWRENCE, JR, MASON WALTERS, AMANDA WALTERS, KRYSTENA KEEBLER, CARLY BLACKWELL, S L W. (Attachments: # 1 SUMMONS FOR KINGDOM OF SAUDI ARABIA) (PAULOS, CHRISTOPHER) (Entered: 05/11/2021) |
| 05/13/2021 | 6 | Summons Issued as to KINGDOM OF SAUDI ARABIA. (blr) (Entered: 05/13/2021) |
| 05/21/2021 | 7 | MOTION to Appear Pro Hac Vice by James P. Kreindler.( Filing fee $ 208 receipt number AFLNDC-6103452.) by BENJAMIN WATSON, JR. (Attachments: # 1 Exhibit Exhibit A - Certificate of Good Standing) (KREINDLER, JAMES) (Entered: 05/21/2021) |
| 05/24/2021 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 7 MOTION to Appear Pro Hac Vice by James P. Kreindler.( Filing fee $ 208 receipt number AFLNDC-6103452.) (blr) (Entered: 05/24/2021) |
| 05/24/2021 | 🔒 | (Court only) ***Reset Deadline - 90 Day No Activity Deadline set for **8/23/2021**. (blr) (Entered: 05/24/2021) |

| 05/25/2021 | 8 | MOTION to Appear Pro Hac Vice by Andrew J. Maloney, III.( Filing fee $ 208 receipt number AFLNDC-6107095.) by BENJAMIN WATSON, JR. (Attachments: # 1 Exhibit Exhibit A - Certificate of Good Standing) (MALONEY, ANDREW) (Entered: 05/25/2021) |
|---|---|---|
| 05/25/2021 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 8 MOTION to Appear Pro Hac Vice by Andrew J. Maloney, III.( Filing fee $ 208 receipt number AFLNDC-6107095.) (blr) (Entered: 05/25/2021) |
| 05/25/2021 | 9 | ORDER. The Motion to Appear Pro Hac Vice, ECF No. 7, is GRANTED. Attorney James P. Kreindler, of the law firm of Kreindler & Kreindler LLP, is admitted pro hac vice to represent Plaintiffs, pursuant to Local Rule 11.1(C). Signed by JUDGE M CASEY RODGERS on 5/25/2021. (blr) (Entered: 05/25/2021) |
| 05/25/2021 | 10 | ORDER. The Motion to Appear Pro Hac Vice, ECF No. 8, is GRANTED. Attorney Andrew Joseph Maloney, III, of the law firm of Kreindler & Kreindler LLP, is admitted pro hac vice to represent Plaintiffs, pursuant to Local Rule 11.1(C). Signed by JUDGE M CASEY RODGERS on 5/25/2021. (blr) (Entered: 05/25/2021) |
| 05/25/2021 | 🔒 | (Court only) ***Reset Deadline - 90 Day No Activity Deadline set for **8/23/2021**. (blr) (Entered: 05/25/2021) |
| 06/01/2021 | 11 | AFFIDAVIT *REQUESTING FOREIGN MAILING PURSUANT TO 28 U.S.C. 1608(a)(3)* by CARLY BLACKWELL, RYAN BLACKWELL, THOMAS C BORTNER, EVELYN BRADY, JOHN ROBERT BRADY, JONATHAN GLASS, JOY GLASS, S S H, S S H, II, SAMEH HAITHAM, SHADIN HAITHAM, CHARLES HOGUE, MATTHEW HOUSAM, MICHAEL HOYLAND, GEORGE JOHNSON, KRYSTENA KEEBLER, MATTHEW KEEBLER, IRVIN LAWRENCE, JR, KRISTY LEHMER, GRANT LOPEZ, HEATHER LOPEZ, CURTIS PICKETT, JESSICA PICKETT, BREANNA THOMAS, JESSICA TINCH, MATTHEW TINCH, L N W, S L W, AMANDA WALTERS, DUSTIN WALTERS, MASON WALTERS, SHANE WALTERS, BENJAMIN WATSON, JR, SHEILA WILEMON WATSON. (Attachments: # 1 Exhibit A - Letter to Clerk from Counsel) (PAULOS, CHRISTOPHER) (Entered: 06/01/2021) |
| 06/03/2021 | 12 | CERTIFICATE OF MAILING - DHL (blr) (Entered: 06/03/2021) |
| 06/03/2021 | 13 | CERTIFICATE OF MAILING - FEDEX (blr) (Entered: 06/03/2021) |
| 06/10/2021 | 14 | MOTION to Appear Pro Hac Vice by David E. Harris.( Filing fee $ 208 receipt number AFLNDC-6131779.) by S S H, S S H, II, SAMEH HAITHAM, SHADIN HAITHAM, L N W, S L W, AMANDA WALTERS, DUSTIN WALTERS, MASON WALTERS, SHANE WALTERS. (Attachments: # 1 Exhibit A) (HARRIS, DAVID) (Entered: 06/10/2021) |
| 06/11/2021 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 14 MOTION to Appear Pro Hac Vice by David E. Harris.( Filing fee $ 208 receipt number AFLNDC-6131779.) (mb) (Entered: 06/11/2021) |
| 06/11/2021 | 15 | ORDER granting 14 Motion to Appear Pro Hac Vice (Appointed DAVID E HARRIS for Plaintiffs. Attorney David Echols Harris, of the law firm of Sico Hoelscher Harris LLP, is admitted pro hac vice to represent the Plaintiffs in this matter, pursuant to Local Rule 11.1(C). (DAVID E HARRIS for RYAN BLACKWELL, THOMAS C BORTNER, EVELYN BRADY, JOHN ROBERT BRADY, JONATHAN GLASS, JOY GLASS, S S H, S S H, II, SAMEH HAITHAM, SHADIN HAITHAM, CHARLES HOGUE, MATTHEW HOUSAM, |

| | | |
|---|---|---|
| | | MICHAEL HOYLAND, GEORGE JOHNSON, KRYSTENA KEEBLER, MATTHEW KEEBLER, IRVIN LAWRENCE, JR KRISTY LEHMER, GRANT LOPEZ, HEATHER LOPEZ, CURTIS PICKETT, JESSICA PICKETT, BREANNA THOMAS, JESSICA TINCH, MATTHEW TINCH, L N W, S L W, AMANDA WALTERS, DUSTIN WALTERS, MASON WALTERS, SHANE WALTERS, BENJAMIN WATSON, JR, SHEILA WILEMON WATSON). Signed by JUDGE M CASEY RODGERS on 6/11/2021. (mb) (Entered: 06/11/2021) |
| 06/15/2021 | 16 | MOTION to Appear Pro Hac Vice by Louie J. Cook.( Filing fee $ 208 receipt number AFLNDC-6135493.) by S S H, S S H, II, SAMEH HAITHAM, SHADIN HAITHAM, L N W, S L W, AMANDA WALTERS, DUSTIN WALTERS, MASON WALTERS, SHANE WALTERS. (Attachments: # 1 Exhibit A) (COOK, LOUIE) (Entered: 06/15/2021) |
| 06/16/2021 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 16 MOTION to Appear Pro Hac Vice by Louie J. Cook.( Filing fee $ 208 receipt number AFLNDC-6135493.) (blr) (Entered: 06/16/2021) |
| 06/16/2021 | 17 | ORDER. The Motion to Appear Pro Hac Vice, ECF No. 16 , is GRANTED. Attorney Louie Jefferson Cook, of the law firm of Sico Hoelscher Harris LLP, is admitted pro hac vice to represent the Plaintiffs in this matter, pursuant to Local Rule 11.1(C). (Appointed LOUIE JEFFERSON COOK for Plaintiffs) Signed by JUDGE M CASEY RODGERS on 6/16/2021. (blr) (Entered: 06/16/2021) |
| 06/24/2021 | 18 | Summons Returned Unexecuted - refused and returned from FEDEX as to KINGDOM OF SAUDI ARABIA. (blr) (Entered: 06/30/2021) |
| 07/09/2021 | 19 | Summons Returned Unexecuted by HEATHER LOPEZ, MATTHEW KEEBLER, JESSICA PICKETT, DUSTIN WALTERS, JONATHAN GLASS, SHEILA WILEMON WATSON, BREANNA THOMAS, BENJAMIN WATSON, JR, RYAN BLACKWELL, THOMAS C BORTNER, GEORGE JOHNSON, JESSICA TINCH, JOY GLASS, MATTHEW HOUSAM, KRISTY LEHMER, JOHN ROBERT BRADY, MATTHEW TINCH, EVELYN BRADY, GRANT LOPEZ, S S H, CURTIS PICKETT, SHADIN HAITHAM, CHARLES HOGUE, MICHAEL HOYLAND, L N W, SHANE WALTERS, SAMEH HAITHAM, S S H, II, IRVIN LAWRENCE, JR, MASON WALTERS, AMANDA WALTERS, KRYSTENA KEEBLER, CARLY BLACKWELL, S L W as to KINGDOM OF SAUDI ARABIA. (Attachments: # 1 Exhibit A - FedEx Tracking, # 2 Exhibit B - DHL Tracking, # 3 Exhibit C - DHL Email to Court) (PAULOS, CHRISTOPHER) (Entered: 07/09/2021) |
| 07/09/2021 | 20 | AFFIDAVIT *REQUESTING FOREIGN MAILING PURSUANT TO 28 U.S.C. 1608(a)(4)* by CARLY BLACKWELL, RYAN BLACKWELL, THOMAS C BORTNER, EVELYN BRADY, JOHN ROBERT BRADY, JONATHAN GLASS, JOY GLASS, S S H, S S H, II, SAMEH HAITHAM, SHADIN HAITHAM, CHARLES HOGUE, MATTHEW HOUSAM, MICHAEL HOYLAND, GEORGE JOHNSON, KRYSTENA KEEBLER, MATTHEW KEEBLER, IRVIN LAWRENCE, JR, KRISTY LEHMER, GRANT LOPEZ, HEATHER LOPEZ, CURTIS PICKETT, JESSICA PICKETT, BREANNA THOMAS, JESSICA TINCH, MATTHEW TINCH, L N W, S L W, AMANDA WALTERS, DUSTIN WALTERS, MASON WALTERS, SHANE WALTERS, BENJAMIN WATSON, JR, SHEILA WILEMON WATSON. (Attachments: # 1 Exhibit A - Letter to Clerk from Counsel) (PAULOS, CHRISTOPHER) (Entered: 07/09/2021) |
| 07/12/2021 | 21 | DOCKET ANNOTATION BY COURT: Re 20 AFFIDAVIT REQUESTING FOREIGN MAILING PURSUANT TO 28 U.S.C. 1608(a)(4). (Documents received |

| | | |
|---|---|---|
| | | from attorney on 7/9/2021, were sealed and picked up by Federal Express.) (alb) (Entered: 07/13/2021) |
| 08/25/2021 | 🔒 | (Court only) ***Set/Reset Deadline - 90 Day No Activity Deadline set for **11/23/2021**. (alb) (Entered: 08/25/2021) |
| 12/01/2021 | 🔒 | (Court only) ***Set/Reset Deadline - 90 Day No Activity Deadline set for **3/1/2022**. (alb) (Entered: 12/01/2021) |
| 02/16/2022 | 22 | NOTICE of Appearance by KRIS ELLIOTT on behalf of CARLY BLACKWELL, RYAN BLACKWELL (ELLIOTT, KRIS) (Entered: 02/16/2022) |
| 03/02/2022 | 🔒 | (Court only) ***Set/Reset Deadline - 90 Day No Activity Deadline set for **5/31/2022**. (alb) (Entered: 03/02/2022) |
| 03/03/2022 | 23 | ACKNOWLEDGMENT OF SERVICE Executed *Notice of Service Under 28 U.S.C. Section 1608(a)(4)* Acknowledgment filed by THOMAS C BORTNER, JONATHAN GLASS, JOY GLASS, CHARLES HOGUE, MATTHEW HOUSAM, MICHAEL HOYLAND, KRYSTENA KEEBLER, MATTHEW KEEBLER, GRANT LOPEZ, HEATHER LOPEZ, JESSICA TINCH, MATTHEW TINCH. (Attachments: # 1 Exhibit A) (PAULOS, CHRISTOPHER) (Entered: 03/03/2022) |
| 03/21/2022 | 24 | MOTION to Appear Pro Hac Vice by Michael K. Kellogg.( Filing fee $ 208 receipt number AFLNDC-6841014.) BY KINGDOM OF SAUDI ARABIA. (Attachments: # 1 Exhibit A) (KELLOGG, MICHAEL) (Entered: 03/21/2022) |
| 03/21/2022 | 25 | MOTION to Appear Pro Hac Vice by Gregory G. Rapawy.( Filing fee $ 208 receipt number AFLNDC-6841300.) by KINGDOM OF SAUDI ARABIA. (Attachments: # 1 Exhibit A) (RAPAWY, GREGORY) (Entered: 03/21/2022) |
| 03/21/2022 | 26 | MOTION to Appear Pro Hac Vice by Andrew C. Shen.( Filing fee $ 208 receipt number AFLNDC-6841361.) by KINGDOM OF SAUDI ARABIA. (Attachments: # 1 Exhibit A) (SHEN, ANDREW) (Entered: 03/21/2022) |
| 03/21/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 25 MOTION to Appear Pro Hac Vice by Gregory G. Rapawy.( Filing fee $ 208 receipt number AFLNDC-6841300.), 26 MOTION to Appear Pro Hac Vice by Andrew C. Shen.( Filing fee $ 208 receipt number AFLNDC-6841361.), 24 MOTION to Appear Pro Hac Vice by Michael K. Kellogg.( Filing fee $ 208 receipt number AFLNDC-6841014.) (mb) (Entered: 03/21/2022) |
| 03/21/2022 | 27 | Consent MOTION for Leave to File *Motion to Dismiss that Exceeds Word Limit* by KINGDOM OF SAUDI ARABIA. (Attachments: # 1 Exhibit A of the Kingdom of Saudi Arabia to Dismiss the Amended Complaint and Memorandum of Law in Support) (BRODSKY, BENJAMIN) Modified on 6/10/2022 to reflect the title of Exhibit A (alb). (Entered: 03/21/2022) |
| 03/22/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 27 Consent MOTION for Leave to File *Motion to Dismiss that Exceeds Word Limit.* (alb) (Entered: 03/22/2022) |
| 03/23/2022 | 28 | ORDER, re 24 Motion to Appear Pro Hac Vice by Michael K. Kellogg ; 25 Motion to Appear Pro Hac Vice by Gregory G. Rapawy ; 26 Motion to Appear Pro Hac Vice by Andrew C. Shen. The motions identified in Exhibit A are GRANTED. Signed by JUDGE M CASEY RODGERS on 3/23/2022. (alb) (Entered: 03/23/2022) |
| 03/23/2022 | 29 | ORDER granting as requested 27 Motion for Leave to Exceed Word Limit. Signed by JUDGE M CASEY RODGERS on 3/23/2022. (alb) (Entered: 03/23/2022) |

| | | |
|---|---|---|
| 03/24/2022 | 30 | First MOTION for Extension of Time to File Response/Reply *to Defendant's Motion to Dismiss* by CARLY BLACKWELL, RYAN BLACKWELL, THOMAS C BORTNER, EVELYN BRADY, JOHN ROBERT BRADY, JONATHAN GLASS, JOY GLASS, S S H, S S H, II, SAMEH HAITHAM, SHADIN HAITHAM, CHARLES HOGUE, MATTHEW HOUSAM, MICHAEL HOYLAND, GEORGE JOHNSON, KRYSTENA KEEBLER, MATTHEW KEEBLER, IRVIN LAWRENCE, JR, KRISTY LEHMER, GRANT LOPEZ, HEATHER LOPEZ, CURTIS PICKETT, JESSICA PICKETT, BREANNA THOMAS, JESSICA TINCH, MATTHEW TINCH, L N W, S L W, AMANDA WALTERS, DUSTIN WALTERS, MASON WALTERS, SHANE WALTERS, BENJAMIN WATSON, JR, SHEILA WILEMON WATSON. (PAULOS, CHRISTOPHER) (Entered: 03/24/2022) |
| 03/25/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 30 First MOTION for Extension of Time to File Response/Reply *to Defendant's Motion to Dismiss.* (alb) (Entered: 03/25/2022) |
| 03/25/2022 | 31 | SUMMONS Returned Executed KINGDOM OF SAUDI ARABIA served on 1/18/2022, answer due 3/21/2022. (Attachments: # 1 Supplement) (alb) Modified on 3/28/2022 to correct the answer due date for 60 days to 3/21/2022 (alb). (Entered: 03/25/2022) |
| 03/25/2022 | 32 | ORDER granting 30 First MOTION for Extension of Time to File Response/Reply to Defendant's Motion to Dismiss. Plaintiffs' deadline to respond to Defendant 's Motion to Dismiss (ECF No. 27 -1) is extended to May 26, 2022. (Internal deadline for referral to judge if response not filed earlier: **5/26/2022**). Signed by JUDGE M CASEY RODGERS on 3/25/2022. (alb) (Entered: 03/25/2022) |
| 05/16/2022 | 33 | Second MOTION for Extension of Time to File Response/Reply as to 32 Order,, Set Deadlines/Hearings, *to Defendant's Motion to Dismiss* by CARLY BLACKWELL, RYAN BLACKWELL, THOMAS C BORTNER, EVELYN BRADY, JOHN ROBERT BRADY, JONATHAN GLASS, JOY GLASS, S S H, S S H, II, SAMEH HAITHAM, SHADIN HAITHAM, CHARLES HOGUE, MATTHEW HOUSAM, MICHAEL HOYLAND, GEORGE JOHNSON, KRYSTENA KEEBLER, MATTHEW KEEBLER, IRVIN LAWRENCE, JR, KRISTY LEHMER, GRANT LOPEZ, HEATHER LOPEZ, CURTIS PICKETT, JESSICA PICKETT, BREANNA THOMAS, JESSICA TINCH, MATTHEW TINCH, L N W, S L W, AMANDA WALTERS, DUSTIN WALTERS, MASON WALTERS, SHANE WALTERS, BENJAMIN WATSON, JR, SHEILA WILEMON WATSON. (PAULOS, CHRISTOPHER) (Entered: 05/16/2022) |
| 05/17/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 33 Plaintiff's Consent Motion to Extend Time to Respond to Defendant's Motion to Dismiss. (alb) Modified on 5/17/2022 to reflect the correct judge (alb). (Entered: 05/17/2022) |
| 05/18/2022 | 34 | ORDER granting 33 Second MOTION for Extension of Time to File Response to Defendant's Motion to Dismiss 27 -1. (Internal deadline for referral to judge if response not filed earlier: **6/9/2022**). Signed by JUDGE M CASEY RODGERS on 05/18/2022. (alb) (Entered: 05/18/2022) |
| 05/23/2022 | 35 | ORDER REASSIGNING CASE. Case reassigned to MAGISTRATE JUDGE ZACHARY C BOLITHO for all further proceedings. MAGISTRATE JUDGE ELIZABETH M TIMOTHY no longer assigned to case. Signed by CHIEF JUDGE |

| | | |
|---|---|---|
| | | MARK E WALKER on 5/23/2022. (erl)**Please use the new judge's initials for all future filings: 3:21cv329-MCR-ZCB. (Entered: 05/24/2022) |
| 06/05/2022 | 🔒 | (Court only) ***Set/Reset Deadline - 90 Day No Activity Deadline set for **9/6/2022**. (alb) (Entered: 06/05/2022) |
| 06/06/2022 | 36 | MOTION for Leave to File *an Enlarged Brief* by CARLY BLACKWELL, RYAN BLACKWELL, THOMAS C BORTNER, EVELYN BRADY, JOHN ROBERT BRADY, JONATHAN GLASS, JOY GLASS, S S H, S S H, II, SAMEH HAITHAM, SHADIN HAITHAM, CHARLES HOGUE, MATTHEW HOUSAM, MICHAEL HOYLAND, GEORGE JOHNSON, KRYSTENA KEEBLER, MATTHEW KEEBLER, IRVIN LAWRENCE, JR, KRISTY LEHMER, GRANT LOPEZ, HEATHER LOPEZ, CURTIS PICKETT, JESSICA PICKETT, BREANNA THOMAS, JESSICA TINCH, MATTHEW TINCH, L N W, S L W, AMANDA WALTERS, DUSTIN WALTERS, MASON WALTERS, SHANE WALTERS, BENJAMIN WATSON, JR, SHEILA WILEMON WATSON. (PAULOS, CHRISTOPHER) (Entered: 06/06/2022) |
| 06/07/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 36 MOTION for Leave to File *an Enlarged Brief*. ("Defendant has not consented.") (alb) (Entered: 06/07/2022) |
| 06/07/2022 | 37 | RESPONSE to Motion re 36 MOTION for Leave to File *an Enlarged Brief* filed by KINGDOM OF SAUDI ARABIA. (BRODSKY, BENJAMIN) (Entered: 06/07/2022) |
| 06/07/2022 | 38 | ORDER granting as requested 36 Motion for Leave to File an Enlarged Brief. Signed by JUDGE M CASEY RODGERS on 06/07/2022. (alb) (Entered: 06/07/2022) |
| 06/09/2022 | 39 | MEMORANDUM in Opposition re 27 Consent MOTION for Leave to File *Motion to Dismiss that Exceeds Word Limit Opposition to Motion to Dismiss* filed by CARLY BLACKWELL, RYAN BLACKWELL, THOMAS C BORTNER, EVELYN BRADY, JOHN ROBERT BRADY, JONATHAN GLASS, JOY GLASS, S S H, S S H, II, SAMEH HAITHAM, SHADIN HAITHAM, CHARLES HOGUE, MATTHEW HOUSAM, MICHAEL HOYLAND, GEORGE JOHNSON, KRYSTENA KEEBLER, MATTHEW KEEBLER, IRVIN LAWRENCE, JR, KRISTY LEHMER, GRANT LOPEZ, HEATHER LOPEZ, CURTIS PICKETT, JESSICA PICKETT, BREANNA THOMAS, JESSICA TINCH, MATTHEW TINCH, L N W, S L W, AMANDA WALTERS, DUSTIN WALTERS, MASON WALTERS, SHANE WALTERS, BENJAMIN WATSON, JR, SHEILA WILEMON WATSON. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26) (PAULOS, CHRISTOPHER) (Entered: 06/09/2022) |
| 06/10/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 27 Consent MOTION for Leave to File Motion to Dismiss that Exceeds Word Limit by KINGDOM OF SAUDI ARABIA. (Attachments: # 1 Exhibit A Motion of the Kingdom of Saudi Arabia to Dismiss the Amended Complaint and Memorandum of Law in Support) 39 Memorandum in Opposition to Motion. (alb) (Entered: 06/10/2022) |
| 06/14/2022 | 40 | MOTION for Leave to File *Reply In Support Of Motion To Dismiss The Amended Complaint (ECF No. 27-1)* by KINGDOM OF SAUDI ARABIA. (BRODSKY, |

| | | BENJAMIN) Modified (removed consent from title) on 6/15/2022 (bkp). (Entered: 06/14/2022) |
|---|---|---|
| 06/14/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 40 Consent MOTION for Leave to File Reply In Support of Motion To Dismiss The Amended Complaint (ECF No. 27 -1). (alb) (Entered: 06/14/2022) |
| 06/15/2022 | 41 | ORDER re 40 MOTION for Leave to File Reply In Support Of Motion To Dismiss The Amended Complaint. The motion is GRANTED. Defendant may file a reply memorandum by July 25, 2022, not to exceed 7,500 words. Signed by JUDGE M CASEY RODGERS on 06/15/22. (Reply memorandum due by **7/25/2022**.) (jfj) (Entered: 06/15/2022) |
| 07/25/2022 | 42 | REPLY to Response to Motion re 27 Consent MOTION for Leave to File *Motion to Dismiss that Exceeds Word Limit* filed by KINGDOM OF SAUDI ARABIA. (BRODSKY, BENJAMIN) (Entered: 07/25/2022) |
| 07/26/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 42 Reply in Support of the Kingdom of Saudi Arabia's Motion to Dismiss the Amended Complaint. (alb) (Entered: 07/26/2022) |
| 08/05/2022 | 43 | MOTION for Discovery *Plaintiffs' Motion for Jurisdictional Discovery* by CARLY BLACKWELL, RYAN BLACKWELL, THOMAS C BORTNER, EVELYN BRADY, JOHN ROBERT BRADY, JONATHAN GLASS, JOY GLASS, S S H, S S H, II, SAMEH HAITHAM, SHADIN HAITHAM, CHARLES HOGUE, MATTHEW HOUSAM, MICHAEL HOYLAND, GEORGE JOHNSON, KRYSTENA KEEBLER, MATTHEW KEEBLER, IRVIN LAWRENCE, JR, KRISTY LEHMER, GRANT LOPEZ, HEATHER LOPEZ, CURTIS PICKETT, JESSICA PICKETT, BREANNA THOMAS, JESSICA TINCH, MATTHEW TINCH, L N W, S L W, AMANDA WALTERS, DUSTIN WALTERS, MASON WALTERS, SHANE WALTERS, BENJAMIN WATSON, JR, SHEILA WILEMON WATSON. (Attachments: # 1 Exhibit Ex. A to Plaintiffs Motion for Jurisdictional Discovery) (PAULOS, CHRISTOPHER) (Entered: 08/05/2022) |
| 08/05/2022 | | Set Deadlines/Hearings re 43 Plaintiffs' Motion for Jurisdictional Discovery. (Internal deadline for referral to judge if response not filed earlier: **8/19/2022**). (alb) (Entered: 08/08/2022) |
| 08/19/2022 | 44 | RESPONSE in Opposition re 43 MOTION for Discovery *Plaintiffs' Motion for Jurisdictional Discovery* filed by KINGDOM OF SAUDI ARABIA. (BRODSKY, BENJAMIN) (Entered: 08/19/2022) |
| 08/22/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 27 MOTION for Leave to File *Motion to Dismiss that Exceeds Word Limit*, 39 Response in Opposition to Motion, 42 Reply to Response to Motion. (alb) (Entered: 08/22/2022) |
| 08/22/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 43 MOTION for Discovery *Plaintiffs' Motion for Jurisdictional Discovery*, 44 Response in Opposition to Motion. (alb) (Entered: 08/22/2022) |
| 08/22/2022 | 🔒 | (Court only) ***Motions terminated: 27 Consent MOTION for Leave to File *Motion to Dismiss that Exceeds Word Limit* filed by KINGDOM OF SAUDI ARABIA. (alb) (Entered: 08/22/2022) |

| 08/22/2022 | 45 | ORDER re 27 Consent MOTION for Leave to File *Motion to Dismiss that Exceeds Word Limit*. To clarify the docket and show administratively that a motion is pending, the Defendant is directed to re-file the Motion to Dismiss as a stand-alone entry within seven (7) days. After filing, the Clerk is directed to link the motion to the previously filed response and reply and refer the matter to chambers. Signed by JUDGE M CASEY RODGERS on 08/22/2022. (alb) (Entered: 08/22/2022) |
|---|---|---|
| 08/22/2022 | | Set Deadlines/Hearings re 45 Order Deadline to refile Motion to Dismiss as a separate entry - **8/29/2022**. (alb) (Entered: 08/22/2022) |
| 08/26/2022 | 46 | MOTION to Dismiss by KINGDOM OF SAUDI ARABIA. (Internal deadline for referral to judge if response not filed earlier: **9/9/2022**). (BRODSKY, BENJAMIN) (Entered: 08/26/2022) |
| 08/26/2022 | 47 | AFFIDAVIT in Support re 46 MOTION to Dismiss *Amended Complaint* filed by KINGDOM OF SAUDI ARABIA. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I) (BRODSKY, BENJAMIN) (Entered: 08/26/2022) |
| 08/29/2022 | 🔒 | (Court only) ***Terminate Deadlines: Re: Set Deadlines/Hearings re 45 Order Deadline to refile Motion to Dismiss as a separate entry - 8/29/2022. (alb) (Entered: 08/29/2022) |
| 09/01/2022 | 48 | ORDER. the Motion for Jurisdictional Discovery filed by Plaintiffs, ECF No. 43 , is hereby referred to the assigned magistrate judge for disposition by order, pursuant to Rule 72(a) of the Federal Rules of Civil Procedure; and the Motion to Dismiss filed by Defendant Kingdom of Saudi Arabia, ECF No. 46 , is hereby referred to the assigned magistrate judge for a report and recommendation pursuant to Rule 72(b) of the Federal Rules of Civil Procedure. See also N.D. Fla. Loc. R. 72.3; 28 U.S.C. § 636(b)(1)(B). Signed by JUDGE M CASEY RODGERS on 09/01/2022. Motions referred to ZACHARY C BOLITHO. (alb) (Entered: 09/01/2022) |
| 09/01/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 48 Order Referring Motion. (alb) (Entered: 09/01/2022) |
| 09/12/2022 | 🔒 | (Court only) ***Terminate Deadlines: Re: 46 MOTION to Dismiss. (response due by 9/6/2022.) (alb) (Entered: 09/12/2022) |
| 09/12/2022 | 🔒 | (Court only) ***Set/Reset Deadline - 90 Day No Activity Deadline set for **12/12/2022**. (alb) (Entered: 09/12/2022) |
| 10/05/2022 | 49 | NOTICE of Hearing re 46 MOTION to Dismiss , 43 MOTION for Discovery *Plaintiffs' Motion for Jurisdictional Discovery* : Motion Hearing set for **10/12/2022 at 02:00 PM** in U.S. Courthouse Pensacola before MAGISTRATE JUDGE ZACHARY C BOLITHO.<br><br>*NOTE: If you or any party, witness, or attorney in this matter has a disability which requires special accommodation, such as a hearing impairment requiring a sign language interpreter or a wheelchair restriction requiring ramp access, please contact the Office of the Clerk at 850-435-8440 at least one week prior to the hearing (or as soon as possible) so arrangements can be made.*<br><br>*/s/ Sylvia Williams*<br>Courtroom Deputy Clerk (sdw) (Entered: 10/05/2022) |
| 10/11/2022 | 50 | NOTICE of Appearance by WILLIAM FRANKLIN CASH, III on behalf of THOMAS C BORTNER, JONATHAN GLASS, JOY GLASS, CHARLES |

| | | |
|---|---|---|
| | | HOGUE, MATTHEW HOUSAM, MICHAEL HOYLAND, KRYSTENA KEEBLER, MATTHEW KEEBLER, GRANT LOPEZ, HEATHER LOPEZ, JESSICA TINCH, MATTHEW TINCH (CASH, WILLIAM) (Entered: 10/11/2022) |
| 10/12/2022 | 51 | Minute Entry for proceedings held before MAGISTRATE JUDGE ZACHARY C BOLITHO: Hearing held on 10/12/2022 re 46 MOTION to Dismiss , 43 MOTION for Discovery *Plaintiffs' Motion for Jurisdictional Discovery*. (Court Reporter CD.) (sdw) (Entered: 10/13/2022) |
| 10/13/2022 | 52 | NOTICE *of Supplemental Authority re: Oct. 12 hearing* by BENJAMIN WATSON, JR (CASH, WILLIAM) (Entered: 10/13/2022) |
| 10/14/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 52 Notice of Supplemental Authority. (alb) (Entered: 10/14/2022) |
| 10/21/2022 | 53 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of digitally recorded proceedings - MOTIONS HEARING - held on 10/12/22, before Judge Zachary C. Bolitho. Court Reporter/Transcriber Julie A. Wycoff, Telephone number 850/470-8196; julieawycoff@gmail.com. <br><br> *Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.* <br><br> Redaction Request due **10/28/2022**. Release of Transcript Restriction set for **1/26/2023**. (jaw) (Entered: 10/21/2022) |
| 11/03/2022 | 🔒 | (Court only) ***Terminate Deadlines: Re: 53 NOTICE OF FILING OF OFFICIAL TRANSCRIPT of digitally recorded proceedings - MOTIONS HEARING - held on 10/12/22. Redaction Request due 10/28/2022. (alb) (Entered: 11/03/2022) |
| 12/13/2022 | 🔒 | (Court only) ***Set/Reset Deadline - 90 Day No Activity Deadline set for **3/13/2023**. (alb) (Entered: 12/13/2022) |
| 01/30/2023 | 🔒 | (Court only) ***Terminate Deadlines: Re: 53 NOTICE OF FILING OF OFFICIAL TRANSCRIPT of digitally recorded proceedings - MOTIONS HEARING - held on 10/12/22. Release of Transcript Restriction set for 1/26/2023. (alb) (Entered: 01/30/2023) |
| 03/25/2023 | 🔒 | (Court only) ***Set/Reset Deadline - 90 Day No Activity Deadline set for **6/13/2023**. (alb) (Entered: 03/25/2023) |
| 05/11/2023 | 54 | REPORT AND RECOMMENDATION. Defendant Saudi Arabia's Motion to Dismiss (Doc. 46 ) be GRANTED and this matter be DISMISSED for lack of jurisdiction under the Foreign Sovereign Immunities Act; Plaintiffs' Motion for Jurisdictional Discovery (Doc. 43 ) be DENIED; The Clerk of Court is directed to close this case. R&R flag set Signed by MAGISTRATE JUDGE ZACHARY C BOLITHO on 05/11/2023. Internal deadline for referral to district judge if objections are not filed earlier: **6/8/2023**. (alb) (Entered: 05/11/2023) |
| 05/17/2023 | 55 | MOTION for Extension of Time to File Response/Reply as to 54 REPORT AND RECOMMENDATION R&R flag set by THOMAS C BORTNER, JONATHAN GLASS, JOY GLASS, CHARLES HOGUE, MATTHEW HOUSAM, MICHAEL HOYLAND, KRYSTENA KEEBLER, MATTHEW KEEBLER, GRANT LOPEZ, HEATHER LOPEZ, JESSICA TINCH, MATTHEW TINCH. (CASH, WILLIAM) (Entered: 05/17/2023) |

| | | |
|---|---|---|
| 05/18/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 55 MOTION for Extension of Time to File Response/Reply as to 54 REPORT AND RECOMMENDATION. (alb) (Entered: 05/18/2023) |
| 05/22/2023 | 56 | ORDER granting re 55 MOTION for Extension of Time to File Objections as to 54 REPORT AND RECOMMENDATION ( Internal deadline for referral to district judge if objections are not filed earlier: **6/26/2023**.) Signed by JUDGE M CASEY RODGERS on 05/22/2023. (alb) (Entered: 05/22/2023) |
| 06/14/2023 | 🔒 | (Court only) ***Set/Reset Deadline - 90 Day No Activity Deadline set for **9/12/2023**. (alb) (Entered: 06/14/2023) |
| 06/27/2023 | 57 | RESPONSE by CARLY BLACKWELL, RYAN BLACKWELL, THOMAS C BORTNER, EVELYN BRADY, JOHN ROBERT BRADY, JONATHAN GLASS, JOY GLASS, S S H, S S H, II, SAMEH HAITHAM, SHADIN HAITHAM, CHARLES HOGUE, MATTHEW HOUSAM, MICHAEL HOYLAND, GEORGE JOHNSON, KRYSTENA KEEBLER, MATTHEW KEEBLER, IRVIN LAWRENCE, JR, KRISTY LEHMER, GRANT LOPEZ, HEATHER LOPEZ, CURTIS PICKETT, JESSICA PICKETT, BREANNA THOMAS, JESSICA TINCH, MATTHEW TINCH, L N W, S L W, AMANDA WALTERS, DUSTIN WALTERS, MASON WALTERS, SHANE WALTERS, BENJAMIN WATSON, JR, SHEILA WILEMON WATSON re 54 REPORT AND RECOMMENDATION R&R flag set *Objections to Magistrate Judge's Report & Recommendations*. (PAULOS, CHRISTOPHER) (Entered: 06/27/2023) |
| 06/27/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 57 Response to 54 REPORT AND RECOMMENDATION. (alb) (Entered: 06/27/2023) |
| 06/30/2023 | 58 | Consent MOTION to Extend Time *to Respond to Plaintiffs' Rule 72(b) Objections to R&R* by KINGDOM OF SAUDI ARABIA. (BRODSKY, BENJAMIN) (Entered: 06/30/2023) |
| 07/03/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 58 Consent MOTION to Extend Time *to Respond to Plaintiffs' Rule 72(b) Objections to R&R. (alb) (Entered: 07/03/2023)* |
| 07/03/2023 | 59 | ORDER granting 58 Consent Motion to Extend the Time to Respond to Plaintiffs' Rule 72(b) Objections Signed by JUDGE M CASEY RODGERS on 07/03/2023. (alb) Modified on 7/7/2023 to add hyperlink (alb). (Entered: 07/03/2023) |
| 07/27/2023 | 60 | ORDER - Given the sensitive nature of the United States foreign relations that could be impacted by this case, the Court finds it necessary to raise the political question doctrine as a potential bar to jurisdiction and seek a statement of interest from the United States under 28 U.S.C. § 517. The United States must file a response to this Order within thirty (30) days. In its response, the United States may decline to submit a statement of interest or accept the Courts invitation by filing a statement of interest. The United States may file its response under seal, if appropriate. The Clerk of the Court is directed to serve this Order on the Attorney General of the United States, the Solicitor General of the United States, and the United States Attorney for the Northern District of Florida. Once the Court has reviewed the United States position, and if warranted, an appropriate briefing schedule will be set to allow the parties to respond. Signed by JUDGE M CASEY RODGERS on 7/27/23. (kr) (Entered: 07/27/2023) |

| 08/04/2023 | 61 | ACKNOWLEDGMENT OF SERVICE Executed as to US ATTORNEY OFFICE in Tallahassee, re: 60 Order. (alb) (Entered: 08/04/2023) |
|---|---|---|
| 08/08/2023 | 62 | NOTICE *of Potential Participation* by UNITED STATES OF AMERICA re 60 Order,,,, (POWERS, JAMES) (Entered: 08/08/2023) |
| 08/08/2023 | 63 | NOTICE of Appearance by JAMES RYAN POWERS on behalf of UNITED STATES OF AMERICA (POWERS, JAMES) (Entered: 08/08/2023) |
| 08/08/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 62 Notice of Potential Participation, by United States of America. (alb) (Entered: 08/08/2023) |
| 08/09/2023 | 64 | REFERRAL AND ORDER re granting 62 Notice by the United States of Potential Participation. The United States' response is due by **9/25/2023**. Signed by JUDGE M CASEY RODGERS on 8/9/2023. (jcw) (Entered: 08/09/2023) |
| 08/09/2023 | 65 | RESPONSE by KINGDOM OF SAUDI ARABIA re 57 Response/Reply,, by KINGDOM OF SAUDI ARABIA. (BRODSKY, BENJAMIN) (Entered: 08/09/2023) |
| 08/10/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 65 THE KINGDOM OF SAUDI ARABIA'S RESPONSE TOPLAINTIFFS' RULE 72 OBJECTIONS. (alb) (Entered: 08/10/2023) |
| 08/11/2023 | 66 | ACKNOWLEDGMENT OF SERVICE Executed as to the US Atty General and the Office of the Solicitor General, re 60 Order. (Attachments: # 1 Office of the Solicitor General) (alb) (Entered: 08/15/2023) |
| 09/13/2023 | 🔒 | (Court only) ***Set/Reset Deadline - 90 Day No Activity Deadline set for **12/12/2023**. (alb) (Entered: 09/13/2023) |
| 09/25/2023 | 67 | NOTICE *of Non-Participation* by UNITED STATES OF AMERICA re 60 Order,,,, (POWERS, JAMES) (Entered: 09/25/2023) |
| 09/26/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 67 NOTICE BY THE UNITED STATES OF NON-PARTICIPATION. (alb) (Entered: 09/26/2023) |
| 09/26/2023 | 68 | ORDER. As indicated in the Court's prior Order, the parties will be permitted to address the political question doctrine issue raised by the Court. The decision of the United States to decline the Court's invitation to provide a statement of interest does not dispose of the issue or the Court's concerns. See generally, Gross v. German Found. Indus. Initiative, 456 F.3d 363, 38990 (3d Cir. 2006) (indicating courts can defer to a persuasive statement of interest by the Government but that there is "no possibility of expressing a lack of respect due the Executive branch when the Executive has not expressed its interest in the dispute"). The parties' simultaneous briefs are due on or before October 10, 2023. Signed by JUDGE M CASEY RODGERS on 09/26/2023.(Briefs are due by **10/10/2023**.) (alb) (Entered: 09/26/2023) |
| 10/10/2023 | 69 | RESPONSE by KINGDOM OF SAUDI ARABIA re 68 Order,,,, Set Deadlines/Hearings,,, *in Response to DE 68 Court Order directing the Parties to file Simultaneous Briefs*. (BRODSKY, BENJAMIN) (Entered: 10/10/2023) |
| 10/10/2023 | 70 | RESPONSE by CARLY BLACKWELL, RYAN BLACKWELL, THOMAS C BORTNER, EVELYN BRADY, JOHN ROBERT BRADY, JONATHAN GLASS, JOY GLASS, S S H, S S H, II, SAMEH HAITHAM, SHADIN HAITHAM, |

| | | |
|---|---|---|
| | | CHARLES HOGUE, MATTHEW HOUSAM, MICHAEL HOYLAND, TEVENIA JACOBS, GEORGE JOHNSON, KRYSTENA KEEBLER, MATTHEW KEEBLER, IRVIN LAWRENCE, JR, KRISTY LEHMER, GRANT LOPEZ, HEATHER LOPEZ, CURTIS PICKETT, JESSICA PICKETT, BREANNA THOMAS, JESSICA TINCH, MATTHEW TINCH, L N W, S L W, AMANDA WALTERS, DUSTIN WALTERS, MASON WALTERS, SHANE WALTERS, BENJAMIN WATSON, JR, SHEILA WILEMON WATSON re 68 Order,,,, Set Deadlines/Hearings,,, . (MOKWA, MATTHEW) (Entered: 10/10/2023) |
| 10/11/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 69 THE KINGDOM OF SAUDI ARABIA'S SUPPLEMENTAL BRIEF REGARDING THE POLITICAL-QUESTION DOCTRINE, 70 PLAINTIFFS' RESPONSE TO COURT ORDER DATED SEPTEMBER 26, 2023 [ECF No. 68 ] RAISING POLITICAL QUESTION DOCTRINE. (alb) (Entered: 10/11/2023) |
| 12/27/2023 | 🔒 | (Court only) ***Set/Reset Deadline - 90 Day No Activity Deadline set for **3/26/2024**. (alb) (Entered: 12/27/2023) |
| 02/28/2024 | 71 | NOTICE of Substitution of Counsel, by SIMON GREGORY JEROME on behalf of UNITED STATES OF AMERICA (JEROME, SIMON) Modified on 3/27/2024 (alb). (Entered: 02/28/2024) |
| 02/28/2024 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 71 Notice of Substitution of Counsel. (alb) (Entered: 02/28/2024) |
| 03/27/2024 | 🔒 | (Court only) ***Set/Reset Deadline - 90 Day No Activity Deadline set for **6/25/2024**. (alb) (Entered: 03/27/2024) |
| 03/30/2024 | 72 | ORDER adopting Report and Recommendations 54 . Signed by JUDGE M CASEY RODGERS on March 30, 2024. (aow) (Entered: 03/30/2024) |
| 03/31/2024 | 73 | CLERK'S JUDGMENT entered pursuant to 72 Order on Report and Recommendation. 90 Day Exhibit Return Deadline set for **7/1/2024** (erl) (Entered: 03/31/2024) |
| 04/26/2024 | 74 | NOTICE OF APPEAL as to 73 Clerk's Judgment by CARLY BLACKWELL, RYAN BLACKWELL, THOMAS C BORTNER, EVELYN BRADY, JOHN ROBERT BRADY, JONATHAN GLASS, JOY GLASS, S S H, S S H, II, SAMEH HAITHAM, SHADIN HAITHAM, CHARLES HOGUE, MATTHEW HOUSAM, MICHAEL HOYLAND, TEVENIA JACOBS, GEORGE JOHNSON, KRYSTENA KEEBLER, MATTHEW KEEBLER, IRVIN LAWRENCE, JR, KRISTY LEHMER, GRANT LOPEZ, HEATHER LOPEZ, CURTIS PICKETT, JESSICA PICKETT, BREANNA THOMAS, JESSICA TINCH, MATTHEW TINCH, L N W, S L W, AMANDA WALTERS, DUSTIN WALTERS, MASON WALTERS, SHANE WALTERS, BENJAMIN WATSON, JR, SHEILA WILEMON WATSON. ( Filing fee $605 Receipt Number AFLNDC-8781181.) (MOKWA, MATTHEW) (Entered: 04/26/2024) |
| 04/29/2024 | 75 | Appeal Instructions re: 74 Notice of Appeal : The Transcript Request Form is available on the Internet at https://www.flnd.uscourts.gov/form/eleventh-circuit-transcript-information-form **PLEASE NOTE** Separate forms must be filed for each court reporter in both the district court and the appeals court. Transcript Order Form due by **5/13/2024**. (alb) (Entered: 04/29/2024) |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

BENJAMIN WATSON, JR., *et al.*,    )
                                  )
              Plaintiffs,          )
                                  )     Civil Action No.
                                  )     3:21-cv-00329-MCR-ZCB
                                  )
      v.                           )
                                  )
                                  )
KINGDOM OF SAUDI ARABIA           )
                                  )
              Defendant.           )
_____   )

**NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

Plaintiffs now serve notice of their intent to appeal the judgment entered on March 31, 2024 (Doc. 73) to the United States Court of Appeals for the Eleventh Circuit.

This notice is being served on behalf of all Plaintiffs – including Benjamin Watson Jr., Individually and as Executor of the Estate of Joshua Kaleb Watson; Sheila Wilemon Watson; Shane Walters and Amanda Walters, Individually and as Co-Executors of the Estate of Cameron Scott Walters; Shane Walters as Representative and Guardian of S.L.W., a minor child; Amanda Walters as Representative and Guardian of L.N.W., a minor child; Dustin Walters; Mason Walters; Sameh Haitham and Evelyn Brady, Individually and as Co-Executors the

1

Estate of Mohammed Sameh Haitham; Sameh Haitham as Representative and Guardian of S.S.H., a minor child and S.S.H. II, a minor child; Shadin Haitham; John Robert Brady; Irvin Lawrence Jr.; George Johnson; Breanna Thomas; Ryan Blackwell; Carly Blackwell; Kristy Lehmer; Jessica Pickett; Curtis Pickett; Charles Hogue; Matthew Tinch; Jessica Tinch; Jonathan Glass; Joy Glass; Matthew Housam; Michael Hoyland; Thomas C. Bortner; Grant Lopez; Heather Lopez; Matthew Keebler; and Krystena Keebler.

Dated: April 26, 2024.                    Respectfully submitted,

                                          /s/ Matthew S. Mokwa
                                          Matthew S. Mokwa, Esq. (FL#47761)
                                          **THE MAHER LAW FIRM, P.A.**
                                          398 W. Morse Blvd., Suite 200
                                          Winter Park, Florida 32789
                                          Phone: (407) 839-0866
                                          Fax: (407) 425-7958
                                          mmokwa@maherlawfirm.com

                                          Filed on Behalf of All Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2024 and in compliance with L.R. 5.1(F), I, Matthew S. Mokwa, electronically filed the foregoing document with the Clerk of Court using the Court's CM/ECF system which sends notice to all parties or counsel of record that have entered appearances in this action.

*/s/ Matthew S. Mokwa*
Matthew S. Mokwa, Esq.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**BENJAMIN WATSON, JR, et al.,**

      **Plaintiffs,**

**v.**                            **CASE NO. 3:21cv329-MCR-ZCB**

**KINGDOM OF SAUDI ARABIA,**

      **Defendant.**

_____/

## ORDER

This suit arises out of a terrorist attack at Naval Air Station Pensacola ("NAS Pensacola") on December 6, 2019. On that date, Mohammad Saeed Al-Shamrani, a Second Lieutenant in the Royal Saudi Air Force ("RSAF"), went on a shooting rampage murdering three United States Navy servicemembers and severely injuring four United States Navy servicemembers, a Navy civil servant, seven Escambia County Sheriff's deputies plus a member of the Department of Defense Police Force, and injuring other first responders as well. The shooting rampage stopped only after Al-Shamrani was shot and killed by the return gunfire and bravery of the responding officers.

Plaintiffs—the surviving victims of the attack and representatives of the deceased servicemembers—brought this 19-count suit under various federal and state terrorism-related statutes and Florida common law against Defendant Kingdom

of Saudi Arabia ("Saudi Arabia") and unnamed officials.[1]  Saudi Arabia filed a motion to dismiss, invoking its sovereign immunity by asserting both facial and factual challenges to the Amended Complaint.  *See* Fed. R. Civ. P. 12(b)(1); ECF No. 46.  As a foreign state, Saudia Arabia is presumed immune from suit in United States' courts under the Foreign Sovereign Immunities Act ("FSIA"), *see* 28 U.S.C. § 1604, and consequently, a specific statutory exception to immunity must apply in order for federal jurisdiction to exist.  Plaintiffs asserted four FSIA statutory exceptions in the Amended Complaint and in response to the motion to dismiss:  (1) the Justice Against Sponsors of Terrorism Act ("JASTA") exception, 28 U.S.C. § 1605B; (2) noncommercial torts exception, § 1605(a)(5); (3) commercial activity exception, § 1605(a)(2); and (4) the exception for waiver, § 1605(a)(1).  ECF No. 39.  Plaintiffs also requested jurisdictional discovery.  *See* ECF No. 43.

The undersigned referred the motion to dismiss to the assigned Magistrate Judge for a Report and Recommendation ("R&R") and referred the request for

---

[1] The specific causes of action include primary and secondary liability under the Anti-Terrorism Act, 18 U.S.C. §§ 2339, 2339A, 2339B, 2339C (harboring a terrorist or providing material support to a terrorist and terrorist organization); Florida common law claims of loss of solatium, assault, battery, false imprisonment, intentional and negligent infliction of emotional distress, negligence and gross negligence, loss of consortium, and third party breach of contract; and state law claims under Florida's Civil Hate Crime Statute, Florida's Civil Remedy for Terrorism and Facilitating Terrorism statute, and Florida's Wrongful Death Act.  ECF No. 5 (Amended Complaint).

jurisdictional discovery for disposition by order.  The Magistrate Judge held oral argument and entered an R&R recommending that the undersigned grant the motion to dismiss based on sovereign immunity and deny discovery. *See Watson v. Kingdom of Saudi Arabia*, Case No. 3:21cv329/MCR/ZCB, ECF No. 54, 2023 WL 4047586, at *1 (N.D. Fla. May 11, 2023).  Plaintiffs objected, and Saudi Arabia has responded. *See* ECF Nos. 57, 65.

When reviewing a magistrate judge's R&R on a dispositive matter, the Court reviews *de novo* all aspects to which a party has specifically objected and "may accept, reject, or modify, in whole or in part, the findings or recommendations made." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3); *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1245 (11th Cir. 2007) ("the district court is generally free to employ the magistrate judge's findings to the extent that it sees fit").  Objections to a nondispositive order, such as the denial of the request for discovery, are reviewed for clear error.  Fed. R. Civ. P. 72(a).  The undersigned has made a *de novo* determination of all timely filed objections to the R&R and reviewed objections to the denial of discovery for clear error.[2]  For reasons that follow, the

---

[2] While clear error is the correct standard for review of the nondispositional denial of discovery, the undersigned has alternatively reviewed the objections regarding discovery *de novo* since they are contained within the R&R, and the result is the same.

undersigned agrees that the motion to dismiss should be granted and discovery denied.

## I.    Factual Background

The Magistrate Judge's Summary of Factual Allegations accurately lays out the events leading up to the attack, the attack itself, and subsequent events and  is adopted without objection and incorporated into this Order by reference. Nonetheless, to facilitate a discussion of the parties' objections, this Order provides an overview of the allegations stated in the Amended Complaint.

At the time of Al-Shamrani's attack, he was a member of the RSAF.  He was also, as United States officials later determined, affiliated with al Qaeda[3] in the Arabian Peninsula ("AQAP"), an organization designated by the United States Department of State as a Foreign Terrorist Organization.  Al-Shamrani carried out the attack wearing his RSAF uniform and while attending military and flight training at NAS Pensacola.  Plaintiffs allege that this training was provided through a Security Cooperation Education and Training Program and is critical to Saudi

---

[3] Proper capitalization and/or hyphenation for "al Qaeda" is inconsistent and unclear at best from the briefs, Westlaw searches, and even Wikipedia.  The undersigned follows the Supreme Court's lead, using lower case, except at the beginning of a sentence, and no hyphen, unless quoted differently.

CASE NO. 3:21cv329-MCR-ZCB

Arabia's purchase of military defense equipment from the United States.[4]   The Amended Complaint alleges that this is a standard "commercial contract" between the United States and a foreign state, as shown by the terms of a standard form Letters of Request, Offer, and Acceptance ("LOA"), which states that United States' laws and regulations apply and that the foreign country agrees to indemnify and hold the United States Government and its agents or officers harmless from any loss or liability (in tort or contract) that might arise in connection with the agreement. ECF No. 5 ¶¶ 50-54.  According to the Amended Complaint, Saudi Arabia is the United States' largest foreign purchaser of military equipment.

Plaintiffs allege that Al-Shamrani "underwent extensive vetting" when he joined the RSAF in 2015 and by then, he was already radicalized in his religious jihadism and anti-American and anti-Jewish ideology.[5]   They further allege that

---

[4] The agreement allows Saudi Arabia to modernize its armed forces through the purchase of equipment and obtain the "training and education necessary to use these sophisticated products." ECF No. 5 ¶¶ 46–50.

[5] Plaintiffs allege that Saudi Arabia sanctions extremism because Wahhabi religious clerics are directly employed by the Saudi Arabia government and given full control over schools, universities, and mosques; it is alleged that "hard-line' religious leaders "have significant sway in Saudi society" and permeate the military.  ECF No. 5 ¶¶ 72–77.  Plaintiffs further allege that Saudi Arabia's Ministry of Defense "routinely publishes a magazine distributed to all members of its military in print and online entitled 'the Muslim Soldier,'" which "frequently contained articles written by Saudi-state supported clerics" known for extremist beliefs. *Id.* ¶¶ 74–75.  Plaintiffs cite one magazine from February 2018 containing extremist language that is reportedly consistent with Al-Shamrani's expressed views.   Plaintiffs contend that this education amounted to state-

Saudi Arabia knew of Al-Shamrani's anti-American sentiments because he was active on Twitter and "regularly posted his radical fundamental ideology on his social media accounts" but nevertheless allowed him to join the RSAF and sent him to the United States for flight training.  ECF No. 5 at ¶¶ 134–150.  The Amended Complaint also alleges that Al-Shamrani told friends when he joined the RSAF that he had been chosen to undergo a "special mission."  ECF No. 5 at ¶ 134.

Al Shamrani began his aviation training at NAS Pensacola in May 2018.  John Doe 1 was the RSAF Country Liaison Officer ("CLO") responsible for supervising Al-Shamrani at NAS Pensacola.  It is alleged that in July 2019, while in the United States, Al-Shamrani purchased the weapon used in the December 2019 attack and possessed it on base in violation of the policies of both countries.  The Amended Complaint alleges in conclusory terms that the CLO "was aware that Al-Shamrani had a weapon on base in violation" of policy and "was aware of Al-Shamrani's planned attack."[6]  On September 11, 2019, Al-Shamrani announced on social media that "the countdown has begun."[7]   ECF No. 5 at ¶ 160.  According to the Amended

---

sponsored indoctrination into jihadism, but there is no allegation that the Saudi government is engaged in terrorist activities or actively recruits terrorists for such activity.

[6] No factual allegations support these conclusory general statements of knowledge.

[7] Plaintiffs allege that the countdown remark was related to President Trump's recognition of Jerusalem as the capital of Israel on December 6, 2017.  Also, shortly before the December 6, 2019, attack, Al-Shamrani made social media postings that echoed the radical propaganda of

Complaint, within a matter of days after Al-Shamrani's social media "countdown" statement, the CLO "abandoned his post" (approximately three months before the attack) and returned to Saudi Arabia.  ECF No. 5 ¶¶ 39(b), 157.  The CLO position was not filled again until January 2020—after the December 2019 attack.   On February 2, 2020, AQAP took responsibility for the attack.[8]

The United States Navy and the Federal Bureau of Investigation ("FBI") each conducted investigations after the attack and issued reports with findings within a short period, some of which are referenced in the Amended Complaint.   Namely, Plaintiffs state that the FBI had determined by January 13, 2020, that Al-Shamrani's December 6 attack was an act of terrorism motivated by jihadist ideology.[9]   And they point to the Navy Command Investigation Report ("Navy Report") (February

---

AQAP and indicated that he felt the targeting of Americans was justified as retribution for the United States' support of Israel.

[8] Al Qaeda has been designated by the United States as a Foreign Terrorist Organization since 1999.  ECF No. 5 at ¶ 82 & n.2.  AQAP was formed from al Qaeda branches in 2009 and has been designated by the United States as a Foreign Terrorist Organization since 2010.  *Id.* ¶¶ 83, 85.  Plaintiffs allege that AQAP and Saudi Arabia have fought "side-by-side in the ongoing Yemen war against the Houthis movement" and that Saudi Arabian officials and prominent citizens have provided al Qaeda with funds, weapons, and diplomatic travel.  *Id.* ¶ 81, 86. It is further alleged that Saudi Arabia has provided AQAP with "significant resources in connection with the Yemen civil war including weapons and military equipment as well as intelligence and financial support." *Id.* ¶ 86.   Additionally, Plaintiffs allege that "[t]he heavy Saudi presence within the group's [AQAP's] upper echelons suggests it maintains robust recruiting and support networks in Saudi Arabia, despite its base of operations in Yemen."  *Id.* ¶ 93.  Notably, there is no allegation that Saudi Arabia recruits AQAP members for the RSAF.

[9] Plaintiffs also allege that the FBI investigation is ongoing.

21, 2020), which found that the CLO had a duty to be present on base, and his absence from the base and failure to supervise Al-Shamrani was a "contributing factor" leading to the operational success of the attack. *Id.* at ¶¶ 173, 183. According to the Navy Report, had the CLO been present from September to December 2019, he "may have provided 2nd Lt. Al-Shamrani with better oversight and resulted in proactive intervention by [Saudi Arabia] prior to the attack."[10] *Id.* at ¶ 184. On May 18, 2020, the Attorney General announced publicly that the FBI had successfully unlocked Al-Shamrani's phones, which revealed that he had been radicalized years before joining the RSAF and had been in direct communication with AQAP up until the night before the attack.[11]

Following the incident, twenty-one Saudi trainees were found to have possessed "derogatory material"[12] unbecoming an officer and were immediately returned to Saudi Arabia on assurance to the Attorney General that he would have

---

[10] There is no allegation that the Navy concluded the CLO knew Al-Shamrani had a weapon in violation of policy or that any report blamed Saudi Arabia for the attack.

[11] Plaintiffs allege that Al-Shamrani's frequent communications with AQAP revealed systemic problems with Saudi Arabia's security screening. They also allege that he shared his plans with his some of his fellow cadets the night before the attack, but there is no allegation that they participated or that any Saudi official ordered the attack.

[12] The January 13, 2020 press release of the Attorney General stated that cadets possessed material containing Anti-American or jihadi sentiments and at least fifteen individuals had some contact with child pornography, although he determined that the conduct would not in the normal course result in federal prosecution.

"full access" to anyone he wanted to interview in the investigation and the cadets would be returned for trial if charged. *Id.* at ¶ 324. It is further alleged that during discussions between the United States and Saudi Arabia after the incident, Saudi Arabia agreed to "cooperate fully in the investigation and compensate the victims for its employees' attack."[13] *Id.* at ¶ 594. Plaintiffs characterize these statements as an oral contract between the two countries requiring Saudi Arabia to fully cooperate in legal proceedings in the United States and to compensate victims, which they say Saudi Arabia allegedly breached by failing to even engage with Plaintiffs.

## II.    DISCUSSION

The Magistrate Judge recommended finding that Plaintiffs failed to make a *prima facie* case as to any one of the FSIA exceptions raised and also denied Plaintiffs' request for jurisdictional discovery. Plaintiffs object on numerous grounds, arguing that the Magistrate Judge incorrectly shifted the burden of production to them, which in turn led to him to improperly deny them jurisdictional discovery, and also erred in various aspects of the legal analysis pertaining to each statutory exception. Saudi Arabia responds that the burden-shifting objections are

---

[13] The Amended Complaint cites news reports of President Trump announcing that the King and Crown Prince of Saudi Arabia had agreed to "be involved in taking care of the families," and stating, "I think they are going to help out the families very greatly." *Id.* ¶ 596 (internal marks omitted). Obviously, this has not happened.

academic because as to each FSIA exception, the Magistrate Judge first determined that Plaintiffs' allegations were inadequate or conclusory and thus the suit does not withstand a facial, let alone factual, challenge.  The undersigned agrees..

Indisputably, "[f]ederal courts are courts of limited jurisdiction" empowered to act only as authorized under the Constitution and as conferred by statute. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  The party invoking federal jurisdiction bears the burden to establish subject matter jurisdiction. *Id.*  In the FSIA context, a foreign state is presumptively entitled to sovereign immunity "*unless* an FSIA statutory exception applies."[14]  *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1312 (11th Cir. 2009) (emphasis in original); *see also* 28 U.S.C. § 1604 (same).  If no exception applies, "then the district court lacks subject matter jurisdiction over the plaintiff's claims."  *Butler*, 579 F.3d  at 1312.

---

[14] "The FSIA is a jurisdictional statute; it 'does not create or modify any causes of action.'" *Comparelli v. Republica Bolivariana De Venezuela*, 891 F.3d 1311, 1319 (11th Cir. 2018) (quoting *Republic of Austria v. Altmann*, 541 U.S. 677, 695 n.15 (2004)); *see also* 28 U.S.C. § 1330(a) (providing "original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a)" for any claim for relief for which "the foreign state is not entitled to statutory immunity").  Foreign sovereign immunity "affords a complete protection 'from *suit*,'" *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 586 (D.C. Cir. 2020) (quoting *Bolivarian Rep. of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 174 (2017)), and is "not merely a defense to liability," *Belhas v. Ya'alon*, 515 F.3d 1279, 1281 (D.C. Cir. 2008) (internal quotations omitted) (stating also that "the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case").

CASE NO. 3:21cv329-MCR-ZCB

A defendant bears "the initial burden of presenting a *prima facie* case that it is a foreign state," *Butler*, 579 F.3d at 1313 n.8, which here is uncontested.  By moving to dismiss on this defense, a foreign state may challenge subject matter jurisdiction "based on either (1) the inadequacy of the pleadings as a matter of law; or (2) a denial of the allegations in the complaint."  *Rux v. Republic of Sudan*, 461 F.3d 461, 467 (4th Cir. 2006).  "[H]ow the district court proceeds to resolve the motion to dismiss depends upon whether the motion presents a factual [or facial] challenge." *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

The Plaintiff must then overcome the presumption of immunity by identifying a FSIA exception and setting out a *prima facie* case that the exception applies, both legally and factually.  *Butler*, 579 F.3d  at 1313 (stating a plaintiff must "produc[e] evidence that the conduct which forms the basis of the complaint falls within one of the statutorily defined exceptions" (quoting *S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1300 (11th Cir. 2000)) (internal marks omitted); *see also Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1221 n.9 (11th Cir. 2018) (stating plaintiff must make an "initial showing that jurisdiction exists based on an exception").  If the Plaintiff establishes a *prima facie* showing that an exception applies, "the defendant must bear the ultimate burden of persuasion to

show that no FSIA exceptions to immunity apply."[15]   *Devengoechea,* 889 F.3d at 1221 n.9.

Although the Eleventh Circuit requires the production of "evidence" to make out a *prima facie* case that a FSIA exception applies *where the facts are disputed*, if the defendant raises a purely legal challenge, as opposed to a factual one, the court considers whether the allegations taken as true are sufficient to bring the case within the specific exception invoked.   *Devengoechea,* 889 F.3d at 1221 n.9 (citing *Bolivarian Rep. of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 174, 187 (2017) (stating purely legal questions must be resolved)).   A facial challenge is a challenge to legal sufficiency.   *Butler*, 579 F.3d at 1313 ("Where, as here, the party asserting immunity under the FSIA does not contest the alleged jurisdictional facts, but rather, challenges their legal adequacy, we review de novo the complaint's jurisdictional allegations to determine whether they were sufficient to eliminate the appellants' presumptive immunity."); *see also Mwani v. bin Laden*, 417 F.3d 1, 15 (D.C. Cir. 2005) (it is a challenge to legal sufficiency where, although

---

[15] As aptly explained in the 9/11 Attacks litigation: "Determining whether [Plaintiffs'] burden is met involves a review of the allegations in the complaint, the undisputed facts, if any, placed before the court by the parties, and—if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue—resolution of disputed issues of fact."   *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 80 (2nd Cir. 2008) (alterations accepted, internal quotations omitted), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010).

the foreign state "does not expressly concede the truth of the plaintiffs' factual allegations, it argues that even if taken as true, the allegations are insufficient to come within [a FSIA] exception"). With a purely legal challenge, the plaintiff bears the ultimate burden of proving that the FSIA exception invoked applies as a matter of law. *Devengoechea,* 889 F.3d at 1221 n.9. To overcome a facial legal challenge, the Plaintiffs "must include sufficient facts to support a reasonable inference that their claims satisfy the terrorist exception and, therefore, that an exercise of subject matter jurisdiction is appropriate." *Rux,* 461 F.3d at 468.

While Plaintiffs take issue with the Magistrate Judge's application of the burden of production, the Court finds it unnecessary to address the debate because, even accepting the nonconclusory allegations in the Amended Complaint as true, the jurisdictional allegations are facially insufficient to support the asserted statutory exceptions and overcome presumptive immunity as a matter of law. *See Butler*, 579 F.3d at 1313. For reasons that follow, the undersigned agrees with the Magistrate Judge's legal analysis and conclusion that the motion to dismiss should be granted but finds no need to consider Saudi Arabia's factual challenge or to adopt any factual "findings" in the R&R.

Plaintiffs invoke the following FSIA exceptions: (1) JASTA, 28 U.S.C. § 1605B, based on alleged tortious acts of Al-Shamrani, other officials responsible

for vetting and supervising him, and Saudi Arabia's alleged material support for terrorism; (2) noncommercial torts, § 1605(a)(5), based on alleged negligence in vetting, retaining, and supervising Al-Shamrani; (3) commercial activity, § 1605(a)(2), based on contract; and (4) waiver, § 1605(a)(1).

### 1. JASTA Exception, 28 U.S.C. § 1605B

As accurately stated in the R&R, the JASTA exception to foreign sovereign immunity, allows suit against a foreign state if:

> (b) . . . money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by—
>
> (1) an act of international terrorism in the United States; and
>
> (2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.

28 U.S.C. § 1605B(b).[16]  Distilled into its elements, this exception requires proof of: (1) an injury or death within the United States; (2) an act of international terrorism in the United States; (3) a tortious act by the foreign state or by its official, employee,

---

[16] The Anti-Terrorism Act ("ATA") authorizes a civil tort suit for U.S. nationals injured by an act of international terrorism.  *See* 18 U.S.C. § 2333.  Although an ATA suit is ordinarily not authorized against a foreign state, *see* 18 U.S.C. § 2337(2), the new sovereign immunity exception of JASTA, § 1605B, expressly allows suit against a foreign state "in accordance with § 2333," as long as the requirements of § 1605B(b) are met.  28 U.S.C. § 1605B(c).

or agent acting within the scope of that office, employment or agency;[17] (4) causation; and (5) resulting damages.  ECF No. 54 at 14 (citing *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 642 (S.D.N.Y. 2018).  Additionally, element (3) (a "tortious act") is further defined by § 1605B(d), which expressly precludes jurisdiction based on "an omission or a tortious act or acts that constitute mere negligence." § 1605B(d).

In this case, the following elements are undisputed: (1) an injury or death occurred within the United States, (2) as a result of an act of terrorism in the United States, and (5) damages resulted.  The heart of the dispute centers on elements (3) and (4)—*i.e.,* whether a tortious act (not an omission or negligence) of/by Saudi Arabia or an employee or agent of Saudi Arabia while acting within their scope of employment caused the Plaintiffs' harm.  Plaintiffs argue the JASTA exception is satisfied because Al-Shamrani, the CLO, and other employees of Saudi Arabia committed tortious acts within the scope of their employment, and Saudi Arabia committed the tort of providing material aid to a terrorist (Al-Shamrani) and AQAP (a terrorist organization), each of which, they allege, caused the attack.

---

[17] Under the JASTA exception, it does not matter where the foreign state's or employee's tort occurs, as long as the act of international terrorism occurred in the United States.  *See* 28 U.S.C. § 1605B(b)(2).

a. Scope of Al-Shamrani's Employment.  In a nutshell, Plaintiffs argue that Al-Shamrani acted within the scope of his employment because his work provided him access to the place where the attack occurred, and he believed he was serving the interests of Saudi Arabia due to his state-indoctrinated extremist religious beliefs. The Magistrate Judge rejected these arguments, finding that Al-Shamrani's acts were not within the scope of his employment because they were committed for his own personal religious extremist purposes.  Plaintiffs argue that the Magistrate Judge erred in not accepting their well-pled allegations and by misconstruing Florida law. The undersigned disagrees and finds no error in the Magistrate Judge's reasoning.

There is no dispute that under Florida law, the scope of employment inquiry turns on whether the conduct (1) was "the kind for which the employee was employed to perform;" (2) "occurred within the time and space limits" of employment; and (3) was "activated at least in part by a purpose to serve the employment." *Spencer v. Assurance Co. of Am*., 39 F.3d 1146, 1150 (11th Cir. 1994) (applying Florida law); *see* ECF No. 54 at 16.  The Magistrate Judge determined that: (1)  Al-Shamrani was employed to fly airplanes, not engage in an attack at the base,[18] and (2)  although the conduct occurred within the time and space

---

[18] Plaintiffs contest the Magistrate Judge's finding that Al-Shamrani was employed to fly airplanes, arguing that this is not supported by the record.  The criticism is meritless and belied by

limits of Al-Shamrani's employment as an RSAF member, (3) Al-Shamrani acted

for his own interests, not those of Saudi Arabia.[19]   The Magistrate Judge rejected

Plaintiffs' argument that the scope of employment analysis is satisfied in this case

solely because Al-Shamrani's work provided him access to NAS Pensacola and an

opportunity to commit the attack.  ECF No. 54 at 17–21.  The Magistrate Judge is

correct.

The general rule in Florida is that an employee's act of common law battery

to accomplish his own purpose is outside the scope of his employment. *See City of*

*Miami v. Simpson*, 172 So. 2d 435, 437 (Fla. 1965) ("The master's liability does not

arise when the servant steps aside from his employment to commit the tort or does

the wrongful act to accomplish some purpose of his own.").  In other words, "[i]f the

tort is activated by a purpose to serve the master or [employer], then [the employer]

is liable. Otherwise he is not." *Id.*; *see also City of Green Cove Springs v. Donaldson*,

---

Plaintiffs' own allegations in the Amended Complaint that Al-Shamrani was "a Second Lieutenant
in the RSAF;" that "[a]t the time of the attack, Al-Shamrani was a flight student participating in
the United States' Security Cooperation Education and Training Program;" and that "[t]he training
provided to Al-Shamrani involved language education and flight training for the planes purchased
by the Kingdom of Saudi Arabia." ECF No. 5 at ¶¶ 39(a), 43, 58.

[19]   The Magistrate Judge also determined that the conduct was not within the scope of Al-
Shamrani's agency because there was no basis for finding that Saudi Arabia authorized the attack
or caused anyone to believe Al-Shamrani was authorized to launch a terrorist attack.  ECF No. 54
at 21 n.9.  This is not expressly challenged.

348 F.2d 197, 203 (5th Cir. 1965)[20] (citing Florida law stating an employer is liable when an employee does a lawful and authorized act in "an unauthorized manner" but not when the employee does "an unlawful or prohibited act" (internal quotations omitted)).  As the Magistrate Judge correctly recognized and discussed, sexual assault cases in Florida illustrate the general principle that rejects liability for unlawful conduct where there could be no purpose to serve the employer.  *See e.g., Iglesia Cristiana La Casa Del Senor, Inc*., 783 So. 2d 353, 357 (3d DCA 2001) (reversing a jury verdict and finding that a pastor's sexual assault of a minor was not within the scope of employment; the church could not be vicariously liable for his criminal act, despite the access provided by the employment); *Agriturf Mgmt., Inc. v. Roe*, 656 So. 2d 954 (Fla. 2d DCA 1995) (employer was not liable for sexual assault of a child, despite the fact that the act occurred on the employer's property and during the employee's work of closing the business for the day).

Plaintiffs allege that Al-Shamrani wore his RSAF uniform during the attack, committed the attack at his workplace, and/or believed that he was, at least in part, serving his employer's (Saudi Arabia's) interests due to state-indoctrinated religious beliefs.  Even accepting these allegations, they are not enough because neither the

---

[20] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) (adopting the case law of the former Fifth Circuit before October 1, 1981, as precedent in this Circuit).

act itself nor the alleged belief by Al-Shamrani that he was serving his employer is grounded in any work-related task or duty of an RSAF member participating in a cooperative training program as a flight trainee at NAS Pensacola, where he was not authorized to possess a weapon. Plaintiffs argue, correctly, that Florida courts have found the scope of employment inquiry satisfied where an employee's intentional tort bears a close nexus to the workplace, to a work-related duty, or to the employee/employer relationship.[21] But the Court has reviewed the cases cited and finds none of them analogous to this case. *See* ECF No. 39 at 28–29 n. 13 (listing cases[22]). True, the cited cases involved a wide variety of intentional torts, even

---

[21] *See, e.g., McMillan v. Dep't of Corr.*, No. 5:13-CV-292-W S-GRJ, 2016 WL 4059230, at *4 (N.D. Fla. July 8, 2016) (explaining that illegal acts of employees are not always "beyond the reach of vicarious liability," such as where a supervisor abused his power by sexually assaulting an inmate, using the employee/employer relationship to gain access to a locked room and to an inmate he was supposed to be supervising); *Hennagan v. Dep't of Highway Safety & Motor Vehicles,* 467 So. 2d 748, 750 (Fla. 1st DCA 1985) (an officer's excessive use of force is not, as a matter of law, outside the scope of employment).

[22] *See, e.g., Fields v. Devereux Found., Inc.*, 244 So. 3d 1193 (Fla. 2d DCA 2018) (assault by a case manager while supervising a visitation); *Valeo v. E. Coast Furniture Co.*, 95 So. 3d 921, 925 (Fla. 4th DCA 2012) (assault purportedly to protect employer's business money); *Gonpere Corp. v. Rebull*, 440 So. 2d 1307 (Fla. 3d DCA 1983) (building manager shot a tenant over an eviction dispute); *Parsons v. Weinstein Enterprises, Inc.*, 387 So. 2d 1044, 1045 (Fla. 3d DCA 1980) (finding a jury question where a patron who allegedly broke a lamp at the business was beaten by a bouncer, while the owner watched); *Lay v. Roux Labs., Inc.*, 379 So. 2d 451, 453 (Fla. 1st DCA 1980) (overzealous parking lot enforcer); *Forster v. Red Top Sedan Service, Inc.*, 257 So. 2d 95 (Fla. 3d DCA 1972) (bus driver assaulted driver of car who delayed him in his duties); *Jax Liquors, Inc. v. Hall,* 344 So.2d 247 (Fla. 1st DCA 1976) (security guard shot an unruly bar patron for removing a drinking glass); *Columbia by the Sea, Inc. v. Petty,* 157 So. 2d 190 (Fla. 2d DCA 1963) (restaurant employee assaulted patron who refused to pay 35 cents for salad dressing).

shootings, at the workplace, but in each instance, contrary to the facts alleged here, the assault arose out of or in relation to an actual work-related task, dispute, or exercise of supervisory authority gone awry.[23]

While no one factor is singularly decisive in this fact intensive inquiry, as Plaintiffs argue, *see Columbia By the Sea, Inc. v. Petty*, 157 So. 2d 190, 191 (Fla. 2d DCA 1963) ("seldom is one of the factors"—nature of duties, course of the assault, or motivation—"deemed of itself decisive; rather, each must be considered in terms of the others"), this case is unquestionably out of the ordinary.  Nothing in the cases cited by Plaintiffs is by any means comparable to Al-Shamrani's murderous attack, which in the undersigned's view was so extreme as to be outside the scope of Al-Shamrani's RSAF employment as a matter of law.  *See Stinson v. Prevatt,* 94 So. 656, 657 (1922) (framing the scope of employment standard as *excluding* homicide[24]); *see also Doe v. Norwich Roman Catholic Diocesan Corp*., 268 F. Supp.

---

[23] Plaintiffs also cite *Tampa Maid Seafood Products v. Porter*, 415 So. 2d 883, 885 (Fla. 1st DCA 1982), which involved an attack committed by an employee using a knife from the workplace.  Although the court found that the tort arose within the scope of employment, the case is distinguishable because here, Al-Shamrani did not commit the attack with a weapon he was authorized to use for work, and the weapon was not related to his military training.  In fact, Al-Shamrani's possession of the gun and ammunition used in the attack on base violated work policies.  *Tampa Maid Seafood* is also distinguishable because it is a worker's compensation case, and Florida courts have explained that the worker's compensation scope of employment test  is broader than the common law tort test. *See Sussman v. Fla. E. Coast Properties, Inc.*, 557 So. 2d 74, 75 (Fla. 3d DCA 1990).

[24] In 1922, the Florida Supreme Court set out the general rule that:

2d 139, 142 (D. Conn. 2003) ("there are occasional cases where a servant's digression from duty is so clear-cut that the disposition of the case becomes a matter of law").[25]

b. Inadequate Vetting, Retention, Supervision.   Plaintiffs also invoked the JASTA exception based on Saudi Arabia's vicarious liability for the negligence or gross negligence of unnamed officials or employees in the vetting and/or retention

---

. . . an employer is liable in damages for the wrongful act of his employee that causes injury to another person, if the wrongful act is done while the employee is acting within the apparent scope of his authority as such employee to serve the interests of the employer, even though the wrongful act also constitutes a crime *not a homicide* or was not authorized by, or was forbidden by, the employer, or was not necessary or appropriate to serve the interests of the employer, unless the wrongful act of the employee was done to accomplish his own purposes, and not to serve the interests of the employer.

*Stinson,* 94 So. at 657 (emphasis added).   In *Stinson*, a supervisor shot and killed a man at the workplace, having mistakenly believed the man was wrongfully enticing laborers away from the company.   While the court found a question of fact on scope of employment, the case is easily distinguishable.   There, a jury could find that the killing stemmed from the supervisor's job requirements of protecting the business and ensuring that laborers were not enticed away to other companies—job duties for which the supervisor was authorized to carry a weapon.   *Id.* The court concluded that therefore, the wrongful act did not "clearly appear" to have been done maliciously for the employee's own purpose.   Here, by contrast, Plaintiffs allegations admit that Al-Shamrani's job did not involve the use or possession of a weapon or ammunition on base—in fact, Plaintiffs readily concede that doing so violated the policies of both countries.   Plaintiffs also recognize that the murders were committed as an act of religious jihadism and terrorism.   Since there is no allegation that Saudi Arabia ordered the attack or authorized Al-Shamrani to use a weapon on base or even to individually possess one for any purpose related to his job (ECF No. 5 at ¶ 156), these terrorist acts were clearly malicious and personal.

[25] It is also worth noting Plaintiffs' allegation that Al-Shamrani "was radicalized years before joining the RSAF." ECF No. 5 at ¶ 341.   If this is true, it demonstrates an even greater disconnect between his radical beliefs and his *employment*.

of Al-Shamrani, or based on the CLO's inadequate supervision of Al-Shamrani while in the United States. The Magistrate Judge concluded that these allegations do not provide a basis for invoking the JASTA exception because Plaintiffs' claims of negligence (and gross negligence) are based on omissions, which do not provide a legal basis for invoking the JASTA immunity exception. *See* 28 U.S.C. § 1605B(d). Plaintiffs object to the characterization of their claims as premised on "omissions" but further argue that omissions can support jurisdiction under the JASTA exception if premised on more culpability than mere negligence, such as gross negligence. The undersigned disagrees.

As noted above, the JASTA immunity exception does not subject a foreign state to "the jurisdiction of the courts of the United States under subsection (b) on the basis of an omission or a tortious act or acts that constitute mere negligence" 28 U.S.C. § 1605B(d). This language is clear and unambiguous. The plain meaning of omission is a "failure to do something," as the Magistrate Judge correctly noted. ECF No. 54 at 23; *see also* Garner's Dictionary of Legal Usage 632 (3d ed. 2011) (defining "omission" as "ordinarily denoting the failure to do something"). Plaintiffs have not cited any authority supporting an interpretation of this phrase that would allow suit based on a "reckless" or "gross" omission, and the undersigned has found none. Moreover, as the statutory phrase is structured, the term "omission" stands on

its own, neither preceded by nor immediately followed by any limiting modifier. *See generally Lockhart v. United States*, 577 U.S. 347, 351 (2016) (under the "rule of the last antecedent," a limiting clause or phrase is ordinarily read as modifying only the noun or phrase immediately preceding it, not words or phrases more remote). The undersigned's *de novo* review of the Amended Complaint confirms that Plaintiffs' allegations are all phrased as a failure of the foreign state and/or its agent(s) to do something, which does not satisfy JASTA.[26]

c. Material Support & the Element of Causation. Plaintiffs also allege that their injuries were "caused by" Saudi Arabia's tortious acts of harboring Al-Shamrani (a terrorist and AQAP member) within its military and providing material support both to Al-Shamrani and AQAP (a designated terrorist organization), such

---

[26] To the extent there are allegations that Saudi Arabia knew of Al-Shamrani's affiliation with AQAP, ECF No. 5 ¶ 144, or that the CLO knew Al-Shamrani had an unauthorized weapon, *id.* at ¶ 156, and failed to take action, these allegations are nonetheless based on omissions (the failure to do something about it), and in any event, the allegations of knowledge are conclusory in nature and not supported by any reasonably sufficient factual allegations. *See Mamani v. Berzain*, 654 F.3d 1148, 1153-54 (11th Cir. 2011) (stating that claims under the Alien Tort Statute based on allegations that a defendant leader or official "knew or should have known" of wrongful acts and failed in his duty to prevent it are "[e]asy to say about leaders of nations, but without adequate factual support of more specific acts by *these* defendants, these bare allegations are not entitled to be assumed as true") (internal marks omitted, emphasis in original). The allegations that Al-Shamrani shared his plans with fellow cadets the night before the attack show no basis for vicarious liability. The CLO was not present to know this and unlawfully retain him based on it, and any failure to perform a duty to report on the part of the trainees would have been a mere omission. The trainees' "participation" in planning is alleged only in conclusory terms, and there is no allegation that any trainee or RSAF official and/or agent participated in the attack itself or approved, ordered, or facilitated the attack.

as funding, weapons, and training.[27]  The Magistrate Judge concluded that proximate cause is the appropriate legal standard for causation under § 1605B(b) and that Plaintiffs' allegations were insufficient to establish proximate cause between Saudi Arabia's conduct and the NAS Pensacola attack.

Plaintiffs alleged that Saudi Arabia provided material support in the form of financing and training to Al-Shamrani.  Specifically, they alleged that Saudi Arabia "knew" Al-Shamrani was affiliated with AQAP because he had made social media comments, he was "extensively vetted" prior to joining the RSAF (contrary to their allegations that he was insufficiently vetted), and Saudi Arabia has engaged in surveillance of its citizens on social media or websites (although they also alleged that Saudi Arabia failed to appropriately monitor Al Shamrani's social media). Plaintiffs argue that the Magistrate Judge failed to discuss these allegations.  The undersigned disagrees.  While not listing them explicitly in the material support

---

[27] *See* 18 U.S.C. §§ 2339 (harboring or concealing a person one knows or has reasonable grounds to believe has committed or is about to commit an act of terrorism); 2339A (providing material support or resources intended to be used in an act of terrorism, including money, training, lodging, safehouses); 2339B (providing material support to designated foreign terrorist organizations); 1339C (prohibiting the financing of terrorism, directly or indirectly, with the intention or knowledge that the funds will be  used to carry out an act of terrorism). These torts require knowledge that the materials provided will be used to support a designated terrorist organization or an act of terrorism. *See generally Holder v. Humanitarian L. Project*, 561 U.S. 1, 16 (2010) (discussing knowledge requirement of § 2339B); *In re Chiquita Brands Int'l, Inc*., 284 F. Supp. 3d 1284, 1307–1309 (S.D. Fla. 2018) (discussing intent requirements under ATA provisions).

analysis, the Magistrate Judge clearly considered these allegations, but he found them conclusory and insufficient to show that any tortious act of Saudi Arabia proximately caused Al-Shamrani's terrorist attack.  On *de novo* review, the only support allegedly given to Al-Shamrani was through his job as an RSAF member, and the allegations that Saudi Arabia knew he was an AQAP operative because he had expressed extremist views and some citizens were subject to surveillance are both conclusory and speculative; there is no sufficient factual allegation from which to reasonably infer that Saudi Arabia knew Al-Shamrani was a terrorist intending to attack the United States.

The Magistrate Judge also found proximate cause lacking as to AQAP. Plaintiffs object, arguing that the Magistrate Judge improperly required a higher burden of proximate cause than necessary at the jurisdictional stage, citing *In re Terrorist Attacks*, 298 F. Supp. 3d at 645 n.8 ("It is well settled that jurisdictional causation under the FSIA is distinct from and more liberal than the substantive causation elements of any one claim.").  On *de novo* review, the undersigned concludes that the Magistrate Judge correctly applied the proximate cause standard as articulated in *In re Terrorist Attacks*.  While this jurisdictional standard may not be as stringent as a "but for" requirement, *see id.*, it still requires "some reasonable connection" to show that the damages alleged were "caused by" the foreign state's

act.[28]  *Id.* at 645–46 (interpreting § 1605B(b) and quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 778 (D.C. Cir. 2017), *vacated and remanded sub nom on other grounds*, *Opati v. Republic of Sudan*, 590 U.S. 418 (2020)).  This is met by showing that the defendant's conduct was (1) a "substantial factor in the sequence of events that led to plaintiff's injury" and (2) that the injury was "reasonably foreseeable or anticipated as a natural consequence of the defendant's actions."  *Id.* at 646 (also noting that the causal link is insufficient if it is "so attenuated that the consequence is more aptly described as mere fortuity" (quoting *Paroline v. United States*, 572 U.S. 434, 445 (2014)).  The Magistrate Judge required nothing more.

Turning to the allegations of material support to AQAP (a designated foreign terrorist organization), Plaintiffs assert:  "Saudi Arabia and AQAP are currently fighting side-by-side in the Yemen war against the Houthis movement," and "Saudi Arabia has provided AQAP with significant resources in connection with the Yemen civil war including weapons and military equipment as well as intelligence and financial support."  ECF No. 5 at ¶86.  Also, Plaintiffs allege that certain Saudi

---

[28] The court in *In re Terrorist Attacks* rejected a more stringent "but for" standard in favor of the traditional proximate cause standard.  298 F. Supp. 3d at 645–46 (citing *Owens*, 864 F.3d at 794; *Rux v. Republic of Sudan*, 461 F.3d 461, 466 (4th Cir. 2006); and *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1124 (D.C. Cir. 2004)).

citizens have been members or leaders in AQAP.[29]  Although these allegations show some general connections between Saudi Arabia and AQAP, the only nonconclusory allegations are limited to the conduct of private citizens or mutual efforts to defeat the Houthis movement in the "ongoing civil war in Yemen."  *Id.*  Reviewing the allegations *de novo*, the undersigned concludes as a matter of law that these connections are too remote and tenuous to demonstrate that Saudi Arabia's actions were a "substantial factor in the sequence of events" leading to the NAS Pensacola attack or that the attack was "reasonably foreseeable" to Saudi Arabia based on its activities in connection with Yemen.  Furthermore, there are no "specific, non-conclusory allegations," *In re Terrorist Attacks*, 298 F. Supp. 3d at 647, that Saudi Arabia or any particular government employee or agent acting within the scope of his/her employment provided material support directly to AQAP, and certainly no

---

[29] Plaintiffs' allegations reference a wide variety of news articles about the Yemen conflict and one excerpt of congressional testimony indicating that Saudi Arabia or some Saudi individuals may have a "relationship" with AQAP in relation to the Yemen war.  *See also* ECF No. 39 (exhibits).  The allegations also state only in conclusory terms that "Saudi Arabian government actors and agents have given al-Qaeda and other Islamic extremist material support and resources." ECF No. 5 ¶106.  They also allege that individual "Saudi Arabian donors and sympathizers remain a critical financial support base of al-Qaeda and constitute the most significant source of funding to al-Qaeda," *id.*, which does not implicate any government official.

allegation that any support was provided *for the planning of this or any attack in the United States*.[30]

Plaintiffs argue that foreseeability of *this particular terrorist attack* is not required where material support is knowingly provided to a designated terrorist organization. This is incorrect for jurisdictional purposes under § 1605(b), which requires *injury in the United States*. Plaintiffs rely on ATA cases discussing the standards for providing material support to a terrorist organization through aiding and abetting. *See Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 858–61 (2d Cir. 2021) (allegation that financial defendant knowingly provided material support to a known terrorist organization was sufficient to show a general awareness that its money laundering banking services were playing a role in terrorist activities); *Linde v. Arab Bank, PLC*, 882 F.3d 314, 332 (2d Cir. 2018) (stating the newly enacted aiding and abetting claim requires a general awareness of the defendant's role in an "overall illegal activity" from which an "act of international terrorism" is a foreseeable risk). These cases are inapposite because they did not involve any

---

[30] The Magistrate Judge also provided specific examples in the R&R of other cases where the allegations were found sufficient and concluded the instant case "pales in comparison" to allegations that have been found to be sufficient in other cases. ECF No. 54 at 32–35. Even if the allegations were sufficient to show material support, Saudi Arabia has denied those allegations, and Plaintiffs have failed to produce evidence in support or to show a specific or targeted allegation that could be proven with limited jurisdictional discovery.

question of overcoming sovereign immunity under § 1605B(b), which by its express

terms does not reference aiding and abetting.[31]  Instead, § 1605(b) requires that the

injury be "caused by" a tortious act of *the foreign state* or its employee or agent

acting within the scope of employment, and causing injury in the United States, to

overcome sovereign immunity, and reasonable foreseeability is a part of that

proximate causation equation.  As the Magistrate Judge concluded, there does not

need to be a direct connection between the acts of the foreign state and the act of

terrorism, but there must be a "reasonable" one.  *See In re Terrorist Attacks*, 298 F.

Supp. 3d at 645.  This demands some showing that the alleged support in the war in

Yemen was a substantial factor in the sequence of events *leading to* Al-Shamrani's

---

[31] The courts in *Kaplan* and *Linde* were considering a provision of JASTA that amended the ATA by adding secondary liability against a "person" who aids and abets terrorism by knowingly providing substantial assistance.  18 U.S.C. § 2333(d)(2).  The amendment states specifically that "person" is determined as defined in 1 U.S.C. § 1 (defining "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals").  A foreign state is not included in that definition of "person" and "aiding and abetting" is not included in the JASTA foreign immunity exception.  As explained in the *In re Terrorist Attacks* MDL, JASTA does not create aiding and abetting liability against foreign states. *See In re Terrorist Attacks on September 11, 2001*, No. 03MDL1570GBDSN, 2023 WL 1797629, at *8 (S.D.N.Y. Feb. 7, 2023) ("Congress considered and amended foreign sovereign immunity in one section of the [JASTA] but provided no explicit waiver of foreign sovereign immunity in its aiding-and-abetting amendment." which is codified at § 2333(d)(2)), *reconsideration denied*, No. 03MDL1570GBDSN, 2023 WL 2971480 (S.D.N.Y. Apr. 17, 2023).  Although substantive liability under the ATA is not at issue, the Court finds this textual analysis persuasive.  But importantly at this jurisdictional stage, aiding and abetting a designated terrorist organization based on a potentially lesser "general awareness" substantive standard is simply not included in § 1605B(b) as a basis for overcoming sovereign immunity.

attack *and* some reasonably foreseeable consequence in the United States, which is not plausible on the allegations of the Amended Complaint; or some showing that it was reasonable to foresee that AQAP would act as Saudi Arabia's *agent* in carrying out an attack in the United States, which Plaintiffs have not even alleged. The undersigned agrees with the Magistrate Judge that on these allegations, "[c]onnecting any conduct by Saudi Arabia to the NAS-P attack requires the stacking of inference, upon inference, upon inference," which amounts to no more than speculation.  ECF No. 54 at 31.

## 2.    Noncommercial Tort Exception, 28 U.S.C. § 1605(a)(5)

Plaintiffs also assert that the FSIA's noncommercial tort exception applies based on the CLO's negligence, namely, his failure to follow rules regarding adequate supervision.  Under the FSIA, a foreign state has no immunity from suit for personal injury or death "occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment."  28 U.S.C. § 1605(a)(5). This exception, unlike the JASTSA exception of § 1605B(b), authorizes jurisdiction for *any* tortious act, even a negligent one, or an omission; but its application is limited by the "discretionary function exception," § 1605(a)(5)(A), and the "entire tort rule," *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109,

115–16 (2d Cir. 2013) ("the 'entire tort' must be committed in the United States")

(quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 441

(1989)).

The term "discretionary function" is not defined in the FSIA, but there is no

dispute that courts apply a two-part inquiry to decide the issue, requiring

consideration of: (1) "whether the challenged action involved an element of choice

or judgment" or the course of action is mandated by a federal statute, regulation, or

policy, and (2) if judgment is exercised, "whether the choice or judgment was one

involving social, economic or political policy."[32] *O'Bryan v. Holy See,* 556 F.3d 361,

383 (6th Cir. 2009) (internal quotations omitted) (citing *Berkovitz by Berkovitz v.*

*United States*, 486 U.S. 531, 536 (1988) (explaining that the discretionary function

exception "protects only governmental actions and decisions based on

considerations of public policy")).  As noted by the Magistrate Judge, case law is

clear that decisions related to the hiring and supervision of employees are

discretionary functions because (1) these decisions involve an element of judgment

and (2) are the type of policy judgments the FSIA discretionary exclusion is designed

---

[32] "[C]ourts typically apply the interpretation of the discretionary function exception of the Federal Tort Claims Act (FTCA)" in the FSIA context because the same language is used in both statutes, and the FTCA is referenced in the FSIA's legislative history.  *O'Bryan v. Holy See,* 556 F.3d 361, 383 (6th Cir. 2009).

to shield. *See, e.g. id.* at 384; *Andrews v. United States*, 121 F.3d 1430, 1441 (11th Cir. 1997) ("courts have recognized that decisions regarding the exercise of supervisory authority are of the sort the discretionary function exception was designed to encompass"); *Burkhart v. Washington Metro. Area Transit Auth.,* 112 F.3d 1207, 1217 (D.C. Cir. 1997) (stating "hiring, training, and supervision choices" are the type that are "susceptible to policy judgment."); *Carlyle v. United States, Dep't of Army*, 674 F.2d 554, 556-57 (6th Cir. 1982) (the manner of supervising army recruits "was a planning level, discretionary function"); ECF No. 54 at 42-43 (citing cases).

Plaintiffs do not argue that hiring, retaining and supervising employees are not discretionary acts but argue instead that in this case, Saudi Arabia was subject to mandatory United States Navy regulations and policies that removed the CLO's discretion, and consequently, the tort claims are not barred by the discretionary function exception. The Magistrate Judge carefully reviewed the regulations and manuals that Plaintiffs cited in the Amended Complaint and attached to their response and concluded that in fact they do not impose a mandatory obligation on Saudi Arabia to properly screen, hire, train or supervise its trainees. *See* ECF No. 54 at 43-47. Instead, the Joint Security Cooperation Education and Training Manual, the Security Assistance Management Manual, the Flight Student Training

Administration Manual, the NAS-P Personal Firearms Policy, the VT-86 Commanding Officer's Violence Prevention Policy, and the NAS-P International Miliary Student Liberty Policy are aimed at the United States military or student conduct. In their objections, Plaintiffs cite to these same regulations and policy manuals but do not argue any particular error in the Magistrate Judge's review of them, and the undersigned's *de novo* review reveals nothing to the contrary either. While these manuals may have imposed obligations on Al-Shamrani as a student and contemplated that a CLO may be assigned to assist trainees, they do not mandate conduct by Saudi Arabia. Because no United States federal statute or military regulation or policy mandates conduct by Saudi Arabia or the CLO in these areas, and supervision and training are the type of duties that require the exercise of judgment and policy-level decisions subject to protection under the discretionary function exception, Plaintiffs have not satisfied the noncommercial tort exception. *See O'Bryan,* 556 F.3d 384. The Magistrate Judge's discussion and decision are adopted.[33]

---

[33] Because the discretionary function exception bars jurisdiction over the noncommercial torts, the undersigned finds no need to discuss the entire tort rule, except to briefly note agreement with the Magistrate Judge that this also would bar the claim. Saudi Arabia's alleged failure to supervise Al-Shamrani during the months preceding the attack did not take place entirely within the United States because the CLO had returned to Saudi Arabia and was no longer present on base. *See O'Bryan*, 556 F.3d at 387 (concluding claims of negligent supervision of clergy by the Holy See could not proceed under the one tort rule because its supervision would not have occurred

### 3.     Commercial Activity Exception, 28 U.S.C. § 1605(a)(2)

Another FSIA exception applies to commercial activity. *See* 28 U.S.C.

§ 1605(a)(2).  Under this exception, a foreign state is subject to federal jurisdiction

in a case in which the action is "based upon" (1) "a commercial activity carried on

in the United States by the foreign state;" (2) "an act performed in the United States

in connection with a commercial activity of the foreign state elsewhere," or (3) "an

act outside the United States in connection with a commercial activity of the foreign

state and that act causes a direct effect in the United States." *Id.*; *Devengoechea*,

889 F.3d at 2220.  Significantly, for a claim to be "based upon" commercial activity,

the commercial activity alleged must be the gravamen of the action.  *See OBB*

*Personenverkehr AG v. Sachs*, 577 U.S. 27, 34 (2015) ("an action is 'based upon'

the 'particular conduct' that constitutes the 'gravamen' of the suit"); *Saudi Arabia*

*v. Nelson*, 507 U.S. 349, 357 (1993) (requiring "something more than a mere

connection with or relation to commercial activity").  An activity of a foreign state

is commercial in nature if it is "the type of action[] by which a private party engages

in 'trade and traffic or commerce'" and not the type of action that requires the

---

in the United States, but finding the noncommercial tort exception was met for liability premised
on supervisors who were located within the United States).

exercise of "powers peculiar to sovereigns."[34] *Devengoechea*, 889 F.3d at 1221 (quoting *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)).  The focus is on the foreign state's actions, not its motives.  *Id*.

Plaintiffs argue that their claims of negligence (Count 14) and third-party breach of contract (Count 19) are "based upon" a commercial transaction—that is, Saudi Arabia's purchase of goods and services from the United States, which governs their relationship. The Magistrate Judge disagreed, concluding that (1) Saudi Arabia's alleged contract for military arms and training of its servicemembers is not commercial but instead amounts to an exercise of sovereign power, citing *UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210, 216–17 (5th Cir. 2009) ("Maintaining an air defense system is a similarly sovereign act."); *MCI Telecommunications Corp. v. Alhadhood*, 82 F.3d 658, 664 (5th Cir. 1996) (finding that "a military training agreement between two sovereign parties" was not commercial in nature), and (2)  that even if the program could qualify as commercial, the gravamen of this lawsuit is decidedly not "based upon" commercial activity within the meaning of § 1605(a)(2).  Plaintiffs object, arguing that their negligence

---

[34] For instance, regulating limits on foreign currency exchange is a sovereign activity that cannot be exercised by a private party, but "a contract to buy army boots or even bullets is a commercial activity because private companies can similarly use sales contracts to acquire goods." *Weltover,* 504 U.S. at 614–15.

and breach of contract claims are based on a commercial contract and that the Magistrate Judge erred by improperly looking to the "purpose" of the transaction as opposed to its "nature." They argue that the "motive" behind the transaction is not relevant, *see Devengoechea*, 889 F.3d at 1221, and that Saudi Arabia's failure to fulfill the terms of its commercial contract, *i.e.*, failure to properly vet and supervise Al-Shamrani, is the "gravamen" of the suit. On *de novo* review, the undersigned finds these arguments unavailing in light of settled law and the facts alleged and adopts the reasoning and conclusion of the Magistrate Judge.

Foremost, the Magistrate Judge's decision is not based on motive but on the inherently sovereign *nature* of the agreement. As described in the Amended Complaint,[35] "[t]hese sales provide the foreign customers with a complete defense capability that includes training, sustainment, and contractor logistics support," and "[p]art and parcel of these sales agreements is the critical training and education necessary to use these sophisticated products." ECF No. 5 at ¶ 46. 50. Plaintiffs further allege that "[p]rogram management, trainers, simulators, travel, billeting, and medical support may also be included as components of the sales," and that Al-Shamrani was present at NAS Pensacola to complete all of his aviation training. *Id.*

---

[35] While the agreement is not in the record, the Court accepts Plaintiffs' allegations regarding its nature.

¶¶ 55, 56, 58.  Through this agreement, RSAF personnel are trained on equipment, language, and aviation skills at a secure United States Navy base alongside United States servicemembers, aiding Saudi Arabia in developing an air defense system. This cooperative arrangement necessarily involves the exercise of sovereign judgment and powers of a type that "cannot be exercised by private citizens" and thus is not commercial in nature.  *See Devengoechea*, 889 F.3d at 1221; *UNC Lear Servs.*, 581 F.3d at 216.

The Court rejects Plaintiffs' reliance on *Simon v. Republic of Hungary*, 443 F. Supp. 3d 88, 110 (D.D.C. 2020), *aff'd in part, remanded in part*, 77 F.4th 1077 (D.C. Cir. 2023), as misplaced.  There, the court determined that Hungary's military equipment purchases, including airplanes, munitions, electronics and armaments, from the United States' foreign military sales program, were simply commercial contracts for goods.  *Id.* (citing *Weltover*, 504 U.S. at 614, and stating "a contract to buy army boots" is commercial in nature).  Here, by contrast, the agreement between the United States and Saudi Arabia, as alleged, included an interwoven cooperative training relationship between two sovereign countries that was not at issue in *Simon* and could not be purchased by an ordinary citizen.

Because the agreement alleged is not commercial in nature, there is no need to consider Plaintiffs' argument that the gravamen of their causes of action for

negligence and contract are "based upon" a commercial transaction.  That said, the Magistrate Judge also ruled alternatively on the issue, and the undersigned agrees with his conclusion.   The Supreme Court has made it clear that instead of "individually analyzing" each cause of action, courts must "zero[] in on the core of the[] suit."  *OBB Personenverkehr*, 577 U.S. at 34 (stating *Nelson* "teaches that an action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit").  Viewing the 170-page Amended Complaint as a whole, all of Plaintiffs' claims of injury turn on the one "tragic episode," *id.*, which is Al-Sharmrani's act of terrorism in the United States, not a commercial activity.  As the Magistrate Judge concluded, there is no plausible way this Court could say that the claims are "based upon" contract or any act in connection with commercial activity.[36]  *See* ECF No. 54 at 54 ("Plaintiffs' lawsuit is not about some commercial deal gone bad.").  The objection is overruled.

### 4.    Waiver Exception, 28 U.S.C. § 1605(a)(1)

The final FSIA exception invoked by Plaintiffs is waiver.  A foreign state is not immune in any case "in which [it] has waived its immunity either explicitly or

---

[36] Additionally, because the gravamen of the suit can be determined based on the allegations as a whole, the Court finds no clear error in the denial of discovery to obtain the contract.

by implication." 28 U.S.C. § 1605(a)(1).  Both explicit and implicit waivers of sovereign immunity are "narrowly construed," and a waiver must be clear and unambiguous.  *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 691 (D.C. Cir. 2022); *see also Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991) (requiring waiver to be "unmistakable" and "unambiguous"); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990) (FSIA legislative history noted courts have found implied waiver of sovereign immunity if the foreign state agreed to arbitration in another country, agreed that the law of a particular country governed a contract, or filed a responsive pleading without raising the defense of sovereign immunity).

Plaintiffs rely on a sample LOA stating it is subject to United States law and regulation, including procurement law, and argue that Saudi Arabia's conduct after the attack demonstrates waiver by verbally agreeing to cooperate in the investigation and to compensate victims (as alleged through statements of the Attorney General and former President Trump).  The Magistrate Judge rejected the arguments, reasoning that no clear waiver appears in the terms of the standard form LOA, which incorporates United States regulations and procurement law but instead indicates that any dispute will be resolved through "consultations" between the parties..

Plaintiffs' only objection is that they were denied discovery to obtain the actual contract to see whether there are any terms of waiver; they do not know whether it contains an express waiver of immunity. The denial of discovery is not clearly erroneous or contrary to law. Jurisdictional discovery in the FSIA context is "ordered circumspectly and only to verify specific facts crucial to an immunity determination." *Butler*, 579 F.3d at 1314; *see also Sequeira v. Republic of Nicaragua*, 815 F. App'x 345, 351–52 (11th Cir. 2020) (stating that although district courts have "a range of choice" regarding discovery, jurisdictional discovery against a foreign state must be "used only to confirm specific factual allegations" and must "not cause the undue burdens that foreign sovereign immunity is designed to prevent."). This requires courts to balance the need "for discovery to substantiate exceptions . . . against the need to protect a sovereign's or sovereign agency's legitimate claim to immunity from discovery," *Butler*, 579 F.3d at 1314 (internal quotations and alterations omitted). In other words, the party seeking jurisdictional discovery from a foreign sovereign must first articulate a nonconclusory and "reasonable basis" for jurisdiction, *In re Terrorist Attacks*, 298 F. at 641, and "a likelihood that additional supplemental facts will make jurisdiction proper," *Doe v. Bin Laden*, 580 F. Supp. 2d 93, 96 (D.D.C. 2008) (internal marks omitted).

Plaintiffs relied on and cited the standard LOA form in their response to the motion, *see* ECF No. 39 at 79, and they referenced it in the Amended Complaint, ECF No. 5 at 23 ¶¶ 51, 52, 53, 54.  Because neither the terms of the LOA nor the public statements alleged support any finding of express or implied waiver of sovereign immunity—conclusions also reached by the Magistrate Judge and to which Plaintiffs do not specifically object—no allegations support their request for discovery.  Plaintiffs are seeking discovery based only on speculation.[37]

In sum, the role of the Court is limited by the jurisdictional dictates set forth by Congress to protect a foreign state's sovereignty, notwithstanding the gravity of this tragic and horrific terrorist attack.

Accordingly:

1.     The R&R, ECF No. 54, is adopted as discussed herein and all objections are **OVERRULED.**

2.     Saudi Arabia's Motion to Dismiss based on sovereign immunity, ECF No. 46, is **GRANTED**, and the case is **DISMISSED.**

---

[37] The undersigned summarily denies all objections regarding discovery and finds no error, let alone clear error, in the Magistrate Judge's denial of discovery.  Given the Plaintiffs' failure to adequately allege a nonconclusory and reasonable basis for jurisdiction based on an FSIA exception, discovery is both unnecessary and unwarranted.

CASE NO. 3:21cv329-MCR-ZCB

3.      Plaintiffs Motion for Jurisdictional Discovery, ECF No. 43, is

**DENIED**.

4.      The Clerk is directed to close the file.

**DONE AND ORDERED** this 30th day of March 2024.


*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**BENJAMIN WATSON, JR, et al.,**

     **Plaintiffs,**

**v.**                            **Case No. 3:21-cv-329-MCR-ZCB**

**KINGDOM OF SAUDI ARABIA,**

     **Defendant.**

_____/

## **JUDGMENT**

Defendant's Motion to Dismiss based on sovereign immunity is

GRANTED and the case is DISMISSED.

                                    JESSICA J. LYUBLANOVITS
                                    CLERK OF COURT

<u>March 31, 2024   </u>                      _s/ Elizabeth Lawrence_
Date                                Deputy Clerk: Elizabeth Lawrence

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

BENJAMIN WATSON, JR., et al.,
     Plaintiffs,

v.                                Case No.: 3:21cv00329/MCR/ZCB

KINGDOM OF SAUDI ARABIA,
     Defendant.
_____/

## REPORT AND RECOMMENDATION

On December 6, 2019, Mohammed Saeed Al-Shamrani committed a terrorist attack at Naval Air Station Pensacola. Before he was killed by law enforcement, Al-Shamrani murdered three U.S. Navy servicemembers. He also injured other servicemembers, as well as law enforcement officers. The terrorist organization al-Qaeda claimed responsibility for Al-Shamrani's attack.

The tragic events of December 6, 2019 form the basis of this lawsuit. Plaintiffs are the deceased servicemembers' heirs, as well as the individuals who survived the attack. Defendant is the Kingdom of Saudi Arabia, in whose military Al-Shamrani was enlisted at the time of the attack. In a 172-page amended complaint, Plaintiffs seek to hold Saudi Arabia responsible for Al-Shamrani's attack. (Doc. 5). Invoking the Foreign Sovereign Immunities Act, Saudi Arabia has filed a motion to dismiss for lack of jurisdiction. (Doc. 46). Plaintiffs have responded in

1

opposition, arguing that four exceptions to the Act apply. (Doc. 39). Plaintiffs have also moved for jurisdictional discovery, which Saudi Arabia has opposed. (Docs. 43, 44). The Court held a lengthy oral argument hearing (Doc. 53), and the matter is now ripe for resolution.

This is a difficult case. It is factually difficult because it involves an evil act committed on U.S. soil against members of the armed forces and law enforcement officers—the bravest among us. It is legally difficult because it involves a complex statutory scheme that reflects a longstanding presumption that foreign sovereigns are beyond the jurisdiction of U.S. courts. Having exhaustively considered the matter and despite feeling great sympathy for Plaintiffs, the Court believes the law precludes the exercise of jurisdiction over Saudi Arabia. The Court, therefore, recommends granting Saudi Arabia's motion to dismiss and denying Plaintiffs' motion for jurisdictional discovery.

## I.    Summary of Factual Allegations

### A.   Events before December 6, 2019

Mohammed Saeed Al-Shamrani was a member of the Royal Saudi Air Force (RSAF). (Doc. 5 at 18).[1] He was selected to receive aviation training from the U.S.

---

[1]The page numbers cited herein are those assigned by the Court's electronic docketing system, as opposed to the page numbers at the bottom of the parties' filings.

military through a Security Cooperation Education and Training Program.  (*Id*. at 20).  Al-Shamrani was assigned to complete that training at Naval Air Station Pensacola (NAS-P).  (*Id*. at 24).  Before being approved for the training program, Al-Shamrani was to be vetted by Saudi Arabia.  (*Id*. at 26).  Al-Shamrani subsequently received approval and was granted a U.S. visa.  (*Id*.).  He arrived in the U.S. on August 28, 2017, but he did not begin aviation training at NAS-P until May of 2018.  (*Id*. at 27, 51).

From May of 2018 to December of 2019, Al-Shamrani participated in training at NAS-P.  (*Id*. at 51).  In July of 2019, Al-Shamrani purchased a 9mm handgun and ammunition.  (*Id*. at 52).  It is alleged that between July 2019 and December 6, 2019, Al-Shamrani regularly entered NAS-P with the handgun concealed in his pilot helmet bag.  (*Id*.).

Plaintiffs allege that Al-Shamrani's supervising officer at NAS-P (a RSAF member tasked with overseeing Saudi Arabian trainees)[2] knew Al-Shamrani had been carrying a handgun on base—something that violated both U.S. and RSAF policy.  (*Id*.).  Nonetheless, the supervising officer took no action.  The supervising officer then departed from NAS-P in September of 2019, which Plaintiffs allege left

---

[2] This individual is referred to throughout the pleadings as the "CLO," which stands for Country Liaison Officer.  (Doc. 5 at 55).

Al-Shamrani and the other Saudi Arabian trainees with no RSAF oversight at NAS-P.  (*Id*. at 52-53).   According to Plaintiffs, Saudi Arabia did not assign a new supervising officer for NAS-P until nearly a month after Al-Shamrani's deadly attack.  (*Id*. at 53).

In November of 2019, Al-Shamrani and some other RSAF trainees visited the 9/11 Memorial in New York City.  (*Id*. at 53-54).   Plaintiffs allege that during the trip, Al-Shamrani and other RSAF trainees praised the 9/11 hijackers and discussed plans for launching an attack at NAS-P.  (*Id*. at 54).[3]   According to Plaintiffs, the trip to New York was unauthorized.  (*Id*. at 53).

The night before the attack (December 5, 2019), Al-Shamrani dined with other RSAF trainees.  (*Id*. at 54).   During the dinner, Al-Shamrani allegedly discussed his plans to attack NAS-P the next morning.[4]  (*Id*.).   Several of the RSAF trainees who dined with Al-Shamrani that night failed to report for duty on the morning of December 6, 2019.  (*Id*.).

---

[3] Contrary to this allegation, the U.S. Navy and the FBI concluded that none of the other RSAF trainees were aware of Al-Shamrani's planned attack.  (Doc. 47-1 at 7; Doc. 47-2 at 3).

[4] As previously noted, this allegation contradicts the findings of the U.S. Navy and the FBI.

**B.   Events of December 6, 2019**

In the early morning hours of December 6, 2019, Al-Shamrani used Twitter to send a series of anti-American messages that included the following: "I hate you because every day you (sic) supporting, funding and committing crimes not only against Muslims but also humanity.  I am against evil, and America as a whole has turned into a nation of evil." (*Id*. at 60).  When Al-Shamrani arrived at NAS-P on December 6, 2019, he visited an Islamic prayer room.  (*Id*. at 61).  He then drove his car to Building 633.  (*Id*.).  At approximately 6:42 a.m., Al-Shamrani entered Building 633 wearing his RSAF uniform and carrying his flight bag.  (*Id*.).  Concealed in the flight bag was the 9mm handgun and ammunition.  (*Id*.).

Once inside Building 633, Al-Shamrani withdrew the handgun and began shooting.  (*Id*. at 62).  Al-Shamrani chanted "Allahu Akbar"—an Islamic phrase meaning "God is great"—throughout his attack.  (*Id*. at 65).  Al-Shamrani's bullets struck and killed Ensign Joshua Kaleb Watson, Airman Cameron Scott Walters, and Airman Mohammed Haitham.  (*Id*. at 62-64).  He also shot and wounded Airman George Johnson, Ensign Breanna Thomas, Airman Ryan Blackwell, Ms. Jessica Pickett, and Ensign Kristy Lehmer.  (*Id*.).

Soon after the attack began, law enforcement officers from the Department of Defense and the Escambia County Sheriff's Office arrived, engaged Al-Shamrani,

and fatally shot him.  (*Id*. at 64-65).  While heroically working to neutralize Al-Shamrani, Captain Charles Hogue of the Department of Defense Police Force and Escambia County deputies Jonathan Glass, Matthew Tinch, Thomas Bortner, Grant Lopez, Matthew Housam, Michael Hoyland, and Matthew Keebler all suffered injuries.  (*Id*. at 16-17).

### C.   Events after December 6, 2019

Saudi Arabia immediately denounced Al-Shamrani's actions.  (Doc. 46 at 17-18).  The Federal Bureau of Investigation (FBI) investigated the attack.  Based on that investigation, the Attorney General announced that there was "no evidence of assistance or pre-knowledge of the attack" by the other RSAF members who were training in the United States.  (Doc. 47-2 at 3).  The Attorney General also stated that Saudi Arabia provided "complete and total support" for the investigation and had ordered all RSAF trainees "to fully cooperate."  (*Id*.).  After gaining access to the contents of Al-Shamrani's cell phone, the FBI released a statement explaining that it appeared Al-Shamrani had "significant ties" to al-Qaeda.  (Doc. 47-3 at 2).

The Navy also investigated the attack and issued a 267-page report.  (Doc. 47-1).  The Navy found that "[t]he self-radicalization" of Al-Shamrani was "the primary cause" of the attack.  (Doc. 47-1 at 30).  According to the Navy, "no one person or

organization knew or could have known" of Al-Shamrani's plan to attack NAS-P. (*Id.*).

## D.   The legal proceedings

In their complaint, Plaintiffs seek to hold Saudi Arabia responsible for Al-Shamrani's attack.  Plaintiffs allege Al-Shamrani was a "Trojan Horse sent by. . .the Kingdom of Saudi Arabia, and its proxy, al Qaeda in the Arabian Peninsula. . .under the auspices of a program tied to billions of dollars in military arms sales from the United States to [Saudi Arabia]."  (Doc. 5 at 8).  The complaint asserts the following causes of action:

1) Vicarious liability/respondeat superior (*Id.* at 86);
2) Violation of the Anti-Terrorism Act, 18 U.S.C. § 2339 predicate (primary liability) (*Id.* at 96);
3) Violation of the Anti-Terrorism Act, 18 U.S.C. § 2339A predicate (primary liability) (*Id.* at 100);
4) Violation of the Anti-Terrorism Act, 18 U.S.C. § 2339B predicate (primary liability) (*Id.* at 105);
5) Violation of the Anti-Terrorism Act, 18 U.S.C. § 2339C predicate (primary liability) (*Id.* at 109);
6) Violation of the Anti-Terrorism Act (aiding and abetting liability) (*Id.* at 113);
7) Loss of Solatium (*Id.* at 120);
8) Assault (*Id.* at 122);
9) Battery (*Id.* at 124);
10) False imprisonment (*Id.* at 126);
11) Intentional infliction of emotional distress (*Id.* at 131);
12) Violation of Florida's Civil Hate Crime Statute (*Id.* at 133);
13) Florida Civil Remedy for Terrorism or Facilitating Terrorism (*Id.* at 136);
14) Negligence and Gross Negligence (*Id.* at 138);

15) Negligent infliction of emotional distress (*Id*. at 151);

16) Wrongful death (*Id*. at 155);

17) Survival action (*Id*. at 162);

18) Loss of Consortium (*Id*. at 164); and

19) Breach of Contract (*Id*. at 166).

As relief, Plaintiffs ask for compensatory and solatium damages, treble damages, and attorneys' fees. (*Id*. at 170).

Saudi Arabia has filed a motion to dismiss for lack of jurisdiction. (Doc. 46). Plaintiffs have responded in opposition and moved for jurisdictional discovery. (Docs. 39, 43).

## II.   Discussion

The motions currently before the Court focus on the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1604. Saudi Arabia claims the FSIA provides it with sovereign immunity and strips this Court of jurisdiction over Plaintiffs' claims. Plaintiffs parry by arguing that jurisdiction exists under four exceptions to the FSIA. Before delving into the particulars of the parties' arguments, an overview of the FSIA is in order.

Congress passed the FSIA in 1976, codifying "basic principles of international law long followed both in the United States and elsewhere." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 179-80 (2017). The FSIA provides that, "a foreign state shall be immune from the jurisdiction of the

courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604.  According to the Supreme Court, the FSIA "provides the sole basis for obtaining jurisdiction over a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (cleaned up).

Under the FSIA, a foreign state is "presumptively immune" unless one of the FSIA's "express exceptions" applies. *OBB Personenverkeher AG v. Sachs*, 577 U.S. 27, 31 (2015); *see also Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1325 (11th Cir. 2003) (recognizing that the FSIA provides "a general grant of immunity for foreign governments and their agents . . . unless the foreign government activity is subject to a specific exception").  In the years since 1976, the FSIA has been amended several times to add new exceptions and modify others. *See generally* 14A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3662.3 (4th ed. 2023) (discussing various amendments to the FSIA).  The FSIA has numerous exceptions.  Most are found in 28 U.S.C. § 1605, while one is found in 28 U.S.C. § 1605B.  If none of the exceptions apply, then "the district court lacks subject matter jurisdiction over the plaintiff's claims" against the foreign state. *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1312 (11th Cir. 2009).[5]

---

[5] Although often discussed in terms of a defect in subject matter jurisdiction, the absence of a FSIA exception also deprives a court of personal jurisdiction over a foreign state.  *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S.

9

In terms of who bears the burden of establishing jurisdiction under the FSIA, the courts have employed a burden-shifting framework.  Under this framework, the defendant must initially show that it is a foreign state.  *In re Terrorist Attacks on Sept. 11, 2011*, 714 F.3d 109, 114 (2d Cir. 2013).  If the defendant does so,[6] then the plaintiff bears the "burden of production" to establish "that jurisdiction exists because a FSIA exception applies."  *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1221 n.9 (11th Cir. 2018).  This means that "the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted."  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 114.  Upon the plaintiff's satisfaction of the burden of production, "the defendant must bear the ultimate burden of persuasion to show that no FSIA exceptions to immunity apply."  *Devengoechea*, 889 F.3d at 1221 n.9.; *see also Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001) (explaining that "if the plaintiff comes forward with sufficient evidence to carry its burden of production" regarding a FSIA exception, then the court should "resolve disputed

---

428, 435 n.3 (1989) (noting that "personal jurisdiction, like subject-matter jurisdiction, exists only when one of the exceptions to foreign sovereign immunity . . . applies").

[6] There is no dispute that Saudi Arabia is a foreign state.

issues of fact, with the defendant foreign sovereign shouldering the burden of persuasion").

A defendant's motion to dismiss for lack of jurisdiction can take the form of a facial challenge, a factual challenge, or both. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003); *Robinson*, 269 F.3d at 140. With a facial (sometimes called a "legal") challenge, a defendant "challenge[s] subject matter jurisdiction based on the allegations in the complaint." *Morrison*, 323 F.3d at 924 n.5. For purposes of a facial challenge, the complaint's allegations are taken as true. *Id*. A factual challenge, on the other hand, "challenge[s] subject matter jurisdiction in fact, irrespective of the pleadings." *Id*. Thus, when there is a factual challenge a district court "may consider extrinsic evidence" and need not assume the allegations' truth.[7] *Id*.; *see also Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (explaining

---

[7] It is inevitable that when there is a factual challenge to jurisdiction under the FSIA, "the jurisdiction and merits inquiries overlap to the extent that each requires examination of the applicable substantive law." *Robinson*, 269 F.3d at 142. Although it can be challenging to delve into such issues at an early stage of the proceeding, doing so "preserves the effectiveness of the immunity doctrine by avoiding putting the foreign government defendant to the expense of defending what may be a protracted lawsuit without an opportunity to obtain an authoritative determination of its amenability to suit at the earliest possible opportunity." *Id*. (cleaned up).

that when a factual challenge is made, "no presumptive truthfulness attaches to the plaintiff's allegations") (internal quotations omitted).

Here, Saudi Arabia mounts both facial and factual challenges to the Court's subject matter jurisdiction.  (Doc. 46 at 22; Doc. 42 at 9).  With respect to the facial challenge, Saudi Arabia asserts that—even if the allegations are taken as true—Plaintiffs have failed to allege facts sufficient to fall within a FSIA exception.  And with respect to the factual challenge, Saudi Arabia says the factual allegations that the complaint relies on to establish a FSIA exception are inconsistent with the actual facts as shown by extrinsic evidence.

In their response to the motion to dismiss, Plaintiffs have argued that this Court has jurisdiction over Saudi Arabia based on the following four FSIA exceptions:  (1) the Justice Against Sponsors of Terrorism Act (JASTA) exception, 28 U.S.C. § 1605B; (2) the noncommercial tort exception, 28 U.S.C. § 1605(a)(5); (3) the commercial activity exception, 28 U.S.C. § 1605(a)(2); and (4) the waiver exception, 28 U.S.C. § 1605(a)(1).  (Doc.  39 at 23, 30, 49, 71, 78).  Each will be considered below.  The Court will first consider the JASTA exception because Plaintiffs' counsel emphasized at oral argument that "this is a JASTA case."  (Doc. 53 at 51, 52).

### A.   The JASTA exception to the FSIA

On September 28, 2016, Congress overrode a presidential veto to enact JASTA, 28 U.S.C. § 1605B.  *See* 14A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3662.3 (4th ed. 2023) (explaining the history of JASTA).  Congress passed JASTA "in part to allow suits against Saudi Arabia for the September 11 attacks."[8]  *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 642 (S.D.N.Y. 2018) (cleaned up).  Congress intended for JASTA to "provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries . . . that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 (2016).  Among other things, JASTA created a new FSIA exception for certain terrorism-related cases.  *Id.*  Below

---

[8] Prior to JASTA's passage, the FSIA's terrorism exception only applied to foreign states that the U.S. government had designated as state sponsors of terrorism.  Saudi Arabia had never received that designation and, therefore, could not be sued under the prior exception.  *See In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 794 (S.D.N.Y. 2005) (explaining that the pre-JASTA terrorism exception "does not provide an exception to immunity" for Saudi Arabia because it "has not been designated a state sponsor of terrorism").  Unlike its predecessor, the JASTA exception does not require the foreign state to be designated as a state sponsor of terrorism.  *Gonzalez v. Google, Inc.*, 282 F. Supp. 3d 1150, 1160 (N.D. Cal. 2017).

is the relevant language of the JASTA exception:

> (b) Responsibility of foreign states.—A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by—
>> (1) an act of international terrorism in the United States; and
>> (2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.
>
> . . . .
>
> (d) Rule of construction.—A foreign state shall not be subject to the jurisdiction of the courts of the United States under subsection (b) on the basis of an omission or a tortious act or acts that constitute mere negligence.

28 U.S.C. § 1605B(b), (d).

The JASTA exception contains five elements.  First, there was an injury to property or a physical injury or death of a person within the U.S.  Second, there was an act of international terrorism in the U.S.  Third, there was a tortious act committed by a foreign state or one of its officials, employees, or agents while acting within the scope of that person's office, employment, or agency.  Fourth, the injury or death was caused by the act of international terrorism and the tortious act by the foreign state and/or its officials, employees, or agents.  Fifth, damages resulted.  *See In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d at 642 (describing the elements of the JASTA exception).

In the current case, Saudi Arabia says Plaintiffs have not satisfied the third (tortious act) and fourth (causation) elements of the JASTA exception. (Doc. 27 at 30-34; Doc. 42 at 28-34). Saudi Arabia further claims that the JASTA exception's exclusion in § 1605B(d) for "omission[s]" and acts of "mere negligence" applies here. (*Id.*).

The JASTA exception requires a tortious act committed by either the foreign state itself or one of its officials, agents, or employees who was acting within scope of the office, agency, or employment. 28 U.S.C. § 1605B(b)(2). Plaintiffs believe both are present in this case. They allege Al-Shamrani was an employee of Saudi Arabia who was acting within the scope of his employment when he opened fire at NAS-P. And they allege Saudi Arabia itself committed tortious acts that caused the NAS-P attack. Saudi Arabia says neither is correct. For the reasons below, the Court agrees with Saudi Arabia.

### 1. Al-Shamrani was not acting within the scope of his employment

Plaintiffs allege that the JASTA exception applies because Al-Shamrani was an employee of Saudi Arabia who was acting within the scope of his employment when he committed the terrorist attack at NAS-P. (*See* Doc. 5 at 12, 92-96). Saudi Arabia sees things differently. It argues that the terrorist attack was not within the scope of employment for a RSAF member like Al-Shamrani. To determine whether

a foreign state's employee was acting within the scope of employment for FSIA purposes, the Court must apply the law of the state where the injury occurred. *See In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d at 643 (applying New York law because it was the site of most of the injuries caused by the 9/11 attacks); *see also O'Bryan v. Holy See*, 556 F.3d 361, 383 (6th Cir. 2009) (recognizing that "[s]tate law, not federal common law, governs whether an officer's or employee's action is within the scope of employment in determining the applicability of the FSIA") (cleaned up).

Because the injuries from Al-Shamrani's attack occurred in Pensacola, Florida, the Court will apply Florida law. For an employee's acts to be considered within the scope of employment, "Florida law requires that the conduct (1) must have been the kind for which the employee was employed to perform; (2) must have occurred within the time and space limits of his employment; and (3) must have been activated at least in part by a purpose to serve the employment." *Spencer v. Assurance Co. of Am.*, 39 F.3d 1146, 1150 (11th Cir. 1994). In Florida, an employer is not responsible for an employee's conduct when the employee "does the wrongful act to accomplish some purpose of his own." *City of Green Cove Springs v. Donaldson*, 348 F.2d 197, 203 (5th Cir. 1965) (cleaned up) (applying Florida law); *see also DeJesus v. Jefferson Stores, Inc.*, 383 So. 2d 274, 275 (Fla. 3d DCA 1980)

16

(holding that an employee acted outside the scope of employment because "the assaults were undertaken for reasons which were purely personal to the employee and were neither activated by a purpose to serve the master nor related in any way to the furtherance of [the employer's] business").   As a general rule, "batteries by employees are held to be outside the scope of an employee's employment." *Agriturf Mgmt., Inc. v. Roe*, 656 So. 2d 954, 955 (Fla. 2d DCA 1995); *see also City of Green Cove Springs*, 348 F.2d at 202 (recognizing that under Florida law it is "generally held that liability for an assault by an employee that bears no relation to the real or apparent scope of his employment or to the interest of his employer is not imposed upon the employer").

Looking to the first scope of employment requirement, the question is: Have Plaintiffs produced evidence showing that Al-Shamrani's terrorist attack was the type of conduct Saudi Arabia employed him to perform?  The answer is:  No.  Saudi Arabia employed Al-Shamrani to serve its national defense by flying airplanes and operating weapons systems as a member of its air force.  It is undisputed that the U.S. is one of Saudi Arabia's most important military allies.  Saudi Arabia obtains significant benefits from its relationship with the U.S., not the least of which was the aviation training program at NAS-P.  Plaintiffs have not sufficiently shown that

jeopardizing an important strategic relationship by causing a disastrous diplomatic incident was within Al-Shamrani's job description.

That conclusion is supported by Saudi Arabia's immediate denunciation of Al-Shamrani's attack. And it is further supported by Saudi Arabia's full cooperation with the FBI, as well as the FBI's conclusion that there was "no evidence of assistance or pre-knowledge of the attack" by Al-Shamrani's RSAF colleagues. (Doc. 47-2 at 3). Rather, the FBI concluded that Al-Shamrani's attack was motivated by his personal "jihadist ideology." (*Id*. at 2). And the Navy similarly found that Al-Shamrani was "self-radicaliz[ed]." (Doc. 47-1 at 7). Put another way, Al-Shamrani committed the attack for his own reasons, and actions "undertaken for reasons that are purely personal to an employee," *Spencer*, 39 F.3d at 1150, fall outside the scope of employment. There is nothing before the Court to support a conclusion that a murderous rampage on a U.S. military installation was "the kind [of conduct] for which [Al-Shamrani] was employed [by Saudi Arabia] to perform." *Id*.

Plaintiffs have argued that Al-Shamrani acted within the scope of his employment because his position with the RSAF provided him with access to NAS-P, as well as the opportunity and ability to commit the attack. (Doc. 5 at 95). But that is insufficient to show that Al-Shamrani was acting within the scope of his

employment.  Just as a pastor (who has access to children and the opportunity to interact with them by virtue of his position) acts beyond the scope of his employment when he sexually assaults a child from the church, *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So. 2d 353, 358 (Fla. 3d DCA 2001), a foreign military trainee who has access to a Naval base by virtue of his position acts beyond the scope of his employment when he commits a murderous attack at the base.  "While [Al-Shamrani] may have had access to [NAS-P] because of his position as [a RSAF trainee] . . . he was not engaging in authorized acts or serving the interests of the [RSAF] during the time" he opened fire at NAS-P.  *Id*.; *see also Agriturf*, 656 So. 2d at 955 (finding that an employee who molested a child on a business's premises was acting beyond the scope of his employment, even though the business "provided the means and the place for [the man] to molest" the child); *Swarna v. Al-Awadi*, 622 F.3d 123, 145 (2d Cir. 2010) (concluding that a Kuwaiti diplomat was not acting within the scope of his employment when he sexually assaulted a woman in the U.S. because "it is beyond question that [the diplomat] did not rape [the victim] to further Kuwait's purposes in the United States").  The information before the Court shows that Al-Shamrani acted for his own purposes and not those of Saudi Arabia when he committed the terrorist attack at NAS-P.  Because Plaintiffs have failed to meet their burden of "producing evidence," *Sequeira v. Republic of Nicaragua*, 815 F. App'x

19

345, 349 (11th Cir. 2020) (cleaned up), to show that the NAS-P attack was within the scope of Al-Shamrani's employment, the JASTA exception does not apply.

In reaching that conclusion, the Court did not overlook Plaintiff's reliance on the Ninth Circuit's decision in *Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989). In *Liu*, the court held that the Director of China's Defense Intelligence Bureau acted within the scope of his employment when he ordered the murder of a journalist who had been critical of China. *Id*. at 1421. The decision in *Liu* is distinguishable from the current case for two reasons. First, the Ninth Circuit was applying California's broad "enterprise theory" for scope of employment. *Id*. at 1427; *see also Smithen v. United States*, No. CV 09-00414-GW, 2017 WL 11628588, at *8 (C.D. Cal. July 28, 2017) (recognizing that "[i]n California, the scope of employment has been interpreted broadly"). That is different than the test applied by the Florida courts. Second, the actor in *Liu* was a high-level Chinese defense official who committed an act that was designed to suppress criticism of China—an act that the court referred to as "sufficiently job related to impose vicarious liability" under California law. *Liu*, 892 F.2d at 1427. That is not comparable to what happened in the current case where a low-level RSAF trainee

committed a terrorist attack that in no way served the purposes of his employer,

Saudi Arabia.  Thus, the Ninth Circuit's decision in *Liu* is not persuasive here. [9]

### 2.    A tortious act of Saudi Arabia did not cause Al-Shamrani's terrorist attack

Next is Plaintiffs' claim that the JASTA exception applies based on Saudi

Arabia's own tortious conduct, as opposed to the tortious conduct of its employee,

Al-Shamrani.  As set forth above, a foreign state is not immune under the FSIA if

there was physical injury or death in the United States "caused by—(1) an act of

---

[9] The Court also did not overlook Plaintiffs' argument that Al-Shamrani was an "agent" of Saudi Arabia who was acting within the scope of his agency when he committed the NAS-P attack.  The argument lacks merit because, as with the employer-employee relationship, a principal is generally not vicariously liable for an agent's intentional torts and criminal actions because such actions are outside the scope of an agent's authority.  *See Jones v. City of Hialeah*, 368 So. 2d 398, 400 (Fla. 3d DCA 1979) (explaining that "[t]here is no liability where the agent has stepped aside from his employment to commit a tort which the principal neither directed in fact, nor could be supposed, from the nature of his employment, to have authorized or expected the agent to do").  Plaintiffs have come forward with no evidence to show that Al-Shamrani was an agent who was "serv[ing] the interests of the principal [Saudi Arabia]" when he committed the terrorist attack.  *Id*.  To the extent Plaintiffs argue that Al-Shamrani's actions can be attributed to Saudi Arabia because he was cloaked with "apparent authority" to commit the attack, the argument is similarly meritless.  Under Florida law, apparent authority "arises where the principal causes others to believe that an individual has the authority to conduct the act in question."  *Moecker v. Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291, 1312 (M.D. Fla. 2001).  Here, the Court has no basis for finding that Saudi Arabia caused anybody to believe that Al-Shamrani was authorized to launch a terrorist attack at NAS-P.

international terrorism in the United States; and (2) a tortious act or acts of the foreign state . . . ." 28 U.S.C. § 1605B(b). For the exception to apply, the foreign state's tortious act must have been one that involves more than an "omission" or "mere negligence." 28 U.S.C. § 1605B(d).

Everyone here agrees that an act of international terrorism caused physical injury and death in the United States. But did Saudi Arabia commit a tortious act that was based on something other than an omission or mere negligence? If so, did that tortious act "cause" the deaths and physical injuries at NAS-P? The Court now turns to those questions.

> **a.** **Did Saudi Arabia commit a tortious act that was based on something more than an omission or mere negligence?**

Plaintiffs argue that the JASTA terrorism exception applies because Saudi Arabia committed tortious acts that caused Al-Shamrani's attack at NAS-P. The alleged tortious acts of Saudi Arabia can be placed in two categories. In the first category are the allegations regarding Saudi Arabia's vetting, retention, and supervision of Al-Shamrani. And in the second category are the allegations that Saudi Arabia materially supported terrorism.

> **i.** **Allegations regarding Saudi Arabia's vetting, retention, and supervision of Al-Shamrani**

Looking to the first category, Plaintiffs allege that Saudi Arabia acted with

22

negligence and gross negligence in its vetting, retaining, and supervising of Al-Shamrani. (*See* Doc. 5 at 138-51). More specifically, Plaintiffs claim Saudi Arabia failed to sufficiently investigate Al-Shamrani's background before approving him to participate in the training program at NAS-P. Plaintiffs also claim that Saudi Arabia failed to appropriately monitor Al-Shamrani's social media and other activities, and it failed to appropriately supervise Al-Shamrani during his time at NAS-P.

The problem for Plaintiffs is that their vetting, retention, and supervision claims are based on omissions by Saudi Arabia. And the JASTA exception provides that a "foreign state shall *not* be subject to the jurisdiction of the courts of the United States [under JASTA] on the basis of an *omission* or a tortious act or acts that constitute mere negligence." 28 U.S.C. § 1065B(d) (emphases added). The term "omission" is undefined in the statute, so the Court will apply the term's plain and ordinary meaning. *See United States v. Meyer*, 50 F.4th 23, 27 (11th Cir. 2022) (stating that when a statutory term is undefined, courts "attempt to discern its ordinary meaning"). To aid in that task, the Court looks to the dictionary. *Id*. The dictionary defines "omission" as "a failure to do something." *Omission*, *Black's Law Dictionary* (8th ed. 2004); *Omission*, *Webster's Third New Int'l Dictionary* (2002) (defining "omission" as "apathy toward or neglect of duty: lack of action").

23

A review of Plaintiffs' complaint reveals that the allegations about the vetting, retention, and supervision of Al-Shamrani are based on Saudi Arabia's "failure to do something."   Indeed, the negligence/gross negligence cause of action (Count Fourteen) states that Saudi Arabia breached its duty of reasonable care by failing to do sixty-one separate things.   (Doc. 5 at 140-48).   Each of the sixty-one things identified in the complaint begins with the phrase "failure to" before detailing the specific ways Saudi Arabia allegedly breached its duty of reasonable care.   (*Id.*). Each allegation of Saudi Arabia's "failure to" do something is an allegation of an "omission"—and omissions cannot provide the basis for jurisdiction under the JASTA exception.   *See In re Terrorist Attacks on Sept. 11, 2011*, 298 F. Supp. 3d 631, 643 (S.D.N.Y. 2018) (recognizing that JASTA "specifically preclude[s] the exercise of jurisdiction over claims against foreign states on the basis of an omission") (cleaned up).   Because Plaintiffs' allegations regarding Saudi Arabia's vetting, retaining, and supervising of Al-Shamrani are premised on omissions, they cannot provide this Court with jurisdiction under the JASTA exception.[10]

---

[10] Plaintiffs have titled their cause of action in Count Fourteen as "negligence & gross negligence." (Doc. 5 at 138).   Negligence and gross negligence are, however, two separate torts with separate elements.   *See generally Elec. Boat Corp. v. Fallen*, 343 So. 3d 1218, 1220 (Fla. 5th DCA 2022) (explaining the difference between negligence and gross negligence under Florida law).   To the extent Plaintiffs are pursuing a negligence claim against Saudi Arabia, the JASTA exception would not provide jurisdiction because it excludes claims based on a "tortious act or acts that

ii. **Allegations that Saudi Arabia provided material support to terrorism in violation of the Anti-Terrorism Act**

Looking to the second category of alleged tortious acts, Plaintiffs claim Saudi Arabia provided material support for terrorism. The legal basis for Plaintiffs' material support claims is the Anti-Terrorism Act, 18 U.S.C. § 2333.[11] The Anti-Terrorism Act authorizes claims based on two theories of liability—primary and secondary. A primary liability claim is one "against the principal perpetrators of acts of international terrorism, but not against secondary actors who facilitate such

---

constitute mere negligence." 28 U.S.C. § 1605B(d). To the extent Plaintiffs are pursuing a gross negligence claim, that claim would not be barred by the JASTA exception's "mere negligence" exclusion because gross negligence requires more than "mere negligence." *See Glaab v. Caudill*, 236 So. 2d 180, 182 (Fla. 2d DCA 1970) (explaining that gross negligence is more than simple negligence and less than willful and wanton conduct). But because the complaint grounds any gross negligence claim on omissions by Saudi Arabia, the gross negligence claim falls within JASTA's "omission" exclusion as explained above. To be clear, the issue is not whether Plaintiffs have plausibly alleged a gross negligence claim under Florida law. Instead, the issue is whether Plaintiffs' gross negligence claim is sufficient to provide this Court with jurisdiction under the JASTA exception. It is not, and that is because the JASTA exception excludes omissions. Although Florida tort law may allow a gross negligence claim based on an omission, the JASTA exception does not confer this Court with jurisdiction over a foreign state based on such a claim.

[11]Claims for relief under the Anti-Terrorism Act are viewed as tort claims. *See Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 83 (E.D.N.Y. 2019) (recognizing that the Anti-Terrorism Act "ultimately is a tort statute") (internal quotations omitted); *see also Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 50 (D.D.C. 2010) (treating the Anti-Terrorism Act as a "federal tort statute").

acts by others." *Freeman*, 413 F. Supp. 3d at 82 (cleaned up).  A secondary liability claim is one against "'any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed . . . an act of international terrorism.'"  *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (quoting 18 U.S.C. § 2333(d)(2)).[12]

Plaintiffs have brought both primary and secondary Anti-Terrorism Act claims against Saudi Arabia.[13]  (*See* Doc. 5 at 96-119).  The primary liability claims allege that Saudi Arabia directly provided material support for the terrorist attack at NAS-P.  The secondary liability claim alleges that Saudi Arabia engaged in acts of material support that aided and abetted the terrorist attack.  Because both the primary and secondary liability claims involve an alleged tortious act that requires more than mere negligence and is not based on an omission, Plaintiffs have cleared the first

---

[12] A secondary liability or aiding and abetting claim was not originally available under the Anti-Terrorism Act.  Such a claim was added by JASTA.  *Honickman*, 6 F.4th at 494.

[13] Although not currently before the Court, it bears noting that it is questionable whether a secondary liability/aiding and abetting claim can be brought against a foreign state under the Anti-Terrorism Act.  The statute authorizes a cause of action against "any person," and at least one court has held that a foreign state falls outside the definition of a "person."  *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03MDL1570, 2023 WL 1797629, at *8-9 (S.D.N.Y. Feb. 7, 2023) (holding that foreign states are not subject to aiding and abetting liability under the Anti-Terrorism Act because they are not "persons" for purposes of the Act).

hurdle with regard to those claims.[14]   That brings us to the second hurdle, which is whether Plaintiffs have established that an alleged tortious act of Saudi Arabia caused Al-Shamrani's terrorist attack at NAS-P.

> **b.** **Did a tortious act of Saudi Arabia cause the terrorist attack at NAS-P?**

It is not enough for Plaintiffs to allege that Saudi Arabia committed a tortious act involving more than an omission or mere negligence—the JASTA exception requires that Plaintiffs go further and show that the tortious act caused the deaths and physical injuries at NAS-P.  To answer the causation question, the Court must first determine what type of causation the JASTA exception requires.  Saudi Arabia argues "but for" causation is required.  (Doc. 42 at 24-26).  For their part, Plaintiffs argue the standard is "proximate causation."  (Doc. 39 at 44-46).

This is an issue of first impression in the Eleventh Circuit.  Other courts outside the Eleventh Circuit, however, have confronted the issue and appear unanimous in the view that the jurisdictional causation standard is proximate cause. *See, e.g.*, *Rux v. Republic of Sudan*, 461 F.3d 461, 473 (4th Cir. 2006) (stating

---

[14] These alleged tortious acts of material support include harboring and concealing terrorists, providing weapons and training to terrorists, failing to implement appropriate screening protocols, and providing funding to terrorists.  (Doc. 5 at 96-112).

"proximate cause is the appropriate standard to apply at this juncture"); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127-28 (D.C. Cir. 2004) (applying proximate cause and finding "no textual warrant" for the claim that "but for" cause is the appropriate standard); *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. at 645 (explaining that "JASTA's 'caused by' requirement was not meant to incorporate principles of 'but for causation'" and adopting "the traditional test for proximate causation" for purposes of jurisdictional causation under JASTA).[15]   Additionally, the Supreme Court has held in the context of another jurisdictional statute that "the phrase 'caused by' . . . requir[es] what tort law has traditionally called 'proximate causation.'"   *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995).

The cases cited above have persuaded the Court that the JASTA exception's causation standard is proximate cause.   Proximate cause requires a "reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered."   *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d at

---

[15] The Fourth Circuit in *Rux* and the D.C. Circuit in *Kilburn* were considering a prior FSIA terrorism exception (28 U.S.C. § 1605(a)(7)), which included virtually identical causation language as that now found in the JASTA exception, 28 U.S.C. § 1605B.   The *In re Terrorist Attacks on September 11, 2001* court was considering the JASTA terrorism exception, and it relied on *Rux* and *Kilburn* in concluding that proximate cause is the appropriate standard.

645.  To meet that standard, a plaintiff must show two things: (1) the defendant's conduct was a "substantial factor in the sequence of events that led to the plaintiff's injury"; and (2) "the plaintiff's injury must have been reasonably foreseeable or anticipated as a natural consequence of the defendant's actions." *Id.* (cleaned up); *see also Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017) (same).

Plaintiffs have failed to produce evidence showing that any tortious acts taken by Saudi Arabia proximately caused Al-Shamrani's terrorist attack.  Aside from the allegations based on omissions and mere negligence (which are excluded under 28 U.S.C. § 1605B(d)),[16] what is left are the allegations regarding Saudi Arabia's material support of terrorism.  Those allegations are conclusory and unsupported by the evidence in the record.  *See generally In re: Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 124 (2d Cir. 2013) (affirming dismissal of material support of

---

[16] It bears mentioning that even if the vetting, retention, and supervision claims were not barred by the exclusion for omissions and acts of mere negligence, they would fail for a lack of causation.  Plaintiffs have not met their burden of producing evidence to show that Saudi Arabia's alleged deficiencies in vetting, retaining, and supervising Al-Shamrani were a substantial factor in the terrorist attack or that the terrorist attack was reasonably foreseeable as a consequence of such alleged deficiencies.  *See generally Watson v. City of Hialeah*, 552 So. 2d 1146, 1149 (Fla. 3d DCA 1989) (finding that "[e]ven if the city was negligent in failing to discharge, reassign, or transfer" two police officers, the plaintiff had failed to show causation because it was not reasonably foreseeable to the city that the police officers would commit a heinous murder).

terrorism claims because the allegations regarding the defendants' connection to the 9/11 attacks were "conclusory" and failed to establish "a proximate causal relationship" between the alleged material support and the terrorist attacks). Moreover, Plaintiffs have failed to show that any of Saudi Arabia's supposed support of al-Qaeda in the Arabian Peninsula (AQAP) was a "substantial factor in the sequence of events," *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d at 646 (cleaned up), that led to Al-Shamrani's attack.

The complaint alleges that some Saudi Arabian citizens are important members of AQAP. (Doc. 5 at 33). And Plaintiffs claim that the "heavy" presence of Saudi Arabian citizens in AQAP's "upper echelons suggests it maintains robust recruiting and support networks in Saudi Arabia, despite its base of operations in Yemen." (*Id*. at 35). The complaint also discusses prior terrorist attacks committed by AQAP, and it states that "AQAP pays its fighters with Saudi riyals due to the support it receives from Saudi Arabia." (*Id*. at 37). It states that AQAP has fundraised "through donations from Saudi Arabia." (*Id*.). It also contains statements regarding Saudi Arabia's adherence to "Sharia law" and the presence of "Wahhabi clerics" in the Saudi Arabian government. (*Id*. at 28-29). And it talks about things Al-Shamrani was likely taught in the Saudi Arabian schools. (*Id*. at 47-48). Another part of the complaint quotes a newspaper article from 2017 that states Saudi Arabia

30

has spread an extreme version of Islam and "is in a tacit alliance with al-Qaeda in Yemen." (*Id*. at 39). Elsewhere, the complaint accuses Saudi Arabia of "present[ing] a public face . . . as a nation fighting al-Qaeda and terrorism while at the same time" providing support and resources to al-Qaeda and other Islamic extremists. (*Id*. at 40).

Plaintiffs have not produced evidence showing that Saudi Arabia's government provided support to AQAP and that such support was a substantial factor in Al-Shamrani's attack at NAS-P. Moreover, Plaintiffs have not shown that Saudi Arabia could have reasonably foreseen or anticipated the NAS-P attack as a natural consequence of its actions. Connecting any conduct by Saudi Arabia to the NAS-P attack requires the stacking of inference, upon inference, upon inference. It also requires accepting at face value Plaintiffs' conclusory allegations about Saudi Arabia's connections to and support of al-Qaeda. But Saudi Arabia has mounted a factual challenge to jurisdiction under the FSIA, which means the Court cannot simply accept the complaint's allegations as true.[17] Rather, Plaintiffs must produce evidence supporting their allegations. Unsubstantiated innuendo, generalized accusations, and conclusory statements are not enough. Although there need not be

---

[17] Even with a facial challenge, "conclusory allegations and legal conclusions" are insufficient to state a claim. *Smith v. United States*, 873 F.3d 1348, 1351 (11th Cir. 2017).

31

a direct connection between the acts of a foreign state and the act of terrorism, there does need to be a "reasonable" one. *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d at 645. Plaintiffs have not shown such a reasonable connection here.

The Southern District of New York's decision in *In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d 631 (S.D.N.Y. 2018), is instructive on this point. The court there found that the plaintiffs had not established that "Saudi Arabia is directly liable for its own tortious actions that proximately caused the 9/11 Attacks." *Id*. at 647. The 9/11 court similarly found that the plaintiffs failed to show a causal connection between a Saudi Arabian entity, the Saudi High Commission (SHC), and the 9/11 attacks. The 9/11 court held that the complaint failed to "plausibly allege" that the SHC's conduct "bears any reasonable connection whatsoever to the 9/11 Attacks." *Id*. The allegations found insufficient in *In re Terrorist Attacks on September 11, 2001* are similar to those made against Saudi Arabia in the current case, both in terms of their conclusory nature and the lack of a causal connection between the alleged support by Saudi Arabia and the terrorist attack.

The deficiencies in Plaintiffs' causation allegations become obvious when this case is compared to another opinion arising out of the 9/11 litigation—this one involving claims against Sudan. *See In re Terrorist Attacks on Sept. 11, 2001*, No.

03-MD-01570, 2022 WL 4227151 (S.D.N.Y. May 3, 2022).  In that opinion, the

9/11 court found that claims against Sudan could go forward under the JASTA

exception.  The 9/11 court explained that there was a close connection between

Sudan and al-Qaeda.  According to the court, the plaintiffs had shown:

- "Al Qaeda's organizational expertise existed because of Sudan."
- Sudan "was a safe harbor as al Qaeda devised plans to attack civil aviation."
- Sudan "gave terrorists papers to foil international counterterrorism efforts."
- Sudan supported al Qaeda in prior terrorist attacks against the United States.
- "Year after year, [Sudan] put the might of a sovereign nation's security services and diplomatic privileges into al Qaeda's growth."
- "Sudan was not several steps removed from al Qaeda.  It worked directly with the organization and actively sought to forge connections with its leadership.  Sudan aided operations directly against the U.S. homeland and U.S. personnel overseas rather than against other nations."

*Id.* at *10.  The 9/11 court summed up its analysis of the jurisdictional causation

issue by stating, "[i]f a nation takes in a group of terrorists because it wants them to

attack the United States, listens approvingly as they talk about attacking the United

States, helps them fund attacks on the United States, trains them in the skills needed

to attack the United States, and supports them in other terrorist attacks on the United

States, then that nation is a substantial factor in the reasonably foreseeable outcome

of those terrorists injuring and killing people when they again attack the United

33

States." *Id*.; *see also Rux v. Republic of Sudan*, 461 F.3d 461, 474 (4th Cir. 2006) (finding that the plaintiffs established Sudan's actions proximately caused a terrorist attack because the allegations described "how Sudan provided Al-Qaeda a base of operations to plan and prepare for the bombing and provided operational support for the attack"); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1129-30 (D.C. Cir. 2004) (concluding there was "no doubt that the plaintiff's allegations satisfy the proximate cause standard" where the complaint sufficiently established that the Libyan government had "funded and directed" a terrorist organization to murder an American citizen).

The current case against Saudi Arabia pales in comparison to what the 9/11 court found to be sufficient against Sudan. Whereas in the 9/11 case there was direct, extensive, and overt support for terrorism against the U.S. at the highest levels of Sudan's government, Plaintiffs here have provided vague, conclusory, and unsubstantiated allegations of indirect support by Saudi Arabia. What the Court has before it is insufficient to support a finding that the Saudi Arabian government provided material support to terrorism and that support proximately caused the NAS-P attack. As the 9/11 court stated when distinguishing Sudan from several Saudi Arabian entities, the allegations against Saudi Arabia are "too tenuous to support jurisdiction, in no small part because if support from [Saudi Arabia] reached al

34

Qaeda, it did so indirectly and through intermediaries." *In re Terrorist Attacks on Sept. 11, 2001*, 2022 WL 4227151, at *10; *see also In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d at 647 (rejecting the plaintiff's allegations that Saudi Arabia was "directly liable for its own tortious actions that proximately caused the 9/11 attacks"). Because Plaintiffs have not produced evidence showing Saudi Arabia provided material support for terrorism that was a substantial factor in the sequence of events that led to the NAS-P attack and that Plaintiffs' injuries were reasonably foreseeable as a natural consequence of Saudi Arabia's actions, they have not satisfied the JASTA exception's causation element.

To recap, the JASTA exception to the FSIA does not provide the Court with jurisdiction over Plaintiffs' claims. Plaintiffs have failed to meet their burden of producing evidence to show that (1) Al-Shamrani was acting within the scope of his employment when he attacked NAS-P; or (2) a tortious act of Saudi Arabia that was based on more than an omission or mere negligence caused Al-Shamrani's attack at NAS-P. Having concluded that the JASTA exception does not apply, the Court will turn to the noncommercial tort exception to the FSIA.

## B.   The noncommercial tort exception to the FSIA

The FSIA provides an exception to sovereign immunity where "money damages are sought against a foreign state for personal injury or death . . . occurring

in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment." 28 U.S.C. § 1605(a)(5). This exception is known as the "noncommercial tort exception." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 111 (2d Cir. 2013). Here, Plaintiffs argue the noncommercial tort exception applies for two reasons: (1) a tortious act or omission of Saudi Arabia caused the NAS-P attack, and (2) a tortious act of Al-Shamrani while acting within the scope of his employment caused the NAS-P attack. (Doc. 39 at 30-49). With respect to the scope of employment theory, the Court's analysis above regarding the JASTA exception is fully applicable. For the reasons previously stated, Al-Shamrani was not acting within the scope of his employment as a RSAF member when he launched the terrorist attack at NAS-P. As for Plaintiffs' claims regarding Saudi Arabia's own tortious conduct, it is necessary to consider two limitations that have been placed on the noncommercial tort exception—the entire tort rule and the discretionary function exclusion.[18]

---

[18] The noncommercial tort exception and the JASTA exception share some similar language. But the two exceptions have key differences. Most notably, the noncommercial tort exception (unlike the JASTA exception) does not exclude omissions and acts of mere negligence. The noncommercial tort exception does, however, exclude discretionary functions, and it requires the entire tort to occur

### 1.    The entire tort rule

The noncommercial tort exception only applies if the "entire tort" was committed in the United States. *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 116; *see also Doe v. Fed. Dem. Republic of Ethiopia*, 851 F.3d 7, 10 (D.C. Cir. 2017) (recognizing that "the *entire* tort must occur in the United States for the noncommercial tort exception to apply") (cleaned up).  This rule finds its genesis in *Argentine Republic v. Amerada Hess Shipping Corp.*, where the Supreme Court held that the noncommercial tort exception "covers only torts occurring within the territorial jurisdiction of the United States."  488 U.S. 428, 441 (1989).  Thus, the noncommercial tort exception is inapplicable if "any portion of plaintiffs' claims [] relies upon acts committed by the [defendant] abroad."  *O'Bryan v. Holy See*, 556 F.3d 361, 385 (6th Cir. 2009).  That is true even if the injury was suffered on United States soil.  *See Doe*, 851 F.3d at 10 ("The 'entire tort'—including not only the injury but also the act precipitating that injury—must occur in the United States."); *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 116 (finding that the "entire tort" was not committed in the United States, even though "the injuries and damage caused by the September 11, 2001 attacks" occurred in the United States).  The entire

---

within the United States—neither the entire tort rule nor the discretionary function exclusion apply to the JASTA exception.

tort rule is in keeping with Congress's desire that the noncommercial tort exception be "limited" in scope, *O'Bryan*, 556 F.3d at 382, and apply in "relatively few situations." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 116 n.8.[19]

To understand how the entire tort rule works in the context of Plaintiffs' claims that Saudi Arabia acted tortiously in its vetting, retention, and supervision of Al-Shamrani, let's look at the Sixth Circuit's decision in *O'Bryan*. In *O'Bryan*, victims of sexual abuse by Catholic priests sued Holy See, which is the central government of the Catholic Church and a foreign state for FSIA purposes. *O'Bryan*, 556 F.3d at 369. The Sixth Circuit explained that the plaintiffs' claims that Holy See failed to appropriately supervise the offending priests "cannot survive" under the entire tort rule because Holy See's acts of supervision "presumably occurred abroad." *Id*. at 385. Similarly, the *O'Bryan* court stated that claims relating to Holy See's promulgation of a policy regarding priests accused of child molestation "would not fall within the tortious act exception because it too presumably occurred abroad." *Id*.

With respect to Plaintiffs' claims that Saudi Arabia acted tortiously by providing material support to terrorism, a decision from the 9/11 court again proves

---

[19] The "primary purpose" of the noncommercial tort exception was to prevent foreign countries from avoiding responsibility for traffic accidents caused by their officials in the United States. *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 116 n.8.

instructive.  The plaintiffs in the 9/11 case sought to hold several Saudi Arabian entities responsible for allegedly "providing funding and other aid to entities that purportedly supported al Qaeda." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 117.  The Second Circuit found that the plaintiffs' allegations fell outside of the noncommercial tort exception because the alleged acts of material support "took place completely outside the United States." *Id*.

When the lessons of *O'Bryan* and *In re Terrorist Attacks on September 11, 2001* are applied here, it is evident that the entire tort rule dooms Plaintiffs' argument that jurisdiction exists under the noncommercial tort exception.  The claims regarding Saudi Arabia's vetting, retention, and supervision of Al-Shamrani are not based entirely on things that happened in the United States.  Rather, Plaintiffs' allegations involve things they claim Saudi Arabian officials failed to do in Saudi Arabia—i.e., conducting a thorough background check, monitoring social media, and supervising the CLO assigned to NAS-P.  Likewise, the allegations regarding material support of terrorism involve actions Plaintiffs say Saudi Arabian officials took in Saudi Arabia.  Although the injuries and damages occurred in the United States, every element of the alleged tortious acts did not.[20]  Thus, the entire tort rule

---

[20] Plaintiffs have argued that "not all of the conduct constituting the tort must occur within the United States; it is sufficient that only some of the acts or omissions occur here, so long as a plaintiff can allege at least one entire tort occurring in the United

prevents Plaintiffs from obtaining jurisdiction over Saudi Arabia under the noncommercial tort exception.

## 2.   The discretionary function exclusion

The noncommercial tort exception to the FSIA does not allow jurisdiction over "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A).   This exclusion is known as the discretionary function exclusion.   When addressing the FSIA's discretionary function exclusion, "courts typically apply the interpretation of the discretionary function exception of the

---

States." (Doc. 39 at 31) (cleaned up).   In support of that argument, Plaintiffs have cited *Olsen by Sheldon v. Gov't of Mexico*, 729 F.2d 641 (9th Cir. 1984).   The reliance on *Olsen* is misplaced.   The Ninth Circuit issued *Olsen* in 1984, which was five years before the Supreme Court's opinion in *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989).   The Court's decision in *Argentine Republic* "first articulated" the entire tort rule.   *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 115-16.   And it held that the noncommercial tort exception only applies to "torts occurring" in the United States.   *Argentine Republic*, 488 U.S. at 441.   The *Argentine Republic* Court did not say "parts of torts," or "the injury from torts"—it said "torts."   Given the language of *Argentine Republic*, as well as the persuasive precedent from the Second, Sixth, and D.C. Circuits, the Court believes that "the entire tort—including not only the injury but also the act precipitating that injury—must occur in the United States."   *Doe v. Fed. Dem. Republic of Ethiopia*, 851 F.3d 7, 10 (D.C. Cir. 2017) (cleaned up); *O'Bryan*, 556 F.3d at 385 (6th Cir. 2009) (stating "any portion of plaintiffs' claims that relies upon acts committed . . . abroad cannot survive" under the entire tort rule); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 115-16 (same).

40

Federal Tort Claims Act (the FTCA)." *O'Bryan*, 556 F.3d at 383. They do that because the language of the FSIA discretionary function exclusion "replicate[s] that of the FTCA" discretionary function provision, and "the legislative history of the FSIA . . . directs [courts] to the FTCA." *Id.*; *see also Swarna v. Al-Awadi*, 622 F.3d 123, 145 (2d Cir. 2010) (looking to FTCA caselaw "when interpreting the FSIA's discretionary function provision").

The courts have adopted a two-step test for determining whether the FSIA's discretionary function exclusion applies.[21] First, did the challenged action involve "an element of choice or judgment," or was it compelled by a federal statute, regulation, or policy? *O'Bryan*, 556 F.3d at 384 (internal quotations omitted). Second, if it did involve choice or judgment, then was the "choice or judgment [] of the type Congress intended to exclude from liability—that is, whether the choice or judgment was one involving social, economic, or political policy"? *Id.* (internal quotations omitted).

Numerous courts have recognized at step one that hiring, retaining, and supervising employees involves an element of judgment and choice. *See, e.g.*, *id.* at 384 (stating that "[a] number of courts" have concluded "that the selection of

---

[21] The two part test was adopted from the Supreme Court's FTCA caselaw. *See United States v. Gaubert*, 499 U.S. 315 (1991); *see also Berkovitz by Berkovitz v. United States*, 486 U.S. 531 (1988).

employees, officials and officers" is typically a discretionary function); *see also Swarna*, 622 F.3d at 146 (holding that the plaintiff's claim "that Kuwait failed to institute procedures or a system to monitor its employees implicates a discretionary function"); *Andrews v. United States*, 121 F.3d 1430, 1441 (11th Cir. 1997) (explaining that "decisions regarding the exercise of supervisory authority are of the sort the discretionary function exception was designed to encompass"). That remains true even when the employees are members of the military. *See Harper v. United States*, No. CV 12-1802, 2020 WL 4192540, at *5 (D.D.C. July 21, 2020) (explaining that the plaintiffs "are at bottom questioning the Army and DOD's supervision and discipline decisions" and "such decisions involve judgment and discretion"); *see also Carlyle v. U.S., Dep't of the Army*, 674 F.2d 554, 555 (6th Cir. 1982) (finding that the Army's decision regarding "whether or not to supervise" and "the extent of any such supervision" over a group of recruits was a "discretionary function"). Similarly, courts have held that a "failure to warn about an individual's dangerousness" is a discretionary function for purposes of the FSIA. *Doe v. Holy See*, 557 F.3d 1066, 1084 (9th Cir. 2009).

And at step two of the test, courts have recognized that "hiring, training, and supervision choices . . . are choices susceptible to policy judgment." *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1217 (D.C. Cir. 1997) (internal

quotations omitted); *see also Carlyle*, 674 F.2d at 557 (recognizing that a decision regarding supervision of recruits was a "planning level, policy-making decision"); *Swarna*, 622 F.3d at 146 (applying the discretionary function exclusion because the plaintiff's failure to supervise claims against Kuwait alleged a "failure that occurred at the planning level of government"). Indeed, the "[c]ase-law is clear that decisions related to employment and supervision are exactly the kind of policy judgments that the discretionary exclusion [in the FSIA] was designed to shield." *Robles v. Holy See*, No. 20-CV-2106, 2021 WL 5999337, at *14 (S.D.N.Y. Dec. 20, 2021).

Here, Plaintiffs try to get around the discretionary function exclusion by arguing that Saudi Arabia was required to engage in certain conduct regarding the vetting, retention, and supervision of Al-Shamrani. (*See* Doc. 39-44). It is true that the discretionary function exclusion does not apply when a "federal statute, regulation, or policy specifically prescribes a course of action." *Foster Logging, Inc. v. United States*, 973 F.3d 1152, 1157 (11th Cir. 2020) (internal quotations omitted). But Plaintiffs have failed to identify any statute, regulation, or policy that mandated conduct by Saudi Arabia with respect to its vetting, retention, and supervision of Al-Shamrani.

Plaintiffs have cited a handful of documents they claim fit the bill—namely, the Joint Security Cooperation Education and Training Manual ("Joint Security

43

Manual"), the Security Assistance Management Manual ("Security Management Manual"), the Flight Student Training Administration Manual ("Flight Student Manual"), the NAS-P Personal Firearms Policy ("Firearms Policy"), the VT-86 Commanding Officer's Violence Prevention Policy ("VT-86 Policy"), and the NAS-P International Military Student Liberty Policy ("Student Liberty Policy"). Unfortunately for Plaintiffs, none of those manuals/policies imposed a mandatory obligation on Saudi Arabia. The Joint Security Manual, the Security Management Manual, the Flight Student Manual, and the VT-86 Policy are aimed at the U.S. military and regulate the conduct of U.S. entities. They were not binding on Saudi Arabia. The Firearms Policy and the Student Liberty Policy may have regulated the conduct of Al-Shamrani while he was at NAS-P, but they did not mandate that Saudi Arabia take any specific actions.

For example, the Joint Security Manual expressly states that it "applies to the active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve . . . the Reserve Components of the Army, the Navy, the Air Force, the Marine Corps, the Air National Guard, the Coast Guard, and DOD agencies." (Doc. 39-8 at 4). Thus, it is clear that the Joint Security Manual regulates the conduct of the U.S. military when training international personnel. (*See* Doc. 39-8 at 24) (stating the purpose of the Joint Security Manual). It does not, however,

44

regulate countries (like Saudi Arabia) who send international personnel for training by the U.S. military. Put another way, the Joint Security Manual does not "mandate[]" that Saudi Arabia "perform [its] function in a specific manner." *Foster Logging, Inc.*, 973 F.3d at 1158.

Similarly, the Security Management Manual is designed for the U.S. military and the Department of Defense. It discusses the "roles and responsibilities" of the Department of Defense and other U.S. agencies. (Doc. 39-9 at 3). The section of the Manual dealing with international training "describes policies and procedures related to the *provision* of international training and education provided under security cooperation authorities." (*Id*. at 9) (emphasis added). As the use of the word "provision" shows, the Manual is designed for the U.S. military as the provider of the training. It is not aimed at regulating the recipients of the U.S. military's training. Although there is a section of the Manual that requires "security screening of each [international] student," that section imposes an obligation on "in-country *U.S. officials*" to conduct a "security screening." (*Id*. at 24) (emphasis added). It imposes no obligation on a foreign country like Saudi Arabia.

The same is true of the Flight Student Manual, which states that its purpose is to "outline procedures for processing students undergoing flight training." (Doc. 39-12 at 3). The Manual states that the "action" it requires is for "[c]ommanders" to

45

implement the policy.  (*Id*. at 4).  The context of the document shows that by "commanders," the Manual is referring to U.S. military personnel.

Plaintiffs have argued that the Flight Student Manual imposed a duty on foreign nations to have a Country Liaison Officer (CLO) assigned to supervise their military members while they received training in the United States.  And Plaintiffs claim Saudi Arabia breached that duty at NAS-P by failing to have a CLO onsite throughout Al-Shamrani's training.  The Flight Student Manual, however, does not mandate that a foreign nation assign a CLO.  Instead, the Flight Student Manual makes the assignment of a CLO discretionary.  It states as follows: "At the request of another country and with the concurrence [of certain U.S. Navy offices], a CLO *may* be assigned to assist with the administrative duties for [trainees] from his or her country."  (*Id*. at 85) (emphasis added).  The Flight Student Manual contemplates situations where there is no CLO assigned, as it states: "In case of serious injury or death *where no CLO is assigned*, the [Training Air Wing Commanders International Military Services Officer] shall act as coordinator with the [International Military Student]'s country representatives."  (*Id*.) (emphasis added).[22]  Thus, Plaintiffs are

---

[22] It bears noting that the Navy's investigation into Al-Shamrani's attack found that there was no "formal agreement" with Saudi Arabia regarding CLO performance and standards.  (Doc. 47-1 at 246).  The Navy's investigation further found that "[e]ven if such an agreement existed . . . the agreement would be nonbinding."  (*Id*.).  Further evidence that at the relevant time Saudi Arabia was not required to have a

incorrect in their assertion that the Flight Student Manual imposed mandatory obligations on Saudi Arabia.

Likewise, the VT-86 Policy governed the conduct of a Navy squadron. *See* (Doc. 39-14 at 2) (requiring "[a]ll members of VT-86" to "carry[] out this policy"). Nothing in the VT-86 Policy can be fairly read as imposing mandatory obligations on a foreign country like Saudi Arabia. As for the Firearms Policy and the Student Liberty Policy, neither imposed any mandatory obligations on Saudi Arabia. These policies regulate the conduct of individuals at NAS-P, not the conduct of foreign states. Thus, they do not provide the Court with a basis for finding the discretionary function exclusion to be inapplicable.

At bottom, Plaintiffs have not identified a "federal statute, regulation, or policy" that "specifically prescribe[d] a course of action" or "mandate[d] particular conduct," *United States v. Gaubert*, 499 U.S. 315, 322, 324 (1991), regarding Saudi Arabia's vetting, retention, and supervision of Al-Shamrani. Instead, the vetting,

---

CLO present, nor was it required to ensure that the CLO performed certain tasks, can be found in the Navy Report's recommendations. One of those recommendations (9.3.5) was that, going forward, the Navy should "require the presence of a CLO as a requirement for the execution" of aviation training. (*Id.* at 250). And another recommendation (9.3.4) was that the Navy "identify contract vehicles to require CLO presence" for certain types of training. (*Id.*). Those recommendations would have been wholly unnecessary if such things were already required before Al-Shamrani's attack.

retention, and supervision "involved the exercise of choice and judgment" and were "the kind of policy judgment that the discretionary function exception was designed to shield." *Id*. at 331-32; *see also Swarna*, 622 F.3d at 146 (finding that the plaintiff's claim that "Kuwait failed to institute procedures or a system to monitor its employees implicates a discretionary function"). Accordingly, the discretionary function exclusion prevents Plaintiffs from obtaining jurisdiction over Saudi Arabia under the noncommercial tort exception to the FSIA.[23]

## C.   The commercial acts exception to the FSIA

The commercial acts exception to the FSIA is the third exception that Plaintiffs say gives the Court jurisdiction over Saudi Arabia. The commercial acts exception provides in pertinent part that a foreign state "shall not be immune . . . in any case—(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). Broken down into its constituent parts, this exception requires that the activity in question be

---

[23] Even if Plaintiffs' claims were able to get by the entire tort rule and the discretionary function exclusion, they would run into a causation problem. The noncommercial tort doctrine, like the JASTA exception discussed previously, requires a causal connection between the tortious acts and the deaths and injuries. And for the reasons already explained regarding the JASTA exception, Plaintiffs have failed to produce evidence showing the requisite causal connection between the actions of Saudi Arabia and Al-Shamrani's terrorist attack.

"commercial."   And it requires that the plaintiff's lawsuit be "based upon" that commercial activity.  Are those requirements met here?  Plaintiffs say they are, and Saudi Arabia says they are not.  Saudi Arabia has the better argument.

### 1.   "Commercial activity" requirement

For purposes of the FSIA, "[a] 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  When determining the commercial character of an activity, courts must focus on the "nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  *Id*.  Congress, however, left "the critical term 'commercial' largely undefined."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 359 (1993) (internal quotations omitted).  This "diffidence necessarily results in judicial responsibility to determine what a 'commercial activity' is for purposes of the Act." *Id*.  Carrying out that responsibility, the Supreme Court has explained that a foreign state "engages in commercial activity" when it "exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns."   *Id*. at 360 (cleaned up).   Thus, the issue becomes "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce."  *Id*. at 360-61 (cleaned up) (emphasis in original).  Or if the actions are

the type that "require sovereign power and thus cannot be performed by a private party." *Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1325 (11th Cir. 2003).

Here, Plaintiffs claim that Saudi Arabia's arrangement for RSAF members to receive training from the U.S. military at NAS-P was a "commercial activity." The Court disagrees. Military training is a sovereign activity and by entering into a training arrangement with the U.S. military, Saudi Arabia "was not exercising powers that a 'private player within the market' could or would exercise." *Strange v. Islamic Republic of Iran*, 320 F. Supp. 3d 92, 97 (D.D.C. 2018). After all, "pledges from one sovereign nation to help develop the armed forces of another . . . is not the type of activity that private players engage in." *Id*. Entering into "such an agreement inherently would require the exercise of state authority." *Id*.

Neither XYZ Corporation nor Joe Q. Public can enter an agreement to receive fighter jet training from the U.S. Navy. At its core, the agreement between the U.S. and Saudi Arabia that led to Al-Shamrani's presence at NAS-P was "a military training agreement between two sovereign parties." *MCI Telecomms. Corp. v. Alhadhood*, 82 F.3d 658, 664 (5th Cir. 1996). And that is not "the type of transaction that private actors could complete." *Beg*, 353 F.3d at 1325; *see also MCI Telecomms. Corp.*, 82 F.3d at 664 (refusing to apply the commercial activity

exception to the FSIA in a case involving a military training agreement between the U.S. and the United Arab Emirates); *UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210, 216 (5th Cir. 2009) (explaining that an agreement to provide training and perform maintenance on Saudi Arabia's fighter jets was not a "commercial activity" for FSIA purposes because the agreement involved providing "personnel that were vital to the operation of a national air defense system," which was an "undeniably sovereign" act).

Before moving on, it is necessary to distinguish *SAMCO Global Arms, Inc. v. Arita*, 395 F.3d 1212 (11th Cir. 2005)—a case on which Plaintiffs rely. (Doc. 39 at 72). In that case, an arms dealer entered a contract to sell weapons to Honduras. *Id*. at 1213. The arms dealer sued Honduras for breach of contract, and Honduras argued it was immune under the FSIA. *Id*. at 1214. Rejecting that argument, the *SAMCO Global Arms* court found that the commercial activity exception to the FSIA applied. In support of its conclusion, the court explained that "where the activity at issue involves a government's contract for purchase and sale of goods, the activity is commercial." *Id*. at 1216. The *SAMCO Global Arms* court further explained that the contract was "essentially for the bailment of goods with a purchase option," which "obviously could have been executed by individuals in the private marketplace." *Id*.

The current case is like *SAMCO Global Arms* in the sense that it involves a foreign military.  The similarities, however, end there.  The current case does not involve the sale of goods between a private corporation and a foreign country.  Rather, it involves a military training arrangement between one sovereign nation's military and another sovereign nation's military.  Whereas a private party can buy goods from another private party or enter into a bailment with a purchase option, a private party cannot enter into a contract for fighter jet training with the U.S. Navy.  Thus, *SAMCO Global Arms* is distinguishable.  The case before the Court today, unlike *SAMCO Global Arms*, is one where the purpose of the arrangement between the U.S. and Saudi Arabia was "undeniably sovereign." *UNC Lear Servs., Inc.*, 581 F.3d at 216.  As such, the commercial activity exception to the FSIA does not apply.

## 2.    "Based upon" requirement

Even if the military training program qualified as "commercial activity," the commercial activity exception to the FSIA would not apply because Plaintiffs' lawsuit is not "based upon" the military training program.  As set forth above, the commercial activity exception only applies if "the action is based upon a commercial activity carried on in the United States."  28 U.S.C. § 1605(a)(2).  The FSIA does not define the phrase "based upon," but the Supreme Court has explained that "an

52

action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit." *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015).

A suit is not "based upon" an act simply because that act constitutes "a single element of a claim." *Id*. at 34. Rather, "the commercial activity relied upon by plaintiff for jurisdictional purposes must be also the activity upon which the lawsuit is based; that is, there must be a connection between that activity and the act complained of in the lawsuit." *O'Bryan v. Holy See*, 556 F.3d 361, 378 (6th Cir. 2009) (cleaned up). "A mere tangential or attenuated connection between the act and the commercial activity will not suffice." *Strange*, 320 F. Supp. 3d at 98 (cleaned up). What is required is a "significant nexus . . . between the commercial activity in th[e] country . . . and a plaintiff's cause of action." *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 155 (2d Cir. 2007) (cleaned up).

The Supreme Court's decision in another case involving Saudi Arabia is helpful here. In *Saudi Arabia v. Nelson*, the plaintiff—a U.S. citizen—agreed to work at a hospital in Saudi Arabia. 507 U.S. at 352. After reporting misconduct at the hospital, the plaintiff was arrested, jailed, and tortured by Saudi Arabian officials. *Id*. at 352-53. Upon his eventual release, the plaintiff returned to the U.S. and sued Saudi Arabia. *Id*. at 353. The plaintiff argued that the FSIA's commercial activity exception applied because the conduct that precipitated his arrest was related to his

employment. *Id*. at 355-56. Rejecting that argument, the *Nelson* Court held that although the employment agreement "led to the conduct that eventually injured" the plaintiff, the agreement "was not the basis" for the lawsuit. *Id*. at 358. The Court further explained that the lawsuit was about tortious conduct allegedly committed by Saudi Arabia, and the "torts, [] not the arguably commercial activities that preceded their commission, form the basis for the [plaintiff's] suit." *Id*.

Applying the above here, the alleged commercial activity (i.e., the military training arrangement between the U.S. and Saudi Arabia) is not "the particular conduct that constitutes the gravamen," *OBB Personenverkehr AG*, 577 U.S. at 35 (cleaned up), of Plaintiffs' lawsuit. Rather, the "gravamen" or "foundation," *id*. at 33, 35, of this lawsuit is a terrorist attack and the harms it caused. Plaintiffs' lawsuit is not about some commercial deal gone bad. This case, like *Nelson*, is about tortious acts—"not the arguably commercial activities that preceded their commission." *Nelson*, 507 U.S. at 358. Because "there is simply no plausible way that this Court could say that Plaintiffs' claims in this case are based upon an act in connection with [any] commercial activities," *id*. (cleaned up), the FSIA's commercial activity exception does not apply.

### D.   The waiver exception to the FSIA

Finally, Plaintiffs claim that the FSIA's waiver exception provides the Court

with jurisdiction.   Under the waiver exception, a "foreign state shall not be immune . . . in any cases—(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver." 28 U.S.C. § 1605(a)(1).  The showing required for waivers of immunity is "exacting." *Strange*, 320 F. Supp. 3d at 98.  Both explicit and implicit waivers are narrowly construed in favor of the foreign state. *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 691 (D.C. Cir. 2022).   An explicit waiver occurs when a foreign state "expressly consents to forgo its sovereign immunity with respect to a certain class of disputes or a particular subject matter."  *Id*.  Explicit waivers must be "clear[] and unambiguous[]." *Id*.

Similarly, the implied waiver provision is "narrow." *Calzadilla v. Banco Latino Internacional*, 413 F.3d 1285, 1287 (11th Cir. 2005).  It does not apply unless the foreign state "reveals its intent to waive its immunity by: (1) agreeing to arbitration in another country, (2) agreeing that the law of a particular country should govern a contract, or (3) filing a responsive pleading in an action without raising the defense of sovereign immunity."  *Id*.

Plaintiffs contend that Saudi Arabia explicitly waived its sovereign immunity by agreeing to cooperate with the U.S. government's investigation of Al-Shamrani's

attack.  They also point to a statement from President Trump, which expressed that the King of Saudi Arabia had said he would "take care of the families" of the victims. (Doc. 5 at 169).

Neither the agreement to cooperate in the investigation nor the statement by President Trump (about what the King of Saudi Arabia allegedly said) constitute an explicit waiver of sovereign immunity.  Agreeing to cooperate in a U.S. government investigation into a terrorist attack is not the same thing as explicitly giving up immunity and consenting to be sued for damages by U.S. citizens regarding that terrorist attack.  Nor is the statement from the King to President Trump about "tak[ing] care of the families" an explicit waiver of sovereign immunity.  The statement says nothing about agreeing to be sued by the victims' families.  It says nothing about consenting to the jurisdiction of the U.S. courts.  And it says nothing about waiving sovereign immunity.  *See generally Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442-43 (1989) (refusing to find a waiver of sovereign immunity and stating it could not "see how a foreign state can waive its immunity . . . by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States").  What is required to explicitly waive sovereign immunity is a "clear, complete, unambiguous, and unmistakable manifestation of

56

the sovereign's intent to waive its immunity." *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1292 (11th Cir. 1999) (internal quotations omitted). Plaintiffs have not supported their explicit waiver argument with any such "clear, complete, unambiguous, and unmistakable manifestation" by Saudi Arabia. Thus, Saudi Arabia has not explicitly waived its sovereign immunity.

Plaintiffs' implied waiver argument fares no better. According to Plaintiffs, Saudi Arabia implicitly waived its sovereign immunity by entering into a military training agreement with the United States. Plaintiffs do not have a copy of any such agreement, but they speculate that the agreement probably contained a clause that could be viewed as an implied waiver of sovereign immunity. In support of their argument, Plaintiffs point to a sample Foreign Military Sales Letter of Offer and Acceptance (LOA) that they believe is similar to the agreement Saudi Arabia may have had with the United States. And that sample LOA states that it "is subject to U.S. law and regulation, including U.S. procurement law." (Doc. 27-1 at 426). This, Plaintiffs say, is sufficient to satisfy the "exacting," *Strange*, 320 F. Supp. 3d at 98, standard required for implied waivers.

The Court disagrees. First, Plaintiffs have not provided any actual agreement between the United States and Saudi Arabia. Plaintiffs are merely speculating about what an agreement might have said. The Court cannot find an implied waiver based

on such speculation.  Second, even if Saudi Arabia signed a contract identical to the sample LOA, the language of the LOA is insufficient to impliedly waive sovereign immunity.

The LOA makes clear that it does not contemplate disputes being resolved through litigation.   According to the LOA: "The [U.S. Government] and the Purchaser agree to resolve any disagreement regarding this LOA *by consultations*[24] between the [U.S. Government] and the Purchaser and not to refer any such disagreement to any international tribunal or third party for settlement."  (Doc. 27-1 at 426) (emphasis added).  This language demonstrates that any signatories to the LOA contemplated disputes being resolved outside of court through the international consultation process.  Thus, the "Court certainly cannot say that it demonstrates [Saudi Arabia's] amenability to being subjected to suit in this country."  *Strange*, 320 F. Supp. 3d at 99.  In reaching that conclusion, the Court is mindful that courts have been "reluctant to find" implied waivers of sovereign immunity and have done so only when "the waiver was unmistakable."  *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991).  The language of the LOA is not unmistakable.

---

[24] In the international law context, a "consultation" is defined as the "interactive methods by which states seek to prevent or resolve disputes."  *Consultation*, *Black's Law Dictionary* (8th ed. 2004).

To summarize, Plaintiffs have argued that four exceptions to the FSIA apply in this case—(1) the JASTA exception; (2) the noncommercial tort exception; (3) the commercial activity exception; and (4) the waiver exception.  Plaintiffs have failed to meet their burden of "overcom[ing] the presumption that [Saudi Arabia] is immune from suit by producing evidence that the conduct which forms the basis of the complaint falls within" any of the four asserted exceptions.  *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1313 (11th Cir. 2009) (cleaned up).  Saudi Arabia is, therefore, immune under the FSIA, and this Court lacks jurisdiction over Plaintiffs' lawsuit.

### E.   Jurisdictional discovery is unwarranted

In response to Saudi Arabia's motion to dismiss, Plaintiffs moved for jurisdictional discovery.  (Doc. 43).  Foreign sovereign immunity is not only immunity from liability, but also immunity from the hassle and expense of the litigation process.  *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 206 (2d Cir. 2016).  Courts, therefore, should be hesitant to authorize jurisdictional discovery against a foreign state.  *Id*.[25]

---

[25] Plaintiffs have argued that they have a "qualified right to jurisdictional discovery." (Doc. 43 at 1).  And they cite to precedent saying that a district court "abuses its discretion if it completely denies a party jurisdictional discovery."  (*Id*.) (citing cases).  None of the cases cited by Plaintiffs, however, involved jurisdictional discovery of a foreign state that has asserted immunity under the FSIA.  In fact, Plaintiffs' motion for jurisdictional discovery lacks any discussion of how courts have handled jurisdictional discovery requests in FSIA cases.  Contrary to the

When deciding if jurisdictional discovery should be permitted against a foreign state, a district court is "to balance the need for discovery to substantiate exceptions to statutory foreign sovereign immunity against the need to protect a sovereign's . . . legitimate claim to immunity from discovery." *Butler*, 579 F.3d at 1314 (cleaned up) (affirming the denial of jurisdictional discovery). This standard is designed to ensure "that jurisdictional discovery is ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination." *Id*. (cleaned up). Thus, broad and vague requests for jurisdictional discovery from a foreign state should be denied. *See Sequeira v. Republic of Nicaragua*, 815 F. App'x 349, 352 (11th Cir. 2020) (affirming the denial of jurisdictional discovery because of the "breadth and lack of detail involved in [the plaintiff's] request for jurisdictional discovery").

---

impression provided by a quick read of Plaintiffs' motion, the rules are entirely different when jurisdictional discovery is sought in a mine run case and when it is sought in a case involving the FSIA. *See, e.g.*, *Consulting Concepts Int'l, Inc. v. Kingdom of Saudi Arabia*, No. 19 Civ. 11787, 2021 WL 1226361, at *7 (S.D.N.Y. Apr. 1, 2021) (explaining that in a case involving foreign sovereign immunity, the plaintiff has "no automatic right" to jurisdictional discovery and, instead, the plaintiff "must establish a prima facie case that the district court has jurisdiction over the defendant before discovery is granted") (cleaned up); *see also Kelly v. Syria Shell Petrol. Dev. B.V.*, 213 F.3d 841, 849 (5th Cir. 2000) (recognizing that in FSIA cases jurisdictional discovery "is *not* permitted as a matter of course" because of the unique comity concerns raised by allowing discovery against a foreign country).

To obtain jurisdictional discovery from a foreign state, a plaintiff must first "establish a *prima facie* case" that jurisdiction is proper under an exception to the FSIA. *Butler*, 579 F.3d at 1314; *see also Licea v. Curacao Drydock Co.*, 794 F. Supp. 2d 1299, 1304 (S.D. Fla. 2011) ("Jurisdictional discovery is only available where the plaintiff is able to carry its initial burden of establishing a *prima facie* case that jurisdiction exists."); *Stutts v. De Dietrich Grp.*, 465 F. Supp. 2d 156, 169 (E.D.N.Y. 2006) ("District courts in this circuit routinely reject requests for jurisdictional discovery where a plaintiff's allegations are insufficient to make out a *prima facie* case of jurisdiction.").

Here, as explained above, Plaintiffs have not established a *prima facie* case that an exception to the FSIA applies. Moreover, Plaintiffs have requested broad jurisdictional discovery that falls at the other end of the spectrum from the type of targeted and circumspect jurisdictional discovery that courts can authorize against a foreign state. In their motion, Plaintiffs seek eight "buckets" of discovery. (Doc. 43 at 9-18). Each "bucket" of requested discovery is quite broad and resembles the merits discovery that occurs in a normal case. For example, in the first "bucket" Plaintiffs seek "jurisdictional discovery to substantiate their allegations and prove [Saudi Arabia] was aware of Al-Shamrani's radicalization and [al-Qaeda] sympathies prior to sending him to the United States." (*Id.* at 10). According to

61

Plaintiffs, the information sought could be found in Saudi Arabia's "files," and Al-Shamrani's "social media accounts, electronic devices and communications." (*Id*.).

In the second "bucket," Plaintiffs seek "all of the information in [Saudi Arabia's] possession that it has shared with the FBI." (*Id*. at 11). And Plaintiffs request jurisdictional discovery to "test and examine the reliability and scope of the Navy investigation." (*Id*.). In another "bucket," Plaintiffs seek "discovery exploring the facts known or knowable by [Saudi Arabia] and RSAF Does 1-30 prior to Al-Shamrani's terrorist attack." (*Id*. at 15). To gain that information, Plaintiffs want to depose numerous individuals, including Saudi Arabian officials. They also want to review "communications, social media accounts, and electronic devices" of Saudi Arabia's officials and agents. (*Id*.).

These are just a few examples of the extremely broad jurisdictional discovery that Plaintiffs want this Court to authorize. Granting Plaintiffs' request, however, would be inconsistent with the requirement that jurisdictional discovery of a foreign state be circumspect. It would also be inconsistent with the purposes underlying the FSIA's grant of sovereign immunity—the discovery sought by Plaintiffs would be expensive, invasive, and undoubtedly time-consuming for Saudi Arabia. Instead of seeking jurisdictional discovery "to confirm specific factual allegations" that do "not cause the undue burdens that foreign sovereign immunity is designed to prevent,"

*Sequeira*, 815 F. App'x at 351-52, Plaintiffs have effectively asked the Court to greenlight a "fishing expedition" that seeks a large amount of information from a foreign state "without any non-speculative basis for believing that [the information] would establish jurisdiction" under the FSIA. *Arch Trading Corp.*, 839 F.3d at 207; *see also Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (affirming the denial of jurisdictional discovery that "was based on little more than a hunch that it might yield jurisdictionally relevant facts"). Plaintiffs have not sought limited and circumspect jurisdictional discovery to verify specific factual allegations in the complaint. They have sought broad discovery in the apparent hopes of finding information that may help establish an exception to the FSIA. That is impermissible. Thus, Plaintiffs' motion for jurisdictional should be denied.

### III.   Conclusion

What happened at NAS-P on December 6, 2019 was a tragedy. Plaintiffs understandably want accountability and compensation. The law, however, does not permit them to obtain those things from Saudi Arabia. Under the FSIA, Saudi Arabia is beyond this Court's jurisdiction unless an exception applies. Plaintiffs have failed to meet their burden of producing evidence to show that an exception applies. And Plaintiffs are not entitled to the broad jurisdictional discovery they have sought. Accordingly, it is respectfully **RECOMMENDED** that:

63

1) Defendant Saudi Arabia's Motion to Dismiss (Doc. 46) be **GRANTED** and this matter be **DISMISSED for lack of jurisdiction under the Foreign Sovereign Immunities Act**;

2) Plaintiffs' Motion for Jurisdictional Discovery (Doc. 43) be **DENIED**;

3) The Clerk of Court be directed to close this case.

At Pensacola, Florida, this 11th day of May 2023.

/s/ *Zachary C. Bolitho*
Zachary C. Bolitho
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control</u>. An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.** *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636.**