**FOR PUBLICATION**

# In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-11310
_____

BENJAMIN WATSON, JR.,

   Individually and as executor of the estate of
   Joshua Kaleb Watson,

SHEILA WILEMON WATSON,

SHANE WALTERS,

   Individually and as co-executor of the estate
   of Cameron Scott Walters and as
   representative of SLW a minor child,

AMANDA WALTERS,

   Individually and as co-executor of the estate
   of Cameron Scott Walters and as
   representative of LNW a minor child,

S L W,

   A Minor Child, et al.,

                          *Plaintiffs-Appellants,*

*versus*

KINGDOM OF SAUDI ARABIA,

                          *Defendant-Appellee.*

———————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:21-cv-00329-MCR-ZCB

———————————————

Before JILL PRYOR, GRANT, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

This violent and tragic case arose out of a shooting rampage involving Royal Saudi Air Force ("RSAF") Second Lieutenant Mohammed Saeed Al-Shamrani, who opened fire with a Glock 45 9-millimeter pistol at Pensacola Naval Air Station ("NAS Pensacola") on December 6, 2019. The shooting resulted in the deaths of U.S. Military Officer Joshua Kaleb Watson and Airman Apprentices Cameron Scott Walters and Mohammed Sameh Haitham and serious injuries sustained by Ensigns Breanna Thomas and Kristy Lehmer, Airmen George Johnson and Ryan Blackwell, Yeoman First Class Jessica Pickett, Department of Defense Officer Captain Charles Hogue, and Escambia County Sheriff's Deputies Matthew Tinch, Jonathan Glass, Michael Hoyland, Thomas C. Bortner, Grant Lopez, Matthew Housam, and Matthew Keebler.

The survivors and the victims' families sued the Kingdom of Saudi Arabia in the Northern District of Florida, alleging a variety of tort and contract claims. Soon thereafter, the Kingdom moved the district court to dismiss the entire Amended Complaint, arguing that it was both facially and factually insufficient to sustain jurisdiction in an American court. The Kingdom asserted that each of the claims laid out in 172 pages was barred by the Foreign

Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605, and that the Plaintiffs had not been able to overcome the Kingdom's sovereign immunity.

The district court agreed with Saudi Arabia, concluding that the jurisdictional allegations were facially insufficient to sustain any of the claims.  The district court did not address the Kingdom's argument that the jurisdictional claims were also insufficient as a matter of fact.  Finally, the trial court denied the Plaintiffs' Request for Jurisdictional Discovery.

After thorough review, and with the benefit of extensive oral argument from able counsel, we agree that most of the Plaintiffs' claims were properly dismissed for lack of subject matter jurisdiction pursuant to the Foreign Sovereign Immunities Act, and the Justice Against Sponsors of Terrorism Act ("JASTA"), 28 U.S.C. § 1605B.  However, one group or bundle of the Plaintiffs' claims -- those based on the theory that the Kingdom had been grossly negligent in vetting, hiring, and sending Airman Al-Shamrani to the United States -- is facially sufficient to survive the jurisdictional attack.  Taking the allegations presented in the Amended Complaint as true (as we must at this stage in the proceedings), we are satisfied that under the terms of the congressional enactment in JASTA, this bundle of claims falls within one of the exceptions to foreign sovereign immunity.  These claims are facially sufficient because they are based on a series of acts of commission (rather than acts of omission) taken by the Kingdom in hiring and vetting Al-Shamrani that rose to the level of gross negligence under Florida law.

The Plaintiffs' other claims, however, which can be grouped under five broad theories of liability, fail to sufficiently meet any of the exceptions to foreign sovereign immunity found in the FSIA or JASTA. These claims fail either because they fall within discretionary functions that are immune from suit; they are based on acts of omission; they are based on tortious acts committed by Al-Shamrani that did not fall within the scope of his employment; they did not proximately cause the Plaintiffs' injuries; or, finally, they do not establish a *prima facie* breach of contract claim.

Accordingly, we affirm in part, reverse in part, and remand the case to the district court for further proceedings, including, in the first instance, answering the other jurisdictional question raised by the Kingdom: whether the first bundle of claims arising out of the Kingdom's conduct in hiring, vetting, and sending its airman to the United States survives the factual challenges.

## I.        Factual Background and Procedural History

At the outset, we recount in some detail the allegations found in the Amended Complaint in order to determine whether, for jurisdictional purposes, they are facially sufficient. We are required to accept the factual allegations as true when we address whether a Complaint is facially sufficient to answer a jurisdictional challenge under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (per curiam).

The Plaintiffs assert that Saudi Arabia is the largest foreign military sales customer of the United States, having agreed to purchase at least $350 billion in military contracts over a number of years. A significant part of the arms trade agreements between the United States and the Kingdom includes the obligation to train Saudi Arabian military personnel on American military bases. The training is funded by Saudi Arabia and is a critical component and condition of the Kingdom's purchase of aircraft, vessels, military equipment, and weapons systems from the United States.

The Amended Complaint identifies one U.S. military education and training program for international personnel, conducted by the U.S. Department of Defense -- the Security Cooperation Education and Training Program ("SCETP"). As part of the sales agreement with Saudi Arabia, the United States trains members of the Royal Saudi Air Force. The commercial transactions with Saudi Arabia use, among other documents, Letters of Offer and Acceptance ("LOA"), which are government-to-government agreements expressly governed by and subject to U.S. law and regulation that contain standard contractual Terms and Conditions, including an indemnification provision.

The foreign state is also required to follow policies and procedures designed to ensure the safety of the United States and its citizens. These include implementing and carrying out various security screening and vetting protocols before program participants can receive an Invitational Travel Order and a visa to come to the United States.

The Amended Complaint tells us that the shooter, Mohammed Saeed Al-Shamrani, was a Second Lieutenant in the RSAF and a member of al Qaeda in the Arabian Peninsula ("AQAP"). He was also a citizen, resident, employee, and agent of the Kingdom of Saudi Arabia. In 2012, Al-Shamrani became active on Twitter, using an account that bore his first and last name and that was easily traceable to him. By 2015, Al-Shamrani allegedly was following religious extremist and hardline clerics on Twitter, and his Twitter account showed evidence of radicalization and the expression of violent anti-American sentiments. Al-Shamrani also allegedly contacted operatives from AQAP by this time.

In 2015, Al-Shamrani joined the Royal Saudi Air Force. Despite his radicalization and the expression of many anti-American views, he was allowed to enroll in the RSAF Academy. The Amended Complaint further alleges that while he was employed by the RSAF, Al-Shamrani regularly posted radical fundamentalist ideology, as well as anti-American and anti-Jewish ideology, on his social media accounts. He commented on and encouraged others to post radical Islamic sentiments on social media, and allegedly he was followed on social media by other Saudi Arabian citizens in the government and in the RSAF, who read and commented on Al-Shamrani's radical posts. Among the ideas he was alleged to have expressed or read, the Amended Complaint includes the following:

> The killing of Shia Muslims, non-Muslims and people who do not pray;

The unfounded conspiracy that the Shia sect of Islam was founded by Jews to divide Muslims;

That Christians and Jews are the enemy of Islam, particularly to the Sunnis; and

That Islam is under attack and threatened by Christians, Jews and Western culture.

Al-Shamrani also echoed the radical and violent teachings of Anwar al-Awlaki, a Yemeni-American cleric and member of AQAP who was described as "perhaps the most prolific jihadist ideologue of all time." Despite the repeated public expression of extremist and violent views, Al-Shamrani was one of two students in his RSAF class of hundreds awarded a scholarship to enter a joint military program in the United States.

The Amended Complaint further asserts that military personnel coming to the United States for education or training at any armed forces training facility, like Al-Shamrani, are classified as foreign government officials and require an A-2 visa, for which applicants must undergo screening and complete a Form DS-160 Online Nonimmigrant Visa Application. As for the screening, Saudi security forces were required to thoroughly probe Al-Shamrani's background, before and after his name was sent to Saudi Arabia's Defense Ministry, because he was a prospective trainee in an American flight program. In May 2017, Saudi Arabia allegedly represented to the United States that Al-Shamrani had cleared the requisite security, medical, and internal character vetting.

As for the Form DS-160, we are told that the form includes entries on personal details, travel, companions, contact information, passport details, family, work, education, training, security, and background. Notably, the security portion contains 55 questions pertaining to such areas as terrorism, espionage, illegal activity, immigration violations, and felony convictions. The Kingdom, on Al-Shamrani's behalf, sent the completed Form DS-160 to the United States. Allegedly, it contained false information, which the Plaintiffs say Saudi Arabia knew or should have known was false. By August 2017, the visa application process was finished and Al-Shamrani was issued his Invitational Travel Orders.

The Kingdom sent Al-Shamrani to the United States shortly thereafter. The Saudi government paid for him first to learn English at Lackland Air Force Base in San Antonio, Texas, where he spent almost a year. Then, in May 2018, Al-Shamrani was transferred to NAS Pensacola in Florida to begin flight training. Throughout 2019, Al-Shamrani continued his flight training in Pensacola as a student participating in the United States' Security Cooperation Education and Training Program.

In July 2019, Al-Shamrani allegedly sought and obtained a Florida state hunting license, which he used to purchase a Glock 45 9-millimeter pistol and hundreds of rounds of ammunition. These purchases violated the Kingdom's policies and procedures, which forbade international military students from owning firearms. Nevertheless, Al-Shamrani stored the pistol and ammunition in the RSAF officer barracks at NAS Pensacola. The Amended Complaint

further says that he carried the Glock pistol and ammunition in his pilot helmet bag between July 2019 and December 6, 2019, the day of the attack.

On September 11, 2019, eighteen years after the attacks on the World Trade Center and the Pentagon, according to the Amended Complaint, Al-Shamrani posted an ominous message on Twitter, proclaiming "the countdown has begun." Later that month, Al-Shamrani wrote out a will on his phone, which purported to explain his forthcoming attack; allegedly he sent a copy of his will to al-Qaeda in the Arabian Peninsula.

During some of the time Al-Shamrani was stationed at NAS Pensacola, a Saudi Country Liaison Officer ("CLO") was also assigned to that base. The Amended Complaint alleges that the CLO was responsible for assisting in administering RSAF students on base, including Al-Shamrani. But in June 2019, both the CLO and the deputy CLO left the base. The CLO returned to NAS Pensacola on August 19, but he departed for Saudi Arabia only ten days later, on August 29. Finally, the CLO returned to Pensacola on September 16, but he did not go to the base or report to his office. Instead, the CLO requested that all official correspondence be forwarded to a hotel in Orlando, Florida. The CLO returned to Saudi Arabia five days later, on September 21, 2019. No Saudi CLO was stationed at NAS Pensacola from September 21, 2019 until January 2020, long after the shooting had occurred.

On the fateful morning of December 6, 2019, the Amended Complaint alleges that Al-Shamrani tweeted a series of messages

on his Twitter account.  We produce them, with typos, in their entirety:

> I'm not against you for just being American, I don't hate you because your freedoms, I hate you because every day you supporting, funding and committing crimes not only against Muslims but also humanity.  I am against evil, and America as a whole has turned into a nation of evil.  What I see from America is the supporting of Israel which is invasion of Muslim countries, I see invasion of many countries by its troops, I see Guantanamo Bay.  I see cruise missiles, cluster bombs and UAV.

> Your decision-makers, the politicians, the lobbyists and the major corporations are the ones gaining from your foreign policy, and you are the ones paying the price for it.  What benefit is it to the American people to suffer for the sake of supporting Israel?  Do you expect to transgress against others and yet be spared retribution?  How many more body-bags are American families willing to receive?  For how long can the US survive this war of attrition?  The US Treasury spend billions of dollars, in order to give Americans a false sense of security.

> The security is shared destiny.  You will not be safe until we live it as reality in [Palestine], and American troops get out of our lands.

Shortly after, at approximately 6:42 a.m., Al-Shamrani entered Building 633 on the Pensacola Naval Air Station wearing his

RSAF uniform. The Amended Complaint says that he went from room to room, firing hundreds of rounds of ammunition from his Glock pistol at personnel throughout the building. He shot and killed U.S. Military Officer Joshua Kaleb Watson and Airman Apprentices Cameron Scott Walters and Mohammed Sameh Haitham, and he shot and seriously injured Ensigns Breanna Thomas and Kristy Lehmer, Airmen George Johnson and Ryan Blackwell, Yeoman First Class Jessica Pickett, Department of Defense Officer Captain Charles Hogue, and Escambia County Sheriff's Deputies Matthew Tinch, Jonathan Glass, Michael Hoyland, Thomas C. Bortner, Grant Lopez, Matthew Housam, and Matthew Keebler. Al-Shamrani was killed by law enforcement officers during the shootout.

The Amended Complaint also asserts that a subsequent FBI investigation of the shooting revealed that Al-Shamrani had communicated frequently with AQAP, and characterized the shooting as an act of terrorism motivated by jihadist ideology. The investigation also revealed that seventeen other Saudi trainees had social media accounts linked to anti-American or jihadi content, and that in total, twenty-one other Saudi trainees possessed "derogatory material" in violation of U.S. and Saudi military law. As a result, these twenty-one trainees were terminated from the program and sent back to Saudi Arabia within days of the attack.

On February 2, 2020, AQAP posted a video claiming responsibility for the attack. The Amended Complaint also says that AQAP's video contained content that could only have been

provided by Al-Shamrani, such as pictures of Al-Shamrani, details about physical testing Al-Shamrani underwent during his training, and a copy of Al-Shamrani's will.

The Amended Complaint states that the FBI announced on May 18, 2020 that it had successfully unlocked Al-Shamrani's iPhone, which revealed that he had been radicalized years before joining the RSAF and that he was in direct communication with AQAP up until the evening before the attack.

On February 22, 2021, the Plaintiffs filed their first Complaint in the Northern District of Florida. The operative Amended Complaint, which spans 172 pages and includes 601 numbered paragraphs, asserts nineteen counts sounding in tort and contract against the Kingdom of Saudi Arabia. Although the Plaintiffs raised nineteen often overlapping causes of action, for analytical purposes and conceptual convenience, we have broken them down into six discrete groupings, since the Amended Complaint articulates six broad theories of liability.[1]

---

[1] In *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015), the Supreme Court, when it determined whether the plaintiffs' claims fell within an exception to foreign sovereign immunity, similarly analyzed multiple and sometimes overlapping claims together when those claims arose from the same underlying events. *See id.* at 30, 35 ("[T]he conduct constituting the gravamen of Sachs's suit plainly occurred abroad. All of her claims turn on the same tragic episode in Austria, allegedly caused by wrongful conduct and dangerous conditions in Austria, which led to injuries suffered in Austria."); *see also id.* at 36 n.2 ("[W]e consider here only a case in which the gravamen of each claim is found in the same place.").

These theories of liability are:

(1) negligence, gross negligence, and negligent infliction of emotional distress arising under Florida law in connection with the Kingdom's conduct in vetting, hiring, and sending Al-Shamrani to the United States for flight training (Counts 1, 14–18) (respondeat superior, negligence and gross negligence, negligent infliction of emotional distress, Florida wrongful death statute, Florida survival action, loss of consortium);

(2) negligence, gross negligence, and negligent infliction of emotional distress arising under Florida law because the Kingdom failed to properly vet Al-Shamrani once he commenced training in the United States, in particular that it failed to monitor his online activities (Counts 1, 14–18) (respondeat superior, negligence and gross negligence, negligent infliction of emotional distress, Florida wrongful death statute, Florida survival action, loss of consortium);

(3) negligence, gross negligence, and negligent infliction of emotional distress arising under Florida law because the Saudi Country Liaison Officer failed to properly supervise Al-Shamrani when he was training in the United States (Counts 1, 14–18) (respondeat superior, negligence and gross negligence, negligent infliction of emotional distress, Florida wrongful death statute, Florida survival action, loss of consortium);

(4) vicarious liability imputed to the Kingdom of Saudi Ara-
bia under Florida law for the intentional torts committed
by Al-Shamrani (Counts 1, 8–13, 16, 18) (respondeat su-
perior, assault, battery, false imprisonment, intentional
infliction of emotional distress, Florida hate crimes stat-
ute, Florida civil remedy for terrorism, Florida wrongful
death statute, loss of consortium);

(5) support of terrorism, under the Anti-Terrorism Act
("ATA") (Counts 2–6 (harboring or concealing terrorists,
providing material support to terrorists, providing mate-
rial support to designated foreign terrorist organizations,
prohibited financing of terrorism, and aiding and abet-
ting acts of international terrorism)); and Florida law
(Counts 1, 7, 16 (respondeat superior, loss of solatium,
wrongful death statute)); and, finally

(6) breach of a written and oral contract between the Saudi
and American governments, listing the Plaintiffs as third-
party beneficiaries (Counts 1, 19) (respondeat superior,
breach of contract).

The Plaintiffs moved for jurisdictional discovery on August
5, 2022; the Kingdom, in turn, urged the district court to dismiss
the Amended Complaint in its entirety for lack of jurisdiction on
August 26, 2022. Both Motions were referred to a magistrate judge
for a Report and Recommendation ("R&R"). On May 11, 2023, the
magistrate judge filed his R&R, recommending that the Motion for
Jurisdictional Discovery be denied and that the Motion to Dismiss
be granted in full. The Plaintiffs filed their objections to the R&R.

Case 3:21-cv-00329-MCR-ZCB    Document 80    Filed 11/13/25    Page 15 of 73
USCA11 Case: 24-11310    Document: 50-1    Date Filed: 11/10/2025    Page: 15 of 71

24-11310                Opinion of the Court                15

The district court invited the United States to file a statement of interest, but the United States filed a Notice of Non-Participation, declining the court's invitation.

On March 30, 2024, the district court issued its opinion adopting much of the R&R, ultimately granting the Kingdom's Motion to Dismiss the Plaintiffs' Amended Complaint in its entirety. The district court also denied the Plaintiffs' Motion for Jurisdictional Discovery. The court observed that "as to each FSIA exception, the Magistrate Judge first determined that Plaintiffs' allegations were inadequate or conclusory and thus the suit does not withstand a facial, let alone factual, challenge. The undersigned agrees." The district court opinion continued:

> While Plaintiffs take issue with the Magistrate Judge's application of the burden of production [as to the factual challenge], the Court finds it unnecessary to address the debate because, even accepting the nonconclusory allegations in the Amended Complaint as true, the jurisdictional allegations are facially insufficient to support the asserted statutory exceptions and overcome presumptive immunity as a matter of law.

The court did not consider the Kingdom's factual challenges to jurisdiction, since it concluded that the Amended Complaint was facially insufficient.

The district court explained that the Plaintiffs failed to establish an exception to foreign sovereign immunity. As for the exception found in JASTA, the trial court determined that Al-Shamrani acted outside the scope of his employment because he was hired

to fly airplanes, not engage in an attack at the naval air base in Pensacola. Moreover, the court concluded that Al-Shamrani had "acted for his own interests, not those of Saudi Arabia."

As for the claims that the Kingdom had inadequately hired, vetted, retained, and supervised Al-Shamrani, the trial court found that each was an act of omission falling outside the scope of JASTA. As for the Plaintiffs' claims that the Kingdom supported terrorism, also based on JASTA, the court concluded that the Amended Complaint failed to sufficiently allege that Saudi Arabia's actions, purportedly in support of AQAP in Yemen, proximately caused the shooting in the United States. As for the non-commercial tort exception to foreign sovereign immunity found in the FSIA, it determined that the Plaintiffs' claims concerning the hiring, retention, and supervision of Saudi employees were discretionary acts falling outside the scope of the exception. Moreover, the district court observed that the Plaintiffs had not identified any regulation or policy manual imposing a mandatory obligation on Saudi Arabia concerning the supervision of its employees while they were being trained in the United States. Finally, the district court rejected the Plaintiffs' argument that the waiver exception to the FSIA applied. The trial court determined that no clear waiver could be found in the standard form LOA.

This timely appeal followed. In this Court, the Plaintiffs assert that their allegations are facially sufficient under the waiver and non-commercial tort exceptions found in the FSIA, and, independently, that the allegations are facially sufficient pursuant to the

exception to foreign sovereign immunity found in JASTA. The Plaintiffs have not argued that the allegations were factually sufficient too. Nor has the Kingdom addressed factual sufficiency for jurisdictional purposes, because the district court had no occasion to address that question. Accordingly, we only address whether the Amended Complaint is facially sufficient for jurisdictional purposes.

Our discussion first explores the text and history surrounding the FSIA and JASTA, and then addresses the facial sufficiency of each grouping of claims the Plaintiffs have levelled against the Kingdom.

## II.        Statutory Background

The Foreign Sovereign Immunities Act "regulates subject matter jurisdiction and provides the only basis for courts in this country to acquire jurisdiction over a foreign state." *Calzadilla v. Banco Latino Internacional*, 413 F.3d 1285, 1286 (11th Cir. 2005) (quoting *Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1290 (11th Cir. 1999)). The FSIA "provides that a foreign state is immune from the jurisdiction of the United States unless an FSIA statutory exemption is applicable." *Id.* (quoting *Aquamar*, 179 F.3d at 1290). When the FSIA is invoked, courts generally consider whether foreign sovereign immunity applies on a claim-by-claim basis. *See, e.g.*, *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) ("[U]nless a specified exception [to the FSIA] applies, a federal court lacks subject-matter jurisdiction over a *claim* against a foreign state." (emphasis added)); *Simon v. Republic of Hungary*, 812 F.3d

18                    Opinion of the Court                    24-11310

127, 141 (D.C. Cir. 2016), *abrogated on other grounds by Fed. Republic of Germany v. Philipp*, 592 U.S. 169 (2021); *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 697 (7th Cir. 2012); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 706 (9th Cir. 1992).[2]

Thus, under the FSIA, although a foreign state, as a general rule, has sovereign immunity from suit and therefore cannot be haled into an American court, the FSIA provides for exceptions under a variety of circumstances. The Plaintiffs invoke two of them: waiver, found in subsection (a)(1), and the non-commercial tort exception, found in subsection (a)(5). They read this way:

---

[2] In the past, this Court has sometimes conducted its FSIA analysis exception-by-exception rather than claim-by-claim. *See, e.g.*, *Glob. Marine Expl., Inc. v. Republic of France*, 33 F.4th 1312, 1318 (11th Cir. 2022) (assessing whether the "commercial activities" exception applied to France's efforts to recover the wreck of a sunken vessel); *Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*, 788 F.3d 1329, 1338–43 (11th Cir. 2015) (same for the waiver and commercial activity exceptions in relation to a breach of contract action). We have never concluded that an exception-by-exception approach is somehow required by the FSIA or mandated by our precedent. We join our sister circuits in affirming that it may often be wiser to proceed on a claim-by-claim basis -- as is the case here. *See Simon*, 812 F.3d at 141; *Abelesz*, 692 F.3d at 697; *Siderman de Blake*, 965 F.2d at 706. The Plaintiffs raise no fewer than nineteen counts, sorted into six discrete theories of liability. *See supra* at pp. 13–15. Each bundle of claims implicates the statutory exceptions found in the FSIA and in JASTA in slightly different ways. In these circumstances, then, and for clarity of analysis, we assess the sufficiency of each bundle of claims, rather than conducting our analysis exception-by-exception.

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case --

    (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

       . . .

    (5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to --

        (A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

        (B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

28 U.S.C. § 1605(a).

The Plaintiffs invoke one additional statute -- the Justice Against Sponsors of Terrorism Act -- which, they say, provides an exception to foreign sovereign immunity and allows them to sue the Kingdom in an American court to answer for the grievous harm inflicted by Al-Shamrani's shooting.

Congress enacted the Justice Against Sponsors of Terrorism Act in 2016 over President Obama's veto.  This Act amended the FSIA and provided an additional exception to foreign sovereign immunity.  Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 3(a), 130 Stat. 852, 853 (2016).  Congress told us in the text that its purpose in enacting JASTA was "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States."  *Id.* § 2(b).

The exception to foreign sovereign immunity found in JASTA reads this way:

> (b) **Responsibility of foreign states.--**A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by --

(1) an act of international terrorism in the United States;
and

(2) a tortious act or acts of the foreign state, or of any
official, employee, or agent of that foreign state
while acting within the scope of his or her office, em-
ployment, or agency, regardless where the tortious
act or acts of the foreign state occurred.

. . .

(d) **Rule of construction.--**A foreign state shall not be sub-
ject to the jurisdiction of the courts of the United States
under subsection (b) on the basis of an omission or a tor-
tious act or acts that constitute mere negligence.

28 U.S.C § 1605B.

Thus, six distinct elements are required by JASTA: (1) money
damages are sought; (2) against a foreign state; (3) for physical in-
jury to person or property or death; (4) the injury or death occurred
in the United States; (5) the injury or death was caused by an act of
international terrorism in the United States; and (6) the injury or
death was caused by a tortious act or acts of the foreign state, or of
any official, employee, or agent of the foreign state while acting
within the scope of his employment.

### III.    Standard of Review

"We review *de novo* whether a defendant is entitled to im-
munity under the Foreign Sovereign Immunities Act." *R&R Int'l*

*Consulting LLC v. Banco do Brasil, S.A.*, 981 F.3d 1239, 1243 (11th Cir. 2020). Challenges to subject matter jurisdiction are brought under Rule 12(b)(1). *See* Fed. R. Civ. P. 12(b)(1). An attack on subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) comes in two forms -- facial or factual. *Lawrence*, 919 F.2d at 1528–29. Facial attacks on the complaint "require[] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Id.* at 1529 (alterations in original) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). "'Factual attacks,' on the other hand, challenge 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.'" *Id.* (quoting *Menchaca*, 613 F.2d at 511).

"A plaintiff defending against a facial attack on jurisdiction enjoys 'safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised,' and both the district court and a reviewing court '*must* consider the [well-pleaded] allegations in the plaintiff's complaint as true.'" *Mulhall v. Unite Here Local 355*, 618 F.3d 1279, 1286 n.8 (11th Cir. 2010) (quoting *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007)). To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It is by now hornbook law that a claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements will not suffice. *Id.* That said, the pleading requirements for a complaint generally are less demanding than those for claims alleging fraud. *Id.* at 686–87.

Finally, we review a district court's "denial, grant, or limitation of a motion for discovery," including motions for jurisdictional discovery, "for abuse of discretion." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1280–81 (11th Cir. 2009) (quoting *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1218 n.76 (11th Cir. 2007)).

## IV.    Analysis

### A.    *The Plaintiffs have presented a facially sufficient jurisdictional claim for grossly negligent vetting and hiring.*

Under Florida law, for jurisdictional purposes, the Plaintiffs have sufficiently stated a claim for gross negligence in connection with Saudi Arabia's failure to properly vet Al-Shamrani. Accepting the factual allegations in the Amended Complaint as true (as we must), there is no dispute that the first five elements of JASTA have been met. First, the Plaintiffs are seeking money damages in the Amended Complaint. Second, the Plaintiffs are seeking damages against the Kingdom of Saudi Arabia, a foreign state. Third, the Plaintiffs are suing on account of physical injury and death. Fourth, the injuries and the deaths occurred at NAS Pensacola, which is in Florida and thus in the United States. Fifth, the Plaintiffs' injuries or deaths were caused by an act of international terrorism.

The only open question is whether the Plaintiffs have suffi-
ciently pled and met the final requirement found in JASTA -- that
the Plaintiffs' injuries were caused by a tortious act of the Kingdom
of Saudi Arabia, or by its employees acting within the scope of their
employment.  Before we can address the question, however, we
face a threshold interpretive issue about the meaning of the phrase
"mere negligence" found in JASTA.  Again, the text of JASTA reads
this way:

> A foreign state shall not be subject to the jurisdiction
> of the courts of the United States under subsection
> (b) on the basis of an omission or a tortious act or acts
> that constitute mere negligence.

28 U.S.C. § 1605B(d).

If the phrase "mere negligence" means "all forms of negli-
gence, as opposed to intentional acts," then tortious acts constitut-
ing both ordinary negligence and gross negligence would be ex-
cluded from the JASTA exception, in which case the Plaintiffs
would have failed to sufficiently plead an exception to the King-
dom's sovereign immunity.  On the other hand, if the phrase "mere
negligence" refers to "ordinary negligence, as opposed to gross
negligence," then only ordinary negligence would be excluded
from the JASTA exception, meaning that the Plaintiffs could sue
under JASTA for claims of gross negligence.

In our view, the better reading of the phrase "mere negli-
gence" is that it refers only to ordinary negligence, which stands in
contrast to gross negligence.  In other circumstances, this Court

has similarly contrasted the phrase "mere negligence" with gross negligence and found the term "mere negligence" to be synonymous with ordinary negligence and no more. Thus, for example, in *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999), we contrasted deliberate indifference claims based on "grossly inadequate" actions with those based on "mere negligence." *Id.* at 1259 (quoting *Howell v. Evans*, 922 F.2d 712, 722 (11th Cir. 1991)). Similarly, in *Owens v. City of Atlanta*, 780 F.2d 1564 (11th Cir. 1986), we observed that the plaintiff was required to "demonstrate gross negligence or deliberate indifference" for an excessive force claim and that "mere negligence or delinquency [was] insufficient." *Id.* at 1567. Likewise, in *Smith v. U.S. Attorney General*, 983 F.3d 1206 (11th Cir. 2020), we defined reckless conduct as "a gross deviation from what a reasonable person would do" and as constituting "more than mere negligence." *Id.* at 1212 (quoting *Reckless, Black's Law Dictionary* (11th ed. 2019)). What's more, generally, we use the word "mere" when we want to emphasize how small, limited, or unimportant something is. *See, e.g., Mere*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/mere (last visited Oct. 8, 2025) ("being nothing more than").

This interpretation of the phrase "mere negligence" also avoids turning the word "mere" into surplusage. As the Supreme Court has repeatedly instructed us, "[i]t is our duty 'to give effect, if possible, to every clause and word of a statute.'" *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1882)); *Setser v. United States*, 566 U.S. 231, 239 (2012); *Chickasaw Nation v. United States*, 534 U.S. 84, 93 (2001);

*Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979).  We are therefore "reluctan[t] to treat statutory terms as surplusage."  *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (alteration in original) (quoting *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 698 (1995)).  Reading the phrase "mere negligence" to include "gross negligence" would render superfluous the modifier "mere," since gross negligence is legally distinct from ordinary negligence.  *Compare Negligence, Black's Law Dictionary* (10th ed. 2014) ("The failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation"), *with Gross Negligence, Black's Law Dictionary* (10th ed. 2014) ("[T]he omission of even such diligence as habitually careless and inattentive people do actually exercise in avoiding danger to their own person or property.").[3]  By giving the word "mere" the meaning of "ordinary," the phrase "mere negligence" takes on a more specific meaning that respects the words Congress chose to use in JASTA.

The disputed jurisdictional elements found in JASTA, then, are whether the Plaintiffs have sufficiently alleged: (1) that Saudi Arabia committed a tortious act, (2) that the theory of liability is based on a tortious act or acts that constitute "mere negligence" or

---

[3] When conducting statutory interpretation, we begin with the ordinary meaning of the term at the time the provision was enacted.  *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1750 (2020) (stating that "the law's ordinary meaning at the time of enactment usually governs"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012) ("Words are to be understood in their ordinary, everyday meanings . . . ."); *id.* at 78 ("Words must be given the meaning they had when the text was adopted.").

something more (here, gross negligence), (3) that Saudi Arabia's tortious acts caused the Plaintiffs' injuries, and (4) that the Kingdom's conduct involved acts of commission, not just acts of omission. The Plaintiffs' Amended Complaint sufficiently alleges the tortious act of negligent hiring; that the Kingdom's conduct rose to the level of gross negligence under Florida common law; that it proximately caused the Plaintiffs' injuries; and that the allegata included numerous acts of commission.

1.    The Amended Complaint sufficiently alleges that Saudi Arabia committed the tort of negligent hiring under Florida law.

We start with what is easy. The Plaintiffs have sufficiently alleged that the Kingdom was negligent under Florida law in vetting, hiring, and dispatching Al-Shamrani to NAS Pensacola. The FSIA states that "[a]s to any claim for relief with respect to which a foreign state is not entitled to immunity . . . the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Thus, the Supreme Court has concluded that "where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances." *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 622 n.11 (1983), *superseded on other grounds by statute*, 28 U.S.C. § 1610(g), *as recognized in Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018). We are therefore bound by Florida law. *See, e.g., Cassirer v. Thyssen-Bornemisza Collection Found.*, 142 S. Ct. 1502, 1508 (2022) (stating that under the FSIA, the "substantive law applying to [a

private party] also applies to [a foreign state]"); *cf. Flohr v. Mackovjak*, 84 F.3d 386, 390 (11th Cir. 1996) (applying state-law definition of "scope of employment" in sovereign immunity analysis under the FTCA).

Under Florida common law, Saudi Arabia had a duty to investigate Al-Shamrani for security purposes and, if it learned that Al-Shamrani posed some imminent danger or security risk, to take action to bar him from entering flight training in the United States. In Florida, a *prima facie* case for negligent hiring includes the following essential elements: "(1) the employer was required to make an appropriate investigation of the employee and failed to do so; (2) an appropriate investigation would have revealed the unsuitability of the employee for the particular duty to be performed or for employment in general; and (3) it was unreasonable for the employer to hire the employee in light of the information he knew or should have known." *Malicki v. Doe*, 814 So. 2d 347, 362 (Fla. 2002) (quoting *Garcia v. Duffy*, 492 So. 2d 435, 440 (Fla. 2d DCA 1986)).

The core predicate is reasonable foreseeability. *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992). Thus, the essential question is "whether the specific danger that ultimately manifested itself . . . reasonably could have been foreseen at the time of hiring." *Malicki*, 814 So. 2d at 362. "[C]entral to the task of judging the employer's responsibility to investigate an employee's background is consideration of 'the type of work to be done by the [prospective] employee.'" *Tallahassee Furniture Co. v. Harrison*, 583 So. 2d 744, 750 (Fla. 1st DCA 1991) (quoting *Williams v. Feather Sound, Inc.*, 386 So.

2d 1238, 1240 (Fla 2d DCA 1980)). Thus, for example, in *Williams v. Feather Sound, Inc.*, 386 So. 2d 1238 (Fla. 2d DCA 1980), the court found that "[i]f an employer wishes to give an employee the indicia of authority to enter into the living quarters of others, it has the responsibility of first making some inquiry with respect to whether it is safe to do so," and because the employer in that case "made no effort to contact prior employers, and . . . did not seek advice from [the employee's] references," then summary judgment in favor of the employer was unwarranted in light of the "suspect" parts of the employee's background. *Id*. at 1240–41 & n.9.

        As for the first element of negligent hiring, the Plaintiffs sufficiently allege that Saudi Arabia had a duty under Florida common law to appropriately investigate Al-Shamrani's background, and the Kingdom failed to adequately conduct such an investigation. The source of Saudi Arabia's obligation is rooted in "the type of work to be done by" Al-Shamrani. *Harrison*, 583 So. 2d at 750 (quoting *Williams*, 386 So. 2d at 1240). Specifically, Al-Shamrani was sent by the Saudis to the United States to learn how to fly American warplanes that had been purchased by the Kingdom. Only because it was integral to receiving flight training was Al-Shamrani authorized to enter a secure American military installation. Since Al-Shamrani was a member of another nation's military and had been sent to the United States to receive training at a secure American military facility, the Kingdom had "the responsibility of first making some inquiry with respect to whether it [was] safe to do so." *Williams*, 386 So. 2d at 1240. Put differently, as alleged in the Amended Complaint, "Saudi Arabia had a duty of reasonable care

in ensuring its training candidates were properly screened for security threats, properly trained to recognize and report security threats," and "routinely monitored."

The Amended Complaint further asserts that Saudi Arabia's duties stemmed from "the protocols, rules, regulations, codes of conduct and standards of the U.S. Department of State, U.S. Department of Defense, the RSAF, and the command-specific programs in which they participated, including the SCETP, FMS [Foreign Military Sales], and IMET [International Military Education and Training]." Finally, the Amended Complaint says that the Foreign Military Student "Letters of Offer and Acceptance," which are "government-to-government agreement[s]," "require the foreign state to follow strict policies and procedures designed to ensure the safety of the United States and its citizens." It was reasonably foreseeable that danger might arise from inadequately screening a flight candidate and then affording him access to a secure American military installation.

As for the second and third elements of negligent hiring, those elements too are sufficiently pled for jurisdictional purposes. The Amended Complaint asserts that the Kingdom had previously investigated Al-Shamrani's background "extensive[ly]" when he joined the RSAF, and also subjected him to extensive vetting "before and after his name was put forward to the Kingdom's Defense Ministry" "[a]s a prospective trainee in an American flight program."

Moreover, the Amended Complaint contains detailed allegations regarding Al-Shamrani's long history of publicly expressing extremist and violent views, even including the period of time before he joined the RSAF, when Al-Shamrani adhered to radical Islamic ideology that promoted extremist views, violent jihad, and a belief that nonbelievers, especially Americans, deserve to die. It also specifically alleges that "Al-Shamrani was a follower of al-Qaeda and AQAP clerics and other extremist ideologues." The Amended Complaint recounts that Al-Shamrani's social media accounts were available publicly and that by 2015, his Twitter account showed evidence of radicalization and the expression of anti-American sentiments. It also alleges that prior to being sent to the United States, Al-Shamrani's Twitter account followed religious extremist and hardline clerics. We are also told he used "his public social media pages to post and share extremist content, prior to the attacks" at NAS Pensacola. Al-Shamrani "adopted . . . and expressly repeated" the following ideas: "[t]he killing of Shia Muslims, non-Muslims and people who do not pray"; "[t]he unfounded conspiracy that the Shia sect of Islam was founded by Jews to divide Muslims"; "[t]hat Christians and Jews are the enemy of Islam, particularly to the Sunnis"; and "[t]hat Islam is under attack and threatened by Christians, Jews and Western culture."

The Amended Complaint also asserts that most of the statements at issue preceded the time when Al-Shamrani came to the United States, and this is the relevant timeframe for discerning what information was available to the Kingdom when it screened the airman for security before sending him to this country.

Although the Amended Complaint does not identify the exact dates, it does answer the "when" question in some detail.  It claims that Al-Shamrani made violent jihadi statements from at least 2015 until when the Kingdom sent him to the United States on August 28, 2017.

In short, for jurisdictional purposes, the Amended Complaint sufficiently alleges that Al-Shamrani held violent and extremist views, that he regularly posted these views on social media accounts, and that he posted these views before the Kingdom sent him to the United States.

The Amended Complaint further claims that even minimal investigation, let alone an "appropriate investigation," would have readily "revealed the unsuitability" of selecting Al-Shamrani "for the particular duty to be performed" -- coming to the United States for flight training at the Pensacola Naval Air Station.  *Malicki*, 814 So. 2d at 362 (quoting *Garcia*, 492 So. 2d at 438).  The Amended Complaint affords the reasonable inference that the Kingdom knew or should have known that Al-Shamrani was a "ticking time bomb" in light of the many violent and radical comments he made.  Thus, the Amended Complaint sufficiently alleges for jurisdictional purposes that the Kingdom unreasonably vetted him, hired him, and sent him to the United States.

2.    <u>The Amended Complaint sufficiently alleges that Saudi Arabia's negligent hiring of Al-Shamrani rose to the level of gross negligence.</u>

The Plaintiffs also have sufficiently alleged that under Florida common law, the actions of the Kingdom in vetting and hiring Al-Shamrani rose to the level of gross negligence.

We turn to Florida law for the meaning of gross negligence. *See, e.g., Cassirer*, 142 S. Ct. at 1508 (stating that under the FSIA, the "substantive law applying to [a private party] also applies to [a foreign state]"); *cf. Flohr*, 84 F.3d at 390 (applying state-law definition of "scope of employment" in sovereign immunity analysis under the FTCA). Gross negligence is defined as "that course of conduct which a reasonable and prudent man would know would probably and most likely result in injury to persons or property." *Carraway v. Revell*, 116 So. 2d 16, 22–23 (Fla. 1959) (quoting *Bridges v. Speer*, 79 So. 2d 679, 682 (Fla. 1955)). Gross negligence requires establishing three things: (1) "circumstances constituting an imminent or clear and present danger amounting to a more than normal or usual peril," (2) "knowledge or awareness of the imminent danger on the part of the tortfeasor," and (3) "an act or omission that evinces a conscious disregard of the consequences." *Elec. Boat Corp. v. Fallen*, 343 So. 3d 1218, 1220 (Fla. 5th DCA 2022) (quoting *Moradiellos v. Gerelco Traffic Controls, Inc.*, 176 So. 3d 329, 335 (Fla. 3d DCA 2015)).

The first element of an imminent or a clear and present danger is readily apparent. As we've previously observed, the Amended Complaint contains numerous detailed allegations regarding Al-Shamrani's publicly available extremist and violent views, which amounted to "circumstances constituting an imminent or clear and present danger amounting to a more than normal

or usual peril," and "knowledge or awareness of the imminent danger on the part of" Saudi Arabia. *Elec. Boat Corp.*, 343 So. 3d at 1220 (quoting *Moradiellos*, 176 So. 3d at 335). It also charges that Al-Shamrani's identity and views online were not hidden: he "was not taking similar steps to mask his identity [as another person, who was operating anonymously online and whom Saudi authorities subsequently de-masked] in his social media posts that made his support for AQAP and his jihadist principles clear." Although "Al-Shamrani underwent extensive vetting when he joined the RSAF" and "Saudi Arabia knew of Al-Shamrani's radicalization and anti-American sentiments," "Al-Shamrani was allowed to enroll in the RSAF Academy."

"According to the FBI," the Amended Complaint continues, "Al-Shamrani's social media posts echoed the teachings of [Anwar] al-Awlaki," who was a "Yemeni-American cleric" and was characterized as being "[o]ne of AQAP's most notorious members"; al-Awlaki "became a prominent English-language propagandist for al-Qaeda" and was "perhaps the most prolific jihadist ideologue of all time," "propagandiz[ing] through hundreds of hours of audio and video lectures, along with written essays, blog posts and other content. Al-Awlaki's videos and writings have continued to influence countless extremists, including Al-Shamrani."

The Amended Complaint thus includes numerous details about Al-Shamrani's extremist ideology and views and how, far from being hidden, they were available on his publicly available social media accounts before he had even joined the RSAF and

throughout his time with the RSAF, before he came to the United States. If there were any doubt as to whether there were "circumstances constituting an imminent or clear and present danger amounting to a more than normal or usual peril," *Elec. Boat Corp.*, 343 So. 3d at 1220 (quoting *Moradiellos*, 176 So. 3d at 335), those doubts were resolved by the subsequent events, including Al-Shamrani's public tweet on September 11, 2019 proclaiming that "the countdown has begun," as well as the shooting itself on December 6, 2019 and Al-Shamrani's accompanying screed.

Put differently, we understand the concept of risk to be the product of the nature or gravity of the harm and the probability it may arise. *See, e.g.*, *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d. Cir. 1947) (Learned Hand, J.). The profound nature of the risk of sending Al-Shamrani for flight training in America amounted to far "more than normal or usual peril." *Elec. Boat Corp.*, 343 So. 3d at 1220 (quoting *Moradiellos*, 176 So. 3d at 335). A Saudi Arabian military officer, who repeatedly urged death to America and to its military apparatus, posed a clear and immediate danger if assigned to a U.S. military base for extensive flight training.

The Amended Complaint further sufficiently alleges "knowledge or awareness of the imminent danger on the part of" Saudi Arabia. *Id.* (quoting *Moradiellos*, 176 So. 3d at 335). Finally, the Amended Complaint asserts that Saudi Arabia undertook multiple acts "that evince[d] a conscious disregard of the consequences." *Id.* (quoting *Moradiellos*, 176 So. 3d at 335). First, it permitted him to initially enroll in the RSAF Academy. Next, Al-

Shamrani's RSAF squadron commanders nominated him for the foreign training program, and then he became one of only two students, out of hundreds in his RSAF Academy class, selected by the Kingdom and awarded a scholarship to enter the joint military program in the United States. Saudi Arabia also asked the United States for an A-2 visa for Al-Shamrani, and the visa was granted based on allegedly false documentation submitted to the United States. Finally, Saudi Arabia paid for Al-Shamrani to spend almost a year learning English (from August 28, 2017 until May 2018) and sent him to the United States in the first place.

For jurisdictional purposes, then, the Amended Complaint sufficiently alleges gross negligence arising from the failure to properly vet the airman before he was sent to Pensacola Naval Air Station.

3.    The allegations sufficiently allege proximate cause.

Next, for jurisdictional purposes, the Amended Complaint sufficiently alleges that Saudi Arabia's grossly negligent vetting and hiring caused grievous injuries and multiple deaths.

Preliminarily, we are required to determine what the phrase "caused by" means in JASTA. JASTA states that foreign sovereign immunity is abrogated if there is:

> physical injury to person or property or death occurring in the United States and caused by . . . a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting

within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605B(b).  Although Saudi Arabia argues that the proper reading of this phrase requires proximate causation in addition to but-for causation -- "'that the harm would not have occurred' in the absence of -- that is, but for -- the defendant's conduct," *Burrage v. United States*, 571 U.S. 204, 211 (2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013)) -- the better reading is the one that the magistrate judge and district judge offered: that "caused by" requires only proximate causation.  *See In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 645 (S.D.N.Y. 2018). The Fourth Circuit has read the phrase "caused by" in connection with a different FSIA exception, 28 U.S.C. § 1605A, to mean "proximate cause."  *Rux v. Republic of Sudan*, 461 F.3d 461, 473 (4th Cir. 2006); *see also Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004); *accord* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338–44 (2008).

Moreover, when the Supreme Court has interpreted the phrase "caused by" in the admiralty jurisdiction setting, it concluded that the same phrase means proximate causation.  *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995) ("The [Extension of Admiralty Jurisdiction] Act uses the phrase 'caused by,' which more than one Court of Appeals has read as requiring what tort law has traditionally called 'proximate causation.'").  None of the authorities cited by Saudi Arabia supports

the application of but-for causation here.  *See, e.g.*, *Burrage*, 571 U.S. at 213–14 (interpreting similar phrases in criminal law context, such as "because of," "based on," "by reason of," "results in," "as a result of," and "results from," as requiring but-for causation, but never interpreting the phrase "caused by"); *Jerome B. Grubart, Inc.*, 513 U.S. at 536 (stating that the phrase "caused by" requires proximate causation); *U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1329 (11th Cir. 2018) (stating that establishing proximate cause requires more than reasonable foreseeability alone).

Indeed, generally we "assume Congress 'is familiar with the common-law rule [of proximate causation] and does not mean to displace it *sub silentio*' in federal causes of action." *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014)); *see also id.* ("[I]n all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause." (quoting *Lexmark Int'l*, 572 U.S. at 132)).  And in *Bank of America Corp.*, the Supreme Court observed that "[a] claim for damages under the FHA -- which is akin to a 'tort action' -- is no exception to this traditional requirement." *Id.* (internal citation omitted) (quoting *Meyer v. Holley*, 537 U.S. 280, 285 (2003)).

Thus, we are satisfied that the appropriate meaning of the phrase "caused by" for foreign sovereign immunity purposes is the same meaning that has been applied to the standard common law definition of proximate cause.  The term "proximate cause" is composed of two parts.  "First, the defendant's actions must be a

'substantial factor' in the sequence of events that led to the plaintiff's injury." *Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017) (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)), *vacated in part on other grounds by Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1610 (2020); *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d at 646. "Second, the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Owens*, 864 F.3d at 794 (quoting *Rothstein*, 708 F.3d at 91); *see also S. Tr. Metals*, 894 F.3d at 1329–30 (noting that for restitution purposes, proximate cause required not just foreseeability, but also that the defendant's misconduct be "a 'substantial' or 'significant contributing cause'" (quoting *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1309 (11th Cir. 2011))); *accord Kemper v. Deutsche Bank AG*, 911 F.3d 383, 392 (7th Cir. 2018). "A requirement of proximate cause thus serves, *inter alia*, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Paroline v. United States*, 572 U.S. 434, 445 (2014).

Both factors have been met. First, Saudi Arabia's alleged grossly negligent conduct in vetting and hiring Al-Shamrani was a substantial factor leading to the Plaintiffs' injuries or deaths. Again, the Kingdom sent Al-Shamrani to the United States to participate in flight training for planes that Saudi Arabia had purchased. Al-Shamrani was only able to access a secure military base at NAS Pensacola because he was employed with the RSAF, was enrolled in flight training, and was sent to the United States. Saudi Arabia was responsible for screening Al-Shamrani's background precisely in

order to prevent potential security threats to the facility and the people who worked and lived there. Had Saudi Arabia done so and done so properly, the Amended Complaint alleges, it would have easily found from a publicly available record Al-Shamrani's repeated expression of violent and extremist views on a variety of social media platforms. And if it had done so, it is alleged, the Kingdom would have been able to take appropriate action, including simply not awarding Al-Shamrani the scholarship to come to the United States for flight training.

More than having just pled a "substantial factor" linking the two, the Amended Complaint plausibly alleges a direct and immediate connection between the Kingdom's alleged grossly negligent conduct in vetting and hiring Al-Shamrani, and the Saudi aviator's ensuing shooting rampage.

Finally, the deaths and injuries sustained by the Plaintiffs were reasonably foreseeable as a natural consequence of the Kingdom's conduct. If we accept, as we must, the Amended Complaint's detailed recitation of facts that strongly suggested Al-Shamrani was a "ticking time bomb," it follows that it was reasonably foreseeable as a natural consequence of grossly negligent vetting that Al-Shamrani would turn violent when he had the chance at NAS Pensacola.

### 4. The allegations sufficiently allege that Saudi Arabia engaged in multiple acts of commission.

The district court concluded that the Plaintiffs failed to satisfy the JASTA exception to foreign sovereign immunity because

their claims relied on acts of omission by the Saudi government, not acts of commission. We disagree. As we see it, the foundation for the Plaintiffs' gross negligence claim under Florida law contains far more than acts of omission. It includes allegations of multiple acts of commission, including the Kingdom's adoption of Al-Shamrani's Form DS-160 and A-2 Visa Application, the Kingdom's conduct in affirmatively forwarding these materials to the United States, and its conduct in sending Al-Shamrani to the United States first to learn English and then for aviation training at NAS Pensacola.

The term "omission" is not defined in JASTA, so we turn to the term's ordinary meaning at the time of enactment. *See United States v. Meyer*, 50 F.4th 23, 27 (11th Cir. 2022); *United States v. Dominguez*, 997 F.3d 1121, 1124–25 (11th Cir. 2021) (using dictionary definitions to define term that was not defined in the statute). When JASTA was enacted in 2016, Black's Law Dictionary defined an "act of omission" or a "negative act" as "[t]he failure to do something that is legally required; a nonoccurrence that involves the breach of a legal duty to take positive action," which "takes the form of either a forbearance or an omission." *Act*, *Black's Law Dictionary* (10th ed. 2014). This contrasts with a "positive act" or an "act of commission," which was defined as "[t]he process of doing or performing; an occurrence that results from a person's will being exerted on the external world." *Id.* Merriam-Webster's Dictionary of Law, meanwhile, defined "omission" as "something neglected, left out, or left undone," whereas "commission" was defined as "an act of committing something," as in "carry[ing] into

action deliberately." Merriam-Webster's Dictionary of Law 86, 335 (2016).

In sum, what these definitions tell us -- and there is no dispute between the parties about these definitions -- are that acts of omission are those in which an actor does not take some action that he was otherwise legally required to undertake, whereas acts of commission are those that require the actor deliberately to take some affirmative action or step to doing something or exerting his will in some way.

The Amended Complaint sufficiently alleges that the Kingdom committed grossly negligent acts of commission rather than omission. First, the Amended Complaint alleges that "Al-Shamrani's Form DS-160 and A-2 application contained false information that was knowingly submitted by the Kingdom of Saudi Arabia to the United States" and that the Form DS-160 included questions relating to the following:

> personal details, travel, companions, contact information, passport details, family, work/education/training, and security/background. The security portion contains fifty-five (55) "yes" or "no" questions pertaining to such areas as terrorism, espionage, illegal activity, immigration violations, felony convictions, etc.

Second, the Amended Complaint asserts that on multiple occasions, Saudi Arabia conducted security screenings for Al-Shamrani -- deliberate and affirmative acts of will or exertion

designed to accomplish an objective.  It alleges that "[a]ll international military students . . . *must* complete local 'host nation' security screening and medical screening prior to receiving an Invitational Travel Order (ITO) and issuance of a visa to travel to the United States for training," and that "Saudi Arabia represented that it conducted the requisite security, medical, and internal character vetting of Al-Shamrani, and completed that process on May 15, 2017."  After the Kingdom made this certification, "[o]n August 8, 2017, the visa application process was concluded and Al-Shamrani was issued his Invitational Travel Orders."  Indeed, Al-Shamrani "underwent extensive vetting by the Kingdom when he joined the RSAF," as well as "before and after his name was put forward to the Kingdom's Defense Ministry" "[a]s a prospective trainee in an American flight program."  Again, the stated purpose of vetting Al-Shamrani in connection with his "nomination and enrollment into the U.S. training program" was to comply with "U.S. policies and procedures, which did not permit access to military training to foreign citizens with ties to fundamental and/or extremist ideology or ties to terrorism."

Third, Saudi Arabia nominated Al-Shamrani for, and awarded him, a scholarship which enabled him to go to Texas to learn English from August 2017 until May 2018, and then to participate in the flight training program at NAS Pensacola from May of 2018 until the time of the attack on December 6, 2019.  These were all affirmative acts, deliberate steps undertaken by the Kingdom, not acts of omission.  These acts enabled Al-Shamrani to enter and live at the military bases in San Antonio, Texas and then at NAS

Pensacola. Finally, the Kingdom was responsible for the affirmative act of sending Al-Shamrani to the United States.

> B. *The Plaintiffs have failed to sufficiently claim an ex-*
> *ception to foreign sovereign immunity on account of*
> *an obligation to continue to vet Al-Shamrani in the*
> *United States.*

The second grouping of claims we have identified alleges that the Kingdom was grossly negligent in failing to continue to monitor and vet Al-Shamrani's social media accounts once he commenced training in the United States. The Plaintiffs assert that Saudi Arabia extensively surveils and monitors its citizens' mobile phone and internet activity -- especially when its citizens are living outside of Saudi Arabia. As a result, the Plaintiffs claim, Saudi Arabia knew about or should have intercepted Al-Shamrani's ominous social media messages from the time he arrived in the United States until the time of the shooting on December 6, 2019. In this respect, the Plaintiffs highlight Al-Shamrani's September 11, 2019 tweet stating "[t]he countdown has begun."

Thus, the Plaintiffs say, they have sufficiently pled subject matter jurisdiction under both the JASTA exception and under the non-commercial tort exception to the FSIA. However, neither theory works. As for the exception to foreign sovereign immunity found in JASTA, this bundle of claims is facially insufficient because it is based on acts of omission, not commission. The Plaintiffs' alternative theory, that this bundle of claims falls under the non-commercial tort exception found in the FSIA, also fails because the FSIA

affords no exception for discretionary conduct, and the thrust of this conduct is wholly discretionary in nature.

We begin with the JASTA exception to sovereign immunity. Under JASTA, "[a] foreign state shall not be subject to the jurisdiction of the courts of the United States . . . on the basis of an omission or a tortious act or acts that constitute mere negligence." 28 U.S.C. § 1605B(d). As a preliminary matter, this language suggests two plausible readings: either foreign sovereign immunity is preserved for claims based on any omission as well as for those based on tortious acts constituting mere negligence, or foreign sovereign immunity is preserved only for those acts of omission or commission that amount to merely negligent conduct. In other words, the question is whether the phrase "that constitute mere negligence" modifies not only "a tortious act or acts," but also "an omission."

In our view, the better reading is the one where the phrase "that constitute mere negligence" modifies only "a tortious act or acts." "The typical way in which syntax would suggest no carryover modification is that a determiner (*a*, *the*, *some*, etc.) will be repeated before the second element." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Thus, for example, in the phrase "[a] solid wall or a fence," "the fence need not be solid." *Id.* at 149 (emphasis omitted). "With postpositive modifiers," which are modifiers that come after the noun they modify, "the insertion of a determiner before the second item tends to cut off the modifying phrase so that its backward reach is limited." *Id.* Thus, for example, in the phrase "[a]n institution or a

society that is charitable in nature," "any institution probably qual-
ifies, not just a charitable one," and in the phrase "[a] corporation
or a partnership registered in Delaware," "the corporation may
probably be registered anywhere." *Id.* (emphasis omitted).

In reading the language found in 28 U.S.C. § 1605B(d), the
postpositive modifying phrase "that constitute mere negligence" is
therefore better understood to reach back only to the phrase "a tor-
tious act or acts." The determiner "a," which precedes "tortious
act or acts," signals that the statute contemplates two separate con-
cepts -- "*an* omission" and "*a* tortious act or acts that constitute
mere negligence." *Id.* (emphasis added). As we see it, then, the
better reading of JASTA is that "[a] foreign state shall not be subject
to the jurisdiction of the courts of the United States . . . on the basis
of an omission" *and* "[a] foreign state shall not be subject to the
jurisdiction of the courts of the United States . . . on the basis of .
. . a tortious act or acts that constitute mere negligence." *Id.* There-
fore, foreign sovereign immunity bars claims based on any omis-
sions, even if it does not bar claims based on tortious acts consti-
tuting gross negligence.

Under the theory of liability offered, the Plaintiffs allege that
Saudi Arabia, knowing that Al-Shamrani had repeatedly posted ex-
tremist views on his social media accounts, either <u>failed</u> to alert the
United States, or that the Kingdom was grossly negligent in vetting
the airman's accounts in the first place, because it <u>failed</u> to actually
pick up the repeated expression of extremist views. In either case,

if it had done its job right, Al-Shamrani would have been sent back home long before the murderous shooting on December 6, 2019.

As we've already explained, an act of omission is defined as "[t]he failure to do something that is legally required; a nonoccurrence that involves the breach of a legal duty to take positive action." *Act*, *Black's Law Dictionary* (10th ed. 2014). This bundle of claims includes only failure-to-act claims; they are claims of omission, not commission. Under JASTA, Congress narrowed the universe of conduct for which a foreign government's sovereign immunity could be abridged. It deliberately chose not to include conduct based on omissions in the JASTA exception. Because JASTA does not subject foreign sovereigns to the jurisdiction of an American court for claims that are based on omissions, the Plaintiffs have not sufficiently alleged jurisdiction under this statute.

This failure-to-properly-vet theory of liability also fails to meet the requirements of the non-commercial tort exception found in the FSIA because these claims are based on the discretionary actions of Saudi officials. Although non-commercial torts are an exception to foreign sovereign immunity, foreign governments retain their sovereign immunity in "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A).

In adjudicating the meaning of the discretionary function exception found in the Federal Tort Claims Act, 28 U.S.C. § 1346, the Supreme Court has observed that this exception "marks the

boundary between Congress' willingness to impose tort liability upon [a government] and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense* (*Varig Airlines*), 467 U.S. 797, 808 (1984). The Courts of Appeals that have addressed this question have read the discretionary function carve-out to the FSIA's non-commercial tort exception in the same way, because Congress borrowed the same language from the FTCA when it adopted the FSIA. *See Swarna v. Al-Awadi*, 622 F.3d 123, 145 (2d Cir. 2010); *O'Bryan v. Holy See*, 556 F.3d 361, 383–84 (6th Cir. 2009); *Fagot Rodriguez v. Republic of Costa Rica*, 297 F.3d 1, 8–9 (1st Cir. 2002); *Joseph v. Off. of the Consulate Gen. of Nigeria*, 830 F.2d 1018, 1026 (9th Cir. 1987). This much the parties agree on.

In essence then, the discretionary function exception affords a foreign government the flexibility it needs to develop and carry out its policy. *See, e.g.*, *United States v. Gaubert*, 499 U.S. 315, 324–25 (1991). By affording sovereign immunity to foreign governments in the exercise of discretionary functions, "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Varig Airlines*, 467 U.S. at 814.

"In evaluating whether the discretionary-function exception applies, we first 'must determine exactly what conduct is at issue.'" *Swafford v. United States*, 839 F.3d 1365, 1370 (11th Cir. 2016) (quoting *Autery v. United States*, 992 F.2d 1523, 1527 (11th Cir. 1993)). We then apply the Supreme Court's two-step test. "First, we consider

whether the challenged conduct 'is a matter of choice for the acting employee.'" *Id.* (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). "[C]onduct cannot be discretionary unless it involves an element of judgment or choice," and it "is not discretionary 'when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow' because 'the employee has no rightful option but to adhere to the directive.'" *Id.* (quoting *Berkovitz*, 486 U.S. at 536). Second, "[i]f the conduct involves an element of judgment and is discretionary, the court 'must determine whether that judgment is of the kind that the discretionary function exception was designed to shield.'" *Id.* (quoting *Berkovitz*, 486 U.S. at 536). Thus, for example, the Supreme Court found that the FAA's actions in formulating and implementing a "spot-check" plan for airline inspection was protected by the discretionary function exception, because the agency had discretion to prescribe "the periods for, and the manner in, which such inspection . . . shall be made." *Varig Airlines*, 467 U.S. at 816 (quoting 49 U.S.C. § 1421(a)(3)(C)) (emphasis omitted).

Applying this test, this bundle of claims falls within a government's discretionary function. The Amended Complaint does not enumerate any "statute, regulation, or policy" that "specifically prescribes a course of action for an employee to follow." *Swafford*, 839 F.3d at 1370 (quoting *Berkovitz*, 486 U.S. at 536). The Plaintiffs have pointed us to no rule, regulation, or statute commanding the Kingdom to vet Al-Shamrani's social media accounts in any way. Instead, they argue generally that the Kingdom had "no discretion to facilitate [Al-Shamrani's] continuing participation in the

program." But, "[w]here no statute or regulation controls . . . , the extent of monitoring required or actually accomplished is necessarily a question of judgment, or discretion, for the government." *Kirchmann v. United States*, 8 F.3d 1273, 1276 (8th Cir. 1993).

What's more, even if the Plaintiffs had identified some written duty to continue to monitor Al-Shamrani's social media accounts -- and they have not -- the argument would still fail under the second step of the analysis. Numerous cases have found that decisions regarding the supervision of employees tend to be decisions "of the sort the discretionary function exception was designed to encompass." *Andrews v. United States*, 121 F.3d 1430, 1441 (11th Cir. 1997; *see also Gaubert*, 499 U.S. at 325, 331–32 ("Day-to-day management . . . regularly requires judgment as to which of a range of permissible courses is the wisest."); *Carlyle v. United States, Dep't of the Army*, 674 F.2d 554, 556–57 (6th Cir. 1982) (stating that "whether or not to supervise [recruits at a hotel], and the extent of any such supervision, was a planning level, discretionary function"); *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1217 (D.C. Cir. 1997) (stating that the "supervision choices" faced by an employer were "susceptible to policy judgment" because they "involve a complex balancing of budgetary considerations, employee privacy rights, and the need to ensure public safety"). This theory of liability rests on the kinds of judgments, like where, when, or how to supervise an employee, that are made daily by supervisors in managing their staff. Thus, under this step too, this theory of liability falls within the governmental discretionary function and affords no exception to foreign sovereign immunity.

C.  *The Plaintiffs have failed to sufficiently claim an ex-*
*ception to foreign sovereign immunity on account of*
*the Saudi CLO's conduct.*

The Plaintiffs relatedly claim that the Kingdom's Country Liaison Officer negligently failed to supervise Airman Al-Shamrani when he was enrolled in flight training at NAS Pensacola and that this failure abrogated foreign sovereign immunity under the FSIA and JASTA. The Plaintiffs allege that Saudi Arabia was obligated to assign a CLO to supervise the RSAF trainees at NAS Pensacola and that the CLO was required to be on site, to monitor the trainees, to ensure their compliance with relevant rules and regulations and report non-compliance, to report to American and Kingdom personnel any issues relating to or arising from the trainees, and, perhaps most importantly, to assist in routine inspections of trainees and their assigned quarters.

The Plaintiffs say that the CLO was not on-site, did not assist in conducting housing inspections, and generally did not perform the supervisory job duties that he was responsible for. As a result, the Plaintiffs reason, the CLO did not find Al-Shamrani's gun and ammunition, either in his barracks or in his pilot helmet bag, and therefore was unable to prevent the shootings. Thus, the Plaintiffs assert that the CLO's failure to properly supervise Al-Shamrani on the ground at NAS Pensacola was not a discretionary function, establishing jurisdiction under the non-commercial tort exception to the FSIA. Alternatively, the Plaintiffs assert that the CLO's

supervisory failures amounted to grossly negligent conduct and thus fall within JASTA's exception to sovereign immunity.

We remain unpersuaded.  First, taking the allegations contained in the Amended Complaint as true, we conclude that the CLO's actions were discretionary functions, barring the application of the FSIA's non-commercial tort exception.  Second, the CLO's alleged failures to act were based on omissions, excluding them from JASTA's reach too.

We begin with the non-commercial tort exception to the FSIA.  Again, foreign governments retain their sovereign immunity in "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A).  "In evaluating whether the discretionary-function exception applies, we first 'must determine exactly what conduct is at issue.'"  *Swafford*, 839 F.3d at 1370 (quoting *Autery*, 992 F.2d at 1527).  We then apply the Supreme Court's two-step test, which we have already described.

Here, the Plaintiffs' bundle of claims concerning the CLO's failure to properly supervise Al-Shamrani fails for a number of reasons.  For starters, the Plaintiffs identify no provision or policy document that requires the Kingdom to assign a CLO in the first place.  Any fair reading of the documents referenced in the Amended Complaint yields the conclusion that assigning a CLO is optional.

Paragraph 170 of the Amended Complaint alleges:

At all times overlapping with Al-Shamrani's presence in the United States and during the attack at NAS, Saudi Arabia was required to have an RSAF CLO assigned to NAS Pensacola to assist in administering RSAF Students on base.

However, the mandatory language found in this paragraph is flatly contradicted by the actual sources cited and incorporated in the following paragraphs -- the Security Assistance Management Manual, DSCA, Chapter 10, IMET ("SAM Manual"), as well as the U.S. Naval Flight Student Training Administration Manual ("TA Manual").[4]

---

[4] Although "a court generally may not consider matters outside of the pleadings without treating the motion as a motion for summary judgment," one "exception[] to this conversion rule" is "the incorporation-by-reference doctrine." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1298 (11th Cir. 2024) (quoting *Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023)).  "[U]nder the incorporation-by-reference doctrine," "a court may properly consider a document" when resolving a motion to dismiss "if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Id*. at 1300.  Not only is the authenticity of the SAM Manual and the TA Manual undisputed, and not only are these documents central to the Plaintiffs' claims because they are the alleged sources of the CLO's obligations, but also they are expressly referenced in the Amended Complaint.

What's more, we have previously considered materials outside the complaint when resolving a motion to dismiss when those materials directly contradict the allegations contained in the complaint.  *See, e.g., Horsley v. Feldt*, 304 F.3d 1125, 1136 (11th Cir. 2002) (considering news article that contradicted the plaintiff's defamation claim); *Baker*, 67 F.4th at 1277–78 (stating that "where a video is clear and obviously contradicts the plaintiff's alleged facts, we accept

54                    Opinion of the Court                    24-11310

The SAM Manual says nothing about whether a country is required to assign a CLO, laying out only the requirements that must be met in order for CLOs to be authorized in the first place, but the TA Manual makes it crystal clear that assigning a CLO is wholly optional.

> In relevant part, the TA Manual states:
>
> At the request of another country and with the con-currence of Navy International Programs Office (NIPO), NETSAFA, and CNATRA, a CLO may be as-signed to assist with the administrative duties for IMSs from his or her country.  When a CLO is not assigned for a particular country, the country's senior NFS located at the training activity may be used in this capacity.  In case of serious injury or death where no CLO is assigned, the TRAWING IMSO shall act as coordinator with the IMS's country representatives.

Notably, this section uses precatory language -- it says that a "CLO *may be assigned*," not that a CLO *shall* be assigned.  What's more, this section clearly contemplates situations in which "a CLO is not assigned for a particular country" or situations in which "no CLO is assigned."  This language tells us that foreign countries, including Saudi Arabia, were not required to assign a CLO.

---

the video's depiction instead of the complaint's account, and view the facts in the light depicted by the video" (internal citations omitted)); *Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225–26 (11th Cir. 2002) (reviewing contents of book that contradicted the plaintiff's libel and slander claims).

However, the Plaintiffs argue, as a fallback, that even if Saudi Arabia was not required to assign a CLO in the first place, if the Kingdom chose to provide one anyway, any CLO they assigned had various duties and obligations enumerated in the TA Manual, and these were mandatory. These included, as relevant here, "[m]aintain[ing] contact with . . . the [International Military Students] represented" by the CLO, *Naval Flight Student Training Administration Manual* § 902d(3)(d) (2014), "[e]nsur[ing] that [students] adhere[d] to [naval] regulations," *id.* § 902d(3)(g), as well as "[a]ssist[ing] in routine inspections of [International Military Students] and their assigned quarters," *id.* § 902d(3)(i).

The main problem with this alternative theory, however, is that these duties and responsibilities are discretionary functions. Thus, for example, the decision by the Navy when to inspect barracks, how often to conduct those inspections, what those inspections actually involved, and whether and when to seek the assistance of the CLO in conducting those inspections, are wholly discretionary in nature. *See, e.g.*, *Varig Airlines*, 467 U.S. at 815–16; *Foster Logging, Inc. v. United States*, 973 F.3d 1152, 1158–60, 1169 (11th Cir. 2020) (finding that U.S. Forestry Branch's controlled burn of an area fell within discretionary function exception because "'the nature of the actions taken' by U.S. Forestry Branch officials in observing, monitoring, or maintaining the controlled burn were 'susceptible to policy analysis'" (quoting *Gaubert*, 499 U.S. at 325)).

Moreover, to the extent the Plaintiffs assert that the CLO's supervisory functions included ensuring that the airmen adhered

to naval regulations and maintained appropriate contacts with the CLO, those functions also are discretionary in nature. *See, e.g.*, *Andrews*, 121 F.3d at 1441 ("[D]ecisions regarding the exercise of supervisory authority are of the sort the discretionary function exception was designed to encompass."); *Gaubert*, 499 U.S. at 325, 331–32 ("Day-to-day management . . . regularly requires judgment as to which of a range of permissible courses is the wisest."); *Carlyle*, 674 F.2d at 556–57 (stating that "whether or not to supervise [recruits at a hotel], and the extent of any such supervision, was a planning level, discretionary function"); *Burkhart*, 112 F.3d at 1217 (stating that the "supervision choices" faced by an employer were "susceptible to policy judgment" because they "involve a complex balancing of budgetary considerations, employee privacy rights, and the need to ensure public safety").

The Plaintiffs also claim that the CLO's negligent failure to supervise Al-Shamrani at the Naval Air Station satisfies the jurisdictional requirements of JASTA. The problem with this theory is that these allegations once again rely solely on acts of omission.

The Plaintiffs allege that the CLO abandoned his post when he left NAS Pensacola in June 2019, travelled to Saudi Arabia, returned to Pensacola only between August 19 and August 29, 2019, left again for Saudi Arabia, and then came back to the United States for five days in September 2019, whereupon he stayed in a hotel in Orlando. In essence, the Plaintiffs have alleged that because the CLO was not at NAS Pensacola, including for the more than two-month period leading up to Al-Shamrani's attack, he could not and

did not do his job in inspecting students' housing, which could have prevented the attack.

As we've observed, however, the Plaintiffs cannot bring claims under JASTA based on omissions. And the claims surrounding the CLO's conduct are claims of omission. They include the CLO's absence from NAS Pensacola for almost all of the relevant timeframe, and thus his failure to assist the Navy in conducting housing inspections. The Plaintiffs say that "the mere presence of an RSAF CLO at NAS Pensacola from September to December 2019 may have 'provided 2nd Lt. Al-Shamrani with better oversight and resulted in proactive intervention by [Saudi Arabia]' prior to the attack." This theory of liability still hinges on an essential act of omission by the CLO -- the failure to assist the Navy in searching the barracks of the airman. Again, the failure to act is the sin of omission -- "[t]he failure to do something that is legally required; a nonoccurrence that involves the breach of a legal duty to take positive action," *Act*, *Black's Law Dictionary* (10th ed. 2014) -- not commission. It is excluded from the JASTA exception to foreign sovereign immunity because Congress chose to immunize the foreign sovereign's acts of omission from review in an American court.

In short, the Plaintiffs have failed to sufficiently claim an exception to foreign sovereign immunity on account of the Saudi CLO's conduct.

D. *The Plaintiffs have failed to sufficiently claim an exception to foreign sovereign immunity on account of the intentional torts committed by Al-Shamrani.*

The intentional torts committed by Al-Shamrani do not fall under the non-commercial tort exception to the FSIA or under JASTA, because Al-Shamrani was not acting within the scope of his employment.  In essence, the Plaintiffs claim that the Kingdom of Saudi Arabia is vicariously liable for Al-Shamrani's criminal acts and intentional torts.  However, the Plaintiffs cannot attribute liability to the Kingdom for the intentional acts of murder, assault, battery, false imprisonment, and intentional infliction of emotional distress because the Plaintiffs have failed to plausibly plead that Al-Shamrani acted within the scope of his employment when he opened fire on December 6, 2019.

We begin again with the text.  The FSIA's "non-commercial tort" exception does not immunize foreign sovereigns from liability for torts "occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment."  28 U.S.C. § 1605(a)(5).  "The question of whether an employee's conduct was within the scope of his employment 'is governed by the law of the state where the incident occurred.'"  *Flohr*, 84 F.3d at 390 (quoting *S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1542 (11th Cir. 1990)).  Since the NAS Pensacola terrorist attack took place in Florida, Florida tort law governs.

Under Florida law, "[a]n employee's conduct is within the scope of his employment only if it is of the kind he is employed to perform, it occurs substantially within the time and space limits of the employment and it is activated at least in part by a purpose to serve the master." *Morrison Motor Co. v. Manheim Servs. Corp.*, 346 So. 2d 102, 104 (Fla. 2d DCA 1977); *see also Whetzel v. Metro. Life Ins. Co.*, 266 So. 2d 89, 91 (Fla. 4th DCA 1972); *Gowan v. Bay County*, 744 So. 2d 1136, 1138 (Fla. 1st DCA 1999).

Although it is undisputed that Al-Shamrani's conduct occurred substantially within the time and space limits of his employment, since he committed the shooting at the Naval Base where he was sent as part of his job, the other two prongs of the scope-of-employment test are not plausibly alleged in the Amended Complaint. Al-Shamrani was awarded a scholarship to enter a joint military program in the United States, the purpose of which was to learn English and then to attend pilot training. Al-Shamrani's conduct underlying his intentional torts was simply not in the same universe of conduct he was employed to perform. It is beyond real dispute that purchasing a firearm, allegedly in violation of Saudi Arabia's policy and procedures, and then attempting to commit mass murder on an American military base, where he was supposed to be learning how to operate military equipment and bringing that knowledge back to Saudi Arabia, were not part of Al-Shamrani's job in coming to the United States. Put differently, "this case lacks a sufficient nexus between the employee's job and his [intentional torts committed against others] to raise even a jury

Case 3:21-cv-00329-MCR-ZCB    Document 80    Filed 11/13/25    Page 60 of 73
USCA11 Case: 24-11310    Document: 50-1    Date Filed: 11/10/2025    Page: 60 of 71

60                          Opinion of the Court                          24-11310

question as to the scope of employment issue." *Spencer v. Assurance Co. of Am.*, 39 F.3d 1146, 1150 (11th Cir. 1994).

Nor can it fairly be said that Al-Shamrani's murderous actions were animated to serve, at least in part, the interests of the Kingdom of Saudi Arabia. The Plaintiffs tell us that the Kingdom has pending the purchase of more than $350 billion in military contracts with the United States. As we've seen, a significant portion of the arms trade between the United States and the Kingdom requires training Saudi military personnel on how to operate the complicated and expensive military hardware they have purchased. Indeed, we are told that training Saudi military personnel is a critical component and condition of purchasing aircraft, vessels, military equipment, and other various weapons systems from the United States. This trade is the very reason why Al-Shamrani was in the United States in the first place. It is difficult to see how his murderous assault in any way furthered the interests of the Kingdom in buying and using complex American military equipment. And if there were any doubt about whether Al-Shamrani's actions undermined the interests of the Saudi government, that doubt is resolved by the King of Saudi Arabia's statements in the immediate aftermath of Al-Shamrani's attack. The Amended Complaint asserts that the King of Saudi Arabia said that he was "finding out what took place" to cause the attack, that he would "be involved in taking care of the families and loved ones," and that he and the Crown Prince were "devastated by what took place in Pensacola" and "sen[t] their condolences."

Even assuming the allegations in the Amended Complaint are true that Al-Shamrani wore his RSAF uniform when he committed the shooting, that Saudi Arabia radicalized Al-Shamrani, and that Saudi Arabia also sought to harm western countries, it still fails as a matter of logic that Saudi Arabia's interests would be served through a shooting rampage. It makes no sense to say that it was within the scope of Al-Shamrani's employment with the Kingdom for him to come to the United States and destroy that relationship. Similarly, it is not plausible to assert that Saudi Arabia would send its pilots for training in the United States to do anything other than learn how to fly those planes. It could not have fallen within the scope of his employment for Al-Shamrani to come to the United States and commit a murderous rampage, at the same time his master was buying the very equipment he was being taught how to fly.

Moreover, the JASTA exception does not apply to Al-Shamrani's intentional torts. Under JASTA:

> A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by -- (1) an act of international terrorism in the United States; and (2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred."

28 U.S.C. § 1605B(b). Subsection (2) bars jurisdiction under JASTA, because the tortious acts of Al-Shamrani were not done while acting within the scope of his employment. The Plaintiffs acknowledge that the same scope-of-employment analysis applicable to the non-commercial tort exception found in the FSIA applies to the JASTA exception. As we've already observed, Al-Shamrani was not acting within the scope of his employment when he committed the intentional torts at issue. Thus, the Plaintiffs have not met the requirements under JASTA. These intentional torts afford no exception to foreign sovereign immunity.

> E.  *The Plaintiffs have failed to sufficiently claim an exception to foreign sovereign immunity under JASTA on account of Saudi Arabia's alleged support for terrorism.*

The Plaintiffs also advance a theory of liability under the Anti-Terrorism Act against Saudi Arabia because, they say, the Kingdom supported terrorism, but this theory fails because, among other reasons, it does not adequately plead proximate cause.

The federal Anti-Terrorism Act, 18 U.S.C. § 2333, provides a cause of action for United States citizens to sue for damages in connection with certain acts of international terrorism. The ATA provides, in pertinent part:

> **(a) Action and jurisdiction.**--Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any

appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

. . .

**(d) Liability.--**

    **(1) Definition.**--In this subsection, the term "person" has the meaning given the term in section 1 of title 1.

    **(2) Liability.**--In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

18 U.S.C. § 2333.

Although the ATA creates a statutory cause of action for injury resulting from acts of international terrorism, a plaintiff suing a foreign country under the ATA still must identify an applicable exception to foreign sovereign immunity in order for his claim to

survive a facial jurisdictional attack. *See, e.g.*, Watson Br. at 52 n.12 (critiquing the district court's analysis for "collaps[ing] the existence of a cause of action under the ATA with the applicability of an exception to foreign sovereign immunity under the FSIA"); *id.* at 21 (listing JASTA as the applicable exception to foreign sovereign immunity for the Plaintiffs' ATA claims). The Plaintiffs argue only that this theory falls within the ambit of the JASTA exception to the FSIA, not the non-commercial tort exception found in the FSIA.

Again, JASTA requires that the death or injury occurring in the United States be "caused by" an act of international terrorism in the United States and a tortious act or acts of the foreign state, or of any employee acting within the scope of his employment. *See* 28 U.S.C. § 1605B(b).

The Plaintiffs' support-for-terrorism claims do not fall within JASTA because they fail at the causation step. In essence, the Plaintiffs' ATA claims rely on the theory that Saudi Arabia funded and equipped AQAP to fight in the ongoing Yemeni civil war, and that it was reasonably foreseeable that funding AQAP in Yemen could result in terroristic violence in the United States. The Amended Complaint alleges that Saudi citizens have joined or funded AQAP, that a Saudi-led coalition in Yemen has acted in concert with al-Qaeda, and that Saudi Arabia has failed to prosecute individuals raising money on behalf of AQAP.

The chain of causation between these actions and Al-Shamrani's actions is wholly attenuated and far too indirect. The claim that the Kingdom funded and assisted AQAP in Yemen, even

if true, is different from directing, supporting, or funding acts of terror in the United States. The Amended Complaint fails to plausibly connect the two. The asserted goal of the Kingdom in supporting one side of a civil war in Yemen is not in the same universe of any goal associated with Al-Shamrani's shooting spree in the United States. The Plaintiffs have failed plausibly to allege that any support provided to AQAP in Yemen was a substantial factor, or even a remote factor in the chain of events leading to Al-Shamrani's attack on December 6, 2019. Nor does the Amended Complaint assert that it was reasonably foreseeable that funding AQAP in Yemen would result, or even might result, in the planning of this attack in the United States, much less that the Kingdom funded and supported Al-Shamrani's training in the United States with the intention to commit these acts of terror.

The Amended Complaint also attempts to articulate a theory that Saudi Arabia supported terrorism by supporting Al-Shamrani, who committed an act of terrorism. But this theory fails because, again, Al-Shamrani was not acting within the scope of his employment when he attacked NAS Pensacola, and there is no indication or plausible assertion that he attacked NAS Pensacola to serve the interests of the Kingdom. In short, the Plaintiffs' pleadings afford no JASTA exception to the Kingdom's foreign sovereign immunity.

> F.  *The Plaintiffs have failed to sufficiently state a claim*
> *for breach of contract for jurisdictional purposes; and*

*the district court did not abuse its discretion in deny-*
*ing the Plaintiffs' Motion for Jurisdictional Discovery.*

Finally, we conclude that the district court correctly dis-
missed the Plaintiffs' breach of contract claim, since the allegations
in the Amended Complaint do not establish a *prima facie* breach of
contract claim.  Because the Amended Complaint fails to state a
claim for breach of contract as a matter of law, the district court
also correctly denied the Plaintiffs' Motion for Jurisdictional Dis-
covery.  The breach of contract claim is premised on the LOA be-
tween Saudi Arabia and the United States, which the Plaintiffs say
waives Saudi Arabia's sovereign immunity.  Two reasons heavily cut
against the Plaintiffs' claim.

First, the indemnification provision in the LOA is not a suffi-
ciently clear manifestation of the Kingdom's intent to waive sover-
eign immunity.  As this Court has observed, "[f]or purposes of the
FSIA, a foreign state expressly waives its right to immunity only
where its intent to do so is clear and unambiguous."  *Architectural
Ingenieria Siglo XXI, LLC v. Dominican Republic*, 788 F.3d 1329, 1338
(11th Cir. 2015).  "And as a general rule, explicit waivers of sover-
eign immunity are narrowly construed in favor of the sovereign
and are not enlarged beyond what the language requires."  *Id.* (in-
ternal quotation marks omitted) (quoting *World Wide Minerals, Ltd.
v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002)).[5]  The

---

[5] Foreign states also may waive their sovereign immunity implicitly, but we
have found that implicit waiver is a narrow exception applying only in

requirement that an express waiver of sovereign immunity be "clear, complete, unambiguous, and unmistakable" is a particularly strict one. *Aquamar*, 179 F.3d at 1292 (citation omitted). In *Aquamar*, a panel of this Court held that a document containing the following statement was insufficient to waive sovereign immunity: "[t]he Republic of Ecuador . . . ha[s] made it clear that any immunity from jurisdiction has been waived . . . . PNB hereby affirms that it is the intention of the Republic to waive sovereign immunity . . . ." *Id.* (alterations in original). We found that this statement "merely states the PNB lawyers' opinion that Ecuador either had filed an explicit waiver of immunity or planned to file one at some point," and that "[a]n express waiver of immunity must be more exact than this." *Id.*

The Plaintiffs' contractual theory of liability is that Saudi Arabia breached its contract with the United States, based on the indemnification provision in a sample LOA. Because there is an indemnification provision, the Plaintiffs' argument goes, Saudi Arabia waived sovereign immunity in its LOA with the United States. But the relevant text of the indemnification provision is not close to a "clear and unambiguous" waiver as required under the law.

---

particular circumstances not found here, such as where the foreign state agrees to arbitrate in another country, agrees that the law of a particular country should govern a contract, or files a responsive pleading in an action without raising the defense of sovereign immunity. *See Architectural Ingenieria Siglo XXI*, 788 F.3d at 1338.

*Architectural Ingenieria Siglo XXI*, 788 F.3d at 1338. The indemnification provision in the generic LOA contract reads this way:

> 3.1.    The Purchaser recognizes that the [U.S. Government ("USG")] will procure and furnish the items described in this LOA on a non-profit basis for the benefit of the Purchaser. The Purchaser therefore undertakes to indemnify and hold the USG, its agents, officers, and employees harmless from any and all loss or liability (whether in tort or in contract) which might arise in connection with this LOA because of:
>
> > 3.1.1.  Injury to or death of personnel of the Purchaser or third parties.

There is even less language to work with in this case than in *Aquamar*: the generic LOA does not mention waiving sovereign immunity at all, let alone express an intention to waive sovereign immunity like in *Aquamar*. Instead, it only generally references indemnification.

What's more, this provision does not waive Saudi Arabia's sovereign immunity because the LOA does not contemplate the liability at issue in this case. Again, the Plaintiffs allege that LOAs involve the purchase of defense articles or the performance of defense services. Under the terms of the LOA, the foreign state agrees to indemnify the United States with respect to procurement and furnishing of the items being sold in the LOA. An agreement to indemnify the United States on that narrow ground does not mean that the foreign state has also agreed to

waive its sovereign immunity in a situation like the one that occurred here, which involves a trainee attacking a U.S. military installation, completely outside the scope of the contract.

Because the LOA's indemnification provision does not waive sovereign immunity, the Plaintiffs have not alleged an exception to the FSIA in Count Nineteen.  The Amended Complaint is insufficient as a matter of law to establish a *prima facie* case that the district court had jurisdiction on this Count.  *Butler*, 579 F.3d at 1314.

The Plaintiffs also claim, in Count Nineteen of the Amended Complaint, that there is a second agreement that waives the Kingdom's sovereign immunity: an oral contract between Saudi Arabia and the United States that Saudi Arabia would cooperate fully in the investigation and compensate the victims for its employee's attack in exchange for the release of RSAF trainees in American custody and their return to Saudi Arabia.  The Plaintiffs' argument is unpersuasive because the Amended Complaint does not provide a basis for finding an express or an implied waiver.  In particular, an agreement to fully cooperate with an investigation and to compensate victims says nothing about sovereign immunity, let alone waiving it.

Similarly, additional allegations in the Amended Complaint are insufficient.  Thus, for example, the Amended Complaint alleges that "President Trump also detailed the agreement, and waiver of immunity, when he indicated that the King of Saudi Arabia and its Crown Prince expressly agreed to 'tak[e] care of the families [and] help out the families very greatly.'"  This statement falls

far short of an agreement to be sued by the victims' families or of consenting to jurisdiction in an American court.

Since the Amended Complaint fails to state a *prima facie* breach of contract claim, the district court correctly denied the Plaintiffs' Motion for Jurisdictional Discovery on Count Nineteen. "[W]hen facts that go to the merits and the court's jurisdiction are intertwined and genuinely in dispute, parties have a 'qualified right to jurisdictional discovery.'" *Am. C.L. Union of Fla., Inc. v. City of Sarasota*, 859 F.3d 1337, 1341 (11th Cir. 2017) (quoting *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 730 n.7 (11th Cir. 1982)). "[T]he principles of comity underlying the FSIA require the district court, when deciding whether or not to allow jurisdictional discovery from a foreign sovereign, to balance the need for 'discovery to substantiate exceptions to statutory foreign sovereign immunity' against the need to 'protect[] a sovereign's or sovereign agency's legitimate claim to immunity from discovery.'" *Butler*, 579 F.3d at 1314 (quoting *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998)). This analysis "serves to ensure that jurisdictional discovery is 'ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination.'" *Id.* (quoting *Rafidain Bank*, 150 F.3d at 176). Thus, for example, this Court has previously found that a district court abuses its discretion when it allows jurisdictional discovery but the complaint is insufficient as a matter of law to establish a *prima facie* case that the district court had jurisdiction. *Id.* at 1314–15.

The Plaintiffs concede that jurisdictional discovery is unnecessary for any of their claims other than the breach of contract matter. But as a matter of law, the allegations in the Amended Complaint, taking them as true, do not establish a *prima facie* case that the district court had jurisdiction to hear the breach of contract claim, since the sample LOA, on which the Plaintiffs' theory is based, does not waive sovereign immunity. The Plaintiffs did not meet their high burden to demonstrate that jurisdictional discovery was warranted, since obtaining discovery could not help the Plaintiffs "substantiate [an] exception[] to statutory foreign sovereign immunity." *Id*. at 1314 (quoting *Rafidain Bank*, 150 F.3d at 176). The district court did not abuse its considerable discretion.

In sum, we affirm in part, reverse in part, and remand the case to the district court for further proceedings, including, in the first instance, answering the other jurisdictional question raised by the Kingdom: whether the first bundle of claims arising out of the Kingdom's conduct in hiring, vetting, and sending its airman to the United States survives the factual challenges.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

November 10, 2025

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  24-11310-GG
Case Style:  Benjamin Watson, Jr., et al v. Kingdom of Saudi Arabia
District Court Docket No:  3:21-cv-00329-MCR-ZCB

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing or rehearing en banc is governed by 11th Cir. R. 40-2. Please see FRAP 40 and the accompanying circuit rules for information concerning petitions for rehearing. Among other things, **a petition for rehearing must include a Certificate of Interested Persons**. See 11th Cir. R. 40-3.

Costs
Costs are taxed against Appellee(s) / Respondent(s).

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Clerk's Office Phone Numbers

General Information:     404-335-6100      Attorney Admissions:           404-335-6122
Case Administration:    404-335-6135      Capital Cases:                 404-335-6200
CM/ECF Help Desk:       404-335-6125      Cases Set for Oral Argument:   404-335-6141

OPIN-1 Ntc of Issuance of Opinion