# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA

BENJAMIN WATSON, JR.; SHEILA
WILEMON WATSON; SHANE
WALTERS; AMANDA WALTERS;
DUSTIN WALTERS; MASON
WALTERS; SAMEH HAITHAM;
EVELYN BRADY; SHADIN
HAITHAM; JOHN ROBERT BRADY;
IRVIN LAWRENCE JR.; GEORGE
JOHNSON; BREANNA THOMAS;
RYAN BLACKWELL; CARLY
BLACKWELL; KRISTY LEHMER;
JESSICA PICKETT; CURTIS PICKETT;
CHARLES HOGUE; MATTHEW
TINCH; JESSICA TINCH; JONATHAN
GLASS; JOY GLASS; MATTHEW
HOUSAM; MICHAEL HOYLAND;
THOMAS C. BORTNER; GRANT
LOPEZ; HEATHER LOPEZ;
MATTHEW KEEBLER; and
KRYSTENA KEEBLER,

        *Plaintiffs*,

    v.

KINGDOM OF SAUDI ARABIA,

        *Defendant.*

Case No. 3:21-cv-329

# SUPPLEMENTAL BRIEF OF THE KINGDOM OF SAUDI ARABIA
# ON REMAND FROM THE ELEVENTH CIRCUIT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ....................................................................................... 1

BACKGROUND .......................................................................................... 3

ARGUMENT ............................................................................................. 13

I.     PLAINTIFFS BEAR THE BURDEN TO PRODUCE
    EVIDENCE TO SUPPORT THEIR ALLEGATIONS
    OF GROSS NEGLIGENCE .............................................................. 13

    A.     This Court Should Now Determine Whether Record
        Evidence Supports Plaintiffs' Contention That Saudi
        Arabia Was Grossly Negligent ............................................. 13

    B.     Plaintiffs Must Come Forward with Sufficient Evidence
        To Support a Finding of Gross Negligence .......................... 14

    C.     Plaintiffs Cannot Meet Their Burden by Resting on the
        Allegations of Their Complaint ........................................... 17

    D.     The Court Can and Should Consider the Navy Reports
        and FBI Statements Under Federal Rule of Evidence
        803(8) ..................................................................................... 19

II.    NO RECORD EVIDENCE SHOWS THAT SAUDI ARABIA
    WAS GROSSLY NEGLIGENT IN SENDING AL-SHAMRANI
    TO THE UNITED STATES .............................................................. 21

    A.     There Is No Evidence That Al-Shamrani's Extremist and
        Violent Views Were Publicly Available by August 2017 ..... 22

    B.     There Is No Evidence That Saudi Arabia Knew of
        Al-Shamrani's Extremist or Violent Views by
        August 2017 .......................................................................... 28

    C.     There Is No Evidence That Saudi Arabia Consciously
        Disregarded Al-Shamrani's Extremist or Violent Views
        in Sending Him to Pensacola ............................................... 32

RESERVATION OF APPELLATE RIGHTS...........................................................34

CONCLUSION ......................................................................................................34

LOCAL RULE 7.1(F) CERTIFICATION

LOCAL RULE 5.1(F) CERTIFICATION

# TABLE OF AUTHORITIES

Page

CASES

*Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193
(2d Cir. 2016).................................................................9

*Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*,
788 F.3d 1329 (11th Cir. 2015) ...................................18

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988)............................................20

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling
Co.*, 581 U.S. 170 (2017)...............................................13, 14, 18

*Butler v. Sukhoi Co.*, 579 F.3d 1307 (11th Cir. 2009)..........................13, 15, 17, 18

*Carraway v. Revell*, 116 So. 2d 16 (Fla. 1959) .......................................................21

*Comparelli v. Republica Bolivariana De Venezuela*, 891 F.3d 1311
(11th Cir. 2018) ............................................................14

*Crawford v. ITW Food Equip. Grp., LLC*, 977 F.3d 1331
(11th Cir. 2020) ...........................................................20, 21

*Dallas Cnty. v. Commercial Union Assur. Co.*, 286 F.2d 388
(5th Cir. 1961) ..............................................................27

*Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213
(11th Cir. 2018) ............................................................9, 15, 16

*Director, Off. of Workers' Comp. Programs v. Greenwich Collieries*,
512 U.S. 267 (1994)......................................................16

*Electric Boat Corp. v. Fallen*, 343 So. 3d 1218 (Fla. 5th DCA 2022)....11, 12, 21, 31

*Enahoro v. Abubakar*, 408 F.3d 877 (7th Cir. 2005)...............................................16

*Federal Republic of Germany v. Philipp*, 592 U.S. 169 (2021) .......................13, 18

*GDG Acquisitions LLC v. Government of Belize*, 849 F.3d 1299
(11th Cir. 2017) ...........................................................15, 18

*Litman v. Massachusetts Mut. Life Ins. Co.*, 825 F.2d 1506
(11th Cir. 1987) ...........................................................................19

*Moradiellos v. Gerelco Traffic Controls, Inc.*, 176 So. 3d 329
(Fla. 3d DCA 2015)..................................................................21, 22

*Odyssey Marine Expl., Inc. v. Unidentified Shipwrecked Vessel*,
657 F.3d 1159 (11th Cir. 2011) ....................................................15

*Phaneuf v. Republic of Indonesia*, 106 F.3d 302 (9th Cir. 1997)....................15, 16

*Republic of Hungary v. Simon*, 604 U.S. 115 (2025) ........................................13, 34

*Robinson v. Government of Malaysia*, 269 F.3d 133 (2d Cir. 2001)......................15

*Ruan v. United States*, 597 U.S. 450 (2022) ............................................................16

*S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292
(11th Cir. 2000) ...........................................................................15

*Sanford Fork & Tool Co., In re*, 160 U.S. 247 (1895) ............................................19

*Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49 (2005) ..........................................16

*Sequeria v. Republic of Nicaragua*, 815 F. App'x 345 (11th Cir. 2020) ...............15

*Serbian E. Orthodox Diocese for U.S. of Am. & Canada v.
Milivojevich*, 426 U.S. 696 (1976) ..............................................26

*Terrorist Attacks on Sept. 11, 2001, In re*, 714 F.3d 109 (2d Cir. 2013) ...........9, 16

*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983) ............................4

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 881 F.3d 835
(11th Cir. 2018) ...........................................................................19

## STATUTES AND RULES

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583,
90 Stat. 2891 (codified as amended at, *inter alia*, 28 U.S.C.
§§ 1602-1611)...............................................................4, 7, 10, 13,
14, 15, 16, 18, 34

28 U.S.C. § 1604................................................................................4, 13

28 U.S.C. § 1605B(b) ..............................................................................7

28 U.S.C. § 1605B(b)(2)........................................................................32

28 U.S.C. § 1605B(d) ........................................................7, 11, 14, 29

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222,
 130 Stat. 852 (2016) ......................................................................7, 10

Fed. R. Evid.:

Rule 301....................................................................................................16

Rule 803(8) ........................................................................................19, 20

Rule 803(8)(A)(iii)..................................................................................19

Rule 803(8)(B)..........................................................................................20

## OTHER MATERIALS

Aden Achmaduddin Kamil El-Warits et al., *The Shifting Trends in
 Baby Naming: An Anthropolinguistic Perspective on the
 Popularity of the Name "Muhammad" in England and Wales*,
 3 Kalimatuna: J. Arabic Rsch. 165 (2024) ....................................23

Reima Al-Jarf, *The Interchange of Personal Names in Muslim
 Communities: An Onomastic Study*, 3 J. Gender, Culture,
 & Soc'y 42 (2024) ...........................................................................23

Rori Donaghy, *The Saudi air force officer who became a human
 rights activist*, Middle East Eye (Mar. 6, 2015),
 https://www.middleeasteye.net/features/saudi-air-force-officer-
 who-became-human-rights-activist ................................................31

Cyril Glassé, *The Concise Encyclopedia of Islam* (1989) ......................23

U.S. Amicus Br., *Republic of Hungary v. Simon*, 604 U.S. 115 (2025)
 (No. 23-867 (U.S. Sept. 3, 2024)) ..................................................34

U.S. Dep't of State, *Saudi Arabia 2017 Human Rights Report*,
    https://www.state.gov/reports/2017-country-reports-on-human-
    rights-practices/saudi-arabia/ .......................................................................30

Declan Walsh, *Al Qaeda Claims It Directed Florida Naval Base
    Shooting*, N.Y. Times (Feb. 2, 2020), *available at*
    https://www.nytimes.com/2020/02/02/world/middleeast/al-
    qaeda-claims-it-directed-florida-naval-base-shooting.html .........................27

**INTRODUCTION**

The Eleventh Circuit has remanded this case for this Court to determine whether the Kingdom of Saudi Arabia acted with gross negligence when it sent Mohammed Saeed Al-Shamrani to the United States to learn how to fly planes Saudi Arabia purchases from the United States.  For purposes of its review, the court of appeals took as true Plaintiffs' allegations that by the key date of August 2017 Al-Shamrani had publicly "urged death to America and its military," that Saudi Arabia knew it, and that Saudi Arabia sent him to the United States in conscious disregard of the danger he posed.  This Court should now consider whether Plaintiffs have produced evidence to support those allegations.

From the outset of this case, Saudi Arabia has challenged Plaintiffs' allegations as factually untrue.  Settled law on foreign sovereign immunity puts the burden on Plaintiffs to produce evidence in response.  Plaintiffs had the opportunity to submit evidence when they opposed Saudi Arabia's motion to dismiss.  They put in 26 exhibits.  None shows any public statement by Al-Shamrani by August 2017 that supports Plaintiffs' allegations about his social-media accounts.  None supports Plaintiffs' claim that Saudi Arabia knew the contents of those accounts or otherwise acted with conscious disregard for the danger Al-Shamrani posed.

This Court has already rejected Plaintiffs' requests for jurisdictional discovery to supplement their gross-negligence allegations. Plaintiffs challenged that rejection on appeal, but contended that jurisdictional discovery was "unnecessary" for most of their claims, including their gross-negligence claims. The Eleventh Circuit went on to affirm this Court's denial of jurisdictional discovery. That affirmance is binding under the familiar mandate rule. Accordingly, the Court should now end its inquiry by finding that Plaintiffs have not met their burden of production.

The Court also can (and if necessary should) consider the Navy's investigative report about the Pensacola shooting and the FBI's public statements about its parallel counterterrorism investigation. Those agency statements are admissible evidence contradicting Plaintiffs' allegations. Al-Shamrani's Twitter account was not easily traceable to him. Nor was his 2015 radicalization public. Instead, he communicated with terrorist accomplices secretly using encryption. Even with all its investigative resources (and with Saudi Arabia's complete cooperation), it took the FBI six months after the attack to confirm those 2015 links. None of that can be squared with Plaintiffs' allegations that, based on information supposedly public in 2017, Saudi Arabia already knew Al-Shamrani was a clear and present danger to his U.S. hosts.

## BACKGROUND

**1.** On May 11, 2021, Plaintiffs filed their First Amended Complaint seeking to hold Saudi Arabia liable for the rogue terrorist attack committed by Mohammed Al-Shamrani on Naval Air Station Pensacola. ECF No. 5 ("FAC"). Along with other theories no longer in the case, Plaintiffs alleged that Saudi Arabia was grossly negligent in vetting Al-Shamrani before sending him to the United States in August 2017. *E.g.*, FAC ¶¶ 134-137, 143-144, 502-514, 519-525.

To support their gross-negligence theory, Plaintiffs alleged that, from 2015 to 2017, Al-Shamrani made public statements on social media that expressed violent and extremist ideas. For example, Plaintiffs alleged that Al-Shamrani endorsed "[t]he killing of Shia Muslims, non-Muslims and people who do not pray," *id.* ¶¶ 75-76; "conspiracy" theories including the theory that "Islam is under attack and threatened by Christians, Jews and Western culture," *id.*; and "the teachings of [Anwar] al-Awlaki," a "prominent English-language propagandist for al-Qaeda," *id.* ¶ 94; *see also id.* ¶ 330 (additional list of "themes" of how "Al-Shamrani viewed the world"). Plaintiffs alleged that Al-Shamrani used an "easily traceable" Twitter account that "bore his first and last name." *Id.* ¶ 131.

Plaintiffs further alleged that Saudi Arabia knew of Al-Shamrani's public social-media statements before it sent him to the United States in August 2017. *Id.* ¶¶ 330-331. They alleged that Saudi Arabia learned of Al-Shamrani's public

social-media statements when he "underwent extensive vetting by the Kingdom when he joined" the Royal Saudi Air Force ("RSAF") and when he was "screened" to be "a prospective trainee in an American flight program." *Id.* ¶¶ 135, 143; *but see id.* ¶ 513(iii) (alternatively alleging that Saudi Arabia "[f]ail[ed] to investigate and screen Al-Shamrani's social media . . . accounts"). They also alleged that Saudi Arabia "was aware of [Al-Shamrani's] extremist ties" because, "[a]t all times," it was "monitoring" him. *Id.* ¶ 114.

**2.** On March 21, 2022, Saudi Arabia moved to dismiss Plaintiffs' Amended Complaint. ECF No. 46 (originally filed as ECF No. 27-1). Saudi Arabia asserted immunity from suit under the Foreign Sovereign Immunities Act of 1976 ("FSIA"). The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States . . . except as provided in [28 U.S.C. §§] 1605 to 1607." 28 U.S.C. § 1604; *see Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493-94 (1983) ("At the threshold of every action in a District Court against a foreign state, . . . the court must satisfy itself that one of the [FSIA's] exceptions applies[.]"). Saudi Arabia raised both a facial challenge to Plaintiffs' allegations, asserting that those allegations were legally insufficient to establish any FSIA exception, and a factual challenge, asserting that the allegations were unsupported by evidence. ECF No. 46, at 10-11.

With its motion, Saudi Arabia submitted the Navy's investigative report on Al-Shamrani's attack. ECF No. 47-1 ("Navy Report").[1] That Report was completed on February 21, 2020, by an "investigating officer" and an "investigation team comprised of subject matter experts." *Id.* at 6-7. Among other things, the Navy found that, "[b]ased upon the information available at the time, no one person or organization knew or could have known 2nd Lt Al-Shamarani would attack active duty service members and civilians." *Id.* at 7. Concerning Al-Shamrani's public Twitter account, it found that Al-Shamrani's "Twitter alias of @M7md_Shamrani . . . does not directly correlate with his full name" and that "[h]is surname Shamrani reflects his family's lineage within the Shamran tribe, one of the largest in Saudi Arabia." *Id.* at 139. The investigating team noted, however, that it did not have access to Al-Shamrani's "Twitter feed." *Id.*

Saudi Arabia also submitted two public statements from the Department of Justice and the FBI. *First*, in January 2020, Attorney General William P. Barr described the FBI's findings that Al-Shamrani's attack was "an act of terrorism" that "was motivated by jihadist ideology." ECF No. 47-2 ("January 2020 Statement"), at 1. The Attorney General described "message[s]," including "anti-American, anti-Israeli, and jihadi" statements, that Al-Shamrani posted on social

---

[1] ECF No. 47-1 includes several documents. The Navy Report begins at ECF-stamped page 24. Citations use the Report's internal page numbers.

media in September and December 2019. *Id.* He stated that "[t]he Kingdom of Saudi Arabia gave complete and total support for [the FBI's] counter-terrorism investigation," which found "no evidence of assistance or pre-knowledge of the attack by other members of the Saudi military (or any other foreign nationals) who are training here in the United States." *Id.* at 2. Some other trainees "had social media containing some jihadi or anti-American content," but "no evidence of any affiliation or involvement with any terrorist activity or group." *Id.*[2] Nothing in the February 2020 statement refers to any social-media content in 2017 or earlier.

*Second*, in May 2020, the Attorney General and FBI Director Christopher Wray released an additional statement describing "important, previously-unknown information" obtained by "unlocking" Al-Shamrani's "two iPhones." ECF No. 47-3 ("May 2020 Statement"), at 1. Based on the "highly-significant evidence" revealed in the phones, the FBI was able to determine that Al-Shamrani "had been radicalized by 2015" and "joined the [RSAF]" only after "connect[ing] and associat[ing] with . . . operatives" from the terrorist group "Al Qaeda in the Arabian Peninsula (AQAP)." *Id.* at 1-2. "Alshamrani and his AQAP associates,"

---

[2] The Attorney General further explained that the Department of Justice had concluded that the "derogatory" social-media material, along with other material indicating "some kind of contact with child pornography," did not warrant "federal prosecution." January 2020 Statement at 2. Saudi Arabia, however, concluded that the material "demonstrated conduct unbecoming an officer" and recalled the individuals involved for investigation and potential charges. *Id.*

the FBI explained, "communicated using end-to-end encrypted apps, with warrant-proof encryption, deliberately in order to evade law enforcement." *Id.* at 1.

3. On June 9, 2022, Plaintiffs opposed Saudi Arabia's motion to dismiss. ECF No. 39. As now relevant, Plaintiffs asserted that this Court has jurisdiction under the Justice Against Sponsors of Terrorism Act of 2016 ("JASTA"). *Id.* at 32-53. JASTA creates an exception to FSIA immunity for "any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States," if the injury is "caused by" both "an act of international terrorism in the United States" and "a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605B(b). That exception does not apply to claims "on the basis of an omission or a tortious act or acts that constitute mere negligence." *Id.* § 1605B(d).

Plaintiffs contended that, to raise a factual challenge, Saudi Arabia was required "to controvert . . . Plaintiffs' material allegations with evidence" and had not done so, ECF No. 39, at 4; and that Saudi Arabia's jurisdictional challenge should be deferred because it is "'inextricably intertwined' with the merits," *id.* at 4-5. Before the appeal, Plaintiffs also contended that the Court should grant Plaintiffs "reasonable jurisdictional discovery," *id.* at 5, 62, before resolving the factual challenge. In a separate motion, they sought "jurisdictional discovery to

substantiate their allegations and prove [Saudi Arabia] was aware of Al-Shamrani's radicalization and AQAP sympathies prior to sending him to the United States." ECF No. 43, at 10.

With their opposition, Plaintiffs submitted 26 exhibits.  ECF Nos. 39-1 to 39-26.  Among other things, those exhibits included a screenshot of Al-Shamrani's Twitter account as of December 9, 2019, ECF No. 39-6; an exemplar of a DS-160 non-immigrant visa application that Al-Shamrani would have submitted before coming to the United States, ECF No. 39-10; an exemplar of an Invitational Travel Order that the U.S. government would have issued to Al-Shamrani before he came to the United States, ECF No. 39-11; several U.S. military manuals, policies, and forms, ECF Nos. 39-12 to 39-15; a 2020 Human Rights Report issued by the U.S. State Department about Saudi Arabia, ECF No. 39-23; and a February 2018 issue of a magazine titled "The Muslim Soldier," ECF No. 39-24.

4.      On May 11, 2023, Magistrate Judge Bolitho recommended that this Court grant Saudi Arabia's motion to dismiss in its entirety.  ECF No. 54.  He addressed both Saudi Arabia's facial and factual challenges to Plaintiffs' allegations.  *Id.* at 12.  He accepted as undisputed Saudi Arabia's initial showing that it is a foreign state, presumptively immune from suit.  *Id.* at 9-10 & n.6. Accordingly, he explained, Plaintiffs bear the "'burden of production,'" also called the "'burden of going forward with evidence,'" to establish an exception.  *Id.* at

10-11 (quoting *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1221 n.9 (11th Cir. 2018), and *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 114 (2d Cir. 2013)).

The Magistrate Judge rejected Plaintiffs' "alleg[ations] that Saudi Arabia acted with . . . gross negligence in its vetting, retaining, and supervising of Al-Shamrani" because he found them to be "based on omissions by Saudi Arabia." *Id.* at 22-24 (citing Plaintiffs' many allegations that Saudi Arabia " 'fail[ed] to' do something"). He also rejected Plaintiffs' request for jurisdictional discovery. *Id.* at 59-63. He reasoned both that "Plaintiffs ha[d] not established a *prima facie* case that an exception to the FSIA applies" and that they had sought "extremely broad jurisdictional discovery." *Id.* at 61-63; *see id.* at 63 (declining "to greenlight a 'fishing expedition' . . . 'without any non-speculative basis' ") (quoting *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 207 (2d Cir. 2016)).

5.    On March 30, 2024, this Court adopted the Magistrate Judge's Report and Recommendation in part, overruled Plaintiffs' objections, granted Saudi Arabia's motion to dismiss, and denied jurisdictional discovery. ECF No. 72. The Court found it unnecessary to resolve the factual challenge to jurisdiction because it found "Plaintiffs' allegations [to be] inadequate or conclusory," so that "the suit does not withstand a facial, let alone factual, challenge." *Id.* at 9-10; *see also id.* at 13. In rejecting Plaintiffs' gross-negligence allegations, the Court agreed "that

Plaintiffs' allegations are all phrased as a failure of the foreign state and/or its agent(s) to do something, which does not satisfy JASTA." *Id.* at 23.  The Court also "denie[d] all objections regarding discovery and f[ound] no error, let alone clear error, in the Magistrate Judge's denial of discovery." *Id.* at 41 n.7.

6.    On November 10, 2025, the Eleventh Circuit affirmed in part, reversed in part, and remanded. *Watson v. Kingdom of Saudi Arabia*, 159 F.4th 1234 (11th Cir. 2025).  The court "agree[d] that most of the Plaintiffs' claims were properly dismissed for lack of subject matter jurisdiction" under the FSIA and JASTA.  *Id.* at 1244.  It held, however, that "Plaintiffs' claims . . . based on the theory that the Kingdom had been grossly negligent in vetting, hiring, and sending . . . Al-Shamrani to the United States" were "facially sufficient because they are based on a series of acts of commission (rather than acts of omission)."  *Id.*

The Eleventh Circuit assumed the truth of Plaintiffs' allegations that Al-Shamrani's "Twitter account showed evidence of radicalization and the expression of violent anti-American sentiments"; that he "regularly posted radical fundamentalist ideology, as well as anti-American and anti-Jewish ideology"; that he "expressed or read" certain "ideas" such as "[t]he killing of Shia Muslims, non-Muslims and people who do not pray"; and that he "echoed the radical and violent teachings of . . . al-Awlaki."  *Id.* at 1245.  It also assumed the truth of Plaintiffs' allegations that Al-Shamrani made such "violent jihadi statements from at least

2015 until . . . the Kingdom sent him to the United States on August 28, 2017," *id.*

at 1257, and that such "information was available to the Kingdom when it screened

the airman for security before sending him to this country," *id.* at 1256.

The Eleventh Circuit then held Plaintiffs' allegations sufficient to plead

"acts of commission" that constituted "gross negligence" under "Florida law."

*Id.* at 1257.[3]   It identified gross negligence as "requi[ring] . . . three things":

> (1) "'circumstances constituting an imminent or clear and present
> danger amounting to a more than normal or usual peril,'"
> (2) "'knowledge or awareness of the imminent danger on the part of
> the tortfeasor,'" and (3) "'an act or omission that evinces a conscious
> disregard of the consequences.'"

*Id.* (quoting *Electric Boat Corp. v. Fallen*, 343 So. 3d 1218, 1220 (Fla. 5th DCA

2022)).   It found the requirement of a "clear and present danger" met by Plaintiffs'

allegations about "Al-Shamrani's publicly available extremist and violent views."

*Id.*   It found the requirement of "knowledge or awareness" met by Plaintiffs'

allegation that "Saudi Arabia knew of Al-Shamrani's radicalization and anti-

American sentiments" because of the "extensive vetting" that he "underwent."   *Id.*

at 1257-58.   And it found the requirement of "act[s]" in "conscious disregard of the

consequences" met by Plaintiffs' allegations that Saudi Arabia submitted a visa

---

[3] The Eleventh Circuit also held that acts of "gross negligence" are more
than "mere negligence" within the meaning of 28 U.S.C. § 1605B(d) and that,
taken as true, Plaintiffs' allegations established proximate causation.  *Watson*,
159 F.4th at 1253-54, 1258-60.

application for Al-Shamrani, screened him for security risks, nominated him for a scholarship, and ultimately "sent him to the United States" despite this "knowledge or awareness." *Id.* at 1258; *see id.* at 1261-62 (holding these were "grossly negligent acts of commission rather than omission").

The Eleventh Circuit affirmed this Court's dismissal of all of Plaintiffs' other claims, including Plaintiffs' claims that Saudi Arabia was grossly negligent in failing to vet or to monitor Al-Shamrani once he was in the United States. *See id.* at 1262-72. It also affirmed this Court's denial of jurisdictional discovery. In doing so, it observed that Plaintiffs "concede[d] that jurisdictional discovery is unnecessary for any of their claims other than the breach of contract matter" and held that this Court had not "abuse[d] its considerable discretion" in denying discovery on that issue. *Id.* at 1274.

The Eleventh Circuit then remanded for this Court to address "whether the . . . bundle of claims arising out of the Kingdom's conduct in hiring, vetting, and sending its airman to the United States survives the factual challenges." *Id.*

**ARGUMENT**

I.   **PLAINTIFFS BEAR THE BURDEN TO PRODUCE EVIDENCE TO SUPPORT THEIR ALLEGATIONS OF GROSS NEGLIGENCE**

   A.   **This Court Should Now Determine Whether Record Evidence Supports Plaintiffs' Contention That Saudi Arabia Was Grossly Negligent**

By declaring "a foreign state . . . immune from the jurisdiction of the courts of the United States . . . except as" otherwise "provided," 28 U.S.C. § 1604, the FSIA creates "a baseline presumption of immunity from suit." *Federal Republic of Germany v. Philipp*, 592 U.S. 169, 176 (2021); *see Butler v. Sukhoi Co.*, 579 F.3d 1307, 1311 (11th Cir. 2009) (collecting cases holding that the FSIA grants "immunity from trial" and from "discovery," rather than "merely a defense to liability"). That immunity "avoid[s], where possible, 'producing friction in our relations with other nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation.' " *Republic of Hungary v. Simon*, 604 U.S. 115, 132 (2025) (quoting *Philipp*, 592 U.S. at 184) (cleaned up).

As *Bolivarian Republic of Venezuela v. Helmerich & Payne International Drilling Co.*, 581 U.S. 170 (2017), explains, courts confronted with "jurisdictional questions" under the FSIA that "turn upon further factual development . . . may take evidence and resolve relevant factual disputes." *Id.* at 174. "[C]onsistent with foreign sovereign immunity's basic objective, namely, to free a foreign sovereign

from *suit*, the court should normally resolve those factual disputes and reach a decision about immunity as near to the outset of the case as is reasonably possible." *Id.  Helmerich* also clarifies that, even where jurisdictional fact disputes "intertwine[ ]" with the merits, they should still be resolved at the threshold. *Id.* at 178; *see id.* ("If to do so, [the court] must inevitably decide some, or all, of the merits issues, so be it.").

The Eleventh Circuit has directed this Court to determine, "in the first instance, . . . whether the first bundle of claims arising out of the Kingdom's conduct in hiring, vetting, and sending its airman to the United States survives the factual challenges." *Watson*, 159 F.4th at 1274. To support jurisdiction, those claims cannot be based on "mere negligence," 28 U.S.C. § 1605(d), but instead must "r[i]se to the level of gross negligence" under "Florida common law," *Watson*, 159 F.4th at 1257. And, as the Eleventh Circuit explained in applying *Helmerich* to the FSIA's commercial-activity exception, this Court should "determine . . . whether the [jurisdictional] requirement is, in fact, established; mere allegations are no longer sufficient." *Comparelli v. Republica Bolivariana De Venezuela*, 891 F.3d 1311, 1326 (11th Cir. 2018).

### B.    Plaintiffs Must Come Forward with Sufficient Evidence To Support a Finding of Gross Negligence

To "overcome the presumption that [a] foreign state is immune from suit in the United States' courts," a plaintiff must "offer[ ] evidence that an FSIA

- 14 -

exception to immunity applies." *S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1300 (11th Cir. 2000); *see also Odyssey Marine Expl., Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1175 (11th Cir. 2011) (same). The Eleventh Circuit has called this requirement both a "burden of production" and a "burden of producing evidence." *Butler*, 579 F.3d at 1313.[4] If the plaintiff meets that burden, Circuit precedent then "shifts" the "burden" to the foreign state "to show, by a preponderance of the evidence, that the exception does not apply." *Odyssey*, 657 F.3d at 1175-76.[5]

Other circuits similarly recognize that overcoming FSIA immunity requires a plaintiff to come forward with evidence. Examples include *Robinson v. Government of Malaysia*, 269 F.3d 133 (2d Cir. 2001), which affirmed Malaysia's immunity from a slip-and-fall suit because the plaintiff "neither pleaded nor c[a]me forward with evidence sufficient to show that his claim [wa]s for a 'tortious act or omission' caused by the Malaysian government," *id.* at 146; *Phaneuf v. Republic of Indonesia*, 106 F.3d 302 (9th Cir. 1997), which recognized the plaintiff's "burden

_____

[4] *See also*, *e.g.*, *Sequeria v. Republic of Nicaragua*, 815 F. App'x 345, 348-49 (11th Cir. 2020) (per curiam) ("burden of establishing subject matter jurisdiction by 'producing evidence'") (quoting *Butler*, 579 F.3d at 1312-13; *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1221 n.9 (11th Cir. 2018) ("burden of production"); *GDG Acquisitions LLC v. Government of Belize*, 849 F.3d 1299, 1306 (11th Cir. 2017) (same).

[5] If a defendant's status as a foreign state is disputed, the defendant has the burden to establish that status. No one disputes Saudi Arabia is a foreign state. ECF No. 54, at 10 & n.6.

of production . . . to offer evidence that an exception applies," *id.* at 307; and

*Enahoro v. Abubakar*, 408 F.3d 877 (7th Cir. 2005), which states that "the

plaintiff" bears the "burden of going forward . . . to produce evidence that the

entity is not entitled to immunity," *id.* at 882.

Requiring evidence (not mere allegations) to overcome the FSIA's

presumption of immunity is consistent with how presumptions and burdens of

production work throughout the law.  Under the Federal Rules of Evidence,

"unless a federal statute or these rules provide otherwise, the party against whom

a presumption is directed has the burden of producing evidence to rebut the

presumption."  Fed. R. Evid. 301.  The Supreme Court has likewise defined the

"burden of production" as an "obligation to come forward with evidence to support

[a] claim."  *Director, Off. of Workers' Comp. Programs v. Greenwich Collieries*,

512 U.S. 267, 272 (1994); *see Ruan v. United States*, 597 U.S. 450, 463 (2022)

(citing *Greenwich* and *Black's Law Dictionary*); *Schaffer ex rel. Schaffer v. Weast*,

546 U.S. 49, 56 (2005) (citing *Greenwich*).

Magistrate Judge Bolitho's Report and Recommendation discussed the

burden-shifting framework and correctly identified Plaintiffs as bearing the

" 'burden of production,' " meaning the " 'burden of going forward with evidence.' "

ECF No. 54 (quoting *Devengoechea*, 889 F.3d at 1221 n.9, and *In re Terrorist

Attacks on Sept. 11, 2001*, 714 F.3d 109, 114 (2d Cir. 2013)).  The Magistrate

- 16 -

Judge then identified areas in which Plaintiffs had not met that burden. *See id.* at 19-20, 29 n.16, 35, 59. This Court should apply the same approach and consider whether Plaintiffs have produced evidence that could support a reasonable finding that Saudi Arabia was grossly negligent in hiring Al-Shamrani, vetting him, and sending him to the United States. As Part II shows, they have not.

### C. Plaintiffs Cannot Meet Their Burden by Resting on the Allegations of Their Complaint

Plaintiffs have incorrectly contended that,

> although Plaintiffs' initial burden of production is couched in terms of "producing evidence," . . . the Court must consider Plaintiffs' well pleaded allegations to be sufficient "evidence" to carry the initial burden – separate and apart from any documentary evidence Plaintiffs may have proffered in support of those allegations.

ECF No. 57, at 9-10 (emphasis omitted); *see id.* at 7-8 (arguing that Plaintiffs need not "adduce evidence" such as "admissible documents and sworn testimony"); *id.* at 10 (asserting that their "well pleaded allegations . . . must be accepted as true until the [Kingdom] produces evidence contradicting all or some of them"). It is strange to describe a burden that can be carried with mere allegations as a "burden of producing evidence," *Butler*, 579 F.3d at 1313, and stranger still to describe Plaintiffs as bearing any burden if Saudi Arabia must first produce evidence to create a factual dispute. And, indeed, the cases do not bear that reading.

Plaintiffs misplace reliance on the Eleventh Circuit's statements in *Butler* and other cases that "[w]hether the plaintiff has satisfied his burden of production

. . . is determined by looking at the allegations in the complaint and the undisputed facts, if any, placed before the court by the parties." *Id.* (cleaned up), *quoted in* ECF No. 57, at 8.  Often, as in *Butler* itself, courts resolve FSIA jurisdiction based on allegations and undisputed facts.  579 F.3d at 1314-15 (holding that "the complaint in this case fails to allege an FSIA statutory exception to sovereign immunity").[6]  But where a court "take[s] evidence and resolve[s] relevant factual disputes," *Helmerich*, 581 U.S. at 174, one party or the other must first come forward with evidence to support its version of the facts.  The FSIA's "baseline presumption of immunity," *Philipp*, 592 U.S. at 176, and the ample precedent cited above foreclose Plaintiffs' argument that Saudi Arabia bears that initial burden.

Nor can Plaintiffs now complain that they lack the benefit of discovery in meeting their burden.  They had a fair chance to seek " 'jurisdictional discovery . . . to verify allegations of specific facts crucial to an immunity determination.' " *Watson*, 159 F.4th at 1274 (quoting *Butler*, 579 F.3d at 1314).  Indeed, when last before this Court, Plaintiffs sought "discovery on the vetting."  ECF No. 53, at 61:14-17; *see* ECF No. 43, at 9-10.  But this Court ruled otherwise.  *See* ECF No.

---

[6] *See also GDG Acquisitions*, 849 F.3d at 1308-10 (holding that the "undisputed and unambiguous facts" established "ratification" of an agreement containing an "explicit waiver of sovereign immunity"); *Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*, 788 F.3d 1329, 1339 (11th Cir. 2015) (observing that the Dominican Republic "d[id] not contest the alleged jurisdictional facts," quoting *Butler*, 579 F.3d at 1313, and holding that the parties' contract waived sovereign immunity by its terms).

54, at 59-63; ECF No. 72, at 41 n.37.  Then, on appeal, Plaintiffs chose effectively to concede away (as "unnecessary") any jurisdictional discovery except for their breach-of-contract claim, and the Eleventh Circuit affirmed on that one remaining point.  *Watson*, 159 F.4th at 1272-74.

That affirmance forecloses any further dispute about jurisdictional discovery.  *See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 881 F.3d 835, 843 (11th Cir. 2018) ("The law of the case doctrine and the mandate rule ban courts from revisiting matters decided expressly or by necessary implication in an earlier appeal of the same case."); *Litman v. Massachusetts Mut. Life Ins. Co.*, 825 F.2d 1506, 1510-11 (11th Cir. 1987) (en banc) (a "district court when acting under an appellate court's mandate, 'cannot . . . give any other or further relief; or review it, even for apparent error, upon a matter decided on appeal'") (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895)).  The Court should thus consider whether Plaintiffs have met their burden on the record as it stands.

### D. The Court Can and Should Consider the Navy Reports and FBI Statements Under Federal Rule of Evidence 803(8)

This Court can (and if necessary should) also consider the Navy Report and the FBI's public statements as admissible evidence.  Those documents are "record[s] or statement[s] of . . . public office[s]" that "set[ ] out" the "factual findings from . . . legally authorized investigation[s]."  Fed. R. Evid. 803(8)(A)(iii).  Rule 803(8) authorizes the Court to consider not only the agencies' granular

- 19 -

findings of fact, but also their "factually based conclusions or opinions." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 162 (1988) (construing former Rule 803(C), now Rule 803(8)(A)(iii)).  Further, the Rule requires the party opposing admission (here, Plaintiffs) to "show that the source of information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8)(B); *see Crawford v. ITW Food Equip. Grp., LLC*, 977 F.3d 1331, 1349 (11th Cir. 2020) (explaining that Rule 803(8) "accord[s] to public records" a "presumption of regularity" placing the "burden of pro[of]" on "the party opposing admission").

Plaintiffs cannot show untrustworthiness.  When assessing trustworthiness under Rule 803(8), courts consider "(1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation."  *Beech Aircraft*, 488 U.S. at 167 n.11 (citing advisory committee's notes).  Three of those four factors cut in favor of trustworthiness.  The Navy Report and the FBI's public statements were timely, coming mere months after the December 2019 shooting.[7] They were based on the work of expert investigators.[8]  There is no basis to suggest

---

[7] *See* Navy Report at 1 (dated Feb. 21, 2020); January 2020 Statement at 1 (dated Jan. 13, 2020); May 2020 Statement (dated May 18, 2020).

[8] *See* Navy Report at 6 (describing an "investigation team . . . of subject matter experts"); January 2020 Statement at 1 (describing the work of "the FBI and the other federal, state, and local law enforcement agencies"); May 2020 Statement at 1 (describing "hours upon hours" spent by the FBI's "technical experts").

those investigators were biased.  Standing alone, the lack of public hearings does not warrant exclusion.  *See Crawford*, 977 F.3d at 1348-49 (affirming admission of OSHA reports prepared without a hearing).

## II.   NO RECORD EVIDENCE SHOWS THAT SAUDI ARABIA WAS GROSSLY NEGLIGENT IN SENDING AL-SHAMRANI TO THE UNITED STATES

Florida defines gross negligence as a "'course of conduct which a reasonable and prudent man would know would probably and most likely result in injury to persons or property.'"  *Watson*, 159 F.4th at 1257 (quoting *Carraway v. Revell*, 116 So. 2d 16, 22-23 (Fla. 1959)).  That means proof of "'circumstances constituting an imminent or clear and present danger amounting to a more than normal or usual peril,'" of "'knowledge or awareness of the imminent danger on the part of the tortfeasor,'" and of "'an act . . . that evinces a conscious disregard of the consequences.'"  *Id.* (quoting *Electric Boat Corp. v. Fallen*, 343 So. 3d 1218, 1220 (Fla. 5th DCA 2022)).

Gross negligence is more demanding than ordinary negligence because it requires a high ("clear and present") level of danger, rather than a mere "possibility of harm."  *Moradiellos v. Gerelco Traffic Controls, Inc.*, 176 So. 3d 329, 335-36 (Fla. 3d DCA 2015).  It requires that the "imminent or 'clear and present'" danger be "known by the actor," *Carraway*, 116 So. 2d at 23, rather than merely something a reasonable person might have anticipated.  And it requires acts in

conscious disregard, not mere "careless disregard," *Moradiellos*, 176 So. 3d at 335-36, of that clear, present, and known danger.

The latest "affirmative act[]" at issue is Saudi Arabia's "sending Al-Shamrani to the United States." *Watson*, 159 F.4th at 1260-61. That happened in August 2017. *See id.* at 1257. Accordingly, evidence can support Plaintiffs' gross-negligence allegations only if it shows what Saudi Arabia knew by August 2017. There is no evidence that, at that time, Saudi Arabia knew of and consciously disregarded a clear and present danger that Al-Shamrani posed to his American hosts.

## A. There Is No Evidence That Al-Shamrani's Extremist and Violent Views Were Publicly Available by August 2017

The Eleventh Circuit reasoned that Plaintiffs had pleaded an "imminent or clear and present danger" through their allegations concerning "Al-Shamrani's publicly available extremist and violent views." *Watson*, 159 F.4th at 1257; *see id.* at 1245 (setting forth the allegations on which the court of appeals relied). It accepted as true Plaintiffs' allegation that "Al-Shamrani made violent jihadi statements from at least 2015 until . . . the Kingdom sent him to the United States on August 28, 2017." *Id.* at 1257. Those allegations are unsupported by any record evidence.

1. Plaintiffs have no evidence to support their allegation that Al-Shamrani's "[T]witter account . . . was easily traceable to him" because it "bore his first and

last name."  FAC ¶ 131; *see Watson*, 159 F.4th at 1245.  Plaintiffs submitted an archived screenshot of his Twitter account as of December 2019 showing the name "Mohammed Al-Shamrani" and the identifier "@M7MD_SHAMRANI."  ECF No. 39-6, at 1.  Although "Al-Shamrani" can be called a "surname," it is not a "last name" as that phrase is used in English to describe a name shared by an immediate family.  In Arabic, it would be called a *nisbah* (literally, "association").[9]  As the Navy Report explains, it "reflects his family's lineage within the Shamran tribe, one of the largest in Saudi Arabia."  Navy Report at 139.  "Mohammed" is an extremely common name in Muslim communities.[10]  Accordingly, the screenshot shows only an individual with a common first name who belonged to one of Saudi Arabia's largest tribes.  It does not show that it would be easy to trace the account to a particular Mohammed Al-Shamrani.

---

[9] Cyril Glassé, *The Concise Encyclopedia of Islam* 296-97, 302 (1989) (explaining that a *nisbah* can be a "clan or tribal name"; giving "al-Hāshimī," meaning "of the Hashimites," as an illustration); *see* Reima Al-Jarf, *The Interchange of Personal Names in Muslim Communities:  An Onomastic Study*, 3 J. Gender, Culture, & Soc'y 42, 46 (2024) (discussing "clan/tribal names" as "Arabic surnames"; "in Saudi Arabia, the full name should include four components":  "first name," "father's name," "grandfather's name," and "surname").

[10] *See* Aden Achmaduddin Kamil El-Warits et al., *The Shifting Trends in Baby Naming:  An Anthropolinguistic Perspective on the Popularity of the Name "Muhammad" in England and Wales*, 3 Kalimatuna:  J. Arabic Rsch. 165, 166-67, 170-71 (2024).

**2.**    Plaintiffs have no evidence to support their allegation that, "[t]hroughout Al-Shamrani's service with the RSAF, [he] regularly posted radical fundamentalist ideology" or "anti-American and anti-Jewish ideology on his social media accounts." FAC ¶ 138. To be specific, they have no evidence of any such posts in or before August 2017. Their screenshot of his account, ECF No. 39-6, is from December 2019. It shows the December 9, 2019 manifesto that he posted the morning of the shooting. It shows retweets of earlier tweets, but it does not show when Al-Shamrani retweeted those earlier posts. The earliest posts retweeted are from December 2017 and March 2018; there is nothing from August 2017 or earlier. Plaintiffs have come forward with no other evidence about Al-Shamrani's own statements on social media.

The FBI's public statements about its investigation further support the conclusion that Al-Shamrani's public social-media accounts showed evidence of radicalization only in the time leading up to the attack itself. In his initial January 13, 2020 public statement, Attorney General Barr referred to Al-Shamrani's "message on social media on Sept. 11 of last year" – that is, 2019. January 2020 Statement at 1. He further stated that Al-Shamrani "also posted other anti-American, anti-Israeli, and jihadi messages on social media, and did so two hours before his attack at the naval base." *Id.* As of that January 2020 statement, the FBI had not yet been able to "unlock" Al-Shamrani's "phones." *Id.* at 2-3.

In May 2020, after the FBI later did unlock the phones, Attorney General Barr and FBI Director Wray stated that "the phones' contents . . . reveal[ed] highly-significant evidence, including" that "Alshamrani and his AQAP associates communicated using end-to-end encrypted apps . . . deliberately in order to evade law enforcement"; and that he "had been radicalized by 2015, and having connected and associated with AQAP operatives, joined the [RSAF] in order to carry out a 'special operation.'" May 2020 Statement at 1-2. The reasonable inference is that Al-Shamrani's 2015 radicalization could not be determined from public social media. If it could, the FBI would have known about it in January 2020, rather than only after unlocking his phones.

3.      Plaintiffs have no evidence to support their allegation that Al-Shamrani "was followed by and friends with other Saudi Arabian citizens in the government and RSAF who read and commented on Al-Shamrani's radical posts." FAC ¶ 138; *see Watson*, 159 F.4th at 1245. None of the documents they submitted in support of their opposition shows who those alleged friends and followers were, what alleged "radical posts" they read, or what "comment[s]" they allegedly made on those posts – much less any such post or comment by August 2017.

4.      Plaintiffs have no evidence to support their allegations that Al-Shamrani "adopted . . . and expressly repeated" certain "ideas," such as "[t]he killing of Shia Muslims, non-Muslims and people who do not pray,"

a "conspiracy" theory that "the Shia sect of Islam was founded by Jews," or the concepts "[t]hat Christians and Jews are the enemy of Islam" or that "Islam is under attack and threatened by Christians, Jews and Western culture." FAC ¶¶ 75-76; *see Watson*, 159 F.4th at 1245. Plaintiffs allege that those "ideas" were "promoted" by a "February 2018" issue of a magazine called "The Muslim Soldier." FAC ¶¶ 74-75; *see* ECF No. 39-24 (copy of the issue with Plaintiffs' translations). But they have no evidence that Al-Shamrani even saw the magazine. In any event, a February 2018 magazine (which is all the record contains) cannot show that Al-Shamrani publicly endorsed such views by August 2017, months before it was published.

To be clear, Saudi Arabia rejects the so-called "ideas" set forth in FAC ¶ 75. It also rejects Plaintiffs' mischaracterization of the religious commentary set forth in the 2018 magazine as promoting those ideas.[11] But this Court need not (indeed, should not) resolve that dispute. In the United States, "religious controversies are not the proper subject of civil court inquiry." *Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 713 (1976). The question

---

[11] For example, the article entitled "Approaching God by establishing prayer" does not advocate "[t]he killing of Shia Muslims, and non-Muslims and people who do not pray." *Compare* FAC ¶ 75 *with* ECF No. 39-24, at 10-15 (ECF pages 68-76). It instead discusses the great importance of prayer, gives scriptural and historical examples in which enemies' and criminals' lives were spared because they prayed, and states that it is not legitimate to fight other Muslims who observe established prayers. *See* ECF No. 39-24, at 11-12, 14 (ECF pages 69-70, 73).

before this Court is whether evidence shows that Al-Shamrani's public statements made him a clear and present danger when he was sent to the United States in August 2017.  A mere assertion that he repeated views allegedly published in a later magazine cannot meet that burden.

    5.    Plaintiffs have no evidence to support their allegation that Al-Shamrani's "social media posts echoed the teachings of [Anwar] al-Awlaki," a "prominent English-language propagandist for al-Qaeda."  FAC ¶ 94.  They attribute this view to the "FBI," citing a February 2020 *New York Times* article for support.  *Id.* ¶ 94 & n.11.  A newspaper article is not evidence.  *See*, *e.g.*, *Dallas Cnty. v. Commercial Union Assur. Co.*, 286 F.2d 388, 391-92 (5th Cir. 1961) ("Of course, a newspaper article is hearsay, and in almost all circumstances is inadmissible.").  Further, the newspaper article, taken at face value, says nothing about Al-Shamrani's social-media statements by August 2017.[12]  As set forth above, comparing the FBI's January and May 2020 statements instead shows that evidence of Al-Shamrani's early radicalization was not publicly available.

---

    [12] *See* Declan Walsh, *Al Qaeda Claims It Directed Florida Naval Base Shooting*, N.Y. Times (Feb. 2, 2020) (referring to FBI statement about Al-Shamrani's "social media comments" without discussing the date of those comments), *available at* https://www.nytimes.com/2020/02/02/world/middleeast/al-qaeda-claims-it-directed-florida-naval-base-shooting.html.

**B.     There Is No Evidence That Saudi Arabia Knew of Al-Shamrani's Extremist or Violent Views by August 2017**

The Eleventh Circuit also ruled that Plaintiffs have pleaded "'knowledge or awareness of the imminent danger on the part of' Saudi Arabia." *Watson*, 159 F.4th at 1258.  It accepted as true Plaintiffs' allegations that "'Al-Shamrani underwent extensive vetting when he joined the RSAF' and 'Saudi Arabia knew of Al-Shamrani's radicalization and anti-American sentiments'" at that time. *Id.* at 1257-58.  Again, this Court should now determine that those allegations are unsupported by record evidence.

1.     Not only do Plaintiffs have no evidence that Al-Shamrani's social media contained extremist or violent content by August 2017, but they also have no evidence that Saudi Arabia had reviewed those accounts by that time.  The only record evidence on vetting is Chapter 6 of the Navy Report. *See* Navy Report at 133-50.  That Chapter quotes "[t]he FY17 screening policy for the Kingdom of Saudi Arabia," under which "[t]raining advisors coordinate[d] with host nation for security clearance and medical clearance checks and internal character vetting" and that "U.S. Military Training Mission . . . training officers w[ould] not publish and issue [an Invitational Travel Order] to students until all requirements [we]re met, such as security clearance, human rights vetting, and medical clearance." *Id.* at 135.  Nothing in the Navy Report indicates specific steps that Saudi Arabia took as part of its "security clearance" or "internal character vetting."  In particular,

- 28 -

the Report does not state that, as of 2017, Saudi Arabia's vetting involved (or was required to involve) social-media review.

**2.** Plaintiffs have no evidence to support their allegation that "Saudi Arabia represented that it conducted the requisite security, medical, and internal character vetting of Al-Shamrani, and completed that process on May 15, 2017." FAC ¶ 64; *see Watson*, 159 F.4th at 1246. The Navy Report states that "2ⁿᵈ Lt Al-Shamrani completed human rights screening on 27 April 2017" and "completed host nation medical screening" on "15 May 2017." Navy Report at 47. But the Report does not give the date of security or character vetting.[13] As the Eleventh Circuit observed later in its opinion, if Saudi Arabia "<u>failed</u> to actually pick up [Al-Shamrani's] repeated expression of extremist views," that "omission" cannot support jurisdiction under 28 U.S.C. § 1605B(d). *Watson*, 159 F.4th at 1263.

**3.** Plaintiffs have no evidence to support their allegation that, "[a]t all times, Saudi Arabia was monitoring Al-Shamrani and was aware of his extremist ties." FAC ¶ 114. Their allegations on this subject focus on criticisms of Saudi Arabia for allegedly intruding on individual privacy and free expression. *See id.*

---

[13] In their original opposition, Plaintiffs incorrectly cited the Security Assistance Management Manual to support their contention that Saudi Arabia "certified that Al-Shamrani was not a security threat." ECF No. 39, at 40 & n.29. The cited provision refers to a certification process for individuals who are receiving "classified instruction." ECF No. 39-9, ¶ C10.3.4. There is no evidence that Al-Shamrani was so certified.

- 29 -

¶¶ 107-125.  Most are supported solely by citations to hearsay newspaper articles or website pages.  *See id.* nn.18-28.

Plaintiffs' lone attempt to introduce evidence on social-media surveillance falls short.  That attempt is a 2020 State Department Human Rights Report that criticizes Saudi Arabia for a "ban[ ]" on "[e]ncrypted communications," allegedly attempting "to identify and detain anonymous or pseudonymous users," and, according to "[m]edia outlets," "access[ing] . . . dissidents' Twitter and social media accounts."  ECF No. 39-23, at 21-22.  But this Court may take notice that the earlier 2017 version of the State Department's report (which covers the now-relevant time period) includes no similar language.[14]

The "Abu Fares" example is also worth mention.  Plaintiffs pleaded it as a "demonstrat[ion] [of] Saudi authorities[']" alleged "ability to de-mask Saudi soldiers operating anonymously online."  FAC ¶¶ 115-116; *see Watson*, 159 F.4th at 1257.  But according to Plaintiffs' own cited source, the former RASF officer in that case successfully remained anonymous until he voluntarily resigned and made his own identity public.  Even then he was not arrested.  He left Saudi Arabia

---

[14] *See* U.S. Dep't of State, *Saudi Arabia 2017 Human Rights Report*, https://www.state.gov/reports/2017-country-reports-on-human-rights-practices/saudi-arabia/.

voluntarily, a year later.[15]  Accordingly, even if it were admissible evidence (which it is not), Plaintiffs' hearsay anecdote still would not support their case.

Indeed, even evidence that Saudi Arabia has sometimes identified anonymous social-media users would not help Plaintiffs.  Gross negligence requires more than evidence that Saudi Arabia theoretically could have known the clear and present danger that Al-Shamrani posed, or even that Saudi Arabia reasonably should have known that danger (as with simple negligence).  Gross negligence requires a showing that Saudi Arabia had "knowledge or awareness," *Electric Boat*, 343 So. 3d at 1220, of the danger.  A reasonable factfinder could not infer knowledge from anything Plaintiffs have produced.

4.    The FBI's statements also show that Saudi Arabia lacked knowledge of the danger that Al-Shamrani posed.  In his January 2020 statement, Attorney General Barr credited Saudi Arabia with "complete and total support for [the FBI's] counter-terrorism investigation" that was "critical to helping the FBI determine whether anyone assisted the shooter in the attack."  January 2020 Statement at 2.  But the FBI did not learn that Al-Shamrani "had been radicalized

---

[15] *See* Rori Donaghy, *The Saudi air force officer who became a human rights activist*, Middle East Eye (Mar. 6, 2015) (stating that the officers who questioned the individual in 2008 "believed his denials," his identity remained "unknown" until he revealed his real name on Twitter in 2012, and he left Saudi Arabia voluntarily in 2013), https://www.middleeasteye.net/features/saudi-air-force-officer-who-became-human-rights-activist.

by 2015" until it had access to his unlocked phones, indicating that the FBI could not determine that Al-Shamrani had been radicalized from public sources. May 2020 Statement at 1; *see supra* pp. 24-25. If Saudi Arabia had evidence of Al-Shamrani's early radicalization in its possession, the FBI would have had that information in January 2020 as part of Saudi Arabia's full cooperation.

### C.    There Is No Evidence That Saudi Arabia Consciously Disregarded Al-Shamrani's Extremist or Violent Views in Sending Him to Pensacola

The Eleventh Circuit ruled that Plaintiffs have pleaded "acts 'that evinced a conscious disregard of the consequences'" ultimately caused by Al-Shamrani's extremist and violent views. *Watson*, 159 F.4th at 1258 (cleaned up). There is no dispute that Saudi Arabia took some of the acts set forth in the court's opinion, such as sending Al-Shamrani to the United States. But Plaintiffs have no evidence to show that "any official, employee, or agent of" Saudi Arabia, "while acting within the scope of his or her office, employment, or agency," 28 U.S.C. § 1605B(b)(2), acted with the mental state of conscious disregard.

In rejecting Plaintiffs' allegations that Al-Shamrani's intentional torts were within the scope of his employment, the Eleventh Circuit held that Plaintiffs' own allegations removed "any doubt about whether Al-Shamrani's actions undermined the interests of the Saudi government." *Watson*, 159 F.4th at 1269. It cited Saudi Arabia's "interests . . . in buying and using complex American military equipment"

and King Salman's immediate, personal expression of "'devastat[ion]'" and offer of "'condolences.'" *Id*. The court added that it "fails as a matter of logic that Saudi Arabia's interests would be served through a shooting rampage" and "makes no sense to say" that "Al-Shamrani's employment" included an attempt to "destroy" Saudi Arabia's "relationship" with the United States. *Id*. at 1269-70.

To be sure, the Eleventh Circuit did not hold that the disconnect between Al-Shamrani's military service and his crimes precluded gross negligence as a matter of law. But now that this Court is considering what inferences to draw from the evidence, it should ask why Al-Shamrani's superiors in the RSAF – a Saudi agency closely concerned with "buying and using complex American military equipment," *id*. at 1269 – would have sent him to the United States in conscious disregard of a known risk that he would attack his American hosts. Nothing in the record offers a persuasive answer to that question.

In sum, the Eleventh Circuit's decision was based on its acceptance of Plaintiffs' pleaded theory that Al-Shamrani "repeatedly urged death to America and to its military apparatus," *id*. at 1258, not only in 2019, but also before Saudi Arabia sent him to the United States in 2017. Because the court did not consider Saudi Arabia's factual challenge, it took those allegations as true. But comparing those allegations to the evidence shows that they lack record support. Accordingly, Plaintiffs cannot meet their burden of production. Further, even if

Saudi Arabia had the burden to come forward with evidence contradicting Plaintiffs' allegations (which it does not), it has met that burden by submitting the Navy Report and the FBI's public statements, which are admissible evidence.

## RESERVATION OF APPELLATE RIGHTS

Current Eleventh Circuit law, which binds this Court, puts the ultimate burden of persuasion on Saudi Arabia if Plaintiffs meet their burden of production. *See supra* p. 15. Saudi Arabia reserves the right to contest that issue later in the case. *See Simon*, 604 U.S. at 126 n.1 (finding it "unnecessary to resolve" which side "bears the burden of persuasion" on FSIA immunity); U.S. Amicus Br. 31 n.*, *Republic of Hungary v. Simon*, 604 U.S. 115 (2025) (No. 23-867 (U.S. Sept. 3, 2024)) (arguing that not only the "burden of production," but also the "ultimate burden of proof," should "rest with the plaintiff").

## CONCLUSION

This Court should grant Saudi Arabia's motion to dismiss.

Dated:  January 16, 2026              Respectfully submitted,

*/s/ Benjamin H. Brodsky*
Benjamin H. Brodsky
Florida Bar No. 73748
Brodsky Fotiu-Wojtowicz, PLLC
200 SE 1st Street, Suite 400
Miami, Florida 33131
Tel: (305) 503-5054
bbrodsky@bfwlegal.com
docketing@bfwlegal.com

Michael K. Kellogg (*pro hac vice*)
Gregory G. Rapawy (*pro hac vice*)
Andrew C. Shen (*pro hac vice*)
Kellogg, Hansen, Todd,
   Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
mkellogg@kellogghansen.com
grapawy@kellogghansen.com
ashen@kellogghansen.com

*Counsel for the Kingdom of Saudi Arabia*

## LOCAL RULE 7.1(F) CERTIFICATION

I, Benjamin H. Brodsky, hereby certify that, pursuant to Local Rule 7.1(F) and this Court's Order dated December 11, 2025, the foregoing Supplemental Brief of the Kingdom of Saudi Arabia on Remand from the Eleventh Circuit contains 7,999 words.

## LOCAL RULE 5.1(F) CERTIFICATION

I, Benjamin H. Brodsky, hereby certify that on January 16, 2026, I caused a true and correct copy of the foregoing Supplemental Brief of the Kingdom of Saudi Arabia on Remand to be served via the CM/ECF system to all parties or counsel of record that have entered appearances in this action.

Respectfully submitted,

*/s/ Benjamin H. Brodsky*
Benjamin H. Brodsky
Florida Bar No. 73748
Brodsky Fotiu-Wojtowicz, PLLC
200 SE 1st Street, Suite 400
Miami, Florida 33131
Tel: (305) 503-5054
bbrodsky@bfwlegal.com
docketing@bfwlegal.com