# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA

BENJAMIN WATSON, JR.;
SHEILA WILEMON WATSON;
SHANE WALTERS; AMANDA
WALTERS; DUSTIN WALTERS;
MASON WALTERS; SAMEH
HAITHAM; EVELYN BRADY;
SHADIN HAITHAM; JOHN
ROBERT BRADY; IRVIN
LAWRENCE JR.; GEORGE
JOHNSON; BREANNA THOMAS;
RYAN BLACKWELL; CARLY
BLACKWELL; KRISTY LEHMER;
JESSICA PICKETT; CURTIS
PICKETT; CHARLES HOGUE;
MATTHEW TINCH; JESSICA
TINCH; JONATHAN GLASS; JOY
GLASS; MATTHEW HOUSAM;
MICHAEL HOYLAND; THOMAS
C. BORTNER; GRANT LOPEZ;
HEATHER LOPEZ; MATTHEW
KEEBLER; AND KRYSTENA
KEEBLER,

       *Plaintiffs*,

v.

KINGDOM OF SAUDI ARABIA,

       *Defendant*

Case No.: 3:21-cv-329

## PLAINTIFFS' SUPPLEMENTAL BRIEF
## ON REMAND FROM THE ELEVENTH CIRCUIT

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................ii

INTRODUCTION ..........................................................................1

I.   PLAINTIFFS HAVE MET THEIR BURDEN FOR JURISDICTIONAL
     DISCOVERY. ......................................................................3

II.  JURISDICTIONAL DISCOVERY ON KSA'S FACTUAL CHALLENGE
     IS ENTIRELY CONSISTENT WITH THE ELEVENTH CIRCUIT'S
     RULING AND MANDATE. ........................................................13

III. TARGETED JURISDICTIONAL DISCOVERY WOULD ENABLE THIS
     COURT TO EFFECTIVELY RESOLVE KSA'S FACTUAL CHALLENGES
     TO ITS SUBJECT-MATTER JURISDICTION. .....................................17

     A.   Most, if Not All, of the Facts Relevant to Plaintiffs'
          Gross Negligence Claim Are Not in Dispute. ......................19

     B.   The "Evidence" Proffered by KSA Does Not Trigger
          a Factual Challenge Under 12(b)(1). ................................20

     C.   The "Evidence" Upon Which KSA Relies Further
          Demonstrates the Need for Jurisdictional Discovery. ..........22

     D.   The "Evidence" KSA Proffers Only *Supports* Plaintiffs'
          Gross Negligence Claim. .............................................24

     E.   The Jurisdictional Discovery Plaintiffs Seek Is
          Narrowly Tailored to the Elements of Their
          Gross Negligence Claim. .............................................28

CONCLUSION ...........................................................................40

LOCAL RULE 7.1(F) CERTIFICATION ..............................................41

LOCAL RULE 5.1(F) CERTIFICATION ..............................................41

ii

## T̲ABLE OF A̲UTHORITIES

### C̲ases̲

*Bolivarian Republic of Venezuela* v.
  *Helmerich & Payne Int'l Drilling Co.*,
  581 U.S. 170 (2017) .................................................................. 5

*Butler* v. *Sukhoi Co.*,
  579 F.3d 1307 (11th Cir. 2009) ....................................... 3, 5, 7

*Devengoechea* v. *Bolivarian Republic of Venezuela*,
  889 F.3d 1213 (11th Cir. 2018) ............................................ 3, 5

*EM Ltd.* v. *Republic of Argentina*,
  473 F.3d 463 (2d Cir. 2007) ..................................................... 8

*First City, Texas–Houston, N.A.* v. *Rafidain Bank*,
  150 F.3d 172 (2d Cir. 1998) ..................................................... 8

*Hansen* v. *PT Bank Negara Indonesia (Persero), TBK*,
  601 F.3d 1059 (10th Cir. 2010) ................................................ 6

*In re Terrorist Attacks on September 11, 2001*,
  538 F.3d 71 (2d Cir. 2008) ....................................................... 3

*Jerome B. Grubart, Inc.* v. *Great Lakes Dredge & Dock Co.*,
  513 U.S. 527 (1995) .................................................................. 8

*Kilburn* v. *Socialist People's Libyan Arab Jamahiriya*,
  376 F.3d 1123 (D.C. Cir. 2004) ............................................ 6, 9

*Lawrence* v. *Dunbar*,
  919 F.2d 1525 (11th Cir. 1990) (per curiam) ................... 11, 17

*Licea* v. *Curacao Drydock Co.*,
  870 F. Supp. 2d 1360 (S.D. Fla. 2012) .............................. 7, 10

*Moran* v. *Kingdom of Saudi Arabia*,
  27 F.3d 169 (5th Cir. 1994) .................................................... 17

*Morrison* v. *Amway Corp.*,
  323 F.3d 920 (11th Cir. 2003) ................................................ 11

*O'Bryan* v. *Holy See*,
  556 F.3d 361 (6th Cir. 2009) ................................................... 3

iii

## TABLE OF AUTHORITIES (CONTINUED)

*Odyssey Marine Exploration, Inc.* v.
  *The Unidentified Shipwrecked Vessel,*
  657 F.3d 1159 (11th Cir. 2011)................................................................17

*Pablo Star Ltd.* v. *Welsh Gov't,*
  961 F.3d 555 (2d Cir. 2020) ...................................................................3

*Paterson* v. *Weinberger,*
  644 F.2d 521 (5th Cir. 1981)..................................................................20

*Phoenix Consulting, Inc.* v. *Republic of Angola,*
  216 F.3d 36 (D.C. Cir. 2000)....................................................6, 7, 8, 21

*Prakash* v. *American Univ.,*
  727 F.2d 1174 (D.C. Cir. 1984) ..............................................................6

*Robinson* v. *Gov't of Malaysia,*
  269 F.3d 133 (2d Cir. 2001) ...............................................................3, 7

*Simpson* v. *Socialist People's Libyan Arab Jamahiriya,*
  470 F.3d 356 (D.C. Cir. 2006)...............................................................7

*Sinaltrainal* v. *Coca-Cola Co.,*
  256 F. Supp. 2d 1345 (S.D. Fla. 2003)..................................................20

*Tatneft* v. *Ukraine,*
  301 F. Supp. 3d 175 (D.D.C. 2018)........................................................12

*Terenkian* v. *Republic of Iraq,*
  694 F.3d 1122 (9th Cir. 2007)................................................................21

*Box* v. *Dallas Mexican Consulate General,*
  487 F. App'x 880 (5th Cir. Aug. 21, 2012)..............................................9

*Watson* v. *Kingdom of Saudi Arabia,*
  159 F.4th 1234 (11th Cir. 2025) ......................................1, 4, 15, 16, 29

## Statutes

Justice Against Sponsors of Terrorism Act (JASTA),
  28 U.S.C. § 1605B................................................2, 4, 10, 29, 32, 37, 39

iv

## TABLE OF AUTHORITIES (CONTINUED)

**Other Authorities**

Brief for Appellee,
*Watson*, 159 F.4th 1234 (No. 24-11310), 2024 WL 4372449 ...............15

Fed. Jud. Ctr.,
*The Foreign Sovereign Immunities Act: A Guide For Judges* (2013) ..21

Fed. R. Civ. P. 12(b)(1) ................................................... 17, 18, 20, 21, 35

Plaintiffs-Appellants' Opening Brief,
*Watson*, 159 F.4th 1234 (No. 24-11310), 2024 WL 3640873...............15

Missy Ryan,
*Gunman in Florida base shooting may have embraced radical ideology years before arriving in the U.S., Saudi report says*,
WASH. POST, Dec. 11, 2019....................................................................27

John Vandiver,
*Saudi report finds radical themes in shooter's past*,
STARS AND STRIPES, Dec. 12, 2019 .......................................................27

\* \* \*

1

## INTRODUCTION

In *Watson* v. *Kingdom of Saudi Arabia*, 159 F.4th 1234 (11th Cir. 2025), the Eleventh Circuit held that Plaintiffs have plausibly alleged "that the Kingdom [of Saudi Arabia ("KSA")] had been grossly negligent in vetting, hiring, and sending Airman Al-Shamrani to the United States," where he subsequently perpetrated the December 6, 2019 terrorist attack at Naval Air Station (NAS) Pensacola. *Id*. at 1244. The Court of Appeals thus reversed this Court's dismissal of those claims, holding that, for purposes of the Foreign Sovereign Immunities Act ("FSIA"), Plaintiffs' claims "are facially sufficient because they are based on a series of acts of commission (rather than acts of omission) taken by [KSA] in hiring and vetting Al-Shamrani that rose to the level of gross negligence under Florida law." *Id*.

On remand, KSA has renewed its motion to dismiss these claims on the basis that, even if Plaintiffs' allegations are "facially sufficient," they are "factually" deficient. Specifically, KSA claims that Plaintiffs bear the burden of producing evidence to support the allegations the Eleventh Circuit sustained—and that "no record evidence" supports Plaintiffs' allegations. KSA Remand Br. 1–2.

2

But KSA's brief fundamentally confuses both the procedure for resolving factual challenges under the FSIA and the implications of the Eleventh Circuit's facial endorsement of Plaintiffs' claims *for* that procedure—which together establish the Plaintiffs' entitlement to at least some jurisdictional discovery. Rather than explain why the Eleventh Circuit's remand does not necessarily require jurisdictional discovery, or specifically articulate the basis for its factual challenge, KSA yet again falls back on a claim of forfeiture on Plaintiffs' part—albeit only by once more failing to accurately confront the sequence of how this case has been litigated.

Because the Eleventh Circuit has sustained the plausibility of Plaintiffs' claims relating to KSA's vetting and hiring of Al-Shamrani, the only way to resolve a factual dispute at this juncture is through jurisdictional discovery—not by dismissing Plaintiffs' claims before Plaintiffs have had *any* opportunity to discover evidence. To dismiss Plaintiffs' claims without such an opportunity would be to turn the Eleventh Circuit's remand into an empty gesture—and eviscerate the exception to foreign sovereign immunity Congress enacted in the Justice Against Sponsors of Terrorism Act (JASTA), 28 U.S.C. § 1605B.

3

## I.    PLAINTIFFS HAVE MET THEIR BURDEN FOR JURISDICTIONAL DISCOVERY.

"[T]o establish subject matter jurisdiction under the FSIA, the plaintiff must overcome the presumption that the foreign state is immune from suit by producing evidence that the conduct which forms the basis of [the] complaint falls within one of the statutorily defined exceptions." *Butler* v. *Sukhoi Co.*, 579 F.3d 1307, 1312–13 (11th Cir. 2009) (citations and internal quotations omitted). But as the *Butler* court went on to explain, "Whether the plaintiff has *satisfied* his burden of production in this regard is determined by looking at 'the allegations in the complaint [and] the undisputed facts, if any, placed before the court by the parties.'" *Id.* at 1313 (quoting *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 80 (2d Cir. 2008) (emphasis added; alteration in original)); *see also O'Bryan* v. *Holy See*, 556 F.3d 361, 376–77 (6th Cir. 2009); *Pablo Star Ltd.* v. *Welsh Gov't,* 961 F.3d 555, 559–60 (2d Cir. 2020); *Robinson* v. *Gov't of Malaysia*, 269 F.3d 133 (2d Cir. 2001). Put another way, Plaintiffs' burden under the FSIA, as *Butler* described it, is to "present[] a *prima facie* case that jurisdiction exist[s]." 579 F.3d at 1313; *see also Devengoechea* v. *Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1221 n.9 (11th Cir. 2018).

4

The critical point for purposes of this remand is that the Eleventh Circuit's ruling necessarily establishes, as law of the case, that Plaintiffs have *carried* that burden with respect to their (grossly) negligent vetting and hiring claims. KSA specifically argued in the Eleventh Circuit that Plaintiffs had failed to adequately plead those claims, and the Court of Appeals disagreed. *See Watson*, 159 F.4th at 1254 ("The Plaintiffs have sufficiently alleged that KSA was negligent under Florida law in vetting, hiring, and dispatching Al-Shamrani to NAS Pensacola."); *id.* at 1257 ("The Plaintiffs also have sufficiently alleged that under Florida common law, the actions of the Kingdom in vetting and hiring Al-Shamrani rose to the level of gross negligence."); *see also id.* at 1258–59 ("[F]or jurisdictional purposes, the Amended Complaint sufficiently alleges that Saudi Arabia's grossly negligent vetting and hiring caused grievous injuries and multiple deaths."); *id.* at 1260–61 ("The district court concluded that the Plaintiffs failed to satisfy the JASTA exception to foreign sovereign immunity because their claims relied on acts of omission by the Saudi government, not acts of commission. We disagree.").

5

As the Eleventh Circuit explained in *Butler*, "Once the plaintiff demonstrates that one of the statutory exceptions to FSIA immunity applies, the burden then shifts to the defendant to prove, by a preponderance of the evidence, that the plaintiff's claims do *not* fall within that exception." 579 F.3d at 1313 (emphasis added). Thus, and contrary to KSA's brief, the question before this Court on remand is whether KSA can meet *its* burden—not whether the Plaintiffs have met theirs. *See, e.g.*, *Devengoechea*, 889 F.3d at 1221 n.9.[1]

In an ordinary case, that litigation would take place at the summary judgment phase of proceedings. Because the factual dispute here is intertwined with this Court's jurisdiction, and because of the specific policy reflected in the FSIA, *see Bolivarian Republic of Venezuela* v. *Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 174 (2017), it should take place at the motion-to-dismiss stage—so long as

---

1. *Devengoechea* reaffirmed this precise distinction by explaining that, "to the extent that a plaintiff's invocation of a FSIA exception rests exclusively on a legal argument (as opposed to a factual one), to establish jurisdiction under the FSIA, the plaintiff bears the ultimate burden of proving that the FSIA exception he or she seeks to invoke applies as a matter of law." 889 F.3d at 1221 n.9. In other words, which party bears the burden *depends upon* whether the jurisdictional challenge is facial (as in *Devengoechea* and in the Eleventh Circuit in this case), or factual (as is what is now before this Court).

6

the foreign sovereign defendant raises a proper factual challenge. *See, e.g.*, *Kilburn* v. *Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1132 (D.C. Cir. 2004). The critical point, though, is that resolution of a factual challenge under the FSIA, especially when a facial challenge has already been rejected, requires allowing *both* sides an opportunity to adduce evidence. Both the Second and D.C. Circuits, which are the hubs for most FSIA litigation, have addressed this point in detail.

In *Phoenix Consulting, Inc.* v. *Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000), for instance, the court of appeals emphasized that, although the district court retains "considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction," it *must* give the plaintiff "ample opportunity to *secure and present* evidence relevant to the existence of jurisdiction." *Id.* at 40 (quoting *Prakash* v. *American Univ.*, 727 F.2d 1174, 1179–80 (D.C. Cir. 1984) (emphasis added)); *see also Hansen* v. *PT Bank Negara Indonesia (Persero), TBK*, 601 F.3d 1059, 1063–64 (10th Cir. 2010) ("When . . . there is a factual question regarding a foreign sovereign's entitlement to immunity, and thus a factual question regarding a district court's

7

jurisdiction, the district court 'must give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'" (quoting *Phoenix Consulting*, 216 F.3d at 40)). Likewise, in *Robinson*, the Second Circuit emphasized that, once an FSIA plaintiff carries its burden of production, the district court must "resolve disputed issues of fact, with the defendant foreign sovereign shouldering the burden of persuasion." 269 F.3d at 141.

And the only way to provide Plaintiffs with an "opportunity to secure and present evidence," and to "*resolve* disputed issues of fact" is through jurisdictional discovery. *See Licea* v. *Curacao Drydock Co.*, 870 F. Supp. 2d 1360, 1366 (S.D. Fla. 2012) ("Once a plaintiff pleads the *prima facie* elements of an exception [to the FSIA], then those allegations are entitled to verification through limited jurisdictional discovery." (citing *Butler*, 579 F.3d at 1314)); *see also Simpson* v. *Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 362 (D.C. Cir. 2006) ("The plaintiffs needed to know why Libya acted as it did, but could not compel Libya to explain.").

To be sure, "in the FSIA context, 'discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an

8

immunity determination.'" *EM Ltd.* v. *Republic of Argentina*, 473 F.3d

463, 486 (2d Cir. 2007) (quoting *First City, Texas–Houston, N.A.* v.

*Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998)). But this is the *exact*

scenario in which courts have held that jurisdictional discovery is both

necessary and appropriate—when the Plaintiffs have carried their

burden of production by establishing the facial validity of their claims,

and when a foreign sovereign defendant has introduced evidence of its

own purporting to rebut Plaintiffs' (thus far untested) allegations. *Cf.*

*Jerome B. Grubart, Inc.* v. *Great Lakes Dredge & Dock Co.*, 513 U.S.

527, 537–38 (1995) ("Normal practice permits a party to establish

jurisdiction at the outset of a case by means of a nonfrivolous assertion

of jurisdictional elements, and any litigation of a contested subject-

matter jurisdictional fact issue occurs in comparatively summary

procedure before a judge alone . . . ." (citations omitted)).

KSA is certainly entitled to proffer contrary evidence, as its brief

on remand in at least some places purports to provide. But Plaintiffs

are entitled, in turn, to an "ample opportunity to secure and present

evidence relevant to the existence of jurisdiction." *Phoenix Consulting*,

216 F.3d at 40. In *Kilburn*, for instance, the D.C. Circuit affirmed the

9

district court's denial of a foreign sovereign defendant's motion to dismiss largely *because* "the only discovery to date has been that which the plaintiff has voluntarily accorded the defendants, and . . . the plaintiff has not yet had an opportunity to conduct any." 376 F.3d at 1132.

In its brief on remand, KSA halfheartedly claims that Plaintiffs have already *had* an opportunity to present evidence—by pointing to the handful of exhibits that Plaintiffs attached to their response to KSA's motion to dismiss. *See* KSA Remand Br. 1. But that's hardly the "ample opportunity" other courts of appeals have required—not just because of the limited posture in (and purposes for) which those exhibits were presented, but because none of those exhibits included evidence Plaintiffs were able to secure *from KSA. See, e.g.*, *Box* v. *Dallas Mexican Consulate General*, 487 F. App'x 880, 885 (5th Cir. Aug. 21, 2012) (unpublished) ("[T]he district court abused its discretion here because . . . the relevant documents reside exclusively with the defendant, and Box never received an opportunity for even narrowly tailored discovery."); *id.* (suggesting it would be an "abuse of discretion

10

where the district court did not provide an opportunity for limited

discovery in the first instance").[2]

Otherwise, "accept[ing] the view that this limited grant of

jurisdictional discovery infringes on sovereign immunity would render

exceptions to the FSIA meaningless by making it impossible (absent an

admission from the sovereign defendant) for a plaintiff to present a

court with an evidentiary basis for an exception." *Licea*, 870 F. Supp. 2d

at 1368. Indeed, accepting KSA's factual challenge (to the limited extent

it is even *making* one) without providing Plaintiffs with any opportunity

to secure evidence of their own would not just render the Eleventh

Circuit's remand meaningless; it would effectively gut JASTA's express

exception to foreign sovereign immunity.

Here, the jurisdictional issues teed up by the Eleventh Circuit's

remand are necessarily intertwined with the merits. Knowledge,

---

2. While seeking to deny Plaintiffs any further opportunity to adduce
evidence, KSA's brief on remand encourages this Court to uncritically
rely upon the Navy investigative report, *see* KSA Remand Br. at 2—a
report that is wholly unreliable on its face, and the conclusions of which
were directly contradicted when the FBI subsequently gained access to
Al-Shamrani's cell phone and social media accounts. *See, e.g.*, ECF 47-3,
at 2–3 (DOJ press release). Again, the point is not that we should
litigate these factual disputes in these briefs; it is that these factual
disputes need to *be* litigated.

11

foreseeability, causation, and the scope of KSA's vetting and certification decisions are all jurisdictional facts under § 1605B—and they are also elements of Plaintiffs' substantive claims. When jurisdictional and merits facts overlap, the right to jurisdictional discovery is at its strongest. *See, e.g.*, *Lawrence* v. *Dunbar*, 919 F.2d 1525, 1530–31 (11th Cir. 1990) (per curiam); *see also Morrison* v. *Amway Corp.*, 323 F.3d 920, 926 (11th Cir. 2003).

Whatever disputed jurisdictional facts exist at this stage of the proceedings cannot be resolved on the current record. The central evidence bearing on KSA's vetting of Al-Shamrani—including, but not limited to, screening files; internal communications; nomination records; certification procedures; extensive background checks (including emails, texts, and social media); and any intelligence available to KSA during the relevant time periods—remains exclusively in Saudi Arabia's possession.

Likewise, the underlying social media and cell phone data for Al-Shamrani remains in the possession of U.S. and Saudi authorities—and has been disseminated only through high-level summaries rather than through direct access to the materials themselves. Indeed, KSA does not

12

deny that Al-Shamrani *had* become radicalized and sympathetic to Al Qaeda in the Arabian Peninsula ("AQAP") by 2015 while living in Saudi Arabia and working as an officer in the Royal Saudi Air Force ("RSAF"). That was two years *before* KSA approved and certified him to enroll in the pilot training programs in the United States. KSA just denies that it knew or could have known about his radicalization.

Without targeted discovery into (and of) these sources, among others, there is no basis pursuant to which this Court can resolve the conflict between Plaintiffs' well-pleaded allegations and KSA's factual assertions to the contrary.

Thus, the proper next step for this Court is to conduct limited jurisdictional discovery—and, in Part III, *infra*, Plaintiffs provide the "detailed showing of what discovery it wishes to conduct or what results it thinks such discovery would produce" that other courts have required. *Tatneft* v. *Ukraine*, 301 F. Supp. 3d 175, 194 (D.D.C. 2018) (internal quotation marks omitted).

13

## II.   JURISDICTIONAL DISCOVERY ON KSA'S FACTUAL CHALLENGE IS ENTIRELY CONSISTENT WITH THE ELEVENTH CIRCUIT'S RULING AND MANDATE.

Notwithstanding the obvious next step mandated by decisions from the Eleventh Circuit and other courts of appeals, KSA's only discussion of jurisdictional discovery in its brief on remand is its claim that Plaintiffs have somehow abandoned their request for it, and that the Eleventh Circuit's ruling thus deprives this Court of the ability to pursue it. *See, e.g.*, KSA Remand Br. 2 ("Plaintiffs . . . contended that jurisdictional discovery was 'unnecessary' for most of their claims, including their gross negligence claims."); *id.* at 19 (claiming that the Eleventh Circuit's ruling "forecloses any further dispute about jurisdictional discovery").

As in its briefing in the Eleventh Circuit, KSA is playing fast and loose with the history of this case in an effort to suggest certain issues were resolved or abandoned—when neither is true. As this Court will recall, the magistrate judge's Report and Recommendation (R&R) in this case had recommended granting KSA's *factual* challenge to Plaintiffs' claims—without allowing for the jurisdictional discovery the Plaintiffs had sought. *See* ECF 54. When Plaintiffs filed their objections

14

to the R&R under Fed. R. Civ. P. 72, the magistrate judge's refusal to allow for jurisdictional discovery on the *factual* disputes to this Court's jurisdiction was a centerpiece of Plaintiffs' arguments for relief. *See, e.g.*, ECF 57, at 13–16.

But instead of adopting Judge Bolitho's R&R, this Court, as was its prerogative, granted KSA's motion to dismiss entirely on *facial* grounds—specifically declining to reach any factual disputes regarding Plaintiffs' allegations. *See* ECF 72, at 13 ("[E]ven accepting the nonconclusory allegations in the Amended Complaint as true, the jurisdictional allegations are facially insufficient to support the asserted statutory exceptions and overcome presumptive immunity as a matter of law.").

Thus, for purposes of appeal to the Eleventh Circuit, the jurisdictional issue was *only* the facial one—whether Plaintiffs' well-pleaded allegations, *if true*, would satisfy any of the exceptions to foreign sovereign immunity.[3] For those purposes, Plaintiffs agreed that

---

3. Indeed, KSA attempted a similar conflation in the Court of Appeals—arguing that Plaintiffs had forfeited arguments on appeal by not raising them in their Rule 72 objections, without acknowledging that the Rule 72 objections had been to Judge Bolitho's resolution of KSA's *factual* challenge, whereas Plaintiffs' appeal entirely concerned

15

"jurisdictional discovery is necessary" only for their breach-of-contract claim—because, assuming the allegations in Plaintiffs' complaint were true, that was the only evidence on which KSA's *facial* challenge to this Court's jurisdiction could nevertheless turn. *See* Plaintiffs-Appellants' Opening Brief at 62–63, *Watson*, 159 F.4th 1234 (No. 24-11310), 2024 WL 3640873. Plaintiffs never conceded that jurisdictional discovery would be unnecessary to resolve KSA's *factual* challenges to subject-matter jurisdiction; they specifically argued the opposite in this Court, and, because this Court resolved KSA's motion to dismiss on alternative (facial) grounds, that issue was not before the Eleventh Circuit at all.[4]

---

this Court's resolution of KSA's *facial* challenge. *See, e.g.*, Brief for Appellee at 31–36, *Watson*, 159 F.4th 1234 (No. 24-11310), 2024 WL 4372449. The Court of Appeals simply ignored KSA's misbegotten gambit.

4. Plaintiffs sought jurisdictional discovery before this Court—and, in doing so, expressly distinguished between KSA's facial and factual challenges. In opposing KSA's motion to dismiss, Plaintiffs stated: "[t]o the extent this Court finds the challenge to be factual, a discovery plan should be entered by the Court and Plaintiffs should be afforded the opportunity to conduct reasonable discovery." ECF 39, at 22. Plaintiffs then filed a *separate* motion seeking jurisdictional discovery "into the jurisdictional allegations that the Kingdom of Saudi Arabia puts in dispute with its motion to dismiss and its accompanying evidence." ECF 40, at 1.

16

KSA attempts to obfuscate this distinction by only citing to, and not actually quoting from, the Eleventh Circuit's discussion of Plaintiffs' requests for jurisdictional discovery. In fact, all that the *Watson* panel held was that, "[s]ince the Amended Complaint fails to state a *prima facie* breach of contract claim, the district court correctly denied the Plaintiffs' Motion for Jurisdictional Discovery *on Count Nineteen*," *i.e.*, the breach-of-contract claim. 159 F.4th at 1273 (emphasis added). The Eleventh Circuit had nothing to say about jurisdictional discovery on KSA's factual challenges to the claims the Court of Appeals revived (for which Plaintiffs *have* made a *prima facie* case)—for the simple and ineluctable reason that the question was neither briefed in nor argued to the Court of Appeals.

Thus, whatever the scope of the "familiar mandate rule," KSA Remand Br. 2, the Eleventh Circuit's ruling included no mandate denying jurisdictional discovery on KSA's factual challenge to Plaintiffs' vetting and hiring claims—and there is no reason why this Court cannot (or should not) order it here.

17

### III. TARGETED JURISDICTIONAL DISCOVERY WOULD ENABLE THIS COURT TO EFFECTIVELY RESOLVE KSA'S FACTUAL CHALLENGES TO ITS SUBJECT-MATTER JURISDICTION.

Factual sufficiency review cannot occur in the abstract; it requires a developed evidentiary record. *See Lawrence*, 919 F.2d at 1529–31 (remanding because the record was insufficient to resolve disputed jurisdictional facts); *Moran* v. *Kingdom of Saudi Arabia*, 27 F.3d 169, 172–73 (5th Cir. 1994) (upholding dismissal only after concluding that the factual record was adequately developed to support the court's findings).

Under Fed. R. Civ. P. 12(b)(1), "[w]hen a party challenges subject matter jurisdiction, the court is given the authority to resolve factual disputes, along with the discretion to devise a method for making a determination with regard to the jurisdictional issue." *Moran*, 27 F. 3d at 172. Once a defendant mounts a factual challenge, the Court may consider evidence outside the pleadings and must resolve factual disputes bearing on subject-matter jurisdiction. *See id*. at 173; *Odyssey Marine Exploration, Inc.* v. *The Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1169 (11th Cir. 2011). Thus, the threshold question for this Court is whether and to what extent KSA has properly *raised* a factual

18

challenge. Only once a factual challenge has been properly asserted should the Court reach the subsequent question of what jurisdictional discovery is required to resolve the parties' disputes of fact.

At present, the parties' briefing necessarily relies upon secondary summaries, incomplete public reporting, and inferences drawn from high-level government statements rather than the underlying source materials themselves. That is not a proper basis for resolving a factual jurisdictional challenge. Rule 12(b)(1) requires that disputed jurisdictional facts be resolved on the *actual evidence*, and this Court cannot meaningfully do so until the relevant materials are made available through targeted jurisdictional discovery.

To the extent KSA has successfully offered a factual challenge, five narrowly tailored discovery categories are essential to resolving it: (1) KSA's personnel, screening, and vetting files for Al-Shamrani; (2) Al-Shamrani's social media and phone data; (3) select investigative materials underlying the U.S. government conclusions relied upon by KSA; (4) select policies and obligations related to the contract-based training programs under which KSA was operating; and (5) evidence regarding KSA's knowledge, tolerance, or disregard of extremist

19

ideology within its military ranks. The appropriateness of these

categories, specifically, is set forth in section III.E, below.

### A.   Most, if Not All, of the Facts Relevant to Plaintiffs' Gross Negligence Claim Are Not in Dispute.

Certain core facts are not in dispute. Mohammed Al-Shamrani

became active on social media in 2012, and was radicalized and

communicating with AQAP by 2015. The FBI concluded—based upon

the forensic extraction of his cell phones *after* the Navy Report—that he

joined the RSAF "to carry out a special operation," he had been in

contact with AQAP since at least 2015, and he maintained jihadist,

anti-American, and anti-Israeli content on his social media accounts.

*See, e.g.*, ECF 47-2, at 2–3.

It is also undisputed that KSA selected, vetted, and officially

sponsored Al-Shamrani for U.S. military flight training. He entered the

United States on an A-2 visa only after KSA prepared the required

diplomatic submissions and certified his suitability under the mandated

security, character, and background-vetting procedures of the Foreign

Military Sales ("FMS") and Security Cooperation Training ("SCT")

programs.

And it is undisputed that, while training at NAS Pensacola, Al-Shamrani carried out a terrorist attack on December 6, 2019, killing three servicemembers and injuring numerous others, including responding law enforcement and emergency personnel. U.S. investigators further confirmed that at least sixteen other Saudi trainees participating in the U.S.-based flight program possessed jihadist, anti-American, or extremist material on their devices. All were removed from the program and sent back to Saudi Arabia.

## B.  The "Evidence" Proffered by KSA Does Not Trigger a Factual Challenge Under 12(b)(1).

KSA's attempt to reassert a "factual" challenge in its brief on remand falls far short of what the law requires. A factual challenge exists only when the defendant comes forward with evidence in the form of affidavits, testimony, or other (admissible) evidentiary materials that contradict the plaintiff's jurisdictional allegations. *See, e.g.*, *Paterson* v. *Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981) (explaining that it is the defendant's evidentiary submission that converts a motion from facial to factual); *Sinaltrainal* v. *Coca-Cola Co.*, 256 F. Supp. 2d 1345, 1350–51 (S.D. Fla. 2003) ("In a factual challenge, the defendant has the burden to produce evidence to contradict the plaintiff's allegations. If

21

the burden is met, the allegations do not carry a presumption of truthfulness."). This requirement applies with equal force in FSIA cases. *See Terenkian* v. *Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2007) (in a factual FSIA challenge "the defendant may introduce testimony, affidavits, or other evidence to dispute[] the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." (alteration in original; internal quotation marks omitted)); *see also* Fed. Jud. Ctr., *The Foreign Sovereign Immunities Act: A Guide For Judges* 26 (2013).

Here, KSA has submitted no affidavits, no testimony, and no documentary evidence contradicting *any* of Plaintiffs' jurisdictional allegations. Nor has it filed an answer denying a single one of the Amended Complaint's 601 factual paragraphs. Under settled Fed. R. Civ. P. 12(b)(1) principles, Plaintiffs' allegations retain their presumption of truthfulness unless and until the foreign sovereign introduces competent evidence disputing them. *See Terenkian*, 694 F.3d at 1131; *Phoenix Consulting*, 216 F.3d at 40. That is especially true where, as here, the Eleventh Circuit has already endorsed the facial validity of Plaintiffs' claims.

22

### C.  The "Evidence" Upon Which KSA Relies Further Demonstrates the Need for Jurisdictional Discovery.

KSA's factual challenge, as renewed in its brief on remand, relies upon only three documents: (1) the Navy Report; (2) a January 13, 2020 U.S. Department of Justice ("DOJ") press release; and (3) a May 18, 2020 DOJ press release. At bottom, none contradict Plaintiffs' allegations. Each is preliminary, incomplete, and expressly limited in scope; and each confirms that critical factual material bearing directly upon Plaintiffs' surviving claims is missing from the "record" as it currently exists.

The Navy Report itself underscores the need for jurisdictional discovery. Finalized just 11 weeks after the attack, it was not intended to determine responsibility, but instead it was focused on proposing measures to reduce future risk. *See* ECF 47-1, at 46 (Navy Report at 23). Navy investigators explicitly noted that they lacked numerous categories of information they deemed "germane to their overall findings." *Id.* at 70 (Navy Report at 47). Those missing materials include: (1) Al-Shamrani's visa application materials; (2) Saudi Arabia's vetting and screening files; (3) the Department of State's screening records; (4) Al-Shamrani's RSAF student file; (5) information from the

23

Navy's Insider Threat Hub; (6) Al-Shamrani's social media content; (7) Al-Shamrani's digital devices; (8) interviews with Saudi IMS personnel; and (9) the results of the post-attack re-screening of the other KSA trainees. *See id.* at 70–71, 79, 163, 228 (Navy Report at 47–48, 56, 140, 205). These are precisely the materials this Court must review in order to adjudicate Saudi Arabia's purported factual challenge; yet none of them are in the record.

The DOJ press releases reflect similar limitations. The January 13, 2020 release, issued just five weeks after the attack, contains no underlying evidentiary detail; expressly limits its findings to other KSA trainees in the United States; and predates the revelations from when the U.S. government gained access to Al-Shamrani's iPhone. And even then, it acknowledges that 21 KSA trainees possessed derogatory material on their devices—including 16 with jihadi or anti-American social media posts.

The May 18, 2020 release confirms that Al-Shamrani had been radicalized since 2015, had been in contact with AQAP since at least 2015, and joined the RSAF to execute a terrorist operation, but it is entirely silent as to what KSA knew or was required to know.

24

In short, the Navy Report and DOJ releases are not substitutes for the underlying evidence. They are out-of-date, limited in their own terms, and necessarily based upon incomplete information collected for purposes other than ascertaining KSA's responsibility for Al-Shamrani's conduct. All that these sources *do* demonstrate is that there is a substantial volume of highly relevant records that neither Plaintiffs nor this Court has ever seen.

## D. The "Evidence" KSA Proffers Only *Supports* Plaintiffs' Gross Negligence Claim.

Far from contradicting Plaintiffs' allegations, the materials to which KSA's brief on remand refer only reinforce Plaintiffs' core theory of why this Court has jurisdiction. Those documents confirm that (1) Al-Shamrani was radicalized years before Saudi Arabia sent him to the United States; (2) KSA affirmatively advanced him through its vetting and visa pipeline; and (3) it did so against the backdrop of systemic extremist infiltration within its training program about which it either knew or should have known.

The FBI's own statements confirm that Al-Shamrani was radicalized well before his 2017 nomination for U.S. flight training. In May 2020, Attorney General Barr and FBI Director Wray explained

25

that data recovered from Al-Shamrani's phones provided "highly significant evidence" that he had been radicalized by 2015, had "connected and associated with AQAP operatives," and joined the RSAF "in order to carry out a 'special operation.'" ECF 47-3, at 1–2.

The FBI further concluded that the attack "was motivated by jihadist ideology" and that Al-Shamrani's social media accounts contained jihadi, anti-American, and anti-Israeli content. ECF 47-2, at 2; see also ECF 47-1, at 34 (Navy Report at 11) (noting social media presence reflecting "jihadist, anti-U.S., and anti-Israeli rhetoric"). The FBI described the "trove of information" contained on the phones as "invaluable." ECF 47-3, at 1. Al-Shamrani's phone data showed significant ties to AQAP "not only before the attack but before he even arrived in the United States," *id*., *i.e.*, at a time when he was subject to KSA's direct supervision and *before* KSA finalized Al-Shamrani's approval to participate in the training program. Those findings directly undercut KSA's assertion that no evidence exists of Al-Shamrani's pre-2017 extremist ideology.

The existing record thus supports an inference that KSA affirmatively advanced Al-Shamrani through its vetting and visa

26

processes despite actual or constructive knowledge of his radicalization.

Under long-standing FMS and SCT protocols, the sending government

must certify that each nominee has cleared the requisite security,

medical, and internal character vetting before the United States will

accept the trainee. *See* ECF 39-8, at 163 ("When a country formally

submits a student name, this constitutes certification that the required

host country-conducted checks have been completed."); ECF 39-9, at 12

(Security Assistance Management Manual ¶ C10.3.4); ECF 47-1, at

157–59 (Navy Report at 134–36).

Likewise, an A-2 trainee visa cannot issue unless the sending

government nominates, sponsors, and officially advances the officer

transmitting the diplomatic note and supporting materials on which the

United States relies. *See* ECF 39-8, at 163 ("The foreign government is

responsible for issuing necessary passports and for requesting visas for

travel to the United States."); *see also* ECF 47-1, at 157–59 (Navy

Report at 134–36). By nominating Al-Shamrani, certifying him as

vetted, and sponsoring (and purporting to verify) his DS-160 visa

application, Saudi Arabia represented that he was suitable for training

at a secure U.S. military installation—even though he was affiliated

27

with AQAP and espoused radical ideology and jihadist, anti-American sentiments.

The record also reflects that this was not an isolated lapse. The January 2020 DOJ release acknowledges that 21 Saudi trainees possessed derogatory material on their devices, including 16 with "jihadi or anti-American social media posts." ECF 47-2, at 2; *see also* ECF 47-1, at 34 (Navy Report at 11). That means *multiple* RSAF trainees were certified by KSA as having "cleared" security and character vetting despite obvious extremist indicators—evidencing, at a minimum, a broader pattern of indifference to U.S. prohibitions on training foreign personnel with anti-American or jihadi sympathies.

Public reporting further notes that a Saudi government assessment of Al-Shamrani's online activity later identified six themes: support for radical Islam and terrorism, support for the Afghan Taliban, hatred of America and the West, opposition to Israel, sectarianism, and rejection of Saudi governmental reforms.[5] Those reports confirm that

---

5. *See* John Vandiver, *Saudi report finds radical themes in shooter's past*, STARS AND STRIPES, Dec. 12, 2019, https://epub.stripes.com/docs/ MID_MID_121219/MID_MID_121219.pdf; *see also* Missy Ryan, *Gunman in Florida base shooting may have embraced radical ideology years before arriving in the U.S., Saudi report says*, WASH. POST, Dec.

28

Saudi authorities themselves eventually recognized the very indicators Plaintiffs allege were present and discoverable before 2017.

Taken together, this existing evidence supports a factual inference that KSA advanced Al-Shamrani through each stage of its vetting, sponsorship, and visa-submission process in the face of radicalization indicators that its procedures were designed to uncover. That reasonable inference goes directly to the elements of knowledge and conscious disregard required by Florida's gross negligence standard— and it underscores why Plaintiffs are entitled to obtain the targeted jurisdictional discovery outlined below into KSA's vetting files, visa-submission records, and related investigative materials.

**E.  The Jurisdictional Discovery Plaintiffs Seek Is Narrowly Tailored to the Elements of Their Gross Negligence Claim.**

Should the Court determine that KSA has successfully raised a factual challenge to Plaintiffs' surviving claims, Eleventh Circuit precedent requires that Plaintiffs be afforded a meaningful opportunity

---

11, 2019, https://www.washingtonpost.com/national-security/gunman-in-base-shooting-may-have-embraced-radical-ideology-years-before-arriving-in-us-saudi-report-says/2019/12/11/249c6890-1bc6-11ea-87f7-f2e91143c60d_story.html.

29

to obtain discovery appropriate to that posture. Plaintiffs do not seek broad, merits-stage discovery, but Plaintiffs *are* entitled to narrow, targeted discovery directly tied to the single theory reinstated by the Eleventh Circuit: whether Saudi Arabia was grossly negligent in selecting, vetting, certifying, and sending Al-Shamrani to the United States for military flight training in 2017.

While U.S. agencies hold portions of the investigative record, the decisive evidence concerning KSA's nomination, screening, and approval of Al-Shamrani remains solely within KSA's control. To enable this Court to perform the fact-specific jurisdictional inquiry that the Eleventh Circuit mandated, Plaintiffs seek discovery in five narrow, targeted categories discussed below.

## 1. Evidence of Saudi Arabia's Vetting of Al-Shamrani and Actual or Constructive Knowledge of His Radicalization

The Eleventh Circuit held that Plaintiffs plausibly alleged that KSA vetted, reviewed, and certified Al-Shamrani before selecting him for the training program and sending him to the United States —and that these allegations go directly to the elements of gross negligence and foreseeability necessary to satisfy the exception to foreign sovereign immunity in 28 U.S.C. § 1605B. *See Watson*, 159 F.4th at 1245–48.

30

Whether KSA possessed, encountered, or disregarded indicators of

radicalization during that process is now a question of jurisdictional

fact that the Court must resolve.

Plaintiffs therefore seek limited discovery into:

- KSA protocols for vetting, screening, and conducting background checks of RSAF officers to be sent to the United States;

- KSA's technical ability to access phones, texts, emails, and social media accounts by August 2017;

- RSAF and Ministry of Defense vetting, screening, and background-check files for Al-Shamrani;

- Any derogatory, extremist, disciplinary, or behavioral indicators concerning Al-Shamrani and any other RSAF officers to be sent abroad for training known or available to KSA by or before 2017;

- Internal communications regarding Al-Shamrani's nomination, clearance, certification, or suitability for U.S. training;

- Documents reflecting the vetting steps Saudi Arabia affirmatively undertook—including the results of each stage of vetting Al-Shamrani for participation in the RSAF and selection and certification for his participation in the U.S.-based military training program; and

- Paperwork completed by Saudi Arabia and submitted to the United States with respect to Al-Shamrani's visa and any other documentation necessary for him to enter the United States and participate in the U.S.-based training program.

This discovery is essential because the Eleventh Circuit preserved

these issues for factual determination, and any primary sources

31

memorializing KSA's knowledge, screening procedures, and internal assessments of Al-Shamrani exist only within KSA's personnel, intelligence, and/or defense files. Without this core discovery, Plaintiffs cannot respond to the factual assertions KSA now half-heartedly advances, and the Court cannot resolve the jurisdictional questions that the Eleventh Circuit's remand requires.

## 2. Access to Al-Shamrani's Social Media and iPhone Data

KSA repeatedly asserts that Plaintiffs have "no evidence" that Al-Shamrani was radicalized before he arrived in the United States in 2017, a rather disingenuous assertion given that the FBI has already determined that (i) Al-Shamrani was radicalized by 2015; (ii) Al-Shamrani was associated with AQAP before joining the RSAF; and (iii) Al-Shamrani joined the RSAF to carry out a "special mission." These conclusions—which, again, were the U.S. government's, not Plaintiffs'— were based on a review of the "trove of information" recovered on Al-Shamrani's iPhones and social media. ECF 47-3, at 2–3; ECF 47-2, at 3.

Neither Plaintiffs nor this Court has ever seen the underlying data. The Navy Report expressly states that investigators did *not* have access to these materials, and the DOJ press releases provide only

32

cursory, high-level summaries. The actual contents—and their
timestamps—remain entirely outside the record.

Because the social media archives and phone extractions contain
evidence of the timing, visibility, and nature of Al-Shamrani's
radicalization, they go directly to the core factual disputes preserved on
remand: foreseeability, knowledge, and causal connection under 28
U.S.C. § 1605B. Without reviewing the underlying data, neither
Plaintiffs nor this Court can evaluate whether KSA's 2017 vetting and
certification decisions were made despite indicators of radicalization
that were (or should have been) apparent to Saudi officials.

Accordingly, Plaintiffs seek targeted discovery of:

- the full forensic extractions of Al-Shamrani's iPhones unlocked in
  May 2020;

- any archives from Al-Shamrani's social media accounts (Twitter/X,
  Facebook, YouTube, etc.);

- metadata or timestamps showing when Al-Shamrani posted
  extremist content to any of his accounts; and

- all communications between Al-Shamrani and AQAP or other
  extremist actors identified in his phone data;

- all communications between Al-Shamrani and KSA employees
  and government agents discussing extremist or anti-American
  content; and

- any reports, assessments, or summaries prepared by the FBI, DOD, DOJ or other U.S. agencies analyzing this material.[6]

This discovery is narrowly tailored to the factual disputes KSA has raised, and it is essential to resolving the jurisdictional issues the Eleventh Circuit directed the Court to determine.

### 3. Relevant Documents from Investigations Conducted by the U.S. and Saudi Governments

KSA relies heavily—and, thus far, exclusively—on the Navy Report and two DOJ press releases as the core "evidence" supporting its factual challenge to this Court's jurisdiction, asserting that these materials show KSA lacked knowledge or involvement. Because KSA invokes these documents to rebut Plaintiffs' jurisdictional allegations, Plaintiffs must be permitted to test the reliability, accuracy, and completeness of those materials before they can be used to sustain a factual challenge to subject-matter jurisdiction.

---

6. It is possible that U.S. investigators provided some or all of these materials to KSA, and so any discovery requests made by Plaintiffs with respect to such materials would be made to both KSA and U.S. authorities.

34

Limited discovery is therefore necessary to determine:

- What information the Navy and FBI reviewed, and what information they lacked, when they completed these reports/press releases;

- Whether U.S. investigators received any vetting, screening, or intelligence materials from KSA;

- What additional evidence, if any, was developed by U.S. investigators after the press releases and the Navy Report; and

- Whether the conclusions cited by KSA reflect preliminary findings or complete investigative results (and the evidentiary basis for each conclusion).

The *Stars and Stripes* and *Washington Post* reporting indicates that KSA conducted an internal assessment that identified six ideological themes in Al-Shamrani's online presence—including support for radical Islam, the Afghan Taliban, and anti-American sentiment. *See ante* at 27 n.5. Yet none of the underlying materials from that investigation have been produced, and KSA has not disclosed what records it reviewed, when that review occurred, or whether similar information existed before 2017. These omissions create a jurisdictionally significant factual gap on issues KSA itself has placed into dispute, and Plaintiffs are entitled to limited discovery to fill that gap before the Court resolves KSA's factual challenge to its jurisdiction.

35

To obtain this information, Plaintiffs anticipate needing to issue subpoenas to the FBI, U.S. Navy, Department of State, and other relevant agencies—and requesting from Saudi Arabia any relevant documents, communications, or analyses that it shared with U.S. investigators or generated internally. This discovery is narrow, directly tied to the materials KSA itself placed at issue, and essential to determining whether the summaries on which KSA has relied actually demonstrate a lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

### 4. Information on KSA's Screening and Vetting Obligations as Part of the U.S. Military Training Program

Plaintiffs also allege that KSA undertook affirmative obligations to select, investigate, and certify its International Military Students under the FMS and SCT programs. ECF 5, at 25–27, 86 (Amended Complaint ¶¶ 62–68, 321–22). Those obligations bear directly on the central jurisdictional question preserved by the Eleventh Circuit: what KSA knew or should have known about Al-Shamrani's radicalization in 2017, what it was required to discover through its vetting process, and whether it advanced him into the U.S. training pipeline despite indicators of extremist ideology.

36

Plaintiffs thus seek discovery on:

- The policies and directives governing nomination, screening, and certification of RSAF trainees for U.S. military training;

- Whether those policies were applied to Al-Shamrani, including any departures, exceptions or irregularities;

- The information, assurances, and certifications KSA provided to the United States as part of the SCT/FMS process; and

- KSA's screening of other RSAF trainees, including whether KSA advanced candidates with extremist indicators of which the Saudi government knew or should have known, and despite U.S. prohibitions on doing so.

This discovery is directly tied to the 2017 negligent-vetting theory and is essential to determining whether KSA consciously disregarded discoverable radicalization indicators when nominating Al-Shamrani for U.S. flight training. The relevant documents and communications— RSAF policies, vetting protocols, certification records, and inter-government submissions—are uniquely within the possession of the KSA, its Ministry of Defense, and the U.S. agencies that received KSA's certifications. Without this evidence, the Court cannot resolve the disputed jurisdictional facts that KSA has placed at issue.

### 5. Information on KSA's Actual or Constructive Knowledge of Al-Shamrani's Ideological Development During His Time in the RSAF

This category of discovery directly relates to Plaintiffs' jurisdictional allegations under 28 U.S.C. § 1605B concerning foreseeability, knowledge, and KSA's vetting responsibilities. Plaintiffs allege that elements of Al-Shamrani's ideological development were shaped—or reinforced—through state-sanctioned military, religious, or doctrinal training administered by KSA. ECF 5, at 21–24 (Amended Complaint ¶¶ 69–77, 351–55). Evidence of the doctrinal content, instructional environment, and supervisory expectations governing RSAF cadets is therefore probative of what KSA knew, expected, or encouraged regarding ideological commitments among its trainees— especially those selected for U.S. flight training.

Plaintiffs thus seek only narrow discovery into:

- RSAF training materials, curricula, and doctrinal content provided to RSAF cadets;

- Records reflecting any ideological assessments, communications, or observations concerning Al-Shamrani prior to 2017; and

- Comparable materials from RSAF personnel who trained alongside him (RSAF Does 1–12).

38

This discovery is jurisdictional because it bears directly on (i) what ideological indicators KSA was positioned to observe; (ii) whether those indicators were consistent with the extremist views later documented on Al-Shamrani's devices and social media; and (iii) whether advancing him through the SCT nomination process reflected KSA's conscious disregard of known risks. Without access to these limited materials, the Court cannot properly evaluate the foreseeability and knowledge elements the Eleventh Circuit identified as intertwined jurisdictional facts.

* * *

Each of these categories is tightly linked to the only issue remaining in the case: whether Plaintiffs' 2017 vetting-and-sending allegations withstand KSA's purported factual challenge—that it did not and could not have known about Al-Shamrani's radicalization. Most of the relevant evidence is in KSA's exclusive possession (and the rest is in the possession of the U.S. government), this limited discovery is both appropriate and essential. Without access to these materials, Plaintiffs cannot meaningfully respond to KSA's factual challenge, and this Court

39

cannot conduct the jurisdictional analysis contemplated by the Eleventh Circuit's remand.

In sum, KSA has chosen to mount what it claims is a factual attack on the only claim the Eleventh Circuit reinstated, while retaining exclusive control over virtually all of the evidence bearing on that factual dispute. The FSIA and Eleventh Circuit precedent do not permit a foreign sovereign to invoke immunity on such a "heads we win, tails you lose" theory—to insist that Plaintiffs "lack evidence" and, in the same breath, deny them any meaningful opportunity to obtain it.

Because Plaintiffs have already satisfied their *prima facie* burden under § 1605B, because the jurisdictional facts overlap with the merits, and because the critical documents and testimony are all in the possession of KSA or U.S. government agencies, limited jurisdictional discovery is not only appropriate but necessary to give effect to both JASTA's text and the Eleventh Circuit's mandate. This Court should therefore hold KSA's motion to dismiss in abeyance pending the targeted jurisdictional discovery outlined above—and should order that discovery forthwith.

40

CONCLUSION

KSA's motion to dismiss should be held in abeyance while this

Court orders—and the parties conduct—limited jurisdictional discovery.

Respectfully submitted,

STEPHEN I. VLADECK (*pro hac vice*)
600 New Jersey Ave., N.W.
Washington, DC  20001
(202) 662-9313
svladeck@gmail.com

CHRISTOPHER G. PAULOS (FL #91579)
**Paulos Law, P.A.**
1507 E. Gadsden St.
Pensacola, FL  32501
(850) 308-3650
cpaulos@pauloslaw.com

MATTHEW S. MOKWA (FL #47761)
**The Maher Law Firm, P.A.**
398 W. Morse Blvd., Suite 200
Winter Park, FL  32789
(407) 839-0866
mmokwa@maherlawfirm.com

JAMES P. KREINDLER (NY #1704980)
DANIEL O. ROSE (NY #2774271)
ANDREW J. MALONEY, III
  (NY #2261659)
**Kreindler & Kreindler LLP**
485 Lexington Ave., 28th Floor
New York, NY  10017
(212) 687-8181
jkreindler@kreindler.com
drose@kreindler.com
amaloney@kreindler.com

*Attorneys for Plaintiffs*

February 13, 2026

DAVID E. HARRIS (TX #24049273)
**Sico Hoelscher Harris, LLP**
819 N. Upper Broadway
Corpus Christi, TX  78401
(877) 631-9965
dharris@shhlaw.com

JEFFREY MCFADDEN (FL #19052)
**Law Offices of Jeffrey E.
  McFadden, LLC**
312 Prospect Bay Dr. E.
Grasonville, MD  21638
  (410) 490-1163
jmcfadden@jmcfaddenlaw.com

41

## LOCAL RULE 7.1(F) CERTIFICATION

I, Stephen I. Vladeck, hereby certify that, pursuant to Local Rule 7.1(F) and this Court's Order dated December 11, 2025, the foregoing Plaintiffs' Supplemental Brief on Remand from the Eleventh Circuit contains 7,354 words.

## LOCAL RULE 5.1(F) CERTIFICATION

I, Stephen I. Vladeck, hereby certify that on February 13, 2026, I caused a true and correct copy of the foregoing Plaintiffs' Supplemental Brief on Remand from the Eleventh Circuit to be served via the CM/ECF system to all parties or counsel of record that have entered appearances in this action.

Respectfully submitted,

STEPHEN I. VLADECK (*pro hac vice*)
600 New Jersey Ave., N.W.
Washington, DC  20001
(202) 662-9313
svladeck@gmail.com